UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO. 24-CV-80022-DMM

RYAN GOULD,

    Plaintiff,

vs.

BETHANY GUERRIERO, and
JOSEPH STRZELECKI,

    Defendants.
_____/

**DEFENDANT, JOSEPH STRZELECKI'S STATEMENT OF MATERIAL FACTS IN SUPPORT OF HIS MOTION FOR SUMMARY JUDGMENT**

Defendant, JOSEPH STRZELECKI, by and through his undersigned counsel, pursuant to Rule 56, *Fed.R.Civ.P.,* and Local Rule 56.1, *S.D.Fla.L.R.,* files this Concise Statement of Material Facts in support of his Motion for Summary Judgment, as follows:

1. Joseph Strzelecki is a 28-year-old law enforcement officer employed by the City of Palm Beach Gardens Police Department (PBGPD). He took his oath of office on October 15, 2022, entered field training, and completed successfully completed the 12-month probationary period on March 5, 2024. *Strzelecki Dec.,* ¶1, attached to **Appendix at Tab 1**.

2. Officer Strzelecki remains in good standing with the City. He has not been the subject of any citizen complaints, including any by Ryan Gould. Gould did not name Strzelecki as an offending officer in an internal complaint he filed with PBGPD. **Appendix, Tab 2**.

3. On May 9, 2023, an argument took place between Plaintiff, Ryan Gould, and a pregnant woman while both were utilizing a community pool. Each blames the other for the argument. The female complainant called and informed that she was being harassed by a male (Gould). *Conventionally Filed Audio*, "03 G23-002514 911." Her husband's complaint was

similar, advising that a male in a multi-colored suit was screaming at his wife, calling her a "retard" and demanding that she get out of the pool. He believed the male (Gould) may have been on drugs based upon his behavior. *Audio,* "02 G23-002514 911." Gould also called 911 and reported that a gun was on scene, had been brandished and that he wanted police to respond, and that he would be pressing charges. *Audio*, "01 G23-002514 911."

4. At this time, Strzelecki was on duty serving as a road patrol officer. He was still a rookie/probationary officer. *Strzelecki Dec.,* ¶4.

5. Strzelecki received a dispatch about a female arguing with a male, advising that one party to the argument had a firearm. The location was the community pool at Sabal Ridge. Strzelecki drove to that location, along with Officer Bethany Guerriero, arriving at roughly the same time. *Strzelecki Dec.,* ¶5; *Conventionally Filed BGVideo, JSVideo.*

6. Guerriero had 20 years of experience and was a senior negotiator for crisis intervention. *Guerriero Depo.*, 10:22 – 11:24.

7. Since there had been calls from both sides of the argument, Strzelecki was uncertain who was armed with a gun. But with any gun call, he treated it as a priority call, with a sense of urgency to get there quickly, determine who has the weapon, and eliminate any possibility that it may be utilized. *Strzelecki Dec.,* ¶¶6-7; *Guerriero*, 50:1 – 51:11.

8. Information from dispatch is often useful in assessing who to approach first on scene, and the way to approach, but it is just a tool, and should not cause an officer to definitively conclude on a gun call that any person is unarmed or not a threat. *Strzelecki Dec.,* ¶8.

9. Dispatched information is often incorrect, and not because of incompetence of the dispatchers, but because Dispatch is generally relaying information from citizen callers, that may be inaccurate since callers intentionally have bias when reporting incidents in which they are

personally involved. For instance, someone who is aware that the police have been called about him, may then call 911 himself with competing information (true or false) to defend, or lessen his chances of being arrested. *Strzelecki Dec.,* ¶9.

10. When multiple callers are relaying information, often inconsistently, it is the officer's job to investigate the situation, and not simply credit second-hand information dispatched from on-scene citizen callers. Again, citizen callers are often interested in seeking to impugn one side, and exonerate themselves. *Strzelecki Dec.,* ¶10; *Guerriero*, 52:4 – 52:23.

11. Gould was not believed to be the initial caller. His status as a second caller would not cause Strzelecki to discount information he relayed to dispatch, but at the same time it would not be prudent to accept without investigation who was possibly armed. *Strzelecki Dec.,* ¶11.

12. When driving quickly with lights and sirens to a gun call, hearing and absorbing every fact that comes over the radio is not typical or reasonable. That is why there is no substitute on a gun call for addressing those on scene, and determining who is armed. *Strzelecki Dec.,* ¶12; *Guerriero Depo.*, 45:3 – 46:2; 49:16 – 23.

13. Strzelecki generally understood while traveling to this call that there were two males on scene, and one had a gun that was reported to be in the groin area at the time of the call. Whether it would have remained in his groin area after officers arrived is speculative since a gun can easily be moved on a person. *Strzelecki Dec.,* ¶13.

14. Most calls Strzelecki has responded to have turned out different from the information Dispatch provided. *Strzelecki Dec.,* ¶14. Thus, Strzelecki's primary objective upon arrival was to ensure that whoever had the gun could not use it. *Strzelecki Dec.,* ¶14.

15. Strzelecki's body worn camera video is on file with the Court. It depicts Officer Guerriero arriving first, and out of her vehicle before Strzelecki's car was parked. *Strzelecki Dec.,*

¶17; *Conventionally Filed Videos,* JSVideo and BGVideo.

16. Officer Guerriero appeared to have engaged Gould in conversation as Strzelecki was exiting his vehicle. Her video (BGVideo) reflects that she calmly said, "hey man, how are you doing, keep your hands out of your pockets for me." *Id.; Strzelecki Dec.,* ¶18.

17. On a firearm call, an officer telling someone to keep hands out of pockets is not an optional request, but a directive given for officer safety. Guns can be small, and concealed in bathing suit pockets or waistbands in the back. *Strzelecki Dec.,* ¶19; *Guerriero Depo.*, 61:14-22.

18. Gould responded with words to the effect that he did not have a gun as he came closer to the police. But at that moment, Strzelecki (and Guerriero as well) did not know whether, in fact, he was armed. Gould had not been searched. Strzelecki acknowledges that he was not in fear for his safety. *Strzelecki Dec.,* ¶20; *Guerriero Depo.*, 92:5 – 11.

19. Gould then placed his right hand into his right pocket, even though he had been told by Officer Guerriero not to put his hands in his pockets. *Conventionally Filed Videos,* BGVideo and JSVideo.

20. Gould now claims that he did not hear the directive or understand that he should not have reached in his pockets. *Gould Depo.*, 86:10-14. **Appendix Tab 4**. Whether and to what extent Gould heard and understood what Guerriero demanded was not something Strzelecki considered in the moment since he could not possibly know what Gould heard and understood. Guerriero's statements seemed clear and audible though, both on scene and in reviewing the videos. *Conventionally Filed Videos,* BGVideo and JSVideo; *Strzelecki Dec.,* ¶21.

21. Strzelecki's real-time observations were that Guerriero more forcefully stated on her second command, "keep your hands out of your pockets!." *Strzelecki Dec.,* ¶22. Unlike in the moment, the video can now be viewed second-by-second in freeze frame mode, and it depicts

Guerriero's second command as occurring after Gould had already begun reaching for his pocket (we are talking about split-seconds), but at that moment Strzelecki reasonably perceived that Gould had been told twice to stay out of his pockets, and that he went into his right pocket anyway. *Strzelecki Dec.,* ¶23.

22. Whether Gould had been told once or twice to keep his hands out of his pocket, at a minimum, Gould should have taken his hand out of his pocket without anything in his hand. *Strzelecki Dec.,* ¶24.

23. Gould withdrew what appeared to be a phone from his pocket. *Strzelecki Dec.,* ¶25.

24. Strzelecki could not understand at the time why someone that was told to keep hands out of his pockets twice would then reach for and pull out a phone.[1] *Strzelecki Dec.,* ¶26; *Conventionally Filed Videos,* BGVideo and JSVideo.

25. Guerriero then told Gould twice to put his phone down. Gould remained with his phone in hand, refusing to do so, and then commenced arguing with Officer Guerriero. *Strzelecki Dec.,* ¶27; *Conventionally Filed Videos,* BGVideo and JSVideo.

26. Since Strzelecki believed Gould to have been involved in a gun-related incident that led to multiple calls to 911, he thought it reasonable for Officer Guerriero to direct Gould not to place his hands in his pockets. This is not a command that intrudes to any degree on one's freedom as one can just as easily approach and speak with officers (that notably were there, in part, due to **his 911 call**) with hands away from pockets. *Strzelecki Dec.,* ¶28.

27. Officer Guerriero as the senior officer on scene (by about 20 years) was taking the lead, and Strzelecki was taking cues from her. *Strzelecki Dec.,* ¶29.

---

[1] Gould's deposition testimony was that he did so out of habit. *"I often play with my phone and flip it around." Gould Depo.,* 87:4-7. Strzelecki had no knowledge in the moment that Gould was a person with a habit of playing with and flipping his phone.

28. With Guerriero taking the lead, Strzelecki's primary role then became backup for officer and scene safety. *Strzelecki Dec.,* ¶30.

29. Based upon Strzelecki's vantage point and observations, Gould had been given four commands: two not to go in his pockets, and two to put his phone down, all four of which were not complied with. *Strzelecki Dec.,* ¶31.

30. Officer Guerriero, based upon her experience, saw fit to draw her firearm, order Gould to the ground and detain Gould in handcuffs pending further investigation. *Strzelecki Dec.,* ¶32; *Conventionally Filed Videos,* BGVideo and JSVideo; *Guerriero Depo.*, 36:22-37:37:3.

31. Guerriero's training and experience were significantly superior to Strzelecki, and in the moment, he could not question Guerriero's observations since she was the one giving commands, and her vantage point different from his. *Strzelecki Dec.,* ¶33.

32. Strzelecki could not have reasonably, and would not have directed a senior officer on scene, whose vantage point was not the same, to dispense with an investigatory detention of a noncompliant, argumentative, agitated individual on a gun call, who had disregarded multiple police commands that were given for safety reasons. *Strzelecki Dec.,* ¶34.

33. Strzelecki could not reasonably, nor would he have physically intervened in Officer Guerriero briefly withdrawing her firearm since that would have been imprudent, unsafe and unreasonable to get in the line of fire of an officer with a gun drawn, particularly in the very short period of time she had her gun out. *Strzelecki Dec.,* ¶35.

34. Officer Guerriero had her gun drawn for *12 seconds*. Strzelecki is unaware of anything he could have done, then and even in hindsight, in that short amount of time that could have prevented Guerriero from drawing her gun, or causing her to put it away in less than the mere *12 seconds* it was out. C*onventionally Filed Videos,* BGVideo and JSVideo; *Strzelecki Dec.,* ¶36.

35. Strzelecki had no authority, or ability even if possessed with the authority, to compel Guerriero to put her gun away in that *12 seconds*. Nor would it be reasonable to conclude that Officer Guerriero (a 20-year veteran officer) would have taken directives from a rookie officer and altered her actions in that fleeting amount of time. *Strzelecki Dec.,* ¶37.

36. Although in the same vicinity, Strzelecki could not be certain of what Guerriero was observing. She may have observed something that he did not, that caused her to fear for safety. Guerriero's vast experience could have led her to perceive a risk that Strzelecki could not. Perhaps she saw something in Gould's pockets or behind his back. *Strzelecki Dec.,* ¶38.

37. Per Strzelecki's police training, when one officer draws a lethal weapon, the second officer should cover with a less lethal option. That way, if the subject engages in any quick or furtive movements that might lead to use of a weapon to gain control, the officers will have a less-lethal option. A Taser is a less-lethal option. It is not designed or intended to inflict great bodily injury, but instead to temporarily incapacitate. *Strzelecki Dec.,* ¶39.

38. Gould, in fact, later commended Strzelecki's decision stating, "at least the other guy pulled out his Taser." *Gould Depo.*, 77:19-25.

39. Strzelecki did not discharge his Taser. C*onventionally Filed Videos,* BGVideo and JSVideo; *Strzelecki Dec.,* ¶41.

40. Strzelecki did not touch Gould. *Id; Strzelecki Dec.,* ¶42.

41. Strzelecki unholstered his holster for 23 seconds, until Gould was secured in handcuffs by Officer Guerriero. *Videos,* BGVideo and JSVideo; *Strzelecki Dec.,* ¶43.

42. Gould laughed, and when Officer Guerriero asked him if he thought it was funny, she explained to him that she was detaining him. Gould told her she was "fucked." *Videos,* BGVideo and JSVideo; *Strzelecki Dec.,* ¶44.

43. Strzelecki asked Gould if he had identification, at which point he began to attempt to stand up. C*onventionally Filed Videos,* **BGVideo and JSVideo**; *Strzelecki Dec.,* ¶45.

44. Officer Guerriero directed him back to the ground into a seated position, after which Gould asked, "who the fuck is this?" *Videos,* **BGVideo and JSVideo**; *Strzelecki Dec.,* ¶46.

45. Gould was excited at this point, and Strzelecki told him a couple of times to relax to de-escalate. *Videos,* **BGVideo and JSVideo**; *Strzelecki Dec.,* ¶47.

46. When Gould engaged in more arguments with Officer Guerriero and said he did not have a gun, Strzelecki explained to him that officers would not know that upon arrival. *Videos,* **BGVideo and JSVideo**; *Strzelecki Dec.,* ¶48.

47. The body worn camera videos show that Strzelecki was present ***for only about 90 seconds from the time Guerriero ordered Gould to the ground until Strzelecki left with Officer Michael Valerio*** to address the other individuals involved in the call. *Videos,* **BGVideo and JSVideo**; *Strzelecki Dec.,* ¶¶51-52.

48. Officer Valerio observed Gould in handcuffs being detained, and he too did not request or direct Officer Guerriero to release him. *Strzelecki Dec.,* ¶¶55.

49. Strzelecki did not encounter Gould again until Gould was at the Palm Beach Gardens Police Department. The remainder of Gould's interaction with PBGPD law enforcement officers (and it was prolonged and included Gould calling Guerriero a "psycho" and "pussy," impugning police officers repeatedly, insulting military veterans, lying about being an attorney, and effectively imploring officers to arrest him on several occasions, even explaining he "would love it" if he were arrested) occurred outside of Strzelecki's presence. Strzelecki only learned of Gould's abhorrent behavior after the fact. *Strzelecki Dec.,* ¶¶56; **Conventionally Filed Video, GouldVideo at 038-0:56; 1:10-1:25; 1:45-1:55; 2:17-2:19; 6:24-8:00; 14:05-14:10: 15:40-**

**16:30; 26:06-26:20; 27:00-27:35.** *Gould,* 106:2; 29:9-30:6; 24:15-25:4.

50. Strzelecki remained on scene but in a completely other location, unable to see Gould for over an hour. Gould was arrested after Strzelecki departed. *Strzelecki Dec.,* ¶57.

51. Gould understood that at the time Strzelecki left the area, he was being detained. *Gould*, 68:13-17. Gould does not assert that Strzelecki detained him at all. *Gould*, 114:10-13.

52. Ultimately, based upon what occurred while Strzelecki was briefly present with Gould on scene, he would not have placed Gould under arrest; however, the decision to arrest him was made by Officer Guerriero after Strzelecki departed, and more may have transpired. Even though Strzelecki would not have arrested Gould based upon what occurred in his presence, whether and to what extent Officer Guerriero had probable cause or arguable cause is for her to explain, including whether any of Gould's actions after Strzelecki left contributed to her decision.

53. All probable cause determinations were made by Officer Guerriero. *Guerriero*, 142:12 – 144:16; *Strzelecki Dec.*, ¶60.

54. Strzelecki was also informed by a supervisor that Gould was being arrested based upon Officer Guerriero's probable cause. *Strzelecki Dec.,* ¶61.

55. Strzelecki was tasked with writing a report on this arrest only because Officer Guerriero was taken from the scene with chest pain and admitted to the hospital for a cardiac event. Had she not fallen ill and taken to the hospital, it would have been her report. *Strzelecki Dec.,* ¶62; *Guerriero*, 104:14 – 107:16.

56. Because it was Guerriero's arrest and formulation of probable cause (and not Strzelecki's), he specifically and contemporaneously noted: "Due to the facts above **Ofc. Guerriero found probable cause to charge Mr. Gould** with one count of resist officer without violence F.S.S. 842.02." (emphasis added). **Appendix, Tab 3**, p. 7; *Strzelecki Dec.*, ¶63.

57. Guerriero's probable cause included Gould reaching in his pockets when told not to do so, and refusing to identify himself during the police investigation. *Guerriero Depo.*, 145:8 – 147:8. **Appendix Tab 5.**

58. Had Strzelecki made any probable cause determinations, the report would not have expressed that the arrest was solely based upon the probable cause determination of another officer. *Strzelecki Dec.,* ¶64.

59. Strzelecki transported Gould from the PBGPD to the jail, but not from the scene to the PBGPD. During transport and at the jail, Strzelecki had no discretion or authority to unarrest or release Gould since Guerriero made an arrest. Strzelecki was not a supervisor and had no ability to override the decision of a senior officer, or any officer for that matter. *Strzelecki Dec.,* ¶¶65-66.

60. One or more supervisors viewed video (from the community, not officer body cameras) of the interaction between Gould and the other parties with whom he had been involved, and determined that Gould was a victim of a crime. *Strzelecki Dec.,* ¶69.

61. Strzelecki was directed to unarrest Gould and take him home. Gould was not charged with any crime since no papers charging him with a crime were filed or submitted. *Strzelecki Dec.,* ¶70; *Gould Depo.,* 45:16 – 46:1.

62. Gould was not booked into the Palm Beach County Jail. He was not photographed or fingerprinted. Strzelecki asked Gould if he would like to ride home with the handcuffs removed, and then dropped him off back in the community and returned to work. *Strzelecki Dec.,* ¶¶71-72.

63. Gould has not sought or received any medical treatment whatsoever for any reason relating to this occurrence. *Gould Depo.*, 42:18-23. He made no complaints about any hot pavement on scene. *Id.*, 181:24-25; 184:9-11; 187:7-9.

64. The individual with the gun was arrested and prosecuted. *Strzelecki Dec.*, ¶75.

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 5th day of June, 2024, I electronically filed the foregoing document with the Clerk of Court by using the CM/ECF system or by email to all parties. I further certify that I either mailed the foregoing document and the Notice of Electronic Filing by first class mail to any non-CM/ECF participants and/or the foregoing document was served via transmission of Notice of Electronic Filing generated by CM/ECF to any and all active CM/ECF participants.

JOHNSON, ANSELMO, MURDOCH,
BURKE, PIPER & HOCHMAN, P.A.
***Attorneys for Defendant, Strzelecki***
2455 East Sunrise Blvd., Suite 1000
Fort Lauderdale, Florida 33304
(954) 463-0100 - Telephone
(954) 463-2444 – Facsimile
Alexander@jambg.com
Cintron@jambg.com Andrews@jambg.com

*/s/ Scott D. Alexander*
SCOTT D. ALEXANDER
FLA. BAR NO. 057207

**SERVICE LIST**

*Counsel for Plaintiff*
**James M. Slater, Esq. (111779)**
Slater Legal, PLLC
9000 Dadeland Blvd., Suite 1500
Miami, FL 33156
Tel: 305.523.9023
james@slater.legal
alicia@slater.legal

*Co-Counsel for Plaintiff*
**Eric A. Rice, Esq.**
**Law Office of Eric A. Rice, LLC.**
1 W. Water Street, Suite 275
St. Paul, MN 55107
Tel: 651.998.9660
Fax: 651.344.0763
eric@ricedefense.com

*Counsel for Defendant, Guerriero*
**Gregory J. Morse, Esq. (0505099)**
**R.E. "Rick" King, III, Esq. (90473)**
King Morse PLLC
2240 Palm Beach Lakes Blvd., Suite 300
West Palm Beach, FL 33409
Tel: 561.651.4145 / 561.557.1079
greg@morselegal.com
rick@kingmorselaw.com
kristen@kingmorselaw.com

---

*Counsel for Defendant, Strzelecki*
**SCOTT D. ALEXANDER, ESQ. (057207)**
JOHNSON, ANSELMO, MURDOCH,
BURKE, PIPER & HOCHMAN, P.A.
2455 East Sunrise Blvd., Suite 1000
Fort Lauderdale, FL 33304
Tel: 954.463.0100
Fax: 954.463.2444
Alexander@jambg.com
Cintron@jambg.com Andrews@jambg.com