UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 24-CV-80022-DMM

RYAN GOULD,

    Plaintiff,

vs.

BETHANY GUERRIERO, and
JOSEPH STRZELECKI,

    Defendants.
_____/

## DECLARATION OF JOSEPH STRZELECKI

I, Joseph Strzelecki, pursuant to 28 U.S.C. §1746, declare as follows:

1. My name is Joseph Stzelecki, I am over 18 years of age, and I have personal knowledge of the facts set forth herein.

2. I am a 28-year-old law enforcement officer employed by the City of Palm Beach Gardens Police Department (PBGPD). I took my oath of office on October 15, 2022, entered field training, and completed successfully completed my 12-month probationary period on March 5, 2024.

3. I remain an officer in good standing with the City. I have not been the subject of any citizen complaints, including any by Ryan Gould, although he did elect to file this lawsuit against me despite not naming me in his internal complaint to PBGPD. A true and correct copy of Gould's citizen complaint with the PBGPD is attached to the Appendix at Tab 1.

4. On May 9, 2023, I was on duty serving as a road patrol officer. I was still a rookie/probationary officer.

5. A call came over the radio about a female arguing with a male, and dispatch advised

that one party to the argument had a firearm. The location was the community pool at Sabal Ridge. I drove to that location, along with Officer Bethany Guerriero, a senior officer with approximately 20 years of experience. We arrived at roughly the same time.

6. Since there had been calls from both sides of the argument, I was uncertain at the time of my arrival who was armed with a gun. The female half of the argument (a pregnant woman), with her husband, called and said there was a threat by the other male (later identified as Gould), and then there was a call by the threatening male (Gould) stating that he had been threatened with a firearm while officers were already en route.

7. With any call involving an argument with a weapon involved, I treated this as a priority call, with a sense of urgency to get there quickly, determine who has the weapon, and eliminate any possibility that it may be utilized.

8. While information from dispatch is often useful in assessing who to approach first on scene, and the way to approach (such as if the person may be armed), information from dispatch is just a tool, and should not cause an officer to definitively conclude on a gun call that any person is unarmed or not a threat.

9. Dispatch information is often incorrect, and not because of incompetence of the dispatchers, but because dispatch is generally relaying information from citizen callers, that may be inaccurate because callers intentionally have bias when reporting incidents in which they are personally involved. For instance, someone who is aware that the police have been called about him, may then call 911 himself with competing information (true or false) in an effort to defend, or lessen his chances of being arrested

10. When multiple callers are relaying information, often inconsistent with each other, it is my job as an officer to get to the scene and investigate the situation, and not simply credit

second-hand information dispatched based solely upon reports from parties on scene. Again, citizen callers are often interested in seeking to impugn one side, and exonerate themselves.

11. In this instance, it was my understanding that the person that had been harassing the pregnant woman (Gould) was not the initial caller. While his status as a second caller would not cause me to discount any information he relayed to dispatch, at the same time it would not be prudent to accept without investigation who was possibly armed.

12. When running code (lights and sirens activated), and rushing to a gun call, hearing and absorbing every single fact that comes over the radio is not typical or reasonable. That is why there is no substitute on a gun call from addressing those on scene, and determining who is armed.

13. I generally understood while traveling to this call that there were two males on scene, and one had a gun that was reported to be in the groin area at the time of the call. Whether it would have remained in his groin area after officers arrived is speculative since a gun can easily be moved on a person.

14. As I explained in my deposition testimony, the vast majority of calls officers arrive at rarely turn out to be the way we receive them from dispatch.

15. In this situation, the reliable information that was most salient to me upon my arrival was that we had an incident involving two parties, one of whom had a gun. For that reason, my primary objective upon arrival was to ensure that whoever had the gun could not harm someone with it.

16. What happened after I arrived is captured on my body worn camera video, which is conventionally filed with the Court. Without the benefit of being able to freeze frame, second-by-second on scene like we can now, I will describe what I objectively observed on scene.

17. I pulled up and parked my vehicle in front of the clubhouse of the pool area at the

community. Officer Guerriero arrived before me, and was already out of her vehicle before my car was parked.

18. Officer Guerriero appeared to have engaged a shirtless male (referred to hereinafter as Gould) in conversation as I was exiting my vehicle. Based upon my recollection in conjunction with viewing Guerriero's body worn camera video (my audio had not yet begun recording as of their initial interaction), she said, "hey man, how are you doing, keep your hands out of your pockets for me."

19. On a gun call, an officer telling someone to keep hands out of pockets is not an optional request, but a directive given for officer safety. Guns can be small, and concealed in bathing suit pockets or waistbands in the back.

20. Gould responded with words to the effect that he did not have a gun as he came closer to the police. But at that moment, I did not know whether, in fact, he was armed or unarmed. To my knowledge, he had not been searched. I acknowledge that I was not in fear for my safety.

21. Gould then placed his right hand into his right pocket, even though he had been told by Officer Guerriero not to put his hands in his pockets. I understand Gould has since testified that perhaps he did not hear the directive. Whether and to what extent Gould heard and understood what Officer Guerriero was stating to him was not something I considered in the moment since I could not possibly know what Gould heard and understood. Guerriero's statements seemed clear and audible though, both on scene and in reviewing the video.

22. Again, observing this in real time, it appeared to me that Gould was reaching for and into his pocket as Guerriero more forcefully stated, "keep your hands out of your pockets!."

23. The video can now be viewed second-by-second in freeze frame mode, and it depicts Guerrero's second command as occurring after he had already begun reaching for his

pocket (we are talking about split-seconds), but at that moment I perceived that Gould had been told twice to stay out of his pockets, and that he went into his right pocket anyway.

24. In any event, whether he had been told once or twice to keep his hands out of his pocket, at a minimum, Gould should have taken his hand out of his pocket without anything in his hand.

25. Gould withdrew what appeared to be a phone from his pocket.

26. I could not understand at the time why someone that was told to keep hands out of his pockets twice would then reach for and pull out a phone.[1]

27. Guerriero then told Gould twice to put his phone down. Gould remained with his phone in hand, refusing to do so, and then commenced arguing with Officer Guerriero.

28. Since I believed Gould to have been involved in a gun-related incident that led to multiple calls to 911, it was reasonable for Officer Guerriero to direct Gould not to place his hands in his pockets. This is not a command that in any way intrudes to any degree on one's freedom as one can just as easily approach and speak with officers (that notably are there, in part, due to **his 911 call**) with hands away from pockets.

29. Officer Guerriero as the senior officer on scene (by about 20 years) was taking the lead, and I was taking cues from her.

30. With her taking the lead, my primary role then became backup for officer and scene safety.

31. Based upon my vantage point and observations, Gould had been given four commands: two not to go in his pockets, and two to put his phone down, all four of which were

---

[1] Gould's deposition testimony was that he did so out of habit. "I often play with my phone and flip it around." *Gould Depo.,* 87:4-7. I had no knowledge in the moment that Gould was a person with a habit of playing with and flipping his phone.

not complied with.

32. Officer Guerriero, based upon her experience, saw fit to draw her firearm, order Gould to the ground and detain Gould in handcuffs pending further investigation.

33. Guerriero's training and experience were significantly superior to mine, and in the moment, I could not question her observations since she was the one giving commands, and her vantage point different from mine.

34. I could not have reasonably, and would not have directed a senior officer on scene, whose vantage point was not the same as mine, to dispense with an investigatory detention of a noncompliant, argumentative, agitated individual on a gun call, who had disregarded multiple police commands that were given for safety reasons.

35. I could not reasonably, nor would I have physically intervened in Officer Guerriero briefly withdrawing her firearm since that would have been imprudent, unsafe and unreasonable to get in the line of fire of an officer with a gun drawn, particularly in the very short period of time she had her gun out.

36. Officer Guerriero had her gun drawn for *12 seconds*. I cannot fathom in that short amount of time anything I could possibly have done to force her to put her gun away. Both at the scene and even in hindsight.

37. I would have had no authority, or ability even if I had the authority, to compel her to put her gun away in the brief *12 seconds* it was out. Nor would it be reasonable to conclude that Officer Gurriero (a 20-year veteran officer) would have taken directives from a rookie officer such as myself in the heat of those moments, in such a short span of time.

38. Importantly, while I was in the same general vicinity, again I could not be certain of what Officer Guerriero was observing. She may have observed something that I did not, that

caused her to fear for her own safety. Her vast experience could have led her to perceive a risk that I could not. Perhaps she saw something in Gould's pockets or behind his back.

39. Per my police training, when one officer draws a lethal weapon, the second officer should cover with a less lethal option. That way, if the subject engages in any quick or furtive movements that might lead to use of a weapon to gain control, the officers will have a less-lethal option. A Taser is a less-lethal option. It is not designed or intended to inflict great bodily injury, but instead to temporarily incapacitate.

40. Gould, in fact, later commended my decision stating, "at least the other guy pulled out his Taser."

41. I did not discharge my Taser.

42. I did not touch Mr. Gould.

43. In viewing my body worn camera video, I unholstered it at about 0:35 and re-holstered it at 0:58 (total 23 seconds) when Gould was secured in handcuffs by Officer Guerriero.

44. Gould laughed, and when Officer Guerriero asked him if he thought it was funny, she explained to him that she was detaining him. Gould told her she was "fucked."

45. I asked Gould if he had identification, at which point he began to attempt to stand up.

46. Officer Guerriero directed him back to the ground into a seated position, after which Gould asked me, "who the fuck is this?"

47. Gould was excited at this point, and I told him a couple of times to relax to de-escalate.

48. When Gould engaged in more arguments with Officer Guerriero and said he did not have a gun, I explained to him that officers would not know that upon arrival.

49. Gould continued to argue with and insult Officer Guerriero.

50. He asked her for her supervisor. He then proceeded to ask another male officer, "are you in charge of this lady?"

51. Officer Guerriero's body worn camera reflects that at 2:30 (meaning 2 mins and thirty seconds of the video on file with the Court), I departed the area. I went to the pool area where the other parties to the disturbance with Gould were located. Gould was told to get on the ground (initial detention) at 1:01, meaning I was present for a grand total of about **90 seconds** of his investigatory detention.

52. My body worn camera also depicts this time frame. Gould was told to get on the ground at 0:32 and I was departing the area at 2:03.

53. As I was walking back toward the pool area, I explained to Officer Michael Valerio that Gould was detained by Officer Guerriero because he was told to keep his hands out of his pockets, and Gould then reached in his pockets.

54. At about this same time, Officer Michael Valerio stated that the man in the pool area had a firearm. No law enforcement officer informed me of this for the brief time period I was present with Gould.

55. Officer Valerio observed Gould in handcuffs being detained, and he too did not request or direct Officer Guerriero to release him.

56. I did not see Gould again until he was at the Palm Beach Gardens Police Department. The remainder of Gould's interaction with PBGPD law enforcement officers (and it was prolonged and included Gould calling Guerriero a "pussy," impugning police officers repeatedly, insulting military veterans, lying about being an attorney, and effectively imploring officers to arrest him) occurred outside of my presence. I only learned of his behavior well after

the fact.

57. I remained on scene in the pool area, and in the clubhouse, unable to see or hear Gould for over an hour.

58. At the time I departed Gould, about 90 seconds after he was detained, he was not under arrest, or told that he was under arrest. He was still being detained.

59. Ultimately, based upon what occurred while I was briefly present with Gould, it would not have been my decision to place him under arrest; however, the decision to arrest him was made by Officer Guerriero after I was no longer there. Even though I would not have arrested Gould based upon what occurred in my presence, whether and to what extent Officer Guerriero had probable cause or arguable cause will be for her to explain, including whether any of his actions after I left contributed to her decision.

60. All probable cause determinations were made by Officer Guerriero, as she herself acknowledged in her deposition at pages 142-144. She made the arrest, not me.

61. I was also informed by a supervisor that Gould was being arrested based upon Officer Guerriero's probable cause.

62. I was tasked with writing a report on this arrest only because Officer Guerriero was taken from the scene with chest pain and admitted to the hospital for a cardiac event. Had she not fallen ill and taken to the hospital, it would have been her report.

63. Because it was Guerriero's arrest and formulation of probable cause (and not mine), I specifically and contemporaneously noted: "Due to the facts above **Ofc. Guerriero found probable cause to charge Mr. Gould** with one count of resist officer without violence F.S.S. 842.02." (emphasis added). A copy of my report is attached to the Appendix at Tab 2.

64. Had I made any probable cause determinations, my report would not have

expressed that the arrest was solely based upon the probable cause determination of another officer.

65. Due to Guerriero still being at the hospital when the time came to transport Gould from the PBGPD to jail, that transportation was tasked to me as well.

66. I, however, did not transport Gould from the incident scene to PBGPD.

67. I had no discretion or authority to unarrest or release Gould since Officer Guerriero found probable cause and arrested Gould. I was not a supervisor and had no ability to override the decision of a senior officer, or any officer for that matter.

68. A supervisor approved the report and probable cause determination of Officer Guerriero.

69. After I had already departed the scene, I understand that one or more supervisors viewed video (from the community, not officer body cameras) of the interaction between Gould and the other parties with whom he had been involved, and determined that Gould was a victim of a crime.

70. I was contacted while at the Palm Beach County Jail, and directed by a supervisor to unarrest Gould and take him home. I complied with that command.

71. Gould was not charged with any crime since no papers charging him with a crime were filed or submitted.

72. Gould was not booked into the Palm Beach County Jail. He was not photographed or fingerprinted.

73. I asked Gould if he would like to ride home with the handcuffs removed.

74. I dropped him off back in the community and returned to work.

75. The individual with the gun was arrested and prosecuted.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

_____*Joseph Strzelecki*_____
Joseph Strzelecki

Dated: 05/24/2024