Bethany Guerriero
April 25, 2024                                                      1

```
 1              UNITED STATES DISTRICT COURT
         FOR THE SOUTHERN DISTRICT OF FLORIDA
 2              CASE NO. 9:24CV80022DMM

 3

 4   RYAN GOULD,

 5                 Plaintiff,

 6   -vs-

 7

     BETHANY GUERRIERO and JOSEPH STRZELECKI,
 8
                   Defendants.
 9   _____/

10

11

12

13                      US LEGAL SUPPORT
                        444 W Railroad Avenue
14                      Suite 300
                        West Palm Beach, Florida 33401
15                      Thursday, April 25, 2024
                        8:12 a.m. - 11:45 a.m.

16

17              DEPOSITION OF BETHANY GUERRIERO

18

19

20

21

22

23
                   Taken before Robyn Maxwell, RPR, FPR,
24   RSA, and Notary Public in and for the State of Florida at
     Large, pursuant to Notice of Taking Deposition filed in
25   the above-mentioned cause.
```

```
 1   APPEARANCES:

 2

 3       ON BEHALF OF THE PLAINTIFF:
             ERIC ALAN RICE, ESQUIRE
 4           erice@floridatax.com
             GUTTER CHAVES JOSEPHER RUBIN FORMAN FLEISHER
 5           MILLER, P.A.
             2101 NW Corporate Boulevard
 6           Suite 107
             Boca Raton, Florida 33431
 7           561.998.7847

 8

 9       ON BEHALF OF BETHANY GUERRIERO:
             GREGORY JOSEPH MORSE, ESQUIRE
10           greg@morselegal.com
             RALPH EDWARD KING, III, ESQUIRE
11           rick@kingmorselaw.com
             KING | MORSE, PLLC
12           2240 Palm Beach Lakes Boulevard
             Suite 300
13           West Palm Beach, Florida 33409
             561.317.5766

14

15

         ON BEHALF OF JOSEPH STRZELECKI:
16           SCOTT DAVID ALEXANDER, ESQUIRE
             alexander@jambg.com
17           MELISSA LYNNE JOHNSON, ESQUIRE
             mljohnson@jambg.com
18           JOHNSON, ANSELMO, MURDOCH, BURKE, PIPER &
             HOCHMAN, P.A.
19           2455 E Sunrise Boulevard
             Suite 1000
20           Fort Lauderdale, Florida 33304
             954.463.0100

21

22

23

24

25
```

```
1                   INDEX OF PROCEEDINGS

2    WITNESS                                       PAGE

3    BETHANY GUERRIERO
     DIRECT EXAMINATION BY MR. RICE                  4
4    CERTIFICATE OF OATH OF WITNESS                165
     REPORTER'S DEPOSITION CERTIFICATE             166
5    READ & SIGN LETTER TO WITNESS                 167

6
                        PLAINTIFF EXHIBITS
7
        EXHIBIT              DESCRIPTION          PAGE
8
        Exhibit 1    Dispatch radio recording of   43
9                    incident
                     RETAINED BY COUNSEL
10
        Exhibit 2    Surveillance parking lot video 43
11                   RETAINED BY COUNSEL

12      Exhibit 3    Officer Strzelecki's body-worn 43
                     camera video of the incident
13                   RETAINED BY COUNSEL

14      Exhibit 4    Officer Guerriero's body-worn  43
                     camera video of the indicent
15                   RETAINED BY COUNSEL

16      Exhibit 5    Officer Strzelecki's Incident  43
                     Report
17
        Exhibit 6    Officer Strzelecki's interview 43
18                   during the IA process

19      Exhibit 7    Event Report                   43
                     Confidential
20

21

22   {Reporter's Note:  Exhibits 1-4 were retained by
     Mr. Rice.}
23

24

25
```

Bethany Guerriero
April 25, 2024                                          4

```
 1   Thereupon,

 2   the following proceedings began at 8:12 a.m.:

 3              THE COURT REPORTER:  Raise your right hand,

 4         please.

 5              Do you solemnly swear or affirm the

 6         testimony you are about to give in this matter

 7         will be the truth, the whole truth and nothing but

 8         the truth?

 9              THE WITNESS:  Yes, I do.

10   Thereupon,

11                   BETHANY GUERRIERO,

12   having been first duly sworn or affirmed, was examined

13   and testified as follows:

14                   DIRECT EXAMINATION

15   BY MR. RICE:

16         Q.    Good morning.

17         A.    Good morning.

18         Q.    How would you like me to address you today?

19         A.    You can call me Beth, that's fine.

20         Q.    Okay.  If that --

21         A.    That works.

22         Q.    -- changes, let me know.

23         A.    Sure, no problem.

24         Q.    Have you ever taken a deposition before?

25         A.    Yes, I have.
```

Bethany Guerriero
April 25, 2024                                    5

1          Q.     When was that?

2          A.     I took one -- let's see.

3                 In relation to this case or just any case?

4          Q.     Just any deposition.

5          A.     I would say within the last year.

6          Q.     What was the circumstances of that

7     deposition?

8          A.     Well, it had to do with this case, I

9     believe.  I don't know.  No.  I don't -- I don't know.  I

10    don't -- I'm sorry, I don't. . .

11         Q.     That's fine.

12                And so, I just want to go over at the

13    beginning some ground rules about how a deposition works.

14         A.     Okay.

15         Q.     So at this deposition, the reporter will be

16    making a record under oath.  Everything that is being

17    said in the room will be taken down verbatim, including

18    my questions and your answers.

19         A.     Okay.

20         Q.     After the deposition, there will be a

21    transcript available that you'll be able to review.  The

22    purpose of this deposition is to get information that can

23    be used in this court case or others.

24                Because the reporter is writing down what

25    we're saying, I just ask only one of us speak at a time.

Bethany Guerriero
April 25, 2024                                    6

1          A.    Okay.

2          Q.    So even if you know where my question is

3    going, please wait until I fully finish the question, and

4    I will do my best to wait until you're done answering

5    before starting another one.

6                Also, at certain times, your attorneys may

7    state objections.

8          A.    Uh-huh.

9          Q.    I just ask that you wait to respond until

10   they finish speaking the objection.  Generally, you can

11   continue your response after they've made it, unless your

12   attorney directs you to not respond.

13         A.    Okay.

14         Q.    Does that make sense?

15         A.    Yes, sir, it does.

16         Q.    Now, I also ask that if you don't

17   understand any of my questions, that you ask for a

18   clarification.

19         A.    Okay.

20         Q.    If you answer a question that I've asked,

21   then I'll assume that you sufficiently understood it, be

22   able to answer it; is that fair?

23         A.    That's fair.

24         Q.    If you need a question repeated back or

25   clarified, please let us know.

Bethany Guerriero
April 25, 2024                                    7

1                    Also, if you need a break at any time for

2       any reason, I'm happy to do that.  The one thing that I

3       ask is just that you just finish answering any pending

4       questions before we take a break.

5              A.    Okay.

6              Q.    Does that work for you?

7              A.    Yes, sir.

8              Q.    All right.  Is there anything today that

9       would impair your ability to participate in this

10      deposition?

11             A.    No.

12             Q.    Can I get your full name, please?

13             A.    First name is Bethany, last name is

14      Guerriero.

15             Q.    Can you spell that, please?

16             A.    Sure.  First is B-E-T-H-A-N-Y; last is

17      G-U-E-R-R-I-E-R-O.

18             Q.    Can I get your date of birth, please?

19             A.    2/20/1975.

20             Q.    What city and state do you currently reside

21      at?

22             A.    Delray Beach, Florida.

23             Q.    Did you meet with anyone to prepare before

24      this deposition today?

25             A.    I met with my attorney.

Bethany Guerriero
April 25, 2024                                    8

 1          Q.    So I'm going to say that, I'm not going to

 2    ask for confidential conversations with your attorney.

 3    If there's any information that is part of a private,

 4    legal conversation with your attorneys --

 5          A.    Uh-huh.

 6          Q.    -- I don't want you to include that; I'm

 7    not asking about that.  Otherwise, I'm asking about

 8    anything besides that.

 9                Does that make sense?

10          A.    Yes.

11          Q.    Did you review any documents to prepare for

12    this deposition?

13          A.    Yes.

14          Q.    What documents did you review?

15          A.    Transcripts from my IA involving this case.

16          Q.    So is it fair to say the IA file?

17          A.    Yes.

18          Q.    Anything else?

19          A.    No.

20          Q.    Did you talk to anyone else, besides your

21    attorneys, to prepare for this deposition?

22          A.    No.

23          Q.    Have you ever been charged with or

24    convicted of a crime?

25          A.    I was not convicted of any crime, no.

```
 1              Q.     Have you been charged with a crime?

 2              A.     I had been charged with a crime, yes.

 3              Q.     And what was that?

 4              A.     Back in 2019, I was charged with

 5      cyberstalking, I believe.

 6              Q.     Can you tell me what the allegations were?

 7              A.     Sure.   It was imposed by my ex-wife Nicole

 8      Guerriero, during a divorce and custody battle, that I

 9      was cyberstalking her.

10              Q.     Do you know what county that was in?

11              A.     Palm Beach.

12              Q.     And what was the resolution of that case?

13              A.     It was nolle prossed by the State

14      Attorney's Office.

15              Q.     Okay.   Can you describe your education

16      related to law enforcement, please?

17              A.     Sure.   I completed a four-year degree,

18      bachelor's degree, at Florida Atlantic University prior

19      to my employment as a law enforcement officer, in

20      addition to six months at the police academy located in

21      Lake Worth, Palm Beach County.   And then while employed

22      as a police officer, just numerous trainings over the

23      course of 20 years.

24              Q.     Can you describe your work experience

25      related to law enforcement?
```

Bethany Guerriero
April 25, 2024                                    10

```
 1                    MR. ALEXANDER:  All right.  Excuse me for

 2           one second.

 3                    MR. RICE:  Actually, let's go off the

 4           record, yes, yes.  Sorry.

 5                    (Discussion off the record.)

 6   BY MR. RICE:

 7           Q.    So I'm sorry if I cut you off.

 8           A.    It's okay.

 9           Q.    Can you continue describing your law

10   enforcement work experience?

11           A.    Since being employed, correct?

12           Q.    Correct.  So I'm asking for any employment,

13   work, those sorts of things related to law enforcement.

14           A.    I don't -- I got hired in 2003, went into

15   the police academy in 2004 and was released from field

16   training in June of 2004.  And I've been with the City of

17   Palm Beach Gardens ever since then.  So everything I've

18   done in the last 20 years has been law enforcement

19   related.

20           Q.    And what positions or roles have you had

21   with the Palm Beach Gardens Police?

22           A.    I was a undercover tax agent.  I held the

23   position of field training officer on and off for the

24   course of 13 years.  I was briefly on SWAT for a little

25   while.  I was senior negotiator on our Crisis
```

Bethany Guerriero
April 25, 2024                                    11

1    Intervention and Hostage Negotiation Team.  I worked in

2    our community involvement unit for a number of years

3    where I ran our juvenile first offender program.  I also

4    was in charge of running our Explorer program, which is

5    the young adults that aspire to possibly go on into law

6    enforcement.  I was a CPR instructor.  That's about it.

7    It's a lot of -- a lot of stuff.

8             Q.    Have you had any specialized training, as

9    part of your law enforcement experience?

10            A.    I have.

11            Q.    Can you describe that, please?

12            A.    Sure.  As a former SWAT operator, I had

13   gone through not only the tryout for that team, but I had

14   gone to basic entry school, as well as a sniper school,

15   so that was my training encompassing that unit.

16   Throughout the years being on our Crisis Intervention and

17   our Hostage Negotiation Team, numerous trainings,

18   advanced trainings for that position I held on that team.

19            Q.    Anything else?

20            A.    As far as being an undercover narcotics

21   agent, I had been to numerous conferences and trainings.

22   And related to that, I had been to instructor schools for

23   becoming a field training officer.  So yes.

24            Q.    Anything else?

25            A.    I think -- I think I've covered everything.

Bethany Guerriero
April 25, 2024                                          12

```
 1           Q.    Okay.  What's your current employment
 2    status?
 3           A.    I am not employed.  I -- I work for myself
 4    on a part-time basis.
 5           Q.    And how did your employment at the Palm
 6    Beach Gardens end?
 7           A.    I was terminated on August 25th of 2023.
 8           Q.    And during this deposition, I'm going to
 9    refer to the incident and Mr. Gould.  That's the incident
10    at issue in this lawsuit.
11                 Are you familiar with that incident?
12           A.    I am, yes.
13           Q.    And you understand that as we talk further,
14    when I'm referring to events of the incident, that I'm
15    referring to that with Mr. Gould?
16           A.    Yes, sir, I understand.
17           Q.    Now, as part of this lawsuit, did you
18    search for any materials that you personally possessed
19    related to the incident or this lawsuit?
20           A.    I'm not sure I understand what you're
21    asking.
22           Q.    Were you aware that the plaintiff had
23    requested certain materials from you that you may have
24    related to Mr. Gould or this lawsuit?
25           A.    Such as -- can you give me an example
```

Bethany Guerriero
April 25, 2024                                        13

```
 1   because I'm still --

 2            Q.    Such as handwritten notes about the

 3   incident, emails about the incident, text messages?

 4            A.    Okay.  Yeah.  I had -- I had been asked

 5   about that.

 6            Q.    And did you search for those materials?

 7            A.    I don't have anything that's related to

 8   that.

 9            Q.    Did you do any searching to make sure you

10   have nothing related?

11            A.    I -- I did do searching, and I -- I don't

12   have anything that's related to that.

13            Q.    Okay.  And I will ask, too, that, as this

14   is a deposition and I'm hoping to ask you questions to

15   get information from you, to please refrain from looking

16   at your attorney or else maybe we'll switch seating up

17   because I just want to make sure I'm getting the answers

18   from you and not --

19            A.    Okay.

20            Q.    -- other sources.

21            A.    Understandable.

22            Q.    Is that fair?

23            A.    Sure.

24            MR. MORSE:  Just let the record reflect,

25            none of her attorneys were giving her any answers
```

Bethany Guerriero
April 25, 2024                                      14

```
 1              to answer her question.

 2                   MR. RICE:  And I'll say for the record that

 3         I have no concerns at the moment.

 4                   MR. MORSE:  Okay.

 5                   MR. RICE:  I just want to make sure, we

 6         move forward --

 7                   MR. MORSE:  Sure.

 8                   MR. RICE:  -- it doesn't continue.

 9                   MR. MORSE:  No issues.

10   BY MR. RICE:

11         Q.    Do you have any handwritten notes of any

12   sort related to the incident or the matters in the

13   lawsuit?

14         A.    No, sir.

15         Q.    Do you have any emails, besides any sent to

16   your attorneys privately, related to the incident or this

17   lawsuit?

18         A.    No, sir.

19         Q.    Again, same question regarding text

20   messages?

21         A.    No, sir, I don't.

22         Q.    Any social media posts or direct messages?

23         A.    No, sir.

24         Q.    Have you discussed this incident, the

25   lawsuit or those matters with anybody, besides your
```

Bethany Guerriero
April 25, 2024                                      15

```
 1   attorneys privately?

 2           A.    No, sir.

 3           Q.    Now, tell me about -- I believe you had

 4   critical stress management and deescalation training; is

 5   that correct?

 6           A.    That's correct.

 7           Q.    Can you tell me about that, please?

 8           A.    We receive training annually within the

 9   department, but, you know, as a crisis negotiator/hostage

10   negotiator, as stated previously this morning, you know,

11   I -- I do have trainings that other people at the

12   department that are not on a team such as what I was part

13   of has partaken in.

14           Q.    And what sort of general skills or matters

15   do you learn about in those trainings?

16           A.    You know, deescalation, picking up on

17   different cues such as verbal or nonverbal in relation to

18   human behavior.

19           Q.    Is deescalation important for a police

20   officer?

21           A.    It is, yes.

22           Q.    Why?

23           A.    Because it's a tactic that is used in hopes

24   of bringing a situation back down to a calmer level that

25   can be manageable.
```

Bethany Guerriero
April 25, 2024                               16

```
 1          Q.    Do you know if the Palm Beach Gardens has a
 2   policy regarding deescalation?
 3          A.    We do.
 4          Q.    And what is that?
 5          A.    I'm kind of paraphrasing as to -- as to
 6   what I just described, but, you know, we do have, you
 7   know, trainings in relation to how to deescalate with the
 8   general public or subjects or whoever we may encounter
 9   while at work.
10          Q.    What is your understanding about why Palm
11   Beach Gardens has that policy?
12          A.    It's -- it's important.  I think it's
13   important with any law enforcement --
14                MR. MORSE:  Object --
15          A.    -- job.
16                MR. MORSE:  -- as to form.
17                You can go ahead and answer when I say
18          "object as to the form," unless I instruct you not
19          to.  It's okay to answer.
20                THE WITNESS:  It's okay to answer?
21                MR. MORSE:  Yeah.
22                THE WITNESS:  Okay.
23          A.    It's -- it's an important aspect of -- of
24   policing.
25
```

```
 1   BY MR. RICE:

 2        Q.    Now, before the incident with Mr. Gould,

 3   were you subject to any medical conditions that affected

 4   your performance, as a police officer?

 5        A.    That day or in general or --

 6        Q.    What I'm asking is -- and, again, if I need

 7   to clarify, please let me know.

 8        A.    Sure.

 9        Q.    Sometimes my questions can get a bit

10   unwieldy --

11        A.    Sure.

12        Q.    -- and weird.

13        A.    Understandable.

14        Q.    The day of the incident with Mr. Gould, was

15   there anything that you were subject to, suffered from,

16   had in your history, et cetera, that may have had an

17   effect on your performance, as a police officer, that

18   day?

19        A.    No, not that day, no.

20        Q.    And so, just to be clear to ask kind of the

21   flip side, on the day of the incident with Mr. Gould,

22   there were no impairments, that you were aware of, to

23   your ability to operate, as a police officer?

24        A.    That's correct.

25        Q.    Okay.  Were you trained in use of force
```

Bethany Guerriero
April 25, 2024                                    18

1    standards?

2            A.    Yes.

3            Q.    Can you tell me, generally, how an officer

4    is supposed to approach use of force?

5            A.    If -- you know, a- -- again there's

6    escalation and deescalation that can be involved with

7    that.  And, you know, we are met with different levels of

8    not only protecting ourselves but protecting the general

9    public and protecting the -- the subjects that we are

10   encountering with, as well as our officers.

11           Q.    Can an officer use force whenever they

12   want?

13           A.    No.

14           Q.    When can an officer generally use force?

15           A.    When it's subjective and reasonable.

16           Q.    Can you expound on that for me, please?

17           A.    Sure, I'll -- I'll --I'll do the best I

18   can.

19                 So every situation is -- is different.  And

20   that objectable [sic] reasonableness can change while

21   encountering subjects, people, citizens throughout the --

22   the course of a call or investigation.  And we have to be

23   diligent of that.

24           Q.    And I'll also make clear at this point that

25   when I'm asking about certain concepts or understandings,

Bethany Guerriero
April 25, 2024                              19

1    I'm most interested as to what you understood on the day

2    of the incident.

3              A.    Okay.

4              Q.    If there are things that -- I want to

5    change the time frame, I'll specify, you know, today

6    versus the date of the incident.  And likewise, please

7    let me know if you're understanding --

8              A.    Okay.

9              Q.    -- since the incident has changed.

10             A.    Uh-huh.

11             Q.    Is that fair?

12             A.    That's fair.

13             Q.    Now, you mentioned that threats can change

14   throughout an encounter, correct?

15             A.    Correct.

16             Q.    And is it your understanding that an

17   officer needs to adapt to the threat being presented?

18             A.    Yes.

19             Q.    So if there is no threat currently

20   existing, can an officer generally use force?

21             MR. MORSE:  Object as to form.

22             A.    Again, that -- that can change.  I'm sorry.

23             That can change during an encounter.

24   BY MR. RICE:

25             Q.    I understand that can change.

Bethany Guerriero
April 25, 2024                                    20

```
 1                    And so, I'm just saying, at the base level,
 2      let's say that an encounter starts and there is no threat
 3      even perceivable.
 4              A.    Okay.
 5              Q.    Can an officer generally use force?
 6                    MR. MORSE:  Object as to form.
 7              A.    Again, it -- it would be that officer's
 8      objective reasonableness at that moment while in an
 9      encounter, investigation.
10      BY MR. RICE:
11              Q.    And so, what I'm asking -- okay.  If
12      there's no safety threat to an officer, what else might
13      permit an officer to use force?
14                    MR. MORSE:  Object as to form.
15                    THE WITNESS:  Can I answer or. . .
16                    MR. MORSE:  Yeah, no, when I say, "object
17          as to form," yes.
18                    THE WITNESS:  Okay.
19                    MR. MORSE:  Continue to answer, unless Rick
20          or I tell you not to answer a question.
21                    THE WITNESS:  Okay.  Okay.
22              A.    Again, that can change throughout an
23      encounter.
24      BY MR. RICE:
25              Q.    And I understand it can change, but let's
```

Bethany Guerriero
April 25, 2024                                    21

1    say that it does not change.

2           A.    Okay.

3           Q.    I want to get your understanding.

4           A.    Uh-huh.

5           Q.    So let's say there's no safety threat.

6           A.    Uh-huh.

7           Q.    Nothing has changed, and nothing is

8    changing?

9           A.    Okay.

10          Q.    Just a simple example.

11                When could an officer use force during that

12   situation if there's no safety threat, or could they not?

13          A.    Again, I'm -- I'm going to stick to my

14   answer that, you know, that can change, and an encounter

15   can present initially as nonthreatening and then it can

16   evolve into something.

17          Q.    And from my example, please assume that the

18   situation does not evolve and does not change.

19          A.    Okay.

20          Q.    When could an officer use force in that

21   situation, or could they not?

22          A.    If you're speaking about that specific

23   moment in time where there's absolutely no threat at --

24   at that exact moment, then no.

25          Q.    Is it your understanding that an officer

Bethany Guerriero
April 25, 2024                                    22

1    could not use force if there's no safety threat, there's

2    no adapting safety threat, there's no change, generally

3    an officer could not use force in that situation; is that

4    fair?

5            A.    That's fair.

6                  MR. MORSE:  Object as to form.

7    BY MR. RICE:

8            Q.    Now let's talk about changes and

9    adaptations.

10                 If it goes from no safety threat to

11   potential safety threat, then could an officer use force?

12           A.    Yes.

13           Q.    Describe for me how that works and what an

14   officer would consider.

15           A.    There's -- there's a lot of variables, you

16   know, to that.  It's -- you know, for us information can

17   always be changing.  So, you know, it's what we are

18   receiving information-wise at the time that's going to, I

19   guess, dictate an -- an outcome or -- or how that

20   objective reasonableness can change.

21           Q.    And you mentioned the objective standard.

22                 Would you agree that an officer needs to

23   view safety threats based on objective facts available to

24   the officer?

25           A.    Yes.

Bethany Guerriero
April 25, 2024                                                    23

```
 1              Q.    And so, is it your understanding that an
 2   officer could use force based on only the potential of a
 3   safety threat?
 4              A.    Yes.
 5              Q.    And how would that look?
 6              A.    Again, there's -- there's so many different
 7   variables that can be, you know, inserted here to -- to
 8   describe that, and it really is that officer's perception
 9   with what they're being given with at the moment, how
10   that's going to change or stay the same.
11              Q.    Can you give me an example of when an
12   officer would be justified in using force to a potential,
13   but not actual, safety threat?
14              A.    When there's a weapon involved.
15              Q.    Would the officer have to have information
16   that a weapon may be involved?
17              A.    Yes.
18              Q.    Can an officer just assume in every
19   encounter that a weapon is involved?
20              A.    You have to.
21              Q.    And so, is an officer justified in using
22   force in every encounter?
23              A.    They could be, depending upon how a
24   situation unfolds.
25              Q.    So is it your understanding, and, again,
```

Bethany Guerriero
April 25, 2024                                               24

```
 1    I'm trying to get to your understanding --

 2           A.    Uh-huh.

 3           Q.    -- that because anyone could potentially be

 4    armed at any moment --

 5           A.    Uh-huh.

 6           Q.    -- that as an officer, you are justified in

 7    using force in nearly every situation?

 8                 MR. MORSE:  Object as to form.

 9           A.    It is our responsibility to assume that

10    every one has a weapon.  We're already bringing one

11    weapon, which is our own --

12    BY MR. RICE:

13           Q.    And --

14           A.    -- to a scene.

15           Q.    And I want to get to your understanding.

16           A.    Uh-huh.

17           Q.    If you are an officer assuming everyone

18    else is armed that you come into contact with, would you

19    feel justified in using force upon anyone until you know

20    that they are not armed?

21           A.    Force when it's reasonable.

22           Q.    And so, what would be reasonable force in

23    that situation?

24           A.    There is an unknown until that unknown can

25    be clarified with details.  It also has to do with
```

1    demeanor of -- of somebody, you know, on scene that we

2    could be encountering or -- or dealing with that, you

3    know, we're in an information gathering standpoint, and a

4    person's demeanor can, again, change that objective

5    reasonableness for us.

6              Q.    Would you agree, though, that a demeanor is

7    something that an officer can observe?

8              A.    You can, yes.

9              Q.    And so, that would be information that an

10   officer could perceive and then decide whether to use

11   force, correct?

12             A.    Correct.

13             Q.    Can an officer use force based solely on

14   assumptions?

15             A.    Again, that would come back to their --

16   there's a -- there's a lot of factors with that, so I

17   don't. . .

18             Q.    And my question is just based solely on

19   assumptions.

20             If an officer has no perception, no

21   observable facts of a safety threat --

22             A.    Uh-huh.

23             Q.    -- but has an assumption that there's a

24   safety threat, based solely on that assumption, is it

25   your understanding that an officer can use force?

Bethany Guerriero
April 25, 2024                                          26

```
 1              A.    You can.

 2              Q.    Okay.  Are there certain facts -- factors

 3    that you're supposed to consider as an officer about

 4    using force?

 5              A.    Yes.

 6              Q.    Are you familiar with the Graham factors?

 7              A.    "The Graham factors," can you -- it -- it

 8    may be -- had -- it may have been presented a different

 9    way with our agency with policies, so. . .

10              Q.    Well, I'll just ask you some general

11    questions.

12                    As an officer, are you supposed to consider

13    the severity of the crime at issue, with respect to use

14    of force?

15              A.    Yes.

16              Q.    Are you supposed to consider whether the

17    suspect poses an immediate threat to the safety of

18    officers or others?

19              A.    Yes.

20              Q.    And are you supposed to consider whether

21    someone is actively resisting or attempting to evade

22    arrest?

23              A.    Yes.

24              Q.    And how would you use those factors in your

25    use of force analysis?
```

Bethany Guerriero
April 25, 2024                                    27

```
 1              A.    Again, that can -- that can escalate or

 2    deescalate, depending upon how an encounter or situation

 3    unfolds with -- 1, with what an officer is presented with

 4    initially, and 2, how that can continue to unfold through

 5    information gathering.

 6              Q.    And so, you mentioned escalate is

 7    deescalate is also possible during an encounter that a

 8    threat could go away, correct?

 9              A.    A threat could potentially go away, sure.

10              Q.    Was it your understanding that at that

11    point, less force or no force may be justified?

12              A.    It could be.  It's --

13              Q.    I mean, what was your understanding?

14              A.    I'm not -- I'm not sure.

15              MR. MORSE:  Are you asking about the

16              incident --

17              A.    Yeah.

18              MR. MORSE:  -- or just in general?

19    BY MR. RICE:

20              Q.    I'm asking in general.  Again, I'm happy to

21    clarify.

22              A.    Right.

23              Q.    But let's say that, just an example

24    encounter --

25              A.    Uh-huh.
```

Bethany Guerriero
April 25, 2024                                              28

```
 1                  Q.     -- someone poses a threat, they have a gun.

 2                  A.     Uh-huh.

 3                  Q.     They let the officer take the gun, they're

 4    no longer armed, they are compliant and polite.

 5                         At that point, would you agree that their

 6    threat level has gone down?

 7                  A.     To a degree.

 8                  Q.     And so, would an officer in the face of

 9    less threat be justified in using less force or no force

10    at that point?

11                  A.     At that point, sure.

12                  Q.     So you'd agree that an officer would have

13    to adapt up with force and down with force, during a

14    situation as it unfolds?

15                  A.     Correct.

16                  Q.     And that's a moment-by-moment analysis,

17    correct?

18                  A.     Yes.

19                  Q.     Okay.  Are you also aware that officers had

20    a duty to intervene when other officers used unlawful

21    force?

22                  A.     Yes.

23                  Q.     Can you describe that for me, please?

24                  A.     I can give a broad example.  But, you know,

25    if maybe someone has already been taken into custody and
```

Bethany Guerriero
April 25, 2024                                      29

1   someone continues to use physical force against that

2   person when there is perhaps adequate number of backups

3   on scene or they are no longer actively or passively

4   resisting, and, you know, that type of action from an

5   officer continues, then another officer on scene would

6   have a duty to intervene.

7          Q.    And that's an affirmative duty to

8   intervene, correct?

9          A.    Yes.

10         Q.    And so, if an officer perceives improper

11  force being used and they don't act, then they have

12  failed their duty, correct?

13         A.    Correct.

14         Q.    Is there a duty to report officer

15  misconduct, as part of the Palm Beach Gardens Police

16  Force?

17         A.    Yes.

18         Q.    Is that a policy?

19         A.    Yes.

20         Q.    What's your understanding of that?

21         A.    That if an officer on a scene or -- you

22  know, witnesses conduct that is perceived as misconduct,

23  then they have a duty to report that.

24         Q.    Does that go for every officer who

25  witnesses misconduct?

Bethany Guerriero
April 25, 2024                                           30

 1          A.    Yes.

 2          Q.    Are there any exceptions, that you know of,

 3   where an officer could see misconduct and fail to report

 4   it but abide by policy?

 5          A.    I believe so.

 6          Q.    And what would that be?

 7          A.    I'm not quite sure how to answer that or

 8   what you're looking for, specifically.

 9          Q.    Sure.

10                To put it in clearer terms, does an officer

11   who witnesses misconduct by another officer always have

12   to report the misconduct per policy?

13          A.    Per policy, does that happen?  All the

14   time?  I -- I don't know.  I can't answer that.

15          Q.    Is it your understanding that the policy

16   would require that?

17          A.    Sure, the policy can require that.

18          Q.    Are you aware of instances where officers

19   of the Palm Beach Gardens witnessed officer misconduct

20   and did not report it?

21          A.    I'm quite sure.

22          Q.    How often would you say that occurs?

23          A.    I -- I don't want to -- I don't want to

24   generalize or -- or speculate, but, you know, nothing is

25   100 percent, so I'm -- I'm quite sure that it does

Bethany Guerriero
April 25, 2024                                        31

1    happen.

2         Q.    How many instances are you personally aware

3    of?

4         A.    I -- I don't feel comfortable giving an --

5    an exact number because I -- I don't know.

6         Q.    Is it more than ten?

7         A.    I have no idea.

8         Q.    Would you say it is a regular occurrence?

9         A.    At my agency or agencies across the board?

10        Q.    Your agency.

11        A.    I -- I can't give an accurate number.  I

12   don't know.

13        Q.    Would it surprise you if an officer did not

14   report another officer's misconduct?

15        A.    It would not surprise me, no.

16        Q.    Why not?

17        A.    Because, again, nothing is -- is a hundred

18   percent, so, again, I -- I -- I can't -- I can't give an

19   exact number or answer.  I just know that it probably

20   does happen.

21        Q.    Did you ever have any discussions with any

22   officers about not reporting officer misconduct?

23        A.    Not that I remember, no.

24        Q.    Never in your career?

25        A.    I don't think so, no.

Bethany Guerriero
April 25, 2024                                    32

```
 1           Q.    Were you aware of any other officers

 2   discussing not reporting officer misconduct in any

 3   circumstance?

 4           A.    I can't recall; I don't know.

 5           Q.    And you were with an officer during the

 6   Gould incident, correct, at the beginning?

 7           A.    Which officer are you referring to?

 8           Q.    Strzelecki.

 9           A.    Strzelecki, yes.

10           Q.    Let's turn to your understanding of the

11   resisting an officer without force statute.

12                 Are you familiar with that criminal

13   statute?

14           A.    Yes.

15           Q.    What is your understanding of what

16   constitutes that crime?

17           A.    Resisting without violence?  Is that --

18           Q.    Correct.

19           A.    -- what you're speaking of?

20                 So it's a -- it could be a -- a passive

21   aggressive -- you know, if -- if I am giving verbal

22   commands and you are not listening to what I need you to

23   do, that would constitute as resisting an officer without

24   violence.

25           Q.    Do you have an understanding -- and, again,
```

Bethany Guerriero
April 25, 2024                                    33

1    I preface that because I want to get to your

2    understanding; not the general or legal version.

3              But are there times when a person would be

4    able to disobey or disregard an officer's command without

5    violating that statute?

6         A.    I would say, if it's more along the lines

7    of a consensual encounter and there is no incident or

8    situation or investigation at hand.

9         Q.    So describe for me what a "consensual

10   encounter" is?

11        A.    I could be driving down the street, and I

12   see somebody, and I have real no rhyme or reason to

13   checkout with them, and I said, you know, hey man, can

14   I -- can I ta- -- can I talk to you?  That's one thing

15   they have; during a consensual, they can either talk to

16   me or not, but they're not obligated to at that point.

17        Q.    And is that different than say, like, an

18   investigative stop?

19        A.    Yes, it's different.

20        Q.    Describe to me what an investigative stop

21   is.

22        A.    Well, an investigative stop is going to

23   involve a -- a reason or a situation that we are called

24   to where we are now legally investigating a potential

25   crime or investigating a situation to which upon we've

Bethany Guerriero
April 25, 2024                                           34

1   been called to.

2            Q.    And is it your understanding that during an

3   investigative stop, you can make commands of people

4   present at the scene?

5            A.    Yes.

6            Q.    And what sort of commands can you make?

7            A.    That depends.  If, you know, I need to

8   speak with somebody that is potentially in- -- involved,

9   I can, you know, command to speak to that person.  It --

10  but, again, that's -- that depends upon what a scene or a

11  situation looks like when we're initially responding.

12           Q.    Do you make any efforts to let, I'll say,

13  person, civilian -- the person you're encountering, just

14  so we're clear.

15                 But do you make any efforts to let the

16  person you're encountering know whether it's a consensual

17  encounter or an investigative stop?

18           A.    I mean, if I am going to a call that I've

19  been asked to respond to and conduct an investigation,

20  then no.

21           Q.    Do you have any concerns that the person

22  you're encountering might be confused whether it's a

23  consensual encounter or an investigative stop?

24           A.    No.

25           Q.    Do you assume that they understand what's a

Bethany Guerriero
April 25, 2024                                            35

1    lawful command and what's merely a request, generally?

2              A.    Generally.

3              Q.    And so, for you, would it be appropriate

4    for you to inform someone that there's a legal duty to

5    comply with your command?

6              A.    Again, I -- I -- I feel that that can

7    change or present itself differently, as a call or

8    investigation is unfolding.

9              MR. MORSE:  Object as to form.

10   BY MR. RICE:

11             Q.    But would you give that information, if you

12   deemed it necessary during an encounter?

13             A.    Well, again, it depends on what deems it to

14   be necessary, but, you know, I'm going to ref- -- I'm go

15   degree to refer back to, a situation can sometimes

16   dictate how that's going to go.

17             Q.    Have you ever encountered situations where

18   a civilian is confused about whether they need to comply

19   with an order or not?

20             A.    I'm quite sure over the course of -- of

21   20 years I have an en- -- encountered that.  I just, off

22   the top of my head, for the sake of giving correct

23   information, I don't want to just throw it out.  But, you

24   know, yes, I -- in 20 years, you do encounter that at

25   some point.

Bethany Guerriero
April 25, 2024                                    36

1          Q.    Is it your understanding that for criminal

2    resistance, the one that we're talking about --

3          A.    Uh-huh.

4          Q.    -- that person would need to understand

5    that they were subject to a lawful order and then failed

6    to comply?

7          A.    Yes.

8          Q.    So is it your understanding that the person

9    would need to understand that they were given a lawful

10   command; not merely a consensual request --

11         A.    Correct.

12         Q.    -- to resist it?

13         A.    Yes.

14         Q.    Okay.  Can you describe for me -- do you

15   know what "temporary detentions" are?

16         A.    Sure.  When you're temporarily detaining

17   somebody, you are still in the midst of -- of conducting

18   an investigation and -- and -- and doing factfinding.

19   We're trying to gather as much information as possible to

20   make headway during a scene because not all the times are

21   they cut and dry.

22         Q.    What does a temporary detention look like?

23         A.    You can temporarily detain somebody by

24   using handcuffs; you can temporarily detain somebody by

25   putting them in the backseat of your car; you can

Bethany Guerriero
April 25, 2024                                      37

1    temporarily detain somebody by having them have a seat

2    and letting them know, hey, I need you to have a seat;

3    we're conducting an investigation.

4              Q.    How does that -- excuse me.

5                    How does that compare to an arrest?

6              A.    When someone is under arrest, you let them

7    know they're under arrest and for what charge.

8              Q.    So would it be your general practice to

9    tell someone who's under arrest that they are under

10   arrest?

11             A.    Again, that -- that situation can change

12   from a -- you know, a temporary detention, and then it

13   can, you know, turn itself or upgrade to an arrest, yes.

14             Q.    And that's what I'm asking.

15                   Just your general practice though, you

16   would inform somebody that they're under arrest, if they

17   were?

18             A.    Yes.

19             Q.    Do you generally tell people what crime

20   they're arrested for, if they're arrested?

21             A.    That is also situational, depending upon

22   what is going on external factor wise when it comes to a

23   multitude of things.  It could be, you know, safety not

24   only for us but for the -- you know, the person we have

25   detained or -- or under arrest.  So at that specific

Bethany Guerriero
April 25, 2024                                    38

```
 1    moment in time, it may not always be feasible to let them

 2    know what they're under arrest for, but will come about

 3    during the investigation or -- or detention, arrest,

 4    however you want to say that, see it.

 5           Q.    Are you aware that the Palm Beach Gardens

 6    has policies regarding response to resistance?

 7           A.    Yes.

 8           Q.    Do the policies direct officers to use

 9    deescalation when appropriate?

10           A.    When appropriate, yes.

11           Q.    And what's your understanding of how that

12    works?

13           A.    Again, it could be situational.  You know,

14    escalation/deescalation can change throughout the course

15    of a call or an investigation.  And we have to respond

16    accordingly to those changes, if there are any.

17           Q.    So if an officer is presented with some

18    resistance and an officer can equally either deescalate

19    or use force, what does Palm Beach Gardens' policy direct

20    the officer to do?

21           A.    Whatever is feasible and safe in -- in that

22    moment, again, because it -- it can change.

23           Q.    So is it your understanding that Palm Beach

24    Gardens' policy leaves it completely up to the officer

25    whether to use force in response to resistance or
```

Bethany Guerriero
April 25, 2024                                    39

```
 1   deescalate, and that's the officer's decision?

 2           A.    Well, are you asking me about decision or

 3   discretion?

 4           Q.    Well, I'm asking about preference.

 5                 So again, if force or deescalation or

 6   equally available --

 7           A.    Uh-huh.

 8           Q.    -- does Palm Beach Gardens' policy and

 9   training encourage an officer to do one over the other?

10                 MR. MORSE:  Object as to form.

11                 THE WITNESS:  Can I answer or. . .

12                 MR. MORSE:  Yeah, always answer with that.

13                 THE WITNESS:  Okay.

14                 MR. MORSE:  That's fine.

15           A.    Again, it's -- it's that that can change

16   from situation to situation.  I mean, you -- you have to

17   do what's best not only for your safety but for the

18   safety of other officers, for the safety of the general

19   public and initially, that person you have in custody.

20   BY MR. RICE:

21           Q.    So I just want to make sure I understand

22   you correctly.

23           A.    Uh-huh.

24           Q.    There's really no preference between

25   deescalation and use of force, based on your
```

Bethany Guerriero
April 25, 2024                                              40

1    understanding?

2            A.     I mean, of course, deescalation would be a

3    preferred method.  Is it always going to work?  No.

4            Q.     Now, I want to start talking about the

5    incident with Mr. Gould.

6            A.     Uh-huh.

7            Q.     Before you arrived on scene at the parking

8    lot, were you aware of any information about the

9    incident?

10           A.     Very -- it -- it was brief.  We were

11   notified that there was some type of disturbance at the

12   neighborhood -- one of the neighborhood pools involving a

13   firearm.

14           Q.     Were you listening to the radio at the

15   time, the police radio?

16           A.     Yes.

17           Q.     Were you hearing calls come in from

18   dispatch about the incident?

19           A.     Yes.

20           Q.     What information did you get from the

21   police radio about the incident?

22           A.     It was difficult, at best, to get initial

23   information because there were different dispatchers

24   coming on to the radio giving information, and there were

25   three different people calling 911 that day, so the

Bethany Guerriero
April 25, 2024                                          41

```
 1   initial dissemination of information was not clear.

 2          Q.    Did you get information from any other

 3   source, besides the police radio, before you arrived on

 4   scene?

 5          A.    One of our K-9 officers, Valerio, had

 6   arrived shortly prior to mine and Officer Strzelecki's

 7   arrival.  And the only thing that he had said that I

 8   remember hearing over the radio just prior to pulling in

 9   was that he was 10-12 with -- which means, in our code,

10   he was with somebody on the other side of the pool.  And

11   that was -- that was it.  That was the initial

12   information that he had provided.

13          Q.    Did Officer Valerio communicate any

14   potential safety threats at that time?

15          A.    He did not.  He did not indicate which

16   party he was with nor that a firearm was secured at that

17   time.

18          Q.    As an officer, would you generally air

19   potential safety threats to other officers, if feasible?

20          A.    I would, yes.

21          Q.    How was Officer Valerio's tone at the time?

22   Was it calm, agitated?

23          A.    I mean, he -- he did not seem elevated, but

24   that doesn't always mean anything because we have

25   officers that -- I mean, a horrific incident could be
```

Bethany Guerriero
April 25, 2024                                      42

```
 1  going on, and they sound like a commercial airline pilot

 2  with their demeanor and how calm they are, so. . .

 3          Q.    But you would agree that he could be calm

 4  because the situation's calm, correct?

 5          A.    Could be, but, again --

 6                MR. MORSE:  Object as to form.

 7          A.    -- I'm not going to speculate.

 8  BY MR. RICE:

 9          Q.    Were you aware that a person with a

10  multicolored swimsuit was involved in the incident?

11          A.    Yes.

12          Q.    And so, I want to walk through the incident

13  moment by moment.

14                So I just want to be clear, right now, I'm

15  asking about:  Before you arrive, you're aware that there

16  was someone with a multicolored swimsuit?

17          A.    There was, yes.  And right before pulling

18  into the development, I remember looking at my computer

19  screen where information is updated via dispatch as they

20  receive it.  And one of the last things I remember

21  looking in those, we call them, CAD notes was "multicolor

22  colored bathing suit, gun in groin area."

23          Q.    Do you know if that CAD information is

24  saved?

25          A.    It should be.
```

Bethany Guerriero
April 25, 2024                                    43

```
 1              MR. MORSE:  Object as to form.

 2              MR. RICE:  So I'm going to introduce

 3         Exhibit 7, which is an event report.

 4              And I'll note for the record that I'm going

 5         to use the same numbering as the deposition

 6         yesterday with Officer Strzelecki.

 7              For the record, Exhibit 1 is the radio

 8         recording regarding this incident; Exhibit 2 is a

 9         surveillance parking lot video; Exhibit 3 is

10         Strzelecki's body-worn camera of the incident;

11         Exhibit 4 is Officer Guerriero's body-worn camera;

12         Exhibit 5 is Officer Strzelecki's report regarding

13         this incident; Exhibit 6 is Officer Strzelecki's

14         interview during the IA process.  And so, this

15         will be Exhibit 7, an event report related to this

16         incident.

17              (Plaintiff Exhibit 1 was marked.)

18              (Plaintiff Exhibit 2 was marked.)

19              (Plaintiff Exhibit 3 was marked.)

20              (Plaintiff Exhibit 4 was marked.)

21              (Plaintiff Exhibit 5 was marked.)

22              (Plaintiff Exhibit 6 was marked.)

23              (Plaintiff Exhibit 7 was marked.)

24    BY MR. RICE:

25         Q.   So I'm go going to turn my computer
```

Bethany Guerriero
April 25, 2024                                            44

```
1   around -- actually, I think I have a paper copy.

2              (Counsel confer sotto voce.)

3   BY MR. RICE:

4        Q.    So I'm handing you a six-page document

5   called "Event Report."  And I want to turn your attention

6   to the back page.

7              Is this the CAD information that you were

8   referring to?

9        A.    I believe so, yes.

10       Q.    And when I show you exhibits or ask you

11  about things, if you need a moment, please read them

12  through and make sure you have an understanding, and feel

13  free to refer to it as I ask questions; is that fair?

14       A.    Yes.

15       Q.    So if you need a moment to just take it in

16  and read it, let me know.

17       A.    Okay.

18       Q.    But does this appear to be the information

19  that would've been displayed on your computer before

20  arriving to the incident?

21       A.    Yes.

22       Q.    Do you have any reason to believe that is

23  not that information?

24       A.    No.

25       Q.    Can you point to me on this document or
```

Bethany Guerriero
April 25, 2024                                    45

1   maybe read for the record the notations that you reviewed

2   before getting out of your car?

3          A.    It literally was this last paragraph where

4   it says, "has the weapon in a holster and groin area."

5   And then the -- the few notes underneath that, "white

6   male, brown hair, multicolored suit."  Again, the -- the

7   notes are not super clear, reading them even now.

8          Q.    Did you review the notes in between those

9   notations?

10          A.    Briefly, but, again, you know, I'm -- I'm

11   pulling into a -- a development so, 1, I'm trying to

12   drive; 2, my computer is dinging at me letting me know

13   there is notes being updated; and 3, I'm trying to pay

14   attention to my environment as I'm -- I'm pulling in.

15          Q.    So is it fair to say you didn't completely

16   read these notes before you went to the in- -- like,

17   before you got out of your car?

18          A.    Well, and -- and that's -- I think I had

19   said that, and I'll clarify that, that I remember seeing,

20   you know, certain things involving a -- a weapon and a

21   multicolored bathing suit and a bunch of stuff in

22   between, so. . .

23          Q.    Was the information in this document

24   available to you, before you got out of your car?

25          A.    It was; however, I am pulling up to a scene

Bethany Guerriero
April 25, 2024                                                          46

1  where there is a gun involved, so I'm not going to sit in

2  my car continuing to read if there is a potential threat.

3          Q.    And that's what I was going to ask, is:

4  You made the decision, instead of to read the notes or

5  get more information from this source, to get out of your

6  car and engage with the person in the parking lot?

7          A.    Well, correct, because that person was now

8  walking towards us, so I -- I don't take anything for

9  granted.

10         Q.    And the information you had available at

11 that moment was that someone had a weapon and a holster

12 in a groin area, correct?

13         A.    That's correct, uh-huh.

14         Q.    And someone was wearing a multicolored

15 swimsuit, correct?

16         A.    Correct.

17         Q.    Any other information regarding the

18 incident before you got out of your car?

19         A.    Just I remember hearing Officer Valerio or

20 the officer who had just gotten there prior to me saying

21 that he was 10-12 on the other side of the pool, just for

22 my information.

23         Q.    So you knew Officer Valerio was generally

24 in the area, correct?

25         A.    Generally in the area.

Bethany Guerriero
April 25, 2024                                    47

```
 1          Q.    Did you see his vehicle, when you pulled

 2    up?

 3          A.    I did see his vehicle, yes.

 4          Q.    Did you see Officer Valerio, when you

 5    pulled up?

 6          A.    Not readily, no, which is why I think maybe

 7    he was trying to put out his location.  I -- I don't

 8    know; I can't answer for him.

 9                (Recess taken, 8:58 a.m. to 9:03 a.m.)

10                MR. RICE:  All right.  We're back on.

11    BY MR. RICE:

12          Q.    Did anything happen during the break that

13    affects your ability to continue this deposition?

14          A.    No, sir.

15          Q.    And I only ask because you never know the

16    one time something does.

17                MR. MORSE:  If you don't ask, you don't

18          know.

19                MR. RICE:  Exactly.

20          A.    No.  I appreciate you asking, though.

21    BY MR. RICE:

22          Q.    All right.  So we were talking about the

23    beginning of the incident.

24                Were you aware of any description of the

25    person who actually had the gun?
```

Bethany Guerriero
April 25, 2024                                                48

1          A.    I do not remember hearing that at all.

2          Q.    And as you sit here today, how is your

3    memory of that incident?

4          A.    I mean, pretty good I would say; however,

5    we are coming up on a -- on a year now, so I mean, I'm

6    only human, and I'm probably not going to have everything

7    100 percent correct, but I'm going to do my best to

8    recall for you.

9          Q.    Sounds good.

10               Now, when you first arrived on the scene,

11   what is going through your mind?

12         A.    As someone that's been there a long time, a

13   lot is unfolding.  You know, primarily, as far as I'm

14   concerned and from my standpoint and how I'm feeling and

15   dealing with things at that moment, I still have at least

16   one firearm outstanding because I never heard that a

17   firearm was secured, and I don't really know at this

18   point who is still armed.  I -- I don't know, you know.

19               So first and foremost, I tried to take an

20   abundance of caution in -- not only for myself but for a

21   newer officer and for the community; it's broad daylight.

22   We don't know who's out and about.

23         Q.    And so, your primary concern, again, I want

24   to make sure I get it correct, is locating that unknown

25   firearm?

Bethany Guerriero
April 25, 2024                                    49

```
 1            A.    Correct.
 2            Q.    Do you know if any other officers had
 3    information about where the firearm was?
 4            A.    No.
 5            Q.    Do you know whether dispatch had
 6    information about who had the firearm?
 7            A.    No.  At -- at -- at that moment, like I
 8    said, I'm -- I did not know.
 9            Q.    And you knew that Officer Valerio had
10    previously responded, correct?
11            A.    Right, yeah.  He was maybe a minute ahead
12    of me or so.
13            Q.    Could you have radioed to Officer Valerio
14    or dispatched to ask them if they had information on
15    where the firearm was?
16            A.    I mean, again, anything is possible.  You
17    know, maybe.  But at that point, if, to me, there's a --
18    there was a lot of -- you know, a lot of radio traffic
19    going on, there were different dispatchers.  And
20    sometimes in our profession, I'm not saying it's always
21    right, but less is more, and one less person on the radio
22    at that moment is what I -- what I was thinking, in case,
23    God forbid, something else unfolded.
24            Q.    So the situation wasn't so urgent to need
25    you to use the radio; is that fair?
```

Bethany Guerriero
April 25, 2024                                      50

```
 1              A.    I'm not saying that it wasn't urgent at

 2      all.  I'm just saying that sometimes in calls that

 3      pres- -- present urgency or a real threat such as a

 4      firearm or another type of potential weapon being

 5      involved, especially a gun, I don't want to clog the air,

 6      especially when I'm -- there -- there's a lot of things

 7      going on at one time, so I'm listening and absorbing

 8      Officer Valerio's last bit of radio traffic, I'm pulling

 9      into the parking lot, I am trying to be aware of my

10      surroundings.  I have my computer going off, I have the

11      police radio going off.  So I have a multitude of factors

12      I am trying to now, in a matter of seconds, you know,

13      compartmentalize.

14              Q.    Well, you had a couple different options

15      available to you though at the beginning of the incident,

16      correct?  And I'll explain them:  You could have further

17      reviewed the computer notes, correct?

18              A.    I mean, it -- it -- it's an option, but at

19      that moment. . .

20              Q.    Well, that's what I'm asking:  The option

21      was available, correct?  There was nothing stopping you

22      from sitting in your car and reviewing the computer notes

23      first before getting out, right?

24              A.    No, but for me, that wasn't a safe thing to

25      do.
```

Bethany Guerriero
April 25, 2024                                    51

1           Q.    And that's what I was going to ask

2    eventually is, why you decided the course you chose.

3                 But the computer was an option.

4                 You could have radioed to ask if Valerio or

5    dispatch had information about where the gun was,

6    correct?

7           A.    A possibility.

8           Q.    And otherwise, you can just get out of your

9    car and go engage with the person in the parking lot,

10   right?

11          A.    Correct.

12          Q.    And why did you choose to get out of your

13   car and engage with the person in the parking lot rather

14   than review the computer notes or radio about the

15   location of the gun?

16          A.    Because, to me, there was still a safety --

17   a severe safety concern there.  There is -- there is a

18   gun somewhere.  And when I see someone walking towards my

19   vehicle or towards my general direction and I don't know

20   who that person is, I need to get out of my vehicle so

21   that I could try to see or start determining what's going

22   on.  I'm not just going to let a person walk up on me

23   that I don't know.

24          Q.    Well, and you can refer to the computer

25   notes here, but had you looked at them, you can see that

1    the caller has the gun in the holster with his wife, and

2    he was referring to the man in the swimsuit as somebody

3    else, right?

4            A.    But it wasn't clear who exactly the caller

5    was because we had three individuals calling 911 at the

6    same time.

7            Q.    Now, what I'm saying is, on the report in

8    front of you, though --

9            A.    Okay.

10           Q.    -- if you had read it, you would see the

11   caller was with his wife and had his gun in a holster,

12   and he was reporting a man in a multicolored bathing suit

13   harassing his wife.

14           A.    Okay.

15           Q.    I mean, you can look at the document in

16   front of you.

17           A.    No, I -- and I understand what you're

18   saying; I'm looking at the document.

19                 However, when you look at this -- this

20   presentation of -- of notes, I would kind of have to

21   really put all my focus into reading this jumbled

22   presentation of notes and now take my eyes off of the

23   person that's walking to my left.

24           Q.    Well, if I were to say that the document in

25   front of you has information about who has the gun, would

Bethany Guerriero
April 25, 2024                                            53

1    you disagree with that?

2           A.    No.

3           Q.    And you would agree that this information

4    was available to you in your computer at the start of the

5    incident, correct?

6           A.    It -- it was there.

7           Q.    So I'm going to say it again:  You didn't

8    choose this option, and I understand your reason for

9    doing it.

10          A.    Uh-huh.

11          Q.    But had you looked in your computer, you

12   could've gotten information about where the gun was,

13   right?

14          A.    Well, we're looking at this from hindsight.

15   I'm looking at this realtime as it's unfolding.

16          Q.    Noted.

17                And looking at it from hindsight today --

18          A.    Uh-huh.

19          Q.    -- understanding that's not often how

20   officers operate --

21          A.    Uh-huh -

22          Q.    -- that's not how officer evaluate use of

23   force, but --

24          A.    Uh-huh.

25          Q.    -- with hindsight, you would agree that

Bethany Guerriero
April 25, 2024                                    54

1  this information or this document has information about

2  who had the gun?

3        A.    No.  You can agree to anything that's

4  hindsight, but at the moment when I'm going through that,

5  I -- I wouldn't say that that was a hundred percent fair

6  to say.

7        Q.    When you get out of your car, what efforts

8  do you do, if any, to understand where the gun is?

9        A.    I can see an individual approaching me with

10  a multicolored bathing suit who later on I understand to

11  be Mr. Gould.

12        Q.    Uh-huh.

13        A.    Again, that wasn't readily available to me

14  at that moment.  And I remember the -- the first thing I

15  had said to him was in an, I would say fairly, calm and

16  professional manner, hey man, do me a favor and keep

17  your -- your hand out of your pocket, away from your

18  pocket because from my angle, I had already -- and, you

19  know, I'm looking over the front end of a -- of a Tahoe;

20  I'm only 5'5", and that's a huge vehicle.  I had seen

21  both hands disappear from my sight.

22        Q.    So as you pulled up, did you see anything

23  in Mr. Gould's hand?

24        A.    I wasn't looking directly at his hands,

25  again, because like I said, I'm -- I'm pulling into a

Bethany Guerriero
April 25, 2024                                    55

```
 1   development, I'm driving, I'm trying to, like, make sense

 2   of whatever little notes are -- are popping up here

 3   because the computer's dinging, and I just remember

 4   seeing a person, a -- a male out of my peripheral vision

 5   as I'm -- I'm pulling around to park.

 6           Q.    So would it be fair to say that you didn't

 7   observe Mr. Gould's hands as you were pulling up?

 8           A.    That's fair to say, yeah.

 9           Q.    Okay.  How tall did Mr. Gould appear to be?

10           A.    I -- I don't know.  I just want to say

11   average height for a male.

12           Q.    Would 5'2" be a reasonable statement of his

13   height?

14           A.    No.  He seemed a -- a little bit taller

15   than that, but. . .

16           Q.    Would 6 feet seem a reasonable statement of

17   his height?

18           A.    I -- I would say.

19           Q.    And Mr. Gould is wearing a multicolored

20   swimsuit, correct?

21           A.    Board shorts or -- yeah.

22           Q.    And he did not have a shirt on, right?

23           A.    Correct.

24           Q.    And he didn't have a backpack or anything

25   on him, correct?
```

Bethany Guerriero
April 25, 2024                                          56

```
 1              A.    Correct.

 2              Q.    Did you see a gun in a holster in his groin

 3    area?

 4              A.    I couldn't initially really see anything

 5    because, you know, if -- if a groin is in a holster --

 6    if -- if a holster is in a groin area -- I mean, firearms

 7    are all shapes and sizes, so are holsters, so I can't say

 8    with 100 percent certainty that I knew a gun was there or

 9    not.

10              Q.    I didn't ask if you knew a gun was there.

11              But did you see a gun in a holster in his

12    groin area?

13              A.    No.

14              Q.    And so, again, I want to make sure I get

15    your words correctly, you started out the encounter with,

16    hey, can I talk to you for a minute, would you do me a

17    favor and keep your hands out of your pocket; is that

18    fair?

19              A.    Uh-huh.

20              Q.    Yes?

21              A.    Yes, sorry.

22              Q.    Do you think it would be reasonable that

23    Mr. Gould understood that as a request and not a command

24    to keep his hands out of his pockets?

25                   MR. MORSE:  Object as form.
```

Bethany Guerriero
April 25, 2024                                    57

```
 1            A.    Request, command, I'm -- I'm telling you
 2    to -- to do something.
 3    BY MR. RICE:
 4            Q.    Well, you rephrased it as more asking him
 5    to do it, correct?
 6            A.    Okay.  Yeah, can --
 7            Q.    Fair.
 8            A.    Can -- sure.  Can you keep your hands out
 9    of your pockets for me?
10            Q.    And is that how you understood it, that you
11    were starting as a kind of more friendly ask to keep his
12    hands out of his pocket?
13            A.    Correct, yeah.
14            Q.    Because later in the incident, you did give
15    more assertive commands, correct?
16            A.    Yes.
17            Q.    Would you agree that at the very incident,
18    that first statement was not one of those assertive
19    commands?
20            A.    Maybe not assertive or a- -- aggressive,
21    but it was -- I did ask him to do something.
22            Q.    You did.
23                  And again, I want to be clear your
24    understanding was that you were commanding him to keep
25    his hands out of his pocket; is that fair?
```

1           A.    Command/asking, yeah, I -- I asked him not

2    to do something.

3           Q.    And Mr. Gould said that he was confused and

4    thought you were merely requesting, as a favor, to keep

5    his hands out of his pockets, but he had no legal duty to

6    do so at that moment.

7                 Would you dispute that that was a

8    reasonable belief?

9                 MR. MORSE:  Object as to --

10                MR. ALEXANDER:  Object to form.

11          A.    I'm sorry.  That --

12   BY MR. RICE:

13          Q.    Sure --

14          A.    -- threw me off.  Can -- can you --

15          Q.    -- everybody jumps in.

16                So objection is preserved.  I'll try to

17   rephrase or restate the best I can.

18          A.    Okay.

19          Q.    If Mr. Gould were to say, I heard

20   Officer Guerriero say that and I understood it as just a

21   request to keep my hands out of my pockets, she was

22   asking nicely, but it wasn't a legal command for me to do

23   so, would you say that that's reasonable or not

24   reasonable?

25          A.    I mean, it could be perceived as -- as

Bethany Guerriero
April 25, 2024                                    59

1    reasonable.

2           Q.    Okay.  And that's what I'm asking, is

3    like --

4           A.    Yeah.

5           Q.    -- if you could say, here's why this is --

6           A.    Uh-huh.

7           Q.    -- outrageous, or here's why, yes, I agree,

8    I just want to get your understanding, to be clear.

9           A.    Uh-huh.

10          Q.    And so, take me through from that first

11   moment, let's say, through to the point that Mr. Gould

12   gets on the ground.

13                Can you just walk me through that, please?

14          A.    Sure.  I'll -- I'll do the best that I can.

15                So I remember after initially coming into

16   contact with him and asking him to keep his hands away

17   from his pockets, out of his pockets, I was met with, "I

18   am not the one with" -- "with the gun," and he said it

19   with an -- an air of agitation to it, which, initially,

20   for me, now it -- it flipped that switch --

21          Q.    Uh-huh.

22          A.    -- because there was -- to me, at that

23   moment, was not presenting like a victim.  You know, over

24   the course of 20 years, if I've asked people, or

25   especially on a scene where a gun is involved, I had not

Bethany Guerriero
April 25, 2024                                    60

1    been met with that type of answer or retort, which,

2    again, heightened now my senses even more.

3           Q.    Sure.  We can stop there because again, I

4    kind of want to go piece by piece.

5           A.    Sure.

6           Q.    So his response, the best you can recall

7    is, I don't have a gun, right?

8           A.    "I'm" -- "I'm not the one with" --

9    "with" -- "with a gun," or yeah, however he --

10          Q.    I was going to say, if I misstate something

11   or whatever, please correct me.  I want to understand --

12          A.    Sure.

13          Q.    -- what you recall.

14          A.    Uh-huh.

15          Q.    Can you articulate why that didn't -- that

16   wasn't consistent with how you would expect a victim to

17   respond?

18          A.    Because it came off as a -- like, a --

19   like -- like -- like a bit aggressive in the -- in the

20   realm that he wasn't really down for listening to what I

21   was telling him.  And after he came with that, I saw the

22   hands drop again.  And at that point, I remember telling

23   him more forcefully now to, "keep your hands out of your

24   pockets," and comes up with a -- what I later was able to

25   realize a phone, but. . .

Bethany Guerriero
April 25, 2024                                      61

```
 1           Q.    So let's walk through a couple of those

 2    pieces.

 3           A.    Okay.

 4           Q.    First, I want to go back to when he puts

 5    his hand in his pocket, right.

 6                 At that point, you say something to the

 7    effect of, "Keep your hands out of your pockets," right?

 8           A.    Uh-huh.

 9           Q.    Is that fair?

10           A.    That's fair.

11           Q.    Would you characterize that as an assertive

12    command?

13           A.    Yes.

14           Q.    And if Mr. Gould were to say that he was

15    confused whether that was a command or a polite request,

16    do you think that would be reasonable?

17                 MR. MORSE:  Object as to form.

18           A.    I don't think so.  We are -- we are on a --

19    on a gun call, and I am telling you to keep your hands

20    out of your pockets, and I felt at that point I was being

21    challenged.  And to me, that equates a severe safety

22    risk.

23    BY MR. RICE:

24           Q.    And that's what I want to get at is, again,

25    is based on your understanding --
```

1          A.    Yeah.

2          Q.    -- is that second command, based on your

3    tone and phrasing, it was not confusing whether it was a

4    mere request or a command; is that fair?

5          A.    I would say that's fair, yeah.

6          Q.    Okay.  Do you have any training regarding

7    how trauma can affect people?

8          A.    I'm not a doctor; I'm not a psychiatrist by

9    any means.  I mean, do I have experience, as I had stated

10   before, with crisis intervention, hostage negotiation, I

11   do.  You know, we are trained to pick up on verbal, as

12   well as nonverbal queues; you know, some behaviors, if

13   you will.  And for me, he -- like, I understand there

14   could be a multitude of responses from somebody.

15         Q.    Uh-huh.

16         A.    That day, it just was not the typical

17   response that I had encountered in the past of a victim.

18         Q.    But you would agree that trauma can affect

19   various people very differently?

20         A.    Of course.  I'm -- I'm not -- I'm not

21   disputing that at all.  That's why I said, although I've

22   got all of this training, I'm still not a doctor of

23   what's going through someone's head in a split second.

24         Q.    And trauma can often make someone

25   emotionally heightened; is that fair?

Bethany Guerriero
April 25, 2024                                     63

```
 1              MR. MORSE:  Object as to form.
 2       A.    Ye- --
 3              THE WITNESS:  I can answer yes?
 4              MR. MORSE:  Yeah, yeah, yeah.
 5              THE WITNESS:  Okay.
 6              MR. MORSE:  Just to explain, just so we
 7       don't keep --
 8              THE WITNESS:  Yeah, I mean --
 9              MR. MORSE:  Yeah, "Object as to form" is to
10       reference the record for us.  Like, if there was a
11       question about, hey, what did Mr. Morse or
12       Mr. King talk with you about last night, that I
13       would object to, and you wouldn't answer that.
14              THE WITNESS:  Okay.  But --
15              MR. MORSE:  But the "Object as to form" is
16       for more for the lawyers later down the road.  So
17       you can always answer those questions.
18              THE WITNESS:  All right.  I just want to
19       make sure.
20              MR. MORSE:  I know when you hear
21       "objections," they go, I can't, but no, they're
22       very different in these types of depositions, so
23       answer always unless we tell you not to answer.
24              MR. RICE:  And it's good to clarify because
25       you'll be hearing that a lot as we go forward.
```

Bethany Guerriero
April 25, 2024                                    64

```
 1                THE WITNESS:  Yeah.  I just want to make
 2           sure I'm doing things the right way here today.
 3                MR. RICE:  "Object to form" means don't
 4           talk over your attorney, but carry on afterward.
 5           I would expect your attorneys will jump in with a
 6           "do not to respond" --
 7                MR. MORSE:  Sure, sure.
 8                MR. RICE:  -- "proceed" if you shouldn't.
 9           So like I said, just give a beat to allow your
10           attorneys to object, and then we can carry on.
11                THE WITNESS:  Okay.
12   BY MR. RICE:
13           Q.   So I believe my question, and objection
14   preserved, is:  Do you understand that trauma can make
15   somebody emotionally heightened; make their emotions more
16   severe?
17           A.   Sure, I do understand that.
18           Q.   Can trauma make somebody more irritable?
19                MR. MORSE:  Object as to form.
20           A.   It -- it could.
21   BY MR. RICE:
22           Q.   Okay.  And I understand -- again, I want to
23   make sure I got your stuff here.
24           A.   Uh-huh.
25           Q.   You were concerned that Mr. Gould's
```

Bethany Guerriero
April 25, 2024                                           65

1   response evinced some aggressive edge, fair?

2          A.    That's fair.

3          Q.    Was it inconsistent with suffering some

4   trauma?

5          A.    I -- again, I --

6                MR. MORSE:  Object as to form.

7          A.    I can't answer that because I'm in my own

8   situation realtime; he's in his situation realtime.  So

9   for me to try to answer for him what he was feeling or

10  going through at that moment would be unfair and

11  incorrect for me to say.

12  BY MR. RICE:

13         Q.    And I guess, what I want to get at though

14  is:  At that time you had very little information

15  available?

16         A.    That's correct, yes.

17         Q.    And based on that short response by

18  Mr. Gould, is it a fair possibility that it could be

19  aggression or it could be trauma, but you didn't have the

20  information at the moment to determine?

21         A.    That's fair, and that's correct, yes.

22  Thank you.

23         Q.    That's all I want to get at, is there's

24  always possibilities.

25         A.    Okay.

Bethany Guerriero
April 25, 2024                                          66

```
 1            Q.    I'm just going through my notes.  Give me a
 2   moment.
 3            A.    No, no worries.  Take your time.
 4            Q.    Now I want to go back to that second
 5   command from you, the "Keep your hands out of your
 6   pockets."
 7                  After you gave that command, did you
 8   observe Mr. Gould's hands go back into his pockets at any
 9   time?
10            A.    I observed them drop again, which could
11   indicate that he's going back towards his pockets again.
12   Again, because of -- of -- of where I am in relation to
13   him, instead of keeping hands up or visible or whatever,
14   they -- for whatever reason, they -- they dropped again,
15   and I -- I'm not taking that chance, I'm sorry.
16            Q.    At that point, though, after the command,
17   "Keep your hands out of your pockets," did you have a
18   full view of Mr. Gould?
19            A.    I believe -- I believe so.
20            Q.    You don't recall anything obstructing you
21   at that point, correct?
22            A.    Not at that point, no.
23            Q.    And I'll tell you what because I don't want
24   to just go off your memory.
25            A.    Uh-huh.
```

Bethany Guerriero
April 25, 2024                               67

```
 1              Q.    Would it be helpful to review that portion
 2    of your body-worn camera video --
 3              A.    Sure.
 4              Q.    -- to refresh your memory?
 5              A.    Sure.
 6                    MR. MORSE:  Can you broadcast it up here?
 7                    MR. RICE:  I cannot.  I'll swing it around.
 8                    So we're going to go to Exhibit 4, and I'm
 9              going to start from the beginning.  And if you
10              have --
11                    MR. ALEXANDER:  And while we're doing that,
12              quickly, can we go off the record one minute very
13              briefly.
14                    MR. RICE:  Sure.  Let's go off the record.
15                    (Recess taken at 9:24 a.m. to 9:29 a.m.)
16    BY MR. RICE:
17              Q.    Why don't we go back on the record because
18    I want to play for you a portion of your body-worn
19    camera.
20              A.    Okay.
21              Q.    And so, I'm going to start it at the
22    beginning and play through a portion of the incident.  If
23    you need to refer to it or anything played back or have
24    any other issues, let me know, okay?
25              A.    Okay.
```

Bethany Guerriero
April 25, 2024                                                68

```
 1              Q.    Can you see it okay with the glare?

 2              A.    Yes, I can.

 3                    (Video playing.)

 4                    THE WITNESS:  Yeah, that first 30 seconds

 5         is always muted on our BWCs.

 6                    UNIDENTIFIED SPEAKER:  33, I'm making

 7         contact on the other side of the pool, just

 8         letting you know.

 9                    (Video playing.)

10                    MR. RICE:  I pause at 45 seconds.

11                    THE COURT REPORTER:  Did you want me to

12         transcribe the video?

13                    MR. RICE:  No, you don't need to transcribe

14         the video.

15                    THE COURT REPORTER:  Thank you.

16                    MR. RICE:  Resuming at 45 seconds.

17                    (Video playing.)

18                    MR. RICE:  All right.  You can stop it

19         there.

20    BY MR. RICE:

21              Q.    All right.  So I'll stop at 1:11.

22              A.    Okay.

23              Q.    Does that help refresh your recollection?

24                    MS. JOHNSON:  I'm back guys, if --

25              A.    Yes.
```

Bethany Guerriero
April 25, 2024                                          69

```
 1              MS. JOHNSON:  Unless you already started.

 2              MR. RICE:  No.  And I'll just say for the

 3         record, I was playing Beth, her body-worn camera

 4         from the beginning to 1:11 on the recording, just

 5         so she could view it and refresh her memory.  But

 6         that's all I've --

 7              MS. JOHNSON:  Okay.

 8              MR. RICE:  -- gone over.

 9              MS. JOHNSON:  Okay.

10              MR. RICE:  And do you want to identify

11         yourself for the record, please?

12              MS. JOHNSON:  Yes, Melissa Johnson.  And I

13         am here in place of Scott Alexander, who was

14         originally appearing at the deposition.

15              MR. RICE:  Thank you.

16              And I'll also just state for the record

17         that unless anybody objects, I don't need the

18         statements transcribed on any of the recordings or

19         exhibit because those are available in the

20         exhibits.

21              MR. MORSE:  No objection.

22              MS. JOHNSON:  Yeah, no objection.

23    BY MR. RICE:

24         Q.   So after review of that video, would you

25    agree that after that second time you said, "Keep your
```

Bethany Guerriero
April 25, 2024                                      70

1   hands out of your pockets," the time that you said it

2   forcefully, Mr. Gould never reached his hand into his

3   pocket?

4            A.    That's not -- I don't think that's

5   necessarily accurate from -- I -- I understand things are

6   -- are moving quickly there, but, you know, like you

7   said, we're trying to break things down, you know, piece

8   by piece.  So when I have a lot of -- of -- of this and

9   then --

10           Q.    I'll just say, you can't gesture and say

11  that --

12           A.    Okay.

13           Q.    If you can describe it for the record,

14  please.

15           A.    Okay.  There -- there was -- there was

16  clear agi- -- agitation with him at this point.  So hands

17  coming up, phone was in the right hand, I believe, hands

18  come back down again, now although, the -- the right hand

19  is -- is occupied, the left arm and hand comes back down

20  to the left side of the -- of -- of the pocket.  And if

21  you look at the video again, as I'm walking forward, he

22  actually blades and takes a -- a step back and -- and

23  blades his body.  And there was an object, I wasn't quite

24  sure what it was, towel, bed, clothing or whatever, just

25  behind him.  So when he took that slight bladed stance

Bethany Guerriero
April 25, 2024                                    71

1    back in the area of where this article was that was

2    unknown to me at the time but observable, he also started

3    to move backwards.  And I'm -- I just wasn't sure; was he

4    going for that, was he -- I'm not going to say or give

5    any more commands past of what I did about keeping your

6    hands away or out of your pockets, or -- you know, now

7    we're re- -- retreating backwards.

8              Q.    I appreciate that.  I want to stick to the

9    question that I asked --

10             A.    Okay.

11             Q.    -- which is:  Did you observe Mr. Gould put

12   his hand in his pocket, after that forceful command?

13             A.    Yeah, I wasn't going to give him another

14   opportunity to possibly do that.

15             Q.    I didn't ask if you were going to give him

16   an opportunity.

17             A.    Uh-huh.

18             Q.    I asked:  Did you observe Mr. Gould put his

19   hand in his pocket after you gave the forceful command?

20             A.    It wasn't in his pocket, but, again, the --

21   the hands dropped.  So I don't know where those hands are

22   -- are going at that point.

23             Q.    So is it fair to say that you did not

24   observe Mr. Gould put his hand in his pocket after you

25   gave the forceful command?

Bethany Guerriero
April 25, 2024                                          72

```
 1              A.    His hands, they dropped.
 2              Q.    Okay.  Would it be fair though, if
 3     some were to say -- if I were to say you did not observe
 4     Mr. Gould put his hand in his pocket after you gave the
 5     forceful command, is that an accurate statement?
 6              A.    It's an accurate statement.  I just didn't
 7     know where they were going to go, so. . .
 8              Q.    And so, you had other concerns besides his
 9     hand being in his pocket at that moment; is that fair?
10              A.    Yes.
11              Q.    One of those concerns was that Mr. Gould
12     dropped his hands, correct?
13              A.    Uh-huh.
14              Q.    Yes?
15              A.    Yes.  Sorry.  So sorry.
16              Q.    It gets everybody.
17                    And by Mr. Gould dropping his hands, what
18     is the concern there?
19              A.    I don't know if he's going to put his hands
20     back in or around his -- his pockets.  I don't know
21     what's in that left pocket.  I have no idea.
22              Q.    And so, the concern -- again, correct me if
23     I'm wrong, but is that, by dropping his hands, he could
24     reach for a weapon concealed on his person?
25              A.    He could, yes.
```

Bethany Guerriero
April 25, 2024                                              73

```
 1            Q.    Any other concerns, or is that the main
 2    one?
 3            A.    That was the main one.
 4            Q.    And at that the moment, you're outside of
 5    reaching distance to Mr. Gould, correct?
 6            A.    What do you mean, "reaching distance" --
 7            Q.    You --
 8            A.    -- for --
 9            Q.    Neither you or Mr. Gould could reach out
10    with your arms and touch each other, correct?
11            A.    Correct.
12            Q.    So a danger at that moment would be some
13    sort of long-range weapon, fair?
14            A.    Long-range weapon as far as what?
15            Q.    Longer than something in somebody's hand,
16    right?
17            A.    Well, I mean, a -- a weapon could -- could
18    be a weapon.  It could -- it could be a knife.  I -- it
19    -- that -- that phone could've been a gun, you know.
20    We're presented with all kinds of training throughout law
21    enforcement, even in the academy, of -- of numerous
22    things shown to us where, you know, phones are presented
23    as firearms.  I -- I don't know.
24            Q.    So is it your understanding that if someone
25    is holding a phone, you can treat them as armed?
```

Bethany Guerriero
April 25, 2024                                      74

1        A.    Until I can secure that person and figure

2   out further what's going on, I have to assume that

3   anything could be a weapon, especially on a gun call.

4        Q.    Now, you also mentioned that he blades his

5   body.

6              Can you describe what you mean by that,

7   please?

8        A.    So he dropped back with his -- with his

9   left foot sightly.  So when you take a bladed stance, to

10  me, that could present as being a defensive type

11  stance -- especially because the left foot bladed back

12  towards where that unknown object was that I -- I wasn't

13  sure at the point what that was, what could have been in

14  it, under it, on it, I don't know; I just know that

15  seeing that heightened my awareness at that point that he

16  was -- he was taking that stance towards something.

17  That's one of those behaviors that, for me, was equating

18  to possibly not something very good.

19       Q.    Did you observe any indication of a weapon

20  in that pile on the ground?

21       A.    Not from where I was standing, no.

22       Q.    Did you have any information that a weapon

23  was in a pile on the ground at that time?

24       A.    No, but it doesn't mean in the time I get

25  there from the time he was wherever he was that it

Bethany Guerriero
April 25, 2024                                        75

```
 1   couldn't have been placed there, dropped there.  Like, we
 2   could speculate all day --
 3           Q.    Well, I was going to say --
 4           A.    -- what could've.
 5           Q.    I'm sorry.  I didn't mean to talk over you.
 6           A.    No, it's okay.
 7           Q.    Would it be fair to say that it was
 8   speculation then that there could be a weapon under that
 9   pile?
10           A.    There could be, and -- yeah, it could --
11   there could've been, absolutely.
12           Q.    Did Mr. Gould appear scared by your
13   approach?
14           A.    No.  He, actually -- and this -- this is
15   what really kind of heightened my awareness even more was
16   that, he was very, like, defiant and -- and just seemed
17   extremely agitated and angry with the fact that we were
18   at where we were at.
19           Q.    Is agitation and anger consistent with
20   symptoms of trauma?
21               MR. MORSE:  Object as to form.
22           A.    It -- it could be, but, you know, at that
23   moment, I'm -- I'm trying to do a job, and I -- I wasn't
24   there at that moment to figure out if it was trauma or
25   not.  I have to keep everybody safe, including Mr. Gould.
```

```
 1    BY MR. RICE:

 2          Q.    A common command by officers is for someone

 3    to put their hands up, correct?

 4          A.    It can be, yeah.

 5          Q.    Okay.  I mean, is that a command that you

 6    have issued many times before?

 7          A.    I have.

 8          Q.    And the reason that commands someone to put

 9    their hands up is to keep their hands away from their

10    body to grab be something, correct?

11          A.    Correct.

12          Q.    And so the officer can clearly see their

13    hands, right?

14          A.    Uh-huh.

15          Q.    Yes?

16          A.    Yes.

17          Q.    Did you command Mr. Gould to put his hands

18    up?

19          A.    No.  I just remember saying to keep his

20    hands away or out of your pockets and. . .

21          Q.    So you commanded him to keep his hands out

22    of his pockets, but you did not command him to put his

23    hands up, fair?

24          A.    Fair.

25          Q.    Did you command Mr. Gould not to drop his
```

Bethany Guerriero
April 25, 2024                                        77

1    hands?

2          A.    No, but your pockets are on your pants, so

3    if I tell you, "Keep your hands out of your pockets," you

4    would assume, and sometimes we can't assume, but you're

5    going to have to drop your hands to keep them out of your

6    pockets, so. . .

7          Q.    But after that forceful command to keep his

8    hands out of his pockets, you would agree that Mr. Gould

9    did not disobey a command by merely dropping his hands,

10   fair?

11         A.    You're really splitting hairs on that one.

12   Um --

13         Q.    I am.  I'm going to split hairs.

14               And the level of detail I want to get to

15   is:  By Mr. Gould dropping his hands but not putting them

16   into his pockets, did that comply with your demand?

17         A.    No.

18         Q.    How so?

19         A.    Because I'm telling you to keep your hands

20   out of or away from your pockets, and you're dropping

21   your hands.  And I remember him saying, you know,

22   basically, like, he doesn't have to listen to me; he

23   didn't commit a crime.  So there was deflection when I'm

24   trying to give a command for everyone's safety.

25         Q.    Should Mr. Gould have known that by you

Bethany Guerriero
April 25, 2024                                      78

```
 1   telling him to keep his hands out of his pockets, that he

 2   was not to drop his hands?

 3              MR. MORSE:  Object as to form.

 4        A.    I would say, reasonably, yes.

 5   BY MR. RICE:

 6        Q.    And how would Mr. Gould have known that you

 7   ordering him to keep his hands out of his pockets also

 8   included not dropping his hands?  What information was

 9   available to Mr. Gould to give him that understanding?

10              MR. MORSE:  Object as to form.

11        A.    I mean, I'm not really sure, but, you know,

12   I'm going to stick with what I've been saying.  And I'm

13   telling you to keep your hands out of or away from your

14   pockets.

15   BY MR. RICE:

16        Q.    Did you command Mr. Gould not to move?

17        A.    I don't remember.  I don't think so.

18        Q.    Did you command Mr. Gould to remain fully

19   facing you?

20        A.    I don't think so.  I don't remember.

21        Q.    And it's a common police command to order

22   somebody to remain in place, fair?

23        A.    It can be.

24        Q.    And maybe they don't say it like a lawyer,

25   but they'll say stop, don't move, correct?
```

Bethany Guerriero
April 25, 2024                                      79

1          A.     They could.  You could, yes.

2          Q.     But you didn't give that command to

3    Mr. Gould during that initial part of the encounter,

4    correct?

5          A.     Correct.

6          Q.     And so, Mr. Gould blades his body, as you

7    described.

8                 Was he disobeying a command, in your

9    opinion?

10         A.     I perceived it as such, yes.

11         Q.     Why?

12         A.     Because again, I'm -- I'm -- I'm working

13   off of, you know, other past experiences that, you know,

14   in situations possibly similar to that, people are a lot

15   calmer.  They want direction; they -- they need to know

16   what to do to -- to stay safe.  And I was not getting

17   that level of compliance from Mr. Gould.  And again, you

18   know, I understand you're saying what you're saying in

19   regards to trauma responses, but I'm not a doctor, and

20   it's -- my job is initial safety of the scene.  And when

21   I'm being met with verbal resistance, active

22   resistance --

23                 (Phone interruption.)

24         A.     -- it's going to --

25                 MR. RICE:  Let's go off the record for a

Bethany Guerriero
April 25, 2024                                    80

1          moment.

2                    (Recess taken, 9:43 a.m. to 9:44 a.m.)

3     BY MR. RICE:

4          Q.    What information, if any, did Mr. Gould

5     have available to him to understand that he was not to

6     move or blade his body?

7                    MR. MORSE:  Object as to form.

8          A.    Well, like I said, the -- the commands that

9     I had given him of, you know, to keep his hands out of

10    his pockets to me seemed pretty clear.

11    BY MR. RICE:

12         Q.    So you understood the command to "Keep your

13    happened out of your pocket" as to include don't move and

14    don't blade away from the officers?

15         A.    Uh-huh.

16         Q.    "Yes"?

17         A.    Yes.

18         Q.    Was Mr. Gould detained at any point, during

19    this encounter?

20         A.    Yes.

21         Q.    At what point did the detention start?

22         A.    When I ordered him to the ground and I

23    handcuffed him.

24         Q.    So would you agree that before you ordered

25    him to the ground, your understanding was that Mr. Gould

Bethany Guerriero
April 25, 2024                                        81

1   was not detained?

2           A.    Before I ordered him to the ground?

3           Q.    Yes.

4           A.    No, I wouldn't say that.  I mean, if -- if

5   I'm -- if I'm engaging with you and now we have each

6   other's attention and I'm being greeted with what I had

7   described to you earlier and now it quickly moves to the

8   point of I'm putting you on the ground and detaining you

9   and handcuffing you, I'm not sure at what point he didn't

10  realize he wasn't free to go at that moment.

11          Q.    Sure.  And I'm not asking you to speak to

12  what he actually thought.

13          A.    Uh-huh.

14          Q.    But what was your understanding of when

15  Mr. Gould was detained?

16          A.    The minute he was ordered to the ground.

17          Q.    Okay.  Was Mr. Gould arrested at any point

18  during this encounter?

19          A.    He was, yes.

20          Q.    And at what point did the arrest occur?

21          A.    After -- so after I was trying to get more

22  information as far as who he was and his involvement in

23  the incident.

24          Q.    Is there a specific moment you can cite to

25  when the detention converts to an arrest?

Bethany Guerriero
April 25, 2024                                              82

```
 1              A.    After he is handcuffed, I roll him over

 2    immediately to -- to sit him up, and he immediately went

 3    to pop up, and I said, "yeah, I did not tell you to" --

 4    "to get up."  You know, and from that point it was just

 5    what I perceived to be some, you know, verbal, as well as

 6    active resistance, even after in custody.  And trying to

 7    speak with Mr. Gould to try to ascertain certain

 8    information was just not possible at that moment due to

 9    agitation and aggravation on both of our parts.

10              Q.    And so, that's the moment that you

11    considered Mr. Gould under arrest; is that fair?

12              A.    Correct, because I am trying to gather more

13    information and I'm not able to ascertain that, even as

14    far as a simple name; "What's your name?"

15              Q.    I want to go back towards the beginning of

16    the encounter.  Again, I'm sorry to jump back and forth.

17              A.    That's okay.

18              Q.    Was there an opportunity to deescalate,

19    after you gave your forceful command?

20              A.    To me, there was not, because he was still

21    verbally resistant at that point.  So it was very

22    difficult for me to try to get anything further out of

23    him because there was just a bunch of banter going on,

24    you know, back and forth that made it very difficult for

25    me to try to, like, keep the situation calm enough to get
```

Bethany Guerriero
April 25, 2024                                    83

1   him to calm down where I could talk to him.

2          Q.    Well, I mean, an officer can deescalate

3   from someone using heightened or aggressive language,

4   correct?

5          A.    What do you mean?

6          Q.    Well, when could you deescalate a

7   situation, if not when someone's using resistant

8   language?

9          A.    Well, at -- at one point, you know, when he

10  was still seated, I even tried.  I said, "hey, let-" --

11  "let's take this back down a notch."  And I was still met

12  with the verbal aggression, and there were now other

13  officers arriving on scene.  And it got to the point

14  where I could not get any further with him, verbally, and

15  once enough officers were there, deescalation can be as

16  simply as me walking away, which is what I did.

17         Q.    Sure.

18                And you'd agree by that point, though, the

19  situation had escalated quite a bit from the beginning of

20  the encounter?

21         A.    Yes.

22         Q.    And so I'll say, as jumping back towards

23  the beginning --

24         A.    Uh-huh, yes.

25         Q.    -- when you gave your forceful command and

Bethany Guerriero
April 25, 2024                                                    84

```
 1   Mr. Gould responds with the language, could you have

 2   deescalated or attempted to deescalate at that point?

 3                   MR. MORSE:  I'm going to object as to form;

 4          this has already been answered.

 5                   But you go ahead and answer, again.

 6          A.    Again, given -- given the nature of the

 7   call, that there is a firearm and my main focus at that

 8   very moment is everybody's safety, mine, his, the general

 9   public, my backup officers, no, I did not feel at that

10   moment I had room for any type of deescalation because it

11   was just an immediate one-after-the-other verbal

12   resistance from him, so. . .

13   BY MR. RICE:

14          Q.    So is it fair to say you made the decision

15   then not to pursue deescalation at that point?

16                   MR. MORSE:  Object as to form.  She already

17          answered that question several times now.

18                   You can go ahead and answer it again.

19          A.    I'm going to stick with what I have and how

20   I have been answering because that is what my perception

21   and my belief at that very moment was; try to gain some

22   type of control, whether it be through escalation, not

23   escalation.  I'm not going to wait after I've already

24   said at least twice to "Keep your hands out of your

25   pockets."
```

Bethany Guerriero
April 25, 2024                                        85

```
 1    BY MR. RICE:

 2          Q.    You would agree that you drawing your gun

 3    is an escalation, fair?

 4          A.    Yes.

 5          Q.    Why did you draw your gun?

 6          A.    Because when I saw all of those movements

 7    of the hands now dropping again, that bladed stance and,

 8    like, back pedaling, I don't know what's underneath that

 9    towel, backpack, clothing that I'm unsure of at -- at

10    this time; I don't know if you still have anything in

11    your pockets.  He never once turned away from me, so I

12    still can't see his back.  I don't know what's there.

13          Q.    Can an officer draw their gun whenever they

14    feel like it?

15          A.    No.

16          Q.    When is it appropriate for an officer to

17    draw their gun?

18          A.    Again, when it's objective and reasonable.

19    And at that moment, with what was going on with the

20    information that I had been provided, which was very

21    little, and still knowing to me that there was a gun

22    outstanding, I'm not going to wait for me or someone else

23    to be shot.

24          Q.    Well, you -- and I want to clarify, because

25    "objective" and "reasonable," you would agree, are pretty
```

Bethany Guerriero
April 25, 2024                                        86

```
 1   vague terms, fair?

 2          A.    Uh-huh.

 3                MR. MORSE:  Object as to form.

 4   BY MR. RICE:

 5          Q.    "Yes"?

 6          A.    Yes.

 7          Q.    I want to get to your understanding, if you

 8   can explain it better, what sort of circumstances --

 9                MR. MORSE:  Object as to form.

10   BY MR. RICE:

11          Q.    -- should be present -- what sort of

12   circumstances should be present for an officer to draw

13   their lethal firearm?

14          A.    Well, when I am going to a disturbance

15   where a firearm is involved, as far as I am concerned,

16   there is still a firearm outstanding because nobody

17   clarified that they had a gun in their possession that

18   was made safe, and I have the type of resistance that I'm

19   getting from Mr. Gould, I am not going to wait a third or

20   fourth time to see if you're going to go back in your

21   pockets or not for the safety of everyone there, and I

22   drew my firearm.

23          Q.    And you would agree that drawing your

24   firearm presents a deadly force threat to Mr. Gould,

25   fair?
```

Bethany Guerriero
April 25, 2024                                            87

1              A.    Fair.

2              Q.    And generally, you should draw your firearm

3      when you are faced with a potentially deadly or very

4      significant safety threat, fair?

5              A.    I considered that -- that situation at that

6      moment to have been that.

7              Q.    And what I'm asking is generally though.

8                    MR. MORSE:  Object as to form.

9      BY MR. RICE:

10             Q.    Generally though, an officer should only

11     draw their lethal firearm if there's a deadly force or a

12     significant safety threat, correct; not just any safety

13     threat, fair?

14             A.    Well, I'm speaking about this incident; I'm

15     not speaking about a generalized incident.

16             Q.    And so, that's not answering my question.

17             A.    Right.

18             Q.    Because my question is about the general --

19             A.    Okay.

20             Q.    -- information.

21                   So generally, would you agree that an

22     officer should only draw their firearm in the face of a

23     deadly or very significant safety threat?

24             A.    Yes.

25             Q.    Okay.  And you would agree that an officer

Bethany Guerriero
April 25, 2024                                          88

1    needs to respond to objective, articulable facts when

2    using use of force, fair?

3           A.    Fair.

4           Q.    And an officer -- again, we've talked about

5    all of this, but when you encountered, Mr. Gould, did you

6    have any objective, articulable facts that he was armed?

7           A.    I didn't have any that he wasn't, so I had

8    to assume that he was, just, again, based on the lack of

9    information that was put out.

10          Q.    So you perceived the safety threat based on

11   an absence of information; is that fair?

12          A.    On a firearm call, yes.

13          Q.    Do you have any objective, articulable

14   facts, at the moment you draw your firearm, that

15   Mr. Gould is armed?

16          A.    Again, I had already given, at least twice,

17   to "Keep your hands out of your pockets."  And when I'm

18   met with the behavior that I had described numerous

19   times, I am not going to take that chance of you pulling

20   a weapon or possibly a firearm.

21          Q.    I understand you're not going to take that

22   chance --

23          A.    Uh-huh.

24          Q.    -- and you were concerned about Mr. Gould's

25   demeanor and posture.

1             What I'm asking is:  Can you tell me any

2    articulable, objective facts that Mr. Gould was armed at

3    the time?

4        A.    I didn't know enough about him or the

5    situation to make that determination.  Again, you're wit-

6    -- you're looking at this from a hindsight, and I am

7    giving you realtime moments.

8        Q.    And so, at the moment you draw your

9    firearm --

10       A.    Uh-huh.

11       Q.    -- if someone were to stop you, pull you

12   aside and say, can you point to me any objective,

13   articulable fact that Mr. Gould is armed, what would you

14   respond with?

15       A.    Well, again, given his actions and what I

16   considered not to be the normal reaction of a victim,

17   yes, that, to me, was objective and reasonable, given the

18   situation and the information that was provided to me at

19   that time.

20       Q.    Any other objective, articulable facts that

21   Mr. Gould was armed?

22       A.    Again, during a split-second decision, no.

23       Q.    And you would agree that about eight

24   seconds had lapsed between Mr. Gould reaching into his

25   pocket and when you draw your gun; does that sound about

Bethany Guerriero
April 25, 2024                                    90

1   right?

2           A.      Again, we're looking from a hindsight

3   perspective.  I wasn't counting the seconds at that time.

4           Q.      But if someone were to say, that was about

5   eight seconds, would you have any reason to dispute that?

6           A.      I guess not, no.

7           Q.      And during those eight seconds, you and

8   Mr. Gould continued talking to each other, correct?

9           A.      Correct.

10          Q.      And you had the opportunity to continue

11  observing Mr. Gould, correct?

12          A.      Again, hindsight.  I'm not going to wait

13  for a third or fourth time or a fifth time for you to

14  disobey commands and getting near pockets that I don't

15  know, which is an unknown for me.

16          Q.      Again, and I think you're kind of assuming

17  where I'm going, but I'm not asking that question.

18          A.      Uh-huh.

19          Q.      I'm not asking why you made the decision

20  that you did.

21                  I'm just asking:  During that time period,

22  you were able to observe Mr. Gould, correct?

23          A.      Yes.

24          Q.      Did you observe any indication that there

25  was a weapon on Mr. Gould's body?

Bethany Guerriero
April 25, 2024                                    91

```
1              A.    I -- I couldn't -- I couldn't readily see

2     anything, but that doesn't mean that there's -- something

3     wasn't there or couldn't have been there.

4              Q.    And again, I want to be clear, you're

5     answering a question I didn't ask.

6                    What I'm asking is:  Did you see any

7     indication that there was a weapon on Mr. Gould's body?

8                    MR. MORSE:  I'm going to object as to form.

9              She just answered your question.

10                   MR. RICE:  Well, I ask --

11                   MR. MORSE:  You can go ahead and answer it.

12    BY MR. RICE:

13             Q.    I was going to say, I asked it.  I feel it

14    wasn't answered.  I understand that you lacked

15    information --

16             A.    Uh-huh.

17             Q.    -- and you assumed that he was armed.

18             A.    Uh-huh.

19             Q.    That's not my question.

20                   My question is:  Did you see any indication

21    on Mr. Gould's body that he was armed?

22             A.    Well, what's an indication to you.

23             Q.    A bulge.

24             A.    Uh-huh.

25             Q.    Did you see a bulge on Mr. Gould's clothes?
```

Bethany Guerriero
April 25, 2024                                                    92

```
 1              A.    No, but that doesn't always mean anything.

 2              Q.    Again, I didn't ask if it means anything.

 3                    I just asked:  Did you see a bulge?

 4              A.    No.

 5              Q.    Did you see a gun on his person?

 6              A.    Not visible.

 7              Q.    Did Mr. Gould say that he was armed?

 8              A.    All he said was, "I'm not the one with the

 9    gun," but we don't ever initially believe people until we

10    get further along in our investigation that dispels our

11    fears.

12              Q.    And I get it.  And, I guess, we're having

13    some confusion because you're answering the opposite what

14    of what I'm asking.  And I get that you're answering what

15    your assumptions were based on and why you were assuming

16    things.  What I'm asking is the opposite.

17                    What did you actually observe?  For

18    example, if someone is holding a gun in their hand, you

19    don't need to assume they have a gun; you can perceive

20    they have a gun, correct?

21              A.    I observed that he was verbally and, to a

22    degree, physically noncompliant.

23              Q.    And do those --

24              MR. MORSE:  I'm going to object as to form.

25                    And I'd like the record to reflect,
```

Bethany Guerriero
April 25, 2024                                    93

1             Mr. Rice, you're putting into Ms. Guerriero's head

2             things that she is not saying or doing.

3                   MR. RICE:  I'm going --

4                   MR. MORSE:  She never said --

5                   MR. RICE:  -- to ask for no speaking

6             objections, please, or we can go outside the room.

7                   MR. MORSE:  Well, I can put on the record

8             that the editorializing with what you're putting

9             on her is inappropriate.

10                  MR. RICE:  And I'm going to object to --

11                  MR. MORSE:  But you can --

12                  MR. RICE:  -- speaking objections.

13                  MR. MORSE:  -- answer his question.

14            Again, I want the record to be clear.  It's

15            a deposition, Mr. Rice.  I can put on the record

16            what I perceive in a deposition of improper

17            behavior, of putting things to my client that

18            she's not saying.

19                  MR. RICE:  And that's fine.  I'm just

20            concerned with coaching a witness about potential

21            ways to answer my questions.

22                  MR. MORSE:  I'm not coaching anybody.

23            She's answered your question, like, seven times

24            already.  So --

25                  MR. RICE:  No.  And I'll --

Bethany Guerriero
April 25, 2024                                    94

```
1                MR. MORSE:  -- she can answer again.  It's
2        just by saying she's confused.  She didn't say she
3        was confused.  That's all.  You said she was
4        confused.  I'd like the record to be clear that
5        you're adding traits to her answers that she's not
6        saying.  That's all.  That's the only thing I'm
7        saying.  I'm not coaching anybody.
8                MR. RICE:  And my --
9                MR. MORSE:  There is no reason to coach.
10               MR. RICE:  My understanding is questions
11       are not evidence, correct?
12               MR. MORSE:  What's that?
13               MR. RICE:  My understanding is my questions
14       are not evidence, correct?
15               MR. MORSE:  Well, it depends.
16               MR. RICE:  Are they evidence?
17               MR. MORSE:  Well, it depends if, you know,
18       the case ever went to trial, there was impeachment
19       or things like that or if things were trying to be
20       mischaracterized as the witness was confused in
21       the deposition.  Look, I said she was confused.
22       That's all.  This doesn't need to turn into
23       something it's not.  I want the record to be
24       clear, she didn't say she was confused; you said
25       she was confused as a preamble to your question.
```

Bethany Guerriero
April 25, 2024                                                95

1          You should probably ask the question instead of

2          preambling it.

3    BY MR. RICE:

4          Q.    Well, and, again, I'll go back and say for

5    the record, if any of my question are inaccurate or

6    unclear or confusing, please let me know; is that fair?

7          A.    That's fair.  And I feel that I've been

8    doing that; however, I'm not confused with what I'm

9    telling you, which was happening in realtime to me.

10         Q.    I am not saying that you're confused about

11   what you're telling me.  My concern is, that's not the

12   question that I'm asking.

13               The question I'm asking is:  Can you

14   describe for me anything that you observed affirmatively,

15   that existed, to indicate that Mr. Gould was, in fact,

16   armed?

17         A.    No.

18         Q.    Okay.  That's all.  That's the question I

19   was asking you.  And my concern was just the answers

20   you're providing to me, at least, didn't answer that

21   question, but thank you for your response.

22               Now, at some point you ordered Mr. Gould to

23   get on the ground, correct?

24         A.    Correct.

25         Q.    Would you agree that at that point, your

Bethany Guerriero
April 25, 2024                                        96

1    emotions were heightened?

2         A.    Yes.

3         Q.    Why were they heightened?

4         A.    Because I have somebody who I still don't

5    know who they are, what they're involvement is in this

6    case, again, given the information that I was provided

7    initially at the time.  His behavior, to me, was not

8    typical of a victim.  I'm not saying it -- it can't ever

9    be like that.  But through my experience, the verbal

10   agitation, the -- how do -- how do I say this?  But

11   coming back at me with the aggravation that he did that

12   he's not the one with the gun and, you know, whatever

13   other verbal word salad was going on at the moment was

14   not typical of a victim or trying to gain control of a

15   scene that is potentially very dangerous.

16        Q.    Did you feel you were losing control of a

17   situation at that moment?

18        A.    No.

19        Q.    Were you scared at moment?

20        A.    No.

21        Q.    Why weren't you scared?

22        A.    Because I was able to get control,

23   initially, of the situation, finally, to get Mr. Gould on

24   the ground and secured, in hopes that I could possibly

25   further my investigation figuring out who he was.

Bethany Guerriero
April 25, 2024                              97

1    Pulling up to that scene, yes, it's always a fear for us.

2              So backtracking just a bit, you know, I

3    would be untruthful in saying to you that I do my job

4    with no fear.  We all should have a healthy fear --

5         Q.   Well --

6         A.   -- because we never know.

7         Q.   I'll say that sounds like a dumb question,

8    but I just want to ask for clarity:  When there's a

9    potential safety threat, does that cause you to be

10   scared?

11        A.   Sure.  Sure.

12        Q.   Did you ever see Mr. Gould reach toward his

13   back, while he was standing?

14        A.   No.

15        Q.   Mr. Gould was shirtless at the time,

16   correct?

17        A.   Yes.

18        Q.   Do you know how hot it was that day?

19        A.   I -- I don't have a particular degree, no.

20        Q.   Was it a warm day, would you say?

21        A.   It was May, so it was warm.

22        Q.   And you ordered Mr. Gould to lie down on

23   the pavement, correct?

24        A.   Correct.

25        Q.   And he was shirtless, right?

Bethany Guerriero
April 25, 2024                                          98

```
 1            A.    Yes.

 2            Q.    Did you have any concerns about the heat of

 3     the pavement on Mr. Gould's chest at the time?

 4            A.    Which is why I immediately rolled him over

 5     and sat him up.

 6            Q.    Okay.

 7                  MR. MORSE:  Keep going.  I have to use the

 8            restroom.

 9     BY MR. RICE:

10            Q.    During that part of the encounter when

11     Mr. Gould is on the ground, did he appear to be

12     expressing some confusion about why you were detaining

13     him?

14            A.    Some but, again, verbally, he was extremely

15     verbally aggressive with me, repeatedly telling me that,

16     you know, he wasn't the one that had committed a crime,

17     or he's not doing a crime, or again, I'm not trying to

18     direct quote Mr. Gould by any means, but I am painting

19     the picture for you in answering the question that he was

20     still verbally resistant, which made it difficult for me

21     at that particular second in time -- moment in time to

22     get further clarification.

23            Q.    Okay.  And I'll say, too, as far as exact

24     statements of what people said, you would agree there's a

25     video recording of that?
```

Bethany Guerriero
April 25, 2024                                    99

1          A.    Yes.

2          Q.    And that has what people literally said,

3    correct?

4          A.    Yes.  Yes, sir.

5          Q.    And I'm just asking you for your general

6    recollection and understanding of the situation; is that

7    fair?

8          A.    That's fair enough, yeah.

9          Q.    Why did you handcuff Mr. Gould?

10         A.    Well, due to his behavior and what he was

11   saying, his agitated state.  You know, sometimes

12   detaining somebody like that could be a form of

13   deescalation and making a scene safe for everybody

14   involved.

15         Q.    Okay.  So that was your intention and

16   understanding when handcuffing him?

17         A.    Correct.

18         Q.    Were you aware that Officer Strzelecki

19   unholstered and pointed his taser at the time?

20         A.    At the -- again, I'm going from realtime at

21   those moments.  I don't recall seeing that; however, it

22   was my understanding after the fact that that's what had

23   happened.

24         Q.    Did you give any sort of signal or

25   communication to Officer Strzelecki during the initial

Bethany Guerriero
April 25, 2024                                      100

1    portion of the incident that you were perceiving a safety

2    threat?

3            A.    It all happened so quickly, so I -- I

4    don't -- I don't recall.  I don't think that I gave any

5    direct comment to him.  I just stayed focused and

6    continued with what I was doing at that moment.

7            Q.    And I was going to say, is it fair to say

8    you were focused on Mr. Gould at the time?

9            A.    Yes.

10           Q.    And you don't recall any sort of

11   intentional, verbal or signal communication to

12   Officer Strzelecki that you are perceiving a safety

13   threat; is that fair?

14           A.    That's fair.

15           Q.    Okay.  Now, when you rolled over Mr. Gould,

16   you told him to sit up, correct?

17           A.    Yes.

18           Q.    Did you command him to not stand up?

19           A.    I did because -- and I'm -- I'm not sure

20   whose body camera it shows; it could be mine.  Again, I'm

21   not trying to misquote anything.  But he immediately

22   pushed up against my legs to start standing up, and I had

23   given him another verbal command to sit down; that I did

24   not instruct him to stand up.

25           Q.    Okay.  Would it help refresh your memory to

Bethany Guerriero
April 25, 2024                                          101

1  see that portion of the body camera recording?

2          A.    I mean, if you want to show it to me, okay.

3          Q.    That's fine.  I can ask you.

4                So is it your recollection, though, that

5  the order went:  You told Mr. Gould to sit up, he does

6  sit up but then starts to stand up?

7          A.    Uh-huh.

8          Q.    "Yes"?

9          A.    Yes.

10         Q.    And then you say, "I didn't tell you to

11  stand up," and you put him back on the ground?

12         A.    In a seated position, correct.

13         Q.    And so, would you agree that when Mr. Gould

14  initially tried to stand up, you had not commanded him

15  not to stand up; is that fair?

16         A.    Fair.

17         Q.    Okay.  Did you know at the time that

18  Officer Strzelecki was asking Mr. Gould about his ID?

19         A.    I don't -- I don't recall that.  I don't

20  remember.

21         Q.    Was it possible that Mr. Gould was standing

22  up to engage with Officer Strzelecki and make his ID

23  available?

24                MR. MORSE:  Object as to form.

25         A.    I don't remember.

Bethany Guerriero
April 25, 2024                                              102

```
 1   BY MR. RICE:

 2          Q.    Would it be helpful to watch the video or

 3   no?

 4          A.    I mean, if -- again, if you want to show it

 5   to me, but. . .

 6          Q.    Sure.

 7                MR. RICE:  Why don't we start your body

 8          camera at 1:30.

 9                (Video played from 1:30 to 1:43.)

10                MR. RICE:  So I'm going to stop it at 1:43.

11   BY MR. RICE:

12          Q.    Were you aware that Officer Strzelecki had

13   tried talking with Mr. Gould at that moment?

14          A.    All I heard was Mr. Gould the whole time,

15   so if Officer Strzelecki said something, he was drowned

16   out by Mr. Gould.

17          Q.    Is it fair to say that your attention was

18   solely on Mr. Gould at the moment?

19          A.    That's fair to say.

20          Q.    And at this point in the encounter,

21   Mr. Gould has said that he did not have a gun, and that

22   he was, in fact, the person being harassed by the person

23   who did have the gun, correct?

24          A.    Correct.

25          Q.    Did you consider that information at all or
```

Bethany Guerriero
April 25, 2024                                          103

```
 1   assign any value to it?
 2          A.     Initially, no.
 3          Q.     Why not?
 4          A.     Because of his behavior still.
 5          Q.     Were you concerned that Mr. Gould was
 6   frustrated that he was the victim of one crime and had
 7   now been held at gun point and arrested by police?
 8                 MR. MORSE:  Object as to form.
 9          A.     I was not readily concerned at that moment
10   because I was still trying to gain control of the scene
11   and Mr. Gould with his verbal defiance, shall I say, was
12   making that difficult.
13   BY MR. RICE:
14          Q.     So is it fair to say that your mind was not
15   on that possibility?
16          A.     At that moment, I guess that's fair to say.
17                 MR. MORSE:  Object as to form.
18   BY MR. RICE:
19          Q.     Now, during this encounter, would you agree
20   you made unprofessional statements towards Mr. Gould?
21          A.     Yes, I did.
22          Q.     And what statements would you consider to
23   be unprofessional?
24          A.     I did refer to him as a -- as a punk.
25   There was some unprofessional language in the form of --
```

Bethany Guerriero
April 25, 2024                                                    104

1   of cursing.  So, you know, I will tell you that that was

2   unnecessary.

3           Q.    Why did you make those comments?

4           A.    I think, again, going through that

5   situation with all of the unknowns and being met with the

6   verbal defiance that I was, I was still in a heightened

7   state after an adrenalin dump.  And it was also at that

8   point that I started not feeling well and realizing that,

9   medically, there could've been something going on with me

10  at that moment.

11          Q.    Is it fair to say that during this

12  encounter, you were experiencing extreme emotions?

13          A.    Yes.

14          Q.    Now, I want to ask about the medical

15  concerns.

16                Toward later in the incident, you left the

17  scene due to medical concerns, correct?

18          A.    Yes.

19          Q.    And I don't want to talk about any

20  irrelevant medical concerns.

21                But I'll ask you:  Are you aware of any

22  medical conditions or circumstances that affected your

23  conduct or performance in this incident?

24          A.    Again, not initially because I'm -- I'm not

25  a doctor.  I just knew that there was something not right

Bethany Guerriero
April 25, 2024                                        105

1   happening with me, medically.

2          Q.    And again, we don't need to go into things

3   that are not --

4          A.    Uh-huh.

5          Q.    -- pertinent.

6          A.    Correct.

7          Q.    But in hindsight, having been evaluated and

8   having distance from the incident, as you sit here today,

9   are you aware of anything, medically, that was going on

10  during the incident that may have affected your conduct?

11         A.    It very well could have, but, you know,

12  that wasn't apparent to me until, like you said,

13  hindsight.  I've already been admitted and on the cardiac

14  floor for two days.

15         Q.    And so, what condition may have contributed

16  to this, to your conduct during this incident?

17         A.    It was a cardiac incident.

18         Q.    Can you explain in more detail, please?

19         A.    I don't have to.

20              MR. MORSE:  With regard to that, actually,

21         she said she had a cardiac incident.  Actually,

22         give us a minute on her medical information --

23              MR. RICE:  Okay.

24              MR. MORSE:  -- just to see where -- because

25         I want to talk to her about it, though because we

Bethany Guerriero
April 25, 2024                                    106

```
 1              have HIPAA and things like that.  I know we're in

 2              a deposition and it's relevant, so we'll probably

 3              get it.  I just want to talk to her, again, just

 4              about her private medical; that's all.

 5                   MR. RICE:  Let's just go off the record and

 6              take a moment to -- actually, before we go off the

 7              record, let me just make a record.

 8                   Counsel is going to confer with their

 9              client about medical issues, so we're taking a

10              break to facilitate that.

11                   MR. MORSE:  Cool.

12                   (Recess taken, 10:14 a.m. to 10:22 a.m.)

13  BY MR. RICE:

14         Q.   Did anything occur during the break that

15  affects your ability to continue this deposition?

16         A.   No.

17         Q.   Did you have a conversation with anybody

18  else besides your attorneys, during the break?

19         A.   No.

20         Q.   So I was asking about a medical condition,

21  and I want to be clear, I'm asking about your

22  understanding, as you sit here today.

23              Could you describe any medical condition or

24  circumstances that existed that may have affected your

25  conduct during the incident?
```

Bethany Guerriero
April 25, 2024                                          107

```
 1              A.    I wasn't aware of anything outstanding

 2       prior to this incident.  There were things that were

 3       discovered later on after hospitalization.

 4              Q.    And what was discovered later on?

 5              A.    I suffered a cardiac incident.  I was

 6       admitted for two days.  On the third day, I was dismissed

 7       from the hospital to follow up with a cardiologist

 8       through workman's comp, which took place over the course

 9       over eight weeks.  And it was discovered that there -- I

10       have -- again, I'm not a doctor, so I'm just trying to

11       give you the best of what I can of what was discovered.

12                    An enlarged part of my heart where the top

13       of -- again, I don't want to misquote things, but

14       basically, an -- an enlargement, in addition to some

15       leaking, which, that day, could have contributed to

16       everything medically that I was feeling.

17              Q.    And I appreciate that, and I will say,

18       we're not here for a medical matter.

19              A.    Sure.

20              Q.    What I'm most concerned about is, again,

21       what the benefit of hindsight and what you've learned

22       through diagnosis and treatment how, if at all, could

23       that condition have impacted your performance during the

24       incident?

25              A.    It could have greatly.
```

Bethany Guerriero
April 25, 2024                                          108

```
 1              Q.    How so?

 2              A.    You know, not feeling well, not feeling

 3  100 percent, not really understanding what was -- what

 4  was going on, it being not typical of any other type of

 5  maybe stressful event I've encountered and there have

 6  been plenty over 20 years, that not being a typical

 7  response.  And then having those symptoms I was having --

 8  I was -- -- I was going through, magnify and continue and

 9  become greater to the point where I knew something was

10  severely wrong and was transported.

11              Q.    Did you have any indication that this

12  condition existed before or during the incident?

13              A.    No.

14              Q.    Did that medical condition affect your

15  judgment at all?

16              A.    It possibly could have, yes.

17              Q.    How?  How could it have?

18              A.    You know, experiencing -- like, towards --

19  towards the tail end of that, I was experiencing some

20  chest pain.  Does it happen?  Yes.  But this wasn't

21  readily going away; it was actually getting worse as time

22  was going on, and to the point where this is the first

23  time in 20 years of being on this job that I had ever had

24  to use any type of workman's comp, you know what I'm

25  saying?
```

Bethany Guerriero
April 25, 2024                                                                         109

1               And sometimes as police officers, to our

2    own fault, aren't always great at expressing when maybe

3    we don't feel well or something may not be going on

4    because you don't want to jump to conclusions in

5    understanding that, you know, there was some stressful

6    things that had happened.  But when it wasn't going away,

7    it was actually persisting and getting worse when things

8    were supposed to be calmer, I realized that something was

9    wrong.

10              Q.    Did that condition contribute to the stress

11   you were experiencing during the incident?

12              A.    It could have, yes.

13              Q.    Would you say it could have increased your

14   stress during the incident?

15              A.    It could have, yes.

16              Q.    Did what you were experiencing distract you

17   in any way from your interactions with Mr. Gould?

18              A.    I believe so because at -- you know, again

19   I'm -- I'm not trying to justify the verbiage that was

20   going on between us.  You know, I'll admit all day long

21   that that wasn't my best moment at all.  But I also feel,

22   hindsight we don't try to do that, but in this case, I

23   feel it's necessary because of the medical things that

24   were uncovered that yes, that could have played a part.

25              Q.    Okay.  And to be clear, what I'm most

Bethany Guerriero
April 25, 2024                                                   110

```
 1    interested in is if there were circumstances or factors

 2    that affected how you perceived things, how you made

 3    judgement calls, how you interacted with Mr. Gould, if

 4    this medical condition is one of them, I just want to

 5    understand how it may have impacted things and how you

 6    perceived or know that it did.

 7                    And so, I'll ask you:  In any other ways

 8    that we haven't discussed, are there any possible ways or

 9    ways that it -- the medical condition affected your

10    interaction with Mr. Gould or performance during the

11    incident?

12        A.    Not -- not being a doctor, I mean, it's --

13    like I said, it's -- it's very possible, you know.  I

14    just know one's hospitalized and going through treatment

15    and further testing and everything else, it definitely

16    cleared things up, I guess, as far as what could have

17    happened, medically, that day with me.

18        Q.    Is it fair to say that towards the end of

19    this incident, you were quite concerned about the medical

20    condition?

21        A.    Yes.

22        Q.    Now, at some point during the incident, did

23    you come to an understanding that Mr. Gould was not the

24    person with the gun and that the person with the gun was

25    elsewhere?
```

Bethany Guerriero
April 25, 2024                                    111

```
 1              A.    Yes.

 2              Q.    When did you come to that understanding?

 3              A.    I believe it was once I was finally able to

 4    speak with Officer Valerio.

 5              Q.    And did you learn that from

 6    Officer Valerio, or did you know that yourself?

 7              A.    I know it was Officer Valerio once he had

 8    come out and heard the commotion and realized what was

 9    going on.  He, at some point, I don't know exactly when,

10    let me know.

11              Q.    Sure.  Would it be helpful to maybe review

12    your body camera --

13              A.    Sure.

14              Q.    -- recording?

15              MR. RICE:  So I'm going to pull up

16        Exhibit 4.

17    BY MR. RICE:

18              Q.    You know, I'm just going to let it play

19    from the beginning, and I'll just give you a preview of

20    what I'm going to ask so you can watch for this.

21              I want to have an understanding of when and

22    how you learned what the situation was, that there was a

23    person harassing somebody's wife, who had the gun and

24    where that person was; is that fair?

25              A.    Okay.
```

Bethany Guerriero
April 25, 2024                                          112

1          Q.    So I'm going to play it through a bit just
2     so you can watch what happened.
3          A.    Whose body camera is this?
4          Q.    This is Exhibit 4, and this is your body
5     camera.
6          A.    Okay.
7                (Video playing.)
8          A.    Okay, so --
9                MR. RICE:   I'm going to stop at 2:20.
10               (Video paused.)
11         A.    Right.   So now that Officer Valerio is out
12    and he heard this is when it became apparent to me who
13    actually had a gun, who did not and --
14    BY MR. RICE:
15         Q.    And so, at 2:20 I'm stopping.
16               So how at this point did you know who had
17    the gun and who didn't?
18         A.    Well, all right.   Maybe not exactly at this
19    point, I'm sorry.
20               But, like, now that he's here, I remember
21    him clarifying who had what.
22         Q.    And so, at this point on your video, have
23    you heard Officer Valerio describe that to you yet?
24         A.    Not at -- not at this point, but it's. . .
25         Q.    And I understand that you're having -- now,

Bethany Guerriero
April 25, 2024                                          113

1    correct me if I'm wrong, but you're starting to remember

2    things.  I'm going to play it through to about five

3    minutes and 30 seconds, and just again, I'm just going to

4    ask you at the end how you understood and learned the

5    nature of the incident, where the gun was.

6           A.    Okay.

7           Q.    And then we'll proceed.

8                 (Video playing.)

9                 MR. RICE:  So I'm going on stop at 5:34.

10          A.    Uh-huh.

11   BY MR. RICE:

12          Q.    And you would agree on the video that

13   you're explaining -- who's this officer you're talking

14   to?

15          A.    That's Sergeant Glass.

16          Q.    You're explaining to Sergeant Glass that

17   Mr. Gould was accused of harassing a caller's wife,

18   correct?

19          A.    Correct.

20          Q.    How did you know that?

21          A.    I don't want to misspeak because there's a

22   lot of moving parts and a lot of different people's

23   videos, so I don't, honestly, remember at what point I

24   received that information as far as, like, who was who.

25          Q.    Well, would you agree -- and that's why I

Bethany Guerriero
April 25, 2024                                                    114

1    played the full five-and-a-half minutes of the beginning

2    of the encounter --

3              A.    Uh-huh.

4              Q.    -- that it's likely that you knew that

5    information before you encountered Mr. Gould?  Would that

6    be fair?

7              A.    I don't -- again, I -- I don't remember at

8    what point I had gotten that information, but it wasn't

9    initially when I had first gotten there and all of this

10   unfolded.

11             Q.    So in the first five-and-a-half minutes of

12   this video, after you get out of your car, when you have

13   this conversation, can you direct me to a moment where

14   you learn of that information?

15             A.    I don- -- honestly, I don't recall.  I

16   don't remember.

17             Q.    Can you point me to a portion of this video

18   where you learned of this information, before the

19   five-and-a-half minute mark?

20             A.    I don't remember.  I'm sorry.

21             Q.    So I take that as a no then?

22             A.    Yeah, no.

23             Q.    So if you can't point that out on the

24   video, would it be fair to say that you knew that

25   information before you got out of your car?

Bethany Guerriero
April 25, 2024                                    115

 1           A.    No.

 2           Q.    Why not?

 3           A.    Because I don't know exactly at what point

 4    I had received that information, understood that

 5    information, processed that information because from the

 6    moment I had gotten there, this is what I was dealing

 7    with.

 8           Q.    Okay.  And I just want to make sure your

 9    testimony is clear today, and so correct me if I misstate

10    something.

11                 But my understanding is that you cannot

12    point to a specific moment on this video before the

13    five-and-a-half minute mark where you learned of this

14    information, and so is that fair?

15           A.    I mean, that's fair.  I guess, that I

16    just -- I don't recollect when exactly that was.

17           Q.    And that's what I was going to say.

18                 As you sit here today, you are uncertain

19    and cannot say at all when you learned that information?

20           A.    That's fair to say.  I -- I -- I can't give

21    you a specific point in time.  I don't recall or remember

22    when that was.

23           Q.    But you would agree that at the

24    five-and-a-half minute mark, you did, in fact, have that

25    understanding, correct, that Mr. -- I'll ask a better

Bethany Guerriero
April 25, 2024                                        116

1   question.
2              At about the five-and-a-half minute mark on
3   your video, you would agree that you have the
4   understanding that Mr. Gould was accused of harassing a
5   caller's wife and that the caller was somebody else?
6        A.    That's what I was taking from that, yes.
7        Q.    And I'm just going to play a little bit
8   more of this conversation.
9              MR. RICE:  So we'll go back to about 5:18.
10             (Video playing.)
11             MR. RICE:  I'm going to stop at six minutes
12         and 30 seconds.
13  BY MR. RICE:
14        Q.    And if you need me to replay a portion to
15  refresh your memory --
16        A.    Uh-huh.
17        Q.    -- please let me know.
18             During this conversation, is it Sergeant
19  Glass you were talking to?
20        A.    Yes, yes.
21        Q.    You relayed to him that Mr. Gould was
22  accused of harassing a caller's wife, correct?
23        A.    Correct.
24        Q.    And your understanding at this time was
25  that the caller had lifted his shirt and shown a gun to

1   Mr. Gould, correct?

2          A.    Correct.

3          Q.    And you understood that the caller had the

4   gun; not Mr. Gould, correct?

5          A.    Correct.

6          Q.    Can you point to any portion of this video

7   that shows where you learned all of that information?

8          A.    I -- again, I -- I can't because I don't

9   remember at what point I formally, like, received

10  everything to the point where I was relaying this to him.

11         Q.    And I'll just clarify my question because I

12  know it feels like I'm asking literally the same thing 20

13  times, but I'm trying not to.

14               Before I asked you about the information

15  that Mr. Gould was not the caller and was the person

16  accused of harassing the wife, now I'm asking, in

17  addition to that, that the caller had lifted his shirt up

18  and had a gun and that the call was the one with the gun;

19  not Mr. Gould.

20               So those additional facts, did you see any

21  part, prior to this video, where you learned that

22  information?

23         A.    No, but, again, I don't -- I don't remember

24  at what point I had received all of that information.

25         Q.    And so, as you sit here today, you just

Bethany Guerriero
April 25, 2024                                    118

1    don't know where that information came from, period?

2            A.    I don't remember.  I'm -- I'm not -- I'm

3    trying to tell that you with everything -- the way that

4    it had gone on and we're now almost a year later, I -- I

5    don't remember.

6            Q.    Is there anything that you know of that

7    would refresh your memory as to that point?

8            A.    I don't know.  I mean, there's a ton of

9    other peoples' body camera videos, so I -- I don't know.

10   I feel like I've answered this question for you to the

11   best that I can right now.

12           Q.    And I'll tell you what.  Where I'm getting

13   at is, some day later, something will come across your

14   attention and you can say, oh, now I see this material

15   and now I remember where I learned this information.

16               And what I'm asking today is:  Is there

17   some source of information that would let you know where

18   you learned it from?

19               For example, would listening to the radio

20   transmissions, the recordings of the radio transmissions

21   before the incident, would that help refresh your memory

22   whether you learned the information we're talking about

23   from that?

24           A.    I mean, it's possible, but I -- again, it's

25   how I was receiving information or even hearing any,

Bethany Guerriero
April 25, 2024                                    119

1    because I may not have been hearing that just because I

2    was focused on other things at the time, which is trying

3    to get to that scene.  So I -- I don't want to go down a

4    rabbit hole and talk myself into an answer that I've told

5    you, I don't remember.  I don't know.

6              Q.    Understood.

7                    But you would agree that at the point of

8    your discussion with Sergeant Glass, you appeared to

9    understand that information, right?

10             A.    Yes.  I just don't un- -- I don't remember

11   at what -- I just -- I don't remember.

12                   MR. RICE:  Well, I'm going to play a

13                   portion of Exhibit 1, a radio recording, and this

14                   is a recording of dispatch and calls related to

15                   the incident.

16                   (Excerpts from Exhibit 1, radio recording,

17                   were played and transcribed as follows:)

18                   DISPATCH:  336922.  Sabal Ridge at 100,

19                   Sabal Ridge Circle, 1-0-0 Sabal Ridge Circle.

20                   Clubhouse pool, white male, brown hair

21                   multicolored suit.  Advised a male's harassing his

22                   wife.  Male calling the wife name and telling

23                   people to get out of the pool, 5400.  Possible 57,

24                   caller's 10-12, nothing further.

25                   The male's now walking to the other side of

Bethany Guerriero
April 25, 2024                                                         120

1              the clubhouse.  We also have the white land line

2              caller's by the ECCW and does have a signal zero

3              on him.

4         A.    Can I stop you for one second?

5              MR. RICE:  I'm going to stop at 1:34.

6              (Excerpts from Exhibit 1, radio recording,

7         were paused.)

8         A.    Okay.  So in listening to this thus far it

9    is not clear to me who has what, who is the victim, who

10   is the suspect.  All I'm getting is descriptors.  There's

11   no -- again, you have three different people calling 911.

12   So listening to this radio traffic, it's still not very

13   clear who has what or who's doing what.

14   BY MR. RICE:

15        Q.    I'm not a police officer, so I just want to

16   see if you can confirm the information on this recording.

17        A.    Uh-huh.

18        Q.    The dispatch appears to be relaying that

19   someone called in to report a male harassing his wife,

20   correct?

21        A.    Correct.

22        Q.    And the male who was harassing the wife was

23   wearing a multicolored swimsuit, correct?

24        A.    That's -- that's what I'm hearing, yeah.

25        Q.    Okay.  And, again --

```
 1              A.    But it's --
 2              Q.    -- I'm just ask- -- I didn't mean to cut
 3     you off.
 4                    But what I'm asking is:  As you sit here
 5     listening to the recording today --
 6              A.    Uh-huh.
 7              Q.    -- would you agree that that is the
 8     information that the dispatch was relaying?
 9              A.    Yes, but again, we're going back 20/20 --
10     like, hindsight 20/20; not in that moment when I've got a
11     bunch of different things going through my head.
12              Q.    And what I'll say is, the question I'm
13     asking right now are not going back in hindsight.
14                    As we sit here and listen to it today --
15              A.    Uh-huh.
16              Q.    -- I just want to confirm, because I was
17     not there and I'm not a police officer, that my
18     understanding of what's on this call matches your
19     understanding of what's on this call.
20                    And so --
21              A.    Which is?
22              Q.    That dispatch is relaying that someone
23     called in to report a male harassing his wife?
24              A.    But there were also three different people
25     reporting that same information, so who is who?
```

Bethany Guerriero
April 25, 2024                                                    122

 1              Q.    But that information is in this dispatch
 2   call, correct?
 3              A.    In what form?
 4              Q.    And the dispatcher is saying a caller's
 5   reporting a male --
 6              A.    Right.
 7              Q.    -- a white male --
 8              A.    But who?
 9              Q.    -- in a multicolored swimsuit harassing his
10   wife.
11              A.    But what caller?  Which -- which one, when
12   we have three different ones?
13              Q.    Well, that information -- and we'll put
14   stuff together.
15              My question though is --
16              A.    Uh-huh.
17              Q.    -- that information, that one piece --
18              A.    Uh-huh.
19              Q.    -- is in this radio transmission, correct?
20              A.    That's correct, but, again, we're also
21   going upon dispatch, who is not there either.
22              Q.    And I'm not asking that question.
23              A.    Okay.  But I'm trying to provide you my
24   insight to that.
25              Q.    And you can, but I just want to make clear

Bethany Guerriero
April 25, 2024                                                    123

1    that I'm not asking that question.

2            A.    Okay.

3            Q.    Dispatch also relayed that that male walked

4    to the other side of the clubhouse, correct?

5            A.    But which male?

6            Q.    The male who was accused of harassing the

7    wife.

8                  MR. MORSE:  Object as to form.

9            A.    Which is who?  Where's the descriptor on

10   that though?

11   BY MR. RICE:

12           Q.    I'm saying, that's what dispatch relayed;

13   is that correct or not?

14                 MR. MORSE:  Object to form.

15   BY MR. RICE:

16           Q.    Or don't you know?

17           A.    It's -- it's unclear to me, listening to

18   that, exactly who that might be.

19           Q.    Fair.

20                 Dispatch said that the caller had a CCW and

21   a gun in a holster in his groin area, correct?

22           A.    Right.

23                 Which caller; 1, 2 or 3?

24           Q.    I didn't ask that.

25           A.    But I'm providing you that information

Bethany Guerriero
April 25, 2024                                    124

1   because that's how it was perceived by me.

2          Q.    And I would just ask you to please listen

3   to the question being asked.

4          A.    Okay.

5          Q.    Make sure you understand it.  If I'm being

6   unclear or it feels like I'm asking something that I'm

7   not, please let me know.

8          A.    Okay.

9          Q.    What I'm asking is:  On this call, dispatch

10  relayed that the caller has a CCW and a gun in a holster

11  in his groin area, correct?

12         A.    Correct.

13             MR. RICE:  And I'm going to continue to

14       play it back at 1:34.

15             RICK KING:  Can you start at beginning?

16             MR. RICE:  At the request of counsel, I

17       will start at 00 and play it through.

18             (Excerpts from Exhibit 1, radio recording,

19       were resumed and transcribed as follows:)

20             DISPATCH:  336922 --

21             (Excerpts from Exhibit 1, radio recording,

22       were paused.)

23             MR. RICE:  Let's go off the record for a

24       moment.

25             THE COURT REPORTER:  Did you want to give

1         me a transcript of this?

2                  MR. RICE:  We don't need to write -- this

3         is an exhibit.  You don't need to -- and if you

4         have already, that's awesome, but --

5                  THE COURT REPORTER:  No.  I would want the

6         audio recording to transcribe it correctly against

7         later.

8                  MR. RICE:  I'll give you the audio.  But

9         this is an exhibit.  I'll give you this file.  I

10        don't have a written transcript of it, and we --

11                 THE COURT REPORTER:  Yeah, I can write that

12        for you later if you want a really fresh --

13                 MR. RICE:  If you want.  And like I said, I

14        don't actually think we need a transcript.

15                 MR. MORSE:  I agree.  The audio and video

16        is what it is so I mean.

17                 THE COURT REPORTER:  In the Florida court

18        reporter handbook, we are supposed to transcribe

19        videos being played and audio being played, so

20        that's why I'm asking if you're going to give

21        me --

22                 MR. MORSE:  They're exhibits, so you'll

23        definitely get it.

24                 (Discussion off the record.)

25                 MR. RICE:  I'm going resume at 10 seconds.

Bethany Guerriero
April 25, 2024                                                    126

```
 1                  And if you're having trouble hearing the

 2             audio or need portions played back, let me know.

 3                  THE WITNESS:  Okay.

 4                  MR. RICE:  I know that my laptop doesn't

 5             have the best speakers.

 6                  THE WITNESS:  No, you're okay.

 7                  (Excerpts from Exhibit 1, radio recording,

 8             were resumed.)

 9                  (Excerpts from Exhibit 1, radio recording,

10             were paused.)

11        A.    "Advised a male is harassing his wife," so

12   whose wife?  The man in the multicolored bathing suit?

13   Because that's how I understand that.

14   BY MR. RICE:

15        Q.    Okay.

16                  MR. RICE:  I'm going to resume, play it

17             back at 36 seconds.

18                  (Excerpts from Exhibit 1, radio recording,

19             were resumed.)

20        A.    Again, who?  Which caller?

21                  MR. RICE:  I'm going to stop at 1:37.

22                  (Excerpts from Exhibit 1, radio recording,

23             were paused.)

24        A.    The -- the -- the suspect or the person

25   with the multicolored bathing suit because that's the
```

Bethany Guerriero
April 25, 2024                                          127

1   last descriptor I remember hearing.

2   BY MR. RICE:

3          Q.    Well, wouldn't you agree that the dispatch

4   seems to use three terms for the people involved:  One is

5   "caller," one is "male," and one is "wife."

6          A.    Okay.  And how am I supposed to decipher

7   that without any other physical descriptors, other than a

8   multicolored bathing suit?

9          Q.    And I'm not asking if you understood that,

10  but I mean, you would agree that at this point in the

11  recording, that dispatcher used those terms to refer to

12  three different people?

13         A.    Correct.

14         Q.    Okay.

15              MR. RICE:  Let's carry on at 1:37.

16              (Excerpts from Exhibit 1, radio recording,

17         were resumed.)

18         A.    Can you stop that for a second?

19              Can you pull up --

20              MR. RICE:  Stopping at 2:35.

21              (Excerpts from Exhibit 1, radio recording,

22         were paused.)

23         A.    Can you pull up a picture of Mr. Gould?

24  BY MR. RICE:

25         Q.    I cannot.

Bethany Guerriero
April 25, 2024                                          128

```
 1              A.    Because I'm pretty sure he had brownish

 2    hair and -- and facial hair, as well.

 3              Q.    That's what you recall?

 4              A.    I do.

 5              Q.    And I was going to say, after we get

 6    through this exhibit, if you want to refer back to your

 7    body camera, I'm happy to pull that up.

 8              A.    That's fine.

 9              MR. RICE:  I'll resume at 2:35.

10              (Excerpts from Exhibit 1, radio recording,

11         were resumed.)

12              MR. RICE:  I'm going to stop at 3:31.

13              (Excerpts from Exhibit 1, radio recording,

14         were paused.)

15    BY MR. RICE:

16              Q.    Was that most recent transmission you

17    responding to the call?

18              A.    Yes.

19              Q.    So at this time, were you listening to the

20    radio transmissions?

21              A.    I believe, after this, I had gotten on the

22    radio, is when Officer Valerio let me know he was 10-12

23    on the other side of the pool from my 14.  That's all he

24    said.

25              Q.    And after listening to about
```

Bethany Guerriero
April 25, 2024                                      129

1   three-and-a-half minutes of the radio transmissions,

2   would you agree that dispatch talks about two calls

3   coming in?

4          A.    At least two calls, yes.

5          Q.    And the first minute-and-a-half is a call

6   from someone who says that a white male in a multicolored

7   swimsuit is harassing his wife, correct?

8          A.    Uh-huh correct.

9          Q.    And after about a-minute-and-a-half,

10  dispatch reports that a second caller has called in,

11  correct?

12         A.    Correct.

13         Q.    And this second caller claims that someone

14  lifted his shirt and showed him a gun, correct?

15         A.    Correct.

16         Q.    Would you agree that the information you

17  conveyed to Sergeant Glass about the incident and who was

18  involved is contained in these radio calls?

19         A.    Not all of it.

20         Q.    What information is not contained in these

21  radio calls?

22         A.    Who is who.

23         Q.    So whether Mr. Gould was the person with

24  the gun in his groin or whether Mr. Gould was the person

25  being threatened by it, correct?

Bethany Guerriero
April 25, 2024                                    130

```
 1              A.    Correct.

 2              Q.    But when you talked to Sergeant Glass, you

 3   understood who was who at that point, correct?

 4              A.    Correct.  I just don't recall where I got

 5   the clarification from is what I'm trying to tell you.

 6              Q.    I understand that.

 7                    Is there any other information that you

 8   conveyed to Sergeant Glass at about the five-and-a-half

 9   minute mark on your body camera recording that is not

10   present in these radio calls?

11              A.    I don't -- I don't -- again, I don't -- I

12   don't really recall.  I don't know.  I don't think so.

13              Q.    As you sit here today, there's nothing you

14   can point to?

15              A.    Correct.

16              Q.    Okay.  Did you tell Sergeant Glass and

17   other officers that Mr. Gould went back into his pockets

18   again?

19              A.    Yes.

20              Q.    Why did you say that?

21              A.    Because that's what it had appeared to me

22   at the time was potentially happening.  Again, I'm in --

23   I'm in a heightened state, I've got a lot going on.  So

24   for me, that's what my perception was at that moment.

25              Q.    Was your perception that, because earlier
```

Bethany Guerriero
April 25, 2024                                    131

```
 1    we talked about, and, again, I'm going to be splitting

 2    hairs here because that's what I do, that there's a

 3    difference between Mr. Gould dropping his hands and going

 4    into his pockets, right?

 5          A.    Correct.

 6          Q.    Did you perceive Mr. Gould go into his

 7    pockets a second time?

 8          A.    I perceived hands dropping, which could

 9    have led to that.

10          Q.    Would it have been more accurate to tell

11    Sergeant Glass that you saw Mr. Gould drop his hands a

12    second time?

13          A.    Perhaps, but I was still in a heightened

14    state of emotion and, like, realizing that whatever was

15    going on with me medically wasn't getting any -- any

16    better.  I was still feeling symptomatic; although, that

17    may not have been conveyed at that moment, that's what

18    was going on for me.  So again, my perception at that

19    moment of what was going on was real for me at that

20    moment.

21          Q.    So it would be fair to say there were

22    circumstances that may have led you to be less precise

23    with your language at that moment?

24          A.    That's correct.

25          Q.    Okay.  Did you say that Mr. Gould was,
```

Bethany Guerriero
April 25, 2024                                                              132

1    "obviously, amped-up on something"?

2            A.    I did say that.

3            Q.    What did you mean by that?

4            A.    What I meant by that was, he was, again,

5    not presenting what I had experienced in past calls for

6    service, investigations as typical victim behavior.  You

7    know, coming into contact with people all the time for a

8    living, we literally have to make split-second decisions;

9    we have to look at stuff that are literally going by in

10   the matter of milliseconds.  And to me, he seemed like he

11   could have been on something --

12           Q.    Can --

13           A.    -- with his demeanor.

14           Q.    Can you articulate specific things that led

15   you to come to that judgment?

16           A.    The -- the animation of the -- of the

17   hands, of verbally resisting me when it came to -- you're

18   saying to me that he wasn't fully understanding, but my

19   perception was in his moment of not understanding was

20   being defiant and not listening to us.  As police

21   officers, we take that as a huge red flag and as a

22   potential threat or threat.

23           Q.    So is it fair to say that you perceived him

24   as being an aggressor towards you?

25           A.    That was my perception at the moment, yes.

Bethany Guerriero
April 25, 2024                                      133

 1          Q.    Did Mr. Gould exhibit any signs of
 2    intoxication?
 3          A.    So he was sweating profusely.  I understand
 4    there's -- there's -- there's a temperature thing going
 5    on right here.  I understand, according to him and the
 6    way things went for him -- trauma responses, we've
 7    already discussed this, that it could present symptoms
 8    like that.  Again, I'm not a doctor.  I just go based
 9    upon my experiences and my trainings and my dealings with
10    people and the general public on a daily basis, and
11    that's how it was perceived to me.
12          Q.    And I appreciate that clarification.
13                So generally, would it be fair to say that
14    some of these indicators could be both consistent with
15    intoxication but also other explanations?
16          A.    Absolutely, yes.
17          Q.    And I'm asking:  Knowing that, can you
18    articulate any indicators that Mr. Gould was intoxicated
19    or under the influence of any substances?  So sweating
20    was one, correct?
21          A.    Sweating was one.  The -- the -- the -- you
22    know, the hand movements up and down and, you know, it --
23    it came off as a bit erratic.  The statements that he was
24    making, the verbal combativeness of that.  You know,
25    initially, the -- the lack of respect for me and my

Bethany Guerriero
April 25, 2024                                              134

1    presence and what I was trying to do -- and I -- I

2    understand he could have been, you know, again, 20/20 in

3    his own head, but when I'm trying to make a split-second

4    decision, I don't have time for that.

5         Q.    Anything else?

6         A.    No, sir.

7         Q.    Okay.  Now, you said that during the

8    initial detention of Mr. Gould, your primary concern was

9    to locate if there was any weapon, fair?

10        A.    Fair.

11        Q.    Was a search conducted of Mr. Gould or his

12   belongings nearby for a weapon?

13        A.    By me?  No.

14        Q.    Did you request a search?

15        A.    I don't remember specifically asking for

16   one; however, sometimes things get taken for granted that

17   shouldn't.  I wasn't the only police officer on the

18   scene, so I'm not trying to place blame on anybody else,

19   but there was a bunch of us there at that point; any one

20   of us could have done that.

21        Q.    Why would you say, if you know, why did you

22   not request or search Mr. Gould for weapons?

23        A.    I was still in a -- in a heightened state

24   and, again, I was, like, combatting internally what was

25   ever going on with me medically, realizing that something

Bethany Guerriero
April 25, 2024                                    135

1    wasn't quite right and, literally, just kind of hold

2    things together.  I also realized that with the

3    heightened state, and there were other officers there,

4    maybe Mr. Gould wouldn't have appreciated if I was

5    continuing to put my hands on him.

6         Q.    So would it be fair to say that once

7    Mr. Gould was in handcuffs and there were many officers

8    around him, that your priority shifted to the medical

9    condition you were concerned about and your heightened

10   emotions?

11        A.    Correct.

12        Q.    Okay.  Did you request that a supervisor

13   arrive during Mr. Gould's arrest?

14        A.    I did.

15        Q.    Why?

16        A.    Well, to be quite honest with you, as a

17   senior officer on that particular platoon, we had three

18   supervisors on duty that day, and it seemed a little odd

19   to me that with the type of call that this was, a

20   disturbance presenting a firearm, that perhaps a

21   supervisor would not have been en route sooner.  And at

22   least for me, when somebody is taken into custody, we

23   either request a supervisor.  Or once someone is taken

24   into custody, that we reiterate to a supervisor, are you

25   48, that we either have a 10-15, which is someone that's

Bethany Guerriero
April 25, 2024                                    136

```
1    been arrested or in custody or what have you.  I just

2    felt that because of what was going on, I was shocked

3    that a supervisor wasn't en route sooner than it took me

4    to have to call one to the scene.

5         Q.    So for Palm Beach Gardens Police -- which

6    you are a long-time member of and have experience with,

7    correct?

8         A.    Yes, yes.

9         Q.    -- is it standard practice to call a

10   supervisor for all custodial arrests for any offense?

11        A.    Maybe not particularly to a scene, but to,

12   at the very least, notify a supervisor that someone has

13   been detained, arrested, placed in handcuffs where -- it

14   is customary, and it's something that I have a practiced

15   over the years, to let a supervisor know so that they're

16   aware of what's going on, as a supervisor.

17        Q.    And so, you would say that custom combined

18   with the fact that this was a gun incident led you to

19   call for a supervisor?

20        A.    Yes.

21        Q.    Is that correct?

22        A.    That's correct.

23        Q.    Okay.  Now, at some point, did you come

24   into contact with the person who had the gun in his

25   groin?
```

Bethany Guerriero
April 25, 2024                                                    137

1          A.    Yes.

2          Q.    And what do you recall, if anything, about

3    that interaction?

4          A.    I recall walking around to the interior of

5    the pool area and the north side of the clubhouse where I

6    ran in or I came into contact with a man with the last

7    name of Silva.  At that point, and I'm generalizing here,

8    I don't want to say specifically, but it was now apparent

9    to me that he was the subject that had a firearm.  Before

10   any questioning in regards to that, I remember reading

11   him his Miranda warnings, because that was on the body

12   camera.

13         Q.    And you talked to Mr. Silva, correct?

14         A.    Briefly, yes.

15         Q.    And he was with a woman, correct?

16         A.    Yes.

17         Q.    And that person was, presumably, his wife?

18         A.    Presumably, yes.  She was in a bathing

19   suit, and she presented to me as, obviously, very

20   pregnant.

21         Q.    Was Mr. Silva shorter than Mr. Gould?

22         A.    I'm going to be honest with you here, I

23   didn't really take into account how tall anybody was.  I

24   -- I didn't.  It just. . .

25         Q.    So as you sit here today, you have no

Bethany Guerriero
April 25, 2024                                          138

```
 1   recollection of that, either way?

 2          A.     No.

 3          Q.     Okay.

 4          A.     I don't.

 5          Q.     Was Mr. Silva wearing a shirt and shorts at

 6   the time?

 7          A.     I do remember a short-sleeve shirt.  And

 8   he -- I -- they look like baggy shorts.  I don't know.

 9          Q.     And when --

10          A.     He was --

11          Q.     When you first encountered Mr. Silva, was

12   he still armed?

13          A.     No.

14          Q.     Did he have a holster in his groin, do you

15   know?

16          A.     I don't remember.

17          Q.     Did you have any safety concerns when you

18   approached Mr. Silva?

19          A.     At that point I did not because he was in

20   contact with other officers.  I'm not exactly sure all

21   who before I got there, but he was no longer armed.

22          Q.     So is it fair to say that because other

23   officers were present and did not seem concerned

24   themselves, that you did not have any concerns yourself?

25          A.     I'm not saying that.  I'm just saying I did
```

Bethany Guerriero
April 25, 2024                                    139

```
 1   not see a firearm on Mr. Silva at that point.
 2        Q.    Did you know he was disarmed when you first
 3   approached him?
 4        A.    I did not.  Well, I take that back.  I
 5   don't remember if it was clarified who had secured the
 6   weapon at that point.  I don't remember; I don't know.
 7        Q.    And I'll say, I'm not trying to do memory
 8   games or anything like that.
 9        A.    Uh-huh.
10        Q.    Would it be helpful to view your body-worn
11   camera about that initial encounter with Mr. Silva?
12        A.    That's fine.
13             MR. RICE:  I'm going to go back to
14        Exhibit 4.  I'm going to start at about 733.
15             (Video playing.)
16             MR. RICE:  Now, I'm going to stop it at
17        7:46.
18   BY MR. RICE:
19        Q.    This is when you first encountered
20   Mr. Silva and a woman, correct?
21        A.    Correct.
22        Q.    At this point you understand that Mr. Silva
23   was previously armed, correct?
24        A.    At this point, yes.
25        Q.    Do you know if Mr. Silva is still armed?
```

Bethany Guerriero
April 25, 2024                                                    140

```
 1          A.   I see a holster.  It ap- -- it appears
 2   empty, but, again, there were two other officers there
 3   with him.
 4          Q.   So did --
 5          A.   So. . .
 6          Q.   Did you have any safety concerns at this
 7   time?
 8          A.   With there being two other officers already
 9   there speaking with him and he is relatively calm, I did
10   not.
11          Q.   So the fact that Mr. Silva has been accused
12   of threatening somebody with a gun previously was not a
13   sufficient safety concern to warrant action by you at
14   this time, correct?
15          A.   But when I arrived there, I did not know
16   who was who.  At first, I didn't.
17          Q.   And I didn't ask that.
18               What I asked was the mere fact that
19   Mr. Silva was accused of previously threatening somebody
20   with a gun was not a sufficient safety threat for you to
21   use force or take any action at this time, correct?
22          A.   Correct.
23          Q.   Okay.  And the fact that Mr. Silva had
24   possessed a gun was also not a fact that required action
25   by you at this time, correct?
```

Bethany Guerriero
April 25, 2024                                   141

```
 1              A.     Correct.

 2              Q.     And it was your understanding that

 3    Mr. Silva had a holster in his groin area but not a gun,

 4    correct?

 5              A.     Correct.

 6              Q.     Okay.  Do you know where the gun was at

 7    this point?

 8              A.     At that particular moment, I did not.

 9              Q.     Were you concerned that the gun could be

10    elsewhere on Mr. Silva's body?

11              A.     I don't -- I don't recall, like, feeling

12    that way or I -- I don't -- I don't know.

13              Q.     Well, I'm just curious because I believe

14    previously, you talked about how generally you assumed

15    most people were armed or take action against officers,

16    correct?

17              A.     Correct.

18              Q.     So wouldn't you assume that Mr. Silva was

19    still armed until it was confirmed to you that he was

20    not?

21              A.     I mean, it -- it's reasonable --

22              MR. MORSE:  Object as to form;

23         mischaracterization.

24              A.     You could say that, but he was also with

25    two other police officers at that point.
```

Bethany Guerriero
April 25, 2024                                          142

```
 1    BY MR. RICE:
 2         Q.    And so, the fact that he was with other
 3    officers, did that alleviate any potential safety
 4    concerns you may have felt?
 5         A.    A bit, yes, because when I encountered
 6    Mr. Gould, there was nobody around him.  So I didn't know
 7    who he had made contact with.  I didn't know who he was.
 8         Q.    And just to that point, when you first
 9    encountered Mr. Gould, you didn't know whether
10    Officer Valerio had made contact with him or not, fair?
11         A.    I had no idea.  I had no clue.
12         Q.    Did you provide probable cause for
13    Mr. Gould's arrest?
14         A.    In what capacity?  What do you mean?  I
15    mean, I had placed the man under arrest.
16         Q.    Well, officers are generally required to
17    provide a probable cause statement or affidavit in
18    connection with someone's arrest, correct?
19         A.    Correct.  I was also carted off to the
20    hospital.
21         Q.    And I know you weren't on the scene, but
22    did you provide the information to establish that
23    probable cause for Mr. Gould's arrest?
24         A.    Briefly, I had, you know, explained
25    initially upon my arrival what had taken place, which
```

Bethany Guerriero
April 25, 2024                                                    143

 1   constituted me placing him under arrest.

 2          Q.    Well, and I'll tell you why I'm asking

 3   this, is:  Did you understand that Officer Strzelecki

 4   wrote a report and filled out that probable cause

 5   affidavit?

 6          A.    Much later on I did.

 7          Q.    And so, is it your understanding that

 8   Officer Strzelecki relied on your observations and your

 9   account of the incident to establish probable cause for

10   Mr. Gould's arrest?

11          A.    Yes.

12                MR. MORSE:  Objects as to form.

13   BY MR. RICE:

14          Q.    And what I'm asking is, what

15   Officer Strzelecki understood is that you were providing

16   probable cause through your account and observations.

17                Did you also have that understanding about

18   the time of the incident, that your account and

19   observations would be used to establish probable cause

20   for Mr. Gould's arrest?

21          A.    Well, yes, because it was how I perceived

22   everything happening up to the point of him being

23   arrested.

24          Q.    And during this incident, do you believe

25   there was probable cause to arrest Mr. Gould?

Bethany Guerriero
April 25, 2024                                    144

1          A.     Absolutely.

2          Q.     Based on what?

3          A.     Based on his actions, based on the totality

4    of the circumstances, the information that was received

5    by me, perceived by me at that time.

6          Q.     What crime, if any, was there probable

7    cause for?

8          A.     Resisting.

9          Q.     Resisting without violence or force?

10         A.     Yeah.  Re- -- resisting -- resisting an

11   officer.

12         Q.     And what conduct by Mr. Gould specifically

13   established probable cause for that particular crime?

14         A.     Going back to I had told him, at least

15   twice, to keep his hands out of or away from his pockets,

16   to which he did not listen.

17         Q.     And so, just to clarify, I know we've gone

18   through this quite a bit before, but I just want to make

19   sure I understand, that specific conduct would be the

20   first time that Mr. Gould reached into and pulled his

21   cell phone out of his pocket, correct?

22         A.     No.

23         Q.     Okay.

24         A.     It would be after the second time that I

25   had told him, I can tell you one time, and if you do not

Bethany Guerriero
April 25, 2024                                            145

1    listen when I tell you one time -- regardless of how I'm

2    asking, telling you, commanding you, yelling at you,

3    whatever, I'm telling you not to do something, whether

4    it's in a nice way or not such a nice way, it takes one

5    time.  I -- I let it go to two, almost three times before

6    I ordered him on to the ground because of the behaviors,

7    both verbally and nonverbally, he was displaying.

8            Q.    So was it your understanding that when

9    Mr. Gould reached into his pocket and pulled his cell

10   phone out --

11           A.    I did not know.

12           Q.    What I'm asking is:  When Mr. Gould reached

13   into his pocket and pulled his cell phone out, would that

14   alone have established probable cause, in your opinion,

15   for resisting an officer?

16           A.    Yes, because I had already told him not to

17   do that.

18           Q.    And would it establish further probable

19   cause when Mr. Gould dropped his arms down near his

20   pockets after your additional command, correct?

21           A.    Correct.

22           Q.    Anything else establish probable cause or

23   those, the instances?

24           A.    Well, once he was in -- in custody and he

25   had already, you know, stood up and now there's other

Bethany Guerriero
April 25, 2024                                    146

```
 1   officers there, we -- were asked for his name, he was

 2   deflecting by asking or saying other things, and it was a

 3   refusal to provide his name for basic identification

 4   purposes so we could further our investigation the

 5   correct way.   That's obstruction.

 6           Q.    So you understood that Mr. Gould's refusal

 7   to provide a name during an arrest also constituted

 8   resistance?

 9           A.    Correct.

10           Q.    But you would agree that Mr. Gould could

11   not have been under arrest at that point, unless he

12   had --

13                 MR. ALEXANDER:   Object --

14   BY MR. RICE:

15           Q.    -- previous- --

16                 MR. ALEXANDER:   -- to form.

17   BY MR. RICE:

18           Q.    -- -ly committed some crime, correct, or

19   been -- let me strike that question.

20                 But you would agree that by the time

21   Mr. Gould was under arrest, you had to have probable

22   cause of some crime at that point in time, correct?

23           A.    I'm going to a gun call, which I -- I don't

24   know at that very moment who is who.   And when I'm met

25   with that type of resistance, both verbally, I have PC if
```

Bethany Guerriero
April 25, 2024                                    147

```
 1   a crime was committed at that point.

 2          Q.    Well -- and what I'm asking is:  You would

 3   just agree that a requirement for Mr. Gould to be

 4   arrested is the existence of probable cause that he

 5   committed some crime, correct?

 6          A.    He did commit a crime by going back down

 7   after me giving him an order not to do so, and we're on a

 8   firearm call.

 9          Q.    And I didn't ask if he did commit a crime

10   or that sort of thing.  It's just, just asking about the

11   requirements for an arrest.

12          A.    Uh-huh.

13          Q.    In order for you to make an arrest, you

14   need probable cause that someone has committed a crime,

15   correct?

16          A.    He did right in front of me.

17          Q.    I didn't ask if he did right in front of

18   you.

19                What I'm asking is:  For you to arrest

20   somebody, it is required that you have probable cause

21   that that person committed a crime, correct?

22          A.    Correct.

23          Q.    Okay.  Now, during this incident, were

24   there times that officers, including you, muted their

25   body camera audio?
```

Bethany Guerriero
April 25, 2024                                          148

```
 1              A.    I did.  I -- I -- I know that I did.  It

 2    was not intentional.  We try very hard to -- to, like,

 3    never do those things; however, in an -- in an event

 4    to -- to mute it, I believe I turned it off and didn't

 5    realize that I -- I did so.  The buttons are kind of

 6    close in relation in that system that you have to hit

 7    them in to mute as opposed to turn off -- honestly, was a

 8    simple mistake.  I didn't mean anything by that, by

 9    trying to mute it.

10              Q.    Well, and what I'm asking isn't about the

11    muting though.

12              A.    Uh-huh.

13              Q.    Are there circumstances that policy allows

14    you to mute the audio of your body camera recorders?

15              A.    Yes.

16              Q.    What are those circumstances?

17              A.    So anything that we're not trying to give

18    any type of official statement to, or, you know,

19    sometimes things that may not be immediately relevant to

20    whatever is going on but, you know, you -- there -- there

21    is stipulations in the policy where you can mute the body

22    camera.  Do we try not to do that, yes, but. . .

23              Q.    Would having a conversation with other

24    officers about an incident qualify as a time when you

25    could mute your audio?
```

```
 1              A.    What -- what incident are -- are we
 2     referring to?  This one --
 3              Q.    No, dur- --
 4              A.    -- specifically --
 5              Q.    During --
 6              A.    -- or --
 7              Q.    During this incident, if you were to have a
 8     conversation with just other officers, would you be
 9     allowed to mute your audio per policy?
10              A.    Yes.
11              Q.    Why?
12              A.    Because it may not have anything to do
13     specifically with what's going on with that particular
14     case or. . .
15              Q.    So would it be fair to say that any
16     discussions, even among officers, related to this
17     incident, the people involved, potential crimes would be
18     audio recorded by body cameras?
19              A.    Correct.
20              Q.    Do you recall what was discussed while your
21     body camera was muted?
22              A.    I -- I don't.  I. . .
23              Q.    Why did you mute your body camera?
24              A.    I -- I don't want to misspeak here.
25     Like -- like I said, it was a mistake.  I didn't mean to,
```

Bethany Guerriero
April 25, 2024                                    150

1  like, try to mute or even turn it off.  I think it was --

2  I was trying to explain maybe what was going on with me,

3  too.  But, again, I don't want to -- I don't want to

4  speculate or -- or misspeak.

5          Q.    But it's your position today that audio

6  recordings should have been maintained of any

7  discussions, even among police officers, related to the

8  incident, the people or potential crimes?

9          A.    Yes.

10         Q.    Okay.  And do you have knowledge of anybody

11 not doing that?

12         A.    Not off the top of my head, no.

13               THE WITNESS:  Can we take a restroom break?

14               MR. RICE:  Yeah, let's take a five,

15         ten-minute break.

16               (11:19 a.m. to 11:24 a.m.)

17 BY MR. RICE:

18         Q.    Again, I'll ask you:  Did anything occur

19 during your break that prevents your ability to continue

20 this deposition?

21         A.    No.

22         Q.    Okay.  Later when you were in the hospital,

23 did you have a conversation with Sergeant Beath?

24         A.    I did.

25         Q.    What did you discuss with him?

Bethany Guerriero
April 25, 2024                                              151

1          A.     Again, I don't -- I'm not aware of verbatim

2     because by the time he had come to see me, several hours

3     had passed so I was already medicated.  A decision based

4     on initial tests was already made that I was going to be

5     admitted to the cardiac unit.  So I was merely waiting to

6     be transported upstairs to the cardiac unit by the time

7     Sergeant Beath had gotten there.

8          Q.     And what topics, if any, did you discuss

9     with him?

10         A.     He had come in to the emergency room to

11    notify me that he had unarrested Mr. Gould and that I

12    probably was going to be facing some type of disciplinary

13    action.

14         Q.     And how did you feel about that

15    information?

16         A.     To be quite honest with you, it was

17    disturbing to me because, again, as I had stated, I was

18    already medicated, they had worked several hours to get

19    my blood pressure back down to an acceptable level.  My

20    wife was now present at the time that Sergeant Beath had

21    showed up along with two other officers in the general

22    emergency room area to discuss issues that, I personally

23    feel, could have been dealt with at another time.

24         Q.     So is it fair to say that those weren't the

25    place or circumstances to raise those issues?

Bethany Guerriero
April 25, 2024                                      152

```
 1              A.    Correct.
 2              Q.    Putting those concerns aside and looking to
 3   the substance of the information, how did you feel about
 4   that, the fact that Mr. Gould had been unarrested and
 5   that there was an investigation being opened?
 6              A.    I was -- I was disturbed by that
 7   information, to be honest with you.
 8              Q.    Why?
 9              A.    Because I had probable cause to arrest
10   Mr. Gould for what had occurred that day.  And learning
11   that he had been unarrested when I had probable cause to
12   effect that said arrest, I couldn't understand why or
13   where that was coming from.  But, again, I was already
14   medicated when I am having this discussion being brought
15   to me.
16              Q.    Did you have a discussion with
17   Sergeant Beath that he would bet $20 that the case
18   wouldn't go to IA?
19              A.    That he said that?
20              Q.    Correct.
21              A.    Yeah, he did say that.
22              Q.    How did you understand that comment?
23              A.    Again, I was medicated.  So, you know, I
24   just -- I was feeling very uneasy on top of not feeling
25   well.  I was -- I felt as if I was being put in a
```

Bethany Guerriero
April 25, 2024                                                     153

1    position where I really couldn't go anywhere because I'm

2    wearing a hospital gown, I have IVs and all kinds of

3    testing equipment attached to me, so it's not like I can

4    just readily get up and walk away from the situation.

5              Q.    How engaged were you with Sergeant Beath at

6    the time?

7              A.    How engaged?  What do you mean?

8              Q.    Correct.  I mean, you mentioned these

9    medical concerns and other things on your mind.

10             A.    Uh-huh.

11             Q.    Were you able to be present mentally in

12   that conversation or not?

13             A.    No, absolutely not.  I don't -- I don't

14   feel that was an appropriate time when someone's in there

15   for a cardiac incident and they've already been medicated

16   and you come to the hospital several hours later.

17             Q.    So I want to go to an interview that you

18   gave.

19             At some point this matter did get referred

20   to IA, correct?

21             A.    Correct.

22             Q.    Do you know how it was referred to IA?

23             A.    I don't because, again, I was in the

24   hospital for two, three days before it was even brought

25   to my attention that this was now an IA investigation.

Bethany Guerriero
April 25, 2024                                                    154

1          Q.    And as you sit here today, do you feel that

2     your conduct warranted an Internal Affairs investigation?

3          A.    No.

4          Q.    Why not?

5          A.    Because during these types of situations

6     and over the course of 20 years, you know, you see things

7     that -- that happen.  I -- you know, I'm not going to sit

8     here and give specifics, but I've witnessed several

9     things.  I've been the person that has maybe had to

10    intervene and calm a situation down before human emotions

11    completely took over, so. . .

12         Q.    So is it fair to say that, as you sit here

13    today, your position is that you acted reasonably and by

14    the standards you're supposed to during this incident?

15         A.    Well, as I discussed with you earlier,

16    the -- the back and forth verb- -- verbally between

17    Mr. Gould and I, you know, was unnecessary.

18         Q.    So you would agree there was some

19    unprofessional language on your part?

20         A.    Yes, unprofessional language, absolutely.

21         Q.    But other than that, do you feel that you

22    acted appropriately and in line with standards?

23         A.    I do.

24         Q.    Okay.  As part of the IA investigation, you

25    gave an interview, correct?

Bethany Guerriero
April 25, 2024                                    155

```
 1              A.    Correct.

 2              Q.    And was it a voluntary interview?

 3              A.    I'm not really sure what you mean by that.

 4              Q.    Did you choose to participate, or were you

 5     legally compelled to participate?

 6              A.    Well --

 7              Q.    If you know.

 8              A.    I mean, it's an IA investigation, so I am

 9     required to come in and give a statement.

10              Q.    So you felt legally compelled to give a

11     statement, fair?

12              A.    Correct.

13              Q.    And you gave the statement with counsel

14     present, correct?

15              A.    Correct.

16              Q.    I have as Exhibit 8 a recording of your

17     interview, and I want to go over a few points to see if

18     what you said in that interview are accurate and still

19     accurate today.

20                    MR. RICE:  So I'm going to start at nine

21              minutes and four seconds.

22                    (Excerpts from Exhibit 8, recorded

23              interview, were played and transcribed as

24              follows:)

25                    OFFICER GUERRIERO:  Yes, a male wearing
```

Bethany Guerriero
April 25, 2024                                      156

```
 1            multicolored shorts.  And as I was pulling in --
 2                 (Excerpts from Exhibit 8, recorded
 3            interview, were paused.)
 4                 MR. RICE:  You know what?  Let me start
 5            back at, like, 8:30 to just give you some context.
 6                 (Excerpts from Exhibit 8, recorded
 7            interview, were resumed and transcribed as
 8            follows:)
 9                 IA INVESTIGATOR:  You just got involved.
10                 OFFICER GUERRIERO:  Uh-huh.
11                 IA INVESTIGATOR:  Dispatch said the
12            individual that was armed has a -- was a CCW
13            holder and had the gun holstered in his waist.
14                 The second caller, which eventually turned
15            out to be Mr. Gould, said the subject with the gun
16            pulled up his shirt and revealed that the gun was
17            in his belt, and he was described as 5'2" and 120
18            pounds.
19                 Now, when you arrived, do you recall
20            Mr. Gould was wearing a bathing suit and Crocs?
21                 OFFICER GUERRIERO:  When I arrived I
22            remember seeing, yes, a male wearing multicolored
23            shorts.  And as I was pulling in, I could see him.
24            And then to the -- as he was walking towards me,
25            he was now to my left as I was starting to pull
```

Bethany Guerriero
April 25, 2024                                    157

```
 1            around.  And just behind him, I -- where the

 2            stopped car was, I noticed a -- a lump.  I wasn't

 3            sure what was it was at the time; if it was a

 4            shirt, if it was a backpack, if it was a towel.  I

 5            wasn't sure.

 6                 And the radio traffic was very confusing.

 7            I wasn't sure at first because as -- as one of the

 8            last things I'm looking at just prior to my

 9            arrival, I see, which I highlighted here in the

10            notes, that the caller's been advised to show his

11            hands at all times to the officer, keep his hands

12            away from his groin area.

13                 So it became known to me later on down the

14            road that there were actually three people.  The

15            three people that eventually were involved were

16            all calling 911 at the same time and each were

17            speaking to a different dispatcher.  I was --

18                 MR. RICE:  I'll stoop at 10:10.

19                 (Excerpts from Exhibit 8, recorded

20            interview, were paused.)

21   BY MR. RICE:

22            Q.   Over that portion we listened to, was

23   everything that you said in that interview accurate, as

24   of today?

25            A.   Yes.
```

Bethany Guerriero
April 25, 2024                                              158

1          Q.    How recently, if at all, have you reviewed
2     your interview with Internal Affairs?
3          A.    Like, thoroughly; like, page by page, or
4     just glancing at it?
5          Q.    In any manner, if I were to ask you if you
6     generally were familiar with the interview you gave with
7     Internal Affairs?
8          A.    I'm -- I'm generally familiar, yes.
9          Q.    As you sit here today, are there any
10    portions of that interview that you dispute or now claim
11    are inaccurate?
12         A.    I don't believe so.
13         Q.    Okay.  You have had prior discipline beyond
14    this incident, correct?
15         A.    Yes.
16         Q.    Can you briefly describe any prior
17    discipline you have received?
18         A.    In 2019, I received a prior discipline for
19    language on a scene where I had arrested an intoxicated
20    individual for creating a disturbance at the mall when he
21    had put his hands and shoved me but not only my partner,
22    backup officer that had initially gotten on scene,
23    resulting in a use of force by deploying my taser.  So
24    during that heightened incident, the language that I
25    used, I guess, was deemed unprofessional, and I was given

Bethany Guerriero
April 25, 2024                                    159

1   a written reprimand for that.

2           Q.    Anything else?

3           A.    Also a little bit later on in 2019, an

4   incident involving my ex-wife who is a Lieutenant for the

5   City of Delray in overseeing the IA unit at the time of

6   said incident.  We were in the middle of a pretty

7   contentious divorce, child custody.  I don't know how

8   much further you want me to -- to get into this but. . .

9           Q.    That's fine, but that's generally what it

10  involved.

11                And what came of it?

12          A.    What -- what came of it was that the State

13  Attorney's Office dismissed and null processed her

14  allegation.  In turn, my ex-wife was put under IA to

15  which she was sustained on six counts of perjury, and I

16  signed an NDA because I sued the City of Delray and won

17  for false arrest, false report and other civil rights

18  violations.

19          Q.    Okay.  Did any of those incidents

20  contribute to your actions or understanding of the

21  incident with Mr. Gould?

22          A.    What do you mean?  I don't understand that

23  question.

24          Q.    Well, just, for example, if you had

25  previously -- if someone had previously been disciplined

Bethany Guerriero
April 25, 2024                                                    160

 1   for using excessive force when encountering a suspect,

 2   they may approach a subsequent encounter with knowledge

 3   that they shouldn't or should do things that it may

 4   affect their conduct, right?

 5          A.    Well, the incident in 2019, I was issued a

 6   written reprimand for my language.  My use of force was

 7   cleared.

 8          Q.    And you were given a written reprimand for

 9   your language.

10                What I'm asking is:  Did that have any

11   affect -- based on your understanding as you sit here

12   today, did that have any affect on our interaction with

13   Mr. Gould?

14          A.    Again, you know, should the banter have

15   continued, no.  And I've -- I've sat here and, you know,

16   told you that; you know, I'm honest with that.  However,

17   given the circumstance that elicited the heightened

18   response and, you know, having a medical issue go on,

19   contributing factors, yes.

20          Q.    So it would be fair to say, though, that

21   during your incident with Mr. Gould, you understood what

22   was expected of you, in terms of professional language?

23          A.    I was concerned with protecting and --

24   and -- you know, the safety of lives; not so much my

25   language --

Bethany Guerriero
April 25, 2024                                            161

```
 1              Q.    That's not --

 2              A.    -- to be honest with you.

 3              Q.    That's not the question I asked.

 4              A.    Okay.

 5              Q.    The question I asked was:  During your

 6  interaction with Mr. Gould --

 7              A.    Uh-huh.

 8              Q.    -- you had a good understanding of what was

 9  expected for you, with respect to professional language?

10              A.    Sure.

11              Q.    And you also understood what could

12  potentially happen if you violated those standards,

13  correct?

14              A.    Correct.

15              Q.    Have you had any training in reactionary

16  gaps or time lag issues?

17              A.    What do you mean?

18              Q.    Well, there is a set of training and

19  principles about the time it takes for someone to, say,

20  perceive a threat, understand the threat and react to it.

21                    Are you familiar with that line of

22  training?

23                    MR. MORSE:  Object as to form.

24              A.    To what your specifics are, no.

25
```

Bethany Guerriero
April 25, 2024                                        162

1    BY MR. RICE:

2         Q.    Okay.   That is about what I have, so I'm

3    going to ask some closing questions.

4              Have all of your answers been complete

5    today?

6         A.    Yes, sir.

7         Q.    Have all of your answers today been

8    accurate, or is there anything, now that we're at the

9    end, that you would like to go back and revisit?

10        A.    No.

11        Q.    And so, just so the record's clear, you

12   believe that, as you sit here today, that all your

13   answers have been accurate, correct?

14        A.    Yes.

15        Q.    Have you understood all my questions

16   sufficiently or asked for clarification, as I've asked

17   them?

18        A.    Yes.

19             MR. RICE:  I have nothing further.

20             MR. MORSE:  Let's take a five-minute break.

21             MR. RICE:  Yes, sure.

22             (Recess taken, 11:39 a.m. to 11:45 a.m.)

23             MR. MORSE:  We don't have any questions.

24             MR. RICE:  I have nothing further.

25             MR. MORSE:  That's it.

Bethany Guerriero
April 25, 2024                                    163

1              MR. ALEXANDER:  No, nothing further here.

2              MR. RICE:  Will you read and sign?

3              MR. MORSE:  Read, read, yep.

4              MS. JOHNSON:  We have no questions either.

5              MR. RICE:  Thank you.  This concludes the

6         deposition.

7              (Thereupon, the deposition was concluded at

8         approximately 11:45 a.m.  Signature and

9         formalities were not waived.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              EXCEPT FOR ANY CORRECTIONS MADE ON
                THE ERRATA SHEET BY ME, I CERTIFY
 2              THIS IS A TRUE AND ACCURATE TRANSCRIPT.

 3

 4              BETHANY GUERRIERO

 5

                Sworn to and subscribed before me this
 6
        day of            2024.
 7
    Personally known     or I.D. _____
 8

 9

10
                     Notary Public in and for the
11                   State of Florida at Large

12  My commission expires:

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                    CERTIFICATE OF OATH OF WITNESS

2

3    THE STATE OF FLORIDA         )
                                  )  SS:
4    COUNTY OF PALM BEACH         )

5

6

7              I, Robyn Maxwell, Registered Professional

8    Reporter, Registered Professional Reporter, Notary Public

9    in and for the State of Florida at Large, certify that

10   the witness, BETHANY GUERRIERO, personally appeared

11   before me on April 25, 2024 and was duly sworn by me.

12             WITNESS my hand and official seal this

13   13th day of May, 2024.

14             *Robyn Maxwell*

15             <%16987,Signature%>
               Robyn Maxwell, RPR, FPR, CLR
16             Realtime Systems Administrator
               Notary Public, State of Florida at Large
17

18   Notary No. HH 232817

19   My Commission Expires: 4/4/2028

20

21

22

23

24

25

```
1              REPORTER'S DEPOSITION CERTIFICATE

2

3    THE STATE OF FLORIDA  )

4    COUNTY OF PALM BEACH  )

5

6              I, Robyn Maxwell, Florida Professional

7    Reporter, certify that I was authorized to and did

8    stenographically report the deposition of BETHANY

9    GUERRIERO, the witness herein on April 25, 2024; that a

10   review of the transcript was requested; that the

11   foregoing pages numbered pages 1 through 168; and that

12   the transcript is a true and complete record of my

13   stenographic notes.

14             I further certify that I am not a

15   relative, employee, attorney, or counsel of any of the

16   parties, nor am I a relative or employee of any of the

17   parties' attorney or counsel connected with the action,

18   nor am I financially interested in the action.

19

20             DATED this 13th day of May, 2024.

21

22

23   _____
     Robyn Maxwell, Signature

24   Robyn Maxwell, RPR, FPR, CLR
     Realtime Systems Administrator

25
```

```
1   Gregory Joseph Morse, ESQUIRE
    greg@morselegal.com
2

3   13th of May, 2024

4   RE:  Gould, Ryan  vs. Guerriero, Bethany, et ano
    04/25/2024, BETHANY GUERRIERO, FLA 6672209
5

6       The above-referenced transcript is available for

7   review.

8       The witness should read the testimony to verify its

9   accuracy. If there are any changes, The witness should

10  note those with the reason on the attached Errata Sheet.

11      The witness should, please, date and sign the Errata

12  Sheet and email to the deposing attorney as well as to

13  Veritext at Transcripts-fl@veritext.com and copies will

14  be emailed to all ordering parties.

15      It is suggested that the completed errata be returned

16  30 days from receipt of testimony, as considered

17  reasonable under Federal rules*, however, there is no

18  Florida statute to this regard.

19      If the witness fails to do so, the transcript may be

20  used as if signed.

21      Yours,

22      Veritext Legal Solutions

23  *Federal Civil Procedure Rule 30(e)/Florida Civil

24  Procedure Rule 1.310(e).

25
```

```
1    RE:  Gould, Ryan  vs. Guerriero, Bethany, et ano  | FLA

2    6672209

3    DEPO OF:  BETHANY GUERRIERO          TAKEN:  04/25/2024

4                  E R R A T A  S H E E T

5    PAGE_____ LINE_____ CHANGE_____

6    _____

7    REASON_____

8    PAGE_____ LINE_____ CHANGE_____

9    _____

10   REASON_____

11   PAGE_____ LINE_____ CHANGE_____

12   _____

13   REASON_____

14   PAGE_____ LINE_____ CHANGE_____

15   _____

16   REASON_____

17   PAGE_____ LINE_____ CHANGE_____

18   _____

19   REASON_____

20

21   Under penalties of perjury, I declare that I have
     read the foregoing document and that the facts
22   stated in it are true.

23

24

     _____  _____
25   BETHANY GUERRIERO                          DATE
```

Bethany Guerriero
April 25, 2024                                                    1

---

**$**

**$20**
  152:17

---

**-**

**--i'll**
  18:17
**-ly**
  146:18

---

**0**

**00**
  124:17

---

**1**

**1**
  27:3 43:7,17
  45:11
  119:13,16
  120:6 123:23
  124:18,21
  126:7,9,18,
  22 127:16,21
  128:10,13
**1-0-0**
  119:19
**10**
  125:25
**10-12**
  41:9 46:21
  119:24
  128:22
**10-15**
  135:25
**100**
  30:25 48:7
  56:8 108:3
  119:18
**10:10**
  157:18

**10:14**
  106:12
**10:22**
  106:12
**11:19**
  150:16
**11:24**
  150:16
**11:39**
  162:22
**11:45**
  162:22
**120**
  156:17
**13**
  10:24
**14**
  128:23
**1:11**
  68:21 69:4
**1:30**
  102:8,9
**1:34**
  120:5 124:14
**1:37**
  126:21
  127:15
**1:43**
  102:9,10

---

**2**

**2**
  27:4 43:8,18
  45:12 123:23
**2/20/1975**
  7:19
**20**
  9:23 10:18
  35:21,24
  59:24 108:6,
  23 117:12
  154:6
**20/20**
  121:9,10
  134:2

**2003**
  10:14
**2004**
  10:15,16
**2019**
  9:4 158:18
  159:3 160:5
**2023**
  12:7
**25th**
  12:7
**2:20**
  112:9,15
**2:35**
  127:20 128:9

---

**3**

**3**
  43:9,19
  45:13 123:23
**30**
  68:4 113:3
  116:12
**33**
  68:6
**336922**
  119:18
  124:20
**36**
  126:17
**3:31**
  128:12

---

**4**

**4**
  43:11,20
  67:8 111:16
  112:4 139:14
**45**
  68:10,16
**48**
  135:25

---

**5**

**5**
  43:12,21
**5'2"**
  55:12 156:17
**5'5"**
  54:20
**5400**
  119:23
**57**
  119:23
**5:18**
  116:9
**5:34**
  113:9

---

**6**

**6**
  43:13,22
  55:16

---

**7**

**7**
  43:3,15,23
**733**
  139:14
**7:46**
  139:17

---

**8**

**8**
  155:16,22
  156:2,6
  157:19
**8:12**
  4:2
**8:30**
  156:5
**8:58**
  47:9

---

Bethany Guerriero
April 25, 2024                                                          2

**9**

**911**
  40:25 52:5
  120:11
  157:16
**9:03**
  47:9
**9:24**
  67:15
**9:29**
  67:15
**9:43**
  80:2
**9:44**
  80:2

**A**

**a-**
  18:5 57:20
**a-minute-and-
a-half**
  129:9
**a.m.**
  4:2 47:9
  67:15 80:2
  106:12
  150:16
  162:22
**abide**
  30:4
**ability**
  7:9 17:23
  47:13 106:15
  150:19
**able**
  5:21 6:22
  33:4 60:24
  82:13 90:22
  96:22 111:3
  153:11
**absence**
  88:11
**absolutely**
  21:23 75:11

  133:16 144:1
  153:13
  154:20
**absorbing**
  50:7
**abundance**
  48:20
**academy**
  9:20 10:15
  73:21
**acceptable**
  151:19
**account**
  137:23
  143:9,16,18
**accurate**
  31:11 70:5
  72:5,6
  131:10
  155:18,19
  157:23
  162:8,13
**accused**
  113:17
  116:4,22
  117:16 123:6
  140:11,19
**across**
  31:9 118:13
**act**
  29:11
**acted**
  154:13,22
**action**
  29:4 140:13,
  21,24 141:15
  151:13
**actions**
  89:15 144:3
  159:20
**active**
  79:21 82:6
**actively**
  26:21 29:3
**actual**
  23:13

**adapt**
  19:17 28:13
**adaptations**
  22:9
**adapting**
  22:2
**adding**
  94:5
**addition**
  9:20 107:14
  117:17
**additional**
  117:20
  145:20
**address**
  4:18
**adequate**
  29:2
**admit**
  109:20
**admitted**
  105:13 107:6
  151:5
**adrenalin**
  104:7
**adults**
  11:5
**advanced**
  11:18
**advised**
  119:21
  126:11
  157:10
**Affairs**
  154:2 158:2,
  7
**affect**
  62:7,18
  108:14
  160:4,11,12
**affected**
  17:3 104:22
  105:10
  106:24
  110:2,9
**affects**
  47:13 106:15

**adapt**

**affidavit**
  142:17 143:5
**affirm**
  4:5
**affirmative**
  29:7
**affirmatively**
  95:14
**affirmed**
  4:12
**afterward**
  64:4
**agencies**
  31:9
**agency**
  26:9 31:9,10
**agent**
  10:22 11:21
**aggravation**
  82:9 96:11
**aggression**
  65:19 83:12
**aggressive**
  32:21 57:20
  60:19 65:1
  83:3 98:15
**aggressor**
  132:24
**agi-**
  70:16
**agitated**
  41:22 75:17
  99:11
**agitation**
  59:19 70:16
  75:19 82:9
  96:10
**agree**
  22:22 25:6
  28:5,12 42:3
  53:3,25 54:3
  57:17 59:7
  62:18 69:25
  77:8 80:24
  83:18 85:2,
  25 86:23
  87:21,25

Bethany Guerriero
April 25, 2024

3

89:23 95:25
98:24 101:13
103:19
113:12,25
115:23 116:3
119:7 121:7
125:15
127:3,10
129:2,16
146:10,20
147:3 154:18

**ahead**
16:17 49:11
84:5,18
91:11

**air**
41:18 50:5
59:19

**airline**
42:1

**Alexander**
10:1 58:10
67:11 69:13
146:13,16

**allegation**
159:14

**allegations**
9:6

**alleviate**
142:3

**allow**
64:9

**allowed**
149:9

**allows**
148:13

**amped-up**
132:1

**analysis**
26:25 28:16

**anger**
75:19

**angle**
54:18

**angry**
75:17

**animation**
132:16

**annually**
15:8

**answer**
6:20,22 14:1
16:17,19,20
20:15,19,20
21:14 30:7,
14 31:19
39:11,12
47:8 60:1
63:3,13,17,
23 65:7,9
84:5,18
91:11 93:13,
21 94:1
95:20 119:4

**answered**
84:4,17
91:9,14
93:23 118:10

**answering**
6:4 7:3
84:20 87:16
91:5 92:13,
14 98:19

**answers**
5:18 13:17,
25 94:5
95:19 162:4,
7,13

**anybody**
14:25 69:17
93:22 94:7
106:17
134:18
137:23
150:10

**anyone**
7:23 8:20
24:3,19

**ap-**
140:1

**apparent**
105:12
112:12 137:8

**appeared**
119:8 130:21

**appearing**
69:14

**appears**
120:18 140:1

**appreciate**
47:20 71:8
107:17
133:12

**appreciated**
135:4

**approach**
18:4 75:13
160:2

**approached**
138:18 139:3

**approaching**
54:9

**appropriate**
35:3 38:9,10
85:16 153:14

**appropriately**
154:22

**area**
42:22 45:4
46:12,24,25
56:3,6,12
71:1 123:21
124:11 137:5
141:3 151:22
157:12

**arm**
70:19

**armed**
24:4,18,20
28:4 48:18
73:25 88:6,
15 89:2,13,
21 91:17,21
92:7 95:16
138:12,21
139:23,25
141:15,19
156:12

**arms**
73:10 145:19

**around**
44:1 55:5
67:7 72:20
135:8 137:4
142:6 157:1

**arrest**
26:22 37:5,
6,7,9,10,13,
16,25 38:2,3
81:20,25
82:11 135:13
142:13,15,
18,23 143:1,
10,20,25
146:7,11,21
147:11,13,19
152:9,12
159:17

**arrested**
37:20 81:17
103:7 136:1,
13 143:23
147:4 158:19

**arrests**
136:10

**arrival**
41:7 142:25
157:9

**arrive**
42:15 135:13

**arrived**
40:7 41:3,6
48:10 140:15
156:19,21

**arriving**
44:20 83:13

**article**
71:1

**articulable**
88:1,6,13
89:2,13,20

**articulate**
60:15 132:14
133:18

**ascertain**
82:7,13

Bethany Guerriero
April 25, 2024                                    4

**ask-**
  121:2
**asked**
  6:20 13:4
  34:19 58:1
  59:24 71:9,
  18 91:13
  92:3 117:14
  124:3 140:18
  146:1 161:3,
  5 162:16
**asking**
  8:7 10:12
  12:21 17:6
  18:25 20:11
  27:15,20
  37:14 39:2,4
  42:15 47:20
  50:20 57:4
  58:22 59:2,
  16 81:11
  87:7 89:1
  90:17,19,21
  91:6 92:14,
  16 95:12,13,
  19 99:5
  101:18
  106:20,21
  117:12,16
  118:16
  121:4,13
  122:22 123:1
  124:6,9
  125:20 127:9
  133:17
  134:15
  143:2,14
  145:2,12
  146:2 147:2,
  10,19 148:10
  160:10
**aspect**
  16:23
**aspire**
  11:5
**assertive**
  57:15,18,20
  61:11

**assign**
  103:1
**assume**
  6:21 21:17
  23:18 24:9
  34:25 74:2
  77:4 88:8
  92:19 141:18
**assumed**
  91:17 141:14
**assuming**
  24:17 90:16
  92:15
**assumption**
  25:23,24
**assumptions**
  25:14,19
  92:15
**Atlantic**
  9:18
**attached**
  153:3
**attempted**
  84:2
**attempting**
  26:21
**attention**
  44:5 45:14
  81:6 102:17
  118:14
  153:25
**attorney**
  6:12 7:25
  8:2 13:16
  64:4
**Attorney's**
  9:14 159:13
**attorneys**
  6:6 8:4,21
  13:25 14:16
  15:1 64:5,10
  106:18
**audio**
  125:6,8,15,
  19 126:2
  147:25
  148:14,25

  149:9,18
  150:5
**August**
  12:7
**available**
  5:21 22:23
  39:6 45:24
  46:10 50:15,
  21 53:4
  54:13 65:15
  69:19 78:9
  80:5 101:23
**average**
  55:11
**aware**
  12:22 17:22
  28:19 30:18
  31:2 32:1
  38:5 40:8
  42:9,15
  47:24 50:9
  99:18 102:12
  104:21 105:9
  107:1 136:16
  151:1
**awareness**
  74:15 75:15
**awesome**
  125:4

---

**B**

---

**B-E-T-H-A-N-Y**
  7:16
**bachelor's**
  9:18
**back**
  6:24 9:4
  15:24 25:15
  35:15 44:6
  47:10 61:4
  66:4,8,11
  67:17,23
  68:24 70:18,
  19,22 71:1
  72:20 74:8,
  11 82:15,16,

  24 83:11,22
  85:8,12
  86:20 95:4
  96:11 97:13
  101:11 116:9
  121:9,13
  124:14
  126:2,17
  128:6 130:17
  139:4,13
  144:14 147:6
  151:19
  154:16 156:5
  162:9
**backpack**
  55:24 85:9
  157:4
**backseat**
  36:25
**backtracking**
  97:2
**backup**
  84:9 158:22
**backups**
  29:2
**backwards**
  71:3,7
**baggy**
  138:8
**banter**
  82:23 160:14
**base**
  20:1
**based**
  22:23 23:2
  25:13,18,24
  39:25 61:25
  62:2 65:17
  88:8,10
  92:15 133:8
  144:2,3
  151:3 160:11
**basic**
  11:14 146:3
**basically**
  77:22 107:14

Bethany Guerriero
April 25, 2024                                                    5

**basis**
 12:4 133:10
**bathing**
 42:22 45:21
 52:12 54:10
 126:12,25
 127:8 137:18
 156:20
**battle**
 9:8
**Beach**
 7:22 9:11,21
 10:17,21
 12:6 16:1,11
 29:15 30:19
 38:5,19,23
 39:8 136:5
**beat**
 64:9
**Beath**
 150:23
 151:7,20
 152:17 153:5
**bed**
 70:24
**began**
 4:2
**beginning**
 5:13 32:6
 47:23 50:15
 67:9,22 69:4
 82:15 83:19,
 23 111:19
 114:1 124:15
**behavior**
 15:18 88:18
 93:17 96:7
 99:10 103:4
 132:6
**behaviors**
 62:12 74:17
 145:6
**behind**
 70:25 157:1
**belief**
 58:8 84:21

**believe**
 5:9 9:5 15:3
 30:5 44:9,22
 64:13 66:19
 70:17 92:9
 109:18 111:3
 128:21
 141:13
 143:24 148:4
 158:12
 162:12
**belongings**
 134:12
**belt**
 156:17
**benefit**
 107:21
**besides**
 8:8,20
 14:15,25
 41:3 72:8
 106:18
**best**
 6:4 18:17
 39:17 40:22
 48:7 58:17
 59:14 60:6
 107:11
 109:21
 118:11 126:5
**bet**
 152:17
**Beth**
 4:19 69:3
**Bethany**
 4:11 7:13
**better**
 86:8 115:25
 131:16
**birth**
 7:18
**bit**
 17:9 50:8
 55:14 60:19
 83:19 97:2
 112:1 116:7
 133:23 142:5

 144:18 159:3
**blade**
 80:6,14
**bladed**
 70:25 74:9,
 11 85:7
**blades**
 70:22,23
 74:4 79:6
**blame**
 134:18
**blood**
 151:19
**board**
 31:9 55:21
**body**
 70:23 74:5
 76:10 79:6
 80:6 90:25
 91:7,21
 100:20 101:1
 102:7 111:12
 112:3,4
 118:9 128:7
 130:9 137:11
 141:10
 147:25
 148:14,21
 149:18,21,23
**body-worn**
 43:10,11
 67:2,18 69:3
 139:10
**break**
 7:1,4 47:12
 70:7 106:10,
 14,18
 150:13,15,19
 162:20
**brief**
 40:10
**briefly**
 10:24 45:10
 67:13 137:14
 142:24
 158:16

**bringing**
 15:24 24:10
**broad**
 28:24 48:21
**broadcast**
 67:6
**brought**
 152:14
 153:24
**brown**
 45:6 119:20
**brownish**
 128:1
**bulge**
 91:23,25
 92:3
**bunch**
 45:21 82:23
 121:11
 134:19
**buttons**
 148:5
**BWCS**
 68:5

---

**C**

**CAD**
 42:21,23
 44:7
**call**
 4:19 18:22
 34:18 35:7
 38:15 42:21
 61:19 74:3
 84:7 88:12
 117:18
 121:18,19
 122:2 124:9
 128:17 129:5
 135:19
 136:4,9,19
 146:23 147:8
**called**
 33:23 34:1
 44:5 120:19
 121:23

Bethany Guerriero
April 25, 2024

6

129:10

**caller**
52:1,4,11
116:5,25
117:3,15,17
122:11
123:20,23
124:10
126:20 127:5
129:10,13
156:14

**caller's**
113:17
116:5,22
119:24 120:2
122:4 157:10

**calling**
40:25 52:5
119:22
120:11
157:16

**calls**
40:17 50:2
110:3 119:14
129:2,4,18,
21 130:10
132:5

**calm**
41:22 42:2,
3,4 54:15
82:25 83:1
140:9 154:10

**calmer**
15:24 79:15
109:8

**camera**
43:10,11
67:2,19 69:3
100:20 101:1
102:8 111:12
112:3,5
118:9 128:7
130:9 137:12
139:11
147:25
148:14,22
149:21,23

**cameras**
149:18

**capacity**
142:14

**car**
36:25 45:2,
17,24 46:2,
6,18 50:22
51:9,13 54:7
114:12,25
157:2

**cardiac**
105:13,17,21
107:5 151:5,
6 153:15

**cardiologist**
107:7

**career**
31:24

**carry**
64:4,10
127:15

**carted**
142:19

**case**
5:3,8,23
8:15 9:12
49:22 94:18
96:6 109:22
149:14
152:17

**caution**
48:20

**CCW**
123:20
124:10
156:12

**cell**
144:21
145:9,13

**certain**
6:6 12:23
18:25 26:2
45:20 82:7

**certainty**
56:8

**cetera**
17:16

**challenged**
61:21

**chance**
66:15 88:19,
22

**change**
18:20 19:5,
13,22,23,25
20:22,25
21:1,14,18
22:2,20
23:10 25:4
35:7 37:11
38:14,22
39:15

**changed**
19:9 21:7

**changes**
4:22 22:8
38:16

**changing**
21:8 22:17

**characterize**
61:11

**charge**
11:4 37:7

**charged**
8:23 9:1,2,4

**checkout**
33:13

**chest**
98:3 108:20

**child**
159:7

**choose**
51:12 53:8
155:4

**chose**
51:2

**Circle**
119:19

**circumstance**
32:3 160:17

**circumstances**
5:6 86:8,12

104:22
106:24 110:1
131:22 144:4
148:13,16
151:25

**cite**
81:24

**citizens**
18:21

**city**
7:20 10:16
159:5,16

**civil**
159:17

**civilian**
34:13 35:18

**claim**
158:10

**claims**
129:13

**clarification**
6:18 98:22
130:5 133:12
162:16

**clarified**
6:25 24:25
86:17 139:5

**clarify**
17:7 27:21
45:19 63:24
85:24 117:11
144:17

**clarifying**
112:21

**clarity**
97:8

**clear**
17:20 18:24
34:14 41:1
42:14 45:7
52:4 57:23
59:8 70:16
80:10 91:4
93:14 94:4,
24 106:21
109:25 115:9
120:9,13

122:25
162:11
**cleared**
  110:16 160:7
**clearer**
  30:10
**clearly**
  76:12
**client**
  93:17 106:9
**clog**
  50:5
**close**
  148:6
**closing**
  162:3
**clothes**
  91:25
**clothing**
  70:24 85:9
**clubhouse**
  119:20 120:1
  123:4 137:5
**clue**
  142:11
**coach**
  94:9
**coaching**
  93:20,22
  94:7
**code**
  41:9
**colored**
  42:22
**combativeness**
  133:24
**combatting**
  134:24
**combined**
  136:17
**come**
  24:18 25:15
  38:2 40:17
  70:18 110:23
  111:2,8
  118:13
  132:15

136:23
151:2,10
153:16 155:9
**comes**
  37:22 60:24
  70:19
**comfortable**
  31:4
**command**
  33:4 34:9
  35:1,5 36:10
  56:23 57:1
  58:22 61:12,
  15 62:2,4
  66:5,7,16
  71:12,19,25
  72:5 76:2,5,
  17,22,25
  77:7,9,24
  78:16,18,21
  79:2,8 80:12
  82:19 83:25
  100:18,23
  145:20
**Command/
asking**
  58:1
**commanded**
  76:21 101:14
**commanding**
  57:24 145:2
**commands**
  32:22 34:3,6
  57:15,19
  71:5 76:8
  80:8 90:14
**comment**
  100:5 152:22
**comments**
  104:3
**commercial**
  42:1
**commit**
  77:23 147:6,
  9
**committed**
  98:16 146:18

147:1,5,14,
21
**common**
  76:2 78:21
**commotion**
  111:8
**communicate**
  41:13
**communication**
  99:25 100:11
**community**
  11:2 48:21
**comp**
  107:8 108:24
**compare**
  37:5
**compartmental
ize**
  50:13
**compelled**
  155:5,10
**complete**
  162:4
**completed**
  9:17
**completely**
  38:24 45:15
  154:11
**compliance**
  79:17
**compliant**
  28:4
**comply**
  35:5,18 36:6
  77:16
**computer**
  42:18 43:25
  44:19 45:12
  50:10,17,22
  51:3,14,24
  53:4,11
**computer's**
  55:3
**concealed**
  72:24
**concepts**
  18:25

**concern**
  48:23 51:17
  72:18,22
  95:11,19
  134:8 140:13
**concerned**
  48:14 64:25
  86:15 88:24
  93:20 103:5,
  9 107:20
  110:19 135:9
  138:23 141:9
  160:23
**concerns**
  14:3 34:21
  72:8,11 73:1
  98:2 104:15,
  17,20
  138:17,24
  140:6 142:4
  152:2 153:9
**conclusions**
  109:4
**condition**
  105:15
  106:20,23
  107:23
  108:12,14
  109:10
  110:4,9,20
  135:9
**conditions**
  17:3 104:22
**conduct**
  29:22 34:19
  104:23
  105:10,16
  106:25
  144:12,19
  154:2 160:4
**conducted**
  134:11
**conducting**
  36:17 37:3
**confer**
  44:2 106:8
**conferences**
  11:21

Bethany Guerriero
April 25, 2024
8

confidential
  8:2
confirm
  120:16
  121:16
confirmed
  141:19
confused
  34:22 35:18
  58:3 61:15
  94:2,3,4,20,
  21,24,25
  95:8,10
confusing
  62:3 95:6
  157:6
confusion
  92:13 98:12
connection
  142:18
consensual
  33:7,9,15
  34:16,23
  36:10
consider
  22:14 26:3,
  12,16,20
  102:25
  103:22
considered
  82:11 87:5
  89:16
consistent
  60:16 75:19
  133:14
constitute
  32:23
constituted
  143:1 146:7
constitutes
  32:16
contact
  24:14 59:16
  68:7 132:7
  136:24 137:6
  138:20
  142:7,10

contained
  129:18,20
contentious
  159:7
context
  156:5
continue
  6:11 10:9
  14:8 20:19
  27:4 47:13
  90:10 106:15
  108:8 124:13
  150:19
continued
  90:8 100:6
  160:15
continues
  29:1,5
continuing
  46:2 135:5
contribute
  109:10
  159:20
contributed
  105:15
  107:15
contributing
  160:19
control
  84:22 96:14,
  16,22 103:10
conversation
  8:4 106:17
  114:13
  116:8,18
  148:23 149:8
  150:23
  153:12
conversations
  8:2
converts
  81:25
conveyed
  129:17 130:8
  131:17
convicted
  8:24,25

Cool
  106:11
copy
  44:1
correct
  10:11,12
  15:5,6 17:24
  19:14,15
  25:11,12
  27:8 28:15,
  17 29:8,12,
  13 32:6,18
  35:22 36:11
  42:4 46:7,
  12,13,15,16,
  24 48:7,24
  49:1,10
  50:16,17,21
  51:6,11 53:5
  55:20,23,25
  56:1 57:5,
  13,15 60:11
  65:16,21
  66:21 72:12,
  22 73:5,10,
  11 76:3,10,
  11 78:25
  79:4,5 82:12
  83:4 87:12
  90:8,9,11,22
  92:20 94:11,
  14 95:23,24
  97:16,23,24
  99:3,17
  100:16
  101:12
  102:23,24
  104:17 105:6
  113:1,18,19
  115:9,25
  116:22,23
  117:1,2,4,5
  120:20,21,23
  122:2,19,20
  123:4,13,21
  124:11,12
  127:13
  129:7,8,11,

  12,14,15,25
  130:1,3,4,15
  131:5,24
  133:20
  135:11
  136:7,21,22
  137:13,15
  139:20,21,23
  140:14,21,
  22,25 141:1,
  4,5,16,17
  142:18,19
  144:21
  145:20,21
  146:5,9,18,
  22 147:5,15,
  21,22 149:19
  152:1,20
  153:8,20,21
  154:25
  155:1,12,14,
  15 158:14
  161:13,14
  162:13
correctly
  39:22 56:15
  125:6
could've
  53:12 73:19
  75:4,11
  104:9
counsel
  44:2 106:8
  124:16
  155:13
counting
  90:3
counts
  159:15
county
  9:10,21
couple
  50:14 61:1
course
  9:23 10:24
  18:22 35:20
  38:14 40:2
  51:2 59:24

Bethany Guerriero
April 25, 2024

9

62:20 107:8
154:6
**court**
4:3 5:23
68:11,15
124:25
125:5,11,17
**covered**
11:25
**CPR**
11:6
**creating**
158:20
**crime**
8:24,25 9:1,
2 26:13
32:16 33:25
37:19 77:23
98:16,17
103:6 144:6,
13 146:18,22
147:1,5,6,9,
14,21
**crimes**
149:17 150:8
**criminal**
32:12 36:1
**crisis**
10:25 11:16
15:9 62:10
**critical**
15:4
**Crocs**
156:20
**cues**
15:17
**curious**
141:13
**current**
12:1
**cursing**
104:1
**custodial**
136:10
**custody**
9:8 28:25
39:19 82:6

135:22,24
136:1 145:24
159:7
**custom**
136:17
**customary**
136:14
**cut**
10:7 36:21
121:2
**cyberstalking**
9:5,9

_____

**D**
_____

**daily**
133:10
**danger**
73:12
**dangerous**
96:15
**date**
7:18 19:6
**day**
17:5,14,18,
19,21 19:1
40:25 62:16
75:2 97:18,
20 107:6,15
109:20
110:17
118:13
135:18
152:10
**daylight**
48:21
**days**
105:14 107:6
153:24
**deadly**
86:24 87:3,
11,23
**dealing**
25:2 48:15
115:6
**dealings**
133:9

**dealt**
151:23
**decide**
25:10
**decided**
51:2
**decipher**
127:6
**decision**
39:1,2 46:4
84:14 89:22
90:19 134:4
151:3
**decisions**
132:8
**deemed**
35:12 158:25
**deems**
35:13
**deescalate**
16:7 27:2,7
38:18 39:1
82:18 83:2,6
84:2
**deescalated**
84:2
**deescalation**
15:4,16,19
16:2 18:6
38:9 39:5,25
40:2 83:15
84:10,15
99:13
**defensive**
74:10
**defiance**
103:11 104:6
**defiant**
75:16 132:20
**definitely**
110:15
125:23
**deflecting**
146:2
**deflection**
77:23

**degree**
9:17,18 28:7
35:15 92:22
97:19
**Delray**
7:22 159:5,
16
**demand**
77:16
**demeanor**
25:1,4,6
42:2 88:25
132:13
**department**
15:9,12
**depending**
23:23 27:2
37:21
**depends**
34:7,10
35:13 94:15,
17
**deploying**
158:23
**deposition**
4:24 5:4,7,
13,15,20,22
7:10,24
8:12,21 12:8
13:14 43:5
47:13 69:14
93:15,16
94:21 106:2,
15 150:20
**depositions**
63:22
**describe**
9:15,24
11:11 22:13
23:8 28:23
33:9,20
36:14 70:13
74:6 95:14
106:23
112:23
158:16
**described**

Bethany Guerriero
April 25, 2024                                    10

16:6 79:7
81:7 88:18
156:17
**describing**
10:9
**description**
47:24
**descriptor**
123:9 127:1
**descriptors**
120:10 127:7
**detail**
77:14 105:18
**details**
24:25
**detain**
36:23,24
37:1
**detained**
37:25 80:18
81:1,15
136:13
**detaining**
36:16 81:8
98:12 99:12
**detention**
36:22 37:12
38:3 80:21
81:25 134:8
**detentions**
36:15
**determination**
89:5
**determine**
65:20
**determining**
51:21
**development**
42:18 45:11
55:1
**diagnosis**
107:22
**dictate**
22:19 35:16
**difference**
131:3

**different**
15:17 18:7,
19 23:6 26:8
33:17,19
40:23,25
49:19 50:14
63:22 113:22
120:11
121:11,24
122:12
127:12
157:17
**differently**
35:7 62:19
**difficult**
40:22 82:22,
24 98:20
103:12
**diligent**
18:23
**dinging**
45:12 55:3
**direct**
4:14 14:22
38:8,19
98:18 100:5
114:13
**direction**
51:19 79:15
**directly**
54:24
**directs**
6:12
**disagree**
53:1
**disappear**
54:21
**disarmed**
139:2
**disciplinary**
151:12
**discipline**
158:13,17,18
**disciplined**
159:25
**discovered**
107:3,4,9,11

**discretion**
39:3
**discuss**
150:25
151:8,22
**discussed**
14:24 110:8
133:7 149:20
154:15
**discussing**
32:2
**discussion**
10:5 119:8
125:24
152:14,16
**discussions**
31:21 149:16
150:7
**dismissed**
107:6 159:13
**disobey**
33:4 77:9
90:14
**disobeying**
79:8
**dispatch**
40:18 42:19
49:5 51:5
119:14,18
120:18
121:8,22
122:1,21
123:3,12,20
124:9,20
127:3 129:2,
10 156:11
**dispatched**
49:14
**dispatcher**
122:4 127:11
157:17
**dispatchers**
40:23 49:19
**dispels**
92:10
**displayed**
44:19

**displaying**
145:7
**dispute**
58:7 90:5
158:10
**disputing**
62:21
**disregard**
33:4
**dissemination**
41:1
**distance**
73:5,6 105:8
**distract**
109:16
**disturbance**
40:11 86:14
135:20
158:20
**disturbed**
152:6
**disturbing**
151:17
**divorce**
9:8 159:7
**doctor**
62:8,22
79:19 104:25
107:10
110:12 133:8
**document**
44:4,25
45:23 52:15,
18,24 54:1
**documents**
8:11,14
**doing**
36:18 53:9
64:2 67:11
93:2 95:8
98:17 100:6
120:13
150:11
**don-**
114:15
**draw**
85:5,13,17

86:12 87:2,
11,22 88:14
89:8,25

**drawing**
85:2 86:23

**drew**
86:22

**drive**
45:12

**driving**
33:11 55:1

**drop**
60:22 66:10
76:25 77:5
78:2 131:11

**dropped**
66:14 71:21
72:1,12 74:8
75:1 145:19

**dropping**
72:17,23
77:9,15,20
78:8 85:7
131:3,8

**drowned**
102:15

**dry**
36:21

**due**
82:8 99:10
104:17

**duly**
4:12

**dumb**
97:7

**dump**
104:7

**dur-**
149:3

**duty**
28:20 29:6,
7,12,14,23
35:4 58:5
135:18

---

**E**

---

**earlier**
81:7 130:25
154:15

**ECCW**
120:2

**edge**
65:1

**editorializin
g**
93:8

**education**
9:15

**effect**
17:17 61:7
152:12

**efforts**
34:12,15
54:7

**eight**
89:23 90:5,7
107:9

**either**
33:15 38:18
122:21
135:23,25
138:1

**elevated**
41:23

**elicited**
160:17

**emails**
13:3 14:15

**emergency**
151:10,22

**emotion**
131:14

**emotionally**
62:25 64:15

**emotions**
64:15 96:1
104:12
135:10
154:10

**employed**
9:21 10:11
12:3

**employment**
9:19 10:12
12:1,5

**empty**
140:2

**en**
135:21 136:3

**en-**
35:21

**encompassing**
11:15

**encounter**
16:8 19:14,
23 20:2,9,23
21:14 23:19,
22 27:2,7,24
33:7,10
34:17,23
35:12,24
56:15 79:3
80:19 81:18
82:16 83:20
98:10 102:20
103:19
104:12 114:2
139:11 160:2

**encountered**
35:17,21
62:17 88:5
108:5 114:5
138:11
139:19
142:5,9

**encountering**
18:10,21
25:2 34:13,
16,22 160:1

**encourage**
39:9

**end**
12:6 54:19
108:19
110:18 113:4
162:9

**enforcement**
9:16,19,25
10:10,13,18
11:6,9 16:13
73:21

**engage**
46:6 51:9,13
101:22

**engaged**
153:5,7

**engaging**
81:5

**enlarged**
107:12

**enlargement**
107:14

**entry**
11:14

**environment**
45:14

**equally**
38:18 39:6

**equates**
61:21

**equating**
74:17

**equipment**
153:3

**erratic**
133:23

**escalate**
27:1,6

**escalated**
83:19

**escalation**
18:6 84:22,
23 85:3

**escalation/
deescalation**
38:14

**establish**
142:22
143:9,19
145:18,22

**established**
144:13
145:14

Bethany Guerriero
April 25, 2024

12

et
  17:16
evade
  26:21
evaluate
  53:22
evaluated
  105:7
event
  43:3,15 44:5
  108:5 148:3
events
  12:14
eventually
  51:2 156:14
  157:15
everybody
  58:15 72:16
  75:25 99:13
everybody's
  84:8
everyone
  24:17 86:21
everyone's
  77:24
evidence
  94:11,14,16
evinced
  65:1
evolve
  21:16,18
ex-wife
  9:7 159:4,14
exact
  21:24 31:5,
  19 98:23
exactly
  47:19 52:4
  111:9 112:18
  115:3,16
  123:18
  138:20
EXAMINATION
  4:14
examined
  4:12

exceptions
  30:2
excerpts
  119:16 120:6
  124:18,21
  126:7,9,18,
  22 127:16,21
  128:10,13
  155:22
  156:2,6
  157:19
excessive
  160:1
excuse
  10:1 37:4
exhibit
  43:3,7,8,9,
  11,12,13,15,
  17,18,19,20,
  21,22,23
  67:8 69:19
  111:16 112:4
  119:13,16
  120:6
  124:18,21
  125:3,9
  126:7,9,18,
  22 127:16,21
  128:6,10,13
  133:1 139:14
  155:16,22
  156:2,6
  157:19
exhibits
  44:10 69:20
  125:22
existed
  95:15 106:24
  108:12
existence
  147:4
existing
  19:20
expect
  60:16 64:5
expected
  160:22 161:9

experience
  9:24 10:10
  11:9 62:9
  96:9 136:6
experienced
  132:5
experiences
  79:13 133:9
experiencing
  104:12
  108:18,19
  109:11,16
explain
  50:16 63:6
  86:8 105:18
  150:2
explained
  142:24
explaining
  113:13,16
explanations
  133:15
Explorer
  11:4
expound
  18:16
expressing
  98:12 109:2
external
  37:22
extreme
  104:12
extremely
  75:17 98:14
eyes
  52:22

_____

F

_____

face
  28:8 87:22
faced
  87:3
facial
  128:2
facilitate

106:10
facing
  78:19 151:12
fact
  75:17 89:13
  95:15 99:22
  102:22
  115:24
  136:18
  140:11,18,
  23,24 142:2
  152:4
factfinding
  36:18
factor
  37:22
factors
  25:16 26:2,
  6,7,24 50:11
  110:1 160:19
facts
  22:23 25:21
  26:2 88:1,6,
  14 89:2,20
  117:20
fail
  30:3
failed
  29:12 36:5
fair
  6:22,23 8:16
  13:22 19:11,
  12 22:4,5
  44:13 45:15
  49:25 54:5
  55:6,8 56:18
  57:7,25
  61:9,10
  62:4,5,25
  65:1,2,18,21
  71:23 72:2,9
  73:13 75:7
  76:23,24
  77:10 78:22
  82:11 84:14
  85:3 86:1,25
  87:1,4,13
  88:2,3,11

Bethany Guerriero
April 25, 2024

13

95:6,7 99:7,
8 100:7,13,
14 101:15,16
102:17,19
103:14,16
104:11
110:18
111:24
114:6,24
115:14,15,20
123:19
131:21
132:23
133:13
134:9,10
135:6 138:22
142:10
149:15
151:24
154:12
155:11
160:20
**fairly**
54:15
**false**
159:17
**familiar**
12:11 26:6
32:12 158:6,
8 161:21
**far**
11:20 48:13
73:14 81:22
82:14 86:15
98:23 110:16
113:24 120:8
**fault**
109:2
**favor**
54:16 56:17
58:4
**fear**
97:1,4
**fears**
92:11
**feasible**
38:1,21
41:19

**feel**
24:19 31:4
35:6 44:12
84:9 85:14
91:13 95:7
96:16 109:3,
21,23 118:10
151:14,23
152:3 153:14
154:1,21
**feeling**
48:14 65:9
104:8 107:16
108:2 131:16
141:11
152:24
**feels**
117:12 124:6
**feet**
55:16
**felt**
61:20 136:2
142:4 152:25
155:10
**field**
10:15,23
11:23
**fifth**
90:13
**figure**
74:1 75:24
**figuring**
96:25
**file**
8:16 125:9
**filled**
143:4
**finally**
96:23 111:3
**fine**
4:19 5:11
39:14 93:19
101:3 128:8
139:12 159:9
**finish**
6:3,10 7:3

**firearm**
40:13 41:16
48:16,17,25
49:3,6,15
50:4 84:7
86:13,15,16,
22,24 87:2,
11,22 88:12,
14,20 89:9
135:20 137:9
139:1 147:8
**firearms**
56:6 73:23
**first**
4:12 7:13,16
11:3 48:10,
19 50:23
54:14 57:18
59:10 61:4
68:4 108:22
114:9,11
129:5 138:11
139:2,19
140:16 142:8
144:20 157:7
**five**
113:2 150:14
**five-and-a-
half**
114:1,11,19
115:13,24
116:2 130:8
**five-minute**
162:20
**flag**
132:21
**flip**
17:21
**flipped**
59:20
**floor**
105:14
**Florida**
7:22 9:18
125:17
**focus**
52:21 84:7

**focused**
100:5,8
119:2
**follow**
107:7
**following**
4:2
**follows**
4:13 119:17
124:19
155:24 156:8
**foot**
74:9,11
**forbid**
49:23
**force**
17:25 18:4,
11,14 19:20
20:5,13
21:11,20
22:1,3,11
23:2,12,22
24:7,19,21,
22 25:11,13,
25 26:4,14,
25 27:11
28:9,13,21
29:1,11,16
32:11 38:19,
25 39:5,25
53:23 86:24
87:11 88:2
140:21 144:9
158:23
160:1,6
**forceful**
71:12,19,25
72:5 77:7
82:19 83:25
**forcefully**
60:23 70:2
**foremost**
48:19
**form**
16:16,18
19:21 20:6,
14,17 22:6
24:8 35:9

Bethany Guerriero
April 25, 2024                                    14

39:10 42:6
43:1 56:25
58:10 61:17
63:1,9,15
64:3,19 65:6
75:21 78:3,
10 80:7
84:3,16
86:3,9 87:8
91:8 92:24
99:12 101:24
103:8,17,25
122:3 123:8,
14 141:22
143:12
146:16
161:23
**formally**
117:9
**forth**
82:16,24
154:16
**forward**
14:6 63:25
70:21
**four**
155:21
**four-year**
9:17
**fourth**
86:20 90:13
**frame**
19:5
**free**
44:13 81:10
**fresh**
125:12
**friendly**
57:11
**front**
52:8,16,25
54:19
147:16,17
**frustrated**
103:6
**full**
7:12 66:18

114:1
**fully**
6:3 78:18
132:18

—————————

————————
G

**G-U-E-R-R-I-**
**E-R-O**
7:17
**gain**
84:21 96:14
103:10
**games**
139:8
**gaps**
161:16
**Gardens**
10:17,21
12:6 16:1,11
29:15 30:19
38:5 136:5
**Gardens'**
38:19,24
39:8
**gather**
36:19 82:12
**gathering**
25:3 27:5
**gave**
66:7 71:19,
25 72:4
82:19 83:25
100:4 153:18
154:25
155:13 158:6
**general**
15:14 16:8
17:5 18:8
26:10 27:18,
20 33:2
37:8,15
39:18 51:19
84:8 87:18
99:5 133:10
151:21

**generalize**
30:24
**generalized**
87:15
**generalizing**
137:7
**generally**
6:10 18:3,14
19:20 20:5
22:2 35:1,2
37:19 41:18
46:23,25
87:2,7,10,21
133:13
141:14
142:16
158:6,8
159:9
**gesture**
70:10
**getting**
13:17 45:2
50:23 79:16
86:19 90:14
108:21 109:7
118:12
120:10
131:15
**give**
4:6 12:25
23:11 28:24
31:11,18
35:11 57:14
64:9 66:1
71:4,13,15
77:24 78:9
79:2 99:24
105:22
107:11
111:19
115:20
124:25
125:8,9,20
148:17 154:8
155:9,10
156:5
**given**
23:9 36:9

80:9 84:6
88:16 89:15,
17 96:6
100:23
158:25
160:8,17
**giving**
13:25 31:4
32:21 35:22
40:24 89:7
147:7
**glancing**
158:4
**glare**
68:1
**Glass**
113:15,16
116:19 119:8
129:17
130:2,8,16
131:11
**God**
49:23
**goes**
22:10
**going**
6:3 8:1 12:8
21:13 22:18
23:10 33:22
34:18 35:14,
16 37:22
40:3 42:1,7
43:2,4,25
46:1,3 48:6,
7,11 49:19
50:7,10,11
51:1,21,22
53:7 54:4
60:10 62:23
65:10 66:1,
11 67:8,9,21
71:4,13,15,
22 72:7,19
74:2 75:3
77:5,13
78:12 79:24
82:23 84:3,
19,23 85:19,

Bethany Guerriero
April 25, 2024
15

22 86:14,19,
20 88:19,21
90:12,17
91:8,13
92:24 93:3,
10 96:13
98:7 99:20
100:7 102:10
104:4,9
105:9 106:8
108:4,8,21,
22 109:3,6,
20 110:14
111:9,15,18,
20 112:1,9
113:2,3,9
115:17
116:7,11
119:12 120:5
121:9,11,13
122:21
124:13
125:20,25
126:16,21
128:5,12
130:23
131:1,3,15,
18,19 132:9
133:4 134:25
136:2,16
137:22
139:13,14,16
144:14
146:23 147:6
148:20
149:13 150:2
151:4,12
154:7 155:20
162:3

**good**
4:16,17
48:4,9 63:24
74:18 161:8

**Gould**
12:9,15,24
17:2,14,21
32:6 40:5
54:11 55:9,

19 56:23
58:3,19
59:11 61:14
65:18 66:18
70:2 71:11,
18,24 72:4,
11,17 73:5,9
75:12,25
76:17,25
77:8,15,25
78:6,9,16,18
79:3,6,17
80:4,18,25
81:15,17
82:7,11 84:1
86:19,24
88:5,15
89:2,13,21,
24 90:8,11,
22 92:7
95:15,22
96:23 97:12,
15,22 98:11,
18 99:9
100:8,15
101:5,13,18,
21 102:13,
14,16,18,21
103:5,11,20
109:17
110:3,10,23
113:17 114:5
116:4,21
117:1,4,15,
19 127:23
129:23,24
130:17
131:3,6,11,
25 133:1,18
134:8,11,22
135:4,7
137:21
142:6,9
143:25
144:12,20
145:9,12,19
146:10,21
147:3 151:11
152:4,10

154:17
156:15,20
159:21
160:13,21
161:6

**Gould's**
54:23 55:7
64:25 66:8
88:24 90:25
91:7,21,25
98:3 135:13
142:13,23
143:10,20
146:6

**gown**
153:2

**grab**
76:10

**Graham**
26:6,7

**granted**
46:9 134:16

**great**
109:2

**greater**
108:9

**greatly**
107:25

**greeted**
81:6

**groin**
42:22 45:4
46:12 56:2,
5,6,12
123:21
124:11
129:24
136:25
138:14 141:3
157:12

**ground**
5:13 59:12
74:20,23
80:22,25
81:2,8,16
95:23 96:24
98:11 101:11

145:6

**Guerriero**
4:11 7:14
9:8 58:20
155:25
156:10,21

**Guerriero's**
43:11 93:1

**guess**
22:19 65:13
90:6 92:12
103:16
110:16
115:15
158:25

**gun**
28:1,3 42:22
46:1 47:25
50:5 51:5,
15,18 52:1,
11,25 53:12
54:2,8 56:2,
8,10,11
59:18,25
60:7,9 61:19
73:19 74:3
85:2,5,13,
17,21 86:17
89:25 92:5,
9,18,19,20
96:12
102:21,23
103:7 110:24
111:23
112:13,17
113:5 116:25
117:4,18
123:21
124:10
129:14,24
136:18,24
140:12,20,24
141:3,6,9
146:23
156:13,15,16

**guys**
68:24

Bethany Guerriero
April 25, 2024                                    16

---

**H**

---

hair
  45:6 119:20
  128:2
hairs
  77:11,13
  131:2
hand
  4:3 33:8
  54:17,23
  61:5 70:2,
  17,18,19
  71:12,19,24
  72:4,9 73:15
  92:18 133:22
handbook
  125:18
handcuff
  99:9
handcuffed
  80:23 82:1
handcuffing
  81:9 99:16
handcuffs
  36:24 135:7
  136:13
handing
  44:4
hands
  54:21,24
  55:7 56:17,
  24 57:8,12,
  25 58:5,21
  59:16 60:22,
  23 61:7,19
  66:5,8,13,17
  70:1,16,17
  71:6,21
  72:1,12,17,
  19,23 76:3,
  9,13,17,20,
  21,23 77:1,
  3,5,8,9,15,
  19,21 78:1,
  2,7,8,13

80:9 84:24
85:7 88:17
131:3,8,11
132:17 135:5
144:15
157:11
158:21
handwritten
  13:2 14:11
happen
  30:13 31:1,
  20 47:12
  108:20 154:7
  161:12
happened
  80:13 99:23
  100:3 109:6
  110:17 112:2
happening
  95:9 105:1
  130:22
  143:22
happy
  7:2 27:20
  128:7
harassed
  102:22
harassing
  52:13 111:23
  113:17
  116:4,22
  117:16
  119:21
  120:19,22
  121:23 122:9
  123:6 126:11
  129:7
hard
  148:2
head
  35:22 62:23
  93:1 121:11
  134:3 150:12
headway
  36:20
healthy
  97:4

hear
  63:20
heard
  48:16 58:19
  102:14 111:8
  112:12,23
hearing
  40:17 41:8
  46:19 48:1
  63:25 118:25
  119:1 120:24
  126:1 127:1
heart
  107:12
heat
  98:2
height
  55:11,13,17
heightened
  60:2 62:25
  64:15 74:15
  75:15 83:3
  96:1,3 104:6
  130:23
  131:13
  134:23
  135:3,9
  158:24
  160:17
held
  10:22 11:18
  103:7
help
  68:23 100:25
  118:21
helpful
  67:1 102:2
  111:11
  139:10
hey
  33:13 37:2
  54:16 56:16
  63:11 83:10
highlighted
  157:9
hindsight
  53:14,17,25

54:4 89:6
90:2,12
105:7,13
107:21
109:22
121:10,13
HIPAA
  106:1
hired
  10:14
history
  17:16
hit
  148:6
hold
  135:1
holder
  156:13
holding
  73:25 92:18
hole
  119:4
holster
  45:4 46:11
  52:1,11
  56:2,5,6,11
  123:21
  124:10
  138:14 140:1
  141:3
holstered
  156:13
holsters
  56:7
honest
  135:16
  137:22
  151:16 152:7
  160:16 161:2
honestly
  113:23
  114:15 148:7
hopes
  15:23 96:24
hoping
  13:14

Bethany Guerriero
April 25, 2024                                                                      17

horrific
  41:25
hospital
  107:7 142:20
  150:22
  153:2,16,24
hospitalizati
on
  107:3
hospitalized
  110:14
hostage
  11:1,17
  62:10
hot
  97:18
hours
  151:2,18
  153:16
huge
  54:20 132:21
human
  15:18 48:6
  154:10
hundred
  31:17 54:5

_____

          I
_____

IA
  8:15,16
  43:14 152:18
  153:20,22,25
  154:24 155:8
  156:9,11
  159:5,14
ID
  101:18,22
idea
  31:7 72:21
  142:11
identificatio
n
  146:3
identify
  69:10

immediate
  26:17 84:11
immediately
  82:2 98:4
  100:21
  148:19
impacted
  107:23 110:5
impair
  7:9
impairments
  17:22
impeachment
  94:18
important
  15:19 16:12,
  13,23
imposed
  9:7
improper
  29:10 93:16
in-
  34:8 45:16
inaccurate
  95:5 158:11
inappropriate
  93:9
incident
  12:9,11,14,
  19 13:3
  14:12,16,24
  17:2,14,21
  19:2,6,9
  27:16 32:6
  33:7 40:5,9,
  18,21 41:25
  42:10,12
  43:8,10,13,
  16 44:20
  46:18 47:23
  48:3 50:15
  53:5 57:14,
  17 67:22
  81:23 87:14,
  15 100:1
  104:16,23
  105:8,10,16,

17,21 106:25
107:2,5,24
108:12
109:11,14
110:11,19,22
113:5 118:21
119:15
129:17
136:18
143:9,18,24
147:23
148:24
149:1,7,17
150:8 153:15
154:14
158:14,24
159:4,6,21
160:5,21
incidents
  159:19
include
  8:6 80:13
included
  78:8
including
  5:17 75:25
  147:24
inconsistent
  65:3
incorrect
  65:11
increased
  109:13
indicate
  41:15 66:11
  95:15
indication
  74:19 90:24
  91:7,20,22
  108:11
indicators
  133:14,18
individual
  54:9 156:12
  158:20
individuals
  52:5

influence
  133:19
inform
  35:4 37:16
information
  5:22 8:3
  13:15 22:16
  23:15 25:3,9
  27:5 35:11,
  23 36:19
  40:8,20,23,
  24 41:1,2,12
  42:19,23
  44:7,18,23
  45:23 46:5,
  10,17,22
  49:3,6,14
  51:5 52:25
  53:3,12 54:1
  65:14,20
  74:22 78:8
  80:4 81:22
  82:8,13
  85:20 87:20
  88:9,11
  89:18 91:15
  96:6 102:25
  105:22
  113:24
  114:5,8,14,
  18,25 115:4,
  5,14,19
  117:7,14,22,
  24 118:1,15,
  17,22,25
  119:9 120:16
  121:8,25
  122:1,13,17
  123:25
  129:16,20
  130:7 142:22
  144:4 151:15
  152:3,7
information-
wise
  22:18
initial
  40:22 41:1,

Bethany Guerriero
April 25, 2024

18

initially
11 79:3,20
99:25 134:8
139:11 151:4
initially
21:15 27:4
34:11 39:19
56:4 59:15,
19 92:9
96:7,23
101:14 103:2
104:24 114:9
133:25
142:25
158:22
inserted
23:7
insight
122:24
instances
30:18 31:2
145:23
instruct
16:18 100:24
instructor
11:6,22
intention
99:15
intentional
100:11 148:2
interacted
110:3
interaction
110:10 137:3
160:12 161:6
interactions
109:17
interested
19:1 110:1
interior
137:4
Internal
154:2 158:2,
7
internally
134:24
interruption
79:23

intervene
28:20 29:6,8
154:10
intervention
11:1,16
62:10
interview
43:14 153:17
154:25
155:2,17,18,
23 156:3,7
157:20,23
158:2,6,10
intoxicated
133:18
158:19
intoxication
133:2,15
introduce
43:2
investigating
33:24,25
investigation
18:22 20:9
33:8 34:19
35:8 36:18
37:3 38:3,15
92:10 96:25
146:4 152:5
153:25
154:2,24
155:8
investigation
s
132:6
investigative
33:18,20,22
34:3,17,23
INVESTIGATOR
156:9,11
involve
33:23
involved
18:6 23:14,
16,19 34:8
42:10 46:1
50:5 59:25

86:15 99:14
127:4 129:18
149:17 156:9
157:15
159:10
involvement
11:2 81:22
96:5
involving
8:15 40:12
45:20 159:4
irrelevant
104:20
irritable
64:18
issue
12:10 26:13
160:18
issued
76:6 160:5
issues
14:9 67:24
106:9
151:22,25
161:16
IVS
153:2

_____

**J**

job
16:15 75:23
79:20 97:3
108:23
Johnson
68:24 69:1,
7,9,12,22
judgement
110:3
judgment
108:15
132:15
jumbled
52:21
jump
64:5 82:16
109:4

jumping
83:22
jumps
58:15
June
10:16
justified
23:12,21
24:6,19
27:11 28:9
justify
109:19
juvenile
11:3

_____

**K**

K-9
41:5
keep
54:16 56:17,
24 57:8,11,
24 58:4,21
59:16 60:23
61:7,19 63:7
66:5,17
69:25 75:25
76:9,19,21
77:3,5,7,19
78:1,7,13
80:9,12
82:25 84:24
88:17 98:7
144:15
157:11
keeping
66:13 71:5
kind
16:5 17:20
52:20 57:11
60:4 75:15
90:16 135:1
148:5
kinds
73:20 153:2
King
63:12 124:15

Bethany Guerriero
April 25, 2024                                    19

**knew**
 46:23 49:9
 56:8,10
 104:25 108:9
 114:4,24
**knife**
 73:18
**know**
 4:22 5:9
 6:2,25 9:10
 15:9,10,16
 16:1,6,7
 17:7 18:5,7
 19:5,7 21:14
 22:16,17
 23:7 24:19
 25:1,3 28:24
 29:4,22
 30:2,14,24
 31:5,12,19
 32:4,21
 33:13 34:7,
 9,16 35:14,
 24 36:15
 37:2,7,12,
 13,23,24
 38:2,13
 42:23 44:16
 45:10,12,20
 47:8,15,18
 48:13,17,18,
 22 49:2,5,8,
 17,18 50:12
 51:19,23
 54:19 55:10
 56:5 59:23
 62:11,12
 63:20 67:24
 68:8 70:6,7
 71:6,21
 72:7,19,20
 73:19,22,23
 74:14 75:22
 77:21 78:11
 79:13,15,18
 80:9 82:4,5,
 24 83:9
 85:8,10,12

 89:4 90:15
 94:17 95:6
 96:5,12
 97:2,6,18
 98:16 99:11
 101:17 104:1
 105:11 106:1
 108:2,18,24
 109:5,18,20
 110:6,13,14
 111:6,7,9,
 10,18 112:16
 113:20 115:3
 116:17
 117:12
 118:1,6,8,9,
 17 119:5
 123:16 124:7
 126:2,4
 128:22
 130:12 132:7
 133:22,24
 134:2,21
 136:15
 138:8,15
 139:2,6,25
 140:15
 141:6,12
 142:6,7,9,
 21,24 144:17
 145:11,25
 146:24
 148:1,18,20
 152:23
 153:22
 154:6,7,17
 155:7 156:4
 159:7
 160:14,15,
 16,18,24
**knowing**
 85:21 133:17
**knowledge**
 150:10 160:2
**known**
 77:25 78:6
 157:13

_____
_____
        **L**

**lack**
 88:8 133:25
**lacked**
 91:14
**lag**
 161:16
**Lake**
 9:21
**land**
 120:1
**language**
 83:3,8 84:1
 103:25
 131:23
 154:19,20
 158:19,24
 160:6,9,22,
 25 161:9
**lapsed**
 89:24
**laptop**
 126:4
**law**
 9:16,19,25
 10:9,13,18
 11:5,9 16:13
 73:20
**lawful**
 35:1 36:5,9
**lawsuit**
 12:10,17,19,
 24 14:13,17,
 25
**lawyer**
 78:24
**lawyers**
 63:16
**leaking**
 107:15
**learn**
 15:15 111:5
 114:14
**learned**
 107:21

 111:22 113:4
 114:18
 115:13,19
 117:7,21
 118:15,18,22
**learning**
 152:10
**leaves**
 38:24
**led**
 131:9,22
 132:14
 136:18
**left**
 52:23 70:19,
 20 72:21
 74:9,11
 104:16
 156:25
**legal**
 8:4 33:2
 35:4 58:5,22
**legally**
 33:24 155:5,
 10
**legs**
 100:22
**let-**
 83:10
**lethal**
 86:13 87:11
**letting**
 37:2 45:12
 68:8
**level**
 15:24 20:1
 28:6 77:14
 79:17 151:19
**levels**
 18:7
**lie**
 97:22
**Lieutenant**
 159:4
**lifted**
 116:25
 117:17

Bethany Guerriero
April 25, 2024                           20

129:14
**likewise**
  19:6
**line**
  120:1 154:22
  161:21
**lines**
  33:6
**listen**
  77:22 121:14
  124:2 144:16
  145:1
**listened**
  157:22
**listening**
  32:22 40:14
  50:7 60:20
  118:19
  120:8,12
  121:5 123:17
  128:19,25
  132:20
**literally**
  45:3 99:2
  117:12
  132:8,9
  135:1
**little**
  10:24 55:2,
  14 65:14
  85:21 116:7
  135:18 159:3
**lives**
  160:24
**living**
  132:8
**locate**
  134:9
**located**
  9:20
**locating**
  48:24
**location**
  47:7 51:15
**long**
  48:12 109:20

**long-range**
  73:13,14
**long-time**
  136:6
**longer**
  28:4 29:3
  73:15 138:21
**look**
  23:5 36:22
  52:15,19
  70:21 94:21
  132:9 138:8
**looked**
  51:25 53:11
**looking**
  13:15 30:8
  42:18,21
  52:18 53:14,
  15,17 54:19,
  24 89:6 90:2
  152:2 157:8
**looks**
  34:11
**losing**
  96:16
**lot**
  11:7 22:15
  25:16 40:8
  43:9 46:6
  48:13 49:18
  50:6,9 51:9,
  13 63:25
  70:8 79:14
  113:22
  130:23
**lump**
  157:2

———————————

          **M**

———————————

**made**
  6:11 46:4
  82:24 84:14
  86:18 90:19
  98:20 103:20
  110:2 142:7,
  10 151:4

**magnify**
  108:8
**main**
  73:1,3 84:7
**maintained**
  150:6
**make**
  6:14 8:9
  13:9,17 14:5
  18:24 34:3,
  6,12,15
  36:20 39:21
  44:12 48:24
  55:1 56:14
  62:24 63:19
  64:1,14,15,
  18,23 89:5
  101:22 104:3
  106:7 115:8
  122:25 124:5
  132:8 134:3
  144:18
  147:13
**making**
  5:16 68:6
  99:13 103:12
  133:24
**male**
  45:6 55:4,11
  119:20,22
  120:19,22
  121:23
  122:5,7
  123:3,5,6
  126:11 127:5
  129:6 155:25
  156:22
**male's**
  119:21,25
**mall**
  158:20
**man**
  33:13 52:2,
  12 54:16
  126:12 137:6
  142:15
**manageable**
  15:25

**management**
  15:4
**manner**
  54:16 158:5
**mark**
  114:19
  115:13,24
  116:2 130:9
**marked**
  43:17,18,19,
  20,21,22,23
**matches**
  121:18
**material**
  118:14
**materials**
  12:18,23
  13:6
**matter**
  4:6 50:12
  107:18
  132:10
  153:19
**matters**
  14:12,25
  15:14
**mean**
  27:13 34:18
  39:16 40:2
  41:23,24,25
  48:4,5 49:16
  50:18 52:15
  56:6 58:25
  62:9 63:8
  73:6,17
  74:6,24 75:5
  76:5 78:11
  81:4 83:2,5
  91:2 92:1
  101:2 102:4
  110:12
  115:15
  118:8,24
  121:2 125:16
  127:10 132:3
  141:21
  142:14,15
  148:8 149:25

Bethany Guerriero
April 25, 2024                                    21

153:7,8
155:3,8
159:22
161:17
**means**
41:9 62:9
64:3 92:2
98:18
**meant**
132:4
**media**
14:22
**medical**
17:3 104:14,
17,20,22
105:22
106:4,9,20,
23 107:18
108:14
109:23
110:4,9,19
135:8 153:9
160:18
**medically**
104:9 105:1,
9 107:16
110:17
131:15
134:25
**medicated**
151:3,18
152:14,23
153:15
**meet**
7:23
**Melissa**
69:12
**member**
136:6
**memory**
48:3 66:24
67:4 69:5
100:25
116:15
118:7,21
139:7
**mentally**

153:11
**mentioned**
19:13 22:21
27:6 74:4
153:8
**mere**
62:4 140:18
**messages**
13:3 14:20,
22
**met**
7:25 18:7
59:17 60:1
79:21 83:11
88:18 104:5
146:24
**method**
40:3
**middle**
159:6
**midst**
36:17
**milliseconds**
132:10
**mind**
48:11 103:14
153:9
**mine**
41:6 84:8
100:20
**minute**
49:11 56:16
67:12 81:16
105:22
114:19
115:13,24
116:2 130:9
**minute-and-a-
half**
129:5
**minutes**
113:3 114:1,
11 116:11
129:1 155:21
**Miranda**
137:11

**mischaracteri
zation**
141:23
**mischaracteri
zed**
94:20
**misconduct**
29:15,22,25
30:3,11,12,
19 31:14,22
32:2
**misquote**
100:21
107:13
**misspeak**
113:21
149:24 150:4
**misstate**
60:10 115:9
**mistake**
148:8 149:25
**moment**
14:3 20:8
21:23,24
23:9 24:4
38:1,22
42:13 44:11,
15 46:11
48:15 49:7,
22 50:19
54:4,14 58:6
59:11,23
65:10,20
66:2 72:9
73:4,12
75:23,24
80:1 81:10,
24 82:8,10
84:8,10,21
85:19 87:6
88:14 89:8
96:13,17,19
98:21 100:6
102:13,18
103:9,16
104:10 106:6
109:21
114:13

115:6,12
121:10
124:24
130:24
131:17,19,
20,23
132:19,25
141:8 146:24
**moment-by-
moment**
28:16
**moments**
89:7 99:21
**months**
9:20
**morning**
4:16,17
15:10
**Morse**
13:24 14:4,
7,9 16:14,
16,21 19:21
20:6,14,16,
19 22:6 24:8
27:15,18
35:9 39:10,
12,14 42:6
43:1 47:17
56:25 58:9
61:17 63:1,
4,6,9,11,15,
20 64:7,19
65:6 67:6
69:21 75:21
78:3,10 80:7
84:3,16
86:3,9 87:8
91:8,11
92:24 93:4,
7,11,13,22
94:1,9,12,
15,17 98:7
101:24
103:8,17
105:20,24
106:11
123:8,14
125:15,22

141:22
143:12
161:23
162:20,23,25
**move**
14:6  71:3
78:16,25
80:6,13
**movements**
85:6  133:22
**moves**
81:7
**moving**
70:6  113:22
**multicolor**
42:21
**multicolored**
42:10,16
45:6,21
46:14  52:12
54:10  55:19
119:21
120:23  122:9
126:12,25
127:8  129:6
156:1,22
**multitude**
37:23  50:11
62:14
**mute**
148:4,7,9,
14,21,25
149:9,23
150:1
**muted**
68:5  147:24
149:21
**muting**
148:11

**N**

**name**
7:12,13
82:14  119:22
137:7  146:1,
3,7

**narcotics**
11:20
**nature**
84:6  113:5
**NDA**
159:16
**nearby**
134:12
**necessarily**
70:5
**necessary**
35:12,14
109:23
**need**
6:24  7:1
17:6  32:22
34:7  35:18
36:4,9  37:2
44:11,15
49:24  51:20
67:23  68:13
69:17  79:15
92:19  94:22
105:2  116:14
125:2,3,14
126:2  147:14
**needs**
19:17  22:22
88:1
**negotiation**
11:1,17
62:10
**negotiator**
10:25  15:10
**negotiator/
hostage**
15:9
**neighborhood**
40:12
**never**
31:24  47:15
48:16  70:2
85:11  93:4
97:6  148:3
**newer**
48:21

**nice**
145:4
**nicely**
58:22
**Nicole**
9:7
**night**
63:12
**nine**
155:20
**nolle**
9:13
**noncompliant**
92:22
**nonthreatening**
21:15
**nonverbal**
15:17  62:12
**nonverbally**
145:7
**normal**
89:16
**north**
137:5
**notations**
45:1,9
**notch**
83:11
**note**
43:4
**Noted**
53:16
**notes**
13:2  14:11
42:21  45:5,
7,8,13,16
46:4  50:17,
22  51:14,25
52:20,22
55:2  66:1
157:10
**noticed**
157:2
**notified**
40:11

**notify**
136:12
151:11
**null**
159:13
**number**
11:2  29:2
31:5,11,19
**numbering**
43:5
**numerous**
9:22  11:17,
21  73:21
88:18

**O**

**oath**
5:16
**object**
16:14,18
19:21  20:6,
14,16  22:6
24:8  35:9
39:10  42:6
43:1  56:25
58:9,10
61:17  63:1,
9,13,15
64:3,10,19
65:6  70:23
74:12  75:21
78:3,10  80:7
84:3,16
86:3,9  87:8
91:8  92:24
93:10  101:24
103:8,17
123:8,14
141:22
146:13
161:23
**objectable**
18:20
**objection**
6:10  58:16
64:13  69:21,

Bethany Guerriero
April 25, 2024

23

22

**objections**
6:7 63:21
93:6,12

**objective**
20:8 22:20,
21,23 25:4
85:18,25
88:1,6,13
89:2,12,17,
20

**objects**
69:17 143:12

**obligated**
33:16

**observable**
25:21 71:2

**observations**
143:8,16,19

**observe**
25:7 55:7
66:8 71:11,
18,24 72:3
74:19 90:22,
24 92:17

**observed**
66:10 92:21
95:14

**observing**
90:11

**obstructing**
66:20

**obstruction**
146:5

**obviously**
132:1 137:19

**occupied**
70:19

**occur**
81:20 106:14
150:18

**occurred**
152:10

**occurrence**
31:8

**occurs**
30:22

**odd**
135:18

**offender**
11:3

**offense**
136:10

**Office**
9:14 159:13

**officer**
9:19,22
10:23 11:23
15:20 17:4,
17,23 18:3,
11,14 19:17,
20 20:5,12,
13 21:11,20,
25 22:3,11,
14,22,24
23:2,12,15,
18,21 24:6,
17 25:7,10,
13,20,25
26:3,12 27:3
28:3,8,12
29:5,10,14,
21,24 30:3,
10,11,19
31:13,22
32:2,5,7,11,
23 38:17,18,
20,24 39:9
41:6,13,18,
21 43:6,11,
12,13 46:19,
20,23 47:4
48:21 49:9,
13 50:8
53:22 58:20
76:12 83:2
85:13,16
86:12 87:10,
22,25 88:4
99:18,25
100:12
101:18,22
102:12,15
111:4,6,7
112:11,23

113:13
120:15
121:17
128:22
134:17
135:17
142:10
143:3,8,15
144:11
145:15
155:25
156:10,21
157:11
158:22

**officer's**
20:7 23:8
31:14 33:4
39:1

**officers**
18:10 26:18
28:19,20
30:18 31:22
32:1 38:8
39:18 41:5,
19,25 49:2
53:20 76:2
80:14 83:13,
15 84:9
109:1 130:17
132:21
135:3,7
138:20,23
140:2,8
141:15,25
142:3,16
146:1 147:24
148:24
149:8,16
150:7 151:21

**official**
148:18

**okay**
4:20 5:14,19
6:1,13,19
7:5 9:15
10:8 12:1
13:4,13,19
14:4 16:19,

20,22 17:25
19:3,8 20:4,
11,18,21
21:2,9,19
26:2 28:19
36:14 39:13
44:17 52:9,
14 55:9 57:6
58:18 59:2
61:3 62:6
63:5,14
64:11,22
65:25 67:20,
24,25 68:1,
22 69:7,9
70:12,15
71:10 72:2
75:6 76:5
81:17 82:17
87:19,25
95:18 98:6,
23 99:15
100:15,25
101:2,17
105:23
109:25
111:25
112:6,8
113:6 115:8
120:8,25
122:23 123:2
124:4,8
126:3,6,15
127:6,14
130:16
131:25 134:7
135:12
136:23 138:3
140:23 141:6
144:23
147:23
150:10,22
154:24
158:13
159:19 161:4
162:2

**once**
83:15 85:11
111:3,7

Bethany Guerriero
April 25, 2024                                              24

135:6,23
145:24
**one**
5:2,25 6:5
7:2 10:2
24:10 33:14
36:2 39:9
40:12 41:5
42:20 47:16
48:16 49:21
50:7 57:18
59:18 60:8
67:12 72:11
73:2,3 74:17
77:11 83:9
92:8 96:12
98:16 103:6
110:4 117:18
120:4
122:11,17
127:4,5
133:20,21
134:16,19
136:4 144:25
145:1,4
149:2 157:7
**one's**
110:14
**one-after-the-other**
84:11
**ones**
122:12
**opened**
152:5
**operate**
17:23 53:20
**operator**
11:12
**opinion**
79:9 145:14
**opportunity**
71:14,16
82:18 90:10
**opposed**
148:7
**opposite**

92:13,16
**option**
50:18,20
51:3 53:8
**options**
50:14
**order**
35:19 36:5
78:21 101:5
147:7,13
**ordered**
80:22,24
81:2,16
95:22 97:22
145:6
**ordering**
78:7
**originally**
69:14
**other's**
81:6
**outcome**
22:19
**outrageous**
59:7
**outside**
73:4 93:6
**outstanding**
48:16 85:22
86:16 107:1
**overseeing**
159:5

----

**P**

----

**page**
44:6 158:3
**pain**
108:20
**painting**
98:18
**Palm**
9:11,21
10:17,21
12:5 16:1,10
29:15 30:19
38:5,19,23

39:8 136:5
**pants**
77:2
**paper**
44:1
**paragraph**
45:3
**paraphrasing**
16:5
**park**
55:5
**parking**
40:7 43:9
46:6 50:9
51:9,13
**part**
8:3 11:9
12:17 15:12
29:15 79:3
98:10 107:12
109:24
117:21
154:19,24
**part-time**
12:4
**partaken**
15:13
**participate**
7:9 155:4,5
**particular**
97:19 98:21
135:17 141:8
144:13
149:13
**partner**
158:21
**parts**
82:9 113:22
**party**
41:16
**passed**
151:3
**passive**
32:20
**passively**
29:3

**past**
62:17 71:5
79:13 132:5
**pause**
68:10
**paused**
112:10 120:7
124:22
126:10,23
127:22
128:14 156:3
157:20
**pavement**
97:23 98:3
**pay**
45:13
**PC**
146:25
**pedaling**
85:8
**pending**
7:3
**people**
15:11 18:21
34:3 37:19
40:25 59:24
62:7,19
79:14 92:9
98:24 99:2
119:23
120:11
121:24
127:4,12
132:7 133:10
141:15
149:17 150:8
157:14,15
**people's**
113:22
**peoples'**
118:9
**perceivable**
20:3
**perceive**
25:10 92:19
93:16 131:6
161:20

Bethany Guerriero
April 25, 2024                              25

perceived
  29:22 58:25
  79:10 82:5
  88:10 110:2,
  6 124:1
  131:8 132:23
  133:11
  143:21 144:5
perceives
  29:10
perceiving
  100:1,12
percent
  30:25 31:18
  48:7 54:5
  56:8 108:3
perception
  23:8 25:20
  84:20
  130:24,25
  131:18
  132:19,25
performance
  17:4,17
  104:23
  107:23
  110:10
period
  90:21 118:1
peripheral
  55:4
perjury
  159:15
permit
  20:13
persisting
  109:7
person
  29:2 33:3
  34:9,13,16,
  21 36:4,8
  37:24 39:19
  42:9 46:6,7
  47:25 49:21
  51:9,13,20,
  22 52:23
  55:4 72:24

  74:1 92:5
  102:22
  110:24
  111:23,24
  117:15
  126:24
  129:23,24
  136:24
  137:17
  147:21 154:9
person's
  25:4
personally
  12:18 31:2
  151:22
perspective
  90:3
pertinent
  105:5
phone
  60:25 70:17
  73:19,25
  79:23 144:21
  145:10,13
phones
  73:22
phrasing
  62:3
physical
  29:1 127:7
physically
  92:22
pick
  62:11
picking
  15:16
picture
  98:19 127:23
piece
  60:4 70:7,8
  122:17
pieces
  61:2
pile
  74:20,23
  75:9

pilot
  42:1
place
  69:13 78:22
  107:8 134:18
  142:25
  151:25
placing
  143:1
plaintiff
  12:22 43:17,
  18,19,20,21,
  22,23
platoon
  135:17
play
  67:18,22
  111:18 112:1
  113:2 116:7
  119:12
  124:14,17
  126:16
played
  67:23 102:9
  109:24 114:1
  119:17
  125:19 126:2
  155:23
playing
  68:3,9,17
  69:3 112:7
  113:8 116:10
  139:15
please
  4:4 6:3,25
  7:12,15,18
  9:16 11:11
  13:15 15:7
  17:7 18:16
  19:6 21:17
  28:23 44:11
  59:13 60:11
  69:11 70:14
  74:7 93:6
  95:6 105:18
  116:17
  124:2,7

plenty
  108:6
pocket
  54:17,18
  56:17 57:12,
  25 61:5
  70:3,20
  71:12,19,20,
  24 72:4,9,21
  80:13 89:25
  144:21
  145:9,13
pockets
  56:24 57:9
  58:5,21
  59:17 60:24
  61:7,20
  66:6,8,11,17
  70:1 71:6
  72:20 76:20,
  22 77:2,3,6,
  8,16,20
  78:1,7,14
  80:10 84:25
  85:11 86:21
  88:17 90:14
  130:17
  131:4,7
  144:15
  145:20
point
  18:24 27:11
  28:5,10,11
  33:16 35:25
  44:25 48:18
  49:17 59:11
  60:22 61:6,
  20 66:16,21,
  22 70:16
  71:22 74:13,
  15 80:18,21
  81:8,9,17,20
  82:4,21
  83:9,13,18
  84:2,15
  89:12 95:22,
  25 102:20
  103:7 104:8

Bethany Guerriero
April 25, 2024                                      26

108:9,22
110:22 111:9
112:16,19,
22,24 113:23
114:8,17,23
115:3,12,21
117:6,9,10,
24 118:7
119:7 127:10
130:3,14
134:19
136:23 137:7
138:19
139:1,6,22,
24 141:7,25
142:8 143:22
146:11,22
147:1 153:19
**pointed**
99:19
**points**
155:17
**police**
9:20,22
10:15,21
15:19 17:4,
17,23 29:15
40:15,21
41:3 50:11
78:21 103:7
109:1 120:15
121:17
132:20
134:17 136:5
141:25 150:7
**policies**
26:9 38:6,8
**policing**
16:24
**policy**
16:2,11
29:18 30:4,
12,13,15,17
38:19,24
39:8 148:13,
21 149:9
**polite**
28:4 61:15

**pool**
41:10 46:21
68:7 119:20,
23 128:23
137:5
**pools**
40:12
**pop**
82:3
**popping**
55:2
**portion**
67:1,18,22
100:1 101:1
114:17
116:14 117:6
119:13
157:22
**portions**
126:2 158:10
**poses**
26:17 28:1
**position**
10:23 11:18
101:12 150:5
153:1 154:13
**positions**
10:20
**possessed**
12:18 140:24
**possession**
86:17
**possibilities**
65:24
**possibility**
51:7 65:18
103:15
**possible**
27:7 36:19
49:16 82:8
101:21
110:8,13
118:24
119:23
**possibly**
11:5 71:14
74:18 79:14

88:20 96:24
108:16
**posts**
14:22
**posture**
88:25
**potential**
22:11 23:2,
12 33:24
41:14,19
46:2 50:4
93:20 97:9
132:22 142:3
149:17 150:8
**potentially**
24:3 27:9
34:8 87:3
96:15 130:22
161:12
**pounds**
156:18
**practice**
37:8,15
136:9
**practiced**
136:14
**preamble**
94:25
**preambling**
95:2
**precise**
131:22
**preface**
33:1
**preference**
39:4,24
**preferred**
40:3
**pregnant**
137:20
**prepare**
7:23 8:11,21
**pres-**
50:3
**presence**
134:1

**present**
21:15 34:4
35:7 50:3
74:10 86:11,
12 130:10
133:7 138:23
151:20
153:11
155:14
**presentation**
52:20,22
**presented**
19:17 26:8
27:3 38:17
73:20,22
137:19
**presenting**
59:23 132:5
135:20
**presents**
86:24
**preserved**
58:16 64:14
**pressure**
151:19
**presumably**
137:17,18
**pretty**
48:4 80:10
85:25 128:1
159:6
**prevents**
150:19
**preview**
111:19
**previous-**
146:15
**previously**
15:10 49:10
139:23
140:12,19
141:14
159:25
**primarily**
48:13
**primary**
48:23 134:8

Bethany Guerriero
April 25, 2024                                                    27

principles
 161:19
prior
 9:18 41:6,8
 46:20 107:2
 117:21 157:8
 158:13,16,18
priority
 135:8
private
 8:3 106:4
privately
 14:16 15:1
probable
 142:12,17,23
 143:4,9,16,
 19,25 144:6,
 13 145:14,
 18,22 146:21
 147:4,14,20
 152:9,11
probably
 31:19 48:6
 95:1 106:2
 151:12
problem
 4:23
proceed
 64:8 113:7
proceedings
 4:2
process
 43:14
processed
 115:5 159:13
profession
 49:20
professional
 54:16 160:22
 161:9
profusely
 133:3
program
 11:3,4
prossed
 9:13

protecting
 18:8,9
 160:23
provide
 122:23
 142:12,17,22
 146:3,7
provided
 41:12 85:20
 89:18 96:6
providing
 95:20 123:25
 143:15
psychiatrist
 62:8
public
 16:8 18:9
 39:19 84:9
 133:10
pull
 89:11 111:15
 127:19,23
 128:7 156:25
pulled
 47:1,5 54:22
 144:20
 145:9,13
 156:16
pulling
 41:8 42:17
 45:11,14,25
 50:8 54:25
 55:5,7 88:19
 97:1 156:1,
 23
punk
 103:24
purpose
 5:22
purposes
 146:4
pursue
 84:15
pushed
 100:22
put
 30:10 47:7

 52:21 71:11,
 18,24 72:4,
 19 76:3,8,
 17,22 88:9
 93:7,15
 101:11
 122:13 135:5
 152:25
 158:21
 159:14
puts
 61:4
putting
 36:25 77:15
 81:8 93:1,8,
 17 152:2

——————

 Q

qualify
 148:24
question
 6:2,3,20,24
 14:1,19
 20:20 25:18
 63:11 64:13
 71:9 84:17
 87:16,18
 90:17 91:5,
 9,19,20
 93:13,23
 94:25 95:1,
 5,12,13,18,
 21 97:7
 98:19 116:1
 117:11
 118:10
 121:12
 122:15,22
 123:1 124:3
 146:19
 159:23
 161:3,5
questioning
 137:10
questions
 5:18 6:17
 7:4 13:14

 17:9 26:11
 44:13 63:17
 93:21 94:10,
 13 162:3,15,
 23
queues
 62:12
quickly
 67:12 70:6
 81:7 100:3
quite
 30:7,21,25
 35:20 70:23
 83:19 110:19
 135:1,16
 144:18
 151:16
quote
 98:18

——————

 R

rabbit
 119:4
radio
 40:14,15,21,
 24 41:3,8
 43:7 49:18,
 21,25 50:8,
 11 51:14
 118:19,20
 119:13,16
 120:6,12
 122:19
 124:18,21
 126:7,9,18,
 22 127:16,21
 128:10,13,
 20,22 129:1,
 18,21 130:10
 157:6
radioed
 49:13 51:4
raise
 4:3 151:25
ran
 11:3 137:6

re-
 71:7 144:10
reach
 72:24 73:9
 97:12
reached
 70:2 144:20
 145:9,12
reaching
 73:5,6 89:24
react
 161:20
reaction
 89:16
reactionary
 161:15
read
 44:11,16
 45:1,16
 46:2,4 52:10
readily
 47:6 54:13
 91:1 103:9
 108:21 153:4
reading
 45:7 52:21
 137:10
real
 33:12 50:3
 131:19
realize
 60:25 81:10
 148:5
realized
 109:8 111:8
 135:2
realizing
 104:8 131:14
 134:25
realm
 60:20
realtime
 53:15 65:8
 89:7 95:9
 99:20
reason
 7:2 33:12,23

 44:22 53:8
 66:14 76:8
 90:5 94:9
reasonable
 18:15 24:21,
 22 55:12,16
 56:22 58:8,
 23,24 59:1
 61:16 85:18,
 25 89:17
 141:21
reasonablenes
s
 18:20 20:8
 22:20 25:5
recall
 32:4 48:8
 60:6,13
 66:20 99:21
 100:4,10
 101:19
 114:15
 115:21 128:3
 130:4,12
 137:2,4
 141:11
 149:20
 156:19
receive
 15:8 42:20
received
 113:24 115:4
 117:9,24
 144:4
 158:17,18
receiving
 22:18 118:25
recent
 128:16
recently
 158:1
recess
 47:9 67:15
 80:2 106:12
 162:22
recollect
 115:16

recollection
 68:23 99:6
 101:4 138:1
record
 5:16 10:4,5
 13:24 14:2
 43:4,7 45:1
 63:10 67:12,
 14,17 69:3,
 11,16 70:13
 79:25 92:25
 93:7,14,15
 94:4,23 95:5
 106:5,7
 124:23
 125:24
record's
 162:11
recorded
 149:18
 155:22
 156:2,6
 157:19
recorders
 148:14
recording
 43:8 69:4
 98:25 101:1
 111:14
 119:13,14,16
 120:6,16
 121:5
 124:18,21
 125:6 126:7,
 9,18,22
 127:11,16,21
 128:10,13
 130:9 155:16
recordings
 69:18 118:20
 150:6
red
 132:21
ref-
 35:14
refer
 12:9 35:15
 44:13 51:24

 67:23 103:24
 127:11 128:6
reference
 63:10
referred
 153:19,22
referring
 12:14,15
 32:7 44:8
 52:2 149:2
reflect
 13:24 92:25
refrain
 13:15
refresh
 67:4 68:23
 69:5 100:25
 116:15
 118:7,21
refusal
 146:3,6
regard
 105:20
regarding
 14:19 16:2
 38:6 43:8,12
 46:17 62:6
regular
 31:8
reiterate
 135:24
related
 9:16,25
 10:13,19
 11:22 12:19,
 24 13:7,10,
 12 14:12,16
 43:15 119:14
 149:16 150:7
relation
 5:3 15:17
 16:7 66:12
 148:6
relayed
 116:21
 123:3,12
 124:10

Bethany Guerriero
April 25, 2024

29

relaying
  117:10
  120:18
  121:8,22
released
  10:15
relevant
  106:2 148:19
relied
  143:8
remain
  78:18,22
remember
  31:23 41:8
  42:18,20
  45:19 46:19
  48:1 54:14
  55:3 59:15
  60:22 76:19
  77:21 78:17,
  20 101:20,25
  112:20
  113:1,23
  114:7,16,20
  115:21
  117:9,23
  118:2,5,15
  119:5,10,11
  127:1 134:15
  137:10
  138:7,16
  139:5,6
  156:22
repeated
  6:24
repeatedly
  98:15
rephrase
  58:17
rephrased
  57:4
replay
  116:14
report
  29:14,23
  30:3,12,20
  31:14 43:3,

12,15 44:5
52:7 120:19
121:23 143:4
159:17
reporter
  4:3 5:15,24
  68:11,15
  124:25
  125:5,11,17,
  18
reporting
  31:22 32:2
  52:12 121:25
  122:5
reports
  129:10
reprimand
  159:1 160:6,
  8
request
  35:1 36:10
  56:23 57:1
  58:21 61:15
  62:4 124:16
  134:14,22
  135:12,23
requested
  12:23
requesting
  58:4
require
  30:16,17
required
  140:24
  142:16
  147:20 155:9
requirement
  147:3
requirements
  147:11
reside
  7:20
resist
  36:12
resistance
  36:2 38:6,
  18,25 79:21,

22 82:6
84:12 86:18
146:8,25
resistant
  82:21 83:7
  98:20
resisting
  26:21 29:4
  32:11,17,23
  132:17
  144:8,9,10
  145:15
resolution
  9:12
respect
  26:13 133:25
  161:9
respond
  6:9,12 34:19
  38:15 60:17
  64:6 88:1
  89:14
responded
  49:10
responding
  34:11 128:17
responds
  84:1
response
  6:11 38:6,25
  60:6 62:17
  65:1,17
  95:21 108:7
  160:18
responses
  62:14 79:19
  133:6
responsibilit
y
  24:9
restate
  58:17
restroom
  98:8 150:13
resulting
  158:23

resume
  125:25
  126:16 128:9
resumed
  124:19
  126:8,19
  127:17
  128:11 156:7
Resuming
  68:16
retort
  60:1
retreating
  71:7
revealed
  156:16
review
  5:21 8:11,14
  45:8 51:14
  67:1 69:24
  111:11
reviewed
  45:1 50:17
  158:1
reviewing
  50:22
revisit
  162:9
rhyme
  33:12
Rice
  4:15 10:3,6
  14:2,5,8,10
  17:1 19:24
  20:10,24
  22:7 24:12
  27:19 35:10
  39:20 42:8
  43:2,24 44:3
  47:10,11,19,
  21 57:3
  58:12 61:23
  63:24 64:3,
  8,12,21
  65:12 67:7,
  14,16 68:10,
  13,16,18,20

Bethany Guerriero
April 25, 2024

30

69:2,8,10,
15,23 76:1
78:5,15
79:25 80:3,
11 84:13
85:1 86:4,10
87:9 91:10,
12 93:1,3,5,
10,12,15,19,
25 94:8,10,
13,16 95:3
98:9 102:1,
7,10,11
103:13,18
105:23
106:5,13
111:15,17
112:9,14
113:9,11
116:9,11,13
119:12
120:5,14
123:11,15
124:13,16,23
125:2,8,13,
25 126:4,14,
16,21 127:2,
15,20,24
128:9,12,15
139:13,16,18
142:1 143:13
146:14,17
150:14,17
155:20 156:4
157:18,21
162:1,19,21,
24

**Rick**
20:19 124:15

**Ridge**
119:18,19

**right**
4:3 7:8 10:1
27:22 42:14,
17 47:10,22
49:11,21
50:23 51:10
52:3 53:13

55:22 60:7
61:5,7 63:18
64:2 68:18,
21 70:17,18
73:16 76:13
87:17 90:1
97:25 104:25
112:11,18
118:11 119:9
121:13 122:6
123:22 131:4
133:5 135:1
147:16,17
160:4

**rights**
159:17

**risk**
61:22

**road**
63:16 157:14

**roles**
10:20

**roll**
82:1

**rolled**
98:4 100:15

**room**
5:17 84:10
93:6 151:10,
22

**route**
135:21 136:3

**rules**
5:13

**running**
11:4

————————————

————————————

**S**

————————————

**Sabal**
119:18,19

**safe**
38:21 50:24
75:25 79:16
86:18 99:13

**safety**
20:12 21:5,

12 22:1,2,
10,11,23
23:3,13
25:21,24
26:17 37:23
39:17,18
41:14,19
51:16,17
61:21 77:24
79:20 84:8
86:21 87:4,
12,23 88:10
97:9 100:1,
12 138:17
140:6,13,20
142:3 160:24

**sake**
35:22

**salad**
96:13

**sat**
98:5 160:15

**saved**
42:24

**saying**
5:25 20:1
46:20 49:20
50:1,2 52:7,
18 76:19
77:21 78:12
79:18 93:2,
18 94:2,6,7
95:10 96:8
97:3 99:11
108:25 122:4
123:12
132:18
138:25 146:2

**says**
45:4 129:6

**scared**
75:12 96:19,
21 97:10

**scene**
24:14 25:1
29:3,5,21
34:4,10
36:20 40:7

41:4 45:25
48:10 59:25
79:20 83:13
96:15 97:1
99:13 103:10
104:17 119:3
134:18
136:4,11
142:21
158:19,22

**school**
11:14

**schools**
11:22

**Scott**
69:13

**screen**
42:19

**search**
12:18 13:6
134:11,14,22

**searching**
13:9,11

**seat**
37:1,2

**seated**
83:10 101:12

**seating**
13:16

**second**
10:2 62:2,23
66:4 69:25
98:21 120:4
127:18
129:10,13
131:7,12
144:24
156:14

**seconds**
50:12 68:4,
10,16 89:24
90:3,5,7
113:3 116:12
125:25
126:17
155:21

Bethany Guerriero
April 25, 2024
31

secure
  74:1
secured
  41:16 48:17
  96:24 139:5
see
  5:2 30:3
  33:12 38:4
  47:1,3,4
  51:18,21,25
  52:10 54:9,
  22 56:2,4,11
  68:1 76:12
  85:12 86:20
  91:1,6,20,25
  92:3,5 97:12
  101:1 105:24
  117:20
  118:14
  120:16 139:1
  140:1 151:2
  154:6 155:17
  156:23 157:9
seeing
  45:19 55:4
  74:15 99:21
  156:22
senior
  10:25 135:17
sense
  6:14 8:9
  55:1
senses
  60:2
Sergeant
  113:15,16
  116:18 119:8
  129:17
  130:2,8,16
  131:11
  150:23
  151:7,20
  152:17 153:5
service
  132:6
set
  161:18

seven
  93:23
several
  84:17 151:2,
  18 153:16
  154:8
severe
  51:17 61:21
  64:16
severely
  108:10
severity
  26:13
shapes
  56:7
shifted
  135:8
shirt
  55:22 116:25
  117:17
  129:14
  138:5,7
  156:16 157:4
shirtless
  97:15,25
shocked
  136:2
short
  65:17
short-sleeve
  138:7
shorter
  137:21
shortly
  41:6
shorts
  55:21 138:5,
  8 156:1,23
shot
  85:23
shoved
  158:21
show
  44:10 101:2
  102:4 157:10
showed
  129:14

  151:21
shown
  73:22 116:25
shows
  100:20 117:7
sic
  18:20
side
  17:21 41:10
  46:21 68:7
  70:20 119:25
  123:4 128:23
  137:5
sight
  54:21
sightly
  74:9
signal
  99:24 100:11
  120:2
signed
  159:16
significant
  87:4,12,23
signs
  133:1
Silva
  137:7,13,21
  138:5,11,18
  139:1,11,20,
  22,25
  140:11,19,23
  141:3,18
Silva's
  141:10
similar
  79:14
simple
  21:10 82:14
  148:8
simply
  83:16
sir
  6:15 7:7
  12:16 14:14,
  18,21,23
  15:2 47:14

  99:4 134:6
  162:6
sit
  46:1 48:2
  82:2 100:16,
  23 101:5,6
  105:8 106:22
  115:18
  117:25
  121:4,14
  130:13
  137:25
  154:1,7,12
  158:9 160:11
  162:12
sitting
  50:22
situation
  15:24 18:19
  21:12,18,21
  22:3 23:24
  24:7,23 27:2
  28:14 33:8,
  23,25 34:11
  35:15 37:11
  39:16 49:24
  65:8 82:25
  83:7,19 87:5
  89:5,18
  96:17,23
  99:6 104:5
  111:22 153:4
  154:10
situation's
  42:4
situational
  37:21 38:13
situations
  35:17 79:14
  154:5
six-page
  44:4
sizes
  56:7
skills
  15:14
slight
  70:25

Bethany Guerriero
April 25, 2024                                    32

sniper
  11:14
social
  14:22
solely
  25:13,18,24
  102:18
solemnly
  4:5
somebody's
  73:15 111:23
someone's
  62:23 83:7
  142:18
  153:14
sooner
  135:21 136:3
sort
  14:12 15:14
  34:6 73:13
  86:8,11
  99:24 100:10
  147:10
sorts
  10:13
sotto
  44:2
sound
  42:1 89:25
sounds
  48:9 97:7
source
  41:3 46:5
  118:17
sources
  13:20
speak
  5:25 34:8,9
  81:11 82:7
  111:4
SPEAKER
  68:6
speakers
  126:5
speaking
  6:10 21:22
  32:19 87:14,

15 93:5,12
  140:9 157:17
specialized
  11:8
specific
  21:22 37:25
  81:24
  115:12,21
  132:14
  144:19
specifically
  30:8 134:15
  137:8 144:12
  149:4,13
specifics
  154:8 161:24
specify
  19:5
speculate
  30:24 42:7
  75:2 150:4
speculation
  75:8
spell
  7:15
split
  62:23 77:13
split-second
  89:22 132:8
  134:3
splitting
  77:11 131:1
stance
  70:25 74:9,
  11,16 85:7
stand
  100:18,24
  101:6,11,14,
  15
standard
  22:21 136:9
standards
  18:1 154:14,
  22 161:12
standing
  74:21 97:13
  100:22

101:21
standpoint
  25:3 48:14
start
  40:4 51:21
  53:4 67:9,21
  80:21 100:22
  102:7
  124:15,17
  139:14
  155:20 156:4
started
  56:15 69:1
  71:2 104:8
starting
  6:5 57:11
  113:1 156:25
starts
  20:2 101:6
state
  6:7 7:20
  9:13 69:16
  99:11 104:7
  130:23
  131:14
  134:23 135:3
  159:12
stated
  15:10 62:9
  151:17
statement
  55:12,16
  57:18 72:5,6
  142:17
  148:18
  155:9,11,13
statements
  69:18 98:24
  103:20,22
  133:23
status
  12:2
statute
  32:11,13
  33:5
stay
  23:10 79:16

stayed
  100:5
step
  70:22
stick
  21:13 71:8
  78:12 84:19
stipulations
  148:21
stood
  145:25
stoop
  157:18
stop
  33:18,20,22
  34:3,17,23
  60:3 68:18,
  21 78:25
  89:11 102:10
  112:9 113:9
  116:11
  120:4,5
  126:21
  127:18
  128:12
  139:16
stopped
  157:2
stopping
  50:21 112:15
  127:20
street
  33:11
stress
  15:4 109:10,
  14
stressful
  108:5 109:5
strike
  146:19
Strzelecki
  32:8,9 43:6
  99:18,25
  100:12
  101:18,22
  102:12,15
  143:3,8,15

**Strzelecki's**
    41:6 43:10,
    12,13
**stuff**
    11:7 45:21
    64:23 122:14
    132:9
**subject**
    17:3,15 36:5
    137:9 156:15
**subjective**
    18:15
**subjects**
    16:8 18:9,21
**subsequent**
    160:2
**substance**
    152:3
**substances**
    133:19
**sued**
    159:16
**suffered**
    17:15 107:5
**suffering**
    65:3
**sufficient**
    140:13,20
**sufficiently**
    6:21 162:16
**suit**
    42:22 45:6,
    21 52:12
    54:10 119:21
    126:12,25
    127:8 137:19
    156:20
**super**
    45:7
**supervisor**
    135:12,21,
    23,24 136:3,
    10,12,15,16,
    19
**supervisors**
    135:18

**supposed**
    18:4 26:3,
    12,16,20
    109:8 125:18
    127:6 154:14
**sure**
    4:23 7:16
    9:7,17 11:12
    12:20 13:9,
    17,23 14:5,7
    17:8,11
    18:17 27:9,
    14 28:11
    30:7,9,17,
    21,25 35:20
    36:16 39:21
    44:12 48:24
    56:14 57:8
    58:13 59:14
    60:3,5,12
    63:19 64:2,
    7,17,23
    67:3,5,14
    70:24 71:3
    74:13 78:11
    81:9,11
    83:17 97:11
    100:19 102:6
    107:19
    111:11,13
    115:8 124:5
    128:1 138:20
    144:19 155:3
    157:3,5,7
    161:10
    162:21
**surprise**
    31:13,15
**surroundings**
    50:10
**surveillance**
    43:9
**suspect**
    26:17 120:10
    126:24 160:1
**sustained**
    159:15

**SWAT**
    10:24 11:12
**swear**
    4:5
**sweating**
    133:3,19,21
**swimsuit**
    42:10,16
    46:15 52:2
    55:20 120:23
    122:9 129:7
**swing**
    67:7
**switch**
    13:16 59:20
**sworn**
    4:12
**symptomatic**
    131:16
**symptoms**
    75:20 108:7
    133:7
**system**
    148:6

---

**T**

---

**ta-**
    33:14
**tactic**
    15:23
**Tahoe**
    54:19
**tail**
    108:19
**take**
    7:4 28:3
    44:15 46:8
    48:19 52:22
    59:10 66:3
    74:9 83:11
    88:19,21
    106:6 114:21
    132:21
    137:23 139:4
    140:21
    141:15

    150:13,14
    162:20
**taken**
    4:24 5:17
    28:25 47:9
    67:15 80:2
    106:12
    134:16
    135:22,23
    142:25
    162:22
**takes**
    70:22 145:4
    161:19
**taking**
    66:15 74:16
    106:9 116:6
**talk**
    8:20 12:13
    22:8 33:14,
    15 56:16
    63:12 64:4
    75:5 83:1
    104:19
    105:25 106:3
    119:4
**talked**
    88:4 130:2
    131:1 137:13
    141:14
**talking**
    36:2 40:4
    47:22 90:8
    102:13
    113:13
    116:19
    118:22
**talks**
    129:2
**tall**
    55:9 137:23
**taller**
    55:14
**taser**
    99:19 158:23
**tax**
    10:22

Bethany Guerriero
April 25, 2024                                    34

team
  11:1,13,17,
  18 15:12
tell
  9:6 15:3,7
  18:3 20:20
  37:9,19
  63:23 66:23
  77:3 82:3
  89:1 101:10
  104:1 118:3,
  12 130:5,16
  131:10 143:2
  144:25 145:1
telling
  57:1 60:21,
  22 61:19
  77:19 78:1,
  13 95:9,11
  98:15 119:22
  145:2,3
temperature
  133:4
temporarily
  36:16,23,24
  37:1
temporary
  36:15,22
  37:12
ten
  31:6
ten-minute
  150:15
terminated
  12:7
terms
  30:10 86:1
  127:4,11
  160:22
testified
  4:13
testimony
  4:6 115:9
testing
  110:15 153:3
tests
  151:4

text
  13:3 14:19
thank
  65:22 68:15
  69:15 95:21
thing
  7:2 33:14
  41:7 50:24
  54:14 94:6
  117:12 133:4
  147:10
things
  10:13 19:4
  37:23 42:20
  44:11 45:20
  48:15 50:6
  64:2 70:5,7
  73:22 92:16
  93:2,17
  94:19 105:2
  106:1 107:2,
  13 109:6,7,
  23 110:2,5,
  16 113:2
  119:2 121:11
  132:14 133:6
  134:16 135:2
  146:2 148:3,
  19 153:9
  154:6,9
  157:8 160:3
think
  11:25 16:12
  31:25 44:1
  45:18 47:6
  56:22 61:16,
  18 70:4
  78:17,20
  90:16 100:4
  104:4 125:14
  130:12 150:1
thinking
  49:22
third
  86:19 90:13
  107:6
thoroughly
  158:3

thought
  58:4 81:12
threat
  19:17,19
  20:2,12
  21:5,12,23
  22:1,2,10,11
  23:3,13
  25:21,24
  26:17 27:8,9
  28:1,6,9
  46:2 50:3
  86:24 87:4,
  12,13,23
  88:10 97:9
  100:2,13
  132:22
  140:20
  161:20
threatened
  129:25
threatening
  140:12,19
threats
  19:13 22:23
  41:14,19
three
  40:25 52:5
  120:11
  121:24
  122:12
  127:4,12
  135:17 145:5
  153:24
  157:14,15
three-and-a-
half
  129:1
threw
  58:14
throw
  35:23
time
  5:25 7:1
  19:5 21:23
  22:18 30:14
  38:1 40:15
  41:14,17,21

47:16 48:12
50:7 52:6
65:14 66:3,9
69:25 70:1
71:2 74:23,
24,25 85:10
86:20 89:3,
19 90:3,13,
21 96:7
97:15 98:3,
21 99:19
100:8 101:17
102:14
108:21,23
115:21
116:24 119:2
128:19
130:22
131:7,12
132:7 134:4
138:6 140:7,
14,21,25
143:18
144:5,20,24,
25 145:1,5
146:20,22
148:24
151:2,6,20,
23 153:6,14
157:3,16
159:5
161:16,19
times
  6:6 33:3
  36:20 76:6
  84:17 88:19
  93:23 117:13
  145:5 147:24
  157:11
today
  4:18 7:8,24
  19:5 48:2
  53:17 64:2
  105:8 106:22
  115:9,18
  117:25
  118:16
  121:5,14

Bethany Guerriero
April 25, 2024                                      35

130:13
137:25 150:5
154:1,13
155:19
157:24 158:9
160:12
162:5,7,12
**told**
100:16 101:5
119:4
144:14,25
145:16
160:16
**ton**
118:8
**tone**
41:21 62:3
**top**
35:22 107:12
150:12
152:24
**topics**
151:8
**totality**
144:3
**touch**
73:10
**towel**
70:24 85:9
157:4
**traffic**
49:18 50:8
120:12 157:6
**trained**
17:25 62:11
**training**
10:16,23
11:8,15,23
15:4,8 39:9
62:6,22
73:20
161:15,18,22
**trainings**
9:22 11:17,
18,21 15:11,
15 16:7
133:9

**traits**
94:5
**transcribe**
68:12,13
125:6,18
**transcribed**
69:18 119:17
124:19
155:23 156:7
**transcript**
5:21 125:1,
10,14
**Transcripts**
8:15
**transmission**
122:19
128:16
**transmissions**
118:20
128:20 129:1
**transported**
108:10 151:6
**trauma**
62:7,18,24
64:14,18
65:4,19
75:20,24
79:19 133:6
**treat**
73:25
**treatment**
107:22
110:14
**trial**
94:18
**trouble**
126:1
**truth**
4:7,8
**try**
51:21 58:16
65:9 82:7,
22,25 84:21
109:22
148:2,22
150:1

**trying**
24:1 36:19
45:11,13
47:7 50:9,12
55:1 70:7
75:23 77:24
81:21 82:6,
12 94:19
96:14 98:17
100:21
103:10
107:10
109:19
117:13 118:3
119:2 122:23
130:5 134:1,
3,18 139:7
148:9,17
150:2
**tryout**
11:13
**turn**
32:10 37:13
43:25 44:5
94:22 148:7
150:1 159:14
**turned**
85:11 148:4
156:14
**twice**
84:24 88:16
144:15
**two**
105:14 107:6
129:2,4
140:2,8
141:25 145:5
151:21
153:24
**type**
29:4 40:11
50:4 60:1
74:10 84:10,
22 86:18
108:4,24
135:19
146:25
148:18

151:12
**types**
63:22 154:5
**typical**
62:16 96:8,
14 108:4,6
132:6

_____

U

_____

**uh-huh**
6:8 8:5
19:10 21:4,6
24:2,5,16
25:22 27:25
28:2 36:3
39:7,23 40:6
46:13 53:10,
18,21,24
54:12 56:19
59:6,9,21
60:14 61:8
62:15 64:24
66:25 71:17
72:13 76:14
80:15 81:13
83:24 86:2
88:23 89:10
90:18 91:16,
18,24 101:7
105:4 113:10
114:3 116:16
120:17
121:6,15
122:16,18
129:8 139:9
147:12
148:12
153:10
156:10 161:7
**un-**
119:10
**unarrested**
151:11
152:4,11
**uncertain**
115:18

Bethany Guerriero
April 25, 2024                                          36

unclear
  95:6 123:17
  124:6
uncovered
  109:24
undercover
  10:22 11:20
underneath
  45:5 85:8
understand
  6:17 12:13,
  16,20 19:25
  20:25 34:25
  36:4,9 39:21
  52:17 53:8
  54:8,10
  60:11 62:13
  64:14,17,22
  70:5 79:18
  80:5 88:21
  91:14 110:5
  112:25 119:9
  124:5 126:13
  130:6 133:3,
  5 134:2
  139:22 143:3
  144:19
  152:12,22
  159:22
  161:20
Understandabl
e
  13:21 17:13
understanding
  16:10 19:7,
  16 21:3,25
  23:1,25
  24:1,15
  25:25 27:10,
  13 29:20
  30:15 32:10,
  15,25 33:2
  34:2 36:1,8
  38:11,23
  40:1 44:12
  53:19 57:24
  59:8 61:25
  73:24 78:9

80:25 81:14
86:7 94:10,
13 99:6,16,
22 106:22
108:3 109:5
110:23
111:2,21
115:11,25
116:4,24
121:18,19
132:18,19
141:2 143:7,
17 145:8
159:20
160:11 161:8
understanding
s
  18:25
understood
  6:21 19:1
  56:23 57:10
  58:20 80:12
  113:4 115:4
  117:3 119:6
  127:9 130:3
  143:15 146:6
  160:21
  161:11
  162:15
uneasy
  152:24
unfair
  65:10
unfold
  27:4
unfolded
  49:23 114:10
unfolding
  35:8 48:13
  53:15
unfolds
  23:24 27:3
  28:14
unholstered
  99:19
UNIDENTIFIED
  68:6

unit
  11:2,15
  151:5,6
  159:5
University
  9:18
unknown
  24:24 48:24
  71:2 74:12
  90:15
unknowns
  104:5
unlawful
  28:20
unnecessary
  104:2 154:17
unprofessiona
l
  103:20,23,25
  154:19,20
  158:25
unsure
  85:9
untruthful
  97:3
unwieldy
  17:10
updated
  42:19 45:13
upgrade
  37:13
upstairs
  151:6
urgency
  50:3
urgent
  49:24 50:1

─────────────

      V

─────────────

vague
  86:1
Valerio
  41:5,13
  46:19,23
  47:4 49:9,13
  51:4 111:4,

6,7 112:11,
23 128:22
142:10
Valerio's
  41:21 50:8
value
  103:1
variables
  22:15 23:7
various
  62:19
vehicle
  47:1,3
  51:19,20
  54:20
verb-
  154:16
verbal
  15:17 32:21
  62:11 79:21
  82:5 83:12
  84:11 96:9,
  13 100:11,23
  103:11 104:6
  133:24
verbally
  82:21 83:14
  92:21 98:14,
  15,20 132:17
  145:7 146:25
  154:16
verbatim
  5:17 151:1
verbiage
  109:19
version
  33:2
versus
  19:6
victim
  59:23 60:16
  62:17 89:16
  96:8,14
  103:6 120:9
  132:6
video
  43:9 67:2

Bethany Guerriero
April 25, 2024

37

68:3,9,12,
14,17 69:24
70:21 98:25
102:2,9
112:7,10,22
113:8,12
114:12,17,24
115:12
116:3,10
117:6,21
125:15
139:15

**videos**
113:23 118:9
125:19

**view**
22:23 66:18
69:5 139:10

**violated**
161:12

**violating**
33:5

**violations**
159:18

**violence**
32:17,24
144:9

**visible**
66:13 92:6

**vision**
55:4

**voce**
44:2

**voluntary**
155:2

———————

**W**

———————

**waist**
156:13

**wait**
6:3,4,9
84:23 85:22
86:19 90:12

**waiting**
151:5

**walk**
42:12 51:22
59:13 61:1
153:4

**walked**
123:3

**walking**
46:8 51:18
52:23 70:21
83:16 119:25
137:4 156:24

**want**
5:12 8:6
13:17 14:5
18:12 19:4
21:3 24:15
30:23 33:1
35:23 38:4
39:21 40:4
42:12,14
44:5 48:23
50:5 55:10
56:14 57:23
59:8 60:4,11
61:4,24
63:18 64:1,
22 65:13,23
66:4,23
67:18 68:11
69:10 71:8
77:14 79:15
82:15 85:24
86:7 91:4
93:14 94:23
97:8 101:2
102:4
104:14,19
105:25
106:3,21
107:13 109:4
110:4 111:21
113:21 115:8
119:3 120:15
121:16
122:25
124:25
125:5,12,13
128:6 137:8

144:18
149:24 150:3
153:17
155:17 159:8

**warm**
97:20,21

**warnings**
137:11

**warrant**
140:13

**warranted**
154:2

**watch**
102:2 111:20
112:2

**way**
26:9 64:2
109:17 118:3
133:6 138:1
141:12 145:4
146:5

**ways**
93:21 110:7,
8,9

**weapon**
23:14,16,19
24:10,11
45:4,20
46:11 50:4
72:24 73:13,
14,17,18
74:3,19,22
75:8 88:20
90:25 91:7
134:9,12
139:6

**weapons**
134:22

**wearing**
46:14 55:19
120:23 138:5
153:2 155:25
156:20,22

**weeks**
107:9

**weird**
17:12

**went**
10:14 45:16
82:2 94:18
101:5 130:17
133:6

**white**
45:5 119:20
120:1 122:7
129:6

**wife**
52:1,11,13
111:23
113:17
116:5,22
117:16
119:22
120:19,22
121:23
122:10 123:7
126:11,12
127:5 129:7
137:17
151:20

**wise**
37:22

**wit-**
89:5

**witness**
4:9 16:20,22
20:15,18,21
39:11,13
63:3,5,8,14,
18 64:1,11
68:4 93:20
94:20 126:3,
6 150:13

**witnessed**
30:19 154:8

**witnesses**
29:22,25
30:11

**woman**
137:15
139:20

**won**
159:16

**word**
96:13

Bethany Guerriero
April 25, 2024                    38

**words**
  56:15
**work**
  7:6 9:24
  10:10,13
  12:3 16:9
  40:3
**worked**
  11:1 151:18
**working**
  79:12
**workman's**
  107:8 108:24
**works**
  4:21 5:13
  22:13 38:12
**worries**
  66:3
**worse**
  108:21 109:7
**Worth**
  9:21
**would've**
  44:19
**write**
  125:2,11
**writing**
  5:24
**written**
  125:10 159:1
  160:6,8
**wrong**
  72:23 108:10
  109:9 113:1
**wrote**
  143:4

──────────

            **Y**

──────────

**Ye-**
  63:2
**yeah**
  13:4 16:21
  20:16 27:17
  39:12 49:11
  55:8,21
  57:6,13 58:1

59:4 60:9
62:1,5 63:4,
8,9 64:1
68:4 69:22
71:13 75:10
76:4 82:3
99:8 114:22
120:24
125:11
144:10
150:14
152:21
**year**
  5:5 48:5
  118:4
**years**
  9:23 10:18,
  24 11:2,16
  35:21,24
  59:24 108:6,
  23 136:15
  154:6
**yelling**
  145:2
**yesterday**
  43:6
**young**
  11:5

──────────

            **Z**

──────────

**zero**
  120:2