```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF FLORIDA
 2   WEST PALM BEACH DIVISION

 3   CASE NO.: 9:24-CV-80022-DMM

 4

 5   RYAN GOULD

 6            Plaintiff,

 7   vs.

 8

     BETHANY GUERRIERO, et ano.,
 9
              Defendants.
10   _____/

11

12                    DEPOSITION OF

13                 JOSEPH STRZELECKI

14
                Wednesday, April 24, 2024
15                1:30 p.m. - 4:15 p.m.

16

17                     U.S. LEGAL
                 515 North Flagler Drive
18                    Suite 620
               West Palm Beach, FL 33401
19

20

21

22   Stenographically reported by:

23   Renne Burns, Court Reporter

24

25
```

```
 1   APPEARANCES:

 2

 3   Attorney for Plaintiff:

 4       ERIC RICE, ESQUIRE
         eric@ricedefense.com
 5       LAW OFFICE OF ERIC A. RICE, LLC
         1 West Water Street, Suite 275
 6       St. Paul, Minnesota 55107
         651-998-9660
 7

 8

 9   Attorney for Defendant:

10       R.E. KING, III, ESQUIRE
         rick@kingmorselaw.com
11       KING|MORSE PLLC
         2240 Palm Beach Lakes Blvd., Ste 300
12       West Palm Beach, FL 33409
         561-557-1079

13

14   Attorney for JOSEPH STRZELECKI:

15       W. HAMPTON JOHNSON, ESQUIRE
         whjohnson@jambg.com
16       SCOTT D. ALEXANDER, ESQUIRE (via Zoom)
         JOHNSON, ANSELMO, MURDOCH, BURKE, PIPER & HOCHMAN,
17       P.A.
         2455 E. Sunrise Blvd., Suite 1000
18       Fort Lauderdale, FL 33304
         954-463-0100

19

20

21

22

23

24

25
```

1                                 INDEX

2    WITNESS:

3    JOSEPH STRZELECKI

4

5         Direct Examination by Mr. Rice ..............4

6         Cross-Examination by Mr. King ............141

7         Cross-Examination by Mr. Johnson .........146

8         Redirect Examination by Mr. Rice .........147

9         Errata Sheet .............................150

10        Certificate of Oath ......................151

11        Letter to Witness Re: Reading ............153

12

13                           E X H I B I T S

14   PLAINTIFF'S

15   Exhibit 1   Radio Transmissions .................26

16   Exhibit 2   Video ...............................51

17   Exhibit 3   Officer Strzelecki Body-worn ........79
                 Camera Recording
18
     Exhibit 4   Officer Guerriero Body-worn .........96
19                Camera Recording

20   Exhibit 5   Report .............................105

21   Exhibit 6   Audio Interview ....................130

22   (Exhibits were provided electronically to the reporter.)

23

24

25

```
 1        REPORTED FROM PALM BEACH COUNTY, FLORIDA

 2          Wednesday, April 24, 2024, 1:30 p.m.

 3   THEREUPON,

 4               JOSEPH STRZELECKI,

 5     being a witness in the notice heretofore filed, being

 6   of lawful age, and being first duly sworn in the above

 7   cause, testified on his oath as follows:

 8               THE WITNESS:  I do.

 9                 DIRECT EXAMINATION

10   BY MR. RICE:

11        Q    Good afternoon.  Is it Mr. Strzelecki?

12        A    Strzelecki.

13        Q    How would you like me to address you

14   today?

15        A    Joe is fine.

16        Q    Okay.  So my name is Eric Rice.  I'm an

17   attorney for the plaintiff and I'm here to take a

18   deposition of you today.  Have you ever taken a

19   deposition before?

20        A    No.

21        Q    So what's going to happen is the reporter

22   is going to make a record under oath.  Everything

23   that is said in the room will be recorded verbatim

24   by the court reporter, including my questions and

25   your answers.  Also, any comments from anyone else
```

Joseph Strzelecki
April 24, 2024                                5

```
 1   in the room including objections.  After the

 2   deposition there will be a written transcript that

 3   you will be able to view and have the testimony

 4   written down.  The testimony today is under oath,

 5   you've just been sworn in.  And the testimony that

 6   you'll give can be used in later proceedings in this

 7   or other matters.

 8           Some ground rules for a deposition.  Since

 9   these are being taken down, only one of us can speak

10   at a time.  So I just ask that even if you know

11   where my question is going, if you can wait until I

12   finish my question.  And I'll try to do the same, of

13   letting you fully answer before I jump in with the

14   next one.  Just so we're not talking over each

15   other.

16           You need to make sure you keep your

17   responses audible and verbal.  So head nods or

18   shakes don't work well, and make sure you speak up

19   and clearly.  If I ask any questions that you don't

20   fully understand, please ask me for a clarification.

21   If you don't ask for a clarification, then I'm going

22   to expect and assume that you understood the

23   question and you can answer it.  Does that make

24   sense?

25       A    Yep.
```

Joseph Strzelecki
April 24, 2024                                    6

```
 1       Q     If you need a question read back or

 2   repeated or clarified, please let us know.  Also, if

 3   you need a break for anything or any time, I'm happy

 4   to do so.  The one thing I ask is you finish any

 5   pending questions, you provide an answer to that

 6   before we take a break.

 7             Does all of that make sense to you?

 8       A     It does.

 9       Q     Are you on any medications or anything

10   today that would impair your ability to participate

11   in this deposition?

12       A     No.

13       Q     Can I get your full name, please?

14       A     Joseph Strzelecki.

15       Q     Can you spell that, please?

16       A     J-O-S-E-P-H, S-T-R-Z-E-L-E-C-K-I.

17       Q     Can I have your date of birth, please?

18       A     March 16th, '96.

19       Q     Can I get an address for your work?

20             MR. JOHNSON:  Okay.  You said for work,

21       that's fine.

22             THE WITNESS:  10500 North Military Trail,

23       Palm Beach Gardens.

24   BY MR. RICE:

25       Q     Is that the West Palm Beach Police
```

Joseph Strzelecki
April 24, 2024                                        7

```
 1    Department?
 2         A    Palm Beach Gardens.
 3         Q    Palm Beach Gardens Police Department?
 4         A    Yes.
 5         Q    Did you meet with anyone to prepare in
 6    advance of this deposition?
 7         A    Yes.
 8         Q    So I'm going to ask you some questions.
 9    And my understanding is anything I ask you, if it
10    includes private legal conversations with you and
11    your lawyers, I don't want you to talk about that.
12    I'd expect that that would be privileged.  But did
13    you talk with anyone else besides private legal
14    conversations with your attorneys to prepare for
15    this deposition?
16         A    No.
17         Q    Did you review any documents in
18    preparation for this deposition?
19         A    Yes.
20         Q    What documents and materials did you
21    review?
22         A    Documents with my attorney.
23         Q    Were any of those documents created by you
24    or your attorney as part of this matter?
25         A    What do you mean by that?
```

```
 1        Q    So I want to ask what you reviewed, and I

 2   don't want to include documents that say -- you

 3   wrote for your attorney, or your attorney wrote to

 4   you as part of legal advice.  But did you review any

 5   police reports for this deposition?

 6        A    Yes.

 7        Q    Did you review any video recordings?

 8        A    Yes.

 9        Q    Did you review any audio recordings?

10        A    Yes.

11        Q    And those were all from the incident at

12   issue here today?

13        A    Correct.

14        Q    And the incident I'm talking about is the

15   one with Ryan Gould.  You're familiar with that

16   incident?

17        A    Yes.

18        Q    And you understand that's why you're here

19   today, correct?

20        A    Yep.

21        Q    Have you ever been charged or convicted of

22   a crime?

23        A    No.

24        Q    Can you briefly describe any relevant

25   schooling and education with respect to law
```

Joseph Strzelecki
April 24, 2024                                    9

```
 1    enforcement.
 2         A     Bachelors degree in all the training --
 3    the normal training that you would get with becoming
 4    a police officer.  On top of certifications that
 5    I've received after the fact.
 6         Q     Do you know what those certificions are,
 7    generally?
 8         A     We do trainings once a month.  For me to
 9    tell you every single training I've had would be --
10    I wouldn't be able to do that.
11         Q     Any trainings, I guess, what you would
12    consider outside the standard course of trainings?
13    Anything specialized?
14         A     Radar laser certification.
15         Q     Anything else?
16         A     Not to my knowledge.  Not that I can think
17    of.
18         Q     Can you please describe your work history
19    in law enforcement.
20         A     I've been a police officer for about a
21    year now.  And had trainings before that on top of
22    the academy.
23         Q     And you work at the Palm Beach Gardens
24    Police Department?
25         A     Correct.
```

Joseph Strzelecki
April 24, 2024                                    10

```
 1          Q     Why did you become a police officer?

 2          A     The cliche answer.  To serve and protect

 3     and to help people that are in need.

 4          Q     How have you found the experience of being

 5     a police officer?

 6          A     I couldn't think of a better job.

 7          Q     Now as part of this litigation, you

 8     understand that you were to locate and provide

 9     materials that were requested, correct?

10          A     Say that one more time?

11          Q     As part of this ligation, you understood

12     that you were supposed to locate and provide

13     materials that were requested, correct?

14                MR. JOHNSON:  And I'll just object to

15          that.  That he's not, obviously, the records

16          custodian for the police department.  He

17          doesn't prepare those records and keep them in

18          the normal course of business.  So he does not

19          have any records with him.  Him, himself, will

20          not be producing the records.

21     BY MR. RICE:

22          Q     Well, you're a personal party to this

23     lawsuit in your individual capacity; do you

24     understand that?

25          A     Yes.
```

Joseph Strzelecki
April 24, 2024                                          11

```
 1        Q    And you understand that requests were

 2   personally served to you, for you to locate and

 3   provide materials to the plaintiff, correct?

 4        A    I'm not really following where you're

 5   going with that.

 6        Q    As part of this litigation were you

 7   ever -- and again, I don't want to talk about

 8   conversations with your attorney.  But do you

 9   understand that you were supposed to locate and

10   provide materials related to this incident, that you

11   had in your personal possession?

12        A    Everything that I had gets turned back

13   into the police department.  So I don't understand.

14        Q    So your position is -- I just want to make

15   sure I'm clear.

16        A    Okay.

17        Q    Anything that would personally have

18   related to this incident would be held in the

19   custody of the police department?

20        A    Correct.  I would have nothing.

21        Q    Did you take any handwritten notes -- and

22   I'm going to use this incident to refer to the Gould

23   matter, that sort of thing.  You understand that

24   when I'm referring to that, I'm talking about the

25   incident at issue in this lawsuit, correct?
```

Joseph Strzelecki
April 24, 2024                                    12

```
 1        A    Yes.
 2        Q    Do you have any handwritten notes related
 3   to the incident in any way?
 4        A    No.
 5        Q    Did you send emails -- again, not to your
 6   attorney privately.  But did you send emails to
 7   anybody else related to this incident?
 8        A    No.
 9        Q    Did you send any text messages to anybody
10   besides your attorney related to this incident?
11        A    No.
12        Q    Did you send any private or public social
13   media messages related to this incident?
14        A    No.
15        Q    Did you have verbal conversations with
16   anybody, except private conversations with your
17   attorney, about this incident?
18        A    Other than the day of the incident, no.
19        Q    And would all of those discussions have
20   been captured in reports and materials related to
21   this incident?
22        A    Correct.
23        Q    As part of your law enforcement training,
24   you are educated in use of force standards, correct?
25        A    Yes.
```

Joseph Strzelecki
April 24, 2024                                          13

```
 1        Q     What is your understanding of the general

 2   principles of use of force?

 3        A     We have different tools -- different

 4   things to use for different kinds of use of force:

 5   Non-lethal, lethal, verbal.  In my opinion it's to

 6   the level of what you perceive at the time.  You

 7   would have to give me a totality of circumstances

 8   for me to answer that in its full capacity.

 9        Q     And when I talk about some legal and

10   training concepts, what I want to know is your

11   understanding.  So for now and going forward, that's

12   what I'm asking about.  Is that clear?

13        A     Yes.

14        Q     So for use of force, you said that you

15   need to evaluate the totality of the circumstances,

16   correct?

17        A     Yes.

18        Q     What factors or things do you look at with

19   respect to a totality of the circumstances analysis?

20        A     The person that I'm out with, their

21   demeanor, how they're acting.  If they are resisting

22   and things of that nature.

23        Q     The person you're out with, are you

24   talking about a potential suspect?

25        A     Could be, yes.
```

Joseph Strzelecki
April 24, 2024                                      14

```
 1        Q     Would it be a fellow officer that you're
 2   looking at too?
 3        A     What do you mean by that?
 4        Q     Well, you said a person that you're out
 5   with.  Are you referring to potentially a partner
 6   that you're on duty with?
 7        A     I'm referring to a suspect.  Somebody that
 8   I would be out with on a call or that was
 9   self-initiated by myself.
10        Q     So you're talking about like a civilian
11   that you would interact with, correct?
12        A     Correct.
13        Q     Is it your understanding that force needs
14   to be a response to a present safety threat?
15        A     Yes.
16        Q     Are there other instances, without a
17   present safety threat, that you're authorized to use
18   force?
19        A     Can you repeat that?
20        Q     So if there's not safety threat, not even
21   a risk of a safety threat present, do you have any
22   understanding that you can use force in any other
23   circumstances?
24        A     Again, it would depend on the totality of
25   the circumstances.  Meaning, that the information we
```

Joseph Strzelecki
April 24, 2024                                        15

```
 1   have prior to going to a call.

 2        Q    So if you go out on a call and, for

 3   example, let's just say there's no safety threat or

 4   risk, fair?

 5        A    Okay.

 6        Q    Can you describe to me another

 7   circumstance where use of force would be authorized

 8   in that situation?

 9        A    No.

10        Q    Is one of the factors that you're supposed

11   to consider the severity of the crime at issue?

12        A    Sure.

13        Q    Is another factor that you've been trained

14   on, that whether a suspect poses an immediate threat

15   to the safety of officers or others?

16        A    Yes.

17        Q    And is another factor you're supposed to

18   consider, whether someone is actively resisting

19   arrest or attempting to evade arrest?

20        A    Yes.

21        Q    And that term "active resistance," are you

22   familiar with that?

23        A    I am.

24        Q    Can you describe to me what active

25   resistance is?
```

Joseph Strzelecki
April 24, 2024                                     16

```
 1        A     It could be actively trying to pull away.

 2   Actively not obeying lawful commands.  Anything in

 3   that regard.

 4        Q     Is there another category of passive

 5   resistence that you're familiar with?

 6        A     Yes.

 7        Q     Can you describe to me what passive

 8   resistance is?

 9        A     Passive resistance would be like more so

10   verbal, you know, as you're trying to give commands

11   and stuff and they're passively resisting.  It would

12   be more of not making actions, but more so speaking.

13        Q     So I'm going to ask you more questions

14   about your understanding.  And unless I specify

15   otherwise, I'm interested in what your understanding

16   was on the date of this incident.  Does that make

17   sense?

18        A     Yes.

19        Q     So if anything has changed, if something's

20   new or changed since the incident, I would just ask

21   that you clarify that to help make sure I

22   understand; is that fair?

23        A     Yes.

24        Q     Is it your understanding that you have a

25   duty to intervene to prevent unlawful force by
```

Joseph Strzelecki
April 24, 2024                                          17

1    another officer from being used or continued to use?

2         A    Yes.

3         Q    Can you describe that for me?

4         A    Someone's getting out of line or violating

5    policies, procedures, ethical code and is a threat,

6    then you would need to step in.

7         Q    And you had this understanding on the date

8    of the incident, correct?

9         A    Yes.

10        Q    Are you familiar with the crime of

11   resisting an officer without force under Florida

12   law?

13        A    Yes.

14        Q    What is your understanding of what

15   constitutes that offense?

16        A    Not obeying lawful commands.  Actively

17   resisting.  Doing things that an officer had the

18   right to tell you at the time and not obeying what

19   they were saying.

20        Q    So was it your understanding that just

21   anyone disobeying any request by any officer could

22   constitute resisting as a crime?

23        A    Say that again?

24        Q    Was it your understanding that a person

25   who didn't obey any command by any officer at any

Joseph Strzelecki
April 24, 2024                                18

```
 1   time can be charged with criminal resisting?
 2        A    Well, they would have to have reasonable
 3   articulated suspicion in order to give the commands.
 4        Q    So is it your understanding that an
 5   officer has to have a legal basis to issue a lawful
 6   command?
 7        A    Correct.
 8        Q    And if an officer issues a command without
 9   a legal basis, can a person disobey or disregard
10   that command without criminal liability?
11             MR. JOHNSON:  Form.  You can answer.
12             THE WITNESS:  Can you repeat the question?
13             MR. RICE:  Sure.  I'm happy to clarify.  I
14        will say sometimes my questions can get a bit
15        tortured, because I'm trying to be specific.
16        If anything gets too unwieldy or unclear,
17        please let me know.
18             I will also say that your attorney from
19        time to time will pose objections.  Generally,
20        you can carry on with the answer after the
21        objection unless your attorney directs you not
22        to respond; is that clear.
23             THE WITNESS:  Yes.
24   BY MR. RICE:
25        Q    So what I wanted to know is, let's say an
```

Joseph Strzelecki
April 24, 2024                              19

```
 1   officer did not have reasonable articulable

 2   suspicion and was just walking down the street and

 3   sees somebody on the sidewalk that they just want to

 4   stop for no particular reason and an officer tells

 5   that person to stop.  Was it your understanding that

 6   if the person keeps walking and disregards that

 7   command, is that criminal resistance?

 8            MR. JOHNSON:  Same objection.  You can

 9        answer.

10            THE WITNESS:  I mean, they would -- any

11        officer would have a reason to go out with that

12        person.  But if they didn't -- I mean,

13        technically if they're given a lawful command,

14        the officer is going out because of something.

15        So they should obey the lawful command.

16   BY MR. RICE:

17        Q    So in your understanding, generally an

18   officer wouldn't give that command in the first

19   place unless there was a lawful basis, correct?

20        A    Correct.

21        Q    What I'm asking is, let's say an officer

22   did not have a lawful basis for a command, was it

23   your understanding that a person could disregard

24   that command without criminal trouble?

25        A    Could you rephrase that?
```

Joseph Strzelecki
April 24, 2024                                              20

1      Q    Sure.  And, again, I'm asking for your

2   understanding.

3           So if an officer, without any basis at

4   all, just tells a person hey, you, stop.  Without

5   legal basis, without the officer having reasonable

6   articulable suspicion or anything like that, was

7   your understanding that the person can just keep

8   walking without criminal liability?

9      A    I mean, again, how I would answer that is,

10  an officer usually should have some reason why

11  they're going out with that person.  It's a

12  consensual stop until -- if they don't have anything

13  or a reason to detain them.

14     Q    So tell me, what is a consensual stop?

15     A    Consensual stop is if I go out with

16  somebody: hey buddy, how are you doing?  If I don't

17  have a legal reason to be there, at any point he can

18  walk away and there's nothing that I can do to

19  follow up with that.

20     Q    And when does a consensual stop generally

21  occur?

22     A    Usually if you're going out with somebody

23  that maybe seems suspicious.  Or if you're just

24  going out with somebody that you don't have,

25  necessarily, a reason to be there, that would be a

Joseph Strzelecki
April 24, 2024                                              21

1  consensual stop.

2       Q    And what is another type of stop besides a

3  consensual stop?

4       A    An investigative stop.

5       Q    What distinguishes a consensual stop from

6  an investigative stop, from the perspective of a

7  police officer?

8       A    The reason to be there.  If we have a

9  reason to be there -- if somebody calls and we're

10 investigating a potential crime, that would be an

11 investigative stop.

12      Q    And was it your understanding that if you

13 are making an investigative stop, that you can keep

14 people on the scene?

15      A    Correct.

16      Q    Now back to the resistance statute.  Is it

17 your understanding that the person -- we'll say the

18 suspect.  Is it your understanding that the suspect

19 needs to do something to actually obstruct or resist

20 officers?

21           MR. JOHNSON:  Form.  You can answer.

22           THE WITNESS:  Yeah.

23 BY MR. RICE:

24      Q    So if the person does something that the

25 officers just don't like, is it fair to say that

Joseph Strzelecki
April 24, 2024                                            22

```
 1  that might not be resistance by itself, fair?
 2          MR. JOHNSON:  Same objection.
 3          THE WITNESS:  Yeah.
 4  BY MR. RICE:
 5      Q    Are you aware of the difference between
 6  physical resistance and verbal resistance?
 7      A    Yes.
 8      Q    Is there any significance between that
 9  difference?
10      A    In regards to resisting?
11      Q    Correct.  So a criminal resisting, is
12  there any significance between verbal resistance
13  compared to physical resistance?
14      A    Yeah.
15      Q    What's the difference?
16      A    Physical resistance would be me telling
17  somebody keep your hands out of your pocket, and
18  then they go reach into their pockets; verbal
19  resistance would be them yelling at me, cursing me
20  out, doing whatever.
21      Q    So why don't we get to that example.  But
22  to issue a lawful command for someone to keep their
23  hands out of their pocket, an officer would have to
24  have a legal basis to issue that command, correct?
25          MR. JOHNSON:  Form.  You can answer.
```

Joseph Strzelecki
April 24, 2024                                                    23

```
 1                THE WITNESS:  Yes.
 2   BY MR. RICE:
 3        Q    And if they didn't have a legal basis to
 4   issue that command, someone could disregard that
 5   without criminal liability, correct?
 6                MR. JOHNSON:  Same objection.  You can
 7        answer.
 8                THE WITNESS:  Sure.
 9   BY MR. RICE:
10        Q    Are you familiar with temporary
11   detentions?
12        A    Am I familiar?
13        Q    Yes.
14        A    Yes.
15        Q    Can you describe to me what a temporary
16   detention is?
17        A    When you detain somebody while
18   investigating the crime.
19        Q    What does that look like?
20        A    It can be in many forms.  You can detain
21   them in handcuffs.  Depending on compliance, you can
22   detain them by having them sit down.  There's
23   different ways you can go about detaining somebody.
24        Q    Is it fair to say that that's essentially
25   the legal authority from an officer to keep someone
```

Joseph Strzelecki
April 24, 2024                                       24

```
 1   present and under the officer's control?
 2              MR. JOHNSON:  Form.  You can answer.
 3              THE WITNESS:  Yes.  Control wouldn't be
 4        the right word, but...
 5   BY MR. RICE:
 6        Q    What would you use then?
 7        A    I would say that they're being held there,
 8   based on that investigation, lawfully, so that we
 9   can investigate what happened during the incident.
10        Q    And what other requirements or
11   responsibilities does a person under a temporary
12   detention have to the officer?
13        A    To obey lawful commands.
14        Q    Does an officer require a certain standard
15   to engage in a temporary detention of somebody?
16        A    Standard meaning what?
17        Q    Does an officer need to suspect a person
18   of committing a crime to engage in a temporary
19   detention?
20              MR. JOHNSON:  Form.  You can answer.
21              THE WITNESS:  Yes, but they can also at
22        the safety and risk of themselves and others.
23   BY MR. RICE:
24        Q    So is it fair to say that if a suspect of
25   a crime or if there's a safety risk, then an officer
```

Joseph Strzelecki
April 24, 2024                                        25

```
 1   can engage in a temporary detention?

 2            MR. JOHNSON:  Same objection.

 3            THE WITNESS:  Yeah.

 4   BY MR. RICE:

 5       Q    Now I want to turn your attention to the

 6   incident at issue with Mr. Gould.  How well do you

 7   remember that?

 8       A    It was a long time ago, but I remember the

 9   incident.

10       Q    Do you remember generally details or

11   specific details?

12       A    General with some specifics.

13       Q    When you responded -- well, why don't I

14   ask this.

15            How did you first learn about this

16   incident?

17       A    We got a call over the radio.

18       Q    So you were listening to radio and that's

19   how you learned about this incident?

20       A    Of course.

21       Q    Do you recall what information you learned

22   from the radio?

23       A    I remember that there was two parties

24   involved, one of which had a firearm.

25       Q    Do you remember if there was a description
```

Joseph Strzelecki
April 24, 2024                                    26

```
 1   given on the radio of the person who had the

 2   firearm?

 3        A    I don't recall.

 4        Q    Do you recall if the information was that

 5   both people had firearms?

 6        A    I don't recall.

 7        Q    Would it help your memory to listen to the

 8   recording of the radio transmissions?

 9        A    Sure.

10             MR. RICE:  What I'll mark as Exhibit 1 is

11        a recording of the radio transmissions.  And I

12        will play it from my laptop.  If you have

13        issues hearing anything or need it repeated,

14        please let me know.  Okay?

15             THE WITNESS:  Okay.

16                 (Plaintiff's Exhibit 1 was marked for

17             Identification.)

18                 (Playing radio transmission

19             recording.)

20             MR. RICE:  So I will stop at 33 seconds.

21   BY MR. RICE:

22        Q    And you just hear a comment by a white

23   male in a multi-colored swimsuit making a report

24   that someone was harassing his wife, correct?

25        A    Yes.
```

Joseph Strzelecki
April 24, 2024                                           27

```
 1        Q    Do you recall hearing that comment before
 2   responding to the incident?
 3        A    No.
 4        Q    And I would ask for clarification.  Is it
 5   do you not remember whether you heard it, or do you
 6   remember not hearing it?
 7        A    Can you rephrase?
 8        Q    Sure.  When you say you don't remember, I
 9   just want to clarify.  Do you not remember whether
10   you heard it, either way it could be either, or are
11   you saying you remember not hearing it?
12        A    I'm sure I heard it.  But I don't remember
13   if I heard it.
14        Q    Okay.  And I just want to clarify, because
15   sometimes things can be a bit confusing.
16             MR. RICE:  I'm going to continue playing
17        at 33 seconds.
18                  (Playing radio transmission
19             recording.)
20             MR. RICE:  I'll stop it at 1 minute 20
21        seconds.)
22   BY MR. RICE:
23        Q    You heard a comment about a male was
24   walking to the outside of the clubhouse, correct?
25        A    Yes.
```

Joseph Strzelecki
April 24, 2024                                               28

1      Q     And that's where you met Mr. Gould,

2    correct?

3      A     Yes.

4                (Playing radio transmission

5           recording.)

6           MR. RICE:  So I'll stop it at 1 minute 31.

7    BY MR. RICE:

8      Q     There the dispatch reported that the

9    caller has a CCW and a weapon on him, correct?

10     A     Yes.

11     Q     Do you recall hearing that comment before

12   you responded to the incident?

13     A     I don't know.

14     Q     Again, to be clear, you don't recall

15   either way?

16     A     I don't recall if I heard it or not.

17     Q     Okay.

18          MR. RICE:  I'll play it from 1:31.

19                (Playing radio transmission

20          recording.)

21          MR. RICE:  I'll stop at 1:41.

22   BY MR. RICE:

23     Q     So there dispatch explained that the

24   caller had a gun in a holster in his groin area,

25   correct?

Joseph Strzelecki
April 24, 2024                                    29

```
 1        A     Yes.
 2              MR. RICE:  Playing it from 1:41.
 3                  (Playing radio transmission
 4              recording.)
 5              MR. RICE:  We'll stop at 2:11.
 6   BY MR. RICE:
 7        Q     And on that portion you would agree you
 8   heard that another caller called in and reported he
 9   was being threatened by a person with a gun, fair?
10        A     Yes.
11              MR. RICE:  I'll play it from 2:11.
12                  (Playing radio transmission
13              recording.)
14              MR. RICE:  I'll stop at 2:20.
15   BY MR. RICE:
16        Q     And there dispatch explained that the
17   person with the gun was a white male, about five
18   two, 120-pounds with a beard, correct?
19        A     No shirt with a beard, I believe is what
20   they said.
21        Q     Correct.  But it also mentioned five foot
22   two and 120 pounds, correct?
23        A     Yes.
24              MR. RICE:  Keep going from 2:20.
25                  Playing radio transmission
```

Joseph Strzelecki
April 24, 2024                                                    30

```
 1              recording.)

 2              MR. RICE:  I'll stop at 3:17.

 3   BY MR. RICE:

 4        Q    Would you agree that the portion

 5   immediately before that was you calling in to say

 6   you're responding?

 7        A    That wasn't me.

 8        Q    Who was that?

 9        A    Another officer.

10        Q    Do you know if it was Officer Valerio?

11        A    It was not.

12        Q    Did you radio in that you were responding?

13        A    I was the first one.  They dispatched me

14   to the call.

15        Q    Is it likely that you were listening to

16   these radio transmissions as you responded?

17        A    Yes.  But at this point, I believe we were

18   running code.  So when you're running a Code 3,

19   lights and sirens, I believe that there's a lot

20   going on at this point.

21        Q    Sure.  Is it possible that you were

22   distracted by your driving and your sirens?

23        A    Distracted from what?

24        Q    From the radio.

25        A    Could be.  It could have been.  I can't
```

Joseph Strzelecki
April 24, 2024                                              31

1    recall if I was at the time.  But again, there's a

2    lot going on.

3         Q    Would it be important for you to have an

4    understanding of a situation before you arrive?

5         A    Of course.

6         Q    And you would get that understanding from

7    these radio callouts, correct?

8         A    Of course.  And visualization, seeing

9    what's going on.

10        Q    Is it likely that you were listening to

11   these radio callouts then to have an understanding

12   of the situation?

13        A    Yes.

14        Q    And is it fair from these radio

15   transmissions -- again, I want to get your

16   understanding.  But from what we just played, had

17   you heard these radio callouts, would it be fair

18   that you would have understood that there were two

19   males involved in the situation?

20        A    Yes.

21        Q    And you would have understood that one

22   male would have had a gun and another would not?

23        A    Yes.

24        Q    And you would understand that the person

25   who had initially called in had a CCW and a gun and

Joseph Strzelecki
April 24, 2024                                                    32

```
 1   a holster in his groin area?

 2        A    Yes.

 3        Q    And the person who initially called in

 4   reported a white male in a multicolored swimsuit

 5   harassing his wife?

 6        A    Yes.

 7        Q    And that male, who was harassing the wife,

 8   went to the other side of the clubhouse?

 9        A    Yes.  But again, 99.9 percent of the calls

10   we go to never turn out to be the way that we get it

11   from dispatch.

12        Q    Sure.  But that information would have

13   been available in the portion of the recording that

14   we listened to, correct?

15        A    Yes.

16        Q    And the person with the gun was described

17   as five foot two and about 120 pounds, among other

18   features, correct?

19        A    With no shirt, yes.

20        Q    And all that information would have been

21   available to you before you arrived in the parking

22   lot and got out of your car, correct?

23        A    Yes.

24        Q    Do you know whether you had that

25   information?
```

```
 1        A    I don't recall if I heard everything

 2   clearly.  But the information was there, yes.

 3        Q    As we sit here today can you tell me, to

 4   the best of your memory, what information you had

 5   about the situation before you stepped out of your

 6   car?

 7        A    We were going to an incident that involved

 8   a firearm between two parties.

 9        Q    Is that it?

10        A    Yes.

11        Q    Okay.  Now take me through what happened

12   as you arrived at the scene.

13        A    Myself and Officer Guerriero arrived at

14   the same time.  We went out with, who I now know as

15   Mr. Gould.  Mr. Gould, I believe, was sitting down

16   upon our arrival.  When we got there, he stood up.

17   Officer Guerriero asked him to keep his hands out of

18   his pocket, at which time he defied.  He went into

19   his right pocket.  She said it again, keep your

20   hands out of your pocket, at which time he pulled

21   out his cell phone.  At that time Officer Guerriero

22   was on his left, our right.  I was on the left side.

23   She drew her firearm at which time I drew my taser.

24   Based on training and experience, I didn't know from

25   her advantage point if she maybe saw something that
```

Joseph Strzelecki
April 24, 2024                                34

```
 1   I didn't.
 2           So based on training and experience, if an
 3   officer goes lethal, the other officer covers with
 4   less lethal, which is exactly what I did.  After
 5   Officer Guerriero detained him, I immediately put my
 6   taser back in its holster.  And within 30 seconds of
 7   that, I had no more interactions with Mr. Gould and
 8   I was with the other party for the remainder of the
 9   incident.
10       Q    So I want to walk back and try to go piece
11   by piece, as best you can recall.
12           When you first pulled up, is it fair to
13   say that you saw Mr. Gould sitting down?
14       A    I believe he was sitting down.  There was
15   a vehicle blocking my view when I initially
16   arrived -- when I was initially getting out of my
17   vehicle.  So, I believe, he was sitting down.
18       Q    Did you see anything in Mr. Gould's hands
19   at that time?
20       A    I want to say he had a shirt, but I'm not
21   too positive.
22       Q    Is it fair to say you don't recall?
23       A    I don't recall.
24       Q    When you initially got out of your car,
25   did you sense any safety threat from Mr. Gould?
```

Joseph Strzelecki
April 24, 2024                                    35

1          A      Initially, no.

2          Q      How was Mr. Gould dressed at the time?

3          A      Can you rephrase?

4          Q      What was Mr. Gould wearing?

5          A      A bathing suit, no shirt and no shoes.

6          Q      Would it have been noticeable if Mr. Gould

7     had a firearm in his bathing suit?

8               MR. JOHNSON:  Form.  You can answer.

9               THE WITNESS:  From the front.  But,

10          obviously, I can't see through him.  So I

11          wouldn't be able to see what he had behind him.

12     BY MR. RICE:

13          Q    Is it fair to say that you could tell that

14     Mr. Gould did not have a firearm in his bathing

15     suit, at least from the front half?

16               MR. JOHNSON:  Form.

17               THE WITNESS:  Yes.

18     BY MR. RICE:

19          Q    And you couldn't see what was behind

20     Mr. Gould and his back, correct?

21          A    Correct.  Or what was in his pockets.

22          Q    And a firearm in a pocket can generally

23     create a bulge, correct?

24               MR. JOHNSON:  Form.

25               THE WITNESS:  Yes.  But they make some

Joseph Strzelecki
April 24, 2024                                      36

```
 1          pretty small firearms nowadays.
 2    BY MR. RICE:
 3          Q    Did you see any bulges in Mr. Gould's
 4    pockets as you first arrived?
 5          A    I did not.  But then again, he had a cell
 6    phone in his pocket.
 7          Q    Well, a cell phone is generally smaller
 8    than most firearms, correct?
 9               MR. JOHNSON:  Form.
10               THE WITNESS:  There's some pretty small
11          firearms out there.
12    BY MR. RICE:
13          Q    A cell phone is generally smaller than
14    most firearms, correct?
15               MR. JOHNSON:  Form.
16               THE WITNESS:  Not all.
17    BY MR. RICE:
18          Q    What is going through your mind as you get
19    out of the car?
20          A    As I'm getting out of my car, Officer
21    Guerriero, as you can see on the video, she took
22    lead.  So for me it was safety and surroundings.
23          Q    And what were you considering about safety
24    and surroundings?
25          A    Due to the fact that we were going to a
```

Joseph Strzelecki
April 24, 2024                              37

1    call where a weapon was involved, my main concern

2    was scene safety.

3         Q    You wanted to make sure that someone

4    didn't pull a gun on you, correct?

5         A    Gun, knife, any type of weapon.

6         Q    Is it fair that with the initial distance,

7    when you're getting out of your car, Mr. Gould is

8    not able to physically touch or reach you, correct?

9              MR. JOHNSON:  Form.

10             THE WITNESS:  With his hands, yes.

11   BY MR. RICE:

12        Q    And if Mr. Gould had had, let's say, a

13   common knife in his hand, he would not have been

14   able to stab or strike you from where you were in

15   your car, correct?

16             MR. JOHNSON:  Form.

17             THE WITNESS:  No.  He would not be able to

18        stab me from where he was.

19   BY MR. RICE:

20        Q    So is it fair that the most concerning and

21   initial threat was Mr. Gould's potential possession

22   of a firearm?

23        A    Any weapon.

24        Q    Did Mr. Gould's demeanor -- initial

25   demeanor.  Again, I want to walk through step by

Joseph Strzelecki
April 24, 2024                                    38

```
 1   step.  So starting at the initial encounter.

 2   Anything about Mr. Gould's initial demeanor present

 3   a safety threat?

 4        A    Yes.

 5        Q    What?

 6        A    He was very agitated after being given a

 7   simple command like keep your hands out of your

 8   pocket.

 9        Q    Well, that's after he was commanded,

10   correct?

11        A    After he was -- when we initially got

12   there, she told him:  Hey, man.  Keep your hands out

13   of your pocket, very nicely, at which time he did

14   not do.  He put his hand in his pocket and got

15   agitated immediately.

16        Q    Was Mr. Gould agitated before the command

17   was given?

18        A    I don't believe so.

19        Q    Was Mr. Gould with a female at the time

20   when you approached him?

21        A    No.

22        Q    Did Mr. Gould appear to be five foot two?

23        A    No.

24        Q    How tall did Mr. Gould appear to be?

25        A    Over six foot -- or six foot.
```

Joseph Strzelecki
April 24, 2024                                    39

```
 1        Q    Was Mr. Gould wearing a multi-colored
 2   bathing suit?
 3        A    Yes, with no shirt.
 4        Q    What did you view your lawful duties, if
 5   any, when you first arrived on the scene?
 6        A    Say that again?
 7        Q    What, if any, did you view your lawful
 8   duties to be when you first arrived on scene?
 9        A    Scene safety.
10        Q    Anything else?
11        A    Scene safety.  Obviously, the parties were
12   separate at that point, if he was already by
13   himself.  And then after that it would be
14   interviewing both parties to see if a crime had
15   occurred.
16        Q    Would that interview have been consensual?
17        A    No.
18        Q    So is it your understanding that you could
19   have forced someone to engage in an interview with
20   you at that time?
21        A    We were there lawfully to investigate a
22   crime that had been alleged.
23        Q    Was it your understanding that you could
24   force Mr. Gould to engage in an interview when you
25   first pulled up?
```

Joseph Strzelecki
April 24, 2024                                          40

```
 1              MR. JOHNSON:  Form.  You can answer.

 2              THE WITNESS:  Yes.

 3   BY MR. RICE:

 4       Q    Under what basis?

 5       A    Again, we had a lawful reason to be there

 6   to investigate a crime.

 7       Q    So is it your understanding as a police

 8   officer if there is a witness or a victim to a

 9   crime, you can still force them to remain and give

10   you an interview?

11              MR. JOHNSON:  Form.

12              THE WITNESS:  So we don't know who is a

13       witness or a victim at that point.  Thereafter,

14       nobody is free to leave.

15   BY MR. RICE:

16       Q    Were you aware that another officer had

17   already been on scene?

18       A    No.  I mean, yes, because I saw his

19   vehicle.  But I did not know if he had already been

20   out with Gould or not.

21       Q    But you were aware that generally there

22   was another officer at the scene, correct?

23       A    Yes.

24       Q    And is it reasonable that if the officer's

25   vehicle was parked in the parking lot near Gould,
```

Joseph Strzelecki
April 24, 2024                                            41

```
 1   that that officer likely had either walked by or had

 2   some sort of understanding that Mr. Gould was there?

 3           MR. JOHNSON:  Form.  You can answer.

 4           THE WITNESS:  I wouldn't jump to

 5       conclusions.

 6   BY MR. RICE:

 7       Q    What other conclusion would there be then?

 8       A    That it went around another way.  Gould

 9   could have not been standing there when he arrived.

10   There's so many things that could have partook

11   before I got there.

12       Q    Is it a reasonable possibility that an

13   officer had an interaction with Gould and then left

14   to go talk to somebody else?

15           MR. JOHNSON:  Form.

16           THE WITNESS:  Sure.

17   BY MR. RICE:

18       Q    Did you consider that possibility as you

19   pulled up?

20       A    I don't recall what I was thinking -- if I

21   was thinking that when I pulled up.

22       Q    Now at some point Officer Guerriero asked

23   Mr. Gould how he was doing and asked him to keep his

24   hands out of his pockets for her, correct?

25       A    Yes.
```

Joseph Strzelecki
April 24, 2024                                              42

```
 1        Q    Do you know whether Mr. Gould understood
 2   he was detained or not at that time?
 3             MR. JOHNSON:  Form.
 4             THE WITNESS:  I can't tell you what he was
 5        thinking.
 6   BY MR. RICE:
 7        Q    Was it your understanding that Mr. Gould
 8   was detained at that time?
 9        A    No.
10        Q    At the time that that was said, did you
11   have any reasonable articulable suspicion that Mr.
12   Gould had committed a crime?
13        A    We didn't know what was going on at that
14   point.  We didn't know if he was a victim, or a
15   suspect, or what have you.
16        Q    So would it be fair to say that you lacked
17   information that Mr. Gould particularly had engaged
18   in a crime?
19        A    Rephrase, please?
20        Q    With respect to Mr. Gould himself, did you
21   have any information that this was a person who
22   potentially engaged in a crime?
23        A    We made contact with him.  It was safe to
24   assume that he was involved in the incident.
25        Q    And involved could have been that he was a
```

Joseph Strzelecki
April 24, 2024                                    43

1    witness, correct?

2         A    Yes.

3         Q    He could have been a victim, correct?

4         A    Yes.

5         Q    What I'm asking is:  Do you have any

6    information that Mr. Gould was actually the criminal

7    perpetrator?

8         A    At that time, no.  That's why we

9    investigate.

10        Q    Did you ever command Mr. Gould to do

11   anything during that period?

12        A    Maybe assist with -- I don't recall.

13        Q    So Officer Guerriero requested that

14   Mr. Gould keep his hands out of his pockets for her,

15   correct?

16        A    Yes.

17        Q    That was part of the initial thing that

18   she said when she got out of her car, correct?

19        A    Yes.

20        Q    And maybe a second or two or three later,

21   Mr. Gould did reach into his pocket, correct?

22        A    Yes.

23        Q    At that time what were you thinking, if

24   anything?

25        A    That he was disobeying a lawful command.

Joseph Strzelecki
April 24, 2024                                                44

```
 1        Q    And what, if anything, were you prepared
 2  to do in response?
 3             MR. JOHNSON:  Form.
 4             THE WITNESS:  At that point I was taking
 5        lead -- or she was taking lead.  So I was going
 6        based off of what she was doing, since she had
 7        made contact with him.
 8  BY MR. RICE:
 9        Q    So is it fair to say at that point you
10  were taking your cues from Officer Guerriero?
11        A    Yes.
12        Q    Do you know whether Officer Guerriero had
13  a legal basis to command Mr. Gould to keep his hands
14  out of his pockets?
15        A    Rephrase that.
16        Q    I'll ask you.  When Officer Guerriero
17  asked Mr. Gould to keep his hands out of his pocket,
18  what legal basis, if any, existed for that command
19  to be issued?
20             MR. JOHNSON:  Form.
21             THE WITNESS:  Reasonable articulation
22        suspicion that we were going to a call with a
23        gun involved.  Officer safety and safety for
24        everyone else.
25
```

Joseph Strzelecki
April 24, 2024                                        45

```
 1   BY MR. RICE:

 2        Q    And to be clear, it was not based on the

 3   fact that Mr. Gould, himself, may be a criminal

 4   suspect, fair?

 5             MR. JOHNSON:  Form.  You can answer.

 6             THE WITNESS:  Yeah.

 7   BY MR. RICE:

 8        Q    Is it fair that you needed to find out

 9   more information before you could tell who is

10   potentially a criminal suspect?

11        A    Yes.  But again, officer safety and safety

12   for everyone on scene is the reason why she did what

13   she did.

14        Q    Mr. Gould grabbed his cell phone and took

15   out of his pocket at that time, correct?

16        A    I believe she gave him two commands and

17   then he grabbed his cell phone.

18        Q    So it's your understanding that Officer

19   Guerriero gave multiple commands that Mr. Gould

20   failed to follow?

21        A    Correct.

22        Q    Is there any significance between Mr.

23   Gould failing to respond to one command versus

24   multiple commands?

25        A    Yeah.  It just shows the pattern of him
```

Joseph Strzelecki
April 24, 2024                                        46

```
 1   not listening and not being compliant.

 2        Q    And would that pattern be consistent with

 3   intending to resist officers?

 4        A    Could be, yes.

 5        Q    So if Mr. Gould had only failed to respond

 6   to one command, is it possible that Mr. Gould maybe

 7   didn't hear the command?

 8             MR. JOHNSON:  Form.

 9             THE WITNESS:  No.

10   BY MR. RICE:

11        Q    How would that not be possible?

12        A    Based on his reaction and the attempt to

13   incite Officer Guerriero and myself.

14        Q    So I know that at a later point Mr. Gould

15   starts verbally, let's say, being contentious; is

16   that fair?

17        A    I would say it was upon the first request

18   is when he started to get mouthy and incite a

19   reaction from the officers.

20        Q    Describe for me the specific facts you

21   used to support that Mr. Gould was intending to

22   incite officers?

23        A    At one point he said -- he looked at all

24   the male officers and said who's in charge of this

25   woman?  I believe he was cursing at her and he was
```

Joseph Strzelecki
April 24, 2024                                    47

1    laughing.

2         Q    And all that conduct occurred after he was

3    in handcuffs and arrested, correct?

4         A    No.

5         Q    When did that conduct occur?

6         A    Right out the gate when he said who the

7    fuck do you think you are, to her.

8         Q    Did Mr. Gould do anything to incite

9    officers before that comment?

10        A    He did not obey a lawful command.

11        Q    And before that did Mr. Gould do anything

12   to incite officers?

13        A    We were not there.

14        Q    So is it fair to say the answer is no?

15        A    Yes.

16        Q    Now one thing you just described is that

17   Mr. Gould did not obey a lawful command, correct?

18        A    Yes.

19        Q    Is it possible that Mr. Gould did not hear

20   the command?

21             MR. JOHNSON:  Form.

22             THE WITNESS:  Again, I can't speak on what

23        he heard or if he heard.

24             MR. RICE:  And that's what I'm asking.

25

Joseph Strzelecki
April 24, 2024                                      48

```
 1   BY MR. RICE:

 2        Q    It's a possibility, correct?

 3             MR. JOHNSON:  Form.

 4             THE WITNESS:  Sure.

 5   BY MR. RICE:

 6        Q    Is it possible that Mr. Gould

 7   misunderstood the command?

 8             MR. JOHNSON:  Same objection.

 9             THE WITNESS:  Possible.  Sure.

10   BY MR. RICE:

11        Q    Is it possible that Mr. Gould took it as a

12   request to keep his hands out of his pockets, not a

13   command to keep his hands out of his pockets?

14             MR. JOHNSON:  Same objection.

15             THE WITNESS:  Sure.

16   BY MR. RICE:

17        Q    And would you agree that if Mr. Gould was

18   not obeying due to confusion, not hearing it,

19   misunderstanding, that that would not be an

20   intention to incite officers, correct?

21             MR. JOHNSON:  Form.  You can answer.

22             THE WITNESS:  Based on the way he was

23        acting, I would say that he understood what was

24        being asked of him.

25
```

Joseph Strzelecki
April 24, 2024                                              49

```
1   BY MR. RICE:

2        Q    That was your understanding, correct?

3        A    Yes.

4        Q    The initial part of the encounter Mr.

5   Gould said that he was not the person with the gun,

6   correct?

7        A    Yes.  I get lied to on a daily basis.

8        Q    Did you take that as a lie?

9        A    I don't recall at the time.

10       Q    Did you have any reason to dispute

11  Mr. Gould's contention that he did not have a gun?

12       A    At that time, no.

13       Q    Now once Mr. Gould removed his hand from

14  his pocket, could you see that he was holding a cell

15  phone?

16       A    I don't recall.

17       Q    Could you see what was in his hands?

18       A    Again, I don't recall.

19       Q    Where were you looking at the time?

20       A    I don't recall.

21       Q    Well, it would have been important for you

22  to observe the relevant facts at the time, correct?

23            MR. JOHNSON:  Form.

24            THE WITNESS:  Yes, but it happened a while

25       ago.
```

Joseph Strzelecki
April 24, 2024                                           50

```
 1   BY MR. RICE:

 2        Q    And if you have a safety concern, it's

 3   likely you would be looking at someone's hands,

 4   correct?

 5             MR. JOHNSON:  Form.

 6             THE WITNESS:  Hands, waist, pockets.

 7   BY MR. RICE:

 8        Q    And it would be important to know if

 9   they've pulled something out of their pocket, what

10   they pulled out, correct?

11        A    Yes.

12             MR. JOHNSON:  Objection.  Officer, just a

13        half second pause before answer.

14             THE WITNESS:  Okay.

15   BY MR. RICE:

16        Q    Is it your understanding that Mr. Gould,

17   in fact, pulled a cell phone out of his pocket?

18        A    Yes.

19        Q    Do you have any information at the time or

20   today that Mr. Gould was armed during the incident?

21        A    No.

22        Q    After pulling the cell phone out of his

23   pocket, did Mr. Gould ever put his hands back into

24   his pockets?

25        A    I don't recall if he did or not.
```

Joseph Strzelecki
April 24, 2024                                        51

```
 1              MR. RICE:  I'm going to go ahead and mark

 2         as Exhibit 2 a parking lot video of the

 3         incident.

 4                   (Plaintiff's Exhibit 2 was marked for

 5              Identification by the reporter.)

 6    BY MR. RICE:

 7         Q    Would it refresh your memory to see the

 8    surveillance camera of the encounter with Mr. Gould?

 9         A    Absolutely.

10              MR. RICE:  My preference would be to play

11         this on my laptop, if anybody wants to come and

12         watch it.

13              MR. JOHNSON:  I'll come around.

14              MR. RICE:  And, unfortunately, on Zoom I

15         don't know how to broadcast this.  But it's the

16         parking lot video showing the initial

17         encounter.

18              MR. ALEXANDER:  Go ahead.  I have the

19         video.

20                   (Playing video.)

21    BY MR. RICE:

22         Q    I'll ask you.  Have you reviewed the

23    surveillance video?

24         A    I don't know if I've seen this one.

25              MR. RICE:  I'm going to start playback at
```

Joseph Strzelecki
April 24, 2024                                    52

```
 1       2 minutes four seconds on this copy, which is

 2       time-stamped 11:32:58 a.m.

 3                  (Playing video)

 4           MR. RICE:  I'm going to pause at

 5       time-stamped 11:33:11.

 6   BY MR. RICE:

 7       Q    Is this the time frame when you and

 8   Officer Guerriero pulled up to the parking lot?

 9       A    Yes.

10           MR. RICE:  I'll resume playback.

11                  (Playing video.)

12           MR. RICE:  I will stop at 11:33:20.

13   BY MR. RICE:

14       Q    Does this video show Mr. Gould reaching

15   into his pocket and pulling his cell phone out?

16       A    Yes.

17       Q    And you are the officer standing behind

18   Officer Guerriero at this time, correct?

19       A    Correct.

20                  (Playing video.)

21           MR. RICE:  I'm going to stop at

22       time-stamped 11:33:26.

23   BY MR. RICE:

24       Q    This is the moment when Officer Guerriero

25   drew her weapon, correct?
```

Joseph Strzelecki
April 24, 2024                                            53

```
 1        A    Yes.

 2        Q    And between the first time that Mr. Gould

 3   reached into his pocket and pulled his cell phone

 4   out, did you observe any other times that Mr. Gould

 5   went into his pocket?

 6        A    No.

 7        Q    Would it be fair to say that approximately

 8   eight seconds transpired between Mr. Gould reaching

 9   into his pocket and Officer Guerriero drawing her

10   firearm?

11        A    Yes.

12             MR. RICE:  I'm going to resume playback.

13                  (Playing video.)

14   BY MR. RICE:

15        Q    And at 11:33:29 does this video show you

16   preparing your taser to be used?

17        A    Yes.

18        Q    You've unholstered your taser, correct?

19        A    Correct.

20        Q    And Mr. Gould is getting on the ground,

21   correct?

22        A    Correct.

23        Q    And Officer Guerriero still has her

24   firearm pointed at Mr. Gould, correct?

25        A    Correct.
```

Joseph Strzelecki
April 24, 2024                                    54

1              MR. RICE:  I'm going to resume playback.

2                   (Playing video.)

3              MR. RICE:  I'll stop at 11:33:54.

4    BY MR. RICE:

5         Q    At this point Mr. Gould is now in

6    handcuffs on the ground, correct?

7         A    Correct.

8         Q    And you're putting your taser away,

9    correct?

10        A    Correct.

11        Q    So I'm going to take this down and ask you

12   a couple questions about that portion of the

13   encounter.  Okay?

14             When Mr. Gould pulled his cell phone out

15   of his pocket and was holding out to his side, was

16   there any safety threat at that moment to you?

17        A    Again, at that point we didn't know if he

18   had anything in his other pocket, in the small of

19   his back.  So I would say at that point, yes.

20        Q    Did Mr. Gould ever reach to his back to

21   pull something out?

22        A    No.

23        Q    Is it fair to say that Mr. Gould kept his

24   hands visible, where you could see them, after he

25   took them out of his pocket?

Joseph Strzelecki
April 24, 2024                                        55

1        A     Yes.

2        Q     Did Mr. Gould do anything else -- so I

3   want to focus on, approximately, the eight seconds

4   after Mr. Gould pulls his cell phone out and before

5   Officer Guerriero draws her weapon, fair?

6        A     Okay.

7        Q     During that time, did Mr. Gould do

8   anything to engage in a safety threat to you or

9   Officer Guerriero?

10       A     No.

11       Q     And at that point you were standing,

12  essentially, next to Officer Guerriero, correct?

13       A     A few feet away.

14       Q     Were you standing by --

15       A     At a different angle than she was.

16       Q     What could Officer Guerriero observe

17  during that period that you could not?

18            MR. JOHNSON:  Form.  You can answer, if

19       you know.

20            THE WITNESS:  I don't know exactly what

21       she was looking at.  But if you look at the

22       video and watch the video, you can see that

23       she's on his left side and I was on his right

24       side.

25

BY MR. RICE:

Q    So would it be fair to say that you could
see more of Mr. Gould's right side body than Officer
Guerriero at that time?

A    Correct.

Q    Was it your understanding that Officer
Guerriero could see more of Mr. Gould's left side
body that you could?

A    Absolutely.

Q    Could you see if Mr. Gould reached toward
anything on his left side?

A    I did not.

Q    Do you know why Officer Guerriero drew her
weapon?

MR. JOHNSON:  Form.

THE WITNESS:  I do not.  You'd have to ask
her.

BY MR. RICE:

Q    What is your understanding about why
Officer Guerriero drew her weapon, if you have any?

MR. JOHNSON:  Form.

THE WITNESS:  You'd have to ask her.

BY MR. RICE:

Q    So you have no understanding at all --

A    She maybe saw something I didn't.

Joseph Strzelecki
April 24, 2024                                57

```
 1      Q    And is that why you drew your taser?

 2      A    Based on training and experience if an

 3 officer goes lethal, the other officer goes less

 4 lethal.

 5      Q    What could Officer Guerriero have seen

 6 that would have been a safety threat?

 7           MR. JOHNSON:  Form.

 8           THE WITNESS:  Weapon.  Something that I

 9      didn't see.

10 BY MR. RICE:

11      Q    Well, Mr. Gould didn't reach down towards

12 his left side, correct?

13      A    Correct.

14      Q    So she couldn't have seen Mr. Gould

15 reaching for something on his left side, correct?

16           MR. JOHNSON:  Form.

17           THE WITNESS:  Not to say that she didn't

18      see something there, though.

19 BY MR. RICE:

20      Q    What could she have seen that would have

21 created a safety threat that warranted pulling her

22 firearm out?

23           MR. JOHNSON:  Form.  You can answer.

24           THE WITNESS:  Any weapon.

25
```

Joseph Strzelecki
April 24, 2024                                    58

1   BY MR. RICE:

2        Q    So would the presence of any weapon --

3   just observing a weapon in the vicinity justify an

4   officer pulling a firearm out and pointing it at

5   somebody?

6            MR. JOHNSON:  Form.  You can answer, if

7        you know.

8            THE WITNESS:  If there's -- depending on

9        the circumstances.

10  BY MR. RICE:

11       Q    So let's start basic.  Is it your

12  understanding that a person merely possessing a

13  firearm allows an officer to draw a firearm and hold

14  someone at gunpoint?

15       A    No.

16       Q    Is it your understanding that the presence

17  of a weapon within someone's reach allows an officer

18  to pull their firearm and hold somebody at gunpoint?

19       A    Depending on the incident.

20       Q    And what would that depend on?  Can you

21  give me an example of what would justify that?

22           MR. JOHNSON:  Form.  You can answer.

23           THE WITNESS:  In an incident where we're

24       responding to a call where somebody threatens

25       somebody with a firearm, would be an incident.

Joseph Strzelecki
April 24, 2024                                    59

BY MR. RICE:

     Q    So if a person possesses a firearm and was
just involved in any way in a call where someone
threatens somebody with a firearm, would those two
factors be enough for an officer to pull their
firearm out and hold somebody at gunpoint?

               MR. JOHNSON:  Form.

               THE WITNESS:  It would depend on the --
          the person we're out with, it would depend on
          their demeanor, how they are acting and things
          of that nature.

BY MR. RICE:

     Q    What I'm asking is:  Would an officer need
ant additional factors, or would that be sufficient?
Just the being on a call where somebody threatened
somebody with a firearm and an officer observing
somebody possessing a firearm.

               MR. JOHNSON:  Form.

BY MR. RICE:

     Q    Would those two things be enough for an
officer to pull a firearm out and hold somebody at
gunpoint?

     A    It would depend on the totality of the
circumstances.

Joseph Strzelecki
April 24, 2024                                                60

1        Q     And what's you understanding?

2              MR. JOHNSON:  Form.

3              THE WITNESS:  It's a case-by-case basis.

4        So I would need details.

5   BY MR. RICE:

6        Q     On those facts alone, you're not

7   comfortable saying that an officer would be

8   justified in holding somebody at gunpoint, fair?

9        A     Sorry.  You went too fast.

10       Q     Someone just generally being on a call,

11  where somebody threatens somebody else with a

12  firearm and seeing somebody in possession of a

13  firearm, if you have those two facts alone, is it

14  your understanding that an officer can pull out a

15  firearm and hold somebody at gunpoint?

16             MR. JOHNSON:  Form.  You can answer, if

17       you know.

18             THE WITNESS:  Again, depending on how he

19       was -- depending on how that person was at the

20       time of me making contact, it would be an

21       incident basis.

22  BY MR. RICE:

23       Q     Let's say the person was cooperative.

24       A     Then I probably wouldn't go that route.

25       Q     Would it be unreasonable, would you say,

Joseph Strzelecki
April 24, 2024                                          61

1   for an officer to pull a gun and hold somebody at

2   gunpoint in that circumstance?

3              MR. JOHNSON:  Form.

4              THE WITNESS:  Unreasonable, no.  Officer

5        safety.

6   BY MR. RICE:

7        Q    And conversely, if you have somebody who

8   is alleged to have threatened people with a firearm

9   and who is known to possess a firearm, should an

10  officer take safety measures in that situation?

11       A    Yes.

12       Q    And what would reasonable safety measures

13  look like?

14       A    Finding out where the firearm is and

15  taking possession of it.

16       Q    Did you ask Mr. Gould if he had a firearm?

17       A    I was only there for, approximately, 90

18  seconds.

19       Q    Is that a "no"?

20       A    I did not.

21       Q    Why not?

22       A    Officer Guerriero took lead.  I was there

23  for officer safety precautions.  And after he was

24  detained, I vacated.

25       Q    Well, you said -- and, again, I want to

Joseph Strzelecki
April 24, 2024                                        62

```
 1   make sure I have your understanding correct.  That

 2   one of the primary objectives of an officer is to

 3   locate where a weapon might be, correct?

 4        A    Yes.

 5        Q    One way an officer can do that is ask

 6   somebody if they're armed, correct?

 7        A    Yes.

 8        Q    And neither you or Officer Guerriero asked

 9   Mr. Gould if he was armed, correct?

10             MR. JOHNSON:  Form.  You can answer.

11             THE WITNESS:  At that time, no.

12   BY MR. RICE:

13        Q    Why not?

14             MR. JOHNSON:  Form as it relates to

15        Officer Guerriero.  You can answer.

16             THE WITNESS:  Again, she was taking lead.

17        So I was there for officer safety.

18   BY MR. RICE:

19        Q    So, again, is that fair to say you defer

20   to Officer Guerriero's handling of the situation?

21        A    Yes.

22        Q    Should Officer Guerriero have asked

23   Mr. Gould if he was armed?

24             MR. JOHNSON:  Form.

25             THE WITNESS:  Something she could have
```

Joseph Strzelecki
April 24, 2024                                    63

```
 1        done, yes.

 2   BY MR. RICE:

 3        Q    But Mr. Gould volunteered that he was not

 4   the one with the gun, correct?

 5        A    Yes.

 6        Q    And that's information to be considered as

 7   to whether Mr. Gould is, in fact, armed, correct?

 8        A    Yes.  But again, we get lied to on a daily

 9   basis.  So word of mouth isn't really something we

10   base our investigations on, or trust.

11        Q    Now when Mr. Gould was taken into custody,

12   did anybody search him for a weapon?

13        A    I wasn't there for the entirety of it.  So

14   I couldn't tell you.

15        Q    But you didn't search Mr. Gould, correct?

16        A    I don't even believe I touched Mr. Gould.

17        Q    Should an officer have searched Mr. Gould

18   for a weapon?

19             MR. JOHNSON:  Form.

20             THE WITNESS:  Yes.

21   BY MR. RICE:

22        Q    Now Mr. Gould, at some point, was lying

23   flat on the ground, correct?

24        A    Yes.

25        Q    And you could see his backside at that
```

Joseph Strzelecki
April 24, 2024                                64

```
 1   point, correct?

 2       A    Yes.

 3       Q    Did you see anything suggesting that he

 4   had a weapon on him?

 5       A    Not at that time.

 6       Q    So when Mr. Gould is lying flat on the

 7   ground, do you have any suspicion that Mr. Gould is

 8   in fact, armed?

 9       A    No.

10       Q    At what point was Mr. Gould arrested?

11       A    I'm not sure.  I wasn't there for that.

12       Q    So is it your understanding that Mr. Gould

13   being ordered onto the ground at gunpoint is not

14   being arrested?

15       A    Correct.  Detained.

16       Q    Is it your understanding that Mr. Gould

17   being handcuff is not arrested?

18       A    Correct.  Detained.

19       Q    Is it your understanding that Officer

20   Guerriero saying that Mr. Gould was arrested does

21   not necessarily constitute an arrest?

22       A    I wasn't there when she told him he was

23   arrested.

24       Q    If an officer tells somebody that they're

25   under arrest, in your opinion does that mean that
```

Joseph Strzelecki
April 24, 2024                                        65

```
 1   the person is under arrest?
 2        A    Yes.
 3        Q    Now I know we've gone over this a couple
 4   of times, but I just want to ask the question
 5   directly.  Why did you take your taser out?
 6        A    Less lethal coverage.
 7        Q    Can you describe to me what that means?
 8        A    Training and experience if an officer goes
 9   lethal, you go nonlethal.
10        Q    Why?
11        A    More options available.  We don't know
12   what's going on at the time.  That's basically it.
13        Q    Is it possible for an officer to use
14   excessive force?
15             MR. JOHNSON:  Form.
16             THE WITNESS:  Yes.
17   BY MR. RICE:
18        Q    Is it possible for an officer to pull a
19   handgun out improperly?
20             MR. JOHNSON:  Form.
21             THE WITNESS:  Yeah.
22   BY MR. RICE:
23        Q    Is it your understanding -- well, I'll
24   just ask you.  Can an officer pull out their handgun
25   on somebody whenever they want?
```

Joseph Strzelecki
April 24, 2024                                    66

```
 1        A     No.  Legally, no.

 2        Q     When can an officer legally pull their

 3   handgun on somebody and hold them at gunpoint?

 4              MR. JOHNSON:  Form.

 5              THE WITNESS:  When they are in fear of

 6        lethal threat from somebody.

 7   BY MR. RICE:

 8        Q     Any other times?

 9        A     Not that I can think of at the moment.

10        Q     And when that threat subsides or no longer

11   exists, is it your understanding that the officer

12   needs to stop holding somebody at gunpoint?

13        A     Yes.

14        Q     And is it fair to say that an officer

15   pulling their handgun out is preparation to use

16   deadly force?

17        A     Yeah.

18        Q     Is it your understanding that having a gun

19   drawn on you, even if the person doesn't fire, can

20   sometimes -- well, that's a garbled question.

21   Strike that.

22              What justifies an officer's use of deadly

23   force?

24        A     An immediate danger to yourself or others.

25        Q     And not just a danger.  But one that can
```

Joseph Strzelecki
April 24, 2024                                  67

 1   cause death or grave bodily harm, correct?

 2        A    Absolutely.

 3        Q    So it needs to be more than just someone

 4   could get hurt, but someone could be seriously hurt

 5   or killed, correct?

 6        A    Absolutely.

 7        Q    When Officer Guerriero drew her weapon,

 8   did you observe anything suggesting that Mr. Gould

 9   could seriously hurt or kill somebody?

10        A    Again, I couldn't see what she saw from

11   her vantage point.

12        Q    Did you observe anything rising to that

13   level?

14        A    Not from what I can see.

15        Q    Did you have any concerns that Officer

16   Guerriero had improperly held Mr. Gould at gunpoint?

17             MR. JOHNSON:  Form.

18             THE WITNESS:  I didn't see what she saw.

19        So at that point I can't make a determination?

20   BY MR. RICE:

21        Q    Well, is it fair to say that from what you

22   saw, you didn't see a deadly threat, correct?

23        A    Based on what I saw, no.

24        Q    Were you concerned that Officer Guerriero

25   had improperly unholstered her gun and held Mr.

Joseph Strzelecki
April 24, 2024                                      68

```
 1    Gould at gunpoint?
 2              MR. JOHNSON:  Form.
 3              THE WITNESS:  Again, I couldn't see what
 4         she saw from her vantage point.  So I can't
 5         answer that.
 6    BY MR. RICE:
 7         Q    I mean, did you have a concern or not?
 8              MR. JOHNSON:  Form.
 9              THE WITNESS:  I could not see what she saw
10         from her vantage point.  So I can't answer
11         that.
12              MR. RICE:
13         A    Understand that you can't articulate any
14    concern about that as we sit here today, fair?
15              MR. JOHNSON:  Form.
16              THE WITNESS:  I couldn't see what she saw
17         from her vantage point.
18    BY MR. RICE:
19         Q    I understand you couldn't see it.  What
20    I'm asking is:  Were you able to consider a concern
21    that -- again, I'm trying to be clear.  What I'm
22    asking about is:  Did you have a concern that she --
23         A    In the moment?
24         Q    At the moment that she had unholstered her
25    weapon improperly.
```

Joseph Strzelecki
April 24, 2024                                    69

1        A    At the moment, no.  Because I could not

2    see what she saw from vantage point.

3    BY MR. RICE:

4        Q    So is it fair to say that you assumed that

5    she saw a potentially deadly threat and that she

6    unholstered her weapon properly?

7              MR. JOHNSON:  Form.

8              THE WITNESS:  As a 20-year officer, yes.

9    BY MR. RICE:

10       Q    Now when Mr. Gould is lying on the ground,

11   could you see that Mr. Gould was, in fact, not armed

12   in any way?

13       A    After the fact, yes.

14       Q    Were you concerned at that point that

15   Officer Guerriero had made a mistake?

16             MR. JOHNSON:  Form.

17             THE WITNESS:  That's not -- I wasn't

18        thinking that at that time, no.

19   BY MR. RICE:

20       Q    Why not?

21       A    Again, I was trying to make sure scene

22   safety.  And I was trying to make sure that

23   everything was okay in regards to safety.

24       Q    And you understand, though, you have a

25   duty to report officer misconduct, correct?

Joseph Strzelecki
April 24, 2024                                    70

1       A     Yes.

2       Q     And the fact that Mr. Gould did not appear

3    to have any weapons on him, would you agree that

4    supports that Officer Guerriero may have improperly

5    held her gun on him?

6              MR. JOHNSON:  Form.  You can answer.

7              THE WITNESS:  I wasn't there when or if he

8         was searched.  Again, I was there for 90

9         seconds, I believe.  So I don't know if he was

10        searched, or if he even did or did not have a

11        weapon on him at the time.

12   BY MR. RICE:

13       Q     As far as you can tell, Mr. Gould had no

14   weapon on his body at all, correct?

15       A     At that time.

16       Q     I mean, he's wearing a swimsuit and there

17   were no bulges, correct?

18             MR. JOHNSON:  Form.

19             THE WITNESS:  Yes.

20   BY MR. RICE:

21       Q     And there was nowhere really else for him

22   to conceal a weapon on his body, correct?

23             MR. JOHNSON:  Form.

24             THE WITNESS:  Correct.

25

Joseph Strzelecki
April 24, 2024                                             71

1   BY MR. RICE:

2        Q    And he didn't have a weapon in his hand at

3   the time, correct?

4        A    Correct.

5        Q    Did you give any thought to reporting

6   Officer Guerriero for improperly using force?

7             MR. JOHNSON:  Form.  You can answer.

8             THE WITNESS:  Not at the time.

9   BY MR. RICE:

10       Q    Why not?

11       A    The supervisors dealt with it accordingly.

12       Q    So you expected the supervisors to handle

13  it?

14            MR. JOHNSON:  Form.

15            THE WITNESS:  It's part of their job.

16  BY MR. RICE:

17       Q    And you didn't feel it was part of your

18  responsibilities -- when you observed no safety

19  threat or things indicating a safety threat, is it

20  fair to say you didn't consider it part of your

21  responsibilities to report potentially improper

22  force?

23            MR. JOHNSON:  Form.  Asked and answered.

24       You can answer.

25            THE WITNESS:  At that time, I was not

Joseph Strzelecki
April 24, 2024                                72

```
 1        thinking of it.
 2   BY MR. RICE:
 3        Q    Should you have reported her use of
 4   force --
 5             MR. JOHNSON:  Form.
 6   BY MR. RICE:
 7        Q    -- as you sit here today?
 8        A    Again, the supervisors handled it
 9   accordingly and in a timely manner, if I'm not
10   mistaken.
11        Q    What I'm asking is:  Looking back on it
12   and knowing things in hindsight, should you have
13   reported her potentially improper force at the time?
14             MR. JOHNSON:  Form.  You can answer.
15             THE WITNESS:  I could have.
16   BY MR. RICE:
17        Q    Should you have?
18             MR. JOHNSON:  Same objection.  You can
19        answer.
20             THE WITNESS:  I mean, the fact that the
21        supervisors did it in a timely manner I could
22        have, yeah.
23   BY MR. RICE:
24        Q    Should you have reported it?
25             MR. JOHNSON:  Same objection.  Asked and
```

Joseph Strzelecki
April 24, 2024                                    73

```
 1        answered.
 2             MR. RICE:  I don't believe I've gotten an
 3        answer.  Again, your attorney can object.  But
 4        I'm not trying to ask you the same question
 5        over and over.  I want just to clarify should
 6        you have.
 7   BY MR. RICE:
 8        Q    Do you feel sitting here today, that as an
 9   officer who was present when the force was used, not
10   observing any facts justifying that force, should
11   you have reported potentially improper force during
12   that incident?
13             MR. JOHNSON:  You're asking him knowing in
14        hindsight all the facts that he knows as he
15        sits here today?
16             MR. RICE:  Correct.
17             MR. JOHNSON:  Not while he was on the
18        scene?
19             MR. RICE:  And that's what I'm asking.
20             MR. JOHNSON:  You can answer.
21             THE WITNESS:  Yeah.
22   BY MR. RICE:
23        Q    You should have?
24        A    Looking back hindsight, 20/20, Monday
25   morning quarterbacking today?  Sure.
```

Joseph Strzelecki
April 24, 2024                                    74

1          Q     And that's what I'm asking.  And I

2    understand that during the time of the incident

3    circumstances were different, perhaps what you were

4    thinking and what you knew was different.  But what

5    I'm asking about is:  If what you observed suggests

6    that an officer uses improper force, do you feel

7    it's appropriate to not report that and leave it to

8    the supervisors to potentially look into it?

9               MR. JOHNSON:  Form.  You can answer.

10              THE WITNESS:  Repeat.

11   BY MR. RICE:

12         Q     If you see a circumstance where an officer

13   potentially uses improper force, is it your

14   understanding to just let the supervisors deal with

15   it, or do you understand that you have a duty to

16   report that improper force?

17         A     A duty to report that.

18         Q     Okay.  You also understood that at the

19   time of the incident there existed a duty to

20   intervene to prevent unlawful force, correct?

21              MR. JOHNSON:  Form.  You can answer.

22              THE WITNESS:  Yes.

23   BY MR. RICE:

24         Q     Did you ever intervene to stop Officer

25   Guerriero from pointing her gun at Mr. Gould?

Joseph Strzelecki
April 24, 2024                                      75

 1        A     No.

 2        Q     Did you ever attempt to?

 3        A     No.

 4        Q     Could you have told Officer Guerriero to

 5   stop pointing her gun at Mr. Gould?

 6        A     Could I have?  Yes.

 7        Q     Did you ever attempt to have Mr. Gould

 8   released from custody?

 9              MR. JOHNSON:  Form.  You can answer.

10              THE WITNESS:  I was not there when he was

11        placed under arrest.

12              MR. RICE:  I appreciate the clarification.

13   BY MR. RICE:

14        Q     Did you ever attempt to have Mr. Gould

15   released from handcuffs?

16        A     With the 30 seconds that I was there after

17   he was detained, no.

18        Q     Could you have asked Mr. Gould to have

19   been released from handcuffs?

20        A     I don't know what happened between the

21   time he was detained, that 20 to 30 seconds I was

22   there, to after the fact.  I was not there.

23        Q     But you could have asked that he be

24   released from custody, correct?  Sorry.

25              You could have asked that he be released

Joseph Strzelecki
April 24, 2024                                      76

```
 1   from handcuffs, correct?

 2        A    Anybody could, yeah.

 3        Q    When Mr. Gould was in handcuffs and as you

 4   were leaving that part of the scene, was there

 5   probable cause that Mr. Gould had committed a crime?

 6        A    Officer Guerriero determined that there

 7   was probable cause.

 8        Q    I'm asking your understanding.  Did you

 9   understand that probable cause existed to charge

10   Mr. Gould with any crime?

11             MR. JOHNSON:  Form.  You can answer.

12             THE WITNESS:  Based on the fellow officer

13        rule, I was told that she had probable cause.

14        Therefore, she determined probable cause for

15        his arrest.

16   BY MR. RICE:

17        Q    Separate from her -- again, I want to talk

18   about -- because you were there for part of the

19   incident, correct?

20        A    Thirty seconds.

21        Q    You saw Mr. Gould's interactions with

22   Officer Guerriero at the beginning of the encounter,

23   correct?

24        A    Yes.

25        Q    And you saw Mr. Gould being placed in the
```

Joseph Strzelecki
April 24, 2024                                    77

1   handcuffs, correct?

2        A    Yes.

3        Q    Based on your perceptions, did you have

4   any basis of probable cause that Mr. Gould committed

5   a crime?

6             MR. JOHNSON:   Just while he was on scene

7        with Mr. Gould?

8             MR. RICE:   Correct.

9   BY MR. RICE:

10       Q    I'm asking from your perceptions -- from

11  your presence on that scene during just that initial

12  phase, can you point to any specific facts

13  supporting probable cause that Mr. Gould committed a

14  crime?

15       A    He disobeyed two lawful commands.  So I

16  believe he could have been arrested for resisting.

17       Q    Any other basis besides those?

18       A    That's all I saw, so...

19       Q    During the encounter Mr. Gould was

20  objecting that he was unlawfully arrested, correct?

21       A    Yes.

22       Q    What was Officer Guerriero's demeanor

23  during that encounter?

24       A    She was a bit agitated.

25       Q    Do you know why?

Joseph Strzelecki
April 24, 2024                                          78

1        A     You'd have to ask her.

2        Q     Did her agitation concern you?

3        A     Not in the moment.

4        Q     You would agree that it's important for an

5  officer to remain emotionally cool?

6        A     Yes.

7        Q     And Officer Guerriero had taken her gun

8  out and pointed it at Mr. Gould, correct?

9        A     Yes.

10       Q     Were you concerned at all during the

11 incident that Officer Guerriero was not emotionally

12 stable enough to act as an officer?

13       A     No.

14       Q     Now at some point you left Mr. Gould to

15 talk to some other people, correct?

16       A     Yes.

17       Q     Why did you do that?

18       A     To investigate what happened.

19       Q     Why didn't you stay with Mr. Gould?

20       A     There was multiple officers there at that

21 point.

22             MR. RICE:  Why don't we take a five to 10

23       minute break.

24             MR. JOHNSON:  Sure.

25                   (A recess was taken from 2:47 p.m to

Joseph Strzelecki
April 24, 2024                                            79

```
 1              2:54 p.m.)

 2              MR. RICE:  Back on the record.

 3   BY MR. RICE:

 4        Q    Did anything occur during the break that

 5   affects your ability to continue this deposition?

 6        A    No.

 7              MR. RICE:  I want to pull up what I will

 8        mark as Exhibit 3.  And this is your body-worn

 9        camera recording.

10                   (Plaintiff's Exhibit 3 was marked for

11              Identification.)

12   BY MR. RICE:

13        Q    During the incident you had a body-worn

14   camera activated, correct?

15        A    Yes.

16        Q    And that's a camera that's essentially at

17   chest level, right?

18        A    Yes.

19        Q    When are you supposed to activate

20   recordings, generally?

21        A    Upon coming into contact with anybody.

22        Q    And you did that for this incident,

23   correct?

24        A    Yes.

25        Q    And you did it because it's general policy
```

Joseph Strzelecki
April 24, 2024                                          80

```
 1   to do so?

 2        A    Correct.

 3        Q    Did you keep your recorder running through

 4   all relevant portions of the incident?

 5        A    I believe so.

 6        Q    I'm saying, it didn't malfunction at all,

 7   correct?

 8        A    No, it did not.

 9             MR. RICE:  So if you want to view it on

10        the laptop and I'll call out numbers if others

11        want to follow along.  But this is the

12        body-worn camera recording.  And I'll just

13        start at the beginning and play it through.

14                  (Playing body-worn camera recording.)

15             MR. RICE:  I'll stop at time-stamped

16        11:33:16.

17   BY MR. RICE:

18        Q    This shows you getting out of your car to

19   initially respond to the incident, correct?

20        A    Yes.

21             MR. RICE:  Resuming playback.

22                  (Playing body-worn camera recording.)

23             MR. RICE:  I'll stop it at 11:33:25.

24   BY MR. RICE:

25        Q    The audio comes on 30 seconds into this
```

Joseph Strzelecki
April 24, 2024                                          81

 1   recording.  And that's because there's a 30 second

 2   buffer from when you hit the button, correct?

 3        A    Yes.

 4        Q    And so it records video and not audio

 5   during that period?

 6        A    Correct.

 7        Q    So at about 30 seconds into this video

 8   file, that's when you hit the button to activate it,

 9   correct?

10        A    I don't recall.

11             MR. RICE:  Resuming.

12                  (Playing body-worn camera recording.)

13             MR. RICE:  I will stop at 11:35:02.

14   BY MR. RICE:

15        Q    During that portion you were able to see

16   pretty much the entire incident -- initial incident

17   you had with Mr. Gould, correct?

18        A    Yes.

19        Q    At this point in the video you're walking

20   away to go talk to somebody else, correct?

21        A    The other party, correct.

22        Q    So sitting here today and watching the

23   video with the benefit of the recording, do you have

24   any concerns about Officer Guerriero's demeanor

25   during this incident?

Joseph Strzelecki
April 24, 2024                                              82

1        A     Looking back now, yes.

2        Q     What sort of concerns do you have?

3        A     She was a bit agitated.

4        Q     Do you feel that she acted as a police

5   officer is expected to act during the situation?

6              MR. JOHNSON:  Form.

7              THE WITNESS:  She could have been more

8        professional, but we are human beings at the

9        end of the day.

10  BY MR. RICE:

11       Q     Are you trained in deescalation?

12       A     Yes.

13       Q     Do you have a responsibility to try

14  deescalate a situation?

15       A     Yes, which I tried to by telling him to

16  relax.

17       Q     Does that responsibility apply to officers

18  who might be agitated?

19       A     Yes.

20       Q     Did you try to deescalate Officer

21  Guerriero?

22       A     By stepping in and telling him to relax

23  and calm down, I was try to deescalate the entire

24  situation.

25       Q     So you tried to step in and take control

Joseph Strzelecki
April 24, 2024                                            83

```
 1    of the situation; is that fair?

 2              MR. JOHNSON:  Form.

 3              THE WITNESS:  I wouldn't say control of

 4         the situation.  But I would say to try to

 5         deescalate the situation.

 6    BY MR. RICE:

 7         Q    Did you do anything directly to Officer

 8    Guerriero to try to deescalate her conduct?

 9         A    No.

10         Q    Why not?

11         A    I was a young officer on the road two

12    months.  She's a 20-year veteran.  So I did not

13    feel, at that time, that I needed to step in and

14    tell a 20-year veteran officer to calm down.

15         Q    Even if you personally felt that her

16    demeanor was improper?

17         A    It wasn't professional.

18         Q    So even in that circumstance you felt -- I

19    just want to make sure I'm clear.  So correct me if

20    I'm wrong.

21              Even in that circumstance you felt you

22    needed to defer to your superior officer, fair?

23         A    I wouldn't say "defer" would be the right

24    word.  I would say that she was taking the reins and

25    I trusted her judgment besides, maybe, some of the
```

Joseph Strzelecki
April 24, 2024                                              84

```
 1   agitation.
 2        Q    Now as part of the Palm Beach Gardens
 3   police force, have you ever been directed,
 4   explicitly or not, to refrain from reporting
 5   misconduct by other officers?
 6        A    No.
 7        Q    Are you aware of any patterns of behavior
 8   where officers do not report misconduct of other
 9   officers?
10        A    No.
11        Q    How would you describe, generally, a
12   relationship between a more experienced officer and
13   a younger officer like yourself?
14             MR. JOHNSON:  Form.  You can answer.
15             THE WITNESS:  They kind of lead you and
16        steer you in the right direction.  So more of a
17        mentor, if you will.
18   BY MR. RICE:
19        Q    Do you younger officers have the power,
20   generally, to step in and correct improper behavior
21   by experienced officers?
22        A    Yes.
23        Q    Is it important that younger officers step
24   in and correct potentially improper behavior by
25   experienced officers?
```

1            MR. JOHNSON:  Form.  You can answer.

2            THE WITNESS:  Yes.

3    BY MR. RICE:

4        Q    Why?

5        A    Everyone should be held accountable -- or

6    have the right to hold somebody accountable.

7    BY MR. RICE:

8        Q    Are you aware of harms that can be caused

9    if an officer engages in improper behavior?

10       A    Of course.

11       Q    What sort of harms can that cause,

12   generally?

13       A    Someone could get hurt.

14       Q    So someone could get subjected to force

15   they didn't otherwise deserve, fair?

16       A    Sure.

17       Q    Someone could get severely hurt, correct?

18       A    Sure.

19       Q    Someone could get killed?

20       A    Sure.

21       Q    Someone could get charged improperly with

22   a crime, correct?

23       A    Sure.

24       Q    Someone could be detained improperly,

25   correct?

Joseph Strzelecki
April 24, 2024                                          86

1        A     Sure.

2        Q     And if the officer acted improperly, then

3    person on the receiving end didn't deserve that,

4    correct?

5        A     It's a basis situation.  I mean, generally

6    speaking?  It would depend on what happened at the

7    time.

8        Q     But that's why it's important to hold even

9    officers accountable, because otherwise bad things

10   can happen, fair?

11              MR. JOHNSON:  Form.

12              THE WITNESS:  Fair to say.

13   BY MR. RICE:

14       Q     And you would agree that some of the harms

15   that officers can cause is pretty serious, correct?

16              MR. JOHNSON:  Form.

17              THE WITNESS:  Sure.

18   BY MR. RICE:

19       Q     Well, is it fair to say that in a position

20   with your authority and ability to use force, you

21   need to do so responsibly, correct?

22              MR. JOHNSON:  Form.

23              THE WITNESS:  Absolutely.

24              MR. RICE:  I'm going to continue playing,

25       starting at 11:35:02, the next portion of the

Joseph Strzelecki
April 24, 2024                                          87

```
 1        encounter.
 2                    (Playing body-worn video recording.)
 3                    MR. RICE:  I'll stop at 2 minutes and 22
 4        seconds on the video file.
 5   BY MR. RICE:
 6        Q    Do you know who you're talking to at that
 7   time?
 8        A    Yes.
 9        Q    Who is that?
10        A    Officer Valerio.
11        Q    And Officer Valerio appeared to have an
12   understanding of who was the victim and who was the
13   aggressor, correct?
14        A    Yes.
15        Q    And from your video, you would agree,
16   Officer Valerio's understanding was that Mr. Gould
17   was the victim of the incident, correct?
18        A    That is what he was told, yes.
19        Q    What was your understanding at the time?
20        A    At that point?
21        Q    Correct.
22        A    Based on what he's telling me, that he
23   believed that Gould would be the victim at this
24   point.
25        Q    And did you have any reason to dispute
```

Joseph Strzelecki
April 24, 2024                                    88

```
 1   that?

 2        A    I did not.

 3        Q    And Officer Valerio explained how he

 4   talked to people and learned where the gun was,

 5   correct?

 6        A    Yes.

 7        Q    And he learned that through verbal

 8   conversations, correct?

 9        A    Well, just to clarify.  At this point I

10   don't know if he stated that he knew where the

11   firearm was.  But he --

12             MR. RICE:  So why don't I go back a few

13        seconds here to 2:03.  I'll play it again.

14                  (Playing body-worn video recording.)

15             MR. RICE:  I'll stop at 2 minutes and 19

16        seconds.

17   BY MR. RICE:

18        Q    Officer Valerio -- and again, I want to be

19   clear.  I'm asking for your understanding, your

20   perception, you were not with Officer Valerio during

21   this portion of the encounter where he first showed

22   up, correct?

23        A    Correct.

24        Q    But he's telling you that he asked Gould

25   where the gun was, correct?
```

Joseph Strzelecki
April 24, 2024                                          89

```
 1        A     Correct.

 2        Q     And based on that, Officer Valerio said he

 3   learned that gun was with somebody else, correct?

 4        A     Correct.

 5        Q     Is that a reasonable course of police

 6   activity in your opinion?

 7              MR. JOHNSON:  Form.  You can answer.

 8              THE WITNESS:  Yes.

 9              MR. RICE:  I'm going to resume playback.

10                 (Playing body-worn video recording.)

11              MR. RICE:  I will stop at 2 minutes and 22

12        seconds.

13   BY MR. RICE:

14        Q     Would you agree that Officer Valerio said

15   he could see the person who had the firearm?

16        A     Yes.

17        Q     And he indicated he could see the firearm

18   on that person, correct?

19        A     Correct.

20              MR. RICE:  I'll resume playback.

21                  Playing body-worn video recording.)

22              MR. RICE:  I'm going to stop the video at

23        2:53 on the video file.

24   BY MR. RICE:

25        Q     You can see a male with his arms above his
```

Joseph Strzelecki
April 24, 2024                                     90

```
 1   head in the picture, correct?

 2        A    Yes.

 3        Q    And that's the person who actually had the

 4   gun, correct?

 5        A    Correct.

 6        Q    Can you see the outline of a firearm under

 7   his shirt near his groin area on the video?

 8        A    I can't make it out for certain.

 9             MR. RICE:  I'll play the videotape and I'm

10        happy to zoom in as well.  But I'm curious to

11        see whether you can see a bulge under his shirt

12        indicating a firearm.

13                  (Playing body-worn video recording.)

14             MR. RICE:  I'm going to stop at 3 minutes

15        and 47 seconds and I'll just ask you.

16   BY MR. RICE:

17        Q    When you were there at the incident, could

18   you see a bulge on his front at that time indicating

19   he had a firearm?

20        A    At the time of the incident?

21        Q    Correct.

22        A    I don't recall.

23        Q    Can you -- looking back at the video, the

24   video is not the highest resolution, fair?

25        A    Yes.
```

Joseph Strzelecki
April 24, 2024                                          91

1        Q     And it doesn't accurately convey what you

2   could see at the time, correct?

3        A     Correct.

4        Q     Can you see on the video any indication

5   that he had a firearm in his groin area?

6        A     Not for certain, no.

7        Q     Okay.  But you are interacting with

8   somebody who is suspected of possessing a firearm,

9   correct?

10       A     Correct.

11       Q     And this is the person who Officer Valerio

12  indicated was the aggressor of the situation,

13  correct?

14       A     Correct.

15       Q     It's fair to say that this person is

16  suspected of committing a crime, correct?

17       A     Correct.

18       Q     And he's armed, correct?

19       A     Correct.

20       Q     Did any officer, while you were present,

21  order him to keep his hands out of his pockets?

22       A     No.

23       Q     Why not?

24       A     Because his hands never went to his

25  pockets.

Joseph Strzelecki
April 24, 2024                                        92

```
 1        Q    Okay.  Would you be concerned if his hands
 2   did go to his pockets?
 3        A    Absolutely.
 4        Q    And this person volunteered that he has a
 5   concealed carry weapon, correct?
 6        A    Yes.
 7        Q    Did you trust him?
 8        A    No.
 9        Q    Why not?
10        A    I don't trust anybody.
11             MR. RICE:  I'm going to resume playback at
12        3:47.
13                  (Playing body-worn video recording.)
14             MR. RICE:  I'm going to stop at 4:02.
15   BY MR. RICE:
16        Q    This is a person who's suspected of
17   engaging in aggressive activity and possessing a
18   firearm.  And you observed Officer Valerio instruct
19   this person to reach into his pocket and pull
20   something out, correct?
21        A    Yes.
22        Q    Were you concerned for your safety at that
23   time?
24        A    I was not.
25        Q    Why not?
```

Joseph Strzelecki
April 24, 2024                                              93

1          A     His demeanor.

2          Q     Who's demeanor?

3          A     The white male.  I don't remember his

4     name.

5          Q     Sure.  Describe to me why his demeanor

6     negated those other concerns.

7          A     When he asked about his CCW license and/or

8     driver's license, he had his hands on top of his

9     head.  When he went to ask him where it was, he said

10    it was in his pocket without reaching, with a calm

11    demeanor.  And he waited for Officer Valerio to tell

12    him that it was okay in order for him to reach in

13    his pockets, because he knew what he had on him.

14         Q     So with an aggressor who is armed, Officer

15    Valerio started with a conversation, correct?

16              MR. JOHNSON:  Form.  You can answer.

17              THE WITNESS:  Yes.

18    BY MR. RICE:

19         Q     Why didn't you and Officer Guerriero start

20    with that with Mr. Gould?

21              MR. JOHNSON:  Form.

22              THE WITNESS:  She did.

23    BY MR. RICE:

24         Q     She started with a conversation?

25         A     Hey man.  How are you?

Joseph Strzelecki
April 24, 2024                                    94

1       Q    And what was Mr. Gould's response?

2       A    Who do you think you are, after she told

3   him to keep his hands out of his pockets.

4       Q    So was officer -- you know, we'll get to

5   that in a second.

6            Was it reasonable for Officer Valerio to

7   engage in a conversation with this person first in

8   your opinion?

9            MR. JOHNSON:  Form.  You can answer.

10           THE WITNESS:  Yes.

11  BY MR. RICE:

12      Q    Was it responsible for Officer Valerio to

13  allow this person to reach into his pocket to grab

14  something?

15      A    Yes.

16      Q    And at this point did you have any safety

17  concerns at 4:02 stopped on the video?

18      A    Obviously, I was watching his waistband.

19  But at that point, because of his demeanor and how

20  he was acting, I did not.

21      Q    Did you feel that drawing any weapons was

22  appropriate at this time?

23      A    Obviously not.

24           MR. RICE:  Resume play back at 4:02 p.m.

25               (Playing body-worn video recording.)

Joseph Strzelecki
April 24, 2024                                          95

```
 1              MR. RICE:  I'm going to stop at 4 minutes

 2        and 22 seconds.

 3  BY MR. RICE:

 4        Q    Were you surprised that Officer Valerio

 5  was able to handle the situation without drawing a

 6  weapon on the white male?

 7        A    No.

 8        Q    Why not?

 9        A    He's an experienced officer.

10        Q    Did you understand this interaction to be,

11  essentially, a standard interaction?

12        A    Yes.

13        Q    And Officer Valerio was able to get

14  consent to take the weapon, correct?

15        A    Correct.

16        Q    And remove it without issue, correct?

17        A    Correct.

18        Q    Officer Valerio also indicated that a

19  person has a right to bear arms, correct?

20        A    Correct.

21        Q    Do you agree with that sentiment?

22        A    Yes.

23        Q    So if person's mere possession of a

24  firearm by itself is not something unlawful,

25  correct?
```

Joseph Strzelecki
April 24, 2024                                    96

1           MR. JOHNSON:  Form.

2           THE WITNESS:  Correct.

3           MR. RICE:  I'll take this down and play

4      for you what will be marked Exhibit 4, Officer

5      Guerriero's body-worn camera.

6                (Plaintiff's Exhibit 4 was marked for

7                Identification by the reporter.)

8  BY MR. RICE:

9      Q    Now you would agree that your body-worn

10  camera did not have audio for the very initial part

11  of the encounter, correct?

12     A    Correct.

13     Q    And that's because you didn't hit your

14  button until midway through, correct?

15     A    Correct.

16     Q    Have you reviewed Officer Guerriero's

17  body-worn camera recording?

18     A    I believe I've seen it, yes.

19           MR. RICE:  So I'm going to play you what's

20      been marked as Exhibit 4.

21                (Playing body-worn video recording.)

22           MR. RICE:  I'm going to stop it at 50

23      seconds.

24  BY MR. RICE:

25     Q    You would agree that Officer Guerriero's

Joseph Strzelecki
April 24, 2024                                         97

```
 1    camera shows that she commanded Mr. Gould to keep

 2    his hands out of his pocket at the initial part of

 3    the encounter, correct?

 4         A    Yes.

 5         Q    And that was before Mr. Gould responded

 6    with anything verbally, correct?

 7         A    Correct.

 8         Q    And, at least on the video, does it appear

 9    that Mr. Gould's hands were in his pockets at the

10    time?

11         A    At the point you have it now, no.

12         Q    Did you see Mr. Gould go to his pockets

13    before this moment?

14         A    I didn't see it.

15         Q    Would you agree that the start of this

16    encounter is very different than the encounter with

17    the gentleman who had the gun?

18         A    She seemed very respectful in the initial

19    encounter.

20         Q    Officer Guerriero did?

21         A    Yes.  Hey, man.  How are you?  Please keep

22    your hands out of your pockets for me.

23         Q    Should Officer Guerriero had started with

24    a conversation to see if Mr. Gould was even armed?

25              MR. JOHNSON:  Form.
```

Joseph Strzelecki
April 24, 2024                                    98

```
 1              THE WITNESS:  It's neither here nor there.

 2        It's Monday morning quarterbacking.  I mean, I

 3        don't think she was wrong in the way she

 4        approached him, no.

 5   BY MR. RICE:

 6        Q    So it would be fair to say that you can

 7   approach a potential situation multiple ways?

 8        A    Yeah.

 9        Q    And is it reasonable, in your opinion,

10   that Officer Valerio did his interaction by

11   conversation?

12              MR. JOHNSON:  Form.

13              THE WITNESS:  So did she.

14   BY MR. RICE:

15        Q    Well, she started with a command, correct?

16        A    Hey, how are you doing, is not a command.

17        Q    But keep your hands out of your pocket --

18   your understanding was that was a command, correct?

19        A    After the fact.

20        Q    Or was that merely a request?

21        A    That was a command.

22        Q    So at this moment, the initial encounter,

23   before Mr. Gould has said anything, before he's done

24   anything with his hands, you felt it was appropriate

25   for Officer Guerriero to command Mr. Gould to keep
```

Joseph Strzelecki
April 24, 2024                                    99

```
 1    his hands out of his pockets?

 2         A    Yes.

 3              MR. RICE:  I'm going to continue playback

 4         at 50 seconds.

 5                   (Playing body-worn video recording.)

 6              MR. RICE:  I'm going to stop at 51.

 7    BY MR. RICE:

 8         Q    Mr. Gould volunteered that he's not the

 9    man with the gun, correct?

10         A    Yes.

11         Q    And at that time -- and I know we've gone

12    over this a couple of times, but I want to be clear.

13              With the benefit of the video, you did not

14    give that statement any weight, fair?

15         A    Can you rephrase?

16         Q    When Mr. Gould said that he was not the

17    man with the gun, did you give any value to that

18    statement at all?

19         A    At the time of the incident?

20         Q    Correct.

21         A    I can't recall.

22                   (Playing body-worn video recording.)

23              MR. RICE:  So I'll stop it at 54 seconds.

24    BY MR. RICE:

25         Q    Would you agree that Officer Guerriero's
```

Joseph Strzelecki
April 24, 2024

100

```
1   second command to keep Mr. Gould's hands out of his

2   pockets was simultaneous with Mr. Gould reaching his

3   hands into his pocket?

4        A    Sure.  Second command.

5        Q    So based on the video and your

6   recollection, as you sit here today, would it be

7   fair to say that Mr. Gould disobeyed only one

8   command to keep his hands out of his pockets?

9        A    I'd have to rewatch the video.

10       Q    Sure.

11            MR. RICE:  And again, I'm happy to replay

12       it, if that helps to refresh your memory.  I'm

13       going to roll it back to 35 seconds.

14            (Playing body-worn video recording.)

15            MR. RICE:  I'll stop at 54 seconds again.

16  BY MR. RICE:

17       Q    Were you able to review the video?

18       A    Yes.

19       Q    Would you agree that Mr. Gould only

20  disobeyed, at most, one command to keep his hands

21  out of his pockets?

22            MR. JOHNSON:  Form.  Are you talking about

23       at this point in the video, or in general?

24            MR. RICE:  In general.  I'll start my

25       question over.
```

Joseph Strzelecki
April 24, 2024

 1   BY MR. RICE:

 2        Q    Did you observe Mr. Gould reach his hands

 3   into his pockets any time other than at this moment

 4   in the video?

 5        A    At this moment in the video?

 6        Q    How many times did Mr. Gould reach his

 7   hands into his pockets?

 8        A    I'd have to see the rest of the video.

 9                (Playing body-worn video recording.)

10            MR. RICE:  So I'm going to stop at 1

11        minute and 23 seconds.

12   BY MR. RICE:

13        Q    And I know that Officer Guerriero's body

14   camera video is a little obscured at moments, but

15   you've had the benefits of viewing your own as well

16   as the surveillance video.

17            From the initial part of the encounter to

18   when Mr. Gould is handcuffed, how many times did you

19   observe him reach his hands into his pockets?

20        A    Once.

21        Q    So would it be fair to say that Mr. Gould,

22   at most, disobeyed one command to keep his hands out

23   of his pockets?

24        A    I don't know.  Because she did tell him

25   while -- it was almost simultaneously, but she did

Joseph Strzelecki
April 24, 2024                                               102

```
 1  tell him again to keep his hands out of his pockets

 2  and he was reaching.

 3      Q    Can a person disobey a command before it's

 4  given?

 5      A    No.

 6      Q    Can a person disobey a command while it's

 7  being given?

 8      A    Yeah.

 9      Q    If it's sufficiently long enough?

10      A    Yes.

11      Q    When Officer Guerriero gave her second

12  command -- and I'll play the video again here.

13          My question is going to be:  Was Mr. Gould

14  hand already in his pocket when she gave the second

15  command?

16          MR. RICE:  So I'll start playback from 41

17      seconds.

18              (Playing body-worn video recording.)

19          MR. RICE:  I'm going to stop it at 52

20      seconds.

21  BY MR. RICE:

22      Q    And you would agree that at this moment in

23  the video, Office Guerriero said "keep" -- about to

24  say keep your hands out of your pocket, fair?

25      A    Correct.  After saying it the first time,
```

Joseph Strzelecki
April 24, 2024                                           103

1    yes.

2         Q    And at this time Mr. Gould's hand is in

3    his pocket, correct?

4         A    Yes.

5         Q    So I just want to be clear.  With the

6    benefit of the videos and your recollection, is it

7    fair to say that Mr. Gould, at most, only disobeyed

8    one command to keep his hands out of his pockets?

9         A    Sure.

10        Q    Would it also be fair to say that Mr.

11   Gould did not disobey multiple commands to keep his

12   hands out of his pockets?

13             MR. JOHNSON:  Form.  You can answer.

14             THE WITNESS:  I didn't see how he was --

15        if his hands were in his pockets prior to her

16        saying it the first time.

17   BY MR. RICE:

18        Q    And I understand the first request.  What

19   I'm asking is:  Would it be accurate to say

20   Mr. Gould disobeyed multiple commands to keep his

21   hands out of his pockets?

22        A    Could I see the video again?

23        Q    Absolutely.

24             MR. RICE:  And that's what I'll say.  If

25        there's any materials at this point that would

Joseph Strzelecki
April 24, 2024                                              104

```
 1        help refresh your recollection, the

 2        surveillance, yours or Officer Guerriero's, I'm

 3        be happy to play them.

 4              I'll start Officer Guerriero's video from

 5        23 seconds.

 6                    (Playing body-worn video recording.)

 7              MR. RICE:  I'm going to stop it at 58

 8        seconds.

 9  BY MR. RICE:

10        Q    Is that a sufficient amount of video to

11  watch?

12        A    Yes.

13        Q    Would it be accurate to say that Mr. Gould

14  disobeyed multiple commands to keep his hands out of

15  his pockets?

16        A    Yes.

17        Q    What do you base that on?

18        A    Base what on?

19        Q    Well, I'm trying to square because, again,

20  I want to get the details.

21              My understanding is your observation,

22  based on these videos and your perception and

23  memory, is that Officer Guerriero gave an initial

24  command for Mr. Gould to keep his hands out of his

25  pockets, right?
```

Joseph Strzelecki
April 24, 2024                                    105

```
 1        A     Yes.

 2        Q     Mr. Gould then reached his hand into his

 3   pocket, right?

 4        A     Correct.

 5        Q     And Officer Guerriero then gave a second

 6   command for Mr. Gould to keep his hands out of his

 7   pockets, correct?

 8        A     Correct.

 9        Q     While that was being said, Mr. Gould

10   removed his hands from his pockets and never put it

11   back in, correct?

12        A     Correct.

13        Q     So what I'm asking is, based on the fact

14   that Mr. Gould put his hands into his pockets after

15   only one command and did not do so following that,

16   would you agree that it is not accurate to say that

17   Mr. Gould disobeyed multiple commands to keep his

18   hands out of his pockets?

19        A     Sure.

20              MR. RICE:  I'm going to take that down and

21        I'm going to pull up what I'll mark as Exhibit

22        5.

23                   (Plaintiff's Exhibit 5 was marked for

24              Identification.)

25
```

Joseph Strzelecki
April 24, 2024                                    106

```
 1   BY MR. RICE:

 2        Q    You wrote a report for this incident,

 3   correct?

 4        A    Yes.

 5        Q    Why do you write reports?

 6        A    To document what happened.

 7        Q    Is it important that you are accurate in

 8   your reports?

 9        A    Yes.

10        Q    Why?

11        A    It gives an accurate description of what

12   happened.

13        Q    And what are your reports typically used

14   for?

15        A    Documentation purposes and arrests.

16        Q    Are they used to potentially charge people

17   with criminal activity?

18        A    Yes.

19        Q    Are they used to find that no improper

20   conduct occurred?

21        A    Yes.

22        Q    And they're used for investigative

23   purposes, correct?

24        A    Correct.

25        Q    And it's important that you be as accurate
```

Joseph Strzelecki
April 24, 2024                                    107

```
 1    as possible so you're giving the best version of the

 2    facts to people who may review them, correct?

 3         A     Correct.

 4         Q     And you understood this when you wrote

 5    your reports, correct?

 6         A     Correct.

 7         Q     Did you also understand that it's

 8    important to be clear about how reliable your

 9    information is?

10         A     Yes.

11         Q     So if you had doubts about certain things,

12    would you typically include that doubt in your

13    reports?

14         A     No.

15         Q     So things you're doubtful about would not

16    be included at all, fair?

17         A     Yes.

18         Q     If information was potentially unreliable,

19    would you note that in your reports?

20         A     Yes.

21         Q     Why would you do that?

22         A     To paint a clear picture of the incident.

23         Q     And to make sure that people reviewing it

24    had a good understanding as to what facts were good

25    and what facts were not so good, fair?
```

Joseph Strzelecki
April 24, 2024                                          108

```
 1        A     Yes.

 2        Q     So I have a copy of Exhibit 5 here.  This

 3   is a report that you wrote as part of this incident,

 4   correct?

 5        A     Yes.

 6        Q     If you want to take a moment to review it

 7   and ensure -- but you provided the narrative that's

 8   listed in this report, correct?

 9        A     Yes.

10        Q     Did anyone influence you to put certain

11   things in this reports?

12        A     Influence meaning, in what regard?

13        Q     Well, encourage you or discourage you in

14   any way to include or not include anything.

15        A     I was told what was told to my sergeant

16   from Officer Guerriero.

17        Q     So is it fair to say that you included

18   Officer Guerriero's involvement or account -- is it

19   fair to say it included Officer Guerriero's account

20   based on what another officer told you?

21        A     Yes.

22        Q     What about your observations in this

23   report?

24        A     What about them?

25        Q     Are they accurate as to what you observed?
```

Joseph Strzelecki
April 24, 2024                                              109

```
 1       A    Yes.

 2       Q    In the center of the second paragraph

 3   there's a statement that Mr. Gould was told multiple

 4   times by Officer Guerriero to keep his hands out of

 5   his pockets, but Mr. Gould defied commands and

 6   reached into front pocket and pulled out a cell

 7   phone.  Is that generally what it says?

 8       A    Yes.

 9       Q    And you would agree that that statement

10   indicates that Mr. Gould disobeyed multiple commands

11   to keep his hands out of his pockets, fair?

12       A    It states that Mr. Gould was told multiple

13   times to keep his hands out of his pockets, but

14   defied commands by reaching into his right pocket.

15       Q    So you would agree that's a fragment --

16   Mr. Gould defied commands, with a plural there,

17   indicates that he defied multiple commands to keep

18   his hand out of his pockets, fair?

19            MR. JOHNSON:  Form.

20            THE WITNESS:  Yes.

21   BY MR. RICE:

22       Q    Did you write that language?

23       A    Yes.

24       Q    Was that statement based or your account

25   or Officer Guerriero's account?
```

Joseph Strzelecki
April 24, 2024                                    110

```
 1        A    Both.

 2        Q    So you wrote in your report, based on your

 3   account, that Mr. Gould disobeyed multiple commands

 4   to keep his hands out of his pocket?

 5        A    Yes.

 6        Q    And you would agree that's not what the

 7   video shows, correct?

 8             MR. JOHNSON:  Form.

 9             THE WITNESS:  He was told at the time that

10        he was going to reach into his pocket.  One

11        could argue that it was defying a command.

12   BY MR. RICE:

13        Q    One command, correct?

14        A    Or multiple.

15        Q    Does the video show that Mr. Gould defied

16   multiple commands to keep his hands out of his

17   pockets?

18             MR. JOHNSON:  Form.  You can answer.

19             THE WITNESS:  Again, I would say that the

20        video -- as he was going to reach in, he was

21        told not to reach in his pocket.  Thereafter, I

22        would say yeah.

23   BY MR. RICE:

24        Q    You would say that that is defying

25   multiple commands?
```

```
1       A    Yes.

2       Q    So the fact that Mr. Gould's hand was

3   already in his pocket and then the command was

4   issued to keep his hands out of his pockets,

5   constituted Mr. Gould disobeying that command?

6       A    After being told right before that to keep

7   his hands out of his pockets, yes.

8       Q    Well, what I'm asking is not whether he

9   disobeyed one command.  What I'm saying is, that

10  second command, in your opinion, the video shows

11  that Mr. Gould did not -- I mean, is it your

12  position that Mr. Gould defied that second command?

13           MR. JOHNSON:  Form.  Asked and answered.

14       You can answer.

15           THE WITNESS:  Again, as he was going to

16       reach in his pocket he was told right before

17       being told not to do that.  So he was doing it

18       to incite something.  Therefore, he was defying

19       multiple commands.

20  BY MR. RICE:

21       Q    What explicit commands did Mr. Gould defy?

22  Can you state explicitly what commands Mr. Gould

23  defied by putting his hands in his pocket?

24       A    The command of keep your hand out of your

25  pockets.
```

Joseph Strzelecki
April 24, 2024                                    112

1        Q    So that's one, correct?

2        A    Yes.

3        Q    Any other commands that Mr. Gould defied

4   by putting his hands into his pockets?

5             MR. JOHNSON:  Form.

6             THE WITNESS:  She told him, while he was

7        putting his hand in his pocket, keep your hands

8        out of your pocket.

9   BY MR. RICE:

10       Q    Well, you would agree that his hand was

11  already in his pocket, which he said that, right?

12       A    It was going into his pocket.

13       Q    And so did Mr. Gould defy that command

14  before it was uttered?

15            MR. JOHNSON:  Form.  You can answer.

16            THE WITNESS:  No.

17  BY MR. RICE:

18       Q    Does your report -- does the statement

19  Mr. Gould defied commands match what you observed on

20  Officer Guerriero's video?

21            MR. JOHNSON:  Form.  You can answer.

22            THE WITNESS:  Yes.

23  BY MR. RICE:

24       Q    Explain it for me.

25       A    Upon me getting there she's asked him to

Joseph Strzelecki
April 24, 2024                                          113

1    keep his hands out of his pockets.  So that's one

2    command.  He then put his hand into his pocket -- or

3    he then pulled his phone out, at which time she told

4    him again.  That would be two commands.  That would

5    be multiple.  Multiple is more than one.

6    BY MR. RICE:

7         Q    Did Mr. Gould defy the second command?

8         A    The first command: Please keep your hands

9    out of your pocket for me.  Command number one, yes.

10   Second command.  Keep your hands out of your pocket

11   for me, after he pulled out his cell phone, command

12   number two.  He then went back into his pocket, at

13   which time you're debating on if that third one was

14   a command or not.

15        Q    So you're saying that Mr. Gould reached

16   into his pocket two times?

17        A    No.  The one time that you showed me.  But

18   upon getting there Officer Guerriero stated:  Hey,

19   man.  Please keep your hands out of your pockets for

20   me, command number one.  Was then told again keep

21   your hands out of your pockets, command number 2,

22   and he reached into his pocket.  You're arguing that

23   third one, but before that there was two.

24        Q    So your testimony as you sit here today,

25   with the benefit of watching the videos and

Joseph Strzelecki
April 24, 2024                                          114

```
 1   recollection, is that two commands were fully issued

 2   before Mr. Gould reached his hand into his pocket,

 3   fair?

 4            MR. JOHNSON:  Form.

 5            THE WITNESS:  Yes.

 6            MR. RICE:  Yes?

 7            THE WITNESS:  Yes.

 8            MR. RICE:  I would like to go back to the

 9       video to confirm after watching it, if that's

10       your contention.  So I'm going to go back to

11       Exhibit 4 and start at 22 seconds.

12            MR. JOHNSON:  I'm sorry.  Why are we

13       replaying the video?

14            MR. RICE:  Because I've received multiple

15       responses about whether there were multiple

16       commands, obeyed/disobeyed.  And I'm curious,

17       as you sit here today, whether your position is

18       that Mr. Gould disobeyed multiple commands.  So

19       command one, then command two, then reached

20       into his pocket, which would be disobeying

21       multiple commands.  Or if your position is

22       command one, reach into pocket.  Command two,

23       no more reaching, which would be disobeying one

24       command.

25            MR. JOHNSON:  And you're asking whether
```

Joseph Strzelecki
April 24, 2024                                     115

 1        that has anything to do with his present

 2        perception after reviewing the video and

 3        knowing the facts today, as opposed to

 4        authoring this report at or near the time of

 5        incident?

 6   BY MR. RICE:

 7        Q    What I'm asking is:  As you sit here

 8   today, with the benefit of the videos and the

 9   perception, is the statements that Mr. Gould defied

10   commands factually accurate?

11        A    Let me see the video one more time.

12             MR. RICE:  I'm going to start at 30.

13                  (Playing video.)

14             MR. RICE:  I'm going to stop at 52

15        seconds.

16   BY MR. RICE:

17        Q    At this frame you'd agree that Mr. Gould's

18   hand is in his pocket, correct?

19        A    Yes.

20        Q    And at this time Mr. Gould has been asked

21   once to keep his hands out of his pockets, correct?

22        A    Yeah.

23             MR. RICE:  I'm going to continue playback.

24                  (Playing video.)

25             MR. RICE:  I'll stop it at one minute.

Joseph Strzelecki
April 24, 2024                                                    116

1    BY MR. RICE:

2         Q    But you would agree that at that point Mr.

3    Gould never put his hands back into his pocket,

4    correct?

5         A    Correct.

6         Q    So what I'm asking you, as you sit here

7    today with the benefit of the video and recollection

8    and everything looking backwards, is the statement

9    that Mr. Gould defied multiple commands factually

10   accurate?

11             MR. JOHNSON:  Again, is it just the

12        command about reaching into his pocket or any

13        other command?

14             MR. RICE:  Well, I can ask you.

15   BY MR. RICE:

16        Q    At that point was Mr. Gould commanded to

17   do anything besides keep his hands out of his

18   pockets?

19        A    I believe she said put the phone down.

20        Q    Later, correct?

21        A    Right at this incident, yes.

22        Q    And in your report you only mentioned the

23   command to keep his hands out of his pockets,

24   correct?

25        A    Yes.

Joseph Strzelecki
April 24, 2024                                        117

1        Q    And the way you wrote it says that

2   Mr. Gould defied commands and reached into his right

3   front pocket and pulled out a cell phone, correct?

4        A    Correct.

5        Q    And it's fair to say that the commands you

6   were referring to were for Mr. Gould to keep his

7   hands out of his pockets, correct?

8        A    Correct.

9        Q    And what I'm asking is:  As you sit here

10  today with the benefit of the video and review,

11  would you agree that the statement that Mr. Gould

12  defied commands and then reached into his right

13  front pocket is inaccurate?

14            MR. JOHNSON:  Form:  You can answer.

15            THE WITNESS:  Can you rephrase?  I'm

16       sorry.

17            MR. RICE:  Here's what I'm getting at,

18       because I know we've spent a lot of time on it

19       at this point.

20  BY MR. RICE:

21       Q    My understanding, and again, correct me if

22  I'm wrong, is that your review of the video shows

23  that Mr. Gould defied one command to keep his hands

24  out of his pocket.  His second command was given.

25  And after that command was given Mr. Gould did not

Joseph Strzelecki
April 24, 2024                                                    118

1    reach into his pocket any further, fair?

2         A    Yes.

3         Q    In the report that you wrote, the language

4    states that Mr. Gould defied multiple commands and

5    then reached into his front pocket.  And what I want

6    to get to is, to the extent that that statement is

7    inaccurate, that Mr. Gould defied multiple commands,

8    was that something that came from you or was that

9    something that came from Officer Guerriero, or both

10   of you?

11        A    I don't recall at the time when I was

12   writing the report if it was from me or...

13        Q    Is it possible that that came from you?

14        A    Possible, yes.

15        Q    Is it possible that you were inaccurate in

16   your report about how many commands Mr. Gould had

17   defied before he reached into his right front

18   pocket?

19             MR. JOHNSON:  Form.  You can answer.

20             THE WITNESS:  Possible.

21   BY MR. RICE:

22        Q    And that possible inaccuracy, where might

23   that have come from?

24        A    From what I was told.

25        Q    What were you told that would influence

Joseph Strzelecki
April 24, 2024                                    119

1   that?

2       A    I was told from a supervisor what Officer

3   Guerriero deemed to be probable cause to arrest him.

4       Q    And part of that probable cause was that

5   Mr. Gould defied multiple commands, correct?

6       A    Part of it, yes.

7       Q    And did you accept that as true, yourself?

8       A    Yes.

9       Q    Even though you were also present during

10  the incident, correct?

11      A    Yes.

12      Q    Now is it fair to say that this incident

13  happened very quickly?

14      A    Yes.

15      Q    Is it possible that you didn't remember

16  that detail correctly?

17      A    Possible.

18      Q    But you didn't note in your report that

19  that fact was potentially wrong, correct?

20      A    Correct.

21      Q    And you didn't know that it was

22  potentially unreliable, correct?

23          MR. JOHNSON:  Form.

24          THE WITNESS:  Yeah.

25

Joseph Strzelecki
April 24, 2024                                              120

```
 1   BY MR. RICE:

 2        Q    Now, you also note that Officer Guerriero

 3   found probable cause to charge Mr. Gould with

 4   resisting without violence, correct?

 5        A    Yes.

 6        Q    Was that an intentional decision to say

 7   that Officer Guerriero found probable cause?

 8        A    Yes.

 9        Q    Why did you make that statement?

10        A    Because this was her arrest.

11        Q    And by attributing that to Officer

12   Guerriero, were you suggesting that you did not find

13   probable cause?

14             MR. JOHNSON:  Form.

15             THE WITNESS:  I can't speak on what she

16        found to be probable cause.

17   BY MR. RICE:

18        Q    What I'm asking -- again, just to get to

19   the point is -- when you wrote this report you

20   didn't say that I and Officer Guerriero found

21   probable cause, correct?

22        A    Correct.

23        Q    By leaving yourself out of that sentence,

24   were you meaning to say that you did not find

25   probable cause?
```

Joseph Strzelecki
April 24, 2024                                          121

 1        A     Not necessarily, no.

 2        Q     So should the absence of you in that

 3   statement be read to say that you're relying only on

 4   Officer Guerriero and that's it?

 5        A     Correct.

 6        Q     You transported Mr. Gould from the scene,

 7   correct?

 8        A     From the scene?  I don't believe so, no.

 9        Q     You met him at the detention area?

10        A     At the police station.

11        Q     Tell me about that part of the incident.

12        A     I went to the station -- the booking.  And

13   that is where I typed up the report.

14        Q     The report that's in front of you?

15        A     Correct.

16        Q     Anything else of note happen during that

17   time?

18        A     I was given information from a supervisor

19   on what was told to them by Officer Guerriero.

20        Q     Did you have any discussions with another

21   officer about making sure there was probable cause

22   to charge Mr. Gould?

23        A     Just the supervisor.

24        Q     What did you discuss?

25        A     He told me what Officer Guerriero told

Joseph Strzelecki
April 24, 2024                                            122

1  them for probable cause.

2        Q    And did they direct you to include that in

3  your report?

4        A    Yes, based on the fellow officer rule.

5        Q    And did that officer direct you that that

6  was probable cause to detain Mr. Gould?

7        A    It was Officer Guerriero's probable cause,

8  not necessarily theirs.

9        Q    So again, I want to be clear.  Do you know

10 who this officer was you were talking to?

11       A    It's a supervisor.

12       Q    What's that person's name?

13       A    I believe it was Sergeant Beef.

14       Q    Did Sergeant Beef say whether he, himself,

15 thought there was probable cause?

16       A    He signed it.

17       Q    And took that as what?

18       A    What she told him was sufficient for

19 probable cause.

20       Q    Did he express any concerns about lack of

21 probable cause during that conversation?

22       A    I don't recall.

23       Q    Were you able to observe Mr. Gould during

24 that time?

25       A    He was in the cell.

Joseph Strzelecki
April 24, 2024                                    123

 1        Q      How did Mr. Gould appear in the cell?

 2        A      I don't recall.

 3        Q      What was his demeanor?

 4        A      I was looking at a screen, typing.

 5        Q      Did you fill out any booking paperwork for

 6   Mr. Gould?

 7        A      I did.

 8        Q      What happened to that paperwork?

 9        A      I don't recall.

10        Q      Do you know if it was destroyed?

11        A      I have no idea.

12        Q      What would that paperwork look like?

13        A      The standard is usually -- you have your

14   arrest affidavit and then your probable cause

15   affidavit, which is this.  And then you would have

16   your evidence -- I'm sorry.  Not your evidence.

17   Your property receipt.  I'm sorry.

18             You would have your property receipt and

19   then you would take all of that to the booking

20   center.  And then after you're done with that, you

21   would come back to the station and do your cover

22   sheet.

23        Q    Do you know if any of those materials were

24   prepared for Mr. Gould?

25        A     If they were prepared?

Joseph Strzelecki
April 24, 2024                                                    124

 1        Q    Yes.

 2        A    They were, because I took them down.

 3        Q    All of them were?

 4        A    Not the cover sheet.  We usually do that

 5   after.

 6        Q    So besides the report in front of you,

 7   what would those other documents be, a property

 8   receipt?

 9        A    The property receipt, the arrest affidavit

10   and probable cause affidavit.

11        Q    So does the probable cause affidavit match

12   what's in the report?

13        A    Yes.

14        Q    So that's, essentially, the probable

15   cause?

16        A    Yes.

17        Q    What's the arrest affidavit?

18        A    That would have the charges, his name and

19   all of that on it.

20        Q    Do you know if that was filled out?

21        A    It was.

22        Q    Do you know where that went?

23        A    I don't.

24        Q    Do you know if a property receipt was

25   filled out?

Joseph Strzelecki
April 24, 2024                                          125

1          A     Yeah.  There had to have been one.

2          Q     Do you know where that went?

3          A     I don't.  It would have been with all the

4    other paperwork.

5          Q     Did you handle that paperwork?

6          A     I did.

7          Q     What did you do with it?

8          A     I don't remember if I left it at the jail

9    or if I brought it back to the station.  I don't

10   recall.  That's not really standard procedure to

11   bring someone in and bring them back.

12         Q     Did you destroy any of that paperwork?

13         A     Absolutely not.

14         Q     Are you aware of anybody else who

15   destroyed that paperwork?

16         A     No.

17         Q     At some point you gave an interview to

18   other officers about this matter, correct?

19         A     The internal affairs you're referring to?

20         Q     Yes.

21         A     Yes.

22         Q     Describe how that came to be.

23         A     I was a witness to an internal affair

24   investigation.

25         Q     Do you know how that investigation opened?

Joseph Strzelecki
April 24, 2024                                          126

```
 1          A     I'm assuming from the chief.

 2          Q     But you don't know?

 3          A     No.

 4          Q     Do you know the nature of that

 5     investigation?

 6          A     Policy violation.

 7          Q     Do you know what policies?

 8          A     I don't.

 9          Q     Do you know the result of that

10     investigation?

11          A     I believe she was terminated.

12          Q     You believe Officer Guerriero was

13     terminated?

14          A     To the extent of what?  I don't know.

15          Q     Again, I'm asking for your understanding.

16                Do you know whether the conduct at issue

17     was the conduct while you were present at the scene?

18          A     Can you rephrase?

19          Q     So the conduct at issue with the internal

20     affairs investigation, did that include Officer

21     Guerriero's conduct while you were present?

22          A     Yeah.

23          Q     I will make it clear, just so we're on the

24     same page.  At some point you split up from Officer

25     Guerriero on this incident, correct?
```

Joseph Strzelecki
April 24, 2024                                           127

```
 1        A     Right.
 2        Q     And so you weren't with her and Mr. Gould
 3   at all times, right?
 4        A     Correct.
 5        Q     What I'm asking is:  Was it your
 6   understanding that the internal affairs
 7   investigation included conduct that occurred while
 8   you were present with Officer Guerriero?
 9        A     Sure.
10        Q     And you didn't report this conduct to
11   internal affairs, right?
12        A     No.
13        Q     That's correct?
14        A     Correct.
15        Q     So would you agree that, based on your
16   understanding, Officer Guerriero engaged in conduct
17   that resulted in her termination that you did not
18   report?
19        A     Depending on when they determined that she
20   was violating policies.
21        Q     But you would agree that that's a
22   possibility, correct?
23        A     Possibility.
24        Q     And if there was a report saying that
25   Officer Guerriero engaged in conduct sufficient to
```

Joseph Strzelecki
April 24, 2024                                              128

```
 1   terminate her while you were present, would you have

 2   any reason to dispute that?

 3            MR. JOHNSON:  Form.  You can answer.

 4            MR. RICE:  I'll flip it around, because

 5        some of these can get a bit weird.

 6   BY MR. RICE:

 7        Q    What I'm essentially asking is:  Are you

 8   in a position to say affirmatively that Officer

 9   Guerriero's conduct, while you were with her, did

10   not result in her termination?

11        A    Am I in a position?  You're going to have

12   to rephrase that one.  Sorry.

13        Q    Sure.  It's kind of backwards.  What I'm

14   asking is:  For the conduct that occurred while you

15   were with her, are you in a position today to say

16   that that conduct did not result in her termination?

17            MR. JOHNSON:  Form.

18            THE WITNESS:  No.

19   BY MR. RICE:

20        Q    So it's a possibility -- just, again, to

21   kind of close the loop both ways.  It's a

22   possibility that the conduct that occurred while you

23   with her resulted in her termination, fair?

24            MR. JOHNSON:  Form.

25            THE WITNESS:  Fair.  Sure.
```

Joseph Strzelecki
April 24, 2024                                          129

1    BY MR. RICE:

2        Q    But as part of those proceedings you gave

3    an interview, correct?

4        A    I did.

5        Q    And you understood during that interview,

6    that it was very important for you to be accurate,

7    correct?

8        A    Correct.

9        Q    And as part of that understanding, did you

10   give information that you were unsure about?

11            MR. JOHNSON:  Form.

12            THE WITNESS:  Not to my knowledge.

13   BY MR. RICE:

14       Q    Did you give information that was

15   unreliable?

16       A    Not to my knowledge.

17       Q    Did you give false information?

18       A    No.

19       Q    When was this interview conducted,

20   generally?

21       A    I don't remember the exact date.

22       Q    Sure.  Was it closer in time to the

23   incident then we sit here today?

24       A    Yes.

25       Q    Do you have a general time frame as to

Joseph Strzelecki
April 24, 2024                                          130

```
 1   when the interview occurred with respect to the

 2   incident?

 3        A    No.

 4        Q    How was your memory of the incident during

 5   the interview?

 6        A    I don't recall the time frame of when it

 7   was, so I don't recall how my memory was at the

 8   time.

 9        Q    If you had trouble remembering things

10   during the interview, would you have noted that?

11        A    Yes.

12        Q    And if you were unsure of things due to

13   your memory, would you have noted that?

14        A    Yes.

15        Q    Or you just wouldn't have said them, fair?

16        A    Yes.

17             MR. RICE:  I'm going to play what is

18        marked as Exhibit 6, it's audio.  This is your

19        interview with internal affairs.  And I'm going

20        to move it to four minutes and 30 seconds --

21        there's the introductory matters, but I believe

22        you start talking about the incident around

23        4:27.  Let me go back a little bit.  Let's do 4

24        minutes.

25                  (Plaintiff's Exhibit 6 was marked for
```

Joseph Strzelecki
April 24, 2024                                    131

```
 1              Identification.)
 2                   (Playing audio recording.)
 3              MR. RICE:  I'm going to stop at 5 minutes
 4         and 20 seconds.
 5    BY MR. RICE:
 6         Q    During that portion you talked about
 7    information that you knew before you arrived on
 8    scene, correct?
 9         A    Yes.
10         Q    As you sit here today, do you have any
11    reason to dispute what you said in this interview
12    was accurate?
13         A    To dispute that it was accurate?
14         Q    Correct.  So again, to be less unwieldy.
15    If in this interview you said you were aware of
16    certain things before you arrived on the scene, as
17    you sit here today is there anything where you would
18    say no, that's wrong or incorrect?
19         A    No.
20         Q    Would you agree that from this interview
21    it appeared that you were listening to the radio
22    transmissions that we listened to a while ago in
23    this deposition?
24         A    Yes.
25         Q    And so does this interview suggest to you
```

Joseph Strzelecki
April 24, 2024                                      132

```
 1   that you heard and were aware of the information in

 2   those radio transmissions?

 3            MR. JOHNSON:  Form.  You can answer.

 4            THE WITNESS:  Yes.

 5   BY MR. RICE:

 6       Q    And specifically you knew before you

 7   arrived on scene that there was a female and husband

 8   party on one half, and a single male on the other

 9   half, fair?

10       A    Yes.

11       Q    And you knew that the male who was alone

12   was saying he was threatened by a firearm from the

13   person with the female, correct?

14       A    Yes.

15            MR. RICE:  I'm going to skip to 8 minutes

16       and 25 seconds.

17                (Playing video.)

18            MR. RICE:  I'm going to stop at 8:51.  And

19       I'll represent to you that you're talking about

20       encounter with Mr. Gould at this time.

21   BY MR. RICE:

22       Q    Is that statement in the interview

23   accurate, as you sit here today, that you did not

24   believe that Mr. Gould was armed during the initial

25   encounter?
```

Joseph Strzelecki
April 24, 2024                                          133

```
 1        A     Yes.

 2              MR. RICE:  I'll skip to 10:08.

 3                    (Playing video.)

 4              MR. RICE:  I'm going to stop at 10:21.

 5   BY MR. RICE:

 6        Q     Is that accurate, as you sit here today,

 7   that you did not fear for your safety at any point

 8   during the incident with Mr. Gould?

 9        A     Yes.

10              MR. RICE:  I'm going to skip to 12

11        minutes.

12                    (Playing video.)

13              MR. RICE:  I'm going to stop at 12:09.

14   BY MR. RICE:

15        Q     As you sit here today is that statement

16   still accurate?  That it was unclear to you why

17   Mr. Gould was being detained?

18        A     Yes.

19              MR. RICE:  I'm going to go to 17:40 -- or

20        17:37.  Let me skip back to 17:30.

21                    (Playing video.)

22              MR. RICE:  I'm going to stop at 17:47.

23   BY MR. RICE:

24        Q     During that portion, you would agree that

25   the fact that Mr. Gould had previously been
```

Joseph Strzelecki
April 24, 2024                                               134

1   victimized and threatened with a gun before

2   encountering you may have contributed to his

3   aggression, fair?

4        A    Yes.  During that, I was explaining what

5   was told to me by my sergeant.

6        Q    So is it fair to say that that's a

7   possibility -- or an understanding that came to you

8   after the incident?

9        A    Correct.

10       Q    Okay.  But as you sit here today, is that

11  still a fair understanding of the situation?

12       A    Yes.

13       Q    Do you know why Gould was released from

14  custody?

15       A    I don't know specifics.

16       Q    What's your understanding about why he was

17  released?

18       A    The supervisors were able to get the

19  parking lot video -- or not the parking lot video.

20  Video of the actual interaction and deemed that his

21  actions were because he was a victim in the incident

22  that we originally responded to, is my

23  understanding.

24            To the accuracy of that, you would have to

25  speak to the supervisors.

Joseph Strzelecki
April 24, 2024                                            135

1        Q      Were you involved in any way in that

2    decision to release Gould?

3        A      No.

4        Q      During your encounter with Gould at the

5    beginning of the incident, did you make any effort

6    to understand whether he was the victim or the

7    aggressor?

8        A      In the initial encounter.

9        Q      During the approximate 30 seconds that you

10   encountered Mr. Gould with Officer Guerriero, did

11   either you or Officer Guerriero make any efforts to

12   understand whether Gould was the victim or the

13   aggressor?

14       A      He didn't give us the opportunity.

15       Q      Did you or Officer Guerriero make my

16   efforts to identify whether he was the victim or the

17   aggressor?

18              MR. JOHNSON:  Form.  Asked and answered.

19              THE WITNESS:  He didn't give us the

20       opportunity.

21   BY MR. RICE:

22       Q      And how did Mr. Gould prevent you from

23   inquiring about that?

24       A      Not obeying lawful commands.

25       Q      Did you ask Mr. Gould whether he was the

Joseph Strzelecki
April 24, 2024                                      136

1  aggressor or the victim?

2        A    He didn't give us the opportunity.

3        Q    Why couldn't you have asked him whether he

4  was the aggressor or the victim?

5        A    I just answered that.  Because he didn't

6  give us the opportunity.  When we got there, he was

7  not obeying lawful commands and very agitated.  So

8  now we had to direct our attention to that.

9        Q    So you were focused on the agitation of

10  the situation, fair?

11        A    Scene safety.

12        Q    Are you familiar with a phenomenon related

13  to time lag and decision making?

14             MR. JOHNSON:  Form.  You can answer, if

15        you know.

16             THE WITNESS:  No.

17  BY MR. RICE:

18        Q    Are you trained on anything like a

19  reaction gap?

20        A    In what regards?

21        Q    Are you -- and again, I want to get to

22  your training and understanding.

23             Do you have any training or understanding

24  about the length of time that can occur from an

25  action occurring and an officer's ability to

Joseph Strzelecki
April 24, 2024                                            137

1    perceive that action and react?

2         A    Yes.

3         Q    Can you describe your training or

4    understanding of that issue?

5         A    There's something called O.O.D.A Loop.

6         Q    Can you spell it?

7         A    I don't know.

8         Q    Can you explain that for us?

9         A    We learned this in training, O.O.D.A Loop.

10   You know, essentially if -- for instance, take an X.

11   If someone is pointing a gun at you and you move off

12   to the side, they're O.O.D.A. Loop.  It takes

13   them -- whatever the math is in order to react, in

14   order for them to readjust to you.  So we're trained

15   more on safety things, but I do know of reaction

16   time and stuff like that.

17        Q    So is it fair to say that during an

18   encounter, especially a stressful one, certain time

19   lags can occur between perception, decision and

20   action?

21        A    Depending on the person.

22        Q    But that's something that can occur,

23   correct?

24        A    Sure.

25        Q    I mean, you're trained on it, right?

Joseph Strzelecki
April 24, 2024                                              138

1        A     Things of that nature, yeah.

2        Q     And why are you trained on that?

3        A     It's important for the line of work.

4        Q     Why is it important?

5        A     Because not everyone has the capability of

6    seeing what they see now and perceiving it for what

7    it is.

8        Q     Do you know whether that sort of gap can

9    occur with any sensory perception, not just sight?

10       A     I'm not a scientist.

11       Q     Would you have any reason to dispute that

12   it can occur with senses beyond sight?

13       A     I'm not a scientist.  I wouldn't be able

14   to tell you.

15       Q     But it is your understanding, essentially,

16   that action can occur and there's a delay between

17   when a person perceives that and processes it?

18             MR. JOHNSON:  Form.

19             THE WITNESS:  I'm not a scientist.

20   BY MR. RICE:

21       Q     How are you trained, though?

22       A     In regard to what?

23       Q     Do you know how long it is reasonable for

24   that time gap to exist?

25             MR. JOHNSON:  What time gap?

Joseph Strzelecki
April 24, 2024                                           139

```
 1              THE WITNESS:  I don't understand what
 2        you're saying here.
 3              MR. RICE:  And I want to go by what you
 4        described.
 5    BY MR. RICE:
 6        Q     You described a scenario where if an
 7    officer sees a threat, for example, right?
 8        A     Uh-huh.
 9        Q     Yes?
10        A     Yes.
11        Q     And an officer says I perceive a threat.
12    There is potentially a time lag between when the
13    threat initially occurred and when the officer
14    perceives and reacts to it, fair?
15        A     You'd have to ask a scientist.
16        Q     Are you trained on this?
17        A     Yeah.
18        Q     Then I want to go by your training.  Have
19    you been trained on time lag issues?
20        A     Issues?  No.  I mean, just on perception.
21        Q     What have you been trained on related to
22    perception?
23        A     Scenario-based trainings.
24        Q     What are those?  Describe them for me.
25        A     Basically a scenario is put in front of
```

Joseph Strzelecki
April 24, 2024                                          140

```
 1    you and you react.
 2         Q    How does your reaction time compare to the
 3    situation?
 4         A    Depends on the situation.
 5         Q    But there can be a lag in a reaction time,
 6    correct?
 7         A    Sure.
 8         Q    You're trained on that?
 9         A    Yeah.
10         Q    Okay.  Are you familiar at all of how
11    trauma can affect somebody's perception during an
12    incident?
13         A    No.
14         Q    You haven't been trained on that?
15         A    Not necessarily.
16         Q    Have you been trained on how trauma can
17    affect the people that you come into contact with?
18         A    Yes.
19         Q    How does trauma potentially affect
20    somebody?
21         A    It can create a negative barrier between
22    them and whatever the trauma was.
23         Q    Have you been trained -- or do you have an
24    understanding of any other effects?
25         A    Not that I can think of.
```

Joseph Strzelecki
April 24, 2024                                        141

```
 1        Q    Have all of your answers -- now that we're

 2   at the end of the deposition, have all of your

 3   answers that you've given today been complete?

 4        A    Yes.

 5        Q    Again, now that we're at the end, is

 6   everything that you said today been accurate, or do

 7   you want to go back and revisit any topics?

 8        A    I'm good.

 9        Q    Did you understand all of my questions

10   sufficiently to answer them or did you ask for

11   clarifications for all unclear questions?

12        A    I asked for clarification.

13        Q    And the ones you didn't ask for

14   clarifications for, you sufficiently understood?

15        A    Yes.

16             MR. RICE:  I have nothing further.

17             MR. ALEXANDER:  Let's go off the record

18        for a minute, guys?

19             MR. RICE:  Yes.  That's fine.

20                  (Discussion off the record.)

21             MR. RICE:  Back on the record.

22             MR. KING:  Deputy Strzelecki, I just have

23        a few questions for you.

24                  CROSS-EXAMINATION

25
```

Joseph Strzelecki
April 24, 2024                                          142

```
 1   BY MR. KING:
 2        Q    Let's talk about the drafting of the
 3   probable cause affidavit.
 4             You drafted the probable cause, right?
 5        A    Yes.
 6        Q    What did you do with it?
 7        A    Submitted it and then took the four copies
 8   that you're supposed to, to the jail.
 9        Q    After you submitted to Sergeant Beef, did
10   he immediately sign off on it?
11        A    Yes, I believe so.
12        Q    Did he make any corrections at all?
13        A    I don't remember, if I'm being honest.
14        Q    That's fine.  Did you ever talk to -- as
15   you were drafting it, before you drafted it, did you
16   speak with Sergeant Beef about the contents of the
17   probable cause affidavit?
18        A    I spoke to -- yeah, either him or Sergeant
19   Glass.  I believe it was Sergeant Beef though.
20        Q    What was the contents of that
21   conversation?  Did they tell you what to write or
22   did you --
23        A    Yeah, basically.  Basically they told me
24   what transpired and what the PC was on behalf of
25   Officer Guerriero.
```

Joseph Strzelecki
April 24, 2024                                                143

```
 1        Q    And you took that with your knowledge of
 2   what was there?
 3        A    Yes.
 4        Q    And you drafted the PC?
 5        A    Yes.
 6        Q    Did you ever talk to Officer Guerriero
 7   about what the PC was?
 8        A    No.  She got transported to the hospital.
 9        Q    So let me ask you this.  When you -- in
10   the time that intervened, you arrived at the scene.
11   And initially when you got out of the car there was
12   a vehicle between you and Mr. Gould?
13        A    Yes.
14        Q    Tell me what your view was when you got
15   out of the car.
16        A    A bit obstructed because of the vehicle.
17        Q    Were you able to see -- what part of Mr.
18   Gould were you able to see?
19        A    I don't recall.
20        Q    As you came around the car, were you able
21   to see him better?
22        A    Yes.
23        Q    Counsel asked about Mr. Gould's behavior.
24   Tell me about what you observed with Mr. Gould once
25   Officer Guerriero gave commands, what did he do?
```

Joseph Strzelecki
April 24, 2024                                    144

```
 1        A     He was very agitated.  He was trying to

 2   incite officers by being very rude, you know,

 3   unjust.

 4        Q     Are you familiar with nonverbal cues of an

 5   intimate attack?

 6        A     Yes.

 7        Q     Were you trained on that in this academy?

 8        A     Yes.

 9        Q     And are some of the nonverbal cues of an

10   attack -- would it be fair to say that some of them

11   are if the person blades their body to you?

12            MR. RICE:  Object to form.

13            THE WITNESS:  Yes.

14   BY MR. KING:

15        Q     Would you agree that -- well, tell me what

16   other nonverbal cues do you remember from your

17   training.

18        A     Could be them looking at a specific area.

19   Could be the blading like you said, distraction.

20        Q     What about angry tone?

21        A     Yeah.

22        Q     When you approached Mr. Gould, you

23   testified earlier that you didn't -- and I think

24   some of it was left out.

25            I want to go back to your conversation
```

Joseph Strzelecki
April 24, 2024                                    145

1   with the detective during the internal affairs; do

2   you remember that?

3       A    Yes.

4       Q    You made the comment that it didn't appear

5   outwardly that he was armed; is that accurate?

6       A    Yes.

7       Q    Could you see into his right pocket?

8       A    No.

9       Q    And did he ultimately have something in

10  his right pocket?

11      A    Yes.

12      Q    Could you see into his left pocket?

13      A    No.

14      Q    Do you know if he had anything in his left

15  pocket?

16      A    I do not.

17      Q    Could you see behind him?

18      A    I could not.

19      Q    At the time that this took place, you

20  could not know -- or did you know who Mr. Gould was

21  based on everything that took place -- based on the

22  information that you received?

23           MR. RICE:  Objection.  Form.

24           THE WITNESS:  No, I did not.

25

Joseph Strzelecki
April 24, 2024                                          146

```
 1   BY MR. KING:
 2        Q    And is it safe to say that during those
 3   interactions as a police officer, your main concern
 4   is that safety?
 5             MR. RICE:  Objection to form.
 6             THE WITNESS:  Absolutely.
 7   BY MR. KING:
 8        Q    Based on your knowledge when you arrived,
 9   was it unreasonable for Officer Guerriero to be
10   concerned that Mr. Gould was carrying a weapon?
11             MR. RICE:  Objection.  Form.
12             THE WITNESS:  Not unreasonable, no.
13             MR. KING:  That's all I have.
14             MR. JOHNSON:  Officer, just one question.
15                  CROSS-EXAMINATION
16   BY MR. JOHNSON:
17        Q    You prepared your report based on your
18   presence since, impressions on scene, and what you
19   observed and saw and did without the benefit of
20   reviewing this incident on a frame-by-frame video
21   recording, right?
22             MR. RICE:  Objection to form.
23             THE WITNESS:  Correct.
24             MR. JOHNSON:  That's all I have.
25             MR. RICE:  I have some brief redirect.
```

Joseph Strzelecki
April 24, 2024                                                      147

1                     REDIRECT EXAMINATION

2    BY MR. RICE:

3         Q    So you stated that an angry tone can be an

4    indicator of an attack, fair?

5         A    Yes.

6         Q    Would you agree that Officer Guerriero

7    used an angry tone toward Mr. Gould throughout the

8    encounter?

9              MR. JOHNSON:  Form.

10             THE WITNESS:  Not throughout, but at a

11        point she did after the initial encounter.

12   BY MR. RICE:

13        Q    At times you'd agree that Officer

14   Guerriero used an angry tone towards Mr. Gould,

15   correct?

16        A    Yes.

17        Q    And that also was combined with Officer

18   Guerriero drawing her weapon and pointing at

19   Mr. Gould, correct?

20        A    Yeah.

21        Q    And she also used physical force on Mr.

22   Gould to put handcuffs on him.  Correct?

23        A    Yeah, to detain him.

24        Q    In your opinion, would it be reasonable

25   for Mr. Gould to have feared an attack by Officer

Joseph Strzelecki
April 24, 2024                                          148

```
 1    Guerriero based on her tone and actions?
 2              MR. JOHNSON:  Form.  You can answer.
 3              THE WITNESS:  You said would it be fair?
 4              MR. RICE:  Correct.
 5              THE WITNESS:  Sure.
 6    BY MR. RICE:
 7         Q    It would be consistent with that training,
 8    correct?
 9              MR. JOHNSON:  Form.
10              THE WITNESS:  Sure.
11              MR. RICE:  I also want to briefly talk
12         about the use of force.
13    BY MR. RICE:
14         Q    Counsel asked you that you could not see
15    what was in Mr. Gould's pockets, correct?
16         A    Correct.
17         Q    Is it your understanding that you can use
18    force based on an absence of information, or do you
19    need specific information that suggests a potential
20    threat?
21              MR. JOHNSON:  Form.  Compound.  Can you
22         answer.
23              THE WITNESS:  We need information that we
24         believe that there's a threat.
25
```

Joseph Strzelecki
April 24, 2024                                       149

```
 1    BY MR. RICE:
 2         Q    And just to be clear.  For use of force
 3    purposes a potential threat needs to be based on
 4    information, not only the absence of information,
 5    fair?
 6         A    Sure.
 7         Q    After questioned by other counsel, do you
 8    wish to change any answers you provided previously?
 9         A    No.
10              MR. RICE:  I have nothing further.
11              MR. JOHNSON:  Nothing from us.  We'll
12         read.
13              Are you ordering?
14              MR. RICE:  Yes.  We'll take an electronic
15         copy.
16              MR. JOHNSON:  We'll take a copy.
17              MR. KING:  We'll take a copy too.
18                  (The deposition concluded at 4:15
19         p.m.)
20
21
22
23
24
25
```

Joseph Strzelecki
April 24, 2024                                            150

ERRATA SHEET

IN RE: RYAN GOULD v. BETHANY GUERRIERO, et ano.
JOSEPH STRZELECKI
April 24, 2024
U.S. LEGAL JOB #6566647

DO NOT WRITE ON TRANSCRIPT, ENTER ANY CHANGES HERE

Page #| Line #|  Change                      |  Reason

_____| _____| _____|_____

_____| _____| _____|_____

_____| _____| _____|_____

_____| _____| _____|_____

_____| _____| _____|_____

_____| _____| _____|_____

_____| _____| _____|_____

_____| _____| _____|_____

_____| _____| _____|_____

_____| _____| _____|_____

_____| _____| _____|_____

_____| _____| _____|_____

Under penalty of perjury, I declare that I have read the
foregoing document and that the facts stated in it are
true.

_____              _____
Date                         JOSEPH STRZELECKI

Please return via e-mail at
southeastorders@uslegalsupport.com

or by mail to U.S. Legal Support Inc.
ATTN: TRANSCRIPT PRODUCTION, 16825 Northchase Drive,
Suite 900, Houston, Texas 77060

Joseph Strzelecki
April 24, 2024                                              151

```
1   STATE OF FLORIDA      )
                          )
2   COUNTY OF PALM BEACH)

3

4           I, Renne Burns, Court Reporter, do hereby

5   certify:

6           That prior to being examined, the witness in

7   the foregoing proceedings was by me duly sworn to

8   testify to the truth, the whole truth, and nothing but

9   the truth;

10          That said proceedings were taken before me at

11  the time and places therein set forth and were taken

12  down by me in shorthand and thereafter transcribed into

13  typewriting under my direction and supervision;

14          I further certify that I am neither counsel

15  for, nor related to, any party to said proceedings, not

16  in anywise interested in the outcome thereof.

17          In witness whereof, I have hereunto subscribed

18  my name.

19  Dated: May 13, 2024

20

21

22  RENNE BURNS, Court Reporter
    Notary No. #HH291489
23  Expires: 09/05/26

24

25
```

1            REPORTER'S DEPOSITION CERTIFICATE

2

3            I, RENNE BURNS, Court Reporter, certify that I

4    was authorized to and did stenographically report the

5    deposition of JOHN STRZELECKI, the witness herein; that

6    a review of the transcript was requested; that the

7    foregoing pages numbered from 1 to 154 inclusive is a

8    true and complete record of my stenographic notes of the

9    deposition by said witness; and that this

10   computer-assisted transcript was prepared under my

11   supervision.

12            I further certify that I am not a relative,

13   employee, attorney or counsel of any of the parties, nor

14   am I a relative or employee of any of the parties'

15   attorney or counsel connected with the action.

16            DATED this 13th day of May, 2024

17

18   _____

19            RENNE BURNS, Court Reporter

20

21

22

23

24

25

```
                    WITNESS NOTIFICATION LETTER

May 13, 2024


JOSEPH STRZELECKI
c/o W. HAMPTON JOHNSON, ESQ.
JOHNSON, ANSELMO, MURDOCH, BURKE, PIPER
2455 E Sunrise Blvd., Ste 1000
Fort Lauderdale, FL 33304
954-463-2444


RE: RYAN GOULD v. BETHANY GUERRIERO, et ano.
    Deposition of JOSEPH STRZELECKI
    U.S. Legal Support Job No. 6566647


The transcript of the above proceeding is now available
for your review.


The transcript of the above-referenced proceeding has
been prepared and is being provided to your office for
review by the witness.



Please call (305) 373-8404 to schedule an appointment
between the hours of 9:00 a.m. and 4:00 p.m., Monday
through Friday, at a U.S. Legal Support office located
nearest you.


We respectfully request that the witness complete their
review by 30 days and return the errata sheet to the
below address or via e-mail to:
southeastproduction@uslegalsupport.com


Sincerely,

Renne Burns
U.S. Legal Support, Inc.
ATTN: TRANSCRIPT PRODUCTION
16825 Northchase Drive, Ste 900
Huston, Texas 77060
```

```
CC via transcript:
Eric Rice, Esq.
eric@ricedefense.com
W. Hamptom Johnson, Esq.
whjohnson@jambg.com
Rick King, Esq.
rick@kingmorselaw.com
```

Joseph Strzelecki
April 24, 2024                                    1

---
**1**
---

**1**
  26:10,16
  27:20 28:6
  101:10
**10**
  78:22
**10500**
  6:22
**10:08**
  133:2
**10:21**
  133:4
**11:32:58**
  52:2
**11:33:11**
  52:5
**11:33:16**
  80:16
**11:33:20**
  52:12
**11:33:25**
  80:23
**11:33:26**
  52:22
**11:33:29**
  53:15
**11:33:54**
  54:3
**11:35:02**
  81:13 86:25
**12**
  133:10
**120**
  29:22 32:17
**120-pounds**
  29:18
**12:09**
  133:13
**16th**
  6:18
**17:30**
  133:20

**17:37**
  133:20
**17:40**
  133:19
**17:47**
  133:22
**19**
  88:15
**1:30**
  4:2
**1:31**
  28:18
**1:41**
  28:21 29:2

---
**2**
---

**2**
  51:2,4 52:1
  87:3 88:15
  89:11 113:21
**20**
  27:20 75:21
  131:4
**20-year**
  69:8 83:12,
  14
**20/20**
  73:24
**2024**
  4:2
**22**
  87:3 89:11
  95:2 114:11
**23**
  101:11 104:5
**24**
  4:2
**25**
  132:16
**2:03**
  88:13
**2:11**
  29:5,11
**2:20**
  29:14,24

**2:47**
  78:25
**2:53**
  89:23
**2:54**
  79:1

---
**3**
---

**3**
  30:18 79:8,
  10 90:14
**30**
  34:6 75:16,
  21 80:25
  81:1,7
  115:12
  130:20 135:9
**31**
  28:6
**33**
  26:20 27:17
**35**
  100:13
**3:17**
  30:2
**3:47**
  92:12

---
**4**
---

**4**
  95:1 96:4,6,
  20 114:11
  130:23
**41**
  102:16
**47**
  90:15
**4:02**
  92:14 94:17,
  24
**4:15**
  149:18
**4:27**
  130:23

---
**5**
---

**5**
  105:22,23
  108:2 131:3
**50**
  96:22 99:4
**51**
  99:6
**52**
  102:19
  115:14
**54**
  99:23 100:15
**58**
  104:7

---
**6**
---

**6**
  130:18,25

---
**8**
---

**8**
  132:15
**8:51**
  132:18

---
**9**
---

**90**
  61:17 70:8
**96**
  6:18
**99.9**
  32:9

---
**A**
---

**a.m.**
  52:2
**ability**
  6:10 79:5
  86:20 136:25

Joseph Strzelecki
April 24, 2024

2

**able**
 5:3 9:10
 35:11 37:8,
 14,17 68:20
 81:15 95:5,
 13 100:17
 122:23
 134:18
 138:13
 143:17,18,20
**above**
 4:6 89:25
**absence**
 121:2 148:18
 149:4
**Absolutely**
 51:9 56:9
 67:2,6 86:23
 92:3 103:23
 125:13 146:6
**academy**
 9:22 144:7
**accept**
 119:7
**account**
 108:18,19
 109:24,25
 110:3
**accountable**
 85:5,6 86:9
**accuracy**
 134:24
**accurate**
 103:19
 104:13
 105:16
 106:7,11,25
 108:25
 115:10
 116:10 129:6
 131:12,13
 132:23
 133:6,16
 141:6 145:5
**accurately**
 91:1
**act**

 78:12 82:5
**acted**
 82:4 86:2
**acting**
 13:21 48:23
 59:10 94:20
**action**
 136:25
 137:1,20
 138:16
**actions**
 16:12 134:21
 148:1
**activate**
 79:19 81:8
**activated**
 79:14
**active**
 15:21,24
**actively**
 15:18 16:1,2
 17:16
**activity**
 89:6 92:17
 106:17
**actual**
 134:20
**additional**
 59:14
**address**
 4:13 6:19
**advance**
 7:6
**advantage**
 33:25
**advice**
 8:4
**affair**
 125:23
**affairs**
 125:19
 126:20
 127:6,11
 130:19 145:1
**affect**
 140:11,17,19

**affects**
 79:5
**affidavit**
 123:14,15
 124:9,10,11,
 17 142:3,17
**affirmatively**
 128:8
**afternoon**
 4:11
**age**
 4:6
**aggression**
 134:3
**aggressive**
 92:17
**aggressor**
 87:13 91:12
 93:14 135:7,
 13,17 136:1,
 4
**agitated**
 38:6,15,16
 77:24 82:3,
 18 136:7
 144:1
**agitation**
 78:2 84:1
 136:9
**ago**
 25:8 49:25
 131:22
**agree**
 29:7 30:4
 48:17 70:3
 78:4 86:14
 87:15 89:14
 95:21 96:9,
 25 97:15
 99:25 100:19
 102:22
 105:16
 109:9,15
 110:6 112:10
 115:17 116:2
 117:11
 127:15,21

 131:20
 133:24
 144:15
 147:6,13
**ahead**
 51:1,18
**ALEXANDER**
 51:18 141:17
**alleged**
 39:22 61:8
**allow**
 94:13
**allows**
 58:13,17
**amount**
 104:10
**analysis**
 13:19
**and/or**
 93:7
**angle**
 55:15
**angry**
 144:20
 147:3,7,14
**answer**
 5:13,23 6:5
 10:2 13:8
 18:11,20
 19:9 20:9
 21:21 22:25
 23:7 24:2,20
 35:8 40:1
 41:3 45:5
 47:14 48:21
 50:13 55:18
 57:23 58:6,
 22 60:16
 62:10,15
 68:5,10 70:6
 71:7,24
 72:14,19
 73:3,20
 74:9,21 75:9
 76:11 84:14
 85:1 89:7
 93:16 94:9

Joseph Strzelecki
April 24, 2024

3

103:13
110:18
111:14
112:15,21
117:14
118:19 128:3
132:3 136:14
141:10
148:2,22
**answered**
71:23 73:1
111:13
135:18 136:5
**answers**
4:25 141:1,3
149:8
**ant**
59:14
**anybody**
12:7,9,16
51:11 63:12
76:2 79:21
92:10 125:14
**anyone**
4:25 7:5,13
17:21 108:10
**appeared**
87:11 131:21
**apply**
82:17
**appreciate**
75:12
**approach**
98:7
**approached**
38:20 98:4
144:22
**appropriate**
74:7 94:22
98:24
**approximate**
135:9
**approximately**
53:7 55:3
61:17
**April**
4:2

**area**
28:24 32:1
90:7 91:5
121:9 144:18
**argue**
110:11
**arguing**
113:22
**armed**
50:20 62:6,
9,23 63:7
64:8 69:11
91:18 93:14
97:24 132:24
145:5
**arms**
89:25 95:19
**around**
41:8 51:13
128:4 130:22
143:20
**arrest**
15:19 64:21,
25 65:1
75:11 76:15
119:3 120:10
123:14
124:9,17
**arrested**
47:3 64:10,
14,17,20,23
77:16,20
**arrests**
106:15
**arrival**
33:16
**arrive**
31:4
**arrived**
32:21 33:12,
13 34:16
36:4 39:5,8
41:9 131:7,
16 132:7
143:10 146:8
**articulable**
19:1 20:6

42:11
**articulate**
68:13
**articulated**
18:3
**articulation**
44:21
**asked**
33:17 41:22,
23 44:17
48:24 62:8,
22 71:23
72:25 75:18,
23,25 88:24
93:7 111:13
112:25
115:20
135:18 136:3
141:12
143:23
148:14
**asking**
13:12 19:21
20:1 43:5
47:24 59:13
68:20,22
72:11 73:13,
19 74:1,5
76:8 77:10
88:19 103:19
105:13 111:8
114:25 115:7
116:6 117:9
120:18
126:15 127:5
128:7,14
**assist**
43:12
**assume**
5:22 42:24
**assumed**
69:4
**assuming**
126:1
**attack**
144:5,10
147:4,25

**attempt**
46:12 75:2,
7,14
**attempting**
15:19
**attention**
25:5 136:8
**attorney**
4:17 7:22,24
8:3 11:8
12:6,10,17
18:18,21
73:3
**attorneys**
7:14
**attributing**
120:11
**audible**
5:17
**audio**
8:9 80:25
81:4 96:10
130:18 131:2
**authoring**
115:4
**authority**
23:25 86:20
**authorized**
14:17 15:7
**available**
32:13,21
65:11
**aware**
22:5 40:16,
21 84:7 85:8
125:14
131:15 132:1

---

**B**

**Bachelors**
9:2
**back**
6:1 11:12
21:16 34:6,
10 35:20
50:23 54:19,

Joseph Strzelecki
April 24, 2024

4

20 72:11
73:24 79:2
82:1 88:12
90:23 94:24
100:13
105:11
113:12
114:8,10
116:3 123:21
125:9,11
130:23
133:20
141:7,21
144:25
**backside**
63:25
**backwards**
116:8 128:13
**bad**
86:9
**barrier**
140:21
**base**
63:10
104:17,18
**based**
24:8 33:24
34:2 44:6
45:2 46:12
48:22 57:2
67:23 76:12
77:3 87:22
89:2 100:5
104:22
105:13
108:20
109:24 110:2
122:4 127:15
145:21
146:8,17
148:1,18
149:3
**basic**
58:11
**basically**
65:12 139:25
142:23

**basis**
18:5,9
19:19,22
20:3,5 22:24
23:3 40:4
44:13,18
49:7 60:3,21
63:9 77:4,17
86:5
**bathing**
35:5,7,14
39:2
**Beach**
4:1 6:23,25
7:2,3 9:23
84:2
**bear**
95:19
**beard**
29:18,19
**Beef**
122:13,14
142:9,16,19
**beginning**
76:22 80:13
135:5
**behalf**
142:24
**behavior**
84:7,20,24
85:9 143:23
**behind**
35:11,19
52:17 145:17
**beings**
82:8
**believe**
29:19 30:17,
19 33:15
34:14,17
38:18 45:16
46:25 63:16
70:9 73:2
77:16 80:5
96:18 116:19
121:8 122:13
126:11,12

130:21
132:24
142:11,19
148:24
**believed**
87:23
**benefit**
81:23 99:13
103:6 113:25
115:8 116:7
117:10
146:19
**benefits**
101:15
**besides**
7:13 12:10
21:2 77:17
83:25 116:17
124:6
**best**
33:4 34:11
107:1
**better**
10:6 143:21
**birth**
6:17
**bit**
18:14 27:15
77:24 82:3
128:5 130:23
143:16
**blades**
144:11
**blading**
144:19
**blocking**
34:15
**bodily**
67:1
**body**
56:3,8
70:14,22
101:13
144:11
**body-worn**
79:8,13
80:12,14,22

81:12 87:2
88:14 89:10,
21 90:13
92:13 94:25
96:5,9,17,21
99:5,22
100:14 101:9
102:18 104:6
**booking**
121:12
123:5,19
**break**
6:3,6 78:23
79:4
**brief**
146:25
**briefly**
8:24 148:11
**bring**
125:11
**broadcast**
51:15
**brought**
125:9
**buddy**
20:16
**buffer**
81:2
**bulge**
35:23 90:11,
18
**bulges**
36:3 70:17
**business**
10:18
**button**
81:2,8 96:14

---

C

**call**
14:8 15:1,2
25:17 30:14
37:1 44:22
58:24 59:3,
15 60:10
80:10

Joseph Strzelecki
April 24, 2024
5

called
  29:8 31:25
  32:3 137:5
caller
  28:9,24 29:8
calling
  30:5
callouts
  31:7,11,17
calls
  21:9 32:9
calm
  82:23 83:14
  93:10
camera
  51:8 79:9,
  14,16 80:12,
  14,22 81:12
  96:5,10,17
  97:1 101:14
capability
  138:5
capacity
  10:23 13:8
captured
  12:20
car
  32:22 33:6
  34:24 36:19,
  20 37:7,15
  43:18 80:18
  143:11,15,20
carry
  18:20 92:5
carrying
  146:10
case-by-case
  60:3
category
  16:4
caused
  85:8
CCW
  28:9 31:25
  93:7
cell
  33:21 36:5,

7,13 45:14,
17 49:14
50:17,22
52:15 53:3
54:14 55:4
109:6 113:11
117:3 122:25
123:1
center
  109:2 123:20
certain
  24:14 90:8
  91:6 107:11
  108:10
  131:16
  137:18
certification
  9:14
certifications
  9:4,6
change
  149:8
changed
  16:19,20
charge
  46:24 76:9
  106:16 120:3
  121:22
charged
  8:21 18:1
  85:21
charges
  124:18
chest
  79:17
chief
  126:1
circumstance
  15:7 61:2
  74:12 83:18,
  21
circumstances
  13:7,15,19
  14:23,25
  58:9 59:24
  74:3

civilian
  14:10
clarification
  5:20,21 27:4
  75:12 141:12
clarifications
  141:11,14
clarified
  6:2
clarify
  16:21 18:13
  27:9,14 73:5
  88:9
clear
  11:15 13:12
  18:22 28:14
  45:2 68:21
  83:19 88:19
  99:12 103:5
  107:8,22
  122:9 126:23
  149:2
clearly
  5:19 33:2
cliche
  10:2
close
  128:21
closer
  129:22
clubhouse
  27:24 32:8
code
  17:5 30:18
combined
  147:17
come
  51:11,13
  118:23
  123:21
  140:17
comes
  80:25
comfortable
  60:7

command
  17:25 18:6,
  8,10 19:7,
  13,15,18,22,
  24 22:22,24
  23:4 38:7,16
  43:10,25
  44:13,18
  45:23 46:6,7
  47:10,17,20
  48:7,13
  98:15,16,18,
  21,25 100:1,
  4,8,20
  101:22
  102:3,6,12,
  15 103:8
  104:24
  105:6,15
  110:11,13
  111:3,5,9,
  10,12,24
  112:13
  113:2,7,8,9,
  10,11,14,20,
  21 114:19,
  22,24
  116:12,13,23
  117:23,24,25
commanded
  38:9 97:1
  116:16
commands
  16:2,10
  17:16 18:3
  24:13 45:16,
  19,24 77:15
  103:11,20
  104:14
  105:17
  109:5,10,14,
  16,17 110:3,
  16,25
  111:19,21,22
  112:3,19
  113:4 114:1,
  16,18,21
  115:10 116:9

Joseph Strzelecki
April 24, 2024                                        6

117:2,5,12
118:4,7,16
119:5 135:24
136:7 143:25
**comment**
26:22 27:1,
23 28:11
47:9 145:4
**comments**
4:25
**committed**
42:12 76:5
77:4,13
**committing**
24:18 91:16
**common**
37:13
**compare**
140:2
**compared**
22:13
**complete**
141:3
**compliance**
23:21
**compliant**
46:1
**Compound**
148:21
**conceal**
70:22
**concealed**
92:5
**concepts**
13:10
**concern**
37:1 50:2
68:7,14,20,
22 78:2
146:3
**concerned**
67:24 69:14
78:10 92:1,
22 146:10
**concerns**
67:15 81:24
82:2 93:6

94:17 122:20
**concluded**
149:18
**conclusion**
41:7
**conclusions**
41:5
**conduct**
47:2,5 83:8
106:20
126:16,17,
19,21 127:7,
10,16,25
128:9,14,16,
22
**conducted**
129:19
**confirm**
114:9
**confusing**
27:15
**confusion**
48:18
**consensual**
20:12,14,15,
20 21:1,3,5
39:16
**consent**
95:14
**consider**
9:12 15:11,
18 41:18
68:20 71:20
**considered**
63:6
**considering**
36:23
**consistent**
46:2 148:7
**constitute**
17:22 64:21
**constituted**
111:5
**constitutes**
17:15
**contact**
42:23 44:7

60:20 79:21
140:17
**contention**
49:11 114:10
**contentious**
46:15
**contents**
142:16,20
**continue**
27:16 79:5
86:24 99:3
115:23
**continued**
17:1
**contributed**
134:2
**control**
24:1,3 82:25
83:3
**conversation**
93:15,24
94:7 97:24
98:11 122:21
142:21
144:25
**conversations**
7:10,14 11:8
12:15,16
88:8
**conversely**
61:7
**convey**
91:1
**convicted**
8:21
**cool**
78:5
**cooperative**
60:23
**copies**
142:7
**copy**
52:1 108:2
149:15,16,17
**correct**
8:13,19 9:25
10:9,13

11:3,20,25
12:22,24
13:16 14:11,
12 17:8 18:7
19:19,20
21:15 22:11,
24 23:5
26:24 27:24
28:2,9,25
29:18,21,22
31:7 32:14,
18,22 35:20,
21,23 36:8,
14 37:4,8,15
38:10 40:22
41:24 43:1,
3,15,18,21
45:15,21
47:3,17
48:2,20
49:2,6,22
50:4,10
52:18,19,25
53:18,19,21,
22,24,25
54:6,7,9,10
55:12 56:5
57:12,13,15
62:1,3,6,9
63:4,7,15,23
64:1,15,18
67:1,5,22
69:25 70:14,
17,22,24
71:3,4 73:16
74:20 75:24
76:1,19,23
77:1,8,20
78:8,15
79:14,23
80:2,7,19
81:2,6,9,17,
20,21 83:19
84:20,24
85:17,22,25
86:4,15,21
87:13,17,21
88:5,8,22,
23,25 89:1,

3,4,18,19
90:1,4,5,21
91:2,3,9,10,
13,14,16,17,
18,19 92:5,
20 93:15
95:14,15,16,
17,19,20,25
96:2,11,12,
14,15 97:3,
6,7 98:15,18
99:9,20
102:25 103:3
105:4,7,8,
11,12 106:3,
23,24 107:2,
3,5,6 108:4,
8 110:7,13
112:1
115:18,21
116:4,5,20,
24 117:3,4,
7,8,21
119:5,10,19,
20,22 120:4,
21,22 121:5,
7,15 125:18
126:25
127:4,13,14,
22 129:3,7,8
131:8,14
132:13 134:9
137:23 140:6
146:23
147:15,19,22
148:4,8,15,
16

**corrections**
142:12

**correctly**
119:16

**counsel**
143:23
148:14 149:7

**COUNTY**
4:1

**couple**
54:12 65:3

99:12

**course**
9:12 10:18
25:20 31:5,8
85:10 89:5

**court**
4:24

**cover**
123:21 124:4

**coverage**
65:6

**covers**
34:3

**create**
35:23 140:21

**created**
7:23 57:21

**crime**
8:22 15:11
17:10,22
21:10 23:18
24:18,25
39:14,22
40:6,9
42:12,18,22
76:5,10
77:5,14
85:22 91:16

**criminal**
18:1,10
19:7,24 20:8
22:11 23:5
43:6 45:3,10
106:17

**CROSS-
EXAMINATION**
141:24
146:15

**cues**
44:10 144:4,
9,16

**curious**
90:10 114:16

**cursing**
22:19 46:25

**custodian**
10:16

**custody**
11:19 63:11
75:8,24
134:14

————————

————————

**D**

**daily**
49:7 63:8

**danger**
66:24,25

**date**
6:17 16:16
17:7 129:21

**day**
12:18 82:9

**deadly**
66:16,22
67:22 69:5

**deal**
74:14

**dealt**
71:11

**death**
67:1

**debating**
113:13

**decision**
120:6 135:2
136:13
137:19

**deemed**
119:3 134:20

**deescalate**
82:14,20,23
83:5,8

**deescalation**
82:11

**defer**
62:19 83:22,
23

**defied**
33:18 109:5,
14,16,17
110:15
111:12,23
112:3,19

115:9 116:9
117:2,12,23
118:4,7,17
119:5

**defy**
111:21
112:13 113:7

**defying**
110:11,24
111:18

**degree**
9:2

**delay**
138:16

**demeanor**
13:21 37:24,
25 38:2
59:10 77:22
81:24 83:16
93:1,2,5,11
94:19 123:3

**department**
7:1,3 9:24
10:16 11:13,
19

**depend**
14:24 58:20
59:8,9,23
86:6

**depending**
23:21 58:8,
19 60:18,19
127:19
137:21

**Depends**
140:4

**deposition**
4:18,19 5:2,
8 6:11 7:6,
15,18 8:5
79:5 131:23
141:2 149:18

**Deputy**
141:22

**describe**
8:24 9:18
15:6,24 16:7

Joseph Strzelecki
April 24, 2024

8

17:3 23:15
46:20 65:7
84:11 93:5
125:22 137:3
139:24
**described**
32:16 47:16
139:4,6
**description**
25:25 106:11
**deserve**
85:15 86:3
**destroy**
125:12
**destroyed**
123:10
125:15
**detail**
119:16
**details**
25:10,11
60:4 104:20
**detain**
20:13 23:17,
20,22 122:6
147:23
**detained**
34:5 42:2,8
61:24 64:15,
18 75:17,21
85:24 133:17
**detaining**
23:23
**detective**
145:1
**detention**
23:16 24:12,
15,19 25:1
121:9
**detentions**
23:11
**determination**
67:19
**determined**
76:6,14
127:19

**difference**
22:5,9,15
**different**
13:3,4 23:23
55:15 74:3,4
97:16
**direct**
4:9 122:2,5
136:8
**directed**
84:3
**direction**
84:16
**directly**
65:5 83:7
**directs**
18:21
**discourage**
108:13
**discuss**
121:24
**discussion**
141:20
**discussions**
12:19 121:20
**disobey**
18:9 102:3,6
103:11
**disobeyed**
77:15 100:7,
20 101:22
103:7,20
104:14
105:17
109:10 110:3
111:9 114:18
**disobeying**
17:21 43:25
111:5
114:20,23
**dispatch**
28:8,23
29:16 32:11
**dispatched**
30:13
**dispute**
49:10 87:25

128:2
131:11,13
138:11
**disregard**
18:9 19:23
23:4
**disregards**
19:6
**distance**
37:6
**distinguishes**
21:5
**distracted**
30:22,23
**distraction**
144:19
**document**
106:6
**Documentation**
106:15
**documents**
7:17,20,22,
23 8:2 124:7
**doing**
17:17 20:16
22:20 41:23
44:6 98:16
111:17
**doubt**
107:12
**doubtful**
107:15
**doubts**
107:11
**drafted**
142:4,15
143:4
**drafting**
142:2,15
**draw**
58:13
**drawing**
53:9 94:21
95:5 147:18
**drawn**
66:19

**draws**
55:5
**dressed**
35:2
**drew**
33:23 52:25
56:13,20
57:1 67:7
**driver's**
93:8
**driving**
30:22
**due**
36:25 48:18
130:12
**duly**
4:6
**duties**
39:4,8
**duty**
14:6 16:25
69:25 74:15,
17,19

---

**E**

**earlier**
144:23
**educated**
12:24
**education**
8:25
**effects**
140:24
**effort**
135:5
**efforts**
135:11,16
**eight**
53:8 55:3
**either**
27:10 28:15
41:1 135:11
142:18
**electronic**
149:14

**emails**
  12:5,6
**emotionally**
  78:5,11
**encounter**
  38:1 49:4
  51:8,17
  54:13 76:22
  77:19,23
  87:1 88:21
  96:11 97:3,
  16,19 98:22
  101:17
  132:20,25
  135:4,8
  137:18
  147:8,11
**encountered**
  135:10
**encountering**
  134:2
**encourage**
  108:13
**end**
  82:9 86:3
  141:2,5
**enforcement**
  9:1,19 12:23
**engage**
  24:15,18
  25:1 39:19,
  24 55:8 94:7
**engaged**
  42:17,22
  127:16,25
**engages**
  85:9
**engaging**
  92:17
**ensure**
  108:7
**entire**
  81:16 82:23
**entirety**
  63:13
**Eric**
  4:16

**essentially**
  23:24 55:12
  79:16 95:11
  124:14 128:7
  137:10
  138:15
**ethical**
  17:5
**evade**
  15:19
**evaluate**
  13:15
**everyone**
  44:24 45:12
  85:5 138:5
**evidence**
  123:16
**exact**
  129:21
**exactly**
  34:4 55:20
**EXAMINATION**
  4:9 147:1
**excessive**
  65:14
**Exhibit**
  26:10,16
  51:2,4 79:8,
  10 96:4,6,20
  105:21,23
  108:2 114:11
  130:18,25
**exist**
  138:24
**existed**
  44:18 74:19
  76:9
**exists**
  66:11
**expect**
  5:22 7:12
**expected**
  71:12 82:5
**experience**
  10:4 33:24
  34:2 57:2
  65:8

**experienced**
  84:12,21,25
  95:9
**explain**
  112:24 137:8
**explained**
  28:23 29:16
  88:3
**explaining**
  134:4
**explicit**
  111:21
**explicitly**
  84:4 111:22
**express**
  122:20
**extent**
  118:6 126:14

---

### F

**fact**
  9:5 36:25
  45:3 50:17
  63:7 64:8
  69:11,13
  70:2 72:20
  75:22 98:19
  105:13 111:2
  119:19
  133:25
**factor**
  15:13,17
**factors**
  13:18 15:10
  59:5,14
**facts**
  46:20 49:22
  60:6,13
  73:10,14
  77:12 107:2,
  24,25 115:3
**factually**
  115:10 116:9
**failed**
  45:20 46:5

**failing**
  45:23
**fair**
  15:4 16:22
  21:25 22:1
  23:24 24:24
  29:9 31:14,
  17 34:12,22
  35:13 37:6,
  20 42:16
  44:9 45:4,8
  46:16 47:14
  53:7 54:23
  55:5 56:2
  60:8 62:19
  66:14 67:21
  68:14 69:4
  71:20 83:1,
  22 85:15
  86:10,12,19
  90:24 91:15
  98:6 99:14
  100:7 101:21
  102:24
  103:7,10
  107:16,25
  108:17,19
  109:11,18
  114:3 117:5
  118:1 119:12
  128:23,25
  130:15 132:9
  134:3,6,11
  136:10
  137:17
  139:14
  144:10 147:4
  148:3 149:5
**false**
  129:17
**familiar**
  8:15 15:22
  16:5 17:10
  23:10,12
  136:12
  140:10 144:4
**far**
  70:13

**fast**
  60:9
**fear**
  66:5 133:7
**feared**
  147:25
**features**
  32:18
**feel**
  71:17 73:8
  74:6 82:4
  83:13 94:21
**feet**
  55:13
**fellow**
  14:1 76:12
  122:4
**felt**
  83:15,18,21
  98:24
**female**
  38:19 132:7,
  13
**file**
  81:8 87:4
  89:23
**filed**
  4:5
**fill**
  123:5
**filled**
  124:20,25
**find**
  45:8 106:19
  120:12,24
**Finding**
  61:14
**fine**
  4:15 6:21
  141:19
  142:14
**finish**
  5:12 6:4
**fire**
  66:19
**firearm**
  25:24 26:2

  33:8,23
  35:7,14,22
  37:22 53:10,
  24 57:22
  58:4,13,18,
  25 59:2,4,6,
  16,17,21
  60:12,13,15
  61:8,9,14,16
  88:11 89:15,
  17 90:6,12,
  19 91:5,8
  92:18 95:24
  132:12
**firearms**
  26:5 36:1,8,
  11,14
**first**
  4:6 19:18
  25:15 30:13
  34:12 36:4
  39:5,8,25
  46:17 53:2
  88:21 94:7
  102:25
  103:16,18
  113:8
**five**
  29:17,21
  32:17 38:22
  78:22
**flat**
  63:23 64:6
**flip**
  128:4
**Florida**
  4:1 17:11
**focus**
  55:3
**focused**
  136:9
**follow**
  20:19 45:20
  80:11
**following**
  11:4 105:15
**follows**

  4:7
**foot**
  29:21 32:17
  38:22,25
**force**
  12:24 13:2,
  4,14 14:13,
  18,22 15:7
  16:25 17:11
  39:24 40:9
  65:14 66:16,
  23 71:6,22
  72:4,13
  73:9,10,11
  74:6,13,16,
  20 84:3
  85:14 86:20
  147:21
  148:12,18
  149:2
**forced**
  39:19
**form**
  18:11 21:21
  22:25 24:2,
  20 35:8,16,
  24 36:9,15
  37:9,16
  40:1,11
  41:3,15 42:3
  44:3,20 45:5
  46:8 47:21
  48:3,21
  49:23 50:5
  55:18 56:15,
  21 57:7,16,
  23 58:6,22
  59:7,18
  60:2,16 61:3
  62:10,14,24
  63:19 65:15,
  20 66:4
  67:17 68:2,
  8,15 69:7,16
  70:6,18,23
  71:7,14,23
  72:5,14
  74:9,21 75:9

  76:11 82:6
  83:2 84:14
  85:1 86:11,
  16,22 89:7
  93:16,21
  94:9 96:1
  97:25 98:12
  100:22
  103:13
  109:19
  110:8,18
  111:13
  112:5,15,21
  114:4 117:14
  118:19
  119:23
  120:14
  128:3,17,24
  129:11 132:3
  135:18
  136:14
  138:18
  144:12
  145:23
  146:5,11,22
  147:9 148:2,
  9,21
**forms**
  23:20
**forward**
  13:11
**found**
  10:4 120:3,
  7,16,20
**four**
  52:1 130:20
  142:7
**fragment**
  109:15
**frame**
  52:7 115:17
  129:25 130:6
**frame-by-
frame**
  146:20
**free**
  40:14

Joseph Strzelecki
April 24, 2024                                   11

front
  35:9,15
  90:18 109:6
  117:3,13
  118:5,17
  121:14 124:6
  139:25
fuck
  47:7
full
  6:13 13:8
fully
  5:13,20
  114:1

_____

              G
_____

gap
  136:19
  138:8,24,25
garbled
  66:20
Gardens
  6:23 7:2,3
  9:23 84:2
gate
  47:6
gave
  45:16,19
  102:11,14
  104:23 105:5
  125:17 129:2
  143:25
general
  13:1 25:12
  79:25
  100:23,24
  129:25
generally
  9:7 18:19
  19:17 20:20
  25:10 35:22
  36:7,13
  40:21 60:10
  79:20 84:11,
  20 85:12
  86:5 109:7

129:20
gentleman
  97:17
getting
  17:4 34:16
  36:20 37:7
  53:20 80:18
  112:25
  113:18
  117:17
give
  5:6 13:7
  16:10 18:3
  19:18 40:9
  58:21 71:5
  99:14,17
  129:10,14,17
  135:14,19
  136:2,6
given
  19:13 26:1
  38:6,17
  102:4,7
  117:24,25
  121:18 141:3
giving
  107:1
Glass
  142:19
goes
  34:3 57:3
  65:8
going
  4:21,22
  5:11,21 7:8
  11:5,22
  13:11 15:1
  16:13 19:14
  20:11,22,24
  27:16 29:24
  30:20 31:2,9
  33:7 36:18,
  25 42:13
  44:5,22
  51:1,25
  52:4,21
  53:12 54:1,
  11 65:12

86:24 89:9,
22 90:14
92:11,14
95:1 96:19,
22 99:3,6
100:13
101:10
102:13,19
104:7
105:20,21
110:10,20
111:15
112:12
114:10
115:12,14,23
128:11
130:17,19
131:3
132:15,18
133:4,10,13,
19,22
good
  4:11 107:24,
  25 141:8
Gould
  8:15 11:22
  25:6 28:1
  33:15 34:7,
  13,25 35:2,
  4,6,14,20
  37:7,12
  38:16,19,22,
  24 39:1,24
  40:20,25
  41:2,8,13,23
  42:1,7,12,
  17,20 43:6,
  10,14,21
  44:13,17
  45:3,14,19,
  23 46:5,6,
  14,21 47:8,
  11,17,19
  48:6,11,17
  49:5,13
  50:16,20,23
  51:8 52:14
  53:2,4,8,20,

24 54:5,14,
20,23 55:2,
4,7 56:10
57:11,14
61:16 62:9,
23 63:3,7,
11,15,16,17,
22 64:6,7,
10,12,16,20
67:8,16 68:1
69:10,11
70:2,13
74:25 75:5,
7,14,18
76:3,5,10,25
77:4,7,13,19
78:8,14,19
81:17 87:16,
23 88:24
93:20 97:1,
5,12,24
98:23,25
99:8,16
100:2,7,19
101:2,6,18,
21 102:13
103:7,11,20
104:13,24
105:2,6,9,
14,17 109:3,
5,10,12,16
110:3,15
111:5,11,12,
21,22 112:3,
13,19 113:7,
15 114:2,18
115:9,20
116:3,9,16
117:2,6,11,
23,25 118:4,
7,16 119:5
120:3 121:6,
22 122:6,23
123:1,6,24
127:2
132:20,24
133:8,17,25
134:13
135:2,4,10,

12,22,25
143:12,18,24
144:22
145:20
146:10
147:7,14,19,
22,25

**Gould's**
34:18 36:3
37:21,24
38:2 49:11
56:3,7 76:21
94:1 97:9
100:1 103:2
111:2 115:17
143:23
148:15

**grab**
94:13

**grabbed**
45:14,17

**grave**
67:1

**groin**
28:24 32:1
90:7 91:5

**ground**
5:8 53:20
54:6 63:23
64:7,13
69:10

**Guerriero**
33:13,17,21
34:5 36:21
41:22 43:13
44:10,12,16
45:19 46:13
52:8,18,24
53:9,23
55:5,9,12,16
56:4,7,13,20
57:5 61:22
62:8,15,22
64:20 67:7,
16,24 69:15
70:4 71:6
74:25 75:4
76:6,22

78:7,11
82:21 83:8
93:19 97:20,
23 98:25
102:11,23
104:23 105:5
108:16 109:4
113:18 118:9
119:3 120:2,
7,12,20
121:4,19,25
126:12,25
127:8,16,25
135:10,11,15
142:25
143:6,25
146:9 147:6,
14,18 148:1

**Guerriero's**
62:20 77:22
81:24 96:5,
16,25 99:25
101:13
104:2,4
108:18,19
109:25
112:20 122:7
126:21 128:9

**guess**
9:11

**gun**
28:24 29:9,
17 31:22,25
32:16 37:4,5
44:23 49:5,
11 61:1 63:4
66:18 67:25
70:5 74:25
75:5 78:7
88:4,25 89:3
90:4 97:17
99:9,17
134:1 137:11

**gunpoint**
58:14,18
59:6,22
60:8,15 61:2
64:13 66:3,

12 67:16
68:1

**guys**
141:18

---

## H

**half**
35:15 50:13
132:8,9

**hand**
37:13 38:14
49:13 71:2
102:14 103:2
105:2 109:18
111:2,24
112:7,10
113:2 114:2
115:18

**handcuff**
64:17

**handcuffed**
101:18

**handcuffs**
23:21 47:3
54:6 75:15,
19 76:1,3
77:1 147:22

**handgun**
65:19,24
66:3,15

**handle**
71:12 95:5
125:5

**handled**
72:8

**handling**
62:20

**hands**
22:17,23
33:17,20
34:18 37:10
38:7,12
41:24 43:14
44:13,17
48:12,13
49:17 50:3,

6,23 54:24
91:21,24
92:1 93:8
94:3 97:2,9,
22 98:17,24
99:1 100:1,
3,8,20
101:2,7,19,
22 102:1,24
103:8,12,15,
21 104:14,24
105:6,10,14,
18 109:4,11,
13 110:4,16
111:4,7,23
112:4,7
113:1,8,10,
19,21 115:21
116:3,17,23
117:7,23

**handwritten**
11:21 12:2

**happen**
4:21 86:10
121:16

**happened**
24:9 33:11
49:24 75:20
78:18 86:6
106:6,12
119:13 123:8

**happy**
6:3 18:13
90:10 100:11
104:3

**harassing**
26:24 32:5,7

**harm**
67:1

**harms**
85:8,11
86:14

**head**
5:17 90:1
93:9

**hear**
26:22 46:7
47:19

**heard**
27:5,10,12, 13,23 28:16 29:8 31:17 33:1 47:23 132:1
**hearing**
26:13 27:1, 6,11 28:11 48:18
**held**
11:18 24:7 67:16,25 70:5 85:5
**help**
10:3 16:21 26:7 104:1
**helps**
100:12
**heretofore**
4:5
**hey**
20:4,16 38:12 93:25 97:21 98:16 113:18
**highest**
90:24
**hindsight**
72:12 73:14, 24
**history**
9:18
**hit**
81:2,8 96:13
**hold**
58:13,18 59:6,21 60:15 61:1 66:3 85:6 86:8
**holding**
49:14 54:15 60:8 66:12
**holster**
28:24 32:1 34:6

**honest**
142:13
**hospital**
143:8
**human**
82:8
**hurt**
67:4,9 85:13,17
**husband**
132:7

---

**I**

---

**idea**
123:11
**Identification**
26:17 51:5 79:11 96:7 105:24 131:1
**identify**
135:16
**immediate**
15:14 66:24
**immediately**
30:5 34:5 38:15 142:10
**impair**
6:10
**important**
31:3 49:21 50:8 78:4 84:23 86:8 106:7,25 107:8 129:6 138:3,4
**impressions**
146:18
**improper**
71:21 72:13 73:11 74:6, 13,16 83:16 84:20,24 85:9 106:19
**improperly**
65:19 67:16,

25 68:25
70:4 71:6 85:21,24 86:2
**inaccuracy**
118:22
**inaccurate**
117:13 118:7,15
**incident**
8:11,14,16 11:10,18,22, 25 12:3,7, 10,13,17,18, 21 16:16,20 17:8 24:9 25:6,9,16,19 27:2 28:12 33:7 34:9 42:24 50:20 51:3 58:19, 23,25 60:21 73:12 74:2, 19 76:19 78:11 79:13, 22 80:4,19 81:16,25 87:17 90:17, 20 99:19 106:2 107:22 108:3 115:5 116:21 119:10,12 121:11 126:25 129:23 130:2,4,22 133:8 134:8, 21 135:5 140:12 146:20
**incite**
46:13,18,22 47:8,12 48:20 111:18 144:2
**include**
8:2 107:12

108:14 122:2 126:20
**included**
107:16 108:17,19 127:7
**includes**
7:10
**including**
4:24 5:1
**incorrect**
131:18
**indicated**
89:17 91:12 95:18
**indicates**
109:10,17
**indicating**
71:19 90:12, 18
**indication**
91:4
**indicator**
147:4
**individual**
10:23
**influence**
108:10,12 118:25
**information**
14:25 25:21 26:4 32:12, 20,25 33:2,4 42:17,21 43:6 45:9 50:19 63:6 107:9,18 121:18 129:10,14,17 131:7 132:1 145:22 148:18,19,23 149:4
**initial**
37:6,21,24 38:1,2 43:17 49:4 51:16

77:11 81:16
96:10 97:2,
18 98:22
101:17
104:23
132:24 135:8
147:11
**initially**
31:25 32:3
34:15,16,24
35:1 38:11
80:19 139:13
143:11
**inquiring**
135:23
**instance**
137:10
**instances**
14:16
**instruct**
92:18
**intending**
46:3,21
**intention**
48:20
**intentional**
120:6
**interact**
14:11
**interacting**
91:7
**interaction**
41:13 95:10,
11 98:10
134:20
**interactions**
34:7 76:21
146:3
**interested**
16:15
**internal**
125:19,23
126:19
127:6,11
130:19 145:1
**intervene**
16:25 74:20,

24
**intervened**
143:10
**interview**
39:16,19,24
40:10 125:17
129:3,5,19
130:1,5,10,
19 131:11,
15,20,25
132:22
**interviewing**
39:14
**intimate**
144:5
**introductory**
130:21
**investigate**
24:9 39:21
40:6 43:9
78:18
**investigating**
21:10 23:18
**investigation**
24:8 125:24,
25 126:5,10,
20 127:7
**investigation
s**
63:10
**investigative**
21:4,6,11,13
106:22
**involved**
25:24 31:19
33:7 37:1
42:24,25
44:23 59:3
135:1
**involvement**
108:18
**issue**
8:12 11:25
15:11 18:5
22:22,24
23:4 25:6
95:16

126:16,19
137:4
**issued**
44:19 111:4
114:1
**issues**
18:8 26:13
139:19,20

_____

**J**

**J-O-S-E-P-H**
6:16
**jail**
125:8 142:8
**job**
10:6 71:15
**Joe**
4:15
**JOHNSON**
6:20 10:14
18:11 19:8
21:21 22:2,
25 23:6
24:2,20 25:2
35:8,16,24
36:9,15
37:9,16
40:1,11
41:3,15 42:3
44:3,20 45:5
46:8 47:21
48:3,8,14,21
49:23 50:5,
12 51:13
55:18 56:15,
21 57:7,16,
23 58:6,22
59:7,18
60:2,16 61:3
62:10,14,24
63:19 65:15,
20 66:4
67:17 68:2,
8,15 69:7,16
70:6,18,23
71:7,14,23
72:5,14,18,

25 73:13,17,
20 74:9,21
75:9 76:11
77:6 78:24
82:6 83:2
84:14 85:1
86:11,16,22
89:7 93:16,
21 94:9 96:1
97:25 98:12
100:22
103:13
109:19
110:8,18
111:13
112:5,15,21
114:4,12,25
116:11
117:14
118:19
119:23
120:14
128:3,17,24
129:11 132:3
135:18
136:14
138:18,25
146:14,16,24
147:9 148:2,
9,21 149:11,
16
**Joseph**
4:4 6:14
**judgment**
83:25
**jump**
5:13 41:4
**justified**
60:8
**justifies**
66:22
**justify**
58:3,21
**justifying**
73:10

Joseph Strzelecki
April 24, 2024

15

---

**K**

---

**keep**
  5:16 10:17
  20:7 21:13
  22:17,22
  23:25 29:24
  33:17,19
  38:7,12
  41:23 43:14
  44:13,17
  48:12,13
  80:3 91:21
  94:3 97:1,21
  98:17,25
  100:1,8,20
  101:22
  102:1,23,24
  103:8,11,20
  104:14,24
  105:6,17
  109:4,11,13,
  17 110:4,16
  111:4,6,24
  112:7 113:1,
  8,10,19,20
  115:21
  116:17,23
  117:6,23
**kept**
  54:23
**kill**
  67:9
**killed**
  67:5 85:19
**kind**
  84:15
  128:13,21
**kinds**
  13:4
**KING**
  141:22 142:1
  144:14
  146:1,7,13
  149:17
**knew**
  74:4 88:10

93:13 131:7
132:6,11
**knife**
  37:5,13
**know**
  5:10 6:2 9:6
  13:10 16:10
  18:17,25
  26:14 28:13
  30:10 32:24
  33:14,24
  40:12,19
  42:1,13,14
  44:12 46:14
  50:8 51:15,
  24 54:17
  55:19,20
  56:13 58:7
  60:17 65:3,
  11 70:9
  75:20 77:25
  87:6 88:10
  94:4 99:11
  101:13,24
  117:18
  119:21 122:9
  123:10,23
  124:20,22,24
  125:2,25
  126:2,4,7,9,
  14,16
  134:13,15
  136:15
  137:7,10,15
  138:8,23
  142:2
  145:14,20
**knowing**
  72:12 73:13
  115:3
**knowledge**
  9:16 129:12,
  16 143:1
  146:8
**known**
  61:9

---

**L**

---

**lack**
  122:20
**lacked**
  42:16
**lag**
  136:13
  139:12,19
  140:5
**lags**
  137:19
**language**
  109:22 118:3
**laptop**
  26:12 51:11
  80:10
**laser**
  9:14
**laughing**
  47:1
**law**
  8:25 9:19
  12:23 17:12
**lawful**
  4:6 16:2
  17:16 18:5
  19:13,15,19,
  22 22:22
  24:13 39:4,7
  40:5 43:25
  47:10,17
  77:15 135:24
  136:7
**lawfully**
  24:8 39:21
**lawsuit**
  10:23 11:25
**lawyers**
  7:11
**lead**
  36:22 44:5
  61:22 62:16
  84:15
**learn**
  25:15

**learned**
  25:19,21
  88:4,7 89:3
  137:9
**leave**
  40:14 74:7
**leaving**
  76:4 120:23
**left**
  33:22 41:13
  55:23 56:7,
  11 57:12,15
  78:14 125:8
  144:24
  145:12,14
**legal**
  7:10,13 8:4
  13:9 18:5,9
  20:5,17
  22:24 23:3,
  25 44:13,18
**legally**
  66:1,2
**length**
  136:24
**lethal**
  13:5 34:3,4
  57:3,4 65:6,
  9 66:6
**letting**
  5:13
**level**
  13:6 67:13
  79:17
**liability**
  18:10 20:8
  23:5
**license**
  93:7,8
**lie**
  49:8
**lied**
  49:7 63:8
**ligation**
  10:11
**lights**
  30:19

---

Joseph Strzelecki
April 24, 2024                                         16

**line**
  17:4 138:3
**listed**
  108:8
**listen**
  26:7
**listened**
  32:14 131:22
**listening**
  25:18 30:15
  31:10 46:1
  131:21
**litigation**
  10:7 11:6
**little**
  101:14
  130:23
**locate**
  10:8,12
  11:2,9 62:3
**long**
  25:8 102:9
  138:23
**longer**
  66:10
**look**
  13:18 23:19
  55:21 61:13
  74:8 123:12
**looked**
  46:23
**looking**
  14:2 49:19
  50:3 55:21
  72:11 73:24
  82:1 90:23
  116:8 123:4
  144:18
**loop**
  128:21
  137:5,9,12
**lot**
  30:19 31:2
  32:22 40:25
  51:2,16 52:8
  117:18
  134:19

**lying**
  63:22 64:6
  69:10

———————————

                M

———————————

**made**
  42:23 44:7
  69:15 145:4
**main**
  37:1 146:3
**make**
  4:22 5:16,
  18,23 6:7
  11:14 16:16,
  21 35:25
  37:3 62:1
  67:19 69:21,
  22 83:19
  90:8 107:23
  120:9 126:23
  135:5,11,15
  142:12
**making**
  16:12 21:13
  26:23 60:20
  121:21
  136:13
**male**
  26:23 27:23
  29:17 31:22
  32:4,7 46:24
  89:25 93:3
  95:6 132:8,
  11
**males**
  31:19
**malfunction**
  80:6
**man**
  38:12 93:25
  97:21 99:9,
  17 113:19
**manner**
  72:9,21
**March**
  6:18

**mark**
  26:10 51:1
  79:8 105:21
**marked**
  26:16 51:4
  79:10 96:4,
  6,20 105:23
  130:18,25
**match**
  112:19
  124:11
**materials**
  7:20 10:9,13
  11:3,10
  12:20 103:25
  123:23
**math**
  137:13
**matter**
  7:24 11:23
  125:18
**matters**
  5:7 130:21
**mean**
  7:25 14:3
  19:10,12
  20:9 40:18
  64:25 68:7
  70:16 72:20
  86:5 98:2
  111:11
  137:25
  139:20
**meaning**
  14:25 24:16
  108:12
  120:24
**means**
  65:7
**measures**
  61:10,12
**media**
  12:13
**medications**
  6:9
**meet**
  7:5

**memory**
  26:7 33:4
  51:7 100:12
  104:23
  130:4,7,13
**mentioned**
  29:21 116:22
**mentor**
  84:17
**mere**
  95:23
**messages**
  12:9,13
**met**
  28:1 121:9
**midway**
  96:14
**Military**
  6:22
**mind**
  36:18
**minute**
  27:20 28:6
  78:23 101:11
  115:25
  141:18
**minutes**
  52:1 87:3
  88:15 89:11
  90:14 95:1
  130:20,24
  131:3 132:15
  133:11
**misconduct**
  69:25 84:5,8
**mistake**
  69:15
**mistaken**
  72:10
**misunderstand
ing**
  48:19
**misunderstood**
  48:7
**moment**
  52:24 54:16
  66:9 68:23,

Joseph Strzelecki
April 24, 2024                                        17

24 69:1 78:3
97:13 98:22
101:3,5
102:22 108:6
**moments**
101:14
**Monday**
73:24 98:2
**month**
9:8
**months**
83:12
**morning**
73:25 98:2
**mouth**
63:9
**mouthy**
46:18
**move**
130:20
137:11
**multi-colored**
26:23 39:1
**multicolored**
32:4
**multiple**
45:19,24
78:20 98:7
103:11,20
104:14
105:17
109:3,10,12,
17 110:3,14,
16,25 111:19
113:5
114:14,15,
18,21 116:9
118:4,7
119:5

——————————

**N**

——————————

**name**
4:16 6:13
93:4 122:12
124:18

**narrative**
108:7
**nature**
13:22 59:11
126:4 138:1
**necessarily**
20:25 64:21
121:1 122:8
140:15
**need**
5:16 6:1,3
10:3 13:15
17:6 24:17
26:13 59:13
60:4 86:21
148:19,23
**needed**
45:8 83:13,
22
**needs**
14:13 21:19
66:12 67:3
149:3
**negated**
93:6
**negative**
140:21
**never**
32:10 91:24
105:10 116:3
**nicely**
38:13
**nods**
5:17
**Non-lethal**
13:5
**nonlethal**
65:9
**nonverbal**
144:4,9,16
**normal**
9:3 10:18
**North**
6:22
**note**
107:19
119:18 120:2

121:16
**noted**
130:10,13
**notes**
11:21 12:2
**notice**
4:5
**noticeable**
35:6
**nowadays**
36:1
**number**
113:9,12,20,
21
**numbers**
80:10

——————————

**O**

——————————

**O.o.d.a**
137:5,9
**O.O.D.A.**
137:12
**oath**
4:7,22 5:4
**obey**
17:25 19:15
24:13 47:10,
17
**obeyed/
disobeyed**
114:16
**obeying**
16:2 17:16,
18 48:18
135:24 136:7
**object**
10:14 73:3
144:12
**objecting**
77:20
**objection**
18:21 19:8
22:2 23:6
25:2 48:8,14
50:12 72:18,
25 145:23

146:5,11,22
**objections**
5:1 18:19
**objectives**
62:2
**obscured**
101:14
**observation**
104:21
**observations**
108:22
**observe**
49:22 53:4
55:16 67:8,
12 101:2,19
122:23
**observed**
71:18 74:5
92:18 108:25
112:19
143:24
146:19
**observing**
58:3 59:16
73:10
**obstruct**
21:19
**obstructed**
143:16
**obviously**
10:15 35:10
39:11 94:18,
23
**occur**
20:21 47:5
79:4 136:24
137:19,22
138:9,12,16
**occurred**
39:15 47:2
106:20 127:7
128:14,22
130:1 139:13
**occurring**
136:25
**offense**
17:15

Joseph Strzelecki
April 24, 2024                                18

**Office**
  102:23
**officer**
  9:4,20 10:1,
  5 14:1 17:1,
  11,17,21,25
  18:5,8 19:1,
  4,11,14,18,
  21 20:3,5,10
  21:7 22:23
  23:25 24:12,
  14,17,25
  30:9,10
  33:13,17,21
  34:3,5 36:20
  40:8,16,22
  41:1,13,22
  43:13 44:10,
  12,16,23
  45:11,18
  46:13 50:12
  52:8,17,18,
  24 53:9,23
  55:5,9,12,16
  56:3,6,13,20
  57:3,5 58:4,
  13,17 59:5,
  13,16,21
  60:7,14
  61:1,4,10,
  22,23 62:2,
  5,8,15,17,
  20,22 63:17
  64:19,24
  65:8,13,18,
  24 66:2,11,
  14 67:7,15,
  24 69:8,15,
  25 70:4 71:6
  73:9 74:6,
  12,24 75:4
  76:6,12,22
  77:22 78:5,
  7,11,12
  81:24 82:5,
  20 83:7,11,
  14,22 84:12,
  13 85:9 86:2
  87:10,11,16

88:3,18,20
89:2,14
91:11,20
92:18 93:11,
14,19 94:4,
6,12 95:4,9,
13,18 96:4,
16,25 97:20,
23 98:10,25
99:25 101:13
102:11
104:2,4,23
105:5
108:16,18,
19,20 109:4,
25 112:20
113:18 118:9
119:2 120:2,
7,11,20
121:4,19,21,
25 122:4,5,
7,10 126:12,
20,24 127:8,
16,25 128:8
135:10,11,15
139:7,11,13
142:25
143:6,25
146:3,9,14
147:6,13,17,
25
**officer's**
  24:1 40:24
  66:22 136:25
**officers**
  15:15 21:20,
  25 46:3,19,
  22,24 47:9,
  12 48:20
  78:20 82:17
  84:5,8,9,19,
  21,23,25
  86:9,15
  125:18 144:2
**okay**
  4:16 6:20
  11:16 15:5
  26:14,15

27:14 28:17
33:11 50:14
54:13 55:6
69:23 74:18
91:7 92:1
93:12 134:10
140:10
**once**
  9:8 49:13
  101:20
  115:21
  143:24
**one**
  5:9,14 6:4
  8:15 10:10
  15:10 25:24
  30:13 31:21
  45:23 46:6,
  23 47:16
  51:24 62:2,5
  63:4 66:25
  100:7,20
  101:22 103:8
  105:15
  110:10,13
  111:9 112:1
  113:1,5,9,
  13,17,20,23
  114:19,22,23
  115:11,25
  117:23 125:1
  128:12 132:8
  137:18
  146:14
**ones**
  141:13
**opened**
  125:25
**opinion**
  13:5 64:25
  89:6 94:8
  98:9 111:10
  147:24
**opportunity**
  135:14,20
  136:2,6
**opposed**
  115:3

**options**
  65:11
**order**
  18:3 91:21
  93:12
  137:13,14
**ordered**
  64:13
**ordering**
  149:13
**originally**
  134:22
**outline**
  90:6
**outside**
  9:12 27:24
**outwardly**
  145:5

---

                 P

**p.m**
  78:25
**p.m.**
  4:2 79:1
  94:24 149:19
**page**
  126:24
**paint**
  107:22
**Palm**
  4:1 6:23,25
  7:2,3 9:23
  84:2
**paperwork**
  123:5,8,12
  125:4,5,12,
  15
**paragraph**
  109:2
**parked**
  40:25
**parking**
  32:21 40:25
  51:2,16 52:8
  134:19

Joseph Strzelecki
April 24, 2024                                    19

part
  7:24 8:4
  10:7,11 11:6
  12:23 43:17
  49:4 71:15,
  17,20 76:4,
  18 84:2
  96:10 97:2
  101:17 108:3
  119:4,6
  121:11
  129:2,9
  143:17
participate
  6:10
particular
  19:4
parties
  25:23 33:8
  39:11,14
partner
  14:5
partook
  41:10
party
  10:22 34:8
  81:21 132:8
passive
  16:4,7,9
passively
  16:11
pattern
  45:25 46:2
patterns
  84:7
pause
  50:13 52:4
PC
  142:24
  143:4,7
pending
  6:5
people
  10:3 21:14
  26:5 61:8
  78:15 88:4
  106:16

107:2,23
  140:17
perceive
  13:6 137:1
  139:11
perceives
  138:17
  139:14
perceiving
  138:6
percent
  32:9
perception
  88:20 104:22
  115:2,9
  137:19 138:9
  139:20,22
  140:11
perceptions
  77:3,10
period
  43:11 55:17
  81:5
perpetrator
  43:7
person
  13:20,23
  14:4 17:24
  18:9 19:5,6,
  12,23 20:4,
  7,11 21:17,
  24 24:11,17
  26:1 29:9,17
  31:24 32:3,
  16 42:21
  49:5 58:12
  59:2,9
  60:19,23
  65:1 66:19
  86:3 89:15,
  18 90:3
  91:11,15
  92:4,16,19
  94:7,13
  95:19 102:3,
  6 132:13
  137:21
  138:17

144:11
person's
  95:23 122:12
personal
  10:22 11:11
personally
  11:2,17
  83:15
perspective
  21:6
phase
  77:12
phenomenon
  136:12
phone
  33:21 36:6,
  7,13 45:14,
  17 49:15
  50:17,22
  52:15 53:3
  54:14 55:4
  109:7 113:3,
  11 116:19
  117:3
physical
  22:6,13,16
  147:21
physically
  37:8
picture
  90:1 107:22
piece
  34:10,11
place
  19:19
  145:19,21
plaintiff
  4:17 11:3
plaintiff's
  26:16 51:4
  79:10 96:6
  105:23
  130:25
play
  26:12 28:18
  29:11 51:10
  80:13 88:13

90:9 94:24
  96:3,19
  102:12 104:3
  130:17
playback
  51:25 52:10
  53:12 54:1
  80:21 89:9,
  20 92:11
  99:3 102:16
  115:23
played
  31:16
playing
  26:18 27:16,
  18 28:4,19
  29:2,3,12,25
  51:20 52:3,
  11,20 53:13
  54:2 80:14,
  22 81:12
  86:24 87:2
  88:14 89:10,
  21 90:13
  92:13 94:25
  96:21 99:5,
  22 100:14
  101:9 102:18
  104:6
  115:13,24
  131:2 132:17
  133:3,12,21
please
  5:20 6:2,13,
  15,17 9:18
  18:17 26:14
  42:19 97:21
  113:8,19
plural
  109:16
pocket
  22:17,23
  33:18,19,20
  35:22 36:6
  38:8,13,14
  43:21 44:17
  45:15 49:14
  50:9,17,23

52:15 53:3,
5,9 54:15,
18,25 92:19
93:10 94:13
97:2 98:17
100:3
102:14,24
103:3 105:3
109:6,14
110:4,10,21
111:3,16,23
112:7,8,11,
12 113:2,9,
10,12,16,22
114:2,20,22
115:18
116:3,12
117:3,13,24
118:1,5,18
145:7,10,12,
15
**pockets**
22:18 35:21
36:4 41:24
43:14 44:14
48:12,13
50:6,24
91:21,25
92:2 93:13
94:3 97:9,
12,22 99:1
100:2,8,21
101:3,7,19,
23 102:1
103:8,12,15,
21 104:15,25
105:7,10,14,
18 109:5,11,
13,18 110:17
111:4,7,25
112:4 113:1,
19,21 115:21
116:18,23
117:7 148:15
**point**
20:17 30:17,
20 33:25
39:12 40:13

41:22 42:14
44:4,9
46:14,23
54:5,17,19
55:11 63:22
64:1,10
67:11,19
68:4,10,17
69:2,14
77:12 78:14,
21 81:19
87:20,24
88:9 94:16,
19 97:11
100:23
103:25
116:2,16
117:19
120:19
125:17
126:24 133:7
147:11
**pointed**
53:24 78:8
**pointing**
58:4 74:25
75:5 137:11
147:18
**police**
6:25 7:3 8:5
9:4,20,24
10:1,5,16
11:13,19
21:7 40:7
82:4 84:3
89:5 121:10
146:3
**policies**
17:5 126:7
127:20
**policy**
79:25 126:6
**portion**
29:7 30:4
32:13 54:12
81:15 86:25
88:21 131:6
133:24

**portions**
80:4
**pose**
18:19
**poses**
15:14
**position**
11:14 86:19
111:12
114:17,21
128:8,11,15
**positive**
34:21
**possess**
61:9
**possesses**
59:2
**possessing**
58:12 59:17
91:8 92:17
**possession**
11:11 37:21
60:12 61:15
95:23
**possibility**
41:12,18
48:2 127:22,
23 128:20,22
134:7
**possible**
30:21 46:6,
11 47:19
48:6,9,11
65:13,18
107:1
118:13,14,
15,20,22
119:15,17
**potential**
13:24 21:10
37:21 98:7
148:19 149:3
**potentially**
14:5 42:22
45:10 69:5
71:21 72:13
73:11 74:8,

13 84:24
106:16
107:18
119:19,22
139:12
140:19
**pounds**
29:22 32:17
**power**
84:19
**precautions**
61:23
**preference**
51:10
**preparation**
7:18 66:15
**prepare**
7:5,14 10:17
**prepared**
44:1 123:24,
25 146:17
**preparing**
53:16
**presence**
58:2,16
77:11 146:18
**present**
14:14,17,21
24:1 38:2
73:9 91:20
115:1 119:9
126:17,21
127:8 128:1
**pretty**
36:1,10
81:16 86:15
**prevent**
16:25 74:20
135:22
**previously**
133:25 149:8
**primary**
62:2
**principles**
13:2
**prior**
15:1 103:15

Joseph Strzelecki
April 24, 2024

21

**private**
7:10,13
12:12,16
**privately**
12:6
**privileged**
7:12
**probable**
76:5,7,9,13,
14 77:4,13
119:3,4
120:3,7,13,
16,21,25
121:21
122:1,6,7,
15,19,21
123:14
124:10,11,14
142:3,4,17
**probably**
60:24
**procedure**
125:10
**procedures**
17:5
**proceedings**
5:6 129:2
**processes**
138:17
**producing**
10:20
**professional**
82:8 83:17
**properly**
69:6
**property**
123:17,18
124:7,9,24
**protect**
10:2
**provide**
6:5 10:8,12
11:3,10
**provided**
108:7 149:8
**public**
12:12

**pull**
16:1 37:4
54:21 58:18
59:5,21
60:14 61:1
65:18,24
66:2 79:7
92:19 105:21
**pulled**
33:20 34:12
39:25 41:19,
21 50:9,10,
17 52:8 53:3
54:14 109:6
113:3,11
117:3
**pulling**
50:22 52:15
57:21 58:4
66:15
**pulls**
55:4
**purposes**
106:15,23
149:3
**put**
34:5 38:14
50:23
105:10,14
108:10 113:2
116:3,19
139:25
147:22
**putting**
54:8 111:23
112:4,7

_____

**Q**

**quarterbacking**
73:25 98:2
**question**
5:11,12,23
6:1 18:12
65:4 66:20
73:4 100:25

102:13
146:14
**questioned**
149:7
**questions**
4:24 5:19
6:5 7:8
16:13 18:14
54:12 141:9,
11,23
**quickly**
119:13

_____

**R**

_____

**Radar**
9:14
**radio**
25:17,18,22
26:1,8,11,18
27:18 28:4,
19 29:3,12,
25 30:12,16,
24 31:7,11,
14,17 131:21
132:2
**reach**
22:18 37:8
43:21 54:20
57:11 58:17
92:19 93:12
94:13 101:2,
6,19 110:10,
20,21 111:16
114:22 118:1
**reached**
53:3 56:10
105:2 109:6
113:15,22
114:2,19
117:2,12
118:5,17
**reaching**
52:14 53:8
57:15 93:10
100:2 102:2
109:14

114:23
116:12
**react**
137:1,13
140:1
**reaction**
46:12,19
136:19
137:15
140:2,5
**reacts**
139:14
**read**
6:1 121:3
149:12
**readjust**
137:14
**reason**
19:4,11
20:10,13,17,
25 21:8,9
40:5 45:12
49:10 87:25
128:2 131:11
138:11
**reasonable**
18:2 19:1
20:5 40:24
41:12 42:11
44:21 61:12
89:5 94:6
98:9 138:23
147:24
**recall**
25:21 26:3,
4,6 27:1
28:11,14,16
31:1 33:1
34:11,22,23
41:20 43:12
49:9,16,18,
20 50:25
81:10 90:22
99:21 118:11
122:22
123:2,9
125:10
130:6,7

Joseph Strzelecki
April 24, 2024                                    22

143:19

**receipt**
123:17,18
124:8,9,24

**received**
9:5 114:14
145:22

**receiving**
86:3

**recess**
78:25

**recollection**
100:6 103:6
104:1 114:1
116:7

**record**
4:22 79:2
141:17,20,21

**recorded**
4:23

**recorder**
80:3

**recording**
26:8,11,19
27:19 28:5,
20 29:4,13
30:1 32:13
79:9 80:12,
14,22 81:1,
12,23 87:2
88:14 89:10,
21 90:13
92:13 94:25
96:17,21
99:5,22
100:14 101:9
102:18 104:6
131:2 146:21

**recordings**
8:7,9 79:20

**records**
10:15,17,19,
20 81:4

**redirect**
146:25 147:1

**refer**
11:22

**referring**
11:24 14:5,7
117:6 125:19

**refrain**
84:4

**refresh**
51:7 100:12
104:1

**regard**
16:3 108:12
138:22

**reins**
83:24

**related**
11:10,18
12:2,7,10,
13,20 136:12
139:21

**relates**
62:14

**relationship**
84:12

**relax**
82:16,22

**release**
135:2

**released**
75:8,15,19,
24,25
134:13,17

**relevant**
8:24 49:22
80:4

**reliable**
107:8

**relying**
121:3

**remain**
40:9 78:5

**remainder**
34:8

**remember**
25:7,8,10,
23,25 27:5,
6,8,9,11,12
93:3 119:15
125:8 129:21

142:13
144:16 145:2

**remembering**
130:9

**remove**
95:16

**removed**
49:13 105:10

**repeat**
14:19 18:12
74:10

**repeated**
6:2 26:13

**rephrase**
19:25 27:7
35:3 42:19
44:15 99:15
117:15
126:18
128:12

**replay**
100:11

**replaying**
114:13

**report**
26:23 69:25
71:21 74:7,
16,17 84:8
106:2 108:3,
8,23 110:2
112:18 115:4
116:22
118:3,12,16
119:18
120:19
121:13,14
122:3 124:6,
12 127:10,
18,24 146:17

**reported**
4:1 28:8
29:8 32:4
72:3,13,24
73:11

**reporter**
4:21,24 51:5
96:7

**reporting**
71:5 84:4

**reports**
8:5 12:20
106:5,8,13
107:5,13,19
108:11

**represent**
132:19

**request**
17:21 46:17
48:12 98:20
103:18

**requested**
10:9,13
43:13

**requests**
11:1

**require**
24:14

**requirements**
24:10

**resist**
21:19 46:3

**resistance**
15:21,25
16:8,9 19:7
21:16 22:1,
6,12,13,16,
19

**resistence**
16:5

**resisting**
13:21 15:18
16:11 17:11,
17,22 18:1
22:10,11
77:16 120:4

**resolution**
90:24

**respect**
8:25 13:19
42:20 130:1

**respectful**
97:18

**respond**
18:22 45:23

Joseph Strzelecki
April 24, 2024                                                23

46:5 80:19
**responded**
   25:13 28:12
   30:16 97:5
   134:22
**responding**
   27:2 30:6,12
   58:24
**response**
   14:14 44:2
   94:1
**responses**
   5:17 114:15
**responsibilities**
   24:11 71:18,
   21
**responsibility**
   82:13,17
**responsible**
   94:12
**responsibly**
   86:21
**rest**
   101:8
**result**
   126:9
   128:10,16
**resulted**
   127:17
   128:23
**resume**
   52:10 53:12
   54:1 89:9,20
   92:11 94:24
**Resuming**
   80:21 81:11
**review**
   7:17,21 8:4,
   7,9 100:17
   107:2 108:6
   117:10,22
**reviewed**
   8:1 51:22
   96:16

**reviewing**
   107:23 115:2
   146:20
**revisit**
   141:7
**rewatch**
   100:9
**Rice**
   4:10,16 6:24
   10:21 18:13,
   24 19:16
   21:23 22:4
   23:2,9 24:5,
   23 25:4
   26:10,20,21
   27:16,20,22
   28:6,7,18,
   21,22 29:2,
   5,6,11,14,
   15,24 30:2,3
   35:12,18
   36:2,12,17
   37:11,19
   40:3,15
   41:6,17 42:6
   44:8 45:1,7
   46:10 47:24
   48:1,5,10,16
   49:1 50:1,7,
   15 51:1,6,
   10,14,21,25
   52:4,6,10,
   12,13,21,23
   53:12,14
   54:1,3,4
   56:1,18,23
   57:10,19
   58:1,10
   59:1,12,19
   60:5,22 61:6
   62:12,18
   63:2,21
   65:17,22
   66:7 67:20
   68:6,12,18
   69:3,9,19
   70:12,20
   71:1,9,16

72:2,6,16,23
73:2,7,16,
19,22 74:11,
23 75:12,13
76:16 77:8,9
78:22 79:2,
3,7,12 80:9,
15,17,21,23,
24 81:11,13,
14 82:10
83:6 84:18
85:3,7
86:13,18,24
87:3,5
88:12,15,17
89:9,11,13,
20,22,24
90:9,14,16
92:11,14,15
93:18,23
94:11,24
95:1,3 96:3,
8,19,22,24
98:5,14
99:3,6,7,23,
24 100:11,
15,16,24
101:1,10,12
102:16,19,21
103:17,24
104:7,9
105:20 106:1
109:21
110:12,23
111:20
112:9,17,23
113:6 114:6,
8,14 115:6,
12,14,16,23,
25 116:1,14,
15 117:17,20
118:21
120:1,17
128:4,6,19
129:1,13
130:17
131:3,5
132:5,15,18,
21 133:2,4,

5,10,13,14,
19,22,23
135:21
136:17
138:20
139:3,5
141:16,19,21
144:12
145:23
146:5,11,22,
25 147:2,12
148:4,6,11,
13 149:1,10,
14
**right**
   17:18 24:4
   33:19,22
   47:6 55:23
   56:3 79:17
   83:23 84:16
   85:6 95:19
   104:25 105:3
   109:14
   111:6,16
   112:11
   116:21
   117:2,12
   118:17
   127:1,3,11
   137:25 139:7
   142:4 145:7,
   10 146:21
**rising**
   67:12
**risk**
   14:21 15:4
   24:22,25
**road**
   83:11
**roll**
   100:13
**room**
   4:23 5:1
**route**
   60:24
**rude**
   144:2

Joseph Strzelecki
April 24, 2024

24

rule
  76:13 122:4
rules
  5:8
running
  30:18 80:3
Ryan
  8:15

---

S

S-T-R-Z-E-L-
E-C-K-I
  6:16
safe
  42:23 146:2
safety
  14:14,17,20,
  21 15:3,15
  24:22,25
  34:25 36:22,
  23 37:2 38:3
  39:9,11
  44:23 45:11
  50:2 54:16
  55:8 57:6,21
  61:5,10,12,
  23 62:17
  69:22,23
  71:18,19
  92:22 94:16
  133:7 136:11
  137:15 146:4
saying
  17:19 27:11
  60:7 64:20
  80:6 102:25
  103:16 111:9
  113:15
  127:24
  132:12 139:2
says
  109:7 117:1
  139:11
scenario
  139:6,25

Scenario-
based
  139:23
scene
  21:14 33:12
  37:2 39:5,8,
  9,11 40:17,
  22 45:12
  69:21 73:18
  76:4 77:6,11
  121:6,8
  126:17
  131:8,16
  132:7 136:11
  143:10
  146:18
schooling
  8:25
scientist
  138:10,13,19
  139:15
screen
  123:4
search
  63:12,15
searched
  63:17 70:8,
  10
second
  43:20 50:13
  81:1 94:5
  100:1,4
  102:11,14
  105:5 109:2
  111:10,12
  113:7,10
  117:24
seconds
  26:20 27:17,
  21 34:6 52:1
  53:8 55:3
  61:18 70:9
  75:16,21
  76:20 80:25
  81:7 87:4
  88:13,16
  89:12 90:15
  95:2 96:23

99:4,23
  100:13,15
  101:11
  102:17,20
  104:5,8
  114:11
  115:15
  130:20 131:4
  132:16 135:9
see
  34:18 35:10,
  11,19 36:3,
  21 39:14
  49:14,17
  51:7 54:24
  55:22 56:3,
  7,10 57:9,18
  63:25 64:3
  67:10,14,18,
  22 68:3,9,
  16,19 69:2,
  11 74:12
  81:15 89:15,
  17,25 90:6,
  11,18 91:2,4
  97:12,14,24
  101:8
  103:14,22
  115:11 138:6
  143:17,18,21
  145:7,12,17
  148:14
seeing
  31:8 60:12
  138:6
sees
  19:3 139:7
self-
initiated
  14:9
send
  12:5,6,9,12
sense
  5:24 6:7
  16:17 34:25
senses
  138:12

sensory
  138:9
sentence
  120:23
sentiment
  95:21
separate
  39:12 76:17
sergeant
  108:15
  122:13,14
  134:5 142:9,
  16,18,19
serious
  86:15
seriously
  67:4,9
serve
  10:2
served
  11:2
severely
  85:17
severity
  15:11
shakes
  5:18
sheet
  123:22 124:4
shirt
  29:19 32:19
  34:20 35:5
  39:3 90:7,11
shoes
  35:5
show
  52:14 53:15
  110:15
showed
  88:21 113:17
showing
  51:16
shows
  45:25 80:18
  97:1 110:7
  111:10
  117:22

Joseph Strzelecki
April 24, 2024

25

side
  32:8 33:22
  54:15 55:23,
  24 56:3,7,11
  57:12,15
  137:12
sidewalk
  19:3
sight
  138:9,12
sign
  142:10
signed
  122:16
significance
  22:8,12
  45:22
simple
  38:7
simultaneous
  100:2
simultaneousl
  y
  101:25
single
  9:9 132:8
sirens
  30:19,22
sit
  23:22 33:3
  68:14 72:7
  100:6 113:24
  114:17 115:7
  116:6 117:9
  129:23
  131:10,17
  132:23
  133:6,15
  134:10
sits
  73:15
sitting
  33:15 34:13,
  14,17 73:8
  81:22
situation
  15:8 31:4,

  12,19 33:5
  61:10 62:20
  82:5,14,24
  83:1,4,5
  86:5 91:12
  95:5 98:7
  134:11
  136:10
  140:3,4
skip
  132:15
  133:2,10,20
small
  36:1,10
  54:18
smaller
  36:7,13
social
  12:12
somebody's
  140:11
someone's
  17:4 50:3
  58:17
something's
  16:19
sort
  11:23 41:2
  82:2 85:11
  138:8
speak
  5:9,18 47:22
  120:15
  134:25
  142:16
speaking
  16:12 86:6
specialized
  9:13
specific
  18:15 25:11
  46:20 77:12
  144:18
  148:19
specifically
  132:6

specifics
  25:12 134:15
specify
  16:14
spell
  6:15 137:6
spent
  117:18
split
  126:24
spoke
  142:18
square
  104:19
stab
  37:14,18
stable
  78:12
standard
  9:12 24:14,
  16 95:11
  123:13
  125:10
standards
  12:24
standing
  41:9 52:17
  55:11,14
start
  51:25 58:11
  80:13 93:19
  97:15 100:24
  102:16 104:4
  114:11
  115:12
  130:22
started
  46:18 93:15,
  24 97:23
  98:15
starting
  38:1 86:25
starts
  46:15
state
  111:22

stated
  88:10 113:18
  147:3
statement
  99:14,18
  109:3,9,24
  112:18 116:8
  117:11 118:6
  120:9 121:3
  132:22
  133:15
statements
  115:9
states
  109:12 118:4
station
  121:10,12
  123:21 125:9
statute
  21:16
stay
  78:19
steer
  84:16
step
  17:6 37:25
  38:1 82:25
  83:13 84:20,
  23
stepped
  33:5
stepping
  82:22
stood
  33:16
stop
  19:4,5 20:4,
  12,14,15,20
  21:1,2,3,4,
  5,6,11,13
  26:20 27:20
  28:6,21
  29:5,14 30:2
  52:12,21
  54:3 66:12
  74:24 75:5
  80:15,23

Joseph Strzelecki
April 24, 2024                              26

81:13 87:3
88:15 89:11,
22 90:14
92:14 95:1
96:22 99:6,
23 100:15
101:10
102:19 104:7
115:14,25
131:3 132:18
133:4,13,22
**stopped**
94:17
**street**
19:2
**stressful**
137:18
**strike**
37:14 66:21
**Strzelecki**
4:4,11,12
6:14 141:22
**stuff**
16:11 137:16
**subjected**
85:14
**submitted**
142:7,9
**subsides**
66:10
**sufficient**
59:14 104:10
122:18
127:25
**sufficiently**
102:9
141:10,14
**suggest**
131:25
**suggesting**
64:3 67:8
120:12
**suggests**
74:5 148:19
**suit**
35:5,7,15
39:2

**superior**
83:22
**supervisor**
119:2
121:18,23
122:11
**supervisors**
71:11,12
72:8,21
74:8,14
134:18,25
**support**
46:21
**supporting**
77:13
**supports**
70:4
**supposed**
10:12 11:9
15:10,17
79:19 142:8
**sure**
5:16,18
11:15 15:12
16:21 18:13
20:1 23:8
26:9 27:8,12
30:21 32:12
37:3 41:16
48:4,9,15
62:1 64:11
69:21,22
73:25 78:24
83:19 85:16,
18,20,23
86:1,17 93:5
100:4,10
103:9 105:19
107:23
121:21 127:9
128:13,25
129:22
137:24 140:7
148:5,10
149:6
**surprised**
95:4

**surroundings**
36:22,24
**surveillance**
51:8,23
101:16 104:2
**suspect**
13:24 14:7
15:14 21:18
24:17,24
42:15 45:4,
10
**suspected**
91:8,16
92:16
**suspicion**
18:3 19:2
20:6 42:11
44:22 64:7
**suspicious**
20:23
**swimsuit**
26:23 32:4
70:16
**sworn**
4:6 5:5

---

**T**

**take**
4:17 6:6
11:21 33:11
49:8 54:11
61:10 65:5
78:22 82:25
95:14 96:3
105:20 108:6
123:19
137:10
149:14,16,17
**taken**
4:18 5:9
63:11 78:7,
25
**takes**
137:12
**taking**
44:4,5,10

61:15 62:16
83:24
**talk**
7:11,13 11:7
13:9 41:14
76:17 78:15
81:20 142:2,
14 143:6
148:11
**talked**
88:4 131:6
**talking**
5:14 8:14
11:24 13:24
14:10 87:6
100:22
122:10
130:22
132:19
**tall**
38:24
**taser**
33:23 34:6
53:16,18
54:8 57:1
65:5
**technically**
19:13
**tell**
9:9 17:18
20:14 33:3
35:13 42:4
45:9 63:14
70:13 83:14
93:11 101:24
102:1 121:11
138:14
142:21
143:14,24
144:15
**telling**
22:16 82:15,
22 87:22
88:24
**tells**
19:4 20:4
64:24

Joseph Strzelecki
April 24, 2024
27

**temporary**
  23:10,15
  24:11,15,18
  25:1
**term**
  15:21
**terminate**
  128:1
**terminated**
  126:11,13
**termination**
  127:17
  128:10,16,23
**testified**
  4:7 144:23
**testimony**
  5:3,4,5
  113:24
**text**
  12:9
**thing**
  6:4 11:23
  43:17 47:16
**things**
  13:4,18,22
  17:17 27:15
  41:10 59:10,
  20 71:19
  72:12 86:9
  107:11,15
  108:11
  130:9,12
  131:16
  137:15 138:1
**think**
  9:16 10:6
  47:7 66:9
  94:2 98:3
  140:25
  144:23
**thinking**
  41:20,21
  42:5 43:23
  69:18 72:1
  74:4
**third**
  113:13,23

**Thirty**
  76:20
**thought**
  71:5 122:15
**threat**
  14:14,17,20,
  21 15:3,14
  17:5 34:25
  37:21 38:3
  54:16 55:8
  57:6,21
  66:6,10
  67:22 69:5
  71:19 139:7,
  11,13
  148:20,24
  149:3
**threatened**
  29:9 59:15
  61:8 132:12
  134:1
**threatens**
  58:24 59:4
  60:11
**three**
  43:20
**time**
  5:10 6:3
  10:10 13:6
  17:18 18:1,
  19 25:8 31:1
  33:14,18,20,
  21,23 34:19
  35:2 38:13,
  19 39:20
  42:2,8,10
  43:8,23
  45:15 49:9,
  12,19,22
  50:19 52:7,
  18 53:2 55:7
  56:4 60:20
  62:11 64:5
  65:12 69:18
  70:11,15
  71:3,8,25
  72:13 74:2,
  19 75:21

  83:13 86:7
  87:7,19
  90:18,20
  91:2 92:23
  94:22 97:10
  99:11,19
  101:3 102:25
  103:2,16
  110:9 113:3,
  13,17 115:4,
  11,20 117:18
  118:11
  121:17
  122:24
  129:22,25
  130:6,8
  132:20
  136:13,24
  137:16,18
  138:24,25
  139:12,19
  140:2,5
  143:10
  145:19
**time-stamped**
  52:2,5,22
  80:15
**timely**
  72:9,21
**times**
  53:4 65:4
  66:8 99:12
  101:6,18
  109:4,13
  113:16 127:3
  147:13
**today**
  4:14,18 5:4
  6:10 8:12,19
  33:3 50:20
  68:14 72:7
  73:8,15,25
  81:22 100:6
  113:24
  114:17
  115:3,8
  116:7 117:10
  128:15

  129:23
  131:10,17
  132:23
  133:6,15
  134:10
  141:3,6
**told**
  38:12 64:22
  75:4 76:13
  87:18 94:2
  108:15,20
  109:3,12
  110:9,21
  111:6,16,17
  112:6 113:3,
  20 118:24,25
  119:2
  121:19,25
  122:18 134:5
  142:23
**tone**
  144:20
  147:3,7,14
  148:1
**tools**
  13:3
**top**
  9:4,21 93:8
**topics**
  141:7
**tortured**
  18:15
**totality**
  13:7,15,19
  14:24 59:23
**touch**
  37:8
**touched**
  63:16
**Trail**
  6:22
**trained**
  15:13 82:11
  136:18
  137:14,25
  138:2,21
  139:16,19,21

Joseph Strzelecki
April 24, 2024                                                      28

140:8,14,16,
  23 144:7
**training**
  9:2,3,9
  12:23 13:10
  33:24 34:2
  57:2 65:8
  136:22,23
  137:3,9
  139:18
  144:17 148:7
**trainings**
  9:8,11,12,21
  139:23
**transcript**
  5:2
**transmission**
  26:18 27:18
  28:4,19
  29:3,12,25
**transmissions**
  26:8,11
  30:16 31:15
  131:22 132:2
**transpired**
  53:8 142:24
**transported**
  121:6 143:8
**trauma**
  140:11,16,
  19,22
**trouble**
  19:24 130:9
**true**
  119:7
**trust**
  63:10 92:7,
  10
**trusted**
  83:25
**try**
  5:12 34:10
  82:13,20,23
  83:4,8
**trying**
  16:1,10
  18:15 68:21

69:21,22
  73:4 104:19
  144:1
**turn**
  25:5 32:10
**turned**
  11:12
**two**
  25:23 29:18,
  22 31:18
  32:17 33:8
  38:22 43:20
  45:16 59:4,
  20 60:13
  77:15 83:11
  113:4,12,16,
  23 114:1,19,
  22
**type**
  21:2 37:5
**typed**
  121:13
**typically**
  106:13
  107:12
**typing**
  123:4

_____

_____

          U

**Uh-huh**
  139:8
**ultimately**
  145:9
**unclear**
  18:16 133:16
  141:11
**understand**
  5:20 8:18
  10:8,24
  11:1,9,13,23
  16:22 31:24
  68:13,19
  69:24 74:2,
  15 76:9
  95:10 103:18
  107:7 135:6,

12 139:1
  141:9
**understanding**
  7:9 13:1,11
  14:13,22
  16:14,15,24
  17:7,14,20,
  24 18:4
  19:5,17,23
  20:2,7
  21:12,17,18
  31:4,6,11,16
  39:18,23
  40:7 41:2
  42:7 45:18
  49:2 50:16
  56:6,19,24
  58:12,16
  60:1,14 62:1
  64:12,16,19
  65:23 66:11,
  18 74:14
  76:8 87:12,
  16,19 88:19
  98:18 104:21
  107:24
  117:21
  126:15
  127:6,16
  129:9 134:7,
  11,16,23
  136:22,23
  137:4 138:15
  140:24
  148:17
**understood**
  5:22 10:11
  31:18,21
  42:1 48:23
  74:18 107:4
  129:5 141:14
**unholstered**
  53:18 67:25
  68:24 69:6
**unjust**
  144:3
**unlawful**
  16:25 74:20

95:24
**unlawfully**
  77:20
**unreasonable**
  60:25 61:4
  146:9,12
**unreliable**
  107:18
  119:22
  129:15
**unsure**
  129:10
  130:12
**unwieldy**
  18:16 131:14
**uttered**
  112:14

_____

          V

**vacated**
  61:24
**Valerio**
  30:10 87:10,
  11 88:3,18,
  20 89:2,14
  91:11 92:18
  93:11,15
  94:6,12
  95:4,13,18
  98:10
**Valerio's**
  87:16
**value**
  99:17
**vantage**
  67:11 68:4,
  10,17 69:2
**vehicle**
  34:15,17
  40:19,25
  143:12,16
**verbal**
  5:17 12:15
  13:5 16:10
  22:6,12,18
  88:7

**verbally**
  46:15 97:6
**verbatim**
  4:23
**version**
  107:1
**versus**
  45:23
**veteran**
  83:12,14
**vicinity**
  58:3
**victim**
  40:8,13
  42:14 43:3
  87:12,17,23
  134:21
  135:6,12,16
  136:1,4
**victimized**
  134:1
**video**
  8:7 36:21
  51:2,16,19,
  20,23 52:3,
  11,14,20
  53:13,15
  54:2 55:22
  81:4,7,19,23
  87:2,4,15
  88:14 89:10,
  21,22,23
  90:7,13,23,
  24 91:4
  92:13 94:17,
  25 96:21
  97:8 99:5,
  13,22 100:5,
  9,14,17,23
  101:4,5,8,9,
  14,16
  102:12,18,23
  103:22
  104:4,6,10
  110:7,15,20
  111:10
  112:20
  114:9,13

  115:2,11,13,
  24 116:7
  117:10,22
  132:17
  133:3,12,21
  134:19,20
  146:20
**videos**
  103:6 104:22
  113:25 115:8
**videotape**
  90:9
**view**
  5:3 34:15
  39:4,7 80:9
  143:14
**viewing**
  101:15
**violating**
  17:4 127:20
**violation**
  126:6
**violence**
  120:4
**visible**
  54:24
**visualization**
  31:8
**volunteered**
  63:3 92:4
  99:8

_____

           **W**
_____

**waist**
  50:6
**waistband**
  94:18
**wait**
  5:11
**waited**
  93:11
**walk**
  20:18 34:10
  37:25
**walked**
  41:1

**walking**
  19:2,6 20:8
  27:24 81:19
**want**
  7:11 8:1,2
  11:7,14
  13:10 19:3
  25:5 27:9,14
  31:15 34:10,
  20 37:25
  55:3 61:25
  65:4,25 73:5
  76:17 79:7
  80:9,11
  83:19 88:18
  99:12 103:5
  104:20 108:6
  118:5 122:9
  136:21
  139:3,18
  141:7 144:25
  148:11
**wanted**
  18:25 37:3
**warranted**
  57:21
**watch**
  51:12 55:22
  104:11
**watching**
  81:22 94:18
  113:25 114:9
**way**
  12:3 27:10
  28:15 32:10
  41:8 48:22
  59:3 62:5
  69:12 98:3
  108:14 117:1
  135:1
**ways**
  23:23 98:7
  128:21
**weapon**
  28:9 37:1,5,
  23 52:25
  55:5 56:14,
  20 57:8,24

  58:2,3,17
  62:3 63:12,
  18 64:4 67:7
  68:25 69:6
  70:11,14,22
  71:2 92:5
  95:6,14
  146:10
  147:18
**weapons**
  70:3 94:21
**wearing**
  35:4 39:1
  70:16
**Wednesday**
  4:2
**weight**
  99:14
**weird**
  128:5
**went**
  32:8 33:14,
  18 41:8 53:5
  60:9 91:24
  93:9 113:12
  121:12
  124:22 125:2
**West**
  6:25
**white**
  26:22 29:17
  32:4 93:3
  95:6
**wife**
  26:24 32:5,7
**witness**
  4:5,8 6:22
  18:12,23
  19:10 21:22
  22:3 23:1,8
  24:3,21 25:3
  26:15 35:9,
  17,25 36:10,
  16 37:10,17
  40:2,8,12,13
  41:4,16 42:4
  43:1 44:4,21
  45:6 46:9

47:22 48:4,
9,15,22
49:24 50:6,
14 55:20
56:16,22
57:8,17,24
58:8,23 59:8
60:3,18 61:4
62:11,16,25
63:20 65:16,
21 66:5
67:18 68:3,
9,16 69:8,17
70:7,19,24
71:8,15,25
72:15,20
73:21 74:10,
22 75:10
76:12 82:7
83:3 84:15
85:2 86:12,
17,23 89:8
93:17,22
94:10 96:2
98:1,13
103:14
109:20
110:9,19
111:15
112:6,16,22
114:5,7
117:15
118:20
119:24
120:15
125:23
128:18,25
129:12 132:4
135:19
136:16
138:19 139:1
144:13
145:24
146:6,12,23
147:10
148:3,5,10,
23
**woman**
46:25

**word**
24:4 63:9
83:24
**work**
5:18 6:19,20
9:18,23
138:3
**write**
106:5 109:22
142:21
**writing**
118:12
**written**
5:2,4
**wrong**
83:20 98:3
117:22
119:19
131:18
**wrote**
8:3 106:2
107:4 108:3
110:2 117:1
118:3 120:19

──────────────

**Y**

──────────────

**yeah**
21:22 22:3,
14 25:3
45:6,25
65:21 66:17
72:22 73:21
76:2 98:8
102:8 110:22
115:22
119:24 125:1
126:22 138:1
139:17 140:9
142:18,23
144:21
147:20,23
**year**
9:21
**yelling**
22:19

**young**
83:11
**younger**
84:13,19,23

──────────────

**Z**

──────────────

**zoom**
51:14 90:10