# PALM BEACH GARDENS POLICE DEPARTMENT

## INTERNAL AFFAIRS INVESTIGATION

### EXECUTIVE SUMMARY REPORT

| | |
|---|---|
| **SUBJECT EMPLOYEE:** | Officer Bethany Guerriero 321 |
| **INVESTIGATION NUMBER:** | 23-003 |
| **DATE:** | August 2, 2023 |
| **INVESTIGATOR:** | Sergeant Todd Grossman 297 |

On May 10th, 2023, Assistant Chief Pape was directed initiate an internal affairs investigation into the actions of Officer Bethany Guerriero regarding her handling of case # 23-002514. The investigation was assigned to me.

Additionally, Mr. Ryan Gould submitted to the department a formal complaint of Officer Guerriero for her handling of same.

The internal review of this matter is specifically related to:

- Police Policy 4.2.1.1 – Response to Resistance
- Police Policy 2.3.12.3 – Conduct Unbecoming
- Police Policy 2.3.12.2 – Conduct
- Police Policy 2.3.16.16 – Making a False Statement, Report, Communications Report Into Any Official Police Record, or Other Official or Required Report on Record

The following evidence sources were reviewed as part of this investigation:

- Surveillance video from the Sabal Ridge community clubhouse
- Bodyworn camera footage from the following officers:
  - Bethany Guerriero
  - Michael Valerio
  - Robert Ayala
  - Reuben Carter
  - Kellen Stairs
  - Joseph Strzelecki
  - Darrin Walker
- 911 calls (3) from Gould, Salvia, Ivanova
- Radio transmission for call 23002514
- Interview of Sergeant Richard Pearce
- Interview of Sergeant Dennis Beath
- Interview of Officer Joseph Strzelecki

# PALM BEACH GARDENS POLICE DEPARTMENT

- Interview of Officer Michael Valerio
- Interview of Officer Kellen Stairs
- Interview of Officer Bethany Guerriero

Based on my investigation, I find that Officer Guerriero's actions were in violation of Police Policy 4.2.1.1 – Response to Resistance, Police Policy 2.3.12.3 – Conduct Unbecoming, Police Policy 2.3.12.2 – Conduct, and Police Policy 2.3.16.16 – Making a False Statement, Report, Communications Report Into Any Official Police Record, or Other Official or Required Report on Record.

I the undersigned do hereby swear, under penalty of perjury, that to the best of my personal knowledge, information, and belief, I have not knowingly or willfully deprived, or allowed another to deprive, the subject of the investigation of any rights contained in ss.112.532 and 112.533, Florida State Statutes.

Sergeant Todd Grossman 297

# PALM BEACH GARDENS POLICE DEPARTMENT

## INTERNAL AFFAIRS INVESTIGATION

## INVESTIGATIVE SUMMARY REPORT

| | |
|---|---|
| **SUBJECT EMPLOYEE:** | Officer Bethany Guerriero 321 |
| **INVESTIGATION NUMBER:** | 23-003 |
| **DATE:** | 8/2/2023 |
| **INVESTIGATOR:** | Sergeant Todd Grossman 291 |

On May 10th, 2023, Assistant Chief Pape was directed initiate an internal affairs investigation into the actions of Officer Bethany Guerriero regarding her handling of case # 23-002514. The investigation was assigned to me.

Additionally, Mr. Ryan Gould submitted to the department a formal complaint of Officer Guerriero for her handling of same.

The narrative contained herein details my investigative actions and findings.

## INCOMING 911 CALLS

### 911 Call from Mr. Ryan Gould

On May 9th, 2023 at about 11:27AM, NorthCom communications center received a 911 call from Mr. Ryan Gould who reported that a man had just brandished a gun at him. Mr. Gould provided the location of the encounter as the Sabal Ridge community pool. He was still present on scene with the other involved party. When the emergency operator asked what type of gun was used, Mr. Gould is heard asking the other subject, "What kind of gun ya got, buddy?" before telling the operator it was a Glock. This indicates that while the incident is reported to have involved a firearm, it wasn't deemed as life-threatening to Mr. Gould, otherwise he likely would have fled the scene entirely.

For the entirety of Mr. Gould's phone call, he sounds upset and perhaps a bit shaken, but not unreasonable and is clearly not overstating or exaggerating the situation. In fact, after units were dispatched, he told the operator, "I moved away...I don't feel I'm in danger...the guy has completely escalated the situation and start showing off his gun...I'm not worried about him using it on me currently...but still, you know, that's fucking weird."

### 911 Call from Mr. Benedetto Salvia

At about the same time, NorthCom communications center received a 911 call from Mr. Benedetto Salvia. Salvia was learned to be the other party involved in the altercation with Mr. Gould. He reported that Mr. Gould was "harassing his wife at the pool" in Sabal Ridge. Mr.

Salvia explained that Mr. Gould was "screaming" at his wife, insulting her, and telling her to get out of the pool. The emergency operator asked if Mr. Gould was seen with any weapons and Mr. Salvia answered, "No, I don't think so. I mean, he's in a bathing suit."

As the call continued, Mr. Salvia advised that Mr. Gould was walking away from the situation and was headed to the other side of the community clubhouse. He volunteered that he is a "concealed carrier" and when asked if he was armed, he answered in the affirmative and said his firearm was in the "appendix position." He confirmed that he did lift his shirt to reveal the firearm, alleging that Mr. Gould was aggressively coming toward him and wife, but he never took the gun out of the holster.

Mr. Salvia told the operator that an officer (M. Valerio) had arrived and was talking to Mr. Gould. Throughout the phone call, he was calm and didn't present the current state of the situation as inflammatory or ongoing. The call ended when Mr. Salvia was approached by Officer Valerio.

## 911 Call from Ms. Anna Ivanova

Ms. Ivanova, Mr. Salvia's wife, also called 911. Her call was placed concurrently with Mr. Gould's, as he can be heard in the background talking to the emergency operator. Ms. Ivanova reported what she described as "a ridiculous situation," and that Mr. Gould was harassing her, so she asked her husband to come to the scene. She said she saw no weapons during her involvement with Mr. Gould, but that her husband was currently armed, but the weapon was secured in a waistband holster.

Ms. Ivanova was calm throughout the phone call and remained on the line until officers arrived and were speaking with Mr. Gould.

## DISPATCHED CALL FOR SERVICE (CAD EVENT ID 23123255)

Officers Strzelecki and Guerriero were dispatched to respond to the call, broadcast as a disturbance call at the Sabal Ridge clubhouse pool. The incident was dispatched based on information from Mr. Salvia, and it was communicated that his wife was being harassed and was told to get out of the pool. The dispatcher stated, "54 signal 0," which means no weapons are involved.

The dispatcher acknowledged that Officer Guerriero was responding to the call as a backup unit, as she had changed her status to "en route" on the MDT in her car.

Communications updated the call, advising that the male (Mr. Gould) was walking to the other side of the clubhouse and that the caller is a CCW holder and has a firearm is holstered in "his groin area."

The next transmission informed responding officers that the other party (Mr. Gould) also called and reported that Mr. Salvia approached him, cautioned him to watch what he said, and lifted his shirt to show his firearm tucked in his belt. That individual was described as "a white male, 5'2", 120 pounds, no shoes, with a beard."

It is important to note that there is a stark contrast between the description of Mr. Salvia and that of Mr. Gould. While the reported height and weight of Mr. Sylvia was inaccurate, the information made available to the responding officers was that he was 5'2" and 120 pounds. Mr. Gould is around 6'02" tall and appears to be about 190 pounds or greater. The difference in these statures is such that a reasonable individual would not confuse the two. Additionally, communications broadcast that Mr. Sylvia was not wearing shoes, which suggests he was otherwise clothed. Mr. Gould was wearing flip flops and only a bathing suit at the time of the call.

Mr. Gould was ultimately arrested for a violation of FSS 843.02. The charging officer, Officer Guerriero, was transported to the hospital with chest pains during the call for service. Officer Strzelecki was then assigned to complete the Probable Cause Affidavit and transport based on Officer Guerriero's account of what happened.

Mr. Sylvia was charged with Improper Exhibition of a Firearm in violation of FSS 790.10.

## POLICE RESPONSE AND ARRIVAL – RADIO TRAFFIC REVIEW

The first unit to arrive on scene was canine Officer Valerio. Shortly after, Officer Guerriero speaks on behalf of Officer Strzelecki and informed Communications that she and him were "about to go 97," meaning they were arriving on scene. The operator acknowledged.

Seven seconds later, Officer Valerio radioed to Officer Guerriero, "33 (Officer Guerriero's call sign), I'm making contact on the other side of the pool, just letting you know." His transmission conveyed a calm demeanor. His tone was not elevated or excited and did not demonstrate a sense of emergency.

Five seconds after, Officer Guerriero replied, "10-4."

Eleven seconds elapsed and the next radio transmission was Officer Guerriero, "33, one detained. I need a supervisor."

## POLICE RESPONSE AND ARRIVAL – BODYWORN CAMERA REVIEW

*All times cited are sourced from BWC footage

### Officer Valerio's Bodyworn Camera

At 11:30AM, Officer Valerio arrived on scene and parked his patrol car just north of the entrance to the Sabal Ridge clubhouse office. As he walked toward the clubhouse, Mr. Gould approached from the south side of the building. He was shirtless, carrying a towel in his right hand, and was wearing only a bathing suit and flip flops. His hair and body were still wet from being in the pool.

Upon first seeing Mr. Gould, Officer Valerio asked, "Are you the one with the firearm?" Mr. Gould told him that Mr. Sylvia was the one who was armed and had the weapon concealed. He explained that he was swimming laps in the pool when Ms. Ivanova entered the water and

began interfering with his exercise. Ms. Ivanova asked if Mr. Gould could swim somewhere else, but he insisted that he had been there for about 30 minutes already and was going to continue to swim as he was.

After that, Ms. Ivanova called her husband, Mr. Sylvia, who responded to the scene and would later flash the pistol that was holstered in his waistband.

One minute into his interaction with Mr. Gould, Officer Valerio excused himself to go speak with the other parties on the other side of the clubhouse. He instructed Mr. Gould to remain in the same place as other officers were soon to arrive.

Mr. Gould appeared to be excited by what had happened but was compliant and cooperative in his demeanor and actions with Officer Valerio.

Two minutes and twenty seconds later, Officer Valerio – who was interviewing Ms. Ivanova and Mr. Sylvia – left the pool area in the middle of their conversation to investigate why his police dog was consistently barking in his vehicle on the other side of the clubhouse. He hurried around the structure to find Mr. Gould handcuffed behind his back and seated on the ground. Officer Guerriero was standing at his right side, leaning over him, and engaged in a heated verbal exchange. Officer Strzelecki was standing to Mr. Gould's left.

## Officer Strzelecki's Bodyworn Camera

At 11:33AM, Officer Strzelecki arrived at the Sabal Ridge clubhouse. As he stopped his patrol vehicle, Officer Guerriero is seen walking perpendicularly to his car in the direction of Mr. Gould. The marked police SUV that contained Officer Valerio's canine unit was to his immediate left (south). Officer Guerriero's car was to the right.

Once Officer Strzelecki exited his car, his BWC footage shows Officer Guerriero walking toward Mr. Gould. She passed Officer Strzelecki's car and the canine vehicle.

When Mr. Gould first appears in Officer Strzelecki's video, he is standing near a curb stop in a parking space to the rear of Officer Valerio's vehicle. During the first few seconds of this particular video, the camera view of Mr. Gould is partially obstructed by the front end of Officer Valerio's SUV. As Officer Strzelecki moved from behind the vehicle, Mr. Gould's hands become visible – the left is at his side and the right appears to scratch his head. At that point, the audio had not yet started to record, but Officer Guerriero is seen advancing toward Mr. Gould with her right hand on the grip of her gun.

Mr. Gould reached with his right hand into his right pocket, using the left hand to pinch the front exterior of the pocket to keep his swimsuit from moving as he removed his cell phone from within. He removed the phone and brought it out to his right side, extending both arms parallel to the ground to their respective sides away from his body.

Officer Guerriero was pointing at Mr. Gould with her left hand as she continued to advance toward him with her right hand on the grip of her holstered gun. Mr. Gould took several small steps backward, keeping his hands visible.

Officer Guerriero then ordered Mr. Gould to the ground with her duty weapon unholstered and pointed at him. Officer Strzelecki, responding to Officer Guerriero's actions, drew his Taser to provide less-than-lethal coverage.

## Officer Guerriero's Bodyworn Camera

Officer Guerriero arrived on scene at about 11:33AM and exited her patrol car. Simultaneously, Officer Valerio informed her he was going around back to interview the other parties and she acknowledged as she closed the door to her car. Officer Strzelecki arrived at the same time and pulled into park between Officer Guerriero's and Officer Valerio's vehicles.

From the vantage point of Officer Guerriero's BWC, which is mounted on her chest below her actual line of sight, Mr. Gould could be seen on the far side of Officer Valerio's car.

She greeted Mr. Gould by stating, "Hey man. How you doing? Keep your hands out of your pockets for me." Mr. Gould replied, "I'm not the one with the gun," as he retrieved his phone from his pocket in the manner described above.

Officer Guerriero's tone then escalated and became forceful, demanding to Mr. Gould, "Keep your hands out of your pockets. Put the phone down." Mr. Gould, taking a step back from the advancing officer, replied, "I haven't done a crime. Don't talk to me like that." His hands remained visible. "Listen to me," Officer Guerriero replied, "I don't know you. You can put that down." Mr. Gould stated, "You're the one with the gun," at which time Officer Guerriero drew her firearm and pointed it at Mr. Gould, continuing to walk toward him and ordering him repeatedly to get down on the ground.

As Mr. Gould complied, he appeared confused by what was transpiring. With his hands on the ground and lowering himself into a prone position on the pavement, he voiced a couple times, "What the fuck is this?" as if in a state of disbelief that he was being ordered to the ground at gunpoint. Officer Guerriero yelled, "Because I told you not to reach for anything," in a more aggressive and louder tone.

Mr. Gould continued to exclaim that he had not committed a crime as he put his hands out to his sides at Officer Guerriero's request. As he stated, "I haven't committed a crime. You guys are fucked," Officer Guerriero said, "Now you can put your hands behind your back." As Mr. Gould insisted he was being unlawfully detained and that she "couldn't do this," Officer Guerriero responded, "Yes, I can. I don't know you. "

As Officer Guerriero handcuffed Mr. Gould, he snickered. "Oh, you think it's funny?" Officer Guerriero asked. "Yeah," Mr. Gould replied, "You're arresting me for nothing." "I'm detaining you right now," was her response. When Officer Guerriero was asked for what crime she was handcuffing Mr. Gould, she told him, "Because you don't want to listen," in an agitated tone.

Officer Guerriero, holding Mr. Gould by the arm, instructed him to sit up from the ground. He changed to an upright position then continued to try to rise to his feet. This does not appear to be an attempt to resist the officer(s) or to be combative; rather, it seems in the middle of a heated altercation with a police officer, he was attempting to follow directions, albeit

incorrectly. Officer Guerriero then pulled Mr. Gould back to the ground while screaming, "Sit down! I didn't say stand up. I said sit down!"

Mr. Gould asked who Officer Guerriero's supervisor is. Continuing with an elevated tone, she said, "I'm getting one." He turned to Officer Strzelecki and stated that he did not do anything, questioning why he was being talked to in such a manner and why he was handcuffed. Mr. Gould was not yelling in return but was clearly upset at the circumstances. Officer Guerriero's response was, "You don't want to listen."

Officer Guerriero told Mr. Gould she was there responding to the call of a gun. She was still speaking in a raised, exclamatory tone, "I told you to keep your hands out of your pockets and you didn't."

At that point, Mr. Gould maintained a calmer disposition, but verbally challenged Officer Guerriero's behavior. When he asked why she was yelling at him, she said, "Because I have every right to right now."

In response, Mr. Gould asked for Officer Guerriero's badge number and was answered, "Three twenty-one Guerriero. G-U-E-R-R-I-E-R-O. Make sure you spell it right." As Mr. Gould continued to comment about her reaction to the situation, Officer Guerriero said, "You can shut your mouth now."

Officer Guerriero continued to be inflammatory in the way she addressed Mr. Gould. He continued to challenge his treatment and she interrupted him by yelling, "Can you shut your mouth so I can explain it to you?" As Mr. Gould continued to ask for a supervisor and demanded an explanation for why he was handcuffed, Officer Guerriero again told him to "shut his mouth" so she could explain.

"Look at you. You're furious. What did I do?" asked Mr. Gould. "You did not listen," was Officer Guerriero's reply.

The exchange between Mr. Gould and Officer Guerriero continued with the former becoming more agitated and the latter continuing to yell. Officer Guerriero insisted that Mr. Gould refused to listen when told to keep his hands from his pockets. She replied to Mr. Gould's questions and statements with such responses as, "I've been here for 20 years, punk," and "I'm in charge, not you, with your blue nail polish. Cute," referring to Mr. Gould's toenail coloring.

Officer Guerriero first greeted Mr. Gould at 11:33:12AM. The heated, antagonistic exchange between the two lasted four minutes and twelve seconds when, at 11:37:24AM, Sergeant Glass arrived and called Officer Guerriero away for an explanation of what happened. The following is her initial statement, verbatim:

"So, this mother fucker, we pull up. The other guy felt threatened by him...the other guy that called is armed. The caller calls, I guess he (Mr. Gould) was doing this, harassing the shit out of his wife, yelling and screaming causing a 38 (a domestic dispute) ...the caller has a gun. This guy (Mr. Gould) came at him the way he came at us and he opened up his shirt. He came out here. Me and Strzelecki roll up and he's got his hand in his fucking pocket and I go (gesturing with

both hands as if she is holding a firearm and pointing it) 'Bro, take your hands out of your pocket, right, and then when I (unintelligible)...he goes...he goes and pulls a phone out and he goes to put it back and I said, 'Keep your fucking hands out of your pocket' and I draw down on him and he goes, 'Where am I going to put a gun on a bathing suit?' I said, 'I don't know you,' right? So then he goes to like, um, he goes to like go back in his pockets again. Now he's laughing and I go, 'Get on the ground, right? So he gets on the ground. He tosses his phone to the side. I go, 'Put your hands behind your back,' so I cuff him up. He's like, "look at you, you piece of shit, you're fucking like...just went off, 'You have no right to detain me. 'He goes, 'Resisting arrest is a secondary' and I'm like what are you talking about? So obviously he's amped up on something but when, like the first couple times when he didn't want to listen to me about keeping his hands out of his fucking pockets and thought it was funny, I drew down on him. Fuck that guy."

Sergeant Glass asked if anyone had talked to the other parties. Officer Guerriero replied, "Not yet 'cause Mike (Valerio) came running out; Joe (Strzelecki) went running out; I'm over here literally by myself with this fucking guy."

Officer Guerriero walked over to the south side of the clubhouse to go around back. Officer Stairs, who had arrived on scene late in the altercation, was on the same side of the building. Officer Guerriero hurriedly told him, "Come on," then muttered to him, "Fuck. Jesus Christ. It's a goddamned rookie hour over here. Not you."

Officer Stairs, who hadn't been privy to the confrontation between Mr. Gould and Officer Guerriero, asked her what happened. She told him, "Fucking guy running his goddamned mouth thinking it's funny, keep putting his hands in his pockets so I drew down on him. I don't know who's armed yet. But the way he's acting, apparently we have a 38 situation over here with the wife."

At 11:40AM, Officer Valerio and Officer Guerriero have a conversation with muted BWCs. The dialogue lasted a little over three minutes. Even without sound, it is apparent Officer Guerriero is still upset and agitated. Another officer's hand is seen touching her shoulder in a calming, supportive manner. At one point in the conversation – absent sound – Officer Guerriero repeats that Mr. Gould kept reaching for his pockets as she gestures with her hands to mimic the actions she is purporting.

## PERSONNEL INTERVIEWS

### Interview of Officer Strzelecki

At the time of this interview, Officer Strzelecki had been a police officer with the City of Palm Beach Gardens for about three months not including his Field Training. He recalled the call for service at Sabal Ridge but did not remember details about the descriptions of those involved. He had a basic recollection of the basic gist of the call.

Prior to the call, Officer Strzelecki had personal interaction with Officer Guerriero and stated her demeanor was "good and calm" and they had been joking around. She did not seem angry or agitated.

Officer Strzelecki remembered hearing Officer Valerio on the radio when he advised he was going to talk to the second half of the involved parties. I asked him if he detected any sense of urgency or anything out of the ordinary in Officer Valerio's radio transmission and he said he did not.

Officer Strzelecki arrived on scene within seconds of Officer Guerriero. On arrival, he saw Mr. Gould sitting down and "he stood up as we were getting out of our vehicles." I asked if it was his opinion that Mr. Gould appeared he could be armed and he said, "In my opinion, I noticed he wasn't wearing a shirt, shoes or socks and had on a bathing suit that was not tight, but you could see if there was a print (the impression or outline of a weapon). Not to say that he couldn't have had a knife or something in the back but, um, no." I reiterated the question, "So on first impressions, it didn't appear outwardly that he (Mr. Gould) was armed?" and Officer Strzelecki answered, "No."

Officer Strzelecki said that Officer Guerriero ordered Mr. Gould to keep his hands from his pockets based on the nature of the call. "From what I remember," he explained, "he was kind of fumbling around and I don't remember exactly at which time he was saying this, but he was basically saying, like, who do you think you are?" in an inciteful manner. Officer Guerriero told Mr. Gould to keep his hands from his pockets, at which time he took out his cell phone.

To follow up, I asked, "At any time after he pulled out his cell phone, did he make an attempt that you saw to go back in his pockets?" Officer Strzelecki answered, "No."

I asked if at any point – due to Mr. Gould's behavior – if Officer Strzelecki feared for his safety and he said he did not. He recalled Officer Guerriero producing her firearm and said he drew his Taser in support, figuring that she must have seen something – a weapon, etc. – that he didn't.

When asked if it was clear at the time Mr. Gould was handcuffed why he was being detained, Officer Strzelecki said, "No." Again, he thought perhaps Officer Guerriero observed something that he did not.

Officer Strzelecki previously said he and Officer Guerriero were joking around before the call. I asked him to describe the point at which Officer Guerriero's attitude shifted from jovial and calm to the state of mind displayed on scene. He said she became agitated in response to Mr. Gould's verbal prodding.

After Officer Guerriero was transported to the hospital for a complaint of chest pain, Officer Strzelecki was told by one of the sergeants to complete the PC Affidavit on her behalf. Prior to Officer Guerriero's departure from the scene, Officer Strzelecki had not had the opportunity to discuss Mr. Gould's charge or the probable cause for arrest. He obtained the facts needed to

complete the report from the limited observations he made personally, and the details Officer Guerriero presented earlier to Sergeant Beath.

Mr. Gould was transported from the scene directly to the Palm Beach County Jail by Officer Strzelecki. Sergeant Glass called the jail to reach Officer Strzelecki and told him to bring Mr. Gould back to Palm Beach Gardens and take him home because it was since learned that Mr. Gould was the victim of a crime, and the resisting charge is being discarded.

Officer Strzelecki did not know if Mr. Gould's hands were in his pockets when Officer Guerriero commanded him to avoid placing them there. I asked if in his opinion he felt probable cause existed to charge Mr. Gould with Resisting an Officer without Violence and he said, "It could go either way," further clarifying, "It's a discretionary charge. Would I have done it? No. Do I think it was there? Yes."

## Interview of Officer Valerio

At the time of this interview, Officer Valerio has been a police officer with the City of Palm Beach Gardens for five years and has six years of prior law enforcement experience with another agency.

Officer Valerio recalled the dispatching of the call in question as an armed disturbance. He was not far from the Sabal Ridge community when the call was broadcast and remembered there being mention of a firearm being displayed. He knew the involved parties had been separated but was unsure of which party had the firearm.

Prior to the call, other than in shift lineup at the start of their tour, Officer Valerio did not have any personal interaction with Officer Guerriero.

Officer Valerio confirmed he was first on scene and made contact with Mr. Gould. He recalled his first interaction with Mr. Gould and asked him if he had a gun, describing his demeanor as hyped and angry that he had a gun pulled on him. When asked if Mr. Gould gave any appearance that he may be armed, he replied, "Not from what I could see. No."

I asked Officer Valerio if there was anything about Mr. Gould's actions or appearance that presented a threat to his safety and he said there was not.

Officer Valerio had left Mr. Gould and went to the pool area to talk to the other parties. During that conversation, he heard yelling and his dog started barking, and noted the radio transmission in which Officer Guerriero advised one subject was in custody. Through the commotion, he could not make out specific voices, but he recognized that one of the voices was a female's and he knew that Officer Guerriero had arrived on scene. Officer Valerio ran back around to the front of the clubhouse to see what was going on.

He discovered that Mr. Gould was handcuffed but had no knowledge of why he had been restrained. Officer Valerio inquired about the reason Mr. Gould was handcuffed and advised, "It was said that when they had arrived, he wasn't listening to what they were asking him to do and it kind of turned into a situation where he was placed into handcuffs."

Officer Valerio stated that he was speaking with a subject that had a gun and emphasized the risk inherent in doing so, but despite this, the commotion created on the other side of the clubhouse was so great that he felt he needed to leave that individual to see what was happening. Officer Valerio reiterated that based on his brief interaction with Mr. Gould, he saw no indication that the situation would unfold as it did based on his demeanor. He added that though Mr. Gould was "loud," he was not aggressive or disrespectful.

## Interview of Sergeant Glass

Sergeant Glass has been a police officer with the City of Palm Beach Gardens for about 18 years with ten years of prior reserve police experience. He has been a first line supervisor for 13 years.

Sergeant Glass did not recall any memorable interaction with Officer Guerriero on May 9th, 2023 prior to the call at Sabal Ridge.

He listened as the call was dispatched and was preparing to head toward it when he heard Officer Guerriero ask for a supervisor. At that time, he was unaware of why a supervisor being requested. He did not specifically recall any particular radio transmissions and confirmed there was no radio traffic that heightened his sense of urgency or implied an elevated risk to responding officers.

Sergeant Glass remembered seeing Officers Strzelecki and Guerriero standing over a man (Mr. Gould) that had been handcuffed. He described Officer Guerriero as "clearly agitated." He said, "I don't want to use the term 'amped up,' but she was clearly agitated. There was bantering going back and forth between (Gould) and her." He tried to get her attention to call her away from the situation and eventually pulled her aside for more information.

I asked Sergeant Glass to describe the "bantering" between Officer Guerriero and Mr. Gould. He said, "There were words going back and forth," but couldn't recall specific dialogue.

Sergeant Glass recalled that Officer Guerriero first told him that she had to draw her weapon and that Mr. Gould was non-compliant, kept going in his pockets and was under arrest for resisting. He said, "She was clearly amped up; I don't know if it was adrenalin."

Sergeant Glass said there was two things about Officer Guerriero's demeanor that bothered him. First, she walked away from him as he was addressing her as if she wasn't even listening to what he was saying. "She's just walking away in the middle of a conversation." Secondly, the fact that Officer Guerriero made it a point to inform Sergeant Glass that she "had to draw down on him" was – as he described – not normal. Sergeant Glass said the situation "just wasn't sitting well" with him.

As it was explained to Sergeant Glass by Officer Guerriero, probable cause was established to charge Mr. Gould with Resisting an Officer without Violence. He pointed out that no one on scene could say if Mr. Gould had been searched, which he noted as odd given that he was placed in handcuffs for non-compliance on a call involving a weapon.

After a conversation with Mr. Gould, Sergeant Glass observed Officer Guerriero speaking with Sergeant Beath. They gave Officer Guerriero the opportunity to explain the probable cause for Mr. Gould's arrest, for which she provided. Later, after speaking with Mr. Sylvia and his wife, the Sergeants on scene were able to contact a property manager to allow them into the clubhouse, and Sergeant Glass felt the need to watch the community's surveillance cameras because he had a "gut feeling" and "something wasn't sitting right" with him.

Once inside the clubhouse office, the Sergeants and Officer Guerriero were able to access the video footage. Sergeant Glass noticed Officer Guerriero appeared ill and noticed on her smart watch that her heart rate was elevated. She was transported to the hospital via ambulance soon thereafter.

I later asked Sergeant Glass to elaborate on the terms "agitated" and "amped up" that he used to describe Officer Guerriero. "She was not...she just clearly was...almost like she was aggravated with the whole thing. Like body tight, language, just...she clearly was...it was like an overload of adrenalin was in her system. I don't know how else to describe it. She clearly was either agitated, amped, adrenalin, I'm not sure what. We've all been in those kinds of situations, but she just seemed like it was beyond her control." Sergeant Glass summarized Officer Guerriero's demeanor as "clearly mad. Angry."

I reiterated that Sergeant Glass felt it was unusual that Officer Guerriero told him that she drew her weapon and asked him to expound on his reasoning. He said he doesn't remember an officer ever telling him he had to "draw down," and that typically he would hear a radio transmission in which an officer advised they have someone at gun or taser point. It's not, as he said, a conversation he's ever had with an officer in the past and felt it is an attempt to justify one's actions. Later in the interview, Sergeant Glass told me he still doesn't know why Officer Guerriero asked for a supervisor and that it is not a common practice to call a supervisor just because an officer made an arrest.

Officer Valerio told Sergeant Glass he wishes he had remained on scene with Mr. Gould for 30 more seconds. When he was asked why, he said because everything was calm when he was there. This was a sentiment Officer Valerio expressed to me as well, and it was another point to Sergeant Glass that bolstered his instinct to review camera footage.

After Officer Guerriero was transported, one of the sergeants had Officer Strzelecki take over the call. Sergeant Glass did not discuss the probable cause with Officer Strzelecki, nor did he read it upon completion. He returned to the police station and began to watch bodyworn camera footage.

While reviewing the footage, he found that Mr. Gould was overall compliant, aside from removing his phone from his pocket after being told not to reach into his pocket. It was about an hour into the call when Officer Valerio was able to review surveillance footage from the Sabal Ridge clubhouse. He called Sergeant Glass and informed him that Mr. Gould was the victim in the initial matter.

Sergeant Glass was sympathetic to Mr. Gould's position as someone who had just been threatened with a gun during an altercation and understood why he was challenging the officer's actions. After watching the video and learning that Mr. Gould was the victim, Sergeant Glass brought the matter to the attention of his Captain and Major. It was decided that Mr. Gould should be made whole and brought home from the jail.

I asked Sergeant Glass if – after reviewing the bodyworn camera footage – he felt there was a discrepancy between what Officer Guerriero told him about the incident and what her camera showed. He said there was. Sergeant Glass advised he did not see Mr. Gould reach into his pockets several times; he did not see him being non-compliant. He could see Mr. Gould was upset at the situation and said that he asked himself how many times in his career he's had to ask people to keep their hands from their pockets several times, but never considered it rising to the level of a charge for resisting an officer.

Sergeant Glass told me that what "really struck" him was while watching the footage from Officer Strzelecki's camera, there's a moment in the video where she (Officer Guerriero) is "literally grimacing with her…I think her hands are clutched; she has this scowl, facial expression, tightened lips, the whole bit…staring at him, Mr. Gould, and he looks up at her and goes, 'What's wrong with you? Look at you,' or something like that. And then she just stood up and she's just kind of moving back and forth with her hands and…totally different than what I got [as an explanation from Officer Guerriero]."

I asked Sergeant Glass if he felt that probable cause existed based only on the video footage and he said he did not.

## Interview of Sergeant Beath

Sergeant Beath has been a police officer with the City of Palm Beach Gardens for about 18 years, with the last seven as a first line supervisor. He spent 12 years in the United States Marine Crops and Navy prior to that.

Prior to the call for service in question, Sergeant Beath had some interaction with Officer Guerriero and didn't note anything uncommon with her mood or demeanor. He responded to the scene at Sabal Ridge after Officer Guerriero requested a supervisor via radio. Before that, he did not hear any radio transmissions related to the call.

When he arrived, Sergeant Beath saw Officer Guerriero "sitting there." He said, "She was pretty angry. Marc (Sergeant Glass) was already there. She seemed pretty angry at the situation that had just occurred…." Officer Guerriero was engaged in conversation with Sergeant Glass and Mr. Gould was already in a police car. I asked Sergeant Beath to explain what he meant by "angry," and he said, "she just fucking looked angry." He asked what was going on and "the first thing out of her (Officer Guerriero) mouth was (paraphrasing) something along the lines of "this fucking new guy. This is his call and now I'm taking it over." He tried to calm Officer Guerriero. She was "very animated, like, with her hands," and said, "She goes I get out of the car and this guy's got his hands in his pockets. I was polite at first. I said 'sir, keep your hands out of his pockets. He was walking towards me and he put his hands in his pockets

again and I told him get your hands out of your fucking pockets." Sergeant Beath described Officer Guerriero physically motioning with her hands going in and out of her pockets to describe Mr. Gould's actions and said Mr. Gould removed the phone from his shorts in a rapid motion to be antagonistic toward her. Based on what he was told, Sergeant Beath supported the arrest.

Officer Valerio told Sergeant Beath that Mr. Gould had told him he would decline prosecution if Mr. Sylvia apologized. He told Officer Guerriero about that and asked if she wanted to "cut him loose." She replied, "No way. The guy was a dick," and that the charge was "Obstruction."

Sergeants Glass and Beath discussed the matter and Sergeant Glass was insistent on watching the bodyworn camera footage of the officers on the scene. Sergeant Beath noticed the camera at the clubhouse and began the process of contacting a community representative to obtain the footage.

In the clubhouse, Sergeant Beath saw Sergeant Glass asking Officer Guerriero if she was alright as she complained of chest pain. The sergeants had Officer Guerriero remove her body armor carrier. Sergeant Beath gave her bodyworn camera to an officer to bring to the station and dock so the footage would upload immediately.

Sergeant Beath recalled the conversation with Officer Strzelecki when he presented the probable cause affidavit and noted that Mr. Gould's actions were not clearly articulated. Officer Strzelecki advised that he did not see the actions that Officer Guerriero reported, so Sergeant Beath had him write what she said before being taken from the scene that established the elements of the charge – that Mr. Gould repeatedly in an antagonistic manner put his hands in an out of his pockets several times, produced his phone in a manner intended to incite the officers, and refused to comply with instructions. He then signed the final draft and Officer Strzelecki transported Mr. Gould to the County Jail.

Afterward, the sergeants convened in Sergeant Glass' office where he had already started watching Officer Guerriero's bodyworn camera footage. Sergeant Beath described his reaction to what he watched, "What I saw….(exhales) I was pretty amazed with what I saw. I've never seen someone act like that. (Laughing) I've never seen someone act like that, I can tell you this…I saw her get out of her patrol car. Now, remind you, please, when you look at that body camera, it's in the center of her chest so you have a good 12-15 inches before her eyes. She gets out of the patrol car. And this is not Monday morning quarterbacking. I watched the video one time…all the way through. It's after that is when I rewind it and Monday morning it. She get's out and there's another patrol car…the engine block is blocking the lower torso of this guy. You see him walking towards her and she's like walking towards him. Very polite, she's like, "Sir, can you get your hands out of your pockets," and it just escalated right after that one sentence. It was 'get your fucking hands out of your pockets, I don't know who the fuck you are.' And he was like "What are you talking about?' He was motherfucking her back and it just became a sword fight. It became a verbal swordfight. He had his hands up. He had his phone…just seeing from the quarter panel I could at least look at someone's shoulders and see what they're doing if he's putting his hands in and out of his pockets. He was like casually

walking towards her. Then I saw him, she was like get your hands out of your pockets, I saw him raise his hands, he puts his hands back down and then comes back up with his phone in his hand..."

Sergeant Beath described Mr. Gould's hand placement as what someone would normally do if told to put their hands up by the police. He continued, "You've got to be fucking kidding me. You've got to be fucking kidding me. It was just 'x' amount of minutes of just attacking each other, the two of them."

I asked Sergeant Beath if Officer Guerriero's account of what happened mirrored what he saw on video. He explained that he does not believe Officer Guerriero lied about the incident, but that her perception was skewed by the heightened state she was in. He said that watching footage from other cameras allowed him to see the event from different perspectives. In doing so, he was able to see that Officer Guerriero drew her firearm after Mr. Gould produced his cellphone and raised it to his side.

Sergeant Beath spoke to the perception of individual officers and opined that what he viewed on bodyworn camera footage is not necessarily an accurate portrayal of what Officer Guerriero believes she saw. That said, he offered that after watching her footage, he watched the footage of other cameras. Sergeant Beath recounted that Officer Valerio was first to respond to the scene and met with Mr. Gould – who was soaking wet and holding a towel - asking him if he had a gun.

He described Officer Valerio's interaction as cool, calm, and collected, "not all hyper about anything." He offered that Mr. Gould's demeanor was also "cool" at the time and portrayed what he felt Mr. Gould was experiencing at the time as, "Cool. Yeah, man. I'll just sit right here." He continued, "He probably sees her car pull up. He stands up and is like (hums a melody) here's the cop that he told me I was going to talk to, you know? And, fuck, I'm getting a gun pointed at me again here, so..."

In summarizing Officer Valerio's interaction with Mr. Gould, Sergeant Beath observed that Mr. Gould was not agitated. I asked who made the decision to release Mr. Gould and to bring him home and Sergeant Beath emphatically said, "I made that decision." "When was that decision made?" I asked. He replied, "That decision was made when I watched the surveillance footage that Gould...everything that he told Valerio was 100 percent true about the incident that took place at the pool. I saw that video and as I'm watching it I'm like 'get that man out of jail, get him the fuck out of jail, get him fucking out of jail right now, get him out of fucking jail, Marc (Glass), I'm telling you you'd better fucking get him out of jail.' 'Are you serious?' You'd better start making fucking phone calls. I'll drive down there personally and pull that man out of jail and drive him to Red Lobster and get him something to eat and get him home.'"

In response to Sergeant Beath's animated reply, I asked what influenced his decision to have Mr. Gould released. He responded, "He didn't commit a crime. He didn't commit a crime. And I'm not going to sit there and do something illegal, immoral, or unethical because some dude was a dick. That's it. I'm not going to ever change the decision I made on that. Get him home."

Sergeant Beath reiterated that Officer Guerriero's perception of Mr. Gould's actions was subjective and exclusive to her, and that the presence of a patrol vehicle in camera view between her and Mr. Gould lends itself to her credit in that she may not have been able to see Mr. Gould's lower half. That includes his hands when they were down to his sides. However, upon seeing the incident from other camera views, he realized that probable cause to charge Mr. Gould with a crime – to include Resisting an Officer without Violence – did not exist. My review of Officer Guerriero's bodyworn camera shows that upon her initial response and interaction with Mr. Gould, her point of view was *not* obstructed as Sergeant Beath recalled.

Visiting Officer Guerriero at the hospital, Sergeant Beath spoke with her about the incident. She asked him who took Mr. Gould to jail, and he told her, "Joe (Strzelecki)." "Good. That guy needed to go to jail," Officer Guerriero said. "No, he didn't," Sergeant Beath said in reply, "Matter of fact, I removed him from jail." She questioned Sergeant Beath's statement, and he assured her that he did, in fact, have Mr. Gould taken home, informing her that she didn't have probable cause to make the arrest. At that point, Sergeant Beath said, Officer Guerriero no longer communicated with him.

Sergeant Beath described Officer Guerriero's anger on the scene as "absolutely uncommon." He said, "Usually as a police officer, you make an arrest, you get some high fives. Hey, good job, great, hey, go help her out with the paperwork. Help secure the scene. The number one thing about this job is we don't work alone, you know...with this one, she put herself on an island. I've never seen her in this fashion."

At the conclusion of the interview, Sergeant Beath stated that he still (at the time of the interview) did not believe Officer Guerriero was lying about her observations, but that she exaggerated the events to justify her actions.

*On Wednesday, July 26th, 2023, I spoke to PBA Counsel Brennan Keeler, who requested that I interview Officer Keelen Stairs and Sergeant Richard Pearce, given that they were on scene at various times throughout this incident. I arranged to interview them both the following day.*

## Interview of Officer Stairs

Officer Stairs has been a police officer with the City of Palm Beach Gardens for five and a half years. He recalled responding to the call for service in question, 23002415. He remembered the call was dispatched as a dispute between parties at the community pool (in Sabal Ridge) and there was mention of a firearm, but he didn't remember exactly what role each party played.

When asked if he remembered any specific radio transmissions from the event, Officer Stairs recalled Officer Guerriero requesting a supervisor and broadcasting that she had "one in custody," which is what he credited for prompting his response as a backup officer. He wasn't initially dispatched to the call but could hear in Officer Guerriero's voice that "there was something going on," so he thought it best to offer his assistance.

Upon arriving, Officer Stairs saw a group of officers standing around Mr. Gould, who was "yelling and yelling and yelling" at those near him. Gould was seated and handcuffed at that time.

Officer Stairs did not recall any specific interaction with Officer Guerriero prior to the call. He described her demeanor on scene as aggravated with "his (Mr. Gould) demeanor." He further added that Mr. Gould's disposition at the time was "highly agitated, with everybody and everything around him." When asked about what Mr. Gould was saying, Officer Stairs said that Mr. Gould was "asking why he was being detained, trying to say that he didn't commit a crime…"

I asked Officer Stairs about the conversation he had with Officer Guerriero as they two walked around the clubhouse toward the pool. He recalled that Officer Guerriero told him that Mr. Gould was not complying with her, being verbally non-compliant, and that he "kept putting his hands in his pocket when she was asking him not to, and that caused her to draw her weapon."

Officer Stairs said that during that conversation, Officer Guerriero was "still upset with him (Mr. Gould). He did not recall details of the conversation he had with Officer Guerriero during which their bodyworn cameras were muted, nor did they discuss the elements of offenses for which Mr. Gould would be charged.

## Interview of Sergeant Pearce

Sergeant Pearce has been a police officer with the City of Palm Beach Gardens 19 years, with the last five as a Sergeant. He recalled the nature of the call (23002514), but did not recall any of the radio traffic related to it. He noticed the call on the Mobile Data Terminal and that it involved a firearm, which led him to respond as the shift supervisor. There was no urgent radio transmission — "I hadn't heard anyone yelling or screaming that I can remember. I don't think I went lights and sirens."

The parties involved in the call were already separated when Sergeant Peace arrived alongside Sergeant Glass. Mr. Gould was being positioned in a patrol vehicle when he arrived. Sergeant Pearce did not recall a radio transmission requesting a supervisor and recalled he did not play a "huge role" in the call.

I asked Sergeant Pearce if he remembered a conversation with Officer Guerriero and Sergeant Glass in what he referred to as a "huddle." He said that Officer Guerriero told him she had grounds for "resisting," but Sergeant Pearce didn't recollect much else. He offered that the scene was confusing when he was there, referring to the fact that the individual that actually possessed the firearm was seated with his wife at the clubhouse. Shortly after, Sergeant Pearce identified that three sergeants were not needed on scene and decided to leave.

I asked Sergeant Pearce to articulate what he — as a supervisor with 19 years of police experience — found confusing about the scene. He said that there was a gun involved, but it wasn't readily apparent who had it. He assumed "the guy handcuffed was the one who had the gun…obviously I was wrong on that."

My next question focused on the specific commands given to Mr. Gould by Officer Guerriero to which he failed to comply. Sergeant Pearce said, "It would be paraphrasing. I know Beth [Guerriero] said that she told the guy [Mr. Gould] to..she gave him orders, he did not do anything that she asked him to do. I believe she admitted she drew down on him, got him on the ground, and proceeded to have him handcuffed...and I know obviously there's a little bit of controversy going around with that part about it...without watching the video I don't know exactly what was said or done...I know that she said he would not listen to her commands and that there was a gun somewhere and that she wanted him to do what she ordered him to do."

Asked to describe Officer Guerriero's demeanor, Sergeant Pearce said, "She was running hot. She was on...you could tell in her head she was on a hot call. She...she was stressed. You can tell she was under stress in that situation."

During previous interviews, Officer Guerriero's behavior was described as agitated and angry. I asked Sergeant Pearce if he concurred with that assessment, and he said agitated was a suitable adjective. He said that he would be agitated as well if someone wasn't listened to his commands on a firearm call, mainly because "they're forcing you to make life decisions that you don't want to make."

I asked Sergeant Pearce about Officer Guerriero's attitude immediately after her initial interaction with Mr. Gould. He stated, "I think that Beth, at that time, was still running very hot. I'm not going to say everything she said was right because she did say some...she went toe to toe with this guy. And they were throwing insults at each other if I remember correctly. I'm going to say Beth might have gone too far in that aspect...maybe she let her emotions go a little bit." He added, "Beth is a very emotional person; she wears her emotion on her sleeve."

Summarizing his assessment of Officer Guerriero's behavior, Sergeant Pearce continued to base justification for her actions on the fact that Mr. Gould "forced" her hand and that his actions left her virtually no choice but to act the way she felt was necessary, which was to produce her firearm. His sentiments are predicated on the notion that the information he was given – that Mr. Gould continuously defied lawful orders given by Officer Guerriero – was an accurate representation of what transpired. His response is reasonable; however, I understand the reality of the Officer Guerriero/Mr. Gould interaction to be different from what Sergeant Pearce believed.

Sergeant Pearce, when asked if he felt Officer Guerriero's behavior was professional, said, "No."

When asked if he witnessed any attempt by Officer Guerriero to de-escalate the tense situation, he was unable to offer an answer based on when he arrived and what he witnessed. From his recollection of watching video footage after the incident, he said that Mr. Gould was probably "just as confused as she (Officer Guerriero) was...as far as de-escalation, it depends on how you consider de-escalation..."

Sergeant Pearce asked for clarification on the intended meaning of de-escalation in the context in which it was asked. "I don't know if I would say de-escalation. I would say it was *escalation*

to the point that maybe she felt necessary in order to gain compliance on this individual. As far as de-escalation, it would be hard to say that."

I recounted that after Mr. Gould was handcuffed and obviously enflamed, questioning why he was being arrested. I asked Sergeant Pearce if Officer Guerriero's calling Mr. Gould a punk, telling him to shut his mouth several times, and ridiculing his painted toenails would be considered the opposite of de-escalation, he replied, "Yeah, I would have to agree with that."

Sergeant Pearce did not take part in the arrest documentation or the decision to bring Mr. Gould back from the County Jail.

## WITNESS INTERVIEWS

On June 21st, 2023, I spoke to Mr. Sylvia by telephone. I asked if he and Ms. Ivanova could avail themselves for an interview regarding the police response to this incident. He initially agreed, but when he called me back, he told me his legal counsel advised against speaking with me as the case was still active.

Two calls and voice mails to attorney Michael Salnick have gone unanswered.

On the same day, I spoke to Mr. Gould by telephone. He declined an interview as part of the Internal Affairs investigation, citing the videos he has posted to the internet as his statement on the matter.

## SUBJECT OFFICER INTERVIEW

On Friday, July 28th, 2023, I held an interview with Officer Guerriero in the Patrol Conference Room of the Palm Beach Gardens Police Department. The interview was conducted as scheduled with PBA Counsel Keeler. Assistant Chief Dominick Pape was also in attendance.

Mr. Keeler, in agreement with Officer Guerriero, waived the reading of Garrity into the record and acknowledged Officer Guerriero's receipt of the Garrity Warnings from me as part of her evidence packet. She also indicated that she understood said document.

Officer Guerriero acknowledged that the matter we were to discuss was the handling of case 23002514 and I opened the interview by playing the bodyworn camera footage from Officer Guerriero's BWC, which illustrates her response, arrival, and interaction with Mr. Gould. I played several minutes of the video, but not its entirety.

I provided an overview of the radio transmission from Communications that said a gun was involved, the armed individual was a CCW holder, and had the firearm holstered in his waist. The second caller, Mr. Gould, said the same subject lifted his shirt and showed the holster in his belt, and that the subject was 5'2" and 120 lbs.

I asked Officer Guerriero if she recalled that Mr. Gould, as seen when she arrived, was wearing only a bathing suit and Crocs footwear. She confirmed that she did, and that at the same time she first observed Mr. Gould, she also noticed a "lump" on the ground behind him but couldn't

make out what it was – a shirt, a backpack, a towel. The radio traffic was "very confusing," and the last thing she recalled in the call notes was that the caller was advised to keep his hands free and visible to responding officers.

Officer Guerriero said she was unsure how long Officer Valerio had been on scene prior to her arrival, but she noticed his assigned vehicle when she arrived. She heard him say he was "10-12" (in the company of) with one party "on the other side", but she was unaware of which party he was present with.

Officer Guerriero offered that, "as far as I know, I'm arriving on a scene where I'm not sure if we have a gun secured yet, and that was my understanding arriving there that I don't know where this gun is because I never heard 'I have the gun secured…so when I'm getting out of the car, I don't even respond to Valerio because I'm not sure who is speaking of yet." A review of the camera footage and radio transmissions confirms Officer Guerriero did, in fact, acknowledge Officer Valerio's transmission with, "10-4."

Officer Guerriero claimed that as she exited her car, she was seeing Mr. Gould over the hood of Officer Valerio's vehicle, and she saw that his "hands initially dropped" which prompted her to say "get your hands out of your pockets."

Review of Officer Guerriero's chest-mounted bodyworn camera confirms that Mr. Gould is partially obstructed by a patrol vehicle when she first exited her car; however, her command to keep his hands free from his pockets was given to Mr. Gould at a time when she had a full and clear view of his entire body and at that time, his hands were out to his sides and were not reaching toward or into his pockets.

Officer Guerriero said she was trying to maintain a position of cover as she approached Mr. Gould. While Officer Guerriero briefly pauses just beyond the front of the driver's side of Officer Valerio's vehicle, her video, and that from the clubhouse titled "Parking Lot Cam", contradict this statement, clearly showing that she does not maintain a position that provides any form of cover. In that same video, one can see that Mr. Gould was clearly looking at and operating his cell phone when Officer Guerriero arrived on scene and drove past him.

As Officer Guerreiro exited her car, Mr. Gould put the phone in his front right pocket. While it may be a matter of Officer Guerriero's perception, there is no indication that Mr. Gould's "hands initially dropped," beyond him using his right hand to stow away his phone.

After giving Mr. Gould a command to avoid his pockets, Mr. Gould reached back to his front right pocket using his right hand and took his phone back out.

I reviewed with Officer Guerriero the timeline of events. After giving the command to keep his hands free of his pockets, three seconds elapsed before Mr. Gould took out his phone. From that point on, she agreed that she continued to advance toward him. Mr. Gould had his phone in his hand and never attempted to reach back into his pockets. Officer Guerriero agreed that Mr. Gould's phone was in his hand and out to his side.

Officer Guerriero offered that, "at that point, he was listening to my commands but then once I had gotten him handcuffed but he was still verbally resisting because he went to stand up..."

I directed the conversation back to prior to Mr. Gould being restrained.

I reiterated: "You order him to keep his hands from his pockets."

Officer Guerriero: "Yes."

Grossman: "He takes his hand, he takes his phone out. He's holding it to his side."

Guerriero: "He didn't listen to the first command."

Grossman: "Okay. From that point to the time you drew your gun was eight seconds."

Guerriero: "Okay."

Grossman: "In that eight seconds, he did not reach for his pockets, you didn't give him any additional commands."

Guerriero: "I told him at least twice to keep his hands out of his pockets after the initial drop which, again, I saw from...as I was pulling up I could see this (gesturing) that he dropped his hands as I'm getting out. I got out rather quickly because of that initial hand drop, which is why I greeted him with, 'hey man keep your hands out of your pockets.'"

Grossman: "So when you initially greet him, you gave him an order to keep his hands from his pockets. One time"

Guerriero: "One time."

Grossman: "Three seconds later, he takes his phone out."

Guerriero: "He goes back into his pocket to retrieve the phone at which point I said, "Hey, I told you to keep your hands out of your pockets and I drew down on him because, again, I don't know where this gun is at."

Grossman: "So we have eight seconds in between when he took his phone out of his pocket and when you drew down on him."

Guerriero: "Ok."

Grossman: "And in those eight seconds, the phone was out of his pocket, he made no other attempt to go back into his pockets. Right?"

Guerriero: "From my vantage point, I saw his hands drop. I don't know what else he's going for."

Grossman: "When did you see his hands drop?"

Guerriero: "So, again, from my vantage point, before I even got out of the car, I saw both hands
disappear, which prompted me to say what I initially said to him. And then, as he
disobeyed that command and goes back into his pocket again and pulls out the
phone, he's now saying to me, 'I'm not the one with the gun.' (She then expressed
her concern for the gun on scene that had yet to be discovered.) And I'm still
keeping an eye on what the object was over there (referring to what may have been
a towel, t-shirt, etc). I don't know if he's going to run back to that…"

Grossman: "But he didn't give you any indication that he was going to run for that or make any
movement toward that."

Guerriero: "I didn't give him enough time to do that, though."

Prior to Officer Guerriero drawing her firearm and pointing at Mr. Gould, eight seconds passed
from when he took out his phone, during which the two mutually approached each other. Mr.
Gould gave no indication that he would move toward that item of concern and had ample time
to do so if he desired.

Grossman: "Right. Because after he took his phone out of his pockets, eight seconds later you
drew your gun at him and ordered him to the ground."

Guerriero: "I did."

Grossman: "So you agree then, that from the time he took his phone out of his pocket, he
didn't defy your commands after that, he didn't make an attempt to reach back into
his pockets…"

Guerriero: "I was attempting to control the scene and make it safe and get him secured."

Grossman: "Ok. It was your belief that he could have been armed."

Guerriero: "He could have been, yes."

Grossman: "And you felt that he wasn't following your commands. So you felt the need to draw
your weapon."

Guerriero: "Correct."

Grossman: "You walked past a patrol car on your way to Mr. Gould."

Guerriero: "That was Valerio's truck, I believe."

Grossman: "Did you consider using that for cover if you thought Mr. Gould was armed?

Guerriero: "Well, I did initially. I was hanging out toward the front of that part portion of the truck. That was my initial approach. Then once was I was able to draw down and continue to advance once I had this here and he got down on the ground and I was able to handcuff him. But I didn't readily move from that area. Yes, I'm getting out of the car when someone's trying to walk up on me. I don't know who you are yet. I had no clue that this guy was a victim potential victim."

Grossman: "But throughout that initial eleven seconds or so interaction you continue to walk towards him. You advance the entire time."

Guerriero: "Right, because he's on the ground and I can see where his hands are and I reholster..."

Grossman: "Not when he's on the ground. From the time you get out of your car to the time you made physical contact with him and handcuffed him towards him the entire time."

Guerriero: "Ok."

Grossman: "So there was no pause behind cover. There was no using a vehicle for cover, that's what I'm asking. You felt that he was armed and posed a threat that you needed to escalate to deadly force but you walked past a vehicle where you had an opportunity to get cover, but you didn't, correct?"

Guerriero: "I mean, yeah. But again, like I said, in my mindset at the time, that's nerve wracking. That's uncomfortable. I'm trying to do the best that I can at that point to make a scene secure. I'm not saying that the last thing I'm thinking about is cover, but I'm trying to prevent an incident."

This last statement seems to contradict her previous answers in which she emphasized using the front of the patrol car as cover.

Grossman: "You handcuffed Mr. Gould."

Guerriero: "I did."

Grossman: "At any time, because it's not clearly visible on video, was he searched?"

Guerriero: "At that time, no."

Grossman: "Why not?"

Guerriero: "Again, I was still trying to maintain some type of control because he was so verbally aggressive. I understand he was handcuffed at that time; however, he was attempting to stand up and I needed him seated. He was considerably taller than me

and at that point I needed him sitting on the ground. I don't know why his initial reaction was to want to get up or verbalize to me I'm going to stand up. No, I'm still trying to take control of my situation and make it safe and you're still verbally not compliant with me, so I'm not going to try to now dig into pockets while I'm trying to have you do what I need you to do right now which is to have a seat on the ground."

Grossman: "Right. So he was laying on the ground. And he was handcuffed. And you rolled him over. And you instructed him to sit up. I understand that he obviously didn't, for whatever reason, whether it was intentional or a misunderstanding, he just went to stand up."

Guerriero: "And I said have a seat on the ground."

Grossman: "But you said that he was trying to get up, that you didn't search him because you were trying to control him, but he wasn't trying to get up until you rolled him over and told him to sit up."

Guerriero: "Right. So he was still, he was listening to that command, but you know, like, I just, I needed him rolled over, I no longer wanted him on his stomach. I needed him to sit up. I don't know this person. I don't know if he's taken something…"

Officer Guerriero suggested the reason to roll Mr. Gould over was based on the need to prevent any injury or medical episode given that Mr. Gould could have been under the influence of drugs and it is dangerous to lay someone prone while handcuffed. This reply, however, does not offer any insight into the question of why there was no search when, in fact, the time to search a potentially armed individual would be when he was handcuffed and in a prone position on the ground.

Grossman: "What I'm trying to understand is you felt that he posed a threat to you, there's a gun involved in the call, you don't know if he's the one with the gun or not, you draw your weapon on him, order him to the ground, because there's a likelihood, you believe, that he is armed…"

Guerriero: "Or somebody or something. Yes, I do."

Grossman: "Well, I would imagine it's him (Mr. Gould) because if somebody else is armed there's no reason to point a weapon at him."

Guerriero: "Correct. He was the only one right there in that immediate area."

Grossman: "So, the individual that you point your weapon and handcuff because you believe he is armed is proned out on the ground is never searched."

Guerriero: "Ok. That's correct. Yeah."

Grossman: "Ok. In the conversation that followed, now he's handcuffed, he makes an attempt to get up, he sits back down. Do you believe you made any effort to de-escalate that situation?"

Guerriero: It was difficult for me to initially try to further de-escalate when he was continually yelling and screaming at me back. At that same time, and I watched my video back over again and again and again, because it was at this point that I was not feeling well, I was not feeling right. I was experiencing horrible pain in my chest... I was experiencing trouble breathing... I looked like I had just run five miles.. so was it my finest moment? Could I have done a better job at de-escalation? Yes, but now I'm like worrying about what's going on with my own self...

Officer Guerriero claims this pain began right *after* she secured Mr. Gould. During this experience, she alleges that despite her pain, she was "still trying to maintain a level of control" and "there was a lot for me at that moment going on." She stated that while there was "Still a lot going on," Mr. Gould continued to "yell and scream."

Despite this, Officer Guerriero still engaged in continuing to provoke Mr. Gould, referring to him as a punk, yelling for him to shut his mouth on several occasions, and ridiculing his painted toenails. Clearly, these comments and the antagonistic behavior is not symptomatic of a physical health concern, nor is it conducive to maintaining control of a scene.

Grossman: "You recall the things (Mr. Gould) was yelling?"

Guerriero: "Just that I don't have to listen to you. You're not my mom. You know, I didn't do anything wrong. I just remember — a few times — I don't have to listen to you. What am I under arrest for? I initially explained that he was being detained, but the further I was met with the resistance, he met the statute for resisting. Again, because I couldn't even get to the point of trying to identify who he was because the verbal aggression just continued. It escalated, you know."

Note that while Mr. Gould made that very statement, he did, after all, comply with Officer Guerriero. As a matter of fact, at one point he told officers on scene that he will not physically resist them, though he would resist them "verbally."

If Officer Guerriero was to establish an argument for a violation of FSS 843.02, it could not be found in the fact Mr. Gould was verbally challenging her actions, as once he was handcuffed, he did not defy any lawful order given to him. In answering this question, Officer Guerriero suggested that Mr. Gould's behavior post-detainment was the grounds for a charge of resisting. It did not appear from any video, nor was it made apparent from her statement, that the idea to charge Mr. Gould with resisting was present until well into the call when Officer Guerriero was visibly upset and engaged in escalated hostility with him.

Grossman: "Once he was handcuffed and on the ground...had he been searched and no weapon found, how would that have changed the outcome of that interaction?"

Guerriero: "Again, I'm not 100% sure because still have an unknown with that item over there by the parking stop. I understand it's not physically on his person... but it's still relevantly (sic) close. Again, at the same time, I'm still now feeling all these feelings

happening and...if it's happening to you you're not exactly at your finest moment or 100%. I'm doing the best I can to hold everything together.

Grossman: "So who checked that item out?

Guerriero: "I don't even know or remember."

Grossman: "Did you direct anyone to check that item out?"

Guerriero: "I don't think I did."

Grossman: "So that item was one of the things you mentioned was of concern to you. That it was a potentially a safety issue for you and whomever else might be around. It's a safety issue because you don't know who this guy is and he can be armed and you don't know what's in that item. So he's handcuffed, he's never searched, and nobody checks that item. And he's yelling I did nothing wrong, I'm not the one with the gun, and clearly he's agitated because he's in handcuffs, right? And at no point does anybody say 'let's check that item, let's check him to see if he has a weapon, and let's figure out exactly why this guy is so pissed that he's handcuffed alleging that he did nothing wrong. Right?"

Guerriero: "That's fair, yeah, that's correct."

Grossman: "You agree then that despite the illness you were feeling at the time, you said you're not yourself, that to quote some of things you had said – you called him a punk, mocked the color of his toenails, the manner in which you delivered your name and spelled it followed by 'make sure you spell it right,' telling him to shut his mouth several times, that that was not in the best interest of controlling the...

Guerriero: "Listen, that did nobody any favors at that point in time. I am not one to try and sugar coat that or you know, not hold myself accountable for that. I'm not trying to give you the reason that I was feeling ill was the main component of...I'm trying to give you everything that was going on with me at that moment and how I was feeling at that moment. Was it my finest hour? Absolutely not. Being in this job as long as we all have...we have had moments throughout our careers that weren't our best. That day on a whole, you know, coming back at him, not my finest moment. But again, I'm trying to slow breathing down that's now not normal for me, feeling not normal and still trying to maintain some level of control. Yeah, are there things that could have been done better? Yeah, absolutely. I'm not saying that there wasn't."

Grossman: "...you requested a supervisor eleven seconds into your interaction. Why?"

Guerriero: "A couple reasons. I was actually surprised with this type of call that maybe a supervisor wasn't en route sooner. I felt that supervisor needs to be on this type of call because it seemed hectic once getting there. I felt there was just not enough communication going on to clarify certain things. I felt from the beginning quite

honestly that it was a mess. You now, and that didn't get any better once I got on scene. And it's not out of the norm to either detain somebody or arrest somebody, especially with a potential aggravated assault with a deadly weapon to have a supervisor present or to request one..."

Officer Guerriero described a scene rife with chaos. On the contrary, the radio transmissions from NorthCom were calm and professional, providing information on all parties, the nature of the disturbance, and the presence of a firearm and its possessor without the inflection of urgency. Officer Valerio arrived on scene first and broadcast radio transmissions in an equally calm and professional manner. When he greeted Mr. Gould, it is apparent that Mr. Gould is upset with the situation but is not hostile or argumentative toward the officer. Furthermore, Mr. Gould even told Officer Valerio that if the other party apologized to him, he would decline prosecution.

All of these factors contributed to my objective view that this call was not only under control, but was being handled professionally and without turmoil prior to Officer Guerriero's arrival.

Grossman: "What part of it was a mess before you arrived?"

Guerriero: "Again, I don't know who's who. I can't readily see Mike (Valerio) right away because...the last radio traffic I hear is 'I'm out with one on the other side.' Ok, I couldn't even get out 'who" because I see out of the corner of my eye Mr. Gould walking toward me and I'm quickly exiting my vehicle and I don't know who's who at that point. Like I said, we have a call where there's a firearm, it's not abnormal to request or have a supervisor there or en route or to request one."

Grossman: "So, when you're talking to Sergeant Glass, you had told him that after Gould took the phone from his pocket, he went back into his pocket, and he asked 'Where am I going to put a gun on a bathing suit?" Now, you're paraphrasing obviously...and then went to reach back into his pockets, and this part I verbatim: So obviously he's amped up on something, but when like the first couple times he didn't want to listen to me about keeping his hands out of his fucking pockets and thought it was funny, I drew down on him. Right?"

Guerreriro: "Mm-hmm."

Grossman: "So you've seen the BWC footage. Is that still accurate?"

Guerriero: "So, again. Being in that heightened state that I was, for me, at that moment, it was the truth. Can visions and absolute truth be skewed a little bit because of a heightened state of stress or a situation like that, yes. And that's where I was at."

Grossman: "You do see now though, watching the bodycam, after he removed the phone from his pocket, he did not reach back into his pockets. "

Guerriero: "After I...yes. But again, I'm looking at this not from a...obviously now, but at the moment it's not a hindsight situation.

Grossman: "843.02 is what he was ultimately charged with. Resisting an officer without violence. (Statute read verbatim). Resist, obstruct, or oppose. Now I know you fell ill and left, then this was all relayed to Officer Strzelecki, but obviously you made a decision at some point to charge Mr. Goud with resisting.

Guerrero: "I did."

Grossman: "Resisting, obstructing, opposing. Tell me which part of the interaction you felt satisfied that."

Guerriero: "Um, by the second time I had to tell him to keep his hands out of his pockets on a potential firearm call and I don't know who he is yet.

Grossman: "When was the second time you told him that?"

Guerriero: "When he had drawn out the phone and I had drawn down at the same time because after the first time (unintelligible), so I consider that to be the second time."

Grossman: "But you gave him a second warning, not because he reached back into his pockets after taking the phone out. He never made a second attempt. After he took the phone out he never went back into his pocket. He never reached into his pocket."

Guerriero: "No, but he went back in to get the phone after the first time I told him not to do that."

Grossman: "After the first time. Right. So let's clarify that then. You gave him a warning not to put his hands in his pockets...he took his phone out..."

Guerriero: "I gave him a command to keep his hands out of his pockets because I saw them here, I saw them drop and go here. That is a verbal command to which he did not listen to the first time."

Grossman: "Agreed. He took his phone out of his pocket after you told him that. After that he never made an attempt to go back into his pockets."

Guerriero: "No."

Grossman: "When you drew your weapon and ordered him to the ground, he went to ground and was handcuffed."

Guerriero: "Mm-hmm."

Grossman: "So the basis for his arrest for 843.02 was him reaching for his phone after you told him not."

Guerriero: "I don't know what that was until..."

Grossman: "That's understood. I'm asking, that's the basis for the arrest for 843.02."

Guerriero: "Yes."

I verbalized a summary of the events as Officer Guerriero and I had just discussed. She was then afforded the opportunity to provide a statement for the record. Her statement was recorded and is included in this case file but is not transcribed or included herein as it was not relevant to the handling of the call or the alleged violations by Officer Guerriero.

## Incident Review

Officer Guerriero was dispatched to a call in the Sabal Ridge community during which a holstered firearm was presented during an argument. Three subjects were involved in the incident, and each placed a separate 911 call to NorthCom to report the matter. Mr. Gould was the individual to whom the firearm was presented as a warning to stand down.

Communications advised via radio that the individual with the gun was a licensed weapon owner and that the gun was concealed in a holster in the "groin area." Additionally, he was described as 5'2" tall and about 120 pounds. The subject was reported to be bare footed.

Officer Valerio arrived on scene first. The interaction between him and Mr. Gould was brief, but it was calm and professional. Officer Valerio left Mr. Gould at the entrance to the clubhouse to await additional officers as he went to the pool area to interview the other parties, Mr. Sylvia and Ms. Ivanova. He informed Officer Guerriero by radio that he was going to the pool area to speak with the other party. She acknowledged.

Officers Guerriero and Strzelecki arrived nearly simultaneously with one another. Officer Strzelecki parked his vehicle to the right (north) of Officer Valerio's SUV and Officer Guerriero parked her patrol car to the right of that.

Officer Guerriero began to walk toward Mr. Gould before Officer Strzelecki exited his car. At that point, from her bodyworn camera footage, Officer Guerriero is completely free from the cover of the parked patrol cars and has a clear and full view of Mr. Gould.

It is apparent even at quick glance that Mr. Gould is clothed only in a bathing suit and open-toed footwear. The armed subject was described by Communications as barefoot and concealing the firearm in a holster worn in his "groin area." Having only this information, Mr. Gould is clearly not concealing a firearm in his "groin area" as he is not wearing a shirt. There are no disruptions in the waistline of his swimsuit or conspicuous indicators that there is anything heavy in his shorts.

Additionally, Mr. Gould is approximately one foot taller than the described subject, standing about 6'3". It was obvious upon seeing him that he is not only taller than 5'2", but weighed considerably more than the described 120 pounds.

Officer Guerriero greeted Mr. Gould in a reasonable and calm manner at 11:33:13AM, "Hey man. How you doing? Keep your hands out of your pockets for me." Mr. Gould pointed toward the pool area and replied, "I'm not the one with the gun," as Officer Guerriero continued to walk toward him. At that point in time, she had walked past Officer Strzelecki's patrol vehicle

and was nearing the front of Officer Valerio's SUV. During her interview, she claims to have paused in consideration of utilizing the vehicle as cover, but made other statements indicating she did not.

Within one second – at 11:33:16AM, Mr. Gould reached into his right shorts pocket with his right hand. His hand did not fully enter the pocket and much of it remained visible. He removed his cell phone without pause. At no time did he make any sudden movements or pretend the phone was a weapon in an antagonistic manner as was suggested during interviews.

As Mr. Gould pulled out his phone, Officer Guerriero ordered him again to keep his hands free from his pockets as he raised his hands – his right hand holding the phone out perpendicular to his side.

Officer Guerriero then ordered Mr. Gould to put the phone down at the same time he became defensive, exclaiming, "I haven't done a crime, don't talk to me like that." Meanwhile, Officer Guerriero continued to advance toward Mr. Gould, saying, "Listen to me. I don't know you. You can put that down." Mr. Gould, talking simultaneously with Officer Guerriero, said, "I don't know you. You're the one with the gun." As he spoke, Mr. Gould took several small steps backward, but the small spacing of the steps didn't net more than a few feet of movement.

At 11:33:24AM, a total of eight seconds after Mr. Gould took out his phone – and as she continued to walk toward him – Officer Guerriero drew her duty pistol and assumed a two-handed grip, pointing it at him.

She ordered Mr. Gould to get down on the ground, at which time he looked to Officer Strzelecki, who was standing to Officer Guerriero's left, and asked, "What the fuck is this?" From his perspective, he was the victim of a crime and didn't appear to understand why he was being ordered to the ground at gunpoint.

"What the fuck?" Mr. Gould questioned as he complied and put his hands down to the pavement. Officer Guerriero replied, "Because I told you not to reach for anything." Mr. Gould continued to profess that he hadn't committed a crime as Officer Guerriero gave more commands to extend his arms to his sides.

Officer Guerriero, in her response to Mr. Gould, based her decision to draw her firearm and point it at him for his non-compliance with her command to not reach for anything; however, she drew her weapon eight full seconds after Mr. Gould took his phone out. In that time, his hands never returned to his pockets. He made no movements that suggested he was reaching for anything. His left arm remained extended down at this side, virtually straight at the elbow. His right – for nearly the entire length of the interaction – remained extended in front of him with his index finger pointing toward the officers.

Officer Guerriero alleged that she was concerned about an unidentified object – possibly a towel or shirt – behind Mr. Gould, and stated her actions prevented Mr. Gould from reaching

for that item. This is inconsistent with what all video shows in so far as Mr. Gould had full eight seconds to make a move toward the item but did not.

Officer Guerriero stepped over Mr. Gould and placed him in handcuffs. He physically complied with Officer Guerriero's commands but continued to state he hadn't committed a crime and that she was wrong for her actions. Officer Guerriero quipped, "You think it's funny?" Mr. Gould responded, "You're detaining me for what crime?" and she replied, "Because you don't want to listen."

Officer Guerriero held Mr. Gould's right arm and assisted him to a seated position, giving him the command to sit up. Mr. Gould sat upright but continued to attempt to climb to his feet. This did not appear to be an attempt to subvert the given commands but looked to be more of a response to a misunderstood order given in the middle of a heated exchange. Officer Guerriero yanked Mr. Gould back to the ground, yelling, "I didn't say get up, I said sit down!" Mr. Gould looked to Officer Strzelecki and asked, "Who the fuck is this?" before turning to Officer Guerriero and asking, "Where's your supervisor?"

As Mr. Gould persistently questioned the situation, Officer Guerriero continued to respond in an aggressive and progressively louder manner, seemingly becoming increasingly irate as she was challenged. Mr. Gould even asked Officer Guerriero why she was yelling at him. She made no effort to de-escalate the situation and continued to answer him loudly and, at times, sarcastically. For example, after Officer Guerriero told Mr. Gould she had "every right" to yell at him, he asked for her badge number. She responded by aggressively stating, "321, Guerriero," before sarcastically spelling it for him, followed by "Make sure you spell it right."

Mr. Gould continued to state his case to officers as they arrived, telling them he was detained for no reason. In my opinion, his tone of voice was reasonable based on the circumstances. He was not resisting the officers in any way and was demanding an explanation to justify his being handcuffed and held at gunpoint. Officer Guerriero told Mr. Gould, "You can shut your mouth now," and persistently addressed him with hostility and frustration.

For several more minutes, Officer Guerriero stayed engaged in arguing with Mr. Gould. In her heated responses, she told him to "shut up," called him a punk, and ridiculed his painted toenails. There was no attempt to calm the situation, diffuse the tension, and offer Mr. Gould a reasonable explanation of what had happened to that point.

Officer Guerriero continuously justified her actions as a necessary response to a potential threat since a firearm was involved in the call. The mention of a firearm at a call for service may – given the individual circumstances – warrant the need to temporarily detain involved parties. But it doesn't make such action a necessity. Prior to Officer Guerriero's arrival, Mr. Gould provided no reason to be detained. It was only after Officer Guerriero's reaction to his production of his phone that the scene became volatile.

Mr. Gould reacted in kind to Officer Guerriero's escalation of the situation. She, in her behavior and treatment of Mr. Gould, antagonized and enflamed the conditions of their interaction, making no attempt to calm and diffuse the flaring tempers and emotional responses.

Throughout the entirety of my interview with Officer Guerriero, she made mention of the potential threat that Mr. Gould posed. She spoke to the dangers of a call involving a firearm and a potential aggravated assault with a deadly weapon. The phrase, "I don't know who he is" was spoken numerous times, inferring that Mr. Gould may be dangerous and capable of causing her harm. This concern was used to justify Officer Guerrero's response, the drawing of her firearm, the ordering of Mr. Gould to the ground and physically restraining him. Yet, despite the concern for her safety and the safety of those around her, Mr. Gould was never searched. The belongings near him for which Officer Guerriero expressed concern were also never searched. Those items were never mentioned in any conversation heard on any of the BWC videos I obtained in this investigation.

After this event, Mr. Gould created and shared a video of the incident to YouTube. The video is titled "What happens when you call the PBG PD after you've been assaulted with a g**" and features footage from the Sabal Ridge community cameras. It is subtitled with an explanation of the events in real time. Some of the explanation provided in the video states, "Bethany Guerriero Badge #321…starts screaming at me while shaking and then draws her gun" and "Bethany Guerriero Badge #321 in my face calling me names making fun of my painted toe nails." The video continues for a total of 5 minutes 19 seconds as the subtitles continuously mention Officer Guerriero and the Department by name.

This video has garnered over 11,000 views. There are over 200 comments to the video, almost all which support Mr. Gould and participate in criticizing Officer Guerriero and the Department.

Mr. Gould's video was discovered by YouTube channel LackLuster, a site with over 961,000 subscribers. LackLuster's description on its channel is "The Police are the most conspicuous form of government. We have a duty to keep ALL public officials accountable…" The footage provided by Mr. Gould was then turned into a higher quality production complete with audio narration.

The video paints the picture of a police officer that has lost her composure and control, overreacted, and falsely arrested Mr. Gould. Her name and that of the Department is mentioned throughout the 19 minute 17 second video. There are 9,800 comments in support of Mr. Gould and the video has been viewed over 630,000 times.

Officer Guerriero last signed that she read and understood the Department's Response to Resistance policy on April 20, 2022. She completed Verbal Judo training in November, 2015. She is a member of the Department's Hostage Negotiation Team and is Crisis Intervention Team (CIT) certified.

## Conclusion

Officer Guerriero justified to her Sergeants the arrest of Mr. Gould on the grounds that he refused to comply with her orders and kept reaching into his pockets after repeated commands not to. Bodyworn camera footage proves this was not the case.

In her statements to Sergeant Glass, Officer Guerriero established the imagery of a non-compliant, hostile, possibly drugged individual who repeatedly defied her commands and "kept reaching for his pockets." A thorough and proper investigation that included a search of Mr. Gould's person and property, coupled with consideration of his statements and obvious confusion, would have showed his lack of intent to commit a crime.

Had Mr. Gould been searched, no weapon would have been found. Had his property been searched, that too would reveal no weapon. Had Officer Guerriero given credence to the various declarations of Mr. Gould in which he exclaimed he had not committed a crime and was, in fact, the victim of a crime, those statements could have been considered – along with the fact that he was proven to be unarmed – and a reasonable conclusion made that Mr. Gould did not knowingly or intentionally resist Officer Guerriero. But this was – by Officer Guerriero's own admission – never done.

In my interview with Officer Guerriero, she shifted the reason for arresting Mr. Gould to his verbal hostility after being handcuffed. Mr. Gould was well within his right to verbalize his disdain for the situation. At one point, he verbalized that he had no intention of physically resisting the officers. De-escalation techniques could have impacted the inflammatory nature of her interaction with Mr. Gould. Perhaps if her emotional state had not been compromised, Officer Guerriero would have considered searching Mr. Gould and his belongings for the weapon she feared he may have possessed, determined he was unarmed and was the victim in this case, and released from custody.

If it was Officer Guerriero's perception that Mr. Gould was non-compliant, she was clearly mistaken, and her own bodyworn camera footage shows that her view of Mr. Gould was unobstructed from the time she first greeted him. She claimed that Mr. Gould repeatedly reached into his pockets in defiance of her orders, but this too was refuted by camera footage from multiple angles.

Officer Guerriero told Mr. Gould not to reach for his pockets on two occasions – once upon greeting him and the next as he pulled out his cell phone. If it is her belief that she gave additional commands that he defied and drew her weapon based on that, she is again inaccurate.

If Officer Guerriero believed Mr. Gould posed a threat to her safety, she should not have continued to advance toward him, leaving cover and exposing herself to harm. If she believed Mr. Gould posed a threat because he reached into his pockets after being ordered not to, she waited eight full seconds after he withdrew his phone before drawing her weapon and ordering him to the ground. At no time during those eight seconds did Mr. Gould behave in a threatening or defiant manner.

It is my belief that the drawing of a firearm and its presentation toward Mr. Gould was unnecessary. It was not a response to his lack of compliance. Had Officer Guerriero's concern that he was defying lawful orders been valid, it is reasonable to conclude she would have drawn her weapon at the moment of the threat and would not continue toward it for eight full seconds before deciding to confront it with deadly force.

Officer Guerriero escalated the situation to a deadly force encounter by producing her firearm and pointing it at Mr. Gould. Not only did she fail to employ de-escalation tactics, but she continued to advance toward Mr. Gould, completely exposed, passing by several parked patrol cars that made suitable cover.

Officer Guerriero last signed an acknowledgement or reading and understanding this policy on April 20, 2022.

Based on these facts, I find the allegation that Officer Guerriero violated policy 4.2.1.1 to be sustained.

## Department Rules and Regulations 2.3.12.2 Conduct

*This regulation provides that "members shall present themselves in a professional manner which is courteous, considerate, civil, and respectful. Members must remain fair, firm, consistent, impartial, and non-prejudicial in the performance of their duties and should avoid conduct which would discredit or embarrass the Department.*

At several points during her interaction with Mr. Gould, Officer Guerriero is discourteous and disrespectful. For example, she called Mr. Gould a punk, ridiculed his painted toenails, and told him to "shut his mouth" several times. Furthermore, she continued throughout their interaction to yell and maintained an irate disposition in her treatment of Mr. Gould. Officer Guerriero unnecessarily introduced discourtesy and disrespect into her dialogue with Mr. Gould and it served no purpose other than to further enflame the situation.

Based on these facts, I find the allegation that Officer Guerriero violated Regulation 2.3.12.2 to be sustained.

## Department Rules and Regulations 2.3.12.3 Conduct Unbecoming

*This regulation provides "as the effectiveness of the Department depends upon the community respect and confidence, no member shall conduct himself or herself in a manner unbecoming the conduct of a member of the City of Palm Beach Gardens Police Department. Prohibited acts or behavior shall include any act or disorderly behavior not specifically mentioned in these Rules and Regulations, when such act of behavior tends to bring the Department into disrepute or reflects discredit upon the individual.*

As demonstrated in this narrative, Officer Guerriero acted in an unprofessional and inappropriate manner based on emotion and not proper and safe procedure. She appeared to be blinded by anger, an opinion shared by her supervisors that were on scene and witnessed first-hand her emotional state. Due to her inability to control those emotions, she arrested Mr. Gould, handcuffing him and ultimately having him taken to the County Jail. Upon review of video footage and discovering that probable cause did not exist for his arrest, Officer Guerriero's supervisor had Mr. Gould taken home from the jail and the charges nullified.

Mr. Gould's experience led him to create a video to share the event with the viewing public on the internet, amassing thousands of views. A larger YouTube channel picked up Mr. Gould's

story and shared a professional-appearing nearly-20-minute exposé on Mr. Gould's arrest and treatment, mentioned Officer Guerriero and the Department several times. Over 600,000 viewers saw that production.

Officer Guerriero's actions are the reason why and how this incident unfolded in the way it did, bringing disrepute to the Department on a large scale in addition to bringing discredit upon herself.

Based on these facts, I find the allegation that Officer Guerriero violated Regulation 2.3.12.3 to be sustained.

## Department Rules and Regulations 2.3.16.16 Making a False Statement, Report, Communications Entry Into Any Official Police Record, or Other Official or Required Report On Record

*This regulation is self-defined by its title.*

During this investigation, it became quite apparent that the details of Officer Guerriero's encounter with Mr. Gould were grossly incorrect as she described them to her supervisors and other officers. Her accusation that Mr. Gould repeatedly put his hands in his pockets despite numerous commands to refrain from doing so was demonstrably false. Bodyworn camera footage from Officer Guerriero's own point of view revealed that while Mr. Gould removed his cell phone from his pocket after her first command, her second command was given contemporaneously with said action, and Mr. Gould was subsequently compliant.

Mr. Gould did not repeatedly refuse to comply with Officer Guerriero's commands – specifically to avoid entering his pockets – thereby forcing her hand to the point she felt she had to draw her weapon to confront the threat that he posed. On the contrary, video footage shows an advancing Officer Guerriero drew her weapon and pointed it at Mr. Gould eight seconds after he removed his cell phone. At no time during those eight seconds did Mr. Gould fail to comply with Officer Guerriero's orders.

I find there is a clear, unmistakable contrast between the actual events and the events provided as the basis for probable cause by Officer Guerriero. In her words to her supervisors, Mr. Gould was non-compliant, reaching into his pockets several times in defiance of her orders. That information was then relayed to another officer as the basis for probable cause to charge Mr. Gould with Resisting an Officer without Violence pursuant to Florida State Statute 843.02.

Statute 843.02 states *whoever shall resist, obstruct, or oppose an officer…in the lawful execution of any legal duty, without offering or doing violence to the person of the officer, shall be guilty of a misdemeanor of the first degree…"*

Mr. Gould made only one movement into his pocket to produce his cell phone immediately after being asked to refrain from entering his pockets. That was the only time Mr. Gould disregarded Officer Guerriero's commands and it is reasonable to believe it was not an intentional act of defiance as he was awaiting the arrival of the officers to talk to him, as he was the caller and victim of a crime. Without an intentional act, the violation of 843.02 cannot be

established, and it became evident to Officer Guerriero's sergeants that this was the case once they reviewed her bodyworn camera footage.

The result of Officer Guerriero's actions and subsequent misrepresentation of the facts was the deprivation of Mr. Gould's freedom as he was handcuffed, arrested, and transported to jail.

Based on these facts, I find the allegation that Officer Guerriero violated Regulation 2.3.16.16 to be Sustained under the heading *sustained misconduct not based on the original complaint.*