Page 1

1                  CITY OF PALM BEACH GARDENS

2

3   PBA/FMCS Case Number:  230921-09536
    ISSUE:  Termination/Guerriero, B

4

5

        ARBITRATION BEFORE RICHARD MILLER, ARBITRATOR

6

                          VOLUME I

7

8

    DATE:              April 16, 2024

9

    TIME:              9:40 o'clock a.m.

10

    PLACE:             City Hall

11                     10500 North Military Trail
                       Palm Beach Gardens, Florida

12

    REPORTER:          KIMBERLY IGLEWSKI, Notary Public

13                     of State of Florida at Large

14  JOB NO.:           6456507

15

16

17

18

19

20

21

22

23

24

25

```
                                                    Page 2
 1    APPEARANCES:
 2    FOR CITY OF PALM BEACH GARDENS:
                       ALLEN NORTON & BLUE, P.A.
 3                     121 Majorca Avenue, Suite 300
                       Coral Gables, Florida 33134
 4                     (305)445-7801
                       rnorton@anblaw.com
 5                     BY: ROBERT L. NORTON, ESQUIRE
 6    FOR PBA/GUERRIERO:
                       KING|MORSE PLLC
 7                     2240 Palm Beach Lakes Blvd., Suite 300
                       West Palm Beach, Florida  33409
 8                     (561)557-1079
                       rick@kingmorselaw.com
 9                     greg@morselegal.com
                       BY: RALPH E. KING III, ESQUIRE
10                     BY: GREGORY J. MORSE, ESQUIRE
11    ALSO PRESENT:    Dominick Pape, PBG Chief of Police
                       Sheryl Stewart, PBG Human Resources
12                     Brooke Judkins, PBG Human Resources
                       Bethany Guerriero, Grievant
13                     Kristen Penque, King|Morse Assistant
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1                      -  -  -
 2                    I N D E X
 3                      -  -  -
 4
 5   WITNESS:            DIRECT    CROSS   REDIRECT   RECROSS
 6
     MAJOR EDUARDO GUILLEN
 7
     BY MR. NORTON        31
 8   BY MR. KING                    51
     BY MR. NORTON                           78
 9
     SERGEANT DENNIS BEATH
10
     BY MR. NORTON        82
11   BY MR. KING                    93
     BY MR. NORTON                          129
12   BY MR. KING                                     131
13   VOLUME II
     SERGEANT MARC GLASS
14
     BY MR. NORTON       139
15   BY MR. MORSE                  147
     BY MR. NORTON                          188
16
     CHIEF DOMINICK PAPE
17
     BY MR. NORTON       189
18   BY MR. KING                   203
     BY MR. NORTON                          213
19
     BETHANY GUERRIERO
20
     BY MR. KING         216
21   BY MR. NORTON                 254
     BY MR. KING                            278
22
23
24
25
```

```
 1
 2                    P R O C E E D I N G S
 3                          - - -
 4          THE ARBITRATOR:  Let's go on the record,
 5    please.  Can we stipulate to an issue?
 6          MR. KING:  Was she terminated for -- or
 7    disciplined for just cause, and if not, what shall
 8    be the remedy.
 9          MR. NORTON:  I agree.
10          THE ARBITRATOR:  Employer prepared with
11    opening statement at this time?
12          MR. NORTON:  I am.
13          THE ARBITRATOR:  Please.
14          MR. NORTON:  Thank you.
15          I attempt to be brief in these things but I
16    don't always achieve that objective.
17          The grievant here today, Ms. Guerriero, has
18    been, at the time of her termination, I think
19    employed by the department 18-plus years.  So that
20    of course will be something they raise.  We think
21    that length of service in this particular case is
22    totally irrelevant.
23          What happened here from our perspective is the
24    grievant started in what I can only describe as a
25    downhill spiral in around 2019.  And that downhill
```

1          spiral included her losing her sense of

2          professionalism and her personal life appears to be

3          somewhat problematic and they merge.

4              So she is, from the perspective of the City,

5          is not emotionally or ethically suited to being a

6          law enforcement officer with the City.

7              And I'll go briefly through, of course, her

8          disciplinary history.

9              In 2019, which I kind of look at -- we look at

10         as the year she just went into an abyss, she

11         received a written reprimand for making an arrest

12         at a mall.  I believe the chief sitting next to me

13         actually was involved in that matter, certainly

14         listened to the body-worn camera footage.

15             She made an arrest with an individual who was

16         agitated, belligerent, cursing, made a legitimate

17         arrest, but she doesn't stop there.  She lost her

18         composure.  She was found to have engaged in

19         instigative behavior.

20             The golden rule of a law enforcement officer

21         when they get on the scene is, can I bring this

22         down?  Can I decelerate?  And she goes in and pokes

23         him and harasses him.  She's screaming fuck at him

24         and saying all kind of profanity.

25             So she ends up getting a written reprimand

Page 6

1       after making a good arrest.  And that reprimand

2       kind of says it all.  Guerriero should reacquaint

3       herself with the department's core values of

4       respect, accountability and professionalism.

5            We will prove to you beyond any doubt, which

6       is not our standard, that she did not adhere to

7       that admonition.  Six months later, she engaged in

8       egregious misconduct which I would say in many

9       departments would have gotten her fired on the

10      spot.  She went into the department's database, the

11      secure database that all law enforcement officers

12      or at least most have in their car where they can

13      access NCIC, they can access DAVID -- and there's

14      very strict rules about when you can go on these.

15      So you can look -- they can drive up behind your

16      car, see your tag, plug that baby in and find out a

17      whole lot of stuff about you.

18           She was utilizing this -- she was in the

19      middle of a very bitter divorce/child custody with

20      her wife who was a law enforcement in Delray.

21           She followed or utilized this database, forget

22      followed, to investigate, stalk, spy on individuals

23      she thought had some relationship with her ex-wife.

24      Romantic or otherwise, I don't know.

25           You simply cannot have law enforcement

1    officers using this high technology and very

2    discreet secretive information and use it for

3    personal vendetta.  And that's what happened, there

4    is no question about that.

5         What she received from this department was a

6    two-day suspension.  This department takes law

7    enforcement officer discipline very seriously.  A

8    two-day suspension here is a significant

9    discipline.

10        And interestingly enough, because this is

11   weaved through this case, her defense, if you want

12   to call it that, was that she was having a very

13   difficult time with a looming divorce and child

14   custody issues, et cetera, and she claimed to have

15   been in a highly emotional state when she's doing

16   this.

17        Well, first of all, you gotta know what you're

18   doing, and emotional state shouldn't have anything

19   to do with it.  But this agency, as every agency in

20   Florida, does report, have to report it to FDLE.

21   And I assume you know that acronym pretty well as

22   long as you've been in the business.

23        FDLE investigated and they suspended her for

24   30 days where she could not be a police officer,

25   and in the process, required her to go to ethics

1        training.  It's all in writing here, it's done by

2        way of an order.

3             And what does the department do?  She now has

4        no ability to be a law enforcement officer.  We put

5        her on modified duty at full law enforcement pay.

6             Now, right when all of this is happening, she

7        gets arrested for stalking her ex-wife who's a law

8        enforcement officer in Delray.  And the arrest, the

9        probable cause affidavit, which I'm sure you're

10       also familiar with and we'll use the acronym PCA,

11       this is a sergeant in Delray swearing under oath to

12       the facts he's utilizing to support the arrest.

13            And again, kind of says it all, behavior has

14       become obsessive.  She has emotional outbursts.

15       She sent 850 documented, god only knows how many

16       there were, text messages to this other woman.  The

17       sergeant doing the investigation found that she was

18       prone to becoming enraged -- these are quotes, not

19       from me -- and has a history of emotional tantrums.

20            Now, a judge, Judge Burton, issued a temporary

21       injunction against her and, once again, the

22       department has somebody that can't perform as a law

23       enforcement officer.  What does the department do?

24       They put her on an extended modified duty at full

25       pay.  She didn't get any punishment from that.

1          Along the way, she also had her -- she left

2     her AR-15, that's how they refer to it, I don't

3     know what rifle it was, and a magazine filled with

4     law enforcement officer's ammunition, which is

5     different from what us regular people use, and it

6     got broken into.  Fortunately, they didn't steal

7     the rifle, but they stole the magazine with the

8     bullets.  And she, again, engaged in inappropriate

9     behavior.

10          Now, the scene that, the straw that you could

11     say broke the camel's back is on May 9th, 2023, a

12     call goes out.  As it turns out, there are three

13     people, a husband and a wife and an individual

14     named Gould.

15          The husband and wife, the husband, I'm not

16     going to go into the debate, these people had an

17     argument at the pool in this condominium place.

18     And the husband at one point lifts his shirt up and

19     he's carrying a weapon, which causes Mr. Gould to

20     get the hell out of there and call 911.  They also,

21     the husband and wife, called 911.

22          And the first man on the scene or the first

23     law enforcement officer on the scene is a gentleman

24     named Valerio who's testified under oath in this

25     case and that did a report at the scene, he arrived

1      on the scene, was greeted by Mr. Gould who left the

2      pool area and who explained, the guy over there has

3      a gun.  He then assists the officer in figuring out

4      to get around to the pool area.

5           He's told to, why don't you just sit down?  He

6      sits down.  He gets back up for a minute to help

7      the law enforcement officer.  He is totally

8      compliant, totally rational, and he is the victim.

9           So I cannot -- the case will spell out what

10     happens there.  She comes on the scene,

11     unbelievable how much she agitates this guy, gets

12     in a verbal debate with him.

13          He is the victim.  He's in a wet bathing suit,

14     completely unarmed.  You couldn't -- he'd have to

15     be carrying a Deringer if he was even armed.

16          She comes on the scene, she gets into a hassle

17     with him, ends up, using her words, draws down on

18     him.  She's now pointing her weapon at this guy who

19     is the victim and he loses his composure.

20          Now, he's had two weapons in 30 minutes, one

21     here with a threat to shoot him and a cop holding

22     it directly at him and coming toward him.

23          He definitely lost his composure.  He did not

24     do one thing physical, though, it was all verbal.

25     Why am I being arrested?  I don't have the gun.

Page 11

1          What are you doing?

2                She puts him down on hot pavement, stretched

3          out.  Then she handcuffs him.  He's still on hot

4          pavement.

5                (At 9:52 a.m., Kristen Penque entered the

6     proceedings.)

7                MR. NORTON:  I assume this is not a witness.

8                MR. KING:  That's my assistant.

9                MR. MORSE:  No, this is our assistant.

10               MR. NORTON:  You want to testify?

11               MS. PENQUE:  Not today, thank you.

12               MR. NORTON:  So ten officers end up on this

13         scene.  Could have been put to bed with no issues.

14         Fortunately two of those people that arrive

15         on-scene are sergeants, Sergeants Glass and Beath,

16         and both of them come on scene and they get the

17         grievant aside, like what's going down here?

18               She goes, I'm giving him orders not to put his

19         hands in his pocket, which she did one time, and he

20         kept putting them back down in there.

21               And then he pulled out a cellphone and put it

22         toward me like it was going to be a weapon, which a

23         cellphone probably could be.  Certainly not the one

24         you'll see in his hand.

25               Anyway, she tells these officers that they

1    believe initially that it's a good arrest because

2    she actually went from detaining him to actually

3    arresting him which requires probable cause.

4         Well, Sergeant Glass meets aside with Beath

5    and goes, something's not right here.  Let's get

6    the body-worn camera and take a look at this whole

7    scenario.  Well, you're going to get to see that.

8    But it showed an absolute abuse of authority every

9    possible way.

10        And the result of it has brought enormous,

11   I've never seen anything like it, negative coverage

12   to this city.  We estimate over 10 million, we've

13   got the actual number on millions as an exhibit,

14   people tuned in to those podcasters or whatever

15   they are, I don't do that myself, to see her

16   mistreatment of this guy.

17        And we are now -- or we are not.  She is

18   currently being faced with a lawsuit.  And

19   interestingly, the City's coverage, which is

20   through the municipal coverage of the League of

21   Cities, determined that she acted outside the scope

22   of her employment and has denied defense or

23   coverage.

24        Now, I think you'll agree with us in the end

25   when you -- when the evidence is unfurled that she

Page 13

```
 1         is not emotionally, she's not stable.  She cannot

 2         run around with the authority of a law enforcement

 3         officer, which is enormous, and we want it to be

 4         enormous, she can't do that.  She cannot be a law

 5         enforcement officer in this city.

 6              That's our position.  Thank you.

 7              THE ARBITRATOR:  Thank you, very much.

 8              Mr. King.

 9              MR. KING:  I'm going to -- I have something

10         that I want to play during the opening but I think

11         there's another issue that I want to bring up prior

12         to my actual opening.

13              THE ARBITRATOR:  All right.  Go ahead.

14              MR. KING:  I know that I think that one of the

15         prior attorneys had brought this up in an attempt

16         to have some sort of summary disposition of the

17         case but I'm going to bring it up now because I

18         feel as though this issue could be or it is

19         dispositive of the case.

20              So police officers are governed by the Florida

21         Law Enforcement Officer's Bill of Rights.  And

22         112.532, subsection six, sets out a limitation of

23         the time that an officer -- that an agency has to

24         discipline an officer.  The statute says that an

25         agency can't suspend, demote or dismiss an officer
```

1    for any complaint that's not completed within 180

2    days.  Now, there are some exceptions to that, none

3    of those would be applicable to this case.

4         The next section, 112.533, talks about what an

5    agency has to do to verify that the complaint has

6    been conducted appropriately.  There are two steps

7    to it.  One, they have to say that they verify that

8    it's truthful, they've read it and they verify that

9    it's truthful, and then the second portion is they

10   have to say that they haven't violated -- they have

11   to swear that they haven't violated the Officers'

12   Bill of Rights.

13        In order to satisfy the first prong, that is

14   to swear that it's truthful, it directs you to

15   another statute, 92.525, and tells you that you

16   have to swear to it under one of the prongs of

17   92.525.

18        There are three ways that you can verify this

19   report.  Way one, you can swear in front of a

20   judge.

21        The second way you can do it is you can, just

22   like the PCs, there's a -- when you write a

23   probable cause affidavit, you sign it and then a

24   police officer verifies it on the side.  Under

25   Section 117.10, a police officer can notarize your

1      probable cause affidavit, that it's accurate.

2           So you can do it that way or you can, on the

3      third way, you can write that I declare, under

4      penalty of perjury, that I've read the foregoing

5      document, and followed by your signature.  And you

6      can do it that way.

7           That statement that you have to write that you

8      have -- you declare under perjury that you've read

9      the document, it's truthful, has to be in the --

10     has to be on the document, the investigative

11     summary.

12          And then there's a second prong where you have

13     to also write that you have to include a statement

14     that's actually in the statute itself that says

15     that you hereby swear, under the penalty of

16     perjury, that to the best of your knowledge, that

17     you haven't knowingly, willfully or deprived

18     another person -- or this person or another person

19     under the bill of rights.  That section is included

20     in their investigative summary.

21          The first section where they're supposed to

22     swear that they've read it and it's true is not

23     there.  They have not verified it in accordance

24     with the statute, which means that it's not a

25     complete investigation, which ultimately means that

Page 16

```
 1        they have violated the Law Enforcement Officers'
 2        Bill of Rights and that this is not a verified
 3        investigation.  And so they've run afoul of the
 4        Bill of Rights and they're not allowed to, under
 5        the law, dismiss her at this point.
 6            So I will provide -- I will brief that in the
 7        brief at the end, along with decisions to that
 8        effect.
 9            THE ARBITRATOR:  All right.  Thank you.
10            Do you want to respond?
11            MR. NORTON:  Yeah, briefly.  This is -- you're
12        not a judge and this is a Florida statute.
13        Appropriately, if they actually believed it, which
14        it's been months and they do not believe it, it is
15        when they have no evidence, they always raise the
16        Bill of Rights.  And that is why we do not have
17        that in our collective bargaining agreement and we
18        took it out, under immense challenge from the
19        union, because we didn't want cases resolved on
20        somebody's impression of whether or not a statute
21        was complied with.  We wanted to go on the facts of
22        the case, whether there was just cause for the
23        action taken, et cetera.  So this is, from my
24        perspective and the City's, this is a nothing.
25            THE ARBITRATOR:  All right.
```

```
 1              MR. KING:  All right.  And just a brief

 2        rebuttal to what he said.

 3              THE ARBITRATOR:  Go ahead.

 4              MR. KING:  The collective bargaining agreement

 5        mentions that they were going to follow Florida

 6        statutes.  Chapter 112 of the Florida statutes is

 7        woven into their procedures.  So to say that they

 8        don't acknowledge it is really disingenuous.

 9              MR. NORTON:  Wait, wait.  We didn't say we

10        didn't acknowledge the law.  We do acknowledge it,

11        we believe in it and we follow it.

12              MR. KING:  Okay.  Very good then.

13              So before I start, and I don't know how to --

14        how I'm going to get this on to there.  So if you

15        don't mind, I'm just going to play it on here.  We

16        can all huddle around and watch it.  It's a YouTube

17        video that I want to start out with.

18              MR. NORTON:  I don't know if -- isn't that

19        part of your case later?  Never mind.  I'll remain

20        silent.

21              MR. KING:  The thing is over here but I don't

22        know how to find it.  I'll just play it right here

23        for you.  Came around, Bob, and you can watch it if

24        you like.

25              MR. NORTON:  Can you turn it at a little
```

Page 18

1     angle?  There.  Yeah.

2           (Video played as follows:)

3           UNKNOWN SPEAKER:  Flipping through cameras, I

4     see two customers in the clothing department.  He

5     was holding a bathing suit.  He balls it up and

6     conceals it in the front of his shorts and then

7     checks and adjusts to make sure it's going to stay

8     there.  They walk just directly to the grocery

9     exit.  They didn't make any attempt to go to a

10    register or pay.  So I made the call to contact law

11    enforcement.

12          UNKNOWN SPEAKER:  The realtime crime center

13    dispatches Deputy Ed Gast (phonetic) to the scene.

14          UNKNOWN SPEAKER:  I'm pulling into the parking

15    lot, still on the phone with Nathan and he informs

16    me where they're at.  We get a shoplifting on a

17    daily basis so it was my normal routine.  I see the

18    suspect.  He was full of tattoos from head to toe.

19    This was a big guy, had a look on his face that,

20    you know, somebody you didn't want to mess with.  I

21    see Nathan several feet behind him just following

22    him to keep an eye on him.  I asked the suspect to

23    come to my vehicle.  I could tell that he was not

24    happy about going.  So I had him put his hands on

25    the vehicle and explained that I was going to

Page 19

1          detain him for my investigation.

2                UNKNOWN SPEAKER:  The shoplifter identifies

3          himself as 43-year-old Ronny Spradley and the woman

4          as his wife, Stacy.

5                UNKNOWN SPEAKER:  We find out that he's

6          actually an 88-time convicted felon.  He had plenty

7          of arrests throughout his history.  He had gone to

8          prison in 1997 for grand theft of a firearm,

9          burglary, got released in 2018.

10               UNKNOWN SPEAKER:  I was going to place him

11         under arrest for shoplifting.  When I grabbed his

12         left wrist to put the cuffs on him, he looked at me

13         and he said, what the (inaudible) are you doing?

14         He just pulled away from me and then started to

15         run.  When I stopped him, I pointed my taser at

16         him, he stopped, he put his hands up.  That's when

17         he lifted up his shirt, pulled out his handgun and

18         started shooting at me.

19               (Video stopped playing.)

20               MR. KING:  So I start off with that because

21         the assertion that someone wearing a pair of shorts

22         can't hide a gun is preposterous.

23               One of the first things that you're taught as

24         a law enforcement officer is that you don't know

25         what someone's capable of, you don't know what

Page 20

```
1       skills they have, you don't know if they have
2       weapons, you treat them as if they do.  Everyone.
3            Mr. Miller, this is an overreaction by the
4       agency.  They are, and as you heard Mr. Norton say,
5       they are 10 million clicks or views or whatever it
6       might be into this case.  And they are -- we're in
7       this era right now where everything is how many
8       clicks, how many views, how many people have seen
9       this, and then we react to it.  In this case, they
10      overreacted.
11           You know, years ago when I was a young law
12      enforcement officer, I was living in Delray and I
13      went to my local Chase Bank.  I was going to go to
14      the bank, and as I walked up to the ATM machine, I
15      saw the trash can up against like the side of the
16      building and there was an object taped up
17      underneath it.  And I looked at it quickly and then
18      I backed off and I called the police.  And a young
19      officer, Tony Strianese, who ultimately became the
20      Chief of Delray one day, he passed away a couple
21      years ago, he was a very good friend of mine,
22      wasn't then but eventually became a very good
23      friend, he responded.  And Tony and I, we called
24      out the bomb squad, we called out all kind of
25      units, we had the businesses evacuated, everything.
```

1          The bomb squad showed up and the guy -- the

2     bomb squad guy, in all his regalia, walks up, he

3     looks at it, reaches in and takes it out.  It's the

4     wheels and the stand of the trashcan.  They had

5     just delivered it.  And if we had taken ten seconds

6     and evaluated what we had, we would have seen the

7     little wheel sticking out of the bottom.  We didn't

8     take the time.  We didn't take the time to look and

9     see what actually happened.  Slow down.

10          There's four allegations against Officer

11     Guerriero in this case:  Response to resistance,

12     that's their use of force policy, and that is,

13     they're alleging that she drew her weapon

14     unnecessarily; conduct unbecoming an officer, which

15     in this case they're suggesting that her arrest was

16     either false or inappropriate; and then

17     untruthfulness, they're alleging that she lied to

18     her supervisors; and then her conduct which they're

19     saying that the language and how she treated

20     Mr. Gould.

21          I'm going to start with the conduct and I'm

22     going to tell you right now, we are not going to

23     deny that she used inappropriate language.  She

24     spoke to him in a way that she will tell you was

25     not her finest hour.  She's going to tell you that

1     she was full of emotion, that she engaged in a

2     verbal sword fight.  Because Mr. Gould wasn't too

3     nice, either.  He was very, in my estimation, he

4     prompted this.  He kept giving it gas.  And she

5     allowed that gas to gas her up and she kept going.

6     We're not going to deny that.

7         Untruthfulness.  Their allegation is that when

8     she explained what occurred to her supervisors, she

9     was inaccurate.  And they have charged her with, I

10    think it's 23.16.16 is their rule number.  And that

11    rule number says, verbatim:  This is when you are

12    making a false statement, report, communication or

13    entry into any official police record or other

14    official or required report on the record.

15        So in order to violate this, an officer would

16    have to make a false statement into an official

17    record or a required report.  Officer Guerriero

18    wrote no report and she gave no official sworn

19    statement.  So that allegation is demonstrably

20    false.

21        She told her sergeant immediately after this

22    event takes place what happened.  She didn't review

23    her body cams, she didn't review the pole cam that

24    was there.  She was still feeling the effects of

25    what just happened.

Page 23

```
 1          And I don't care what anybody tells you, and I
 2     know this firsthand, when you draw your weapon on
 3     someone, police officers, they don't draw their
 4     guns just, you know, willy nilly.  When a police
 5     officer draws their weapon, they are saying to
 6     themselves, they're saying to you, what I'm looking
 7     at, what I'm pointing at, what I'm drawing down on,
 8     I'm thinking that I have to defend myself.
 9          Years ago, the union, as we represented
10     officers in their police officer critical incident
11     cases, we used to do these things called
12     walk-throughs.  And in those walk-throughs, what we
13     would do is we would put the officer back into the
14     place where he was like if he was involved in a
15     shooting, we would take him back to the location
16     where the shooting was and we would have him walk
17     through the incident as to what he was -- he or she
18     was experiencing at the time.  And we did that
19     because there was a belief that when you did that,
20     the officer would kind of relive it.
21          And what you would find, and I remember
22     specifically there was one officer, he was a Palm
23     Beach County Sheriff's deputy, and we were taking
24     him back to the scene.  He had shot and killed a
25     man who had threatened his wife with a machete.
```

Page 24

```
 1      And as he got to the doorway, he, with his finger,
 2      he had his finger pointed like this and he was
 3      yelling into the door, drop the knife, drop the
 4      knife, and then boom, boom, bomb, and he says he
 5      shot.  And that's what he said happened.
 6           And there were four other deputies who were in
 7      the area and none of them said -- none of them
 8      testified that he said drop the knife.
 9           Now, did he have to say drop the knife at that
10      moment as the guy was approaching him with the --
11      no, he didn't.  But he believed that he did.
12           Was he lying?  No, he wasn't lying.  That's
13      what he believed he did.  That's not a lie.  That's
14      the adrenaline.
15           And they're alleging that somehow, in the
16      height of the emotional adrenaline dump that she's
17      going through, that what she said was her official
18      statement, not to mention -- let me just back up a
19      second.  They're also alleging that her pulling
20      that gun violated the response to resistance
21      policy.
22           So they come to that conclusion, from a
23      gentleman sitting behind his desk with the benefit
24      of different camera views and hindsight, which, by
25      the way, in their policy, they say you shouldn't
```

Page 25

1    do, but the question and their policy and what we

2    ask from our officers is to be reasonable.

3         And here's what you're going to learn, this

4    was a gun call.  Despite the cavalier way with

5    which Mr. Norton presented it, it's a gun call.

6    And when cops respond to any call, there's always

7    at least one gun, theirs.  There's always a gun at

8    every call they go to.  And they're responsible for

9    it.  And they're also responsible for whatever you

10   may have.

11        Mr. Gould was -- and you're going to see this,

12   he was at his pocket as she arrived.  He was here

13   at his pocket.  And so that's the first thing she

14   sees.

15        And you're going to learn she says, hey, keep

16   your hand out of your pockets.

17        Mr. Gould says, I'm not the one with a gun.

18   He says something, he puts his hand here and then

19   immediately goes back to his pocket.

20        And she again yells, get your hands out of

21   your pockets.

22        And then Mr. Gould did what we learned, she

23   learned, as young police officers that reinforced

24   throughout your entire career, it's a threat

25   assessment.  It's what she's doing in her mind

Page 26

1    quickly.  Officers are trained that as the -- to

2    use the word from a famous case, these are rapidly

3    evolving situations, and so she's assessing a

4    threat.

5         Mr. Gould shows what we call indicators.  He's

6    a no person.  He immediately says to her, you can't

7    talk to me that way.  You can't tell me what to do.

8         And then he takes a step back with his left

9    foot and he blades his body.  And immediately, he's

10   out like this and then he says, you can't tell me

11   what to do, takes a step back, drops with his left

12   foot, drops his left hand and then he starts to

13   back up.  Those are, you're going to learn, those

14   are verbal and nonverbal cues that officers use to

15   assess a threat level.

16        When he did that, those things, and I'm going

17   to tell you that I don't know that Officer

18   Guerriero, like -- what's the word -- that she

19   understood what was actually happening in her mind,

20   but we process those things so quickly, she

21   responded to them the way she had been trained to.

22        Now this is getting amped up.  She can't see

23   his back.  There's an object behind him, she

24   doesn't know what it is.  He's backing up.  He's

25   not doing anything that you would expect a victim

Page 27

1      to do.

2           And so as he raises the temperature, she

3      draws, get on the ground now.  She draws the

4      weapon, tells him to get on the ground and he gets

5      on the ground.

6           Now, first of all, all of that is reasonable.

7           After he's handcuffed, again, now we go into

8      the area where I say, and she will admit to you,

9      the verbal banter between the two of them, uncalled

10     for, and we'll admit that.

11          But putting him in cuffs, drawing her weapon,

12     all of that is reasonable and within the policies

13     and procedures.

14          The final allegation is conduct unbecoming and

15     that's their saying that he was falsely arrested.

16          So I'm sure you're aware of the letter and the

17     spirit of the law.  By the letter of the law, the

18     statute says, if you resist, obstruct, oppose an

19     officer in a legal execution of any legal duty, it

20     violates the law, period.

21          Officer Guerriero was investigating a gun

22     call.  There's no doubt, there can be no doubt or

23     dispute that she was in the process of a legal

24     duty.

25          She gave him an order not to go to his

Page 28

1      pockets.

2           And let me just say this, she was under the

3      impression that the dispatchers had told the

4      caller, keep your hands away from your pockets.  We

5      later find out that that doesn't apply to this guy,

6      they were talking to the other guy, but the call

7      was confusing coming out.

8           So already, he should have known not to go to

9      his pockets.  As she was pulling up, you're going

10     to see that he was at his pockets which prompted

11     her immediately, the first thing she did getting

12     out of her car, she goes, sir, please keep your

13     hands out of your pockets.

14          And Mr. Gould immediately defied that order

15     and went right back to his pockets, which violates

16     the letter of the law.

17          But the City overreacted.  They unarrested

18     Mr. Gould once they -- they determined later on

19     that he was the victim of the first crime but that

20     doesn't excuse what he did right here.  But in an

21     overreaction, they unarrested him.  And then you

22     ask yourself why.

23          So Sergeant Beath makes the determination that

24     we're going to unarrest him and he added

25     information to the probable cause affidavit.

1          First of all, Officer Guerriero, after the

2     incident calms down, she suffers some cardiac event

3     and leaves the scene.  So they follow-through with

4     the arrest and they charge someone else with

5     making -- with writing the probable cause affidavit

6     based on he was standing there when it all happened

7     so he saw everything that happened.  He was with

8     her, Officer Strzelecki, and he writes the probable

9     cause.

10         When he gives it to Sergeant Beath, you'll

11    find out that Sergeant Beath, he added to it,

12    without seeing the video, he'll tell you he didn't

13    see the video, he just added to it.  And so he

14    added terms and he said, I didn't change

15    grammatically.  He'll testify, he testified, I

16    added substantive changes.

17         So now Mr. Gould's on his way to jail.  They

18    watch the video and Beath decides he's going to

19    unarrest him now because it was Beath that wrote

20    the PC technically.  He was protecting himself.

21         Officer Guerriero has 20 years of experience

22    at this agency.  You're going to hear and he's

23    already stipulated that she had nothing but great

24    evaluations.  In the last 18 years, they've been

25    nothing less than outstanding.

1    She had three incidents of discipline.  She
2    the DAVID violation that he talked about, which I
3    lessened to his craterization of the City's two-day
4    suspension being something really strong from the
5    City.  The City has issued way worse than two-day
6    suspensions.  But she got a two-day suspension for
7    that.
8        The case at the mall, where she arrested the
9    guy, the violent arrest that she arrestee who, when
10   it was over, she used foul language during or after
11   the arrest, she got a written reprimand for that.
12       And then her car was broken into.
13       That's the extent of the discipline for
14   Officer Guerriero.
15       When you consider that she has three incidents
16   of discipline in a nearly 20-year career, the worst
17   of which was a two-day suspension, and you look at
18   the totality of what happened today, Mr. Norton's
19   friend Gary Lippman was famous for saying,
20   someplace between a stern look and this termination
21   is the proper discipline in this case.
22       MR. NORTON:  I'd like the record to reflect
23   Gary Lippman is not my friend.  He got fired as an
24   attorney for the PBA.
25       MR. KING:  That being said --

Page 31

1           MR. NORTON:  But not a bad guy.

2           MR. KING:  That being said, we're asking that

3       you reinstate Officer Guerriero with full back pay

4       and the replacement of all her emolument she lost

5       with this discipline without just cause.

6           THE ARBITRATOR:  Thank you, very much.

7           MR. NORTON:  You ready to go?

8           THE ARBITRATOR:  Yeah, I sure am.

9           MR. NORTON:  I'm going to call Major Guillen

10      if I may.

11          THE ARBITRATOR:  Please raise your right hand.

12  AND THEREUPON,

13                  MAJOR EDUARDO GUILLEN

14  called as a witness herein, after having been first duly

15  sworn, was examined and testified as follows:

16  DIRECT EXAMINATION

17  BY MR. NORTON:

18      Q    Good morning, Major.

19      A    Good morning, sir.  Good morning everyone.

20      Q    You are employed by the Palm Beach Gardens

21  Police Department as a major.  Correct?

22      A    I am, yes.

23      Q    And how long have you been so employed?

24      A    I have been with the City of Palm Beach

25  Gardens for 21 years, going on 22.

Page 32

1           THE COURT REPORTER:  I'm sorry, can I ask for

2       your name, please?

3           THE WITNESS:  Yes.  It's Eduardo,

4       E-D-U-A-R-D-O, Guillen, G-U-I-L-L-E-N.

5           MR. NORTON:  Did you get sworn?  I think I was

6       looking at something else.

7           THE ARBITRATOR:  He's sworn.

8  BY MR. NORTON:

9       Q    And what is your current position, sir?

10      A    I am currently the major of field operations

11  division.

12      Q    Okay.  Were you previously the major of

13  investigations?

14      A    I was, yes.

15      Q    Okay.  And did the case of Guerriero's

16  termination or her problems come your way?

17      A    They did.

18      Q    And how did that happen?

19      A    There was a memo issued on May 10th of 2023

20  from Chief Clint Shannon to Assistant Chief Pape and

21  then he delegated that investigation to me in the

22  investigations division.

23      Q    And was that IA kicked off in part at least as

24  a result of Mr. Gould filing a citizens complaint for

25  the way he was treated by the grievant?

Page 33

1      A    Yes, it was.

2      Q    Okay.  And in your role as a major of

3  investigations, were you in charge of all the

4  investigations for the entire department, IA,

5  detectives, everybody?

6      A    I was, yes.

7      Q    Okay.  And in this case, was Sergeant Grossman

8  the primary individual doing the internal affairs?

9      A    Yes, he was.

10     Q    Okay.  And were you personally involved in it

11  as well?

12     A    I was, yes.

13     Q    And did you attend interviews of some of the

14  key witnesses?

15     A    I did.

16     Q    And did the chief of police who's to my left

17  actually sit in on the interview of the grievant?

18     A    He did.

19     Q    The department took this pretty seriously I

20  assume.

21     A    Yes.

22     Q    In this case, were there a significant number

23  of videos, both audio and non-audio?

24     A    Yes, there were.

25     Q    Okay.  And some of those videos, and in fact

1    the ones that appear to have the best grasp of the

2    scene, were body-worn camera videos.  Is that correct?

3        A    That is correct, yes.

4        Q    Okay.  And as the major in charge of all

5    investigations, did you review all of the internal

6    affairs materials, I'm going to say, in this case which

7    includes reports, probable cause affidavits, numerous

8    videos, surveillance cameras from the scene?

9        A    I did.

10       Q    Okay.  Now, Major, what I would like for you

11   to do, with the assistance of Brooke down there, is

12   we're going to look at some of these body-worn cameras.

13   Rather than drag these things all the way through, I

14   would ask that you fast forward when you think it's

15   appropriate.

16       A    Okay.

17       Q    And opposing counsel can look at the rest of

18   it if he wants.

19       A    Very well.

20       Q    And would you please comment for the benefit

21   of the arbitrator as we go along the issues as far as

22   law enforcement's concern?

23       A    Sure.  Absolutely.

24       Q    All right.  Can we go to, the initial person

25   on the scene here was Officer Valerio?

Page 35

1        A     Valerio, correct.

2        Q     Okay.  And he came on the scene pursuant to

3   the call of I guess several individuals there including

4   Mr. Gould.

5        A     That's correct.  It was a disturbance call.

6        Q     Okay.  Go ahead.  Just ask her when you want

7   to fast forwarded or whatever.

8        A     Sure.

9              This is Officer Valerio responding to the

10  scene.  I think he's going to be near the next couple of

11  seconds here.  Obviously there is no sound in the first

12  30 seconds of video and he'll be arriving on scene here.

13             As he walks out, Mr. Gould's going to come

14  around the corner.

15       Q     One second.

16             That is Mr. Gould.  Right?

17       A     Yes, that's Mr. Gould.

18       Q     That's one of the individuals that called.

19       A     That's correct.  That's Mr. Gould.

20       Q     Okay.  And he's just explained to Officer

21  Valerio that he does not have the gun, the guy back

22  there has it.

23       A     That's correct.

24       Q     Okay.  Go ahead.

25       A     Just one thing I wanted to point out that I

1    think is pertinent, Officer Valerio is dealing with

2    Mr. Gould.  Mr. Gould is obviously upset and agitated.

3            MR. KING:  Objection.  I understand that he's

4        going to narrate what's going on but I don't think

5        that he can just spontaneously come out and say --

6        if there's a question, he can ask it.

7    BY MR. NORTON:

8        Q    I believe he is.  I believe it will save an

9    enormous amount of time.  And this arbitrator is a

10   skilled arbitrator.  He's fully capable of digesting for

11   himself.

12           But I want him to hear what we're thinking as

13   a law enforcement agency is going on here.  And I think

14   he's entitled to do that.  And he's even entitled to

15   speculate.  And you get to cross-examining him.

16           THE ARBITRATOR:  You can go ahead.

17           THE WITNESS:  Okay.  Thank you.

18           So he is agitated.  But as Officer Valerio

19       asks him to move from side to side, he is

20       compliant.

21           And as you can see here, he actually is rather

22       helpful, because he tells Officer Valerio how to

23       get to the other end of the pool.  You're going to

24       see that here in a minute.

25           So he is agitated, but so far, he is compliant

Page 37

1      and he's doing everything that Officer Valerio has

2      asked him to do.

3          He just said basically, Mr. Gould, I don't

4      know if you heard it but he said, if this guy

5      apologizes to me, I won't even press charges.  So

6      that was something that we looked at as well.

7          So at this point, Officer Valerio is walking

8      to this side of the pool to speak to the other

9      parties and finish conducting his investigation as

10     to what occurred based on the call and based on his

11     interaction with Mr. Gould.

12         I think the next pertinent part would be when

13     he speaks to Mr. Gould in the back of the police

14     car further along here.

15         MR. NORTON:  Can you fast forward to that?

16         MS. JUDKINS:  Yeah.

17         MR. NORTON:  And by the way, this of course is

18     in evidence.

19         THE ARBITRATOR:  Right.

20         THE WITNESS:  I'll just let this footage speak

21     for itself.

22  BY MR. NORTON:

23     Q    Excuse me.  Did that say:  What happened?  Who

24  is that lady?

25     A    Who is that lady, right.

1          He seems to be genuinely surprised as, you

2     know, as to what occurred.  Now, of course Officer

3     Valerio is trying to answer his questions but he's also

4     trying to conduct the investigation.

5          Q     Okay.

6          A     And he reiterates that.

7          Q     I think we've gone far enough.

8          A     Right.  And basically Officer Valerio is

9     telling him we can't take the handcuffs off because

10    Officer Guerriero had placed him under arrest.

11         Q     So none of you guys could have gone in there

12    and taken handcuffs off of him.

13         A     No.  An officer placed him under arrest so we

14    are following procedure by keeping him secure.

15         Q     And that officer is Guerriero.

16         A     Correct.

17         Q     Okay.  Go ahead.  Are we going to the next

18    body cam?

19         A     Yes.  I think this is Officer Guerriero's body

20    cam video.  We have the same 30 seconds of silence prior

21    to the audio kicking in.

22               Officer Valerio indicating over the radio that

23    he's investing the case on the other side of the pool.

24               She gets out of her vehicle.  And this is

25    Officer Strzelecki pulling in.

Page 39

1      Q     That's another police car arriving

2    simultaneously?

3      A     If you would just pause it there for one

4    second.

5            One of the things I noticed during this

6    investigation is Officer Guerriero is advancing on

7    Mr. Gould and Mr. Gould is retreating from Officer

8    Guerriero.  In our training, we specify, especially in

9    use of force situations when we believe there is a

10   threat, that distance is your best friend.  And in this

11   case, you can see she is advancing on Mr. Gould and he

12   is retreating.

13           There was a vehicle between her and Mr. Gould

14   and that could have been used for cover, which we also

15   train.  Officer Guerriero chose not to use that vehicle

16   as cover and advanced on Mr. Gould.

17           Another thing that's noticeable from this

18   footage is that she tells him, keep your hands out of

19   your pockets, and he reaches in and grabs his cellphone.

20   She doesn't immediately react to him producing the

21   phone, it's a little time later when he challenges her

22   verbally that she produces her firearm, which you will

23   be able to see that again in Officer Strzelecki's video,

24   but I thought that was notable during the investigation.

25           Q     Stop right there.

Page 40

```
 1              Throughout this case, you'll see, and the
 2      arbitrator will see, that that towel, we know is a towel
 3      now, but laying over there is constantly referred to, is
 4      it not?
 5          A    It is, yes.
 6          Q    As concealing potentially a weapon.
 7          A    That's correct.
 8          Q    Okay.  Go ahead.  Sorry.
 9          A    So this is also notable.  She tells him he is
10      being detained.  And legally, the threshold for
11      detaining somebody is reasonable suspicion.  So I think
12      that's notable because here in a few minutes, we're
13      going to see that change.
14          Q    Stop right there.
15              He said:  I called you guys for help?
16          A    That's correct.  Called you guys for help.
17              You'll see throughout this interaction, he
18      repeatedly says, I am the victim.  I'm the victim here.
19              So we can continue.
20              All right.  So this gentleman is now
21      handcuffed and he is sitting on pavement in a bathing
22      suit.  He is in a position of disadvantage.  He is under
23      control physically.  This is a perfect opportunity to
24      deescalate this situation because he no longer poses a
25      physical threat.  He doesn't pose a physical threat at
```

Page 41

1    all.

2           And she chose not to deescalate but continue

3    this verbal exchange to the point where she calls him a

4    punk, an unnecessary term for somebody who hasn't been a

5    threat so far and isn't a threat.

6           So, yeah, we can continue there.

7      Q    Stop for one second, please.

8           Is it appropriate to have this guy -- is that

9    pavement hot?

10     A    That pavement is hot, yes.

11          MR. KING:  Objection.

12          MR. NORTON:  Objection to hot pavement?

13          MR. KING:  He wasn't there.  He's speculating.

14    He doesn't know if it was hot.

15          That guy's in long sleeves.

16          THE WITNESS:  Do you want me to answer that?

17    BY MR. NORTON:

18     Q    Yes, go ahead.

19     A    So just to clarify, that officer is in long

20    sleeves because he's got full arm tattoos and, per our

21    policy, he has to cover them.

22          And I have been -- lived in Florida my entire

23    life.  I know that during sunny days, and I went through

24    the academy where I was made to do pushups on hot

25    pavement, so I know that that pavement on a sunny day is

Page 42

1    hot from personal experience.

2        Q    Should he have been moved to a more

3    comfortable environment if they're going to continue to

4    detain him?

5        A    Once he is under control and he is detained in

6    a position of disadvantage, at that point, we should

7    make the person that is detained as comfortable as

8    possible, specifically on hot pavement.  Because that

9    could cause further injury.

10       Q    Thank you.  Go ahead.

11       A    Okay.  So this is also notable once we were

12   watching the video, she now places him under arrest.

13   She tells him, you are under arrest.  The problem

14   that -- what I saw in this video is that this is just a

15   few minutes from him being detained where the threshold

16   is reasonable suspicion, she arrests him, that should be

17   based on probable cause but nothing has changed.

18            He has done nothing other than verbal sparring

19   and he has a right to do that.  He can speak all he

20   wants.  So I don't know how we got from reasonable

21   suspicion to probable cause when nothing has changed.

22            This is Sergeant Glass walking up, supervisor.

23            Okay.  She just states, this guy came at us.

24   If you saw the video, that did not happen.

25            All right.  She says, he goes to go back in

```
                                              Page 43
```

 1    his pockets.  She's talking about how he first retrieved

 2    the cellphone but now she's saying he goes to go back in

 3    his pockets.  That did not happen.

 4              She states, look at you, you piece of shit.

 5    He never said that.  That did not happen.

 6              Once again, he didn't want to listen to me

 7    about keeping his hands out of his pockets.  After the

 8    initial retrieval of that cellphone, he never attempted

 9    to get back in his pockets.

10         Q    Did she, and I guess we'll have video that

11    establishes it, but when he's holding that cell phone in

12    his hand, she still had her hand on her gun.  Is that

13    accurate?

14         A    Initially, yes.

15         Q    And then she pulled it when he started

16    mouthing off to her?

17         A    That's correct.

18         Q    Okay.  Thank you.

19         A    Okay.  She says, I'm literally here by myself

20    with this guy.  We know that wasn't the case because

21    Officer Strzelecki was standing right next to her during

22    the entire encounter.

23         Q    All right.  Let's pause a minute.

24         A    That's pretty much the entire interaction.

25         Q    That's pretty much what we're interested in

Page 44

1    showing.

2          A    Yes.

3              MR. NORTON:  Brooke, would you be kind enough

4        to pull up that third body-worn camera video from

5        Strzelecki.

6              THE WITNESS:  This is Officer Strzelecki.

7        This video is going to show the same interaction

8          from a different vantage point.

9    BY MR. NORTON:

10         Q    By the way, while we're pausing, this other

11   officer that was there, Strzelecki?

12         A    Strzelecki.

13         Q    Strzelecki, was he in like his second month of

14   probation?

15         A    Yes.  He was a fairly new officer, very new

16   officer with no law enforcement experience.

17         Q    With a more senior officer.

18         A    That's correct.

19              So once again, we see Officer Guerriero coming

20   up here.  You'll see he retrieves his phone and she

21   still has her hand on her gun but she hasn't pulled it.

22   Now he's challenging her verbally and she draws her

23   weapon.

24              So her initial reaction to him removing that

25   phone wasn't to automatically, you know, challenge a

1    conceived threat but it was his verbal interaction with

2    her that initiated her moving her firearm.  And once

3    again, he is retreating.  He has taken that phone out of

4    his pocket.

5            Go ahead and continue.  All right.  Pause.

6            As we saw there, he retrieved the phone from

7    his pocket, never attempted to go back in his pockets.

8    He followed commands.  When she said get down on the

9    ground, he went down on the ground.  As you can see

10   here, Officer Strzelecki has got a taser out and Officer

11   Guerriero still has her firearm.

12           And you can continue.  All right.  If you

13   could just pause right there.

14           In our training, one of the things that we

15   see, if there is a perceived threat of a firearm being

16   present at a scene, you have an officer that's got

17   lethal force in a firearm and you have a second one

18   who's got a taser out.  You would not withdraw your

19   firearm if you believe there was a firearm present.  So

20   the taser is used when there is a physical resistance

21   but you would not confront a suspect that you believe to

22   be armed with a taser.  You're at a disadvantage.

23           So instead of Strzelecki holstering his taser

24   and going in to handcuff, she holsters her firearm and

25   goes in to handcuff when there's still a perceived

Page 46

1    threat.

2           And you can see here he never gets searched.

3    So it comes into question as to how, you know, how

4    logical that perceived threat was.

5        Q    From the inception to the end -- I don't know

6    about the end, but to the end of her interaction with

7    him there, she never even searched him?

8        A    No.  He was never searched.

9        Q    Did she ever ask him if he had a firearm?

10       A    I don't believe so.

11          But she never searches him, never searches

12   that towel that was on the parking stop there, which

13   was, when we were performing the investigation, seemed a

14   little bit odd, because if you believe that somebody has

15   a firearm on them, that's what you would do is you would

16   search the individuals, search the surrounding to secure

17   that firearm.  But that was never done.

18          You can go ahead.

19       Q    Stop right there for a minute.

20          Is she behaving personally or like a law

21   enforcement officer?

22       A    At this point, in my opinion, she is

23   emotionally driven and that would appear to be personal.

24       Q    Thank you.

25       A    Pause one second, Brooke.

1          Once again, he is now secure, he's on the
2     ground, the next logical step was to conduct a search.
3     He is saying, I don't have a gun.  That would have
4     usually cued an officer to conduct a search and ensure
5     that that's the case, but she's engaged in going back
6     and forth with him and never conducts a search.
7          Q    All right.  Let's stop it.
8               This is a repeat of the prior body-worn camera
9     but from a different angle.  Is there anything further
10    here that is worthy of note from your perspective?
11         A    There is one time when she actually makes a
12    comment about his fingernail polish which, again, was
13    gratuitous.
14         Q    His toenail polish?
15         A    Yes.  Instead of attempting to deescalate,
16    that's an incendiary comment, that's something that's
17    just going to upset somebody so there was really no
18    attempt to deescalate.
19         Q    Was it ever determined who, if anybody,
20    committed a crime on this day?
21         A    Yes.  Mr. Salvia who is the person at the pool
22    did commit a crime and was eventually charged with
23    improper display of a firearm.
24         Q    Okay.  And if you look at Exhibit Number 2,
25    would that be the arrest -- oh, by the way, Exhibit 1 is

Page 48

```
 1    the videos that we've just looked at.

 2         A     Yes, sir.

 3         Q     Okay.  Exhibit 2 is the arrest record on

 4    Salvia for displaying that gun.  Correct?

 5         A     That is correct.

 6         Q     Okay.  And when the smoke cleared here, look

 7    at Exhibit Number 3.  Is this a formal complaint filed

 8    with the department by Mr. Gould?

 9         A     Yes, it is.

10         Q     And I think this has been pretty clearly

11    brought out but how would you characterize what you saw,

12    as a law enforcement officer, his demeanor when Valerio

13    arrived?

14         A     He was compliant.  I mean, he was upset

15    because obviously somebody had just flashed a gun at

16    him.  He had been involved in an altercation but he was

17    compliant, helpful.  Valerio even tells him, hey, can

18    you just stand here, and explains to him, I need to keep

19    him in view, and he complies.

20         Q     So we're looking at a gentleman that you have

21    determined committed no crime.

22         A     He had not committed a crime.

23         Q     Having had a gun pointed at him and threatened

24    with another gun in 30 minutes' time.  Is that accurate?

25         A     That's correct.
```

1      Q    So as a result of this complaint and whatever

2    the sergeants may have determined from the scene, I

3    think you testified to it earlier, but you were directed

4    to conduct an internal affairs investigation?

5      A    I was.

6      Q    And was that done?

7      A    It was.

8      Q    Is that in evidence here as Exhibit Number 4?

9      A    It is.

10     Q    Okay.  And was the investigation thorough?

11     A    Yes.

12     Q    Okay.  And if you look at Number 4, was all of

13   this information that's listed there provided to the

14   grievant before she got interviewed in the IA?

15     A    Yes.

16     Q    Okay.  And was that interview sworn?

17     A    Yes.

18     Q    Is it in evidence here as Exhibit Number 5?

19     A    Yes, it is.

20     Q    That's her testimony as to what happened that

21   day.

22     A    That is correct.

23     Q    And then a final IA report was issued and that

24   would be Number 6?

25     A    That is correct.

Page 50

1      Q    And this executive summary goes together with

2    the investigative summary?

3      A    Yes.

4      Q    And if you look at the second page of the

5    executive summary, is that signed by the Sergeant

6    Grossman, where he's swearing that it's accurate?

7      A    Yes, it is.

8      Q    Okay.  By the way, did you have and do you

9    have any personal animosity toward Ms. Guerriero?

10     A    None whatsoever.

11     Q    Were the two of you friends?

12     A    Yes.

13     Q    Has she been at your home on multiple

14   occasions?

15     A    Yes.

16     Q    Your children play together?

17     A    Absolutely.

18     Q    That's all I got.

19          Oh, by the way, you are a member -- oh, you're

20   not a member of the PBA.

21     A    I am still paying my dues, yeah.

22     Q    Really?

23     A    Yes.

24          MR. NORTON:  I do, too.  Just in case I get in

25      trouble, I want King to come help me.

1           MR. KING:  I got you.

2           THE WITNESS:  They haven't kicked me out yet,

3      so.

4           MR. KING:  It's coming.  It's coming.

5           THE ARBITRATOR:  You need a few minutes,

6      Mr. King?

7           MR. KING:  Yeah, just give me of one second,

8      sir.  I just need to pull something up, that's all.

9           THE ARBITRATOR:  Sure can.

10  CROSS (MAJOR EDUARDO GUILLEN)

11  BY MR. KING:

12      Q    All right.  Good afternoon, Major.

13      A    Good afternoon, Mr. King.

14      Q    Major, let's start with the contract.  You're

15  familiar with the contract.  Correct?

16      A    Somewhat.

17      Q    Okay.

18      A    It no longer applies to me so I haven't read

19  it in a while.

20      Q    Under the contract, you would agree that the

21  parties have agreed to recognize the need for

22  progressive discipline.  Right?

23      A    Yes.

24      Q    And you would agree that the parties have

25  agreed to the need for appropriate discipline.  Right?

Page 52

1    A    Yes.

2    Q    And consistent discipline.

3    A    Yes.

4    Q    And you would also agree that they have agreed

5    that they would only issue discipline for just cause.

6    Correct?

7    A    I'm sorry, I didn't hear that.

8    Q    And they would only issue discipline for just

9    cause.

10    A    That's correct.

11    Q    The next thing I want to talk about is to,

12    just to get these out of the way, is the response to

13    resistance policy.  And the policy -- are you familiar

14    with it?

15    A    I am.

16    Q    Okay.  You know the policy talks about that we

17    were going to evaluate things from the reasonable

18    officer on the scene.

19    A    That's correct.

20    Q    And it talks about rather than with 20/20

21    vision of hindsight.

22    A    Correct.

23    Q    And that we're going to decide whether the

24    officer's actions were objectively reasonable.  Right?

25    A    Right.

Page 53

1      Q    We talk about command presence?

2      A    Correct.

3      Q    We talk about giving advisements?

4      A    Yes.

5      Q    Warnings?

6      A    Sure.

7      Q    Tactical repositioning?

8      A    Right.

9      Q    Engagements, things like that?

10     A    Hm-hmm.

11     Q    In the --

12     A    Yes.

13     Q    I'm sorry, you want to say something?  Go

14   ahead.

15     A    Yeah, I said hm-hmm, and I just told the

16   reporter I said yes because I tend to do that.

17          MR. NORTON:  She didn't have to admonish you.

18          THE WITNESS:  No, she didn't have to yell at

19     me.

20   BY MR. KING:

21     Q    Let's talk about the rules and regulations

22   2.31616, that's the making a false statement.

23     A    All right.

24     Q    You would agree that in order to make a false

25   statement under this policy, you have to make it into an

Page 54

1   official police record?

2      A    Right.

3      Q    And some other required report on the record?

4      A    Right.

5      Q    Okay.  Very good.

6      A    I would -- yeah, okay.

7           MR. KING:  Okay.  Can we go back to -- and if

8      you want, she can operate it.  Can I just have one

9      second?  I want to see how the technology works.

10          THE ARBITRATOR:  Yeah, go ahead.

11          MR. NORTON:  Can we go off the record for just

12     a couple of minutes?

13          THE ARBITRATOR:  Sure can.

14          (A recess was taken.)

15  BY MR. KING:

16     Q    Let's go with Valerio's video.  Let it play.

17  Hit play.  Stop right there.

18          So just, while this is -- it wasn't mentioned,

19  he's carrying that towel in his right hand?

20     A    Yes, he is.

21     Q    And you can't see his hand underneath the

22  towel?

23     A    That's correct.

24     Q    And this is a gun call.  Right?

25     A    It's a gun call.

No

Page 55

1      Q    And tactically, you would want to see his
2  hand, wouldn't you, approaching like that?
3      A    Would I personally see his hand?
4      Q    That's the question, would you want to see his
5  hand as you're walking up to a gun call?  You don't
6  care?
7      A    No, it's not that.  It's not a yes or no
8  answer is the problem.  I know you love those but it's
9  not a yes or no answer.
10      Q    You're walking up to a gun call, there's a man
11  walking toward you with his hand hidden behind a towel.
12  You don't want to know what's in his hand?
13      A    Would I automatically be assuming he's a
14  suspect?
15      Q    You're going to -- stick with the question.
16  You're going to a gun call, there's a man walking up to
17  you -- if you want say no, it's fine.  It's okay.
18      A    There would have to be additional elements
19  other than just --
20      Q    You would allow him to walk up to you with a
21  towel in his hand like that.
22      A    Yes.
23      Q    Okay.  Very good.  Let it play.  Stop right
24  there.
25           Right now, do you know if he has anything in

Page 56

1   his pockets?

2        A    I do not.

3        Q    Let it play.  Stop it right there.

4             Right now, do you know if there's any gun

5   underneath that towel?

6        A    I do not.

7        Q    Pause it for a second.

8             Up to this point, has he gotten on the radio

9   and told anybody what's happened, what's going on with

10  him?

11       A    Not yet.

12       Q    Go ahead, let it play.  Stop.

13            He said three three, I'm making contact on the

14  other side of the pool.  Just so you know.

15       A    That's correct.

16       Q    And so three three is his call sign?

17       A    No.  He's talking to three three.

18       Q    Okay.  So he's communicating with three three.

19       A    That's correct.

20       Q    And he's saying, I'm making contact on the

21  other side of the pool.  Correct?

22       A    Correct.

23       Q    At no time did he say, I made contact on the

24  parking lot, did he?

25       A    That's correct.

Page 57

```
 1       Q    At no time did he say, I made contact with
 2   Mr. Gould and he's unarmed, did he?
 3       A    No.
 4            But we normally wouldn't -- we wouldn't put
 5   out on the air that nothing is happening, so.  But he
 6   also hasn't gotten on the air and said something was
 7   wrong.
 8       Q    My question to you is he meets a man in the
 9   parking lot and goes out with him.  He doesn't go,
10   whatever his call sign was, canine one, I am a 10-12
11   with somebody in the parking lot, does he?
12       A    No.  But he also doesn't --
13       Q    He doesn't say, I'm with someone in the
14   parking lot --
15            MR. NORTON:  He gets to finish his answers.
16            THE WITNESS:  He doesn't say that but he also
17        does not say that there is an issue.
18            If I encounter somebody that I consider to be
19        a threat, I would put that on the air.  He did not.
20   BY MR. KING:
21       Q    The point is, he didn't say he met with him,
22   did he?
23       A    No, he did not.
24       Q    He didn't say that he was going to be waiting
25   there in the parking lot, did he?
```

Page 58

1      A     No.

2      Q     Officer Guerriero and Officer Strzelecki had

3   no idea that that gentleman was going to be there when

4   they pulled up, did they.

5      A     I can't speak to what they knew or did not.

6      Q     Not from him, he didn't tell them.

7      A     He did not tell them.

8      Q     Okay.  All right.  You can stop it.  Let's go

9   to a different video.  Let's go to Guerriero.  Just hold

10  on for just a minute.

11         So I know this initially went out as a

12  disturbance.  Right?

13     A     Disturbance.  Yes.

14     Q     And at some point, it elevated up to, there

15  was some information that there was a gun at the call.

16  Correct?

17     A     Correct.

18     Q     All right.  And every call you go to, there's

19  at least one gun.  Right?

20     A     At least.

21     Q     All right.  And you would agree that if you --

22  when you go to a gun call, it's a little more heightened

23  attention to the call.

24     A     Yes.

25     Q     So you're familiar with condition white,

Page 59

```
 1    condition orange, yellow and red, those conditions that

 2    we talk about as law enforcement officers?

 3         A    We don't use that terminology but I know what

 4    you're talking about.

 5         Q    But you're familiar with it.

 6         A    Right.

 7         Q    So condition white would be you are totally

 8    oblivious, in your living room, feet up, watching TV.

 9    Correct?

10         A    I would assume so.  Again, I don't know that

11    terminology but I think I know what you're referring to

12    which is a response matrix.

13         Q    Yes.

14         A    But we don't use that terminology.

15         Q    But you're familiar with it.

16         A    So if you're asking me what condition white

17    means, I don't know what the definition of that is.

18         Q    All right.  We'll skip it.

19              But would you agree that at a gun call, you're

20    paying your active attention, there's a threat, you know

21    there might be a threat and you're aware of it.

22         A    That's correct.

23         Q    And you would agree with me that gun calls are

24    high-risk calls.

25         A    They can be.  In the state of Florida, you
```

Page 60

```
 1   assume everyone's carrying a gun.  People carry guns
 2   lawfully.  And just because they have a gun on them does
 3   not mean it's a high-risk call.  You do have a
 4   heightened attention.
 5           But like you said, every call has a gun
 6   involved because we carry one in.  So even if we go to a
 7   disturbance at a child's park, there's a gun involved.
 8   It doesn't make it a dangerous call per se.
 9       Q    So your testimony here today is that when you
10   go to a gun call, there's nothing, it's just the same as
11   going to a cat in a tree.
12           MR. NORTON:  Improper characterization of his
13       testimony.
14   BY MR. KING:
15       Q    I'm asking you if a gun call is a
16   heightened -- if you have a heightened attention to a
17   gun call?
18           THE ARBITRATOR:  You can answer that question.
19           THE WITNESS:  I would assume so, yes.
20   BY MR. KING:
21       Q    All right.  You learned at the police academy
22   about tactics.  Right?
23       A    I did.
24       Q    And you learned it throughout your career?
25       A    I did.
```

Page 61

```
 1        Q     And you were taught about hidden weapons.
 2   Right?
 3        A     Hidden weapons.
 4        Q     Hidden weapons, yes.
 5        A     Yes.
 6        Q     Or even disguised weapons.
 7        A     Yes.
 8        Q     And you can't assume that someone is unarmed
 9   when you see them, can you?
10        A     No, you can't.  You also can't assume everyone
11   is armed.
12        Q     As a police officer, when you respond to a
13   call and you see someone, and it's a gun call, you're on
14   a heightened alert.  Correct?
15        A     Correct.
16        Q     And you're watching them for movements.
17   Correct?
18        A     Correct.
19        Q     And you are watching the places where they
20   could normally secrete weapons.  Correct?
21        A     Right.
22        Q     Because you can't assume he doesn't have a
23   gun.
24        A     Correct.
25        Q     And so that's how you're handling it.
```

Page 62

 1   Correct?

 2        A    Correct.  But I'm going to explain it.

 3        Q    Go ahead.

 4        A    Again, we can assume everybody has a weapon

 5   but we can't simply violate people's rights under that

 6   assumption.

 7        Q    No one ever mentioned violating anyone's

 8   rights.

 9        A    I'm just saying, you can't take enforcement

10   action on that assumption.  There has to be an

11   investigative process to come to a resolution, like a

12   search.

13        Q    I appreciate your attempt to do this.

14        A    A search or a pat down.

15        Q    I appreciate your attempt but let's answer the

16   questions.

17        A    I did.

18        Q    So Mr. Gould appears to be wearing swimming

19   trunks.  Right?

20        A    He is wearing swim trunks, yes.

21        Q    And you'll eventually find out that he has at

22   least something in one of his pockets, doesn't he?

23        A    A cellphone, yes.

24        Q    And we don't know what's in the other pocket,

25   do we?

Page 63

1      A    We don't know that there's anything in there,

2   no.

3      Q    And you can't see, from Officer Guerriero's

4   position, she can't see his back, can she?

5      A    No, she cannot.

6      Q    All right.  And he could have something

7   clipped to the back of his shorts.  Correct?

8      A    Could he?

9      Q    Could he?  He could have.  Correct?

10     A    I guess.  But there would be other physical

11  indicators but okay.

12     Q    There would be an indicator he had something

13  clipped to his shorts?

14     A    Swim trunks?  Yes.  They would probably be

15  sagging.  There's more than a simple element.

16     Q    Let's play the video again.  You can move

17  ahead to like 30.  As close to 49 as you can get it.  I

18  was going to tell you just stop it.  Let it play from

19  where it was.  Stop it right there.

20          So at this point, we're looking, she's

21  arrived.

22          And if you can just back it up like two

23  seconds.  Hit that little ten-second back right there

24  and then stop it again where you had it.  Let it play.

25  Stop it right there.

Page 64

1      So at that point, she's getting out of the

2  car, he's there and her vision, at least the camera's

3  vision, is blocked by the engine block of that car.

4  Correct?

5      A    From this vantage point, yes.

6      Q    Now, she is probably maybe 15, 12 to 15 inches

7  higher, her vision, than where her body camera is so

8  maybe she can see a little bit over, but the camera's

9  view is blocked by the engine block of that car.

10  Correct?

11      A    From this vantage point, yes.

12      Q    Okay.  Let it play and stop it at 49.  Stop.

13      So right there, you can see his hand in the

14  area of his pocket.  Correct?

15      A    That's correct.

16      Q    Let it play.  Stop.

17      And as a result of her seeing that, she told

18  him, hands out of the pockets.  Correct?

19      A    Yes.

20      Q    So that's the first time she sees his hand in

21  his pocket and she tells him, hands out of the pockets.

22      A    First and only time, yes.

23      Q    Okay.  Let it play.  Stop it there.

24      And he went back to his pocket a second time

25  now.  Correct?

Page 65

1        A     No.   This is the only time he goes in his

2    pocket.

3        Q     Back up again.   49.   Stop.

4              Hand's not in his pocket there?

5        A     It's not in his pocket, it's near his pocket,

6    from what I can tell from this position.

7        Q     Exactly, from what you could tell in this

8    position.   But she's there on the field, on the screen.

9    Right?   Or she's there in the moment.

10       A     Right.   But that's why we have those body-worn

11   cameras, same vantage point.

12       Q     Right.   But what she can see, it appears as

13   though his hand is near his pocket.   Correct?

14       A     Near his pocket, yes.

15       Q     In or near.

16       A     Near.

17       Q     Okay.   And she's telling him, don't go to your

18   pocket.

19       A     Right.

20             MR. KING:   X out of that video?

21             MR. NORTON:   You don't want to see the part

22       where he lifts his hand up over his head?

23             MR. KING:   Not just yet.   We'll come back to

24       it.   But thanks for your help.

25             MR. NORTON:   You're welcome.   I'll try to

Page 66

```
 1        restrain myself.
 2             MR. KING:  Okay.  Can you go to the parking
 3        lot video.  So we're not going to be able to play
 4        that video for some reason.  Do you have that, Bob?
 5             MR. NORTON:  I'm not giving you my stuff.
 6        What you do need?
 7             MR. KING:  The parking lot video.
 8             MR. NORTON:  No, I don't know what we're
 9        talking about.
10             MR. MORSE:  So with regard to that, because
11        we're restrained by using this equipment, is there
12        a plug-in we can have so we have equal access to
13        this technology equipment?  Because right now, we
14        can't use our computer.  So can someone maybe come
15        in and give us equal access to it?  And that would
16        be great.
17             MR. NORTON:  Well, we sent you guys an e-mail
18        yesterday making sure you had your stuff together.
19             MR. KING:  And we're here.  I just need a
20        plug- in.  If not, I'll just show you on this.
21             MR. NORTON:  We even invited you to come
22        early, didn't we?
23             MR. KING:  We did come early.
24             MR. NORTON:  Okay.  I don't know what more
25        we're supposed to do.
```

1            MR. MORSE:  I'm sure they have an HDMI.  We

2       can just plug it in ourselves.

3            MR. NORTON:  Wait a minute.  You're not giving

4       our people directions.

5            MR. MORSE:  I'm asking if they have an HDMI

6       cable.  I'm not sure what the big deal is.

7            MR. NORTON:  Well, one big deal is you don't

8       talk to one of my people here, you talk to me.  If

9       you're going to suddenly come into this case --

10            MR. MORSE:  Okay.  Why don't you take it down

11       a notch.  There's no reason to be excited.  We're

12       asking to show a video.

13            MR. NORTON:  Really?

14            MR. MORSE:  That's it.

15            MR. NORTON:  It was me?

16            MR. KING:  Okay, whoa, whoa.  Okay, fine.  We

17       got it.  We're just trying to get a video.

18            MR. NORTON:  He needs to read the deescalation

19       section.

20            MR. MORSE:  I don't think so.  I'm 25 years

21       doing this.

22            MR. KING:  What I'm trying to do is show the

23       video so that you could see it properly, that's

24       all.

25            MS. STEWART:  We're calling IT.

Page 68

```
 1            MR. KING:  Thank you.
 2            You want to take a little five?
 3            THE ARBITRATOR:  Sure.
 4            (A recess was taken.)
 5   BY MR. KING:
 6       Q    Let it play.  You can fast forward it until --
 7   I'll tell you.  Just move forward and I'll tell you when
 8   to -- there's no audio on this.  Okay.  Let it play from
 9   here.
10            That's Officer Guerriero.  Now, you can see
11   right here, Mr. Gould has his phone in his hand.
12   Correct?  And he puts it in his pocket.  Correct?
13       A    Oh, you're asking me?  Yes.
14       Q    Yeah.
15            Okay.  That's it.  Thank you.  You can stop
16   that now.
17            All right.  So another thing that you're
18   taught in the academy is that to conduct a threat
19   assessment as you approach a scene.  Right?
20       A    Yeah.
21       Q    All right.  And the threats can be -- that
22   threat assessment is for both verbal and nonverbal cues.
23   Correct?
24       A    Yes.
25       Q    Verbal cues could be that swearing from the
```

Page 69

1   defendant or from the subject, like angrily swearing.

2        A    Could be?  Again, there had to be -- there

3   would have to be other elements present.  Just one

4   element doesn't suffice.

5        Q    Absolutely right.  What I'm suggesting is the

6   subject swearing at the officer might be a verbal cue

7   that this is --

8        A    Might be, yes.

9        Q    Correct.  That's all this is.  It's an

10  assessment.

11       A    Okay.

12       Q    The fact that he is refusing commands could be

13  another clue.  It might not be the totality of clues but

14  it's a clue that you would consider.

15       A    Are you referring to Mr. Gould or in general?

16       Q    Nope.  In general.

17       A    Yes.  If a person is refusing to follow

18  commands, yes.

19       Q    Nonverbal cues are maybe he balls up his

20  fists.  Correct?

21       A    That's correct.

22       Q    If he blades his stance.

23       A    Correct.

24       Q    Drops his shoulders.

25       A    Correct.

Page 70

1       Q    Stops moving all together in fact.  Right?  He
2   just stops.
3       A    No.
4       Q    You don't believe that's one?
5       A    No.
6       Q    Red or flushed face?
7       A    Yes.
8       Q    Grinding his teeth like this?
9       A    Yes.
10      Q    The pulsing of the jaw you see?
11      A    Yes.
12      Q    The thousand-mile stare?
13      A    Yes.
14      Q    Those are things you're taught in the academy.
15  Right?
16      A    Generally, yes.
17      Q    All right.  Let's look at, go back to Officer
18  Guerriero's video again.  Can we go there now?  Let it
19  play.  You can take it to 30 seconds if you want.  Stop
20  it at 45.
21           Now, that's the first look that she gets at
22  Mr. Gould.  Correct?
23      A    From this vantage point, I would agree with
24  that, yes.
25      Q    And from this vantage point, you don't know

Page 71

1   what's in either of Gould's pockets, do you?

2        A    No.

3        Q    And if you assume they were empty, you now

4   know you would be wrong.   Right?

5        A    If I assumed his pockets were empty --

6        Q    You would be wrong.

7        A    -- I would be wrong, yes.

8        Q    And let it play to -- let it play.   Stop.

9             Okay.   So this is where she initially

10  encounters him.   She tells him, how you doing?   And she

11  says, don't go to your pockets.   Correct?   We've been

12  through this already.

13            MR. NORTON:   It speaks for itself.

14            THE WITNESS:   It speaks for itself.   Yeah.

15  BY MR. KING:

16       Q    Okay.   Go ahead.   Okay.   Now, stop it.   What I

17  want you to do now is use the -- will it work on yours?

18  Yes.

19            So this is where he went to his pocket to get

20  his cellphone.   Correct?

21       A    Yes.

22            It also shows that he grabbed his cell phone

23  with his two fingers, which indicates to me that he is

24  trying to demonstrate something.

25       Q    Okay.   Let it keep going.   Keep going.

Page 72

```
 1            All right.  So at this point, he's compliant.
 2     He's hey.
 3       A     Absolutely.
 4       Q     Hands are off to the side.
 5            Okay.  Let it play.  Stop right there.
 6            So now, would you agree he has taken a step
 7     back with his left foot?
 8       A     Yes.
 9       Q     And his hand dropped down below his waist.
10       A     Yeah.
11       Q     And take it forward again.  Like reverse, in
12     reverse.  I'm sorry.  Okay.  Now go back slower again.
13            So his hand drops.
14            Go ahead, keep going.
15            His left foot goes back and now he's at what
16     we call a bladed stance.  Correct?
17       A     No.  No.  That is not a bladed stance.  He is
18     retreating from her position.
19       Q     This is a bladed stance, correct, the way I'm
20     standing right now?
21       A     Mr. King, that is a stretch.
22       Q     I'm asking you a question.  This is a bladed
23     stance.  Correct?
24       A     Yes.
25       Q     He wasn't in a bladed stance there?  We're
```

Page 73

1   standing exactly the same way.

2            MR. NORTON:  Okay.  This has become

3       argumentative.  Under oath, he's saying it's not.

4            MR. KING:  I get to ask my questions.

5            MR. NORTON:  Only two times.

6            THE WITNESS:  I don't --

7   BY MR. KING:

8       Q    You can say no.  You want to disagree?

9       A    I said no.

10           MR. NORTON:  He said it, no.

11           MR. KING:  Okay.  That's fine.  Mr. Norton, I

12      don't need your help.  We got this.  We got this.

13      I promise.

14           MR. NORTON:  I know, but it's my job to see

15      you not badger the guy.  He said no three times.

16           MR. KING:  We got it.  We got this.  I told

17      him it's okay if he says no.  We can all see.

18           MR. NORTON:  Hm-hmm.

19   BY MR. KING:

20      Q    And so at that point, he starts to walk

21   backwards.  Correct?

22      A    He's retreating.  Correct.

23      Q    And she is advancing.  Correct?

24      A    Correct.

25      Q    Keep going.  I want to see the time.

Page 74

```
 1            MS. PENQUE:  It's at 57.
 2   BY MR. KING:
 3       Q    57?  Okay.  Keep going.  Okay.  Stop it there.
 4            Now, at this point, hand is still low.
 5   Correct?
 6       A    Yes.
 7       Q    The object in his hand is in his hand and it's
 8   directed -- it's out in front of his body.  Correct?
 9       A    That's correct.
10       Q    Keep going.
11            And now he's still retreating.  Correct?
12       A    Correct.
13       Q    And now she comes out with a gun.
14       A    He's still retreating.
15       Q    And he's still retreating.  Correct?
16       A    Correct.
17       Q    And now she comes out with a gun.  At this
18   point, she is beyond the front of that car.  Correct?
19       A    Yes.
20       Q    And so there was much talk about her being
21   able to take the car for cover.  She is now out in front
22   of the car.  Correct?
23       A    She is.
24       Q    She's beyond.  Correct.
25            And so it's at this point that she draws her
```

Page 75

1   firearm.  And tactically, if you know, if you are now
2   advancing what you believe might be a threat and cover
3   is behind you, your option is to continue to advance.
4   Correct?

5        A    No.

6        Q    In your mind, you can back up.

7        A    You can retreat and locate cover which is
8   right behind her.

9        Q    Fair enough.

10            And that doesn't put you in a position of
11   disadvantage.

12        A    Absolutely not.

13        Q    Okay.  So back to what, you would agree that
14   she didn't know what was in his pockets.

15        A    Well, she can see that that's a cellphone.

16        Q    But in the beginning, she didn't know what was
17   in his pockets.  Correct?

18        A    She couldn't know what was in his pockets.

19        Q    And he didn't comply with her direct order not
20   to go to the pockets when she told him.  Correct?

21        A    The initial order, no.

22        Q    And you would agree that she didn't know what
23   he was going to remove from the pocket.  Correct?

24        A    Before he removed it?

25        Q    Correct.

Page 76

1      A      No.

2      Q      Okay.  And you would agree that on a gun call,

3  when he reaches into his pocket, it's reasonable for her

4  to consider that it might be a gun.  Correct?

5      A      Again, there would have to be other elements

6  present but it's oversimplification of the process but

7  I'll agree, yes.

8      Q      And you would agree that if it's reasonable

9  for her to consider that it might be a gun, it's

10  reasonable for her to draw her gun.

11      A      It would also -- yes.  But it would also be

12  reasonable for her to seek cover.

13      Q      To wait until he comes out?  Is that what you

14  said?

15      A      For her to seek cover.

16      Q      Okay.  You had said that -- and I just want to

17  make sure that I understood your testimony on direct.

18  When you talked on direct, when you were talking about

19  her statements, you said that her statement to, that he

20  went back into his pocket didn't happen.

21      A      Right.

22      Q      But now you see, initially he went to put his

23  cell phone in first.  Correct?

24      A      That was --

25      Q      And then he went -- I'm sorry, go ahead.

1          A     That was before she gave the order.

2          Q     So he went to his cellphone, she gave the

3     order.  Correct?

4          A     Correct.

5          Q     And then when he went back to go get the

6     cellphone, she gave a second order.  Correct?

7          A     Correct.

8          Q     Do you have a book there?  If you could go to

9     Exhibit Number 4.

10         A     Exhibit 4.  Okay.  Go ahead.

11         Q     And on the first page, under definitions, it

12    talks about the protections of 112.532.  Correct?

13         A     I'm sorry, where?

14         Q     Right under definitions, the first dark bolded

15    thing under definitions.

16         A     Yes.  532.

17         Q     So it talks about -- and that's the Florida

18    Law Enforcement Officers' Bill of Rights.  Correct?

19         A     Correct.

20         Q     And then if you would turn to page seven of

21    ten.

22         A     Seven of ten.

23         Q     Yep.  And if you would look at the letter D,

24    just above five, can you see that?

25         A     Yes.

Page 78

1      Q     And can you read that into the record?

2      A     Of D delta?

3      Q     Yes.

4      A     The standard of proof for making a finding of

5  fact shall be preponderance of the evidence; however, in

6  termination cases, the standard of proof shall be clear

7  and convincing evidence.

8      Q     All right.  Thank you.

9            So just one quick recap and then I think I

10  don't have anything else for you.

11           Just to recap, is that Officer Valerio didn't

12  search Mr. Gould either, did he?

13     A     He did not.

14     Q     And Officer Valerio did not say over the radio

15  that he had secured the firearm at any point, did he?

16     A     No.  Well, not from the video we saw.  I think

17  the firearm is secured later on, but.

18     Q     Right.  But it doesn't happen prior to Officer

19  Guerriero encountering Mr. Gould.

20     A     No.

21           MR. KING:  Give me one second.

22           That's all I have for him.  Thank you.

23  REDIRECT (MAJOR EDUARDO GUILLEN)

24  BY MR. NORTON:

25     Q     I got a couple.

Page 79

1      A     Sure.

2      Q     We pretty much had a cross-examination that
3  primarily dealt with the issue of whether or not
4  Mr. Gould had a gun on him or could have had a gun on
5  him or could have had a gun in the towel that was on the
6  ground.

7      A     Correct.

8      Q     Right?  If you think somebody's got a gun and
9  you got another officer right there with you, what do
10  you do?

11      A     You search them.

12      Q     Of course.  And what do you do with the towel
13  on the ground that she's repeatedly testified was an
14  issue?

15      A     You search it, yes.

16      Q     Actually, I don't know if you noticed this,
17  but in the video that Mr. King was kind enough to play,
18  referred to as the parking lot video, Officer Valerio is
19  behind Gould who's carrying the towel.  Did you notice
20  that?

21      A     I did.

22      Q     Couldn't carry a gun in that towel and not be
23  obvious, could he?

24      A     Right.

25      Q     If you would go to Exhibit 4.

Page 80

1        A     On ours?

2        Q     On ours, yes.

3        A     Okay.

4        Q     And if you look in the bottom corner, we're

5   bates stamped down there.

6        A     Yes.

7        Q     So if you'll go to page 30.

8        A     Page 30.

9        Q     And right there on the first page of this

10   rather lengthy policy, does it talk about deescalation?

11       A     Yes, it does.

12       Q     So right there on that first page, taking an

13   action or communicating verbally, whatever, to calm

14   things down.  Right?

15       A     That's correct.

16       Q     Turn the page over to the next page.  Well,

17   first of all, was there ever any effort on her part that

18   you could tell, see, that would be designed to

19   deescalate that process?

20       A     There was only one instance when she says

21   let's take this down a notch, but then she proceeds to

22   make inflammatory statements which counter that whole

23   situation.

24       Q     Okay.  Thank you.

25             And if you look over here, right in the middle

Page 81

1    of procedures, very first thing we talk about before
2    we're going to use less than lethal force is what?
3        A    If deescalation techniques are not effective
4    or appropriate, an officer may consider the use of less
5    lethal force.
6        Q    Okay.  Based on your years of experience, was
7    this a scenario where deescalation would have been
8    perfect?
9        A    Absolutely.
10       Q    And one more thing, and just so it will be
11   clear but we got video so we can deal with that.  She
12   never drew that gun until his phone was out of his
13   pocket and being held in the air.  Correct?
14       A    That's correct.
15            MR. NORTON:  That's all I got.
16            THE ARBITRATOR:  Mr. King, anything else?
17            MR. KING:  No, I'm good.
18            THE ARBITRATOR:  You're good.
19            THE WITNESS:  Thank you, sir.  It has been a
20       pleasure.  Appreciate it.
21            MR. NORTON:  Major, have a nice day.
22            THE WITNESS:  Thank you.
23            MR. MORSE:  Can we do the next witness?  Are
24       we good to go?
25            THE ARBITRATOR:  Yeah, we are.

Page 82

1          MR. NORTON:  Okay.  Sergeant Beath.

2          THE ARBITRATOR:  Will you please raise your

3      right hand.

4  AND THEREUPON,

5                  SERGEANT DENNIS BEATH

6  called as a witness herein, after having been first duly

7  sworn, was examined and testified as follows:

8          THE WITNESS:  Yes, sir.

9  DIRECT EXAMINATION

10  BY MR. NORTON:

11      Q    I was about to say good afternoon but it's

12  still morning.  Good morning, sir.

13      A    Good morning, Bob.

14      Q    Let's just, before we get going any further,

15  you are a member of the PBA?

16      A    Yes.

17      Q    And you're in the same bargaining unit with

18  the grievant?

19      A    Yes.

20      Q    Thank you.

21          You've been with the Palm Beach County -- Palm

22  Beach Gardens Police Department for 18 years?

23      A    Yes.

24      Q    Okay.  And prior to that?

25      A    I was a marine and a sailor in the US Navy and

Page 83

1    the US Marine Corps for 12 years.

2        Q    Okay.  And did you have occasion, on May 9th

3    of '23, to come to a scene, which we all know what this

4    case is about, where Officer Guerriero was taking

5    action?

6        A    Yes.

7        Q    Why don't you, in your own words, tell the

8    arbitrator what happened when you arrived, what you saw

9    and what you said or did.

10       A    When I arrived on-scene, I was the second

11   supervisor to arrive on-scene.  Sergeant Glass was there

12   prior to.  There was no suspect within scene.

13           And I saw Officer Guerriero, I asked her what

14   was going on.

15           And she explained to me that there was the

16   subject, Mr. Gould.  When she approached him, she told

17   him to get his hands out of his pockets, and he kept

18   reaching his hands in and out of his pockets, making the

19   demonstration of back and forth.  And when he put his

20   hands in his pockets, he pulled out his cellphone, but

21   in an agitated manner as if he was pointing something at

22   her.

23           At which point, I was talking with Sergeant

24   Glass when Sergeant Glass came over.  We spoke.  And

25   Officer Valerio had shortly come over after that, after

Page 84

1   speaking with the person that was arrested, Mr. Gould,

2   he was in a patrol car at the time, he came over and he

3   explained to me that Mr. Gould, as long as he got an

4   apology, he wouldn't prosecute.

5           And I asked her, I said do you want to

6   apologize or have the other guy apologize?

7           And she said, no, he's going to jail.

8           I said okay.

9   Q    At the time when you had finished speaking

10  with her and she told you that he was shoving his hands

11  in and out of his pockets with her giving him orders not

12  to do it, and then pulled out his cellphone and pointed

13  it in an intimidating way, I think you said, if that was

14  all true, would you agree he needed to be detained?

15  A    Yes.

16  Q    Okay.  And that's what you knew at that time.

17  A    Yes.

18  Q    Okay.  Now, did you and Sergeant Glass have a

19  little sidebar there?

20  A    Yes.  Not exactly at that moment but shortly

21  after.

22  Q    Okay.  Please tell the arbitrator, in your

23  words, what was said between the two of you.

24          And I will tell you, Glass will be a witness

25  in this case, Mr. Arbitrator.

Page 85

1        A    So me and Sergeant Glass, we were talking and

2   he had told me, he says, I want to review the body

3   camera.

4            So I said, what's the matter, you don't trust

5   your officers?

6            And he said, no, I just have a gut feeling

7   about this one.

8            And I say, I'm good with that.  Let's go ahead

9   and we'll take a look at it.

10           So with Marc Glass's intuition, we looked at

11  the body camera and got to see what actually occurred.

12       Q    And what, if anything, did you do at that

13  point in time when you looked at the body cam?

14       A    Can you rephrase that or say that again?

15       Q    When you had finished studying, along with

16  Sergeant Glass, the body cam footage, did you have

17  anything to say or do with respect to this individual

18  who's now been arrested?

19       A    At the body camera footage, I was quite

20  mortified with the response from the officer.

21           When I saw the surveillance footage, that's

22  when I saw that the --

23       Q    Oh, okay.  You went beyond the body cam video

24  and also saw the surveillance video from the --

25       A    Afterward.

Page 86

1       Q    Okay.

2       A    When I saw the surveillance footage second,

3   that's when I made the determination that this guy

4   didn't do anything wrong.  He does not need to be

5   arrested.  He committed no crime.

6       Q    Look at Exhibit Number 6.  It's in your book,

7   sir.  Sorry.  And go to page 14 of 36.

8       A    When you say Exhibit 6, am I pulling up the

9   number six tab?

10      Q    Yes, sir.

11      A    Okay.

12      Q    If you're looking down at the bottom, the

13  second paragraph up from the bottom, this is from the

14  IA, which is sworn testimony.  Correct?

15      A    Yes.

16      Q    And this is attributed to you.  And I want you

17  to share with the arbitrator if it's accurate:  I saw

18  the video, and as I'm watching it, I'm like get the man

19  out of jail.  Get him the fuck out of jail.  Get him

20  fucking out right now.  Get him out of fucking jail.

21  I'm telling you, you better get him fucking out of jail.

22          That was your reaction to seeing her arrest?

23      A    The surveillance footage, that's what I said

24  when I saw the surveillance footage, which was after I

25  saw the BWC.

1      Q     Okay.

2      A     So the totality of everything led to get him

3  out of jail.

4      Q     Okay.  We ended up with like ten law

5  enforcement officers on the scene?

6      A     Yes.

7      Q     Okay.  From what you saw, from the videos,

8  you've seen them all by now I assume.

9      A     Yes.

10      Q     The body worn and the surveillance videos.  If

11  you drove up and you were Officer Guerriero and you

12  suspected that that individual had a gun on him, would

13  you have sought, using proper police tactics, cover

14  behind Valerio's vehicle which was right there?

15      A     Yes.

16      Q     And would you then give, shout orders to him?

17      A     Yes.

18      Q     Okay.  And should he have been searched?

19      A     Yes.

20      Q     Should that towel, what's been referred to as

21  an object that appears to be a towel, should that have

22  been searched?

23      A     Yes.

24      Q     Did you see the video footage of when she

25  actually drew her weapon?

Page 88

1      A     Yes.

2      Q     Was there any threat at that point in time

3    from your perspective as a sergeant?

4      A     No.

5      Q     Was there an obligation on her part to

6    deescalate this scenario?

7      A     Yes.

8      Q     Okay.  And did you see Mr. Gould's demeanor

9    when he first interacted with Officer Valerio?

10     A     In the video, yes.

11     Q     And how would you describe that?

12     A     He was calm, explained his story of what was

13   happening.  And even when Officer Valerio asked him,

14   have a seat here, just have a seat, another officer's

15   going to pull up and talk to you, he was like okay.

16           And Officer Valerio even said, do you have

17   anything on you, in the towel, and checked his towel and

18   everything and sat him down.

19           So that's when Officer Valerio went around to

20   the back side of the community pool area to speak with

21   the real suspect.

22     Q     Okay.  Let me check one thing you said.  Are

23   you sure that Officer Valerio did check the towel or did

24   he tell you that he did?

25     A     Well, on the video, it says, hey, do you

Page 89

```
 1    have -- I think it's something along the lines, do you
 2    have anything on you?  He goes, no, just this towel.
 3         Q    Okay.  And Gould, at this point in time, has
 4    been threatened by the pool with a weapon.  We know that
 5    because we charged him, the other guy, with a crime.
 6    Right?
 7         A    Yes.
 8         Q    And he's had an officer point a weapon
 9    directly at him.
10         A    Yes.
11         Q    Would that, in your point of view, explain why
12    a person might be agitated at that point in time?
13         A    Absolutely.
14         Q    Was Officer Guerriero in your squad?
15         A    Yes.
16         Q    And is your squad part of a two-squad platoon?
17         A    Yes.
18         Q    And Sergeant Glass is over the other squad?
19         A    Correct.
20         Q    Okay.  At the time, of course.
21         A    Hm-hmm.
22         Q    While you were on-scene, even when you were
23    accepting her version of what had occurred, because you
24    hadn't seen any video, did you ask her, do you really
25    want to arrest this guy?
```

Page 90

1        A    Yes.

2        Q    And her response?

3        A    Absolutely.  He was a prick.  Something to --

4    a prick or a dick.

5        Q    Okay.

6        A    I said okay.

7        Q    Did you -- well, at the scene, did she have a

8    panic attack or an event of some kind that resulted in

9    Sergeant Glass calling 911?

10       A    Yes.

11       Q    And she ended up in the hospital.

12       A    Correct.

13       Q    And did you go visit her?

14       A    I did.

15       Q    And share with the arbitrator -- well, first

16   of all, why?

17       A    For her well-being.

18       Q    She's part of your squad.

19       A    Yes.

20       Q    Okay.

21       A    So shortly after the incident, I went to the

22   hospital.  There was two other officers in there.  One

23   is Katie Tisdale who's now Katie Marsh, she was in

24   training, and her trainer at that time was FTO Ralph

25   Bradley.  And they had already been in there for a

Page 91

1    little bit of time before I got there.  So when I showed

2    up, I told them they can leave.

3            And I spoke to her, asked her how she was

4    doing, first and foremost.  Met her wife.

5            And then she asked me if he had gone to jail,

6    was glad that guy went to jail.

7            And I said, no, he didn't, I actually took him

8    out.

9            And she had asked me why.

10           And I go, he didn't do anything wrong.

11           So we spoke about the things that occurred on

12   the scene.  And I said, the guy pulled his shirt up and

13   brandished a firearm, you know, at him.  So we wind up,

14   we're going to get -- we're going to go ahead and charge

15   that other guy.

16           So amidst all of this, you know, we got to

17   talking and she asked if she was going to be in trouble.

18           And I said yes.  Yeah, you're going to get in

19   trouble.  And, you know, there's going to be some form

20   of discipline.  I don't know exactly what it's going to

21   be.

22           She spoke about, am I going to get fired for

23   this?

24           And I even told her, I said probably not,

25   probably a couple days suspension without pay and go

Page 92

1    through some remedial training.

2            There was, coincidentally, there was someone

3    that is a gas station attendant that was there that was

4    in another -- it's in a bigger part of a hospital where

5    you have a room but there's a draw curtain.  And she

6    recognized my voice and she was like, hello, Dennis.

7            So I said, oh, hey, Sarah.

8            And that was pretty much it.

9            And, you know, I told the two of them, because

10   as soon as I told them that what she did was wrong, the

11   guy didn't do anything wrong, they looked away.  And

12   specifically I said, the two of you can't even look at

13   me.  I said, just look at me.  They didn't.  So I left.

14           That was pretty much -- pretty much the extent

15   of it, a little awkward and I left.

16       Q    When you pontificated that she might -- she

17   was going to face discipline that might probably be a

18   couple days suspension, right?

19       A    Yes.

20       Q    At that time, were you aware of her prior

21   disciplinary issues?

22       A    Absolutely not.

23       Q    Were you aware that FDLE had ordered this

24   department to take her out of the force for 30 days and

25   go have ethics training?

Page 93

1          A     Absolutely not.

2          Q     Were you aware that she was given a written

3     reprimand for instigating interactions with a person

4     under arrest?

5          A     No.

6          Q     Were you aware that she had a judge issue a

7     temporary injunction for stalking another person?

8          A     No.

9          Q     And that she was doing that stalking in part

10    by utilizing secure -- the DAVID or the NCIC?

11         A     No.

12         Q     That might have changed your opinion on what

13    the appropriate discipline would be?

14         A     Yes.

15         Q     And that would be?

16         A     Termination.

17               MR. NORTON:  That's all I got.

18    CROSS (SERGEANT DENNIS BEATH)

19    BY MR. KING:

20         Q     Sergeant Beath, how long have you been a

21    sergeant in the organization?

22         A     Approximately eight years.

23         Q     I'm sorry, how long have you been employed

24    there?

25         A     Since 2005.

Page 94

1      Q    So nearly 20 years.

2      A    Yes.

3      Q    About the same time as Officer Guerriero.

4      A    Yes.

5      Q    All right.  And by way of explanation, the

6    agency doesn't have lieutenants?

7      A    No lieutenants.

8      Q    And so sergeants kind of run the shift.

9      A    Yes.

10     Q    And at the start of a particular shift,

11   there's a roll call or line-up.  Right?

12     A    Yes.

13     Q    And the officers are required to attend that

14   line-up?

15     A    Yes.

16     Q    And you give them information they need to

17   know?

18     A    Sure.

19     Q    Equipment?

20     A    Yes.

21     Q    And ask questions?

22     A    Yes.

23     Q    And you consider yourself to be somewhat

24   observant.  Right?

25     A    Yes.

1      Q     And if they have issues, sometimes you can

2  even see it on their faces.  Right?

3      A     Sometimes.

4      Q     And you saw Officer Guerriero that day?

5      A     Yes.

6      Q     And you had an opportunity to observe her?

7      A     Yes.

8      Q     And you didn't see anything abnormal?

9      A     No.

10     Q     You didn't hear this call go out?

11     A     I heard the call go out.  I didn't -- I didn't

12  see that there was any type of need to respond given the

13  call at that time.  It was a disturbance.

14     Q     And at some point, you discovered it turned

15  into a gun call.  Correct?

16     A     Yes.

17     Q     And every call you go to has a potential for

18  danger, whether it's a gun call or not.

19     A     Yes.

20     Q     And in every gun call you go to, there's at

21  least one gun.  Right?

22     A     Yes.

23     Q     And you'd agree that a gun call is a little

24  different than another call, it's a little heightened

25  expectation?

Page 96

```
 1        A    Yes.

 2        Q    And you would agree that gun calls are

 3   high-risk calls?

 4        A    Yes.

 5        Q    And you've been taught about hidden weapons?

 6        A    Yes.

 7        Q    And you can never assume that someone is

 8   unarmed.  Is that right?

 9        A    Correct.

10        Q    And Mr. Gould was wearing swim trunks, wasn't

11   he?

12        A    Yes.

13        Q    And we find out that he had something in at

14   least one of his pockets.  Right?

15        A    Yes.

16        Q    And we wouldn't have known what was in the

17   other pocket.  She wouldn't have known when she arrived.

18   Is that true?

19        A    Yes.

20        Q    And she couldn't see his back.

21        A    Right.

22        Q    And it's fair to say that he could have had

23   something in the back and she wouldn't have known.

24   Correct?

25        A    Yes.
```

1       Q     All right.  You went to the police academy?

2       A     Yes.

3       Q     And they taught you there verbal and nonverbal

4     threats?

5       A     Yes.

6       Q     And some of the verbal threats that you might

7     encounter for someone that might be a clue, might be a

8     clue that this person is going to be a no person or it

9     might be an indication of imminent attack, would be he's

10    not following your commands.  Correct?

11      A     Yes.

12      Q     If he was swearing at you?

13      A     Not necessarily.

14      Q     Okay.  So if he's swearing at you and he's not

15    following your commands, could that be an indication

16    he's a no person?

17      A     Sure.

18      Q     Okay.  And as far as nonverbal cues, you would

19    agree that maybe balling up his fists might be a clue?

20      A     Yes.

21      Q     And they list a bunch of these in the academy.

22    Dropping or shifting his shoulders?

23      A     Hm-hmm.  Yes.

24      Q     Increased breathing, stuff like that?

25      A     Yes.

1    Q    Stops moving all together might be something

2  that they might do, they might freeze and look at you

3  and give you that 10,000-mile stare?

4    A    Yes.

5    Q    You might see him grinding his jaw or his

6  teeth?

7    A    Yes.

8    Q    Rapid movements?

9    A    Yes.

10    Q    Blading a stance to you?

11    A    Yes.

12    Q    Not following your directions?

13    A    Yes.

14    Q    All right.  So let's go to --

15    A    Things of like agitation, like an agitated

16  person would be.

17    Q    Yes.

18    A    Sure.

19    Q    Let's go to Guerriero's video.  Let's go back

20  to the beginning or at least when the sound starts and

21  stop it at 45.

22         That was Officer Valerio telling her that he's

23  making contact on the other side of the pool.  Correct?

24    A    Yes.

25    Q    Stop right there.

Page 99

```
 1              That's the first look that she gets of

 2   Mr. Gould.  Right?

 3       A    Well, she drives in, so.

 4       Q    But as far as our view of what happened.

 5       A    Okay, yeah.

 6       Q    That's the first view that she gets.

 7       A    Yeah.

 8       Q    Okay.  And you would agree that her camera is

 9   lower than her eye view?

10       A    Yes.

11       Q    And we can see Gould from the shoulders up?

12       A    Sure.

13       Q    We can't see his hands?

14       A    Right.

15       Q    Go to 49.

16              And at that point, his hands are in or near

17   his pocket?

18       A    Yes.

19       Q    And she tells him -- let it play to 50.  Stop.

20              And she tells him, keep your hands out of your

21   pockets.  Correct?

22       A    After his hands was out of his pockets.

23       Q    Right.

24       A    But was it in his pocket?  Was he walking

25   forward, was that his arm motion walking forward?
```

Page 100

1        Q     I can show you that.

2        A     Okay.

3        Q     In fact, let's leave this where it is and

4    let's go to the pool.  Back it up.  Okay.

5              This is her pulling in right now.  He appears

6    to be on his phone.  Correct?

7        A     So she drives by him, sees him.

8        Q     And then he goes to his pocket, doesn't he?

9        A     Yep.

10       Q     Okay.  All right.  And from this distance, so

11   he goes to his pocket, she sees that action and says,

12   stay away from your pockets.  Correct?

13       A     Yes.

14       Q     Okay.  And then, and from that distance, she

15   can't know what's in his pockets.  Correct?

16       A     Sure.

17       Q     And she would be wrong at that point if she

18   assumed they were empty.  Correct?

19       A     Yes.

20       Q     Do we have Strzelecki's up yet?  Can we go to

21   that?  Let it go to 19.  I think 19 is when it actually

22   starts for him.  You can just let it play, don't worry

23   about it.  Stop it here.

24             Strzelecki, from that view, he can only see

25   from about his mid torso up.  Correct?  You can't see

Page 101

1    his pants?

2         A    Right.

3         Q    And Strzelecki might be able to see, but from

4    this video, we can't see.  Correct?

5         A    We all understand, the camera is lower than

6    the eyes.

7         Q    Yes.

8         A    Right.

9         Q    So let's go, take it to 0023.

10             And so this is where he went back into his

11   pockets after she told him not to.  Correct?

12        A    Yes.

13        Q    And she reaches for her gun.

14        A    When?

15             MR. NORTON:  Wait a minute.  Let's play the

16        video rather than you testify.

17   BY MR. KING:

18        Q    Okay.  Go ahead.  Stop it there.

19             She reached for her gun.  Correct?

20        A    Yeah.

21        Q    But she doesn't take it out, does she?

22        A    Right.

23        Q    Okay.  Let it play.  Okay.  Stop it there.

24   Actually, back it up.

25             Now we're going to go to hers to hear the

1   volume in just a minute.  You can stop it there.

2        A    His hands are clearly out of his pockets.

3        Q    His hands are clearly out of his pockets,

4   they're extended to the side.

5        A    Hm-hmm.

6        Q    And she has given him the command, I said

7   don't go back to your pockets, something to that.

8   Correct?

9        A    Right.

10       Q    All right.  Now tap it forward.

11            He drops his hand to his waist level.

12   Correct?

13       A    Hm-hmm.  Yes.

14       Q    And he takes what he has in his hand, and he's

15   talking to her but he's also, he's projecting it out

16   forward -- I'm sorry, this hand -- and then he dropped

17   his other hand to his waist.  Correct?

18       A    Yes.

19       Q    He takes -- tap it forward further.  He takes

20   a slight drop step with his left foot.  Correct?

21       A    Yes.

22       Q    And she's still walking forward.  She's still

23   advancing.

24       A    Yes.

25       Q    And he -- now let it play.  And now he's

Page 103

```
 1   walking backwards now.  Correct?

 2        A    Yes.

 3             MR. KING:  Stop.  Where are we at?

 4             MS. PENQUE:  31.

 5   BY MR. KING:

 6        Q    Okay.  At this point, she has now drawn her

 7   gun.

 8        A    Hm-hmm.

 9        Q    And let's bring it in reverse, I'm sorry.

10   Okay.  So stop it there.  Let it play.

11             Actually, let's go back to Gould's video --

12   I'm sorry, Guerriero's video.  Let it play.

13        A    So she already knows it's a phone.  Right?  So

14   she said, put the phone down.

15        Q    Yes.

16        A    Okay.

17        Q    So she knows it's a phone.

18        A    Hm-hmm.

19        Q    He has taken the drop step.  Correct?

20        A    Hm-hmm.

21        Q    Now his hand is down by his left side.

22   Correct?

23        A    Yes.

24        Q    And she can see that.  Right?

25        A    Yes.
```

```
                                                   Page 104

 1        Q     And we don't know what's in his left pocket,

 2   do we?

 3        A     No.

 4        Q     He's walking backwards.  Correct?

 5        A     Yes.

 6        Q     She's advancing him.

 7        A     Yes.

 8        Q     She draws -- at this point, she has drawn her

 9   weapon, I believe.

10              Play it forward.

11              Okay.  Right now, she draws her weapon.

12        A     Yes.

13        Q     And she tells him to get on the ground.

14              So I just want to make sure that we're all on

15   the same place.  As she arrives, his hand's near his

16   pocket.

17        A     Hm-hmm.

18        Q     She tells him, hey, take your hand out of your

19   pocket.  Correct?

20        A     Hm-hmm.

21        Q     He points, I'm not the one with the gun, blah,

22   blah, blah, and then he goes right back to his pocket.

23   And she says, hey, I said stay out of your pocket.

24   Correct?

25        A     Yes.
```

1      Q    And then he comes out like this to the side.

2  And then she's talking to him and he takes the one step

3  back, drops his left hand, she comes out.  Is that fair?

4      A    Yes.

5      Q    As he is now standing this way, here dropped,

6  over there is that towel that's on the ground.  Correct?

7      A    Yes.

8      Q    And we don't know what's in that towel, do we?

9      A    No.

10      Q    And by the way, just out of pure tactics, if

11  you were Valerio and you arrived on the scene and I was

12  walking up to you, I was Mr. Gould and I was walking up

13  and I got my hand covered under a towel, what would you

14  have done?

15      A    Well, it depends on the situation.  Now, I'm

16  not going to go with that.  Now --

17      Q    Hold on a second.

18           MR. NORTON:  Let him answer the question.

19           MR. KING:  I'm going to clarify the question.

20           MR. NORTON:  No, I don't want it clarified.

21  Let him answer.

22           THE ARBITRATOR:  Answer the question, please.

23           THE WITNESS:  As someone who has been in this

24      job for 20 years, you kind of get the sixth sense

25      and you could read people most of the time.

```
 1          If you're showing up to a call where someone
 2      may have called in about a gun, showing a gun,
 3      Officer Valerio pulls up, probably how I would,
 4      hey, what's going on?  What do you have going on?
 5      Talking to him briefly and --
 6  BY MR. KING:
 7      Q    I just want to make sure we're clear.
 8      A    Yeah.
 9           MR. NORTON:  He's still answering.
10  BY MR. KING:
11      Q    You're on your way to a gun call.
12      A    I'll let him.  Go ahead.
13      Q    You're on your way to a gun call.
14      A    Right.
15      Q    I emerge from the side of a building with my
16  hand underneath a towel like this.  You're not going to
17  ask me, hey, what's under the towel?
18      A    Who emerged?  He was sitting right here.
19      Q    This is in the video.
20      A    Okay.
21      Q    I'm saying, Valerio I'm talking about.
22           Forget Valerio.  If you're on a gun call and I
23  show up with my hand under a towel and I walk up to you,
24  you're not going to say, hey, can you move that towel?
25      A    I would.
```

Page 107

1        Q     Thank you.

2        A     But a little bit is unfair with the question

3    given the time of day, the location.

4        Q     If you show up at a pool in the middle of the

5    day, someone has a gun, and I walk up with my hand

6    concealed under a towel --

7        A     Where everyone else has towels.

8        Q     Where everyone else has towels.

9        A     Right.

10        Q     But I'm coming up to you, the policeman, on a

11    gun call, you're not going to say, hey, what's -- I

12    mean, for no reason, you're not going to ask to see

13    what's underneath that towel?

14        A     Sure I would.  I'm not saying I wouldn't.

15        Q     Of course.  That was it.

16        A     Okay.

17        Q     This isn't a trick question, I promise.

18             MR. NORTON:  You know, he's making an argument

19        here.  He's not asking questions, getting answers.

20        It's inappropriate and he's giving a completely

21        inaccurate characterization of the --

22             MR. KING:  Play Valerio's video.

23             MR. NORTON:  Yeah, play Valerio's video where

24        you can actually see his hands on the towel.

25             MR. KING:  I'll entertain Bob's objection.

Page 108

1           MR. NORTON:  I appreciate it.

2           MR. KING:  You got it, my friend.  Anything

3      for you, Bob.

4           MR. NORTON:  Well, then I have a couple other

5      things.

6           MS. PENQUE:  It's going to take a second.

7   BY MR. KING:

8      Q    Okay.  We'll come back to that.

9           All right.  But back to Mr. Gould's pockets

10  again.  So I think we've agreed that she didn't know

11  what was in his pockets.  Right?

12     A    Correct.

13     Q    He didn't comply with her first order not to

14  go back to the pockets.  Correct?

15     A    Correct.

16     Q    She didn't know what he was going to take out.

17  Correct?

18     A    Correct.

19     Q    And it would be reasonable, under the

20  circumstances of the call, for her to consider that it

21  might be a gun.  Correct?

22     A    Sure.  Yes.

23     Q    And if she considered that it might be a gun,

24  it would be reasonable for her to draw her weapon at

25  that time.  Correct?

```
                                              Page 109

1          A    Yes.

2          Q    All right.  After he defied the instruction,

3     we watched it on the video, his left hand came down to

4     short level, correct, while he has the phone extended?

5          A    Yes.

6          Q    And then he takes a drop step back, blades his

7     body.  Correct?

8          A    Yes.

9          Q    Then he starts to back up.  Correct?

10         A    Yes.

11         Q    She closes the distance.

12         A    Yes.

13         Q    He continues to try to back up.  Right?

14         A    Yes.

15         Q    And at this point, she still does not know

16    whether he has a gun, does she?

17         A    No.

18         Q    You ever heard of a gun that resembles a smart

19    phone?

20         A    I've seen knives, I've seen other things that

21    resemble.  That was kind of like, we had a bunch of

22    packets back in the day that showed different things

23    that could be different weapons.

24         Q    You've seen something like that?  Look at

25    those two pictures there.
```

```
                                             Page 110
```

1        A    I've seen pictures of these.  I've never seen

2    one in real life.

3        Q    Do you want to see one in real life?

4        A    Yes, please.  Because then I could say I saw

5    one.

6             Oh, we're looking at a video?

7        Q    Yeah.

8        A    No, I thought you had one here to show me.  I

9    can watch this on YouTube anytime.

10       Q    We're here, let's watch it together.

11       A    I figured if there was a real one you could

12   show me, I would love to see it.

13            (Video played.)

14   BY MR. KING:

15       Q    But it does work.  It's an actual gun.

16       A    So you don't have one to show me now.

17       Q    All right.  Let's talk about the situation

18   when you arrived.  Now, when you arrived, where was

19   Officer Guerriero?

20       A    She was standing -- see where Mr. Gould is?

21       Q    Yes.

22       A    Where the road and that white car is?

23       Q    Yes.

24       A    Over off in the grass area, just on the other

25   side of there, that's where we were standing.

Page 111

```
 1        Q    And that's where you met with her?

 2        A    Yes, I believe so.

 3        Q    Who was with her?

 4        A    I think her and I were just the only ones

 5   there.  Marc Glass may have been there.  I don't know if

 6   Marc Glass was talking over at the car with Mr. Gould so

 7   I don't know exactly.

 8        Q    All right.  So you remember giving a statement

 9   to internal affairs?

10        A    Yes.

11        Q    And you remember in that statement, they swore

12   you in?

13        A    Yes.

14        Q    And you knew you had to tell the truth in that

15   statement?

16        A    Yeah.

17        Q    In that statement, did you say to her, when

18   you arrived, that she was huddled up with Sergeant Glass

19   and she was very animated in telling her story?

20        A    Yes.

21        Q    That's not what happened, was it?

22        A    Let me go back to see where I was --

23        Q    Please, go right ahead.

24        A    This section here is all mine.  Right?

25        Q    If you like, here's what I can do for you.  I
```

1    can play that section of your statement.

2            CHIEF PAPE:  Starting on page 12.  He's

3        starting on 12.

4            THE WITNESS:  Yeah, I got it.  Okay.

5    BY MR. KING:

6        Q    Do you remember saying that to internal

7    affairs?

8        A    Yes.

9        Q    But that's not actually what happened, is it?

10       A    Tell me?  What are we trying to get at?

11       Q    What I'm getting at is that when you arrived,

12   you didn't see Beth with Sergeant Glass right then,

13   contrary to what you said to internal affairs.

14       A    I don't know exactly what happened exactly at

15   that spot.

16       Q    Okay.  That's fair.

17       A    If there's anything on video, I'd love to see

18   it.

19       Q    Yes, there is actually.

20       A    All right.

21           MR. KING:  All right.  Go to Valerio's video.

22           MS. PENQUE:  It's got one minute left.

23   BY MR. KING:

24       Q    I have the CAD.  Do you want to see the CAD

25   when you arrived?

Page 113

1          A     No, no, no, that's fine.

2          Q     Because that will tell you what time you got

3     there in reference to when the incident took place.

4     Will that help you out?

5          A     Is it me saying that I'm 97 on the call?

6          Q     Yes.

7          A     I could have already been there or just

8     arriving at that time.  So not everything exactly takes

9     place right on the radio.

10         Q     If I have the video showing you walking from

11    your car and the CAD notes saying you arrived at that

12    time, would you agree that's the time you got there?

13         A     I would be totally satisfied with that.

14         Q     So let's start with the CAD notes.  Let's go

15    to Exhibit 8.  Take a look at that.  And I believe

16    you're on the second page, about halfway down, top

17    one-third of the page.

18         A     I have a final action summary on section

19    eight.

20               MR. NORTON:  You're in my book.

21    BY MR. KING:

22         Q     I'm so sorry, the other book, my friend.

23         A     Okay.  At 11:51:06.

24         Q     Correct.

25         A     Okay.

```
                                                    Page 114

 1              MR. KING:  Is Valerio done?

 2              MS. PENQUE:  30 more seconds.

 3              MR. KING:  Take it to 18:23, I believe.  A

 4         little further back.  Back.  Keep going a little

 5         bit further.

 6              MS. PENQUE:  Forward or back?

 7   BY MR. KING:

 8         Q    Backwards.  You went forward.  Backwards.

 9   Keep going.  Okay.  Keep going back.  You can stop it

10   right there, now let it play.

11              Is that you right there, sir?

12         A    Yeah, right there.  Yes.

13         Q    And this is Valerio who you're meeting with.

14   And that's --

15         A    Who was just coming from the back.

16         Q    Correct.

17         A    Yeah.

18         Q    And that's Sergeant Pearce?

19         A    Yes.

20         Q    And so far you've not seen Beth yet.  Correct?

21         A    No, not yet.

22         Q    Now, in your statement to internal affairs,

23   you told them, as you walked up, Beth was huddled with

24   Sergeant Glass.

25         A    Yes.
```

Page 115

1         Q    And you said that she was angry.

2         A    Yes.

3         Q    And she was animated.

4         A    Yes.

5         Q    However, that's not what happened when you

6    arrived, is it?

7         A    Okay.

8              MR. NORTON:  Let him answer.

9    BY MR. KING:

10        Q    Answer the questions.  I'm going to help you.

11        A    You just want yes or no answers?

12        Q    That's not what happened.  Correct?

13        A    No, that is what happened.  That is what

14   happened.

15        Q    Well, please tell me.

16        A    Okay.  So going off of your question, when I

17   pull up, you know, going with internal affairs, I'm not

18   going to sit there and say, well, I drove up and got out

19   and spoke with Officer Valerio.

20             The situation came down to, with Officer

21   Guerriero's internal affairs investigation, is where I

22   am getting sworn in and take in when I first saw her.

23             If there is any type of misrepresentation

24   there --

25        Q    I'm not suggesting that you did, sir.

Page 116

1     A     Okay.  Because you're pulling me in like,

2  okay, I swore, now you're trying to accuse me of lying.

3     Q     I'm not trying to suggest you were lying.

4  What I'm trying to suggest was you probably watched the

5  video -- and actually, that's one of my questions.  It

6  wasn't intentional.  You probably watched the video of

7  that and conflated the two.  Is that possible?

8     A     Sure.

9     Q     I promise you, I'm not trying to hurt you.

10    A     Okay.

11    Q     Do you want me to play the video or listen to

12 the audio from the IA?

13    A     No, you don't have to.  That's fine.

14    Q     All right.  So let's talk about the arrest.

15          Okay.  So first of all, you would agree with

16 me that the statute is not resisting arrest, it's

17 resisting an officer.  Correct?

18    A     Yes.

19    Q     And the elements of that are resist, obstruct

20 and oppose.  Correct?

21    A     Yes.

22    Q     The lawful execution of any legal duty.  I

23 shortened it a little bit but that's the crux.  Right?

24    A     Yes.

25    Q     And we can, I think you and I can agree that

Page 117

1   her responding to a call was a legal call for duty.

2   Correct?

3        A    Yes.

4        Q    And it was a gun call.  Right?

5        A    Yes.

6        Q    And when she walked up, whether his hand was

7   near or in his pocket, she gave him an order not to do

8   that.  Correct?

9        A    Yes.

10       Q    And he then subsequently immediately defied

11  that order.  Correct?

12       A    Yes.

13       Q    He went to his pocket?

14       A    Yes.

15       Q    And then he -- we talked about he bladed,

16  dropped his left hand?

17       A    Yes.

18       Q    And then he pointed at her with the object in

19  the right hand?

20       A    Yes.

21       Q    Which was the phone.  All right?  And that

22  violates the statute, doesn't it?

23       A    Yes.

24       Q    The letter of the statute.  Correct?

25       A    Yes.

Page 118

1       Q    But not so much the spirit.

2       A    100 percent.

3       Q    All right.  But the letter of the statute.  So

4  technically, that's an arrestable offense.

5       A    Technically, yes.

6       Q    You directed Strzelecki to draft the PC.

7       A    Yes.

8       Q    And he did draft it.

9       A    Yes.

10      Q    And then he brought it to you.

11      A    Yes.

12      Q    And then you read it.

13      A    Yes.

14      Q    And you thought it was vague.

15      A    Yes.

16      Q    And you made changes to it.

17      A    Yes.

18      Q    No.  Not just grammatical changes but actual

19  articulation.

20      A    Yes.

21      Q    Substantive changes.

22      A    Sure.

23      Q    You told him to say that Gould was being

24  defiant?

25      A    Yes.

```
                                                    Page 119

 1        Q     You told him to say that he was using slurs?

 2        A     Yes.

 3        Q     And you told him to add, you can tell me --

 4   you can't tell me what to do, you're not my mother?

 5        A     Yes.

 6        Q     And Strzelecki added all that to the PC?

 7        A     Yes.

 8        Q     And Officer Guerriero never saw that, did she?

 9        A     No.

10        Q     She didn't draft that.

11        A     No.

12        Q     Certainly didn't draft it and she didn't see

13   it.

14        A     No.

15        Q     And then later, you watched the video.

16        A     Yes.

17        Q     And I think you have already conceded that the

18   camera was below her eye view.

19        A     Yes.

20        Q     And the engine block is blocking the lower

21   torso of the guy.

22        A     Yes.

23        Q     But you can see that his hand is near or in

24   his right pocket at that time.

25        A     Yes.
```

```
                                                    Page 120

 1              MR. KING:  I'm sorry if I'm going too fast, I
 2         really apologize.  I'm going to slow down.
 3    BY MR. KING:
 4         Q     And she says politely, sir, can you get your
 5    hands out of your pocket?
 6         A     Yes.
 7         Q     And you say that it escalated after that.
 8         A     Yes.
 9         Q     But actually, she tells him the second time,
10    because he then actually went back into the pocket
11    again.  Right?
12         A     Yes.
13         Q     And then she gives that second order.
14         A     Yes.
15         Q     And then you say that she says, and it was get
16    your fucking hands out of your pocket.
17         A     Yes.
18         Q     But that's not really what she said.
19         A     Okay.
20         Q     She doesn't curse that time, does she?
21         A     I couldn't even tell you.  Keep watching the
22    video and then we can clarify.
23         Q     If I told you, rather than do that, if I told
24    you she didn't curse the second time, any reason not to
25    believe me?
```

```
                                                       Page 121
 1        A    I believe you, Rick.
 2        Q    All right, good.
 3             And it's at that time that the other cues that
 4   we began to talk about occur.  Right?
 5        A    Yes.
 6        Q    So when you were asked about your decision to
 7   unarrest him, Sergeant Grossman said that -- I'm sorry.
 8   When Sergeant Grossman asked you about your decision to
 9   unarrest -- Sergeant Grossman was the AI guy.  Right?
10        A    Yes.
11        Q    And he asked you about your decision to
12   unarrest.
13        A    Yes.
14        Q    And you said that's because he didn't commit a
15   crime.
16        A    Yes.
17        Q    And Grossman clarified that you said that
18   after watching her video, you believed PC existed.
19        A    Yes.
20        Q    But when you watched -- and you said it was
21   Strzelecki's but what you really meant was the other
22   video, the one unobstructed from the park.
23        A    The surveillance one.
24        Q    Surveillance.
25        A    Hm-hmm.
```

Page 122

1      Q    After you watched that, you said that without

2  that car blocking your view, you changed your mind.

3      A    Yes.

4      Q    All right.  Part of your reasoning, as I

5  understood from what you said, was because he hadn't

6  committed a crime in the back.

7      A    Correct.

8      Q    And your reasoning, if I misspeak, please,

9  your reasoning was he hadn't committed a crime in the

10  back.  And so when he came to the front, her arrest was

11  really predicated because he was upset because what

12  happened in the back.

13      A    If --

14      Q    You may.  I want you to explain.

15      A    If you look at the video and you can play stop

16  motion, you can stop motion anything, and make

17  assumptions, but as you let things go and play and let

18  it fluidly play out, you can see the aggression from her

19  going into the call and him taking the steps back and,

20  fluidly, fingertips in his pockets pulling out the phone

21  with a sigh in his voice.  What did I do?  Which is --

22  which is -- you said you could let me speak.

23      Q    Go ahead.

24      A    Which is very common, especially with someone

25  with so many years in law enforcement that should have a

Page 123

1    sixth sense, that has been an HNT, crisis intervention

2    training, has trained kids to do this job, to sit there

3    and calm the situation and do -- on the S.W.A.T. team,

4    to be doing tactful things, not to keep advancing and

5    then arguing with the guy after the whole entire fact,

6    putting him down on the ground, yelling and screaming at

7    him, sword fighting with him.

8         Q    Hold on a second.  Hold on.

9              MR. NORTON:  No, no, he's -- continue to talk.

10             THE WITNESS:  So that's where, when you watch

11        the whole video play out is when you go, how could

12        this have happened?

13   BY MR. KING:

14        Q    So let me ask you a question.

15        A    Yes.

16        Q    Let's separate the park from -- because I

17   agree with you.  Once he's in handcuffs, the sword

18   fighting, inappropriate.  We've conceded that.  No

19   worries.

20        A    With the arrest here?

21        Q    Yes.

22        A    Okay.

23        Q    So after the handcuffs are on and the sword

24   fighting begins, inappropriate.  We've conceded that.

25        A    Even better.

Page 124

1       Q    Let me finish.

2       A    Okay.

3       Q    I have questions.

4            So, but what we're talking about right now is

5    the letter of the law.  She gave him an order

6    immediately upon seeing his hand near his pants.

7    Correct?

8       A    Yes.

9       Q    I keep going over this, I know.

10      A    Go ahead.

11           MR. NORTON:  I object, it's repetitive.  It's

12       the exact same question 15 times.

13    BY MR. KING:

14      Q    But I want him to -- I want him to be -- we're

15    on the same place.  So I'm just trying to clarify and

16    make sure that we're still on the same place.

17      A     We're not on the same place.  We're getting

18    into a debate because you're trying to get what I would

19    think objectively at that time.

20      Q    I'm not asking you that.  What I'm asking you

21    is the letter of the -- there's a difference, the letter

22    and the spirit of the law.  Right?

23      A    Yes.

24      Q    By the letter of the law, he just defied an

25    order she had in a legal process.  Correct?

1          MR. NORTON:  Okay.  Hold it.  I object to him

2      testifying to what the law says.  He can argue that

3      in his brief to you.  You're going to have all the

4      videos.  And if you believe that, wonderful, that's

5      your call.

6          Having him, he's trying to testify to

7      what's --

8          MR. KING:  He's a police officer.

9          MR. NORTON:  I don't care.  He's not a judge.

10          MR. KING:  He's a police officer.  He makes

11      that call.

12          MR. NORTON:  So what?

13          MR. KING:  That's his job.

14          MR. NORTON:  He enforces the laws that he

15      couldn't possibly recall.  They're books this

16      thick.

17          MR. KING:  We're talking about -- actually,

18      turn to the statute.

19          MR. NORTON:  I've got a pending objection.

20      All you've done is testify for two hours.  You

21      haven't gotten one piece of evidence in.

22          MR. KING:  All my evidence is in, we agreed to

23      it already.

24          MR. NORTON:  Well, you agreed to it.

25          Oh, no, no, I don't mean your book.  Of course

Page 126

```
 1       that's in.
 2            MR. KING:  Oh, okay.  All right.
 3            MR. NORTON:  I meant to say effective
 4       evidence.
 5            MR. KING:  Well, that's going to be your
 6       opinion, I guess.
 7  BY MR. KING:
 8       Q    All I'm asking you, Sergeant Beath, is, by the
 9  letter of the law, that's an arrest.
10       A    Yes.
11       Q    That's it.
12            I'm glad you mentioned these things about
13  S.W.A.T. and HNT and all those things because let me ask
14  you this.  Have you been involved in high-risk events?
15       A    Yes.
16       Q    And so you understand adrenaline.
17       A    Yes.
18       Q    And you understand that when you pull your gun
19  on someone, you're not playing, are you?
20       A    No.
21       Q    And when you pull your gun, it's a
22  heightened -- your adrenaline rises up and you get
23  excited.
24       A    Excellent.  Yes.
25            But with the same training, you have to be
```

Page 127

1    able to lower that.

2         Q    Absolutely.

3         A    And you have to be able to deescalate.

4         Q    I'm not arguing that.

5              But what I'm saying to you is once you do

6    that, you get an adrenaline.  Correct?

7         A    Yes.

8         Q    And then at some point, you get an adrenaline

9    dump.  Correct?

10        A    Yes.

11        Q    When she is, the part where you thought you

12   saw that was on the video where she was animated and she

13   was talking to Glass, remember that?

14        A    Yes.

15        Q    She was just -- it was just after the

16   incident.  Right?

17        A    Yes.

18        Q    And likely, her excited state and her

19   emotional dump to him was likely the adrenaline dump.

20        A    Sure.  Yes.

21        Q    Give me one second.  So one quick point and

22   then I just want to talk about your actual first

23   interaction with Officer Guerriero.

24        A    Hm-hmm.

25        Q    So watching that video, the first command she

Page 128

```
1    gave to him was calm.  Right?
2         A    Yes.
3         Q    All right.  Now let's drop back to when you
4    arrived and you met with her.  You said that she was
5    angry, she was animated, and that was from the video.
6    When she talked to you, she was talking with her hands.
7         A    Yes.
8         Q    And she was telling you what happened.
9         A    Yes.
10        Q    But she wasn't angry.  Not at that point.  I'm
11   asking you, was she angry?
12        A    Yes, she was angry.
13        Q    She was angry at that point when she talked to
14   you?
15        A    Yes, she was angry.
16        Q    What was she saying?
17        A    Exactly what I just told you.  And even when I
18   said, do you want to -- are you sure you want to arrest
19   this guy, as long as he gets an apology?  Yeah, he's a
20   prick.
21        Q    Were you wearing your body cam that day?
22        A    Yes.
23        Q    Was it on?
24        A    No.
25        Q    Is that against the rules?
```

1       A    No.

2       Q    Okay.  All right.  Just asking.

3       A    Okay.

4       Q    So you don't have to turn your body cam on.

5       A    No.

6       Q    So your conversation with Beth is not recorded

7    anywhere.

8       A    No.

9       Q    And all we have is Valerio's video.

10      A    Yes.

11      Q    Of her talking like this (indicating).

12      A    Yes.

13           MR. KING:  Okay.  That's all I have.  Thank

14    you.

15   REDIRECT (SERGEANT DENNIS BEATH)

16   BY MR. NORTON:

17      Q    I've got a few.

18      A    Okay.

19      Q    Sergeant, there was a lot of discussion about

20   whether or not this gentleman, Gould, could have had a

21   weapon in his back of his bathing suit.  Did you see

22   when she drove in, she got a crystal clear look at him

23   from behind?

24      A    Yes.

25      Q    And he was in a wet bathing suit.

```
                                                    Page 130

 1         A     Yes.

 2         Q     Okay.  And she identified it as a cellphone

 3    when he pulled it out.  She uses the word cellphone.

 4         A     Yes.

 5         Q     And the whole time, he's pointing his finger

 6    holding the cellphone.  Right?

 7         A     Yes.

 8         Q     His trigger finger, if this could have

 9    possibly been a gun.  He's -- okay.  I got it.

10               And if you looked at Valerio's video, he is,

11    at one point at the very beginning, walking behind this

12    guy who's hardly carrying a towel draped over his hand.

13    He's holding it with his hand and you can see it.  Do

14    you remember that?

15         A     I don't remember how he was holding it.

16         Q     Don't worry, I'll argue it from video.

17         A     Yes.

18         Q     The PCA that was done there, you've now got a

19    guy that is arrested on the ground with handcuffs.

20    Right?

21         A     Yes.

22         Q     And you got an officer that arrested him who's

23    now in the hospital and she's told you a fabricated

24    story, according to your testimony.  Is that what you're

25    putting into the PCA?
```

Page 131

1        A    Yes.

2             MR. NORTON:  Thank you.  Nothing else.

3    RECROSS (SERGEANT DENNIS BEATH)

4    BY MR. KING:

5        Q    I just have a quick follow-up.  Can you see

6    his hand underneath there?

7        A    Is that his hand coming off or is that just

8    the color of the towel?

9        Q    That's just the color of the towel.

10       A    Can you play it fluidly?

11       Q    Absolutely.  Take it black and then bring it

12   forward.

13       A    What's the soonest point Michael meets up with

14   him?  Okay.

15            MR. NORTON:  Yeah, he's going to be behind

16       him.

17   BY MR. KING:

18       Q    Can you see what's under the towel?

19       A    No.

20            MR. NORTON:  No, wait a minute.  If you're

21       going to cross-examine him on it, let the video

22       play out.  Because you can see his hand.

23            MR. KING:  I was done.  My question was over.

24       He answered it already.

25            MR. NORTON:  All right, fine.  No question.

Page 132

1    BY MR. KING:

2        Q    And you can't say for sure, as Officer

3    Guerriero was coming in, that she saw his back, can you?

4        A    When she pulls in --

5        Q    Can you say --

6             MR. NORTON:  Let him answer the question.

7             THE WITNESS:  I'm going to answer this.  I

8        cannot look through her eyes.  It's totally

9        impossible.

10            But I can say this.  When you pull in, as you

11       said, as observant as I should be with someone who

12       has just as much time in as she does, to observe

13       everyone's face, that when she pulls in to this

14       heightened alert gun call, that she should see him,

15       yes.

16   BY MR. KING:

17       Q    Which way was he facing when she pulled in?

18       A    Towards the car that's pulled up there now,

19   Officer Valerio's.

20       Q    When she first --

21       A    Go back to where they pulled in.

22       Q    And she was driving.  Right?

23       A    Yes.

24       Q    And her eyes are on the road --

25            MR. NORTON:  No, this is way beyond cross, I

Page 133

```
 1      think.  No, it isn't.  I apologize.
 2           THE WITNESS:  Well, I would like to even argue
 3      this.  Where he's positioned, this area where you
 4      turn in, there's nothing obstructing.  She's going
 5      to make the right turn to her right side and would
 6      see him sitting right there on the curb.  Go ahead,
 7      watch.
 8  BY MR. KING:
 9      Q    So as she's driving in --
10      A    Yes.
11      Q    -- he is facing -- she's coming from this way,
12  he's facing this way.  There's a possibility that she
13  could have seen his back.  There's a possibility.
14      A    Yes.
15      Q    But you don't know for sure that she did, do
16  you?
17      A    I told you, I can't tell from her eyes.
18      Q    Exactly.  That's it.  You don't know that she
19  saw.
20      A    Right.
21           MR. KING:  Thank you.  No further questions.
22           MR. NORTON:  No questions.
23           THE ARBITRATOR:  All right.  Thank you, very
24      much, for appearing today.
25           THE WITNESS:  Thank you.  Thank you,
```

Page 134

1        everybody.

2                MR. NORTON:  If we want to take a break,

3        Mr. Arbitrator.  The food is here.

4                (A luncheon recess was taken at 12:45 P.M.)

5                (Continued in Volume II.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 135

1                    CERTIFICATE OF REPORTER

2

3

4          I, Kimberly Iglewski, Court Reporter, in and

5     for the State of Florida at large, do hereby certify

6     that I was authorized to and did report the foregoing

7     proceedings, and that the transcript, pages 1 through

8     134 is a true and correct record of the proceedings to

9     the best of my ability.

10        Done and dated this 29th day of April, 2024 at

11    Martin County, Florida.

12

13

14

15

16

          Kimberly Iglewski

17        Court Reporter

18

19

20

21

22

23

24

25

[& - abyss]

| & | | | |
|---|---|---|---|
| **&**  2:2 | | | |

**0**

**0023**  101:9

**1**

**1**  47:25 135:7
**10**  12:12 20:5
**10,000**  98:3
**10-12**  57:10
**100**  118:2
**10500**  1:11
**10th**  32:19
**112**  17:6
**112.532**  13:22
**112.532.**  77:12
**112.533**  14:4
**117.10**  14:25
**11:51:06**  113:23
**12**  64:6 83:1
  112:2,3
**121**  2:3
**129**  3:11
**12:45**  134:4
**131**  3:12
**134**  135:8
**139**  3:14
**14**  86:7
**147**  3:15
**15**  9:2 64:6,6
  124:12
**16**  1:8
**18**  4:19 29:24
  82:22

**2**

**2**  47:24 48:3
**2.31616**  53:22
**20**  29:21 30:16
  94:1 105:24
**20/20**  52:20
**2005**  93:25
**2018**  19:9
**2019**  4:25 5:9
**2023**  9:11 32:19
**2024**  1:8 135:10
**203**  3:18
**21**  31:25
**213**  3:18
**216**  3:20
**22**  31:25
**2240**  2:7
**23**  83:3
**23.16.16**  22:10
**230921-09536**
  1:3
**25**  67:20
**254**  3:21
**278**  3:21
**29th**  135:10

**3**

**3**  48:7

**30**  7:24 10:20
  35:12 38:20
  48:24 63:17
  70:19 80:7,8
  92:24 114:2
**300**  2:3,7
**305**  2:4
**31**  3:7 103:4
**32163**  135:16
**33134**  2:3
**33409**  2:7
**36**  86:7

**4**

**4**  49:8,12 77:9
  77:10 79:25
**43**  19:3
**445-7801**  2:4
**45**  70:20 98:21
**49**  63:17 64:12
  65:3 99:15

**5**

**5**  49:18
**50**  99:19
**51**  3:8
**532**  77:16
**557-1079**  2:8
**561**  2:8
**57**  74:1,3

**6**

**6**  49:24 86:6,8
**6456507**  1:14

**7**

**78**  3:8

**8**

**8**  113:15
**82**  3:10
**850**  8:15
**88**  19:6

**9**

**911**  9:20,21 90:9
**92.525**  14:15
**92.525.**  14:17
**93**  3:11
**97**  113:5
**9:40**  1:9
**9:52**  11:5
**9th**  9:11 83:2

**a**

**a.m.**  1:9 11:5
**ability**  8:4 135:9
**able**  39:23 66:3
  74:21 101:3
  127:1,3
**abnormal**  95:8
**above**  77:24
**absolute**  12:8
**absolutely**
  34:23 50:17
  69:5 72:3 75:12
  81:9 89:13 90:3
  92:22 93:1
  127:2 131:11
**abuse**  12:8
**abyss**  5:10

**academy** 41:24 60:21 68:18 70:14 97:1,21
**accepting** 89:23
**access** 6:13,13 66:12,15
**accordance** 15:23
**accountability** 6:4
**accurate** 15:1 43:13 48:24 50:6 86:17
**accuse** 116:2
**achieve** 4:16
**acknowledge** 17:8,10,10
**acronym** 7:21 8:10
**acted** 12:21
**action** 16:23 62:10 80:13 83:5 100:11 113:18
**actions** 52:24
**active** 59:20
**actual** 12:13 13:12 110:15 118:18 127:22
**actually** 5:13 12:2,2 15:14 16:13 19:6 21:9 26:19 33:17 36:21 47:11 79:16 85:11

87:25 91:7 100:21 101:24 103:11 107:24 112:9,19 116:5 120:9,10 125:17
**add** 119:3
**added** 28:24 29:11,13,14,16 119:6
**additional** 55:18
**adhere** 6:6
**adjusts** 18:7
**admit** 27:8,10
**admonish** 53:17
**admonition** 6:7
**adrenaline** 24:14,16 126:16 126:22 127:6,8 127:19
**advance** 75:3
**advanced** 39:16
**advancing** 39:6 39:11 73:23 75:2 102:23 104:6 123:4
**advisements** 53:3
**affairs** 33:8 34:6 49:4 111:9 112:7,13 114:22 115:17,21
**affidavit** 8:9 14:23 15:1 28:25 29:5

**affidavits** 34:7
**afoul** 16:3
**afternoon** 51:12 51:13 82:11
**afterward** 85:25
**agency** 7:19,19 13:23,25 14:5 20:4 29:22 36:13 94:6
**aggression** 122:18
**agitated** 5:16 36:2,18,25 83:21 89:12 98:15
**agitates** 10:11
**agitation** 98:15
**ago** 20:11,21 23:9
**agree** 4:9 12:24 51:20,24 52:4 53:24 58:21 59:19,23 70:23 72:6 75:13,22 76:2,7,8 84:14 95:23 96:2 97:19 99:8 113:12 116:15 116:25 123:17
**agreed** 51:21,25 52:4 108:10 125:22,24
**agreement** 16:17 17:4

**ahead** 13:13 17:3 35:6,24 36:16 38:17 40:8 41:18 42:10 45:5 46:18 53:14 54:10 56:12 62:3 63:17 71:16 72:14 76:25 77:10 85:8 91:14 101:18 106:12 111:23 122:23 124:10 133:6
**ai** 121:9
**air** 57:5,6,19 81:13
**alert** 61:14 132:14
**allegation** 22:7 22:19 27:14
**allegations** 21:10
**alleging** 21:13 21:17 24:15,19
**allen** 2:2
**allow** 55:20
**allowed** 16:4 22:5
**altercation** 48:16
**amidst** 91:16
**ammunition** 9:4
**amount** 36:9

**amped** 26:22
**anblaw.com** 2:4
**angle** 18:1 47:9
**angrily** 69:1
**angry** 115:1
  128:5,10,11,12
  128:13,15
**animated**
  111:19 115:3
  127:12 128:5
**animosity** 50:9
**answer** 38:3
  41:16 55:8,9
  60:18 62:15
  105:18,21,22
  115:8,10 132:6
  132:7
**answered**
  131:24
**answering**
  106:9
**answers** 57:15
  107:19 115:11
**anybody** 23:1
  47:19 56:9
**anyone's** 62:7
**anytime** 110:9
**anyway** 11:25
**apologize** 84:6,6
  120:2 133:1
**apologizes** 37:5
**apology** 84:4
  128:19
**appear** 34:1
  46:23

**appearances** 2:1
**appearing**
  133:24
**appears** 5:2
  62:18 65:12
  87:21 100:5
**applicable** 14:3
**applies** 51:18
**apply** 28:5
**appreciate**
  62:13,15 81:20
  108:1
**approach** 68:19
**approached**
  83:16
**approaching**
  24:10 55:2
**appropriate**
  34:15 41:8
  51:25 81:4
  93:13
**appropriately**
  14:6 16:13
**approximately**
  93:22
**april** 1:8 135:10
**ar** 9:2
**arbitration** 1:5
**arbitrator** 1:5
  4:4,10,13 13:7
  13:13 16:9,25
  17:3 31:6,8,11
  32:7 34:21 36:9
  36:10,16 37:19
  40:2 51:5,9

54:10,13 60:18
68:3 81:16,18
81:25 82:2 83:8
84:22,25 86:17
90:15 105:22
133:23 134:3
**area** 10:2,4 24:7
  27:8 64:14
  88:20 110:24
  133:3
**argue** 125:2
  130:16 133:2
**arguing** 123:5
  127:4
**argument** 9:17
  107:18
**argumentative**
  73:3
**arm** 41:20 99:25
**armed** 10:15
  45:22 61:11
**arrest** 5:11,15
  5:17 6:1 8:8,12
  12:1 19:11
  21:15 29:4 30:9
  30:11 38:10,13
  42:12,13 47:25
  48:3 86:22
  89:25 93:4
  116:14,16
  122:10 123:20
  126:9 128:18
**arrestable** 118:4
**arrested** 8:7
  10:25 27:15

30:8 84:1 85:18
86:5 130:19,22
**arrestee** 30:9
**arresting** 12:3
**arrests** 19:7
  42:16
**arrive** 11:14
  83:11
**arrived** 9:25
  25:12 48:13
  63:21 83:8,10
  96:17 105:11
  110:18,18
  111:18 112:11
  112:25 113:11
  115:6 128:4
**arrives** 104:15
**arriving** 35:12
  39:1 113:8
**articulation**
  118:19
**aside** 11:17 12:4
**asked** 18:22
  37:2 83:13 84:5
  88:13 91:3,5,9
  91:17 121:6,8
  121:11
**asking** 31:2
  59:16 60:15
  67:5,12 68:13
  72:22 107:19
  124:20,20 126:8
  128:11 129:2
**asks** 36:19

**assertion** 19:21
**assess** 26:15
**assessing** 26:3
**assessment**
  25:25 68:19,22
  69:10
**assistance** 34:11
**assistant** 2:13
  11:8,9 32:20
**assists** 10:3
**assume** 7:21
  11:7 33:20
  59:10 60:1,19
  61:8,10,22 62:4
  71:3 87:8 96:7
**assumed** 71:5
  100:18
**assuming** 55:13
**assumption**
  62:6,10
**assumptions**
  122:17
**atm** 20:14
**attack** 90:8 97:9
**attempt** 4:15
  13:15 18:9
  47:18 62:13,15
**attempted** 43:8
  45:7
**attempting**
  47:15
**attend** 33:13
  94:13
**attendant** 92:3

**attention** 58:23
  59:20 60:4,16
**attorney** 30:24
**attorneys** 13:15
**attributed**
  86:16
**audio** 33:23,23
  38:21 68:8
  116:12
**authority** 12:8
  13:2
**authorized**
  135:6
**automatically**
  44:25 55:13
**avenue** 2:3
**aware** 27:16
  59:21 92:20,23
  93:2,6
**awkward** 92:15

**b**

**b** 1:3
**baby** 6:16
**back** 9:11 10:6
  11:20 23:13,15
  23:24 24:18
  25:19 26:8,11
  26:13,23 28:15
  31:3 35:21
  37:13 42:25
  43:2,9 45:7 47:5
  54:7 63:4,7,22
  63:23 64:24
  65:3,23 70:17
  72:7,12,15 75:6

75:13 76:20
  77:5 83:19
  88:20 96:20,23
  98:19 100:4
  101:10,24 102:7
  103:11 104:22
  105:3 108:8,9
  108:14 109:6,9
  109:13,22
  111:22 114:4,4
  114:6,9,15
  120:10 122:6,10
  122:12,19 128:3
  129:21 132:3,21
  133:13
**backed** 20:18
**backing** 26:24
**backwards**
  73:21 103:1
  104:4 114:8,8
**bad** 31:1
**badger** 73:15
**balling** 97:19
**balls** 18:5 69:19
**bank** 20:13,14
**banter** 27:9
**bargaining**
  16:17 17:4
  82:17
**based** 29:6
  37:10,10 42:17
  81:6
**basically** 37:3
  38:8

**basis** 18:17
**bates** 80:5
**bathing** 10:13
  18:5 40:21
  129:21,25
**beach** 1:1,11 2:2
  2:7,7 23:23
  31:20,24 82:21
  82:22
**beath** 3:9 11:15
  12:4 28:23
  29:10,11,18,19
  82:1,5 93:18,20
  126:8 129:15
  131:3
**becoming** 8:18
**bed** 11:13
**began** 121:4
**beginning** 75:16
  98:20 130:11
**begins** 123:24
**behaving** 46:20
**behavior** 5:19
  8:13 9:9
**belief** 23:19
**believe** 5:12
  12:1 16:14
  17:11 36:8,8
  39:9 45:19,21
  46:10,14 70:4
  75:2 104:9
  111:2 113:15
  114:3 120:25
  121:1 125:4

**believed**  16:13
    24:11,13 121:18
**belligerent**  5:16
**benefit**  24:23
    34:20
**best**  15:16 34:1
    39:10 135:9
**beth**  112:12
    114:20,23 129:6
**bethany**  2:12
    3:19
**better**  86:21
    123:25
**beyond**  6:5
    74:18,24 85:23
    132:25
**big**  18:19 67:6,7
**bigger**  92:4
**bill**  13:21 14:12
    15:19 16:2,4,16
    77:18
**bit**  46:14 64:8
    91:1 107:2
    114:5 116:23
**bitter**  6:19
**black**  131:11
**bladed**  72:16,17
    72:19,22,25
    117:15
**blades**  26:9
    69:22 109:6
**blading**  98:10
**blah**  104:21,22
    104:22

**block**  64:3,9
    119:20
**blocked**  64:3,9
**blocking**  119:20
    122:2
**blue**  2:2
**blvd**  2:7
**bob**  17:23 66:4
    82:13 108:3
**bob's**  107:25
**body**  5:14 12:6
    22:23 26:9 34:2
    34:12 38:18,19
    44:4 47:8 64:7
    65:10 74:8 85:2
    85:11,13,16,19
    85:23 87:10
    109:7 128:21
    129:4
**bolded**  77:14
**bomb**  20:24
    21:1,2 24:4
**book**  77:8 86:6
    113:20,22
    125:25
**books**  125:15
**boom**  24:4,4
**bottom**  21:7
    80:4 86:12,13
**bradley**  90:25
**brandished**
    91:13
**break**  134:2
**breathing**  97:24

**brief**  4:15 16:6
    16:7 17:1 125:3
**briefly**  5:7
    16:11 106:5
**bring**  5:21
    13:11,17 103:9
    131:11
**broke**  9:11
**broken**  9:6
    30:12
**brooke**  2:12
    34:11 44:3
    46:25
**brought**  12:10
    13:15 48:11
    118:10
**building**  20:16
    106:15
**bullets**  9:8
**bunch**  97:21
    109:21
**burglary**  19:9
**burton**  8:20
**business**  7:22
**businesses**
    20:25
**bwc**  86:25

**c**

**c**  4:2
**cable**  67:6
**cad**  112:24,24
    113:11,14
**call**  7:12 9:12,20
    18:10 25:4,5,6,8
    26:5 27:22 28:6

31:9 35:3,5
    37:10 54:24,25
    55:5,10,16
    56:16 57:10
    58:15,18,22,23
    59:19 60:3,5,8
    60:10,15,17
    61:13,13 72:16
    76:2 94:11
    95:10,11,13,15
    95:17,18,20,23
    95:24 106:1,11
    106:13,22
    107:11 108:20
    113:5 117:1,1,4
    122:19 125:5,11
    132:14
**called**  9:21
    20:18,23,24
    23:11 31:14
    35:18 40:15,16
    82:6 106:2
**caller**  28:4
**calling**  67:25
    90:9
**calls**  41:3 59:23
    59:24 96:2,3
**calm**  80:13
    88:12 123:3
    128:1
**calms**  29:2
**cam**  22:23 38:18
    38:20 85:13,16
    85:23 128:21
    129:4

**[camel's - coincidentally]**

**camel's** 9:11
**camera** 5:14
   12:6 24:24 34:2
   44:4 47:8 64:7
   85:3,11,19 99:8
   101:5 119:18
**camera's** 64:2,8
**cameras** 18:3
   34:8,12 65:11
**cams** 22:23
**canine** 57:10
**capable** 19:25
   36:10
**car** 6:12,16
   28:12 30:12
   37:14 39:1 64:2
   64:3,9 74:18,21
   74:22 84:2
   110:22 111:6
   113:11 122:2
   132:18
**cardiac** 29:2
**care** 23:1 55:6
   125:9
**career** 25:24
   30:16 60:24
**carry** 60:1,6
   79:22
**carrying** 9:19
   10:15 54:19
   60:1 79:19
   130:12
**case** 1:3 4:21
   7:11 9:25 10:9
   13:17,19 14:3

   16:22 17:19
   20:6,9 21:11,15
   26:2 30:8,21
   32:15 33:7,22
   34:6 38:23
   39:11 40:1
   43:20 47:5
   50:24 67:9 83:4
   84:25
**cases** 16:19
   23:11 78:6
**cat** 60:11
**cause** 4:7 8:9
   12:3 14:23 15:1
   16:22 28:25
   29:5,9 31:5 34:7
   42:9,17,21 52:5
   52:9
**causes** 9:19
**cavalier** 25:4
**cell** 43:11 71:22
   76:23
**cellphone** 11:21
   11:23 39:19
   43:2,8 62:23
   71:20 75:15
   77:2,6 83:20
   84:12 130:2,3,6
**center** 18:12
**certainly** 5:13
   11:23 119:12
**certificate** 135:1
**certify** 135:5
**cetera** 7:14
   16:23

**challenge** 16:18
   44:25
**challenges**
   39:21
**challenging**
   44:22
**change** 29:14
   40:13
**changed** 42:17
   42:21 93:12
   122:2
**changes** 29:16
   118:16,18,21
**chapter** 17:6
**characterization**
   60:12 107:21
**characterize**
   48:11
**charge** 29:4
   33:3 34:4 91:14
**charged** 22:9
   47:22 89:5
**charges** 37:5
**chase** 20:13
**check** 88:22,23
**checked** 88:17
**checks** 18:7
**chief** 2:11 3:16
   5:12 20:20
   32:20,20 33:16
   112:2
**child** 6:19 7:13
**child's** 60:7
**children** 50:16

**chose** 39:15
   41:2
**circumstances**
   108:20
**cities** 12:21
**citizens** 32:24
**city** 1:1,10 2:2
   5:4,6 12:12 13:5
   28:17 30:5,5
   31:24
**city's** 12:19
   16:24 30:3
**claimed** 7:14
**clarified** 105:20
   121:17
**clarify** 41:19
   105:19 120:22
   124:15
**clear** 78:6 81:11
   106:7 129:22
**cleared** 48:6
**clearly** 48:10
   102:2,3
**clicks** 20:5,8
**clint** 32:20
**clipped** 63:7,13
**close** 63:17
**closes** 109:11
**clothing** 18:4
**clue** 69:13,14
   97:7,8,19
**clues** 69:13
**coincidentally**
   92:2

collective 16:17
17:4
color 131:8,9
come 11:16
18:23 24:22
32:16 35:13
36:5 50:25
62:11 65:23
66:14,21,23
67:9 83:3,25
108:8
comes 10:10,16
46:3 74:13,17
76:13 105:1,3
comfortable
42:3,7
coming 10:22
28:7 44:19 51:4
51:4 107:10
114:15 131:7
132:3 133:11
command 53:1
102:6 127:25
commands 45:8
69:12,18 97:10
97:15
comment 34:20
47:12,16
commit 47:22
121:14
committed
47:20 48:21,22
86:5 122:6,9
common 122:24

communicating
56:18 80:13
communication
22:12
community
88:20
complaint 14:1
14:5 32:24 48:7
49:1
complete 15:25
completed 14:1
completely
10:14 107:20
compliant 10:8
36:20,25 48:14
48:17 72:1
complied 16:21
complies 48:19
comply 75:19
108:13
composure 5:18
10:19,23
computer 66:14
concealed 107:6
concealing 40:6
conceals 18:6
conceded
119:17 123:18
123:24
conceived 45:1
concern 34:22
conclusion
24:22
condition 58:25
59:1,7,16

conditions 59:1
condominium
9:17
conduct 21:14
21:18,21 27:14
38:4 47:2,4 49:4
68:18
conducted 14:6
conducting 37:9
conducts 47:6
conflated 116:7
confront 45:21
confusing 28:7
consider 30:15
57:18 69:14
76:4,9 81:4
94:23 108:20
considered
108:23
consistent 52:2
constantly 40:3
contact 18:10
56:13,20,23
57:1 98:23
continue 40:19
41:2,6 42:3 45:5
45:12 75:3
123:9
continued 134:5
continues
109:13
contract 51:14
51:15,20
contrary 112:13

control 40:23
42:5
conversation
129:6
convicted 19:6
convincing 78:7
cop 10:21
cops 25:6
coral 2:3
core 6:3
corner 35:14
80:4
corps 83:1
correct 31:21
34:2,3 35:1,5,19
35:23 38:16
40:7,16 43:17
44:18 48:4,5,25
49:22,25 51:15
52:6,10,19,22
53:2 54:23
56:15,19,21,22
56:25 58:16,17
59:9,22 61:14
61:15,17,18,20
61:24 62:1,2
63:7,9 64:4,10
64:14,15,18,25
65:13 68:12,12
68:23 69:9,20
69:21,23,25
70:22 71:11,20
72:16,19,23
73:21,22,23,24
74:5,8,9,11,12

[correct - delray]                                                        Page 143

74:15,16,18,22
74:24 75:4,17
75:20,23,25
76:4,23 77:3,4,6
77:7,12,18,19
79:7 80:15
81:13,14 86:14
89:19 90:12
95:15 96:9,24
97:10 98:23
99:21 100:6,12
100:15,18,25
101:4,11,19
102:8,12,17,20
103:1,19,22
104:4,19,24
105:6 108:12,14
108:15,17,18,21
108:25 109:4,7
109:9 113:24
114:16,20
115:12 116:17
116:20 117:2,8
117:11,24 122:7
124:7,25 127:6
127:9 135:8
**counsel** 34:17
**counter** 80:22
**county** 23:23
82:21 135:11
**couple** 20:20
35:10 54:12
78:25 91:25
92:18 108:4

**course** 4:20 5:7
37:17 38:2
79:12 89:20
107:15 125:25
**court** 32:1 135:4
135:17
**cover** 39:14,16
41:21 74:21
75:2,7 76:12,15
87:13
**coverage** 12:11
12:19,20,23
**covered** 105:13
**craterization**
30:3
**crime** 18:12
28:19 47:20,22
48:21,22 86:5
89:5 121:15
122:6,9
**crisis** 123:1
**critical** 23:10
**cross** 3:5 36:15
51:10 79:2
93:18 131:21
132:25
**crux** 116:23
**crystal** 129:22
**cue** 69:6
**cued** 47:4
**cues** 26:14
68:22,25 69:19
97:18 121:3
**cuffs** 19:12
27:11

**curb** 133:6
**current** 32:9
**currently** 12:18
32:10
**curse** 120:20,24
**cursing** 5:16
**curtain** 92:5
**custody** 6:19
7:14
**customers** 18:4

**d**

**d** 3:2 4:2 32:4,4
77:23 78:2
**daily** 18:17
**danger** 95:18
**dangerous** 60:8
**dark** 77:14
**database** 6:10
6:11,21
**date** 1:8
**dated** 135:10
**david** 6:13 30:2
93:10
**day** 7:6,8 20:20
30:3,5,6,17
41:25 47:20
49:21 81:21
95:4 107:3,5
109:22 128:21
135:10
**days** 7:24 14:2
41:23 91:25
92:18,24
**deal** 67:6,7
81:11

**dealing** 36:1
**dealt** 79:3
**debate** 9:16
10:12 124:18
**decelerate** 5:22
**decide** 52:23
**decides** 29:18
**decision** 121:6,8
121:11
**decisions** 16:7
**declare** 15:3,8
**deescalate** 40:24
41:2 47:15,18
80:19 88:6
127:3
**deescalation**
67:18 80:10
81:3,7
**defend** 23:8
**defendant** 69:1
**defense** 7:11
12:22
**defiant** 118:24
**defied** 28:14
109:2 117:10
124:24
**definitely** 10:23
**definition** 59:17
**definitions**
77:11,14,15
**delegated** 32:21
**delivered** 21:5
**delray** 6:20 8:8
8:11 20:12,20

[delta - drawing]                                          Page 144

**delta**  78:2
**demeanor**  48:12
   88:8
**demonstrably**
   22:19
**demonstrate**
   71:24
**demonstration**
   83:19
**demote**  13:25
**denied**  12:22
**dennis**  3:9 82:5
   92:6 93:18
   129:15 131:3
**deny**  21:23 22:6
**department**
   4:19 7:5,6 8:3
   8:22,23 18:4
   31:21 33:4,19
   48:8 82:22
   92:24
**department's**
   6:3,10
**departments**
   6:9
**depends**  105:15
**deprived**  15:17
**deputies**  24:6
**deputy**  18:13
   23:23
**deringer**  10:15
**describe**  4:24
   88:11
**designed**  80:18

**desk**  24:23
**despite**  25:4
**detain**  19:1 42:4
**detained**  40:10
   42:5,7,15 84:14
**detaining**  12:2
   40:11
**detectives**  33:5
**determination**
   28:23 86:3
**determined**
   12:21 28:18
   47:19 48:21
   49:2
**dick**  90:4
**difference**
   124:21
**different**  9:5
   24:24 44:8 47:9
   58:9 95:24
   109:22,23
**difficult**  7:13
**digesting**  36:10
**direct**  3:5 31:16
   75:19 76:17,18
   82:9
**directed**  49:3
   74:8 118:6
**directions**  67:4
   98:12
**directly**  10:22
   18:8 89:9
**directs**  14:14
**disadvantage**
   40:22 42:6

45:22 75:11
**disagree**  73:8
**disciplinary**  5:8
92:21
**discipline**  7:7,9
   13:24 30:1,13
   30:16,21 31:5
   51:22,25 52:2,5
   52:8 91:20
   92:17 93:13
**disciplined**  4:7
**discovered**
   95:14
**discreet**  7:2
**discussion**
   129:19
**disguised**  61:6
**disingenuous**
   17:8
**dismiss**  13:25
   16:5
**dispatchers**
   28:3
**dispatches**
   18:13
**display**  47:23
**displaying**  48:4
**disposition**
   13:16
**dispositive**
   13:19
**dispute**  27:23
**distance**  39:10
   100:10,14
   109:11

**disturbance**
   35:5 58:12,13
   60:7 95:13
**division**  32:11
   32:22
**divorce**  6:19
   7:13
**document**  15:5
   15:9,10
**documented**
   8:15
**doing**  7:15,18
   8:17 11:1 19:13
   25:25 26:25
   33:8 37:1 67:21
   71:10 91:4 93:9
   123:4
**dominick**  2:11
   3:16
**door**  24:3
**doorway**  24:1
**doubt**  6:5 27:22
   27:22
**downhill**  4:25
   4:25
**draft**  118:6,8
   119:10,12
**drag**  34:13
**draped**  130:12
**draw**  23:2,3
   76:10 92:5
   108:24
**drawing**  23:7
   27:11

**drawn** 103:6
  104:8
**draws** 10:17
  23:5 27:3,3
  44:22 74:25
  104:8,11
**drew** 21:13
  81:12 87:25
**drive** 6:15
**driven** 46:23
**drives** 99:3
  100:7
**driving** 132:22
  133:9
**drop** 24:3,3,8,9
  102:20 103:19
  109:6 128:3
**dropped** 72:9
  102:16 105:5
  117:16
**dropping** 97:22
**drops** 26:11,12
  69:24 72:13
  102:11 105:3
**drove** 87:11
  115:18 129:22
**dues** 50:21
**duly** 31:14 82:6
**dump** 24:16
  127:9,19,19
**duty** 8:5,24
  27:19,24 116:22
  117:1

**e**

**e** 2:9 3:2 4:2,2
  32:4,4 66:17
**earlier** 49:3
**early** 66:22,23
**ed** 18:13
**eduardo** 3:6
  31:13 32:3
  51:10 78:23
**effect** 16:8
**effective** 81:3
  126:3
**effects** 22:24
**effort** 80:17
**egregious** 6:8
**eight** 93:22
  113:19
**either** 21:16
  22:3 71:1 78:12
**element** 63:15
  69:4
**elements** 55:18
  69:3 76:5
  116:19
**elevated** 58:14
**emerge** 106:15
**emerged** 106:18
**emolument** 31:4
**emotion** 22:1
**emotional** 7:15
  7:18 8:14,19
  24:16 127:19
**emotionally** 5:5
  13:1 46:23

**employed** 4:19
  31:20,23 93:23
**employer** 4:10
**employment**
  12:22
**empty** 71:3,5
  100:18
**encounter** 43:22
  57:18 97:7
**encountering**
  78:19
**encounters**
  71:10
**ended** 87:4
  90:11
**ends** 5:25 10:17
**enforcement** 5:6
  5:20 6:11,20,25
  7:7 8:4,5,8,23
  9:4,23 10:7 13:2
  13:5,21 16:1
  18:11 19:24
  20:12 36:13
  44:16 46:21
  48:12 59:2 62:9
  77:18 87:5
  122:25
**enforcement's**
  34:22
**enforces** 125:14
**engaged** 5:18
  6:7 9:8 22:1
  47:5
**engagements**
  53:9

**engine** 64:3,9
  119:20
**enormous** 12:10
  13:3,4 36:9
**enraged** 8:18
**ensure** 47:4
**entered** 11:5
**entertain**
  107:25
**entire** 25:24
  33:4 41:22
  43:22,24 123:5
**entitled** 36:14
  36:14
**entry** 22:13
**environment**
  42:3
**equal** 66:12,15
**equipment**
  66:11,13 94:19
**era** 20:7
**escalated** 120:7
**especially** 39:8
  122:24
**esquire** 2:5,9,10
**establishes**
  43:11
**estimate** 12:12
**estimation** 22:3
**et** 7:14 16:23
**ethically** 5:5
**ethics** 7:25
  92:25
**evacuated** 20:25

**evaluate** 52:17
**evaluated** 21:6
**evaluations** 29:24
**event** 22:22 29:2 90:8
**events** 126:14
**eventually** 20:22 47:22 62:21
**everybody** 33:5 62:4 134:1
**everyone's** 60:1 132:13
**evidence** 12:25 16:15 37:18 49:8,18 78:5,7 125:21,22 126:4
**evolving** 26:3
**ex** 6:23 8:7
**exact** 124:12
**exactly** 65:7 73:1 84:20 91:20 111:7 112:14,14 113:8 128:17 133:18
**examination** 31:16 79:2 82:9
**examine** 131:21
**examined** 31:15 82:7
**examining** 36:15
**excellent** 126:24

**exceptions** 14:2
**exchange** 41:3
**excited** 67:11 126:23 127:18
**excuse** 28:20 37:23
**execution** 27:19 116:22
**executive** 50:1,5
**exhibit** 12:13 47:24,25 48:3,7 49:8,18 77:9,10 79:25 86:6,8 113:15
**existed** 121:18
**exit** 18:9
**expect** 26:25
**expectation** 95:25
**experience** 29:21 42:1 44:16 81:6
**experiencing** 23:18
**explain** 62:2 89:11 122:14
**explained** 10:2 18:25 22:8 35:20 83:15 84:3 88:12
**explains** 48:18
**explanation** 94:5
**extended** 8:24 102:4 109:4

**extent** 30:13 92:14
**eye** 18:22 99:9 119:18
**eyes** 101:6 132:8 132:24 133:17

**f**

**fabricated** 130:23
**face** 18:19 70:6 92:17 132:13
**faced** 12:18
**faces** 95:2
**facing** 132:17 133:11,12
**fact** 33:25 69:12 70:1 78:5 100:3 123:5
**facts** 8:12 16:21
**fair** 75:9 96:22 105:3 112:16
**fairly** 44:15
**false** 21:16 22:12,16,20 53:22,24
**falsely** 27:15
**familiar** 8:10 51:15 52:13 58:25 59:5,15
**famous** 26:2 30:19
**far** 34:21 36:25 38:7 41:5 97:18 99:4 114:20

**fast** 34:14 35:7 37:15 68:6 120:1
**fdle** 7:20,23 92:23
**feel** 13:18
**feeling** 22:24 85:6
**feet** 18:21 59:8
**felon** 19:6
**field** 32:10 65:8
**fight** 22:2
**fighting** 123:7 123:18,24
**figured** 110:11
**figuring** 10:3
**filed** 48:7
**filing** 32:24
**filled** 9:3
**final** 27:14 49:23 113:18
**find** 6:16 17:22 19:5 23:21 28:5 29:11 62:21 96:13
**finding** 78:4
**fine** 55:17 67:16 73:11 113:1 116:13 131:25
**finest** 21:25
**finger** 24:1,2 130:5,8
**fingernail** 47:12
**fingers** 71:23

**fingertips**
122:20
**finish**  37:9
57:15 124:1
**finished**  84:9
85:15
**firearm**  19:8
39:22 45:2,11
45:15,17,19,19
45:24 46:9,15
46:17 47:23
75:1 78:15,17
91:13
**fired**  6:9 30:23
91:22
**first**  7:17 9:22
9:22 14:13
15:21 19:23
25:13 27:6
28:11,19 29:1
31:14 35:11
43:1 64:20,22
70:21 76:23
77:11,14 80:9
80:12,17 81:1
82:6 88:9 90:15
91:4 99:1,6
108:13 115:22
116:15 127:22
127:25 132:20
**firsthand**  23:2
**fists**  69:20 97:19
**five**  68:2 77:24
**flashed**  48:15

**flipping**  18:3
**florida**  1:11,13
2:3,7 7:20 13:20
16:12 17:5,6
41:22 59:25
77:17 135:5,11
**fluidly**  122:18
122:20 131:10
**flushed**  70:6
**fmcs**  1:3
**follow**  17:5,11
29:3 69:17
131:5
**followed**  6:21
6:22 15:5 45:8
**following**  18:21
38:14 97:10,15
98:12
**follows**  18:2
31:15 82:7
**food**  134:3
**foot**  26:9,12
72:7,15 102:20
**footage**  5:14
37:20 39:18
85:16,19,21
86:2,23,24
87:24
**force**  21:12 39:9
45:17 81:2,5
92:24
**foregoing**  15:4
135:6
**foremost**  91:4

**forget**  6:21
106:22
**form**  91:19
**formal**  48:7
**forth**  47:6 83:19
**fortunately**  9:6
11:14
**forward**  34:14
37:15 68:6,7
72:11 99:25,25
102:10,16,19,22
104:10 114:6,8
131:12
**forwarded**  35:7
**foul**  30:10
**found**  5:18 8:17
**four**  21:10 24:6
**freeze**  98:2
**friend**  20:21,23
30:19,23 39:10
108:2 113:22
**friends**  50:11
**front**  14:19 18:6
74:8,18,21
122:10
**fto**  90:24
**fuck**  5:23 86:19
**fucking**  86:20
86:20,21 120:16
**full**  8:5,24 18:18
22:1 31:3 41:20
**fully**  36:10
**further**  37:14
42:9 47:9 82:14
102:19 114:4,5

133:21

**g**

**g**  4:2 32:4
**gables**  2:3
**gardens**  1:1,11
2:2 31:20,25
82:22
**gary**  30:19,23
**gas**  22:4,5,5
92:3
**gast**  18:13
**general**  69:15
69:16
**generally**  70:16
**gentleman**  9:23
24:23 40:20
48:20 58:3
129:20
**genuinely**  38:1
**getting**  5:25
26:22 28:11
64:1 107:19
112:11 115:22
124:17
**give**  51:7 66:15
78:21 87:16
94:16 98:3
127:21
**given**  93:2 95:12
102:6 107:3
**gives**  29:10
120:13
**giving**  11:18
22:4 53:3 66:5
67:3 84:11

**[giving - grass]**

107:20 111:8
**glad** 91:6
  126:12
**glass** 3:13 11:15
  12:4 42:22
  83:11,24,24
  84:18,24 85:1
  85:16 89:18
  90:9 111:5,6,18
  112:12 114:24
  127:13
**glass's** 85:10
**go** 4:4 5:7 6:14
  7:25 9:16 13:13
  16:21 17:3 18:9
  20:13 25:8 27:7
  27:25 28:8 31:7
  34:21,24 35:6
  35:24 36:16
  38:17 40:8
  41:18 42:10,25
  43:2 45:5,7
  46:18 53:13
  54:7,10,11,16
  56:12 57:9 58:8
  58:9,18,22 60:6
  60:10 62:3
  65:17 66:2
  70:17,18 71:11
  71:16 72:12,14
  75:20 76:25
  77:5,8,10 79:25
  80:7 81:24 85:8
  86:7 90:13
  91:10,14,25

92:25 95:10,11
95:17,20 98:14
98:19,19 99:15
100:4,20,21
101:9,18,25
102:7 103:11
105:16 106:12
108:14 111:22
111:23 112:21
113:14 122:17
122:23 123:11
124:10 132:21
133:6
**god** 8:15
**goes** 5:22 9:12
  11:18 12:5
  25:19 28:12
  42:25 43:2
  45:25 50:1 57:9
  65:1 72:15 89:2
  100:8,11 104:22
**going** 9:16
  11:17,22 12:7
  13:9,17 17:5,14
  17:15 18:7,24
  18:25 19:10
  20:13 21:21,22
  21:22,25 22:5,6
  24:17 25:3,11
  25:15 26:13,16
  28:9,24 29:18
  29:22 31:9,25
  34:6,12 35:10
  35:13 36:4,4,13
  36:23 38:17

40:13 42:3 44:7
45:24 47:5,17
52:17,23 55:15
55:16 56:9
57:24 58:3
60:11 62:2
63:18 66:3 67:9
71:25,25 72:14
73:25 74:3,10
75:23 81:2
82:14 83:14
84:7 88:15
91:14,14,17,18
91:19,20,22
92:17 97:8
101:25 105:16
105:19 106:4,4
106:16,24
107:11,12 108:6
108:16 114:4,9
114:9 115:10,16
115:17,18 120:1
120:2 122:19
124:9 125:3
126:5 131:15,21
132:7 133:4
**golden** 5:20
**good** 6:1 12:1
  17:12 20:21,22
  31:18,19,19
  51:12,13 54:5
  55:23 81:17,18
  81:24 82:11,12
  82:13 85:8
  121:2

**gotta** 7:17
**gotten** 6:9 56:8
  57:6 125:21
**gould** 9:14,19
  10:1 21:20 22:2
  25:11,17,22
  26:5 28:14,18
  32:24 35:4,16
  35:17,19 36:2,2
  37:3,11,13 39:7
  39:7,11,13,16
  48:8 57:2 62:18
  68:11 69:15
  70:22 78:12,19
  79:4,19 83:16
  84:1,3 89:3
  96:10 99:2,11
  105:12 110:20
  111:6 118:23
  129:20
**gould's** 29:17
  35:13 71:1 88:8
  103:11 108:9
**governed** 13:20
**grabbed** 19:11
  71:22
**grabs** 39:19
**grammatical**
  118:18
**grammatically**
  29:15
**grand** 19:8
**grasp** 34:1
**grass** 110:24

**[gratuitous - happened]**                                    Page 149

**gratuitous**
  47:13
**great**   29:23
  66:16
**greeted**   10:1
**greg**   2:9
**gregory**   2:10
**grievant**   2:12
  4:17,24 11:17
  32:25 33:17
  49:14 82:18
**grinding**   70:8
  98:5
**grocery**   18:8
**grossman**   33:7
  50:6 121:7,8,9
  121:17
**ground**   27:3,4,5
  45:9,9 47:2 79:6
  79:13 104:13
  105:6 123:6
  130:19
**guerriero**   1:3
  2:6,12 3:19 4:17
  6:2 21:11 22:17
  26:18 27:21
  29:1,21 30:14
  31:3 38:10,15
  39:6,8,15 44:19
  45:11 50:9 58:2
  58:9 68:10
  78:19 83:4,13
  87:11 89:14
  94:3 95:4
  110:19 119:8

127:23 132:3
**guerriero's**
  32:15 38:19
  63:3 70:18
  98:19 103:12
  115:21
**guess**   35:3 43:10
  63:10 126:6
**guillen**   3:6 31:9
  31:13 32:4
  51:10 78:23
**gun**   10:3,25
  19:22 24:20
  25:4,5,7,7,17
  27:21 35:21
  43:12 44:21
  47:3 48:4,15,23
  48:24 54:24,25
  55:5,10,16 56:4
  58:15,19,22
  59:19,23 60:1,2
  60:5,7,10,15,17
  61:13,23 74:13
  74:17 76:2,4,9
  76:10 79:4,4,5,8
  79:22 81:12
  87:12 95:15,18
  95:20,21,23
  96:2 101:13,19
  103:7 104:21
  106:2,2,11,13
  106:22 107:5,11
  108:21,23
  109:16,18
  110:15 117:4

126:18,21 130:9
  132:14
**guns**   23:4 60:1
**gut**   85:6
**guy**   10:2,11,18
  12:16 18:19
  21:1,2 24:10
  28:5,6 30:9 31:1
  35:21 37:4 41:8
  42:23 43:20
  73:15 84:6 86:3
  89:5,25 91:6,12
  91:15 92:11
  119:21 121:9
  123:5 128:19
  130:12,19
**guy's**   41:15
**guys**   38:11
  40:15,16 66:17

**h**

**halfway**   113:16
**hall**   1:10
**hand**   11:24
  25:16,18 26:12
  31:11 43:12,12
  44:21 54:19,21
  55:2,3,5,11,12
  55:21 64:13,20
  65:13,22 68:11
  72:9,13 74:4,7,7
  82:3 102:11,14
  102:16,17
  103:21 104:18
  105:3,13 106:16
  106:23 107:5

109:3 117:6,16
  117:19 119:23
  124:6 130:12,13
  131:6,7,22
**hand's**   65:4
  104:15
**handcuff**   45:24
  45:25
**handcuffed**
  27:7 40:21
**handcuffs**   11:3
  38:9,12 123:17
  123:23 130:19
**handgun**   19:17
**handling**   61:25
**hands**   11:19
  18:24 19:16
  25:20 28:4,13
  39:18 43:7
  64:18,21 72:4
  83:17,18,20
  84:10 99:13,16
  99:20,22 102:2
  102:3 107:24
  120:5,16 128:6
**happen**   32:18
  42:24 43:3,5
  76:20 78:18
**happened**   4:23
  7:3 21:9 22:22
  22:25 24:5 29:6
  29:7 30:18
  37:23 49:20
  56:9 83:8 99:4
  111:21 112:9,14

**[happened - indicates]**                                     Page 150

115:5,12,13,14
122:12 123:12
128:8
**happening** 8:6
26:19 57:5
88:13
**happens** 10:10
**happy** 18:24
**harasses** 5:23
**hassle** 10:16
**hdmi** 67:1,5
**he'll** 29:12,15
35:12
**head** 18:18
65:22
**hear** 29:22
36:12 52:7
95:10 101:25
**heard** 20:4 37:4
95:11 109:18
**height** 24:16
**heightened**
58:22 60:4,16
60:16 61:14
95:24 126:22
132:14
**held** 81:13
**hell** 9:20
**hello** 92:6
**help** 10:6 40:15
40:16 50:25
65:24 73:12
113:4 115:10
**helpful** 36:22
48:17

**hey** 25:15 48:17
72:2 88:25 92:7
104:18,23 106:4
106:17,24
107:11
**hidden** 55:11
61:1,3,4 96:5
**hide** 19:22
**high** 7:1 59:24
60:3 96:3
126:14
**higher** 64:7
**highly** 7:15
**hindsight** 24:24
52:21
**history** 5:8 8:19
19:7
**hit** 54:17 63:23
**hm** 53:10,15
73:18 89:21
97:23 102:5,13
103:8,18,20
104:17,20
121:25 127:24
**hmm** 53:10,15
73:18 89:21
97:23 102:5,13
103:8,18,20
104:17,20
121:25 127:24
**hnt** 123:1
126:13
**hold** 58:9
105:17 123:8,8
125:1

**holding** 10:21
18:5 43:11
130:6,13,15
**holstering** 45:23
**holsters** 45:24
**home** 50:13
**hospital** 90:11
90:22 92:4
130:23
**hot** 11:2,3 41:9
41:10,12,14,24
42:1,8
**hour** 21:25
**hours** 125:20
**huddle** 17:16
**huddled** 111:18
114:23
**human** 2:11,12
**hurt** 116:9
**husband** 9:13
9:15,15,18,21

**i**

**ia** 32:23 33:4
49:14,23 86:14
116:12
**idea** 58:3
**identified** 130:2
**identifies** 19:2
**iglewski** 1:12
135:4,16
**ii** 3:13 134:5
**iii** 2:9
**immediately**
22:21 25:19
26:6,9 28:11,14

39:20 117:10
124:6
**immense** 16:18
**imminent** 97:9
**impossible**
132:9
**impression**
16:20 28:3
**improper** 47:23
60:12
**inaccurate** 22:9
107:21
**inappropriate**
9:8 21:16,23
107:20 123:18
123:24
**inaudible** 19:13
**incendiary**
47:16
**inception** 46:5
**inches** 64:6
**incident** 23:10
23:17 29:2
90:21 113:3
127:16
**incidents** 30:1
30:15
**include** 15:13
**included** 5:1
15:19
**includes** 34:7
**including** 35:3
**increased** 97:24
**indicates** 71:23

**indicating** 38:22
129:11
**indication** 97:9
97:15
**indicator** 63:12
**indicators** 26:5
63:11
**individual** 5:15
9:13 33:8 85:17
87:12
**individuals** 6:22
35:3,18 46:16
**inflammatory**
80:22
**information** 7:2
28:25 49:13
58:15 94:16
**informs** 18:15
**initial** 34:24
43:8 44:24
75:21
**initially** 12:1
43:14 58:11
71:9 76:22
**initiated** 45:2
**injunction** 8:21
93:7
**injury** 42:9
**instance** 80:20
**instigating** 93:3
**instigative** 5:19
**instruction**
109:2
**intentional**
116:6

**interacted** 88:9
**interaction**
37:11 40:17
43:24 44:7 45:1
46:6 127:23
**interactions**
93:3
**interested** 43:25
**interestingly**
7:10 12:19
**internal** 33:8
34:5 49:4 111:9
112:6,13 114:22
115:17,21
**intervention**
123:1
**interview** 33:17
49:16
**interviewed**
49:14
**interviews**
33:13
**intimidating**
84:13
**intuition** 85:10
**investigate** 6:22
**investigated**
7:23
**investigating**
27:21
**investigation**
8:17 15:25 16:3
19:1 32:21 37:9
38:4 39:6,24
46:13 49:4,10

115:21
**investigations**
32:13,22 33:3,4
34:5
**investigative**
15:10,20 50:2
62:11
**investing** 38:23
**invited** 66:21
**involved** 5:13
23:14 33:10
48:16 60:6,7
126:14
**irrelevant** 4:22
**issue** 1:3 4:5
13:11,18 52:5,8
57:17 79:3,14
93:6
**issued** 8:20 30:5
32:19 49:23
**issues** 7:14
11:13 34:21
92:21 95:1

**j**

**j** 2:10
**jail** 29:17 84:7
86:19,19,20,21
87:3 91:5,6
**jaw** 70:10 98:5
**job** 1:14 73:14
105:24 123:2
125:13
**judge** 8:20,20
14:20 16:12
93:6 125:9

**judkins** 2:12
37:16

**k**

**katie** 90:23,23
**keep** 18:22
25:15 28:4,12
39:18 48:18
71:25,25 72:14
73:25 74:3,10
99:20 114:4,9,9
120:21 123:4
124:9
**keeping** 38:14
43:7
**kept** 11:20 22:4
22:5 83:17
**key** 33:14
**kicked** 32:23
51:2
**kicking** 38:21
**kids** 123:2
**killed** 23:24
**kimberly** 1:12
135:4,16
**kind** 5:9,24 6:2
8:13 20:24
23:20 44:3
79:17 90:8 94:8
105:24 109:21
**king** 2:6,9,13
3:8,11,12,18,20
3:21 4:6 11:8
13:8,9,14 17:1,4
17:12,21 19:20
30:25 31:2 36:3

41:11,13 50:25
51:1,4,6,7,11,13
53:20 54:7,15
57:20 60:14,20
65:20,23 66:2,7
66:19,23 67:16
67:22 68:1,5
71:15 72:21
73:4,7,11,16,19
74:2 78:21
79:17 81:16,17
93:19 101:17
103:3,5 105:19
106:6,10 107:22
107:25 108:2,7
110:14 112:5,21
112:23 113:21
114:1,3,7 115:9
120:1,3 123:13
124:13 125:8,10
125:13,17,22
126:2,5,7
129:13 131:4,17
131:23 132:1,16
133:8,21

**kingmorselaw...**
2:8
**knew**  58:5 84:16
111:14
**knife**  24:3,4,8,9
**knives**  109:20
**know**  6:24 7:17
7:21 9:3 13:14
17:13,18,22
18:20 19:24,25

20:1,11 23:2,4
26:17,24 37:4
38:2 40:2 41:14
41:23,25 42:20
43:20 44:25
46:3,5 52:16
55:8,12,25 56:4
56:14 58:11
59:3,10,11,17
59:20 62:24
63:1 66:8,24
70:25 71:4
73:14 75:1,14
75:16,18,22
79:16 83:3 89:4
91:13,16,19,20
92:9 94:17
100:15 104:1
105:8 107:18
108:10,16
109:15 111:5,7
112:14 115:17
124:9 133:15,18
**knowingly**
15:17
**knowledge**
15:16
**known**  28:8
96:16,17,23
**knows**  8:15
103:13,17
**kristen**  2:13
11:5

## l

**l**  2:5 32:4,4
**lady**  37:24,25
**lakes**  2:7
**language**  21:19
21:23 30:10
**large**  1:13 135:5
**law**  5:6,20 6:11
6:20,25 7:6 8:4
8:5,7,22 9:4,23
10:7 13:2,4,21
16:1,5 17:10
18:10 19:24
20:11 27:17,17
27:20 28:16
34:22 36:13
44:16 46:20
48:12 59:2
77:18 87:4
122:25 124:5,22
124:24 125:2
126:9
**lawful**  116:22
**lawfully**  60:2
**laws**  125:14
**lawsuit**  12:18
**laying**  40:3
**league**  12:20
**learn**  25:3,15
26:13
**learned**  25:22
25:23 60:21,24
**leave**  91:2 100:3
**leaves**  29:3

**led**  87:2
**left**  9:1 10:1
19:12 26:8,11
26:12 33:16
72:7,15 92:13
92:15 102:20
103:21 104:1
105:3 109:3
112:22 117:16
**legal**  27:19,19
27:23 116:22
117:1 124:25
**legally**  40:10
**legitimate**  5:16
**length**  4:21
**lengthy**  80:10
**lessened**  30:3
**lethal**  45:17
81:2,5
**letter**  27:16,17
28:16 77:23
117:24 118:3
124:5,21,21,24
126:9
**level**  26:15
102:11 109:4
**lie**  24:13
**lied**  21:17
**lieutenants**  94:6
94:7
**life**  5:2 41:23
110:2,3
**lifted**  19:17
**lifts**  9:18 65:22

**likely** 127:18,19
**limitation** 13:22
**line** 94:11,14
**lines** 89:1
**lippman** 30:19
30:23
**list** 97:21
**listed** 49:13
**listen** 43:6
116:11
**listened** 5:14
**literally** 43:19
**little** 17:25 21:7
39:21 46:14
58:22 63:23
64:8 68:2 84:19
91:1 92:15
95:23,24 107:2
114:4,4 116:23
**lived** 41:22
**living** 20:12
59:8
**local** 20:13
**locate** 75:7
**location** 23:15
107:3
**logical** 46:4 47:2
**long** 7:22 31:23
41:15,19 84:3
93:20,23 128:19
**longer** 40:24
51:18
**look** 5:9,9 6:15
12:6 18:19 21:8
30:17,20 34:12

34:17 43:4
47:24 48:6
49:12 50:4
70:17,21 77:23
80:4,25 85:9
86:6 92:12,13
98:2 99:1
109:24 113:15
122:15 129:22
132:8
**looked** 19:12
20:17 37:6 48:1
85:10,13 92:11
130:10
**looking** 23:6
32:6 48:20
63:20 86:12
110:6
**looks** 21:3
**looming** 7:13
**loses** 10:19
**losing** 5:1
**lost** 5:17 10:23
31:4
**lot** 6:17 18:15
56:24 57:9,11
57:14,25 66:3,7
79:18 129:19
**love** 55:8 110:12
112:17
**low** 74:4
**lower** 99:9
101:5 119:20
127:1

**luncheon** 134:4
**lying** 24:12,12
116:2,3

## m

**machete** 23:25
**machine** 20:14
**made** 5:15,16
18:10 41:24
56:23 57:1 86:3
118:16
**magazine** 9:3,7
**mail** 66:17
**major** 3:6 31:9
31:13,18,21
32:10,12 33:2
34:4,10 51:10
51:12,14 78:23
81:21
**majorca** 2:3
**make** 18:7,9
22:16 42:7
53:24,25 60:8
76:17 80:22
104:14 106:7
122:16 124:16
133:5
**makes** 28:23
47:11 125:10
**making** 5:11 6:1
22:12 29:5
53:22 56:13,20
66:18 78:4
83:18 98:23
107:18

**mall** 5:12 30:8
**man** 9:22 23:25
55:10,16 57:8
86:18
**manner** 83:21
**marc** 3:13 85:10
111:5,6
**marine** 82:25
83:1
**marsh** 90:23
**martin** 135:11
**materials** 34:6
**matrix** 59:12
**matter** 5:13
85:4
**mean** 48:14
60:3 107:12
125:25
**means** 15:24,25
59:17
**meant** 121:21
126:3
**meeting** 114:13
**meets** 12:4 57:8
131:13
**member** 50:19
50:20 82:15
**memo** 32:19
**mention** 24:18
**mentioned**
54:18 62:7
126:12
**mentions** 17:5
**merge** 5:3

mess  18:20
messages  8:16
met  57:21 91:4
  111:1 128:4
michael  131:13
mid  100:25
middle  6:19
  80:25 107:4
mile  70:12 98:3
military  1:11
miller  1:5 20:3
million  12:12
  20:5
millions  12:13
mind  17:15,19
  25:25 26:19
  75:6 122:2
mine  20:21
  111:24
minute  10:6
  36:24 43:23
  46:19 58:10
  67:3 101:15
  102:1 112:22
  131:20
minutes  10:20
  40:12 42:15
  48:24 51:5
  54:12
misconduct  6:8
misrepresenta...
  115:23
misspeak  122:8
mistreatment
  12:16

modified  8:5,24
moment  24:10
  65:9 84:20
month  44:13
months  6:7
  16:14
morning  31:18
  31:19,19 82:12
  82:12,13
morse  2:6,10,13
  3:15 11:9 66:10
  67:1,5,10,14,20
  81:23
morselegal.com
  2:9
mortified  85:20
mother  119:4
motion  99:25
  122:16,16
mouthing  43:16
move  36:19
  63:16 68:7
  106:24
moved  42:2
movements
  61:16 98:8
moving  45:2
  70:1 98:1
multiple  50:13
municipal  12:20

            n

n  3:2 4:2 32:4
name  32:2
named  9:14,24

narrate  36:4
nathan  18:15,21
navy  82:25
ncic  6:13 93:10
near  35:10 65:5
  65:13,14,15,16
  99:16 104:15
  117:7 119:23
  124:6
nearly  30:16
  94:1
necessarily
  97:13
need  48:18 51:5
  51:8,21,25 66:6
  66:19 73:12
  86:4 94:16
  95:12
needed  84:14
needs  67:18
negative  12:11
never  12:11
  17:19 43:5,8
  45:7 46:2,7,8,11
  46:11,17 47:6
  81:12 96:7
  110:1 119:8
new  44:15,15
nice  22:3 81:21
nilly  23:4
non  33:23
nonverbal
  26:14 68:22
  69:19 97:3,18

nope  69:16
normal  18:17
normally  57:4
  61:20
north  1:11
norton  2:2,5 3:7
  3:8,10,11,14,15
  3:17,18,21 4:9
  4:12,14 11:7,10
  11:12 16:11
  17:9,18,25 20:4
  25:5 30:22 31:1
  31:7,9,17 32:5,8
  36:7 37:15,17
  37:22 41:12,17
  44:3,9 50:24
  53:17 54:11
  57:15 60:12
  65:21,25 66:5,8
  66:17,21,24
  67:3,7,13,15,18
  71:13 73:2,5,10
  73:11,14,18
  78:24 81:15,21
  82:1,10 93:17
  101:15 105:18
  105:20 106:9
  107:18,23 108:1
  108:4 113:20
  115:8 123:9
  124:11 125:1,9
  125:12,14,19,24
  126:3 129:16
  131:2,15,20,25
  132:6,25 133:22

134:2

**norton's**  30:18

**notable**  39:24
40:9,12 42:11

**notarize**  14:25

**notary**  1:12

**notch**  67:11
80:21

**note**  47:10

**notes**  113:11,14

**notice**  79:19

**noticeable**
39:17

**noticed**  39:5
79:16

**number**  1:3
12:13 22:10,11
33:22 47:24
48:7 49:8,12,18
49:24 77:9 86:6
86:9

**numerous**  34:7

**o**

**o**  4:2 32:4

**o'clock**  1:9

**oath**  8:11 9:24
73:3

**object**  20:16
26:23 74:7
87:21 117:18
124:11 125:1

**objection**  36:3
41:11,12 107:25
125:19

**objective**  4:16

**objectively**
52:24 124:19

**obligation**  88:5

**oblivious**  59:8

**observant**  94:24
132:11

**observe**  95:6
132:12

**obsessive**  8:14

**obstruct**  27:18
116:19

**obstructing**
133:4

**obvious**  79:23

**obviously**  35:11
36:2 48:15

**occasion**  83:2

**occasions**  50:14

**occur**  121:4

**occurred**  22:8
37:10 38:2
85:11 89:23
91:11

**odd**  46:14

**offense**  118:4

**officer**  5:6,20
7:7,24 8:4,8,23
9:23 10:3,7 13:3
13:5,23,24,25
14:24,25 19:24
20:12,19 21:10
21:14 22:15,17
23:5,10,13,20
23:22 26:17

27:19,21 29:1,8
29:21 30:14
31:3 34:25 35:9
35:20 36:1,18
36:22 37:1,7
38:2,8,10,13,15
38:19,22,25
39:6,7,15,23
41:19 43:21
44:6,11,15,16
44:17,19 45:10
45:10,16 46:21
47:4 48:12
52:18 58:2,2
61:12 63:3
68:10 69:6
70:17 78:11,14
78:18 79:9,18
81:4 83:4,13,25
85:20 87:11
88:9,13,16,19
88:23 89:8,14
94:3 95:4 98:22
106:3 110:19
115:19,20
116:17 119:8
125:8,10 127:23
130:22 132:2,19

**officer's**  9:4
13:21 52:24
88:14

**officers**  6:11 7:1
11:12,25 13:20
14:11 16:1 23:3
23:10 25:2,23

26:1,14 59:2
77:18 85:5 87:5
90:22 94:13

**official**  22:13,14
22:16,18 24:17
54:1

**oh**  47:25 50:19
50:19 68:13
85:23 92:7
110:6 125:25
126:2

**okay**  17:12
32:12,15 33:2,7
33:10,25 34:4
34:10,16 35:2,6
35:20,24 36:17
38:5,17 40:8
42:11,23 43:18
43:19 47:24
48:3,6 49:10,12
49:16 50:8
51:17 52:16
54:5,6,7 55:17
55:23 56:18
58:8 63:11
64:12,23 65:17
66:2,24 67:10
67:16,16 68:8
68:15 69:11
71:9,16,16,25
72:5,12 73:2,11
73:17 74:3,3
75:13 76:2,16
77:10 80:3,24
81:6 82:1,24

83:2 84:8,16,18
84:22 85:23
86:1,11 87:1,4,7
87:18 88:8,15
88:22 89:3,20
90:5,6,20 97:14
97:18 99:5,8
100:2,4,10,14
101:18,23,23
103:6,10,16
104:11 106:20
107:16 108:8
112:4,16 113:23
113:25 114:9
115:7,16 116:1
116:2,10,15
120:19 123:22
124:2 125:1
126:2 129:2,3
129:13,18 130:2
130:9 131:14
**old** 19:3
**once** 8:21 28:18
42:5,11 43:6
44:19 45:2 47:1
123:17 127:5
**ones** 34:1 111:4
**opening** 4:11
13:10,12
**operate** 54:8
**operations**
32:10
**opinion** 46:22
93:12 126:6

**opportunity**
40:23 95:6
**oppose** 27:18
116:20
**opposing** 34:17
**option** 75:3
**orange** 59:1
**order** 8:2 14:13
22:15 27:25
28:14 53:24
75:19,21 77:1,3
77:6 108:13
117:7,11 120:13
124:5,25
**ordered** 92:23
**orders** 11:18
84:11 87:16
**organization**
93:21
**outbursts** 8:14
**outside** 12:21
**outstanding**
29:25
**overreacted**
20:10 28:17
**overreaction**
20:3 28:21
**oversimplific...**
76:6
**own** 83:7

**p**

**p** 4:2
**p.a.** 2:2
**p.m.** 134:4

**packets** 109:22
**page** 50:4 77:11
77:20 80:7,8,9
80:12,16,16
86:7 112:2
113:16,17
**pages** 135:7
**pair** 19:21
**palm** 1:1,11 2:2
2:7,7 23:22
31:20,24 82:21
82:21
**panic** 90:8
**pants** 101:1
124:6
**pape** 2:11 3:16
32:20 112:2
**paragraph**
86:13
**park** 60:7
121:22 123:16
**parking** 18:14
46:12 56:24
57:9,11,14,25
66:2,7 79:18
**part** 17:19
32:23 37:12
65:21 80:17
88:5 89:16
90:18 92:4 93:9
122:4 127:11
**particular** 4:21
94:10
**parties** 37:9
51:21,24

**passed** 20:20
**pat** 62:14
**patrol** 84:2
**pause** 39:3
43:23 45:5,13
46:25 56:7
**pausing** 44:10
**pavement** 11:2
11:4 40:21 41:9
41:10,12,25,25
42:8
**pay** 8:5,25
18:10 31:3
91:25
**paying** 50:21
59:20
**pba** 1:3 2:6
30:24 50:20
82:15
**pbg** 2:11,11,12
**pc** 29:20 118:6
119:6 121:18
**pca** 8:10 130:18
130:25
**pcs** 14:22
**pearce** 114:18
**penalty** 15:4,15
**pending** 125:19
**penque** 2:13
11:5,11 74:1
103:4 108:6
112:22 114:2,6
**people** 9:5,13,16
11:14 12:14
20:8 60:1 67:4,8

105:25
**people's** 62:5
**perceived** 45:15
45:25 46:4
**percent** 118:2
**perfect** 40:23
81:8
**perform** 8:22
**performing**
46:13
**period** 27:20
**perjury** 15:4,8
15:16
**person** 15:18,18
15:18 26:6
34:24 42:7
47:21 69:17
84:1 89:12 93:3
93:7 97:8,8,16
98:16
**personal** 5:2 7:3
42:1 46:23 50:9
**personally**
33:10 46:20
55:3
**perspective** 4:23
5:4 16:24 47:10
88:3
**pertinent** 36:1
37:12
**phone** 18:15
39:21 43:11
44:20,25 45:3,6
68:11 71:22
76:23 81:12

100:6 103:13,14
103:17 109:4,19
117:21 122:20
**phonetic** 18:13
**physical** 10:24
40:25,25 45:20
63:10
**physically** 40:23
**pictures** 109:25
110:1
**piece** 43:4
125:21
**place** 1:10 9:17
19:10 22:22
23:14 104:15
113:3,9 124:15
124:16,17
**placed** 38:10,13
**places** 42:12
61:19
**platoon** 89:16
**play** 13:10
17:15,22 50:16
54:16,17 55:23
56:3,12 63:16
63:18,24 64:12
64:16,23 66:3
68:6,8 70:19
71:8,8 72:5
79:17 99:19
100:22 101:15
101:23 102:25
103:10,12
104:10 107:22
107:23 112:1

114:10 116:11
122:15,17,18
123:11 131:10
131:22
**played** 18:2
110:13
**playing** 19:19
126:19
**please** 4:5,13
28:12 31:11
32:2 34:20 41:7
82:2 84:22
105:22 110:4
111:23 115:15
122:8
**pleasure** 81:20
**plenty** 19:6
**pllc** 2:6
**plug** 6:16 66:12
66:20 67:2
**plus** 4:19
**pocket** 11:19
25:12,13,19
45:4,7 62:24
64:14,21,24
65:2,4,5,5,13,14
65:18 68:12
71:19 75:23
76:3,20 81:13
96:17 99:17,24
100:8,11 104:1
104:16,19,22,23
117:7,13 119:24
120:5,10,16

**pockets** 25:16
25:21 28:1,4,9
28:10,13,15
39:19 43:1,3,7,9
45:7 56:1 62:22
64:18,21 71:1,5
71:11 75:14,17
75:18,20 83:17
83:18,20 84:11
96:14 99:21,22
100:12,15
101:11 102:2,3
102:7 108:9,11
108:14 122:20
**podcasters**
12:14
**point** 9:18 16:5
35:25 37:7 41:3
42:6 44:8 46:22
56:8 57:21
58:14 63:20
64:1,5,11 65:11
70:23,25 72:1
73:20 74:4,18
74:25 78:15
83:23 85:13
88:2 89:3,8,11
89:12 95:14
99:16 100:17
103:6 104:8
109:15 127:8,21
128:10,13
130:11 131:13
**pointed** 19:15
24:2 48:23

84:12 117:18
**pointing** 10:18
23:7 83:21
130:5
**points** 104:21
**pokes** 5:22
**pole** 22:23
**police** 2:11 7:24
13:20 14:24,25
20:18 22:13
23:3,4,10 25:23
31:21 33:16
37:13 39:1 54:1
60:21 61:12
82:22 87:13
97:1 125:8,10
**policeman**
107:10
**policies** 27:12
**policy** 21:12
24:21,25 25:1
41:21 52:13,13
52:16 53:25
80:10
**polish** 47:12,14
**politely** 120:4
**pontificated**
92:16
**pool** 9:17 10:2,4
36:23 37:8
38:23 47:21
56:14,21 88:20
89:4 98:23
100:4 107:4

**portion** 14:9
**pose** 40:25
**poses** 40:24
**position** 13:6
32:9 40:22 42:6
63:4 65:6,8
72:18 75:10
**positioned**
133:3
**possibility**
133:12,13
**possible** 12:9
42:8 116:7
**possibly** 125:15
130:9
**potential** 95:17
**potentially** 40:6
**predicated**
122:11
**prepared** 4:10
**preponderance**
78:5
**preposterous**
19:22
**presence** 53:1
**present** 2:11
45:16,19 69:3
76:6
**presented** 25:5
**press** 37:5
**pretty** 7:21
33:19 43:24,25
48:10 79:2 92:8
92:14,14

**previously**
32:12
**prick** 90:3,4
128:20
**primarily** 79:3
**primary** 33:8
**prior** 13:11,15
38:20 47:8
78:18 82:24
83:12 92:20
**prison** 19:8
**probable** 8:9
12:3 14:23 15:1
28:25 29:5,8
34:7 42:17,21
**probably** 11:23
63:14 64:6
91:24,25 92:17
106:3 116:4,6
**probation** 44:14
**problem** 42:13
55:8
**problematic** 5:3
**problems** 32:16
**procedure**
38:14
**procedures** 17:7
27:13 81:1
**proceedings**
11:6 135:7,8
**proceeds** 80:21
**process** 7:25
26:20 27:23
62:11 76:6
80:19 124:25

**produces** 39:22
**producing**
39:20
**profanity** 5:24
**professionalism**
5:2 6:4
**progressive**
51:22
**projecting**
102:15
**promise** 73:13
107:17 116:9
**prompted** 22:4
28:10
**prone** 8:18
**prong** 14:13
15:12
**prongs** 14:16
**proof** 78:4,6
**proper** 30:21
87:13
**properly** 67:23
**prosecute** 84:4
**protecting**
29:20
**protections**
77:12
**prove** 6:5
**provide** 16:6
**provided** 49:13
**public** 1:12
**pull** 44:4 51:8
88:15 115:17
126:18,21
132:10

**pulled** 11:21
19:14,17 43:15
44:21 58:4
83:20 84:12
91:12 130:3
132:17,18,21
**pulling** 18:14
24:19 28:9
38:25 86:8
100:5 116:1
122:20
**pulls** 106:3
132:4,13
**pulsing** 70:10
**punishment**
8:25
**punk** 41:4
**pure** 105:10
**pursuant** 35:2
**pushups** 41:24
**put** 8:4,24 11:13
11:18,21 18:24
19:12,16 23:13
57:4,19 75:10
76:22 83:19
103:14
**puts** 11:2 25:18
68:12
**putting** 11:20
27:11 123:6
130:25

**q**

**question** 7:4
25:1 36:6 46:3
55:4,15 57:8

60:18 72:22
105:18,19,22
107:2,17 115:16
123:14 124:12
131:23,25 132:6
**questions** 38:3
62:16 73:4
94:21 107:19
115:10 116:5
124:3 133:21,22
**quick** 78:9
127:21 131:5
**quickly** 20:17
26:1,20
**quite** 85:19
**quotes** 8:18

**r**

**r** 4:2 32:4
**radio** 38:22 56:8
78:14 113:9
**raise** 4:20 16:15
31:11 82:2
**raises** 27:2
**ralph** 2:9 90:24
**rapid** 98:8
**rapidly** 26:2
**rather** 34:13
36:21 52:20
80:10 101:16
120:23
**rational** 10:8
**reached** 101:19
**reaches** 21:3
39:19 76:3
101:13

**reaching** 83:18
**reacquaint** 6:2
**react** 20:9 39:20
**reaction** 44:24
86:22
**read** 14:8 15:4,8
15:22 51:18
67:18 78:1
105:25 118:12
**ready** 31:7
**real** 88:21 110:2
110:3,11
**really** 17:8 30:4
47:17 50:22
67:13 89:24
120:2,18 121:21
122:11
**realtime** 18:12
**reason** 66:4
67:11 107:12
120:24
**reasonable** 25:2
27:6,12 40:11
42:16,20 52:17
52:24 76:3,8,10
76:12 108:19,24
**reasoning** 122:4
122:8,9
**rebuttal** 17:2
**recall** 125:15
**recap** 78:9,11
**received** 5:11
7:5
**recess** 54:14
68:4 134:4

**recognize** 51:21
**recognized** 92:6
**record** 4:4
22:13,14,17
30:22 48:3 54:1
54:3,11 78:1
135:8
**recorded** 129:6
**recross** 3:5
131:3
**red** 59:1 70:6
**redirect** 3:5
78:23 129:15
**refer** 9:2
**reference** 113:3
**referred** 40:3
79:18 87:20
**referring** 59:11
69:15
**reflect** 30:22
**refusing** 69:12
69:17
**regalia** 21:2
**regard** 66:10
**register** 18:10
**regular** 9:5
**regulations**
53:21
**reinforced**
25:23
**reinstate** 31:3
**reiterates** 38:6
**relationship**
6:23

**released** 19:9
**relive** 23:20
**remain** 17:19
**remedial** 92:1
**remedy** 4:8
**remember**
   23:21 111:8,11
   112:6 127:13
   130:14,15
**remove** 75:23
**removed** 75:24
**removing** 44:24
**repeat** 47:8
**repeatedly**
   40:18 79:13
**repetitive**
   124:11
**rephrase** 85:14
**replacement**
   31:4
**report** 7:20,20
   9:25 14:19
   22:12,14,17,18
   49:23 54:3
   135:6
**reporter** 1:12
   32:1 53:16
   135:1,4,17
**reports** 34:7
**repositioning**
   53:7
**represented**
   23:9
**reprimand** 5:11
   5:25 6:1 30:11

93:3
**required** 7:25
   22:14,17 54:3
   94:13
**requires** 12:3
**resemble** 109:21
**resembles**
   109:18
**resist** 27:18
   116:19
**resistance** 21:11
   24:20 45:20
   52:13
**resisting** 116:16
   116:17
**resolution** 62:11
**resolved** 16:19
**resources** 2:11
   2:12
**respect** 6:4
   85:17
**respond** 16:10
   25:6 61:12
   95:12
**responded**
   20:23 26:21
**responding** 35:9
   117:1
**response** 21:11
   24:20 52:12
   59:12 85:20
   90:2
**responsible**
   25:8,9

**rest** 34:17
**restrain** 66:1
**restrained**
   66:11
**result** 12:10
   32:24 49:1
   64:17
**resulted** 90:8
**retreat** 75:7
**retreating** 39:7
   39:12 45:3
   72:18 73:22
   74:11,14,15
**retrieval** 43:8
**retrieved** 43:1
   45:6
**retrieves** 44:20
**reverse** 72:11
   72:12 103:9
**review** 22:22,23
   34:5 85:2
**richard** 1:5
**rick** 2:8 121:1
**rifle** 9:3,7
**right** 8:6 12:5
   13:13 16:9,25
   17:1,22 20:7
   21:22 28:15,20
   31:11 34:24
   35:16 37:19,25
   38:8 39:25
   40:14,20 42:19
   42:25 43:21,23
   45:5,12,13
   46:19 47:7

51:12,22,25
52:24,25 53:8
53:23 54:2,4,17
54:19,24 55:23
55:25 56:3,4
58:8,12,18,19
58:21 59:6,18
60:21,22 61:2
61:21 62:19
63:6,19,23,25
64:13 65:9,10
65:12,19 66:13
68:11,17,19,21
69:5 70:1,15,17
71:4 72:1,5,20
75:8 76:21
77:14 78:8,18
79:8,9,24 80:9
80:12,14,25
82:3 86:20
87:14 89:6
92:18 94:5,11
94:24 95:2,21
96:8,14,21 97:1
98:14,25 99:2
99:14,23 100:5
100:10 101:2,8
101:22 102:9,10
103:13,24
104:11,22
106:14,18 107:9
108:9,11 109:2
109:13 110:17
111:8,23,24
112:12,20,21

**[right - see]**

113:9 114:10,11 114:12 116:14 116:23 117:4,19 117:21 118:3 119:24 120:11 121:2,4,9 122:4 124:4,22 126:2 127:16 128:1,3 129:2 130:6,20 131:25 132:22 133:5,5,6,20,23

**rights** 13:21 14:12 15:19 16:2,4,16 62:5,8 77:18

**rises** 126:22

**risk** 59:24 60:3 96:3 126:14

**rnorton** 2:4

**road** 110:22 132:24

**robert** 2:5

**role** 33:2

**roll** 94:11

**romantic** 6:24

**ronny** 19:3

**room** 59:8 92:5

**routine** 18:17

**rule** 5:20 22:10 22:11

**rules** 6:14 53:21 128:25

**run** 13:2 16:3 19:15 94:8

**s**

**s** 4:2

**s.w.a.t.** 123:3 126:13

**sagging** 63:15

**sailor** 82:25

**salvia** 47:21 48:4

**sarah** 92:7

**sat** 88:18

**satisfied** 113:13

**satisfy** 14:13

**save** 36:8

**saw** 20:15 29:7 42:14,24 45:6 48:11 78:16 83:8,13 85:21 85:22,24 86:2 86:17,24,25 87:7 95:4 110:4 115:22 119:8 127:12 132:3 133:19

**saying** 5:24 21:19 23:5,6 27:15 30:19 43:2 47:3 56:20 62:9 73:3 106:21 107:14 112:6 113:5,11 127:5 128:16

**says** 6:2 8:13 13:24 15:14 22:11 24:4 25:15,17,18

26:6,10 27:18 40:18 42:25 43:19 71:11 73:17 80:20 85:2 88:25 100:11 104:23 120:4,15 125:2

**scenario** 12:7 81:7 88:6

**scene** 5:21 9:10 9:22,23,25 10:1 10:10,16 11:13 11:15,16 18:13 23:24 29:3 34:2 34:8,25 35:2,10 35:12 45:16 49:2 52:18 68:19 83:3,10 83:11,12 87:5 89:22 90:7 91:12 105:11

**scope** 12:21

**screaming** 5:23 123:6

**screen** 65:8

**se** 60:8

**search** 46:16,16 47:2,4,6 62:12 62:14 78:12 79:11,15

**searched** 46:2,7 46:8 87:18,22

**searches** 46:11 46:11

**seat** 88:14,14

**second** 14:9,21 15:12 24:19 35:15 39:4 41:7 44:13 45:17 46:25 50:4 51:7 54:9 56:7 63:23 64:24 77:6 78:21 83:10 86:2,13 105:17 108:6 113:16 120:9,13,24 123:8 127:21

**seconds** 21:5 35:11,12 38:20 63:23 70:19 114:2

**secrete** 61:20

**secretive** 7:2

**section** 14:4,25 15:19,21 67:19 111:24 112:1 113:18

**secure** 6:11 38:14 46:16 47:1 93:10

**secured** 78:15 78:17

**see** 6:16 11:24 12:7,15 18:4,17 18:21 21:9 25:11 26:22 28:10 29:13 36:21,24 39:11 39:23 40:1,2,13

**[see - sitting]**

40:17 44:19,20
45:9,15 46:2
54:9,21 55:1,3,4
61:9,13 63:3,4
64:8,13 65:12
65:21 67:23
68:10 70:10
73:14,17,25
75:15 76:22
77:24 80:18
85:11 87:24
88:8 95:2,8,12
96:20 98:5
99:11,13 100:24
100:25 101:3,4
103:24 107:12
107:24 110:3,12
110:20 111:22
112:12,17,24
119:12,23
122:18 129:21
130:13 131:5,18
131:22 132:14
133:6
**seeing**  29:12
64:17 86:22
124:6
**seek**  76:12,15
**seemed**  46:13
**seems**  38:1
**seen**  12:11 20:8
21:6 87:8 89:24
109:20,20,24
110:1,1 114:20
133:13

**sees**  25:14 64:20
100:7,11
**senior**  44:17
**sense**  5:1 105:24
123:1
**sent**  8:15 66:17
**separate**  123:16
**sergeant**  3:9,13
8:11,17 12:4
22:21 28:23
29:10,11 33:7
42:22 50:5 82:1
82:5 83:11,23
83:24 84:18
85:1,16 88:3
89:18 90:9
93:18,20,21
111:18 112:12
114:18,24 121:7
121:8,9 126:8
129:15,19 131:3
**sergeants**  11:15
11:15 49:2 94:8
**seriously**  7:7
33:19
**service**  4:21
**sets**  13:22
**seven**  77:20,22
**several**  18:21
35:3
**shannon**  32:20
**share**  86:17
90:15
**sheriff's**  23:23

**sheryl**  2:11
**shift**  94:8,10
**shifting**  97:22
**shirt**  9:18 19:17
91:12
**shit**  43:4
**shoot**  10:21
**shooting**  19:18
23:15,16
**shoplifter**  19:2
**shoplifting**
18:16 19:11
**short**  109:4
**shortened**
116:23
**shortly**  83:25
84:20 90:21
**shorts**  18:6
19:21 63:7,13
**shot**  23:24 24:5
**shoulders**  69:24
97:22 99:11
**shout**  87:16
**shoving**  84:10
**show**  44:7 66:20
67:12,22 100:1
106:23 107:4
110:8,12,16
**showed**  12:8
21:1 91:1
109:22
**showing**  44:1
106:1,2 113:10
**shows**  26:5
71:22

**side**  14:24 20:15
36:19,19 37:8
38:23 56:14,21
72:4 88:20
98:23 102:4
103:21 105:1
106:15 110:25
133:5
**sidebar**  84:19
**sigh**  122:21
**sign**  14:23 56:16
57:10
**signature**  15:5
135:16
**signed**  50:5
**significant**  7:8
33:22
**silence**  38:20
**silent**  17:20
**simple**  63:15
**simply**  6:25
62:5
**simultaneously**
39:2
**sir**  28:12 31:19
32:9 48:2 51:8
81:19 82:8,12
86:7,10 114:11
115:25 120:4
**sit**  10:5 33:17
115:18 123:2
**sits**  10:6
**sitting**  5:12
24:23 40:21
106:18 133:6

situation   40:24
  80:23 105:15
  110:17 115:20
  123:3
situations   26:3
  39:9
six   6:7 13:22
  86:9
sixth   105:24
  123:1
skilled   36:10
skills   20:1
skip   59:18
sleeves   41:15,20
slight   102:20
slow   21:9 120:2
slower   72:12
slurs   119:1
smart   109:18
smoke   48:6
somebody   8:22
  18:20 40:11
  41:4 46:14
  47:17 48:15
  57:11,18
somebody's
  16:20 79:8
someone's   19:25
someplace
  30:20
something's
  12:5
somewhat   5:3
  51:16 94:23

soon   92:10
soonest   131:13
sorry   32:1 40:8
  52:7 53:13
  72:12 76:25
  77:13 86:7
  93:23 102:16
  103:9,12 113:22
  120:1 121:7
sort   13:16
sought   87:13
sound   35:11
  98:20
sparring   42:18
speak   37:8,20
  42:19 58:5
  88:20 122:22
speaker   18:3,12
  18:14 19:2,5,10
speaking   84:1,9
speaks   37:13
  71:13,14
specifically
  23:22 42:8
  92:12
specify   39:8
speculate   36:15
speculating
  41:13
spell   10:9
spiral   4:25 5:1
spirit   27:17
  118:1 124:22
spoke   21:24
  83:24 91:3,11

  91:22 115:19
spontaneously
  36:5
spot   6:10 112:15
spradley   19:3
spy   6:22
squad   20:24
  21:1,2 89:14,16
  89:16,18 90:18
stable   13:1
stacy   19:4
stalk   6:22
stalking   8:7
  93:7,9
stamped   80:5
stance   69:22
  72:16,17,19,23
  72:25 98:10
stand   21:4
  48:18
standard   6:6
  78:4,6
standing   29:6
  43:21 72:20
  73:1 105:5
  110:20,25
stare   70:12 98:3
start   17:13,17
  19:20 21:21
  51:14 94:10
  113:14
started   4:24
  19:14,18 43:15
starting   112:2,3

starts   26:12
  73:20 98:20
  100:22 109:9
state   1:13 7:15
  7:18 59:25
  127:18 135:5
statement   4:11
  15:7,13 22:12
  22:16,19 24:18
  53:22,25 76:19
  111:8,11,15,17
  112:1 114:22
statements
  76:19 80:22
states   42:23
  43:4
station   92:3
statute   13:24
  14:15 15:14,24
  16:12,20 27:18
  116:16 117:22
  117:24 118:3
  125:18
statutes   17:6,6
stay   18:7 100:12
  104:23
steal   9:6
step   26:8,11
  47:2 72:6
  102:20 103:19
  105:2 109:6
steps   14:6
  122:19
stern   30:20

stewart 2:11
67:25
stick 55:15
sticking 21:7
stipulate 4:5
stipulated 29:23
stole 9:7
stop 5:17 39:25
40:14 41:7
46:12,19 47:7
54:17 55:23
56:3,12 58:8
63:18,19,24,25
64:12,12,16,23
65:3 68:15
70:19 71:8,16
72:5 74:3 98:21
98:25 99:19
100:23 101:18
101:23 102:1
103:3,10 114:9
122:15,16
stopped 19:15
19:16,19
stops 70:1,2
98:1
story 88:12
111:19 130:24
straw 9:10
stretch 72:21
stretched 11:2
strianese 20:19
strict 6:14
strong 30:4

strzelecki 29:8
38:25 43:21
44:5,6,11,12,13
45:10,23 58:2
100:24 101:3
118:6 119:6
strzelecki's
39:23 100:20
121:21
studying 85:15
stuff 6:17 66:5
66:18 97:24
subject 69:1,6
83:16
subsection
13:22
subsequently
117:10
substantive
29:16 118:21
suddenly 67:9
suffers 29:2
suffice 69:4
suggest 116:3,4
suggesting
21:15 69:5
115:25
suit 10:13 18:5
40:22 129:21,25
suite 2:3,7
suited 5:5
summary 13:16
15:11,20 50:1,2
50:5 113:18

sunny 41:23,25
supervisor
42:22 83:11
supervisors
21:18 22:8
support 8:12
supposed 15:21
66:25
sure 8:9 18:7
27:16 31:8
34:23 35:8 51:9
53:6 54:13
66:18 67:1,6
68:3 76:17 79:1
88:23 94:18
97:17 98:18
99:12 100:16
104:14 106:7
107:14 108:22
116:8 118:22
124:16 127:20
128:18 132:2
133:15
surprised 38:1
surrounding
46:16
surveillance
34:8 85:21,24
86:2,23,24
87:10 121:23,24
suspect 18:18
18:22 45:21
55:14 83:12
88:21

suspected 87:12
suspend 13:25
suspended 7:23
suspension 7:6
7:8 30:4,6,17
91:25 92:18
suspensions
30:6
suspicion 40:11
42:16,21
swear 14:11,14
14:16,19 15:15
15:22
swearing 8:11
50:6 68:25 69:1
69:6 97:12,14
swim 62:20
63:14 96:10
swimming
62:18
sword 22:2
123:7,17,23
swore 111:11
116:2
sworn 22:18
31:15 32:5,7
49:16 82:7
86:14 115:22

**t**

tab 86:9
tactful 123:4
tactical 53:7
tactically 55:1
75:1

tactics 60:22
87:13 105:10
tag 6:16
take 12:6 21:8,8
23:15 38:9 62:9
67:10 68:2
70:19 72:11
74:21 80:21
85:9 92:24
101:9,21 104:18
108:6,16 113:15
114:3 115:22
131:11 134:2
taken 16:23
21:5 38:12 45:3
54:14 68:4 72:6
103:19 134:4
takes 7:6 21:3
22:22 26:8,11
102:14,19,19
105:2 109:6
113:8
talk 26:7 52:11
53:1,3,21 59:2
67:8,8 74:20
80:10 81:1
88:15 110:17
116:14 121:4
123:9 127:22
talked 30:2
76:18 117:15
128:6,13
talking 28:6
43:1 56:17 59:4
66:9 76:18

83:23 85:1
91:17 102:15
105:2 106:5,21
111:6 124:4
125:17 127:13
128:6 129:11
talks 14:4 52:16
52:20 77:12,17
tantrums 8:19
tap 102:10,19
taped 20:16
taser 19:15
45:10,18,20,22
45:23
tattoos 18:18
41:20
taught 19:23
61:1 68:18
70:14 96:5 97:3
team 123:3
technically
29:20 118:4,5
techniques 81:3
technology 7:1
54:9 66:13
teeth 70:8 98:6
tell 18:23 21:22
21:24,25 26:7
26:10,17 29:12
58:6,7 63:18
65:6,7 68:7,7
80:18 83:7
84:22,24 88:24
111:14 112:10
113:2 115:15

119:3,4 120:21
133:17
telling 38:9
65:17 86:21
98:22 111:19
128:8
tells 11:25 14:15
23:1 27:4 36:22
39:18 40:9
42:13 48:17
64:21 71:10
99:19,20 104:13
104:18 120:9
temperature
27:2
temporary 8:20
93:7
ten 11:12 21:5
63:23 77:21,22
87:4
tend 53:16
term 41:4
terminated 4:6
termination 1:3
4:18 30:20
32:16 78:6
93:16
terminology
59:3,11,14
terms 29:14
testified 9:24
24:8 29:15
31:15 49:3
79:13 82:7

testify 11:10
29:15 101:16
125:6,20
testifying 125:2
testimony 49:20
60:9,13 76:17
86:14 130:24
text 8:16
thank 4:14
11:11 13:6,7
16:9 31:6 36:17
42:10 43:18
46:24 68:1,15
78:8,22 80:24
81:19,22 82:20
107:1 129:13
131:2 133:21,23
133:25,25
thanks 65:24
theft 19:8
theirs 25:7
thick 125:16
thing 10:24
17:21 25:13
28:11 35:25
39:17 52:11
68:17 77:15
81:1,10 88:22
things 4:15
19:23 23:11
26:16,20 34:13
39:5 45:14
52:17 53:9
70:14 80:14
91:11 98:15

108:5 109:20,22
122:17 123:4
126:12,13
**think** 4:18,20
12:24 13:10,14
22:10 32:5
34:14 35:10
36:1,4,13 37:12
38:7,19 40:11
48:10 49:3
59:11 67:20
78:9,16 79:8
84:13 89:1
100:21 108:10
111:4 116:25
119:17 124:19
133:1
**thinking** 23:8
36:12
**third** 15:3 44:4
113:17
**thorough** 49:10
**thought** 6:23
39:24 110:8
118:14 127:11
**thousand** 70:12
**threat** 10:21
25:24 26:4,15
39:10 40:25,25
41:5,5 45:1,15
46:1,4 57:19
59:20,21 68:18
68:22 75:2 88:2
**threatened**
23:25 48:23

89:4
**threats** 68:21
97:4,6
**three** 9:12 14:18
30:1,15 56:13
56:13,16,16,17
56:17,18,18
73:15
**threshold** 40:10
42:15
**throughs** 23:12
23:12
**time** 1:9 4:11,18
7:13 11:19
13:23 19:6 21:8
21:8 23:18 36:9
39:21 47:11
48:24 56:23
57:1 64:20,22
64:24 65:1
73:25 84:2,9,16
85:13 88:2 89:3
89:12,20 90:24
91:1 92:20 94:3
95:13 105:25
107:3 108:25
113:2,8,12,12
119:24 120:9,20
120:24 121:3
124:19 130:5
132:12
**times** 73:5,15
124:12
**tisdale** 90:23

**today** 4:17
11:11 30:18
60:9 133:24
**toe** 18:18
**toenail** 47:14
**together** 50:1,16
66:18 70:1 98:1
110:10
**told** 10:5 22:21
28:3 53:15 56:9
64:17 73:16
75:20 83:16
84:10 85:2 91:2
91:24 92:9,10
101:11 114:23
118:23 119:1,3
120:23,23
128:17 130:23
133:17
**tony** 20:19,23
**took** 16:18
33:19 91:7
113:3
**top** 113:16
**torso** 100:25
119:21
**totality** 30:18
69:13 87:2
**totally** 4:22 10:7
10:8 59:7
113:13 132:8
**toward** 10:22
11:22 50:9
55:11

**towards** 132:18
**towel** 40:2,2
46:12 54:19,22
55:11,21 56:5
79:5,12,19,22
87:20,21 88:17
88:17,23 89:2
105:6,8,13
106:16,17,23,24
107:6,13,24
130:12 131:8,9
131:18
**towels** 107:7,8
**trail** 1:11
**train** 39:15
**trained** 26:1,21
123:2
**trainer** 90:24
**training** 8:1
39:8 45:14
90:24 92:1,25
123:2 126:25
**transcript** 135:7
**trash** 20:15
**trashcan** 21:4
**treat** 20:2
**treated** 21:19
32:25
**tree** 60:11
**trick** 107:17
**trigger** 130:8
**trouble** 50:25
91:17,19
**true** 15:22 84:14
96:18 135:8

**trunks** 62:19,20
  63:14 96:10
**trust** 85:4
**truth** 111:14
**truthful** 14:8,9
  14:14 15:9
**try** 65:25 109:13
**trying** 38:3,4
  67:17,22 71:24
  112:10 116:2,3
  116:4,9 124:15
  124:18 125:6
**tuned** 12:14
**turn** 17:25
  77:20 80:16
  125:18 129:4
  133:4,5
**turned** 95:14
**turns** 9:12
**tv** 59:8
**two** 7:6,8 10:20
  11:14 14:6 18:4
  27:9 30:3,5,6,17
  50:11 63:22
  71:23 73:5
  84:23 89:16
  90:22 92:9,12
  109:25 116:7
  125:20
**type** 95:12
  115:23

**u**

**u** 32:4,4
**ultimately** 15:25
  20:19

**unarmed** 10:14
  57:2 61:8 96:8
**unarrest** 28:24
  29:19 121:7,9
  121:12
**unarrested**
  28:17,21
**unbecoming**
  21:14 27:14
**unbelievable**
  10:11
**uncalled** 27:9
**under** 8:11 9:24
  14:16,24 15:3,8
  15:15,19 16:4
  16:18 19:11
  28:2 38:10,13
  40:22 42:5,12
  42:13 51:20
  53:25 62:5 73:3
  77:11,14,15
  93:4 105:13
  106:17,23 107:6
  108:19 131:18
**underneath**
  20:17 54:21
  56:5 106:16
  107:13 131:6
**understand**
  36:3 101:5
  126:16,18
**understood**
  26:19 76:17
  122:5

**unfair** 107:2
**unfurled** 12:25
**union** 16:19
  23:9
**unit** 82:17
**units** 20:25
**unknown** 18:3
  18:12,14 19:2,5
  19:10
**unnecessarily**
  21:14
**unnecessary**
  41:4
**unobstructed**
  121:22
**untruthfulness**
  21:17 22:7
**upset** 36:2 47:17
  48:14 122:11
**use** 7:2 8:10 9:5
  21:12 26:2,14
  39:9,15 59:3,14
  66:14 71:17
  81:2,4
**used** 21:23
  23:11 30:10
  39:14 45:20
**uses** 130:3
**using** 7:1 10:17
  66:11 87:13
  119:1
**usually** 47:4
**utilized** 6:21
**utilizing** 6:18
  8:12 93:10

**v**

**vague** 118:14
**valerio** 9:24
  34:25 35:1,9,21
  36:1,18,22 37:1
  37:7 38:3,8,22
  48:12,17 78:11
  78:14 79:18
  83:25 88:9,13
  88:16,19,23
  98:22 105:11
  106:3,21,22
  114:1,13 115:19
**valerio's** 54:16
  87:14 107:22,23
  112:21 129:9
  130:10 132:19
**values** 6:3
**vantage** 44:8
  64:5,11 65:11
  70:23,25
**vehicle** 18:23,25
  38:24 39:13,15
  87:14
**vendetta** 7:3
**verbal** 10:12,24
  22:2 26:14 27:9
  41:3 42:18 45:1
  68:22,25 69:6
  97:3,6
**verbally** 39:22
  44:22 80:13
**verbatim** 22:11
**verified** 15:23
  16:2

**verifies**  14:24
**verify**  14:5,7,8
  14:18
**version**  89:23
**victim**  10:8,13
  10:19 26:25
  28:19 40:18,18
**video**  17:17 18:2
  19:19 29:12,13
  29:18 35:12
  38:20 39:23
  42:12,14,24
  43:10 44:4,7
  54:16 58:9
  63:16 65:20
  66:3,4,7 67:12
  67:17,23 70:18
  78:16 79:17,18
  81:11 85:23,24
  86:18 87:24
  88:10,25 89:24
  98:19 101:4,16
  103:11,12
  106:19 107:22
  107:23 109:3
  110:6,13 112:17
  112:21 113:10
  116:5,6,11
  119:15 120:22
  121:18,22
  122:15 123:11
  127:12,25 128:5
  129:9 130:10,16
  131:21

**videos**  33:23,25
  34:2,8 48:1 87:7
  87:10 125:4
**view**  48:19 64:9
  89:11 99:4,6,9
  100:24 119:18
  122:2
**views**  20:5,8
  24:24
**violate**  22:15
  62:5
**violated**  14:10
  14:11 16:1
  24:20
**violates**  27:20
  28:15 117:22
**violating**  62:7
**violation**  30:2
**violent**  30:9
**vision**  52:21
  64:2,3,7
**visit**  90:13
**voice**  92:6
  122:21
**volume**  1:6 3:13
  102:1 134:5

**w**

**waist**  72:9
  102:11,17
**wait**  17:9,9 67:3
  76:13 101:15
  131:20
**waiting**  57:24
**walk**  18:8 23:12
  23:12,16 55:20

  73:20 106:23
  107:5
**walked**  20:14
  114:23 117:6
**walking**  37:7
  42:22 55:5,10
  55:11,16 99:24
  99:25 102:22
  103:1 104:4
  105:12,12
  113:10 130:11
**walks**  21:2
  35:13
**want**  7:11 11:10
  13:3,10,11
  16:10,19 17:17
  18:20 35:6
  36:12 41:16
  43:6 50:25
  52:11 53:13
  54:8,9 55:1,4,12
  55:17 65:21
  68:2 70:19
  71:17 73:8,25
  76:16 84:5 85:2
  86:16 89:25
  104:14 105:20
  106:7 110:3
  112:24 115:11
  116:11 122:14
  124:14,14
  127:22 128:18
  128:18 134:2
**wanted**  16:21
  35:25

**wants**  34:18
  42:20
**warnings**  53:5
**watch**  17:16,23
  29:18 110:9,10
  123:10 133:7
**watched**  109:3
  116:4,6 119:15
  121:20 122:1
**watching**  42:12
  59:8 61:16,19
  86:18 120:21
  121:18 127:25
**way**  8:2 9:1 12:9
  14:19,21 15:2,3
  15:6 21:24
  24:25 25:4 26:7
  26:21 29:17
  30:5 32:16,25
  34:13 37:17
  44:10 47:25
  50:8,19 52:12
  72:19 73:1
  84:13 94:5
  105:5,10 106:11
  106:13 132:17
  132:25 133:11
  133:12
**ways**  14:18
**we've**  12:12
  38:7 48:1 71:11
  108:10 123:18
  123:24
**weapon**  9:19
  10:18 11:22

21:13 23:2,5
27:4,11 40:6
44:23 62:4
87:25 89:4,8
104:9,11 108:24
129:21
**weapons** 10:20
20:2 61:1,3,4,6
61:20 96:5
109:23
**wearing** 19:21
62:18,20 96:10
128:21
**weaved** 7:11
**welcome** 65:25
**went** 5:10 6:10
12:2 20:13
28:15 41:23
45:9 58:11
64:24 71:19
76:20,22,25
77:2,5 85:23
88:19 90:21
91:6 97:1
101:10 114:8
117:13 120:10
**west** 2:7
**wet** 10:13
129:25
**whatsoever**
50:10
**wheel** 21:7
**wheels** 21:4
**white** 58:25
59:7,16 110:22

**whoa** 67:16,16
**wife** 6:20,23 8:7
9:13,15,21 19:4
23:25 91:4
**willfully** 15:17
**willy** 23:4
**wind** 91:13
**withdraw** 45:18
**witness** 3:5 11:7
31:14 32:3
36:17 37:20
41:16 44:6 51:2
53:18 57:16
60:19 71:14
73:6 81:19,22
81:23 82:6,8
84:24 105:23
112:4 123:10
132:7 133:2,25
**witnesses** 33:14
**woman** 8:16
19:3
**wonderful**
125:4
**word** 26:2,18
130:3
**words** 10:17
83:7 84:23
**work** 71:17
110:15
**works** 54:9
**worn** 5:14 12:6
34:2,12 44:4
47:8 65:10
87:10

**worries** 123:19
**worry** 100:22
130:16
**worse** 30:5
**worst** 30:16
**worthy** 47:10
**woven** 17:7
**wrist** 19:12
**write** 14:22 15:3
15:7,13
**writes** 29:8
**writing** 8:1 29:5
**written** 5:11,25
30:11 93:2
**wrong** 57:7 71:4
71:6,7 86:4
91:10 92:10,11
100:17
**wrote** 22:18
29:19

**x**

**x** 3:2 65:20

**y**

**yeah** 16:11 18:1
31:8 37:16 41:6
50:21 51:7
53:15 54:6,10
68:14,20 71:14
72:10 81:25
91:18 99:5,7
101:20 106:8
107:23 110:7
111:16 112:4
114:12,17

128:19 131:15
**year** 5:10 19:3
30:16
**years** 4:19 20:11
20:21 23:9
29:21,24 31:25
67:20 81:6
82:22 83:1
93:22 94:1
105:24 122:25
**yell** 53:18
**yelling** 24:3
123:6
**yellow** 59:1
**yells** 25:20
**yep** 77:23 100:9
**yesterday** 66:18
**young** 20:11,18
25:23
**youtube** 17:16
110:9

FLORIDA RULES OF CIVIL PROCEDURE

Rule 1.310

(e) Witness Review. If the testimony is
transcribed, the transcript shall be furnished to
the witness for examination and shall be read to or
by the witness unless the examination and reading
are waived by the witness and by the parties. Any
changes in form or substance that the witness wants
to make shall be listed in writing by the officer
with a statement of the reasons given by the
witness for making the changes. The changes shall
be attached to the transcript. It shall then be
signed by the witness unless the parties waived the
signing or the witness is ill, cannot be found, or
refuses to sign. If the transcript is not signed by
the witness within a reasonable time after it is
furnished to the witness, the officer shall sign
the transcript and state on the transcript the
waiver, illness, absence of the witness, or refusal
to sign with any reasons given therefor. The
deposition may then be used as fully as though
signed unless the court holds that the reasons
given for the refusal to sign require rejection of



the deposition wholly or partly, on motion under
rule 1.330(d)(4).

DISCLAIMER:  THE FOREGOING CIVIL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019.  PLEASE REFER TO THE APPLICABLE STATE RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the

foregoing transcript is a true, correct and complete

transcript of the colloquies, questions and answers

as submitted by the court reporter. Veritext Legal

Solutions further represents that the attached

exhibits, if any, are true, correct and complete

documents as submitted by the court reporter and/or

attorneys in relation to this deposition and that

the documents were processed in accordance with

our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining

the confidentiality of client and witness information,

in accordance with the regulations promulgated under

the Health Insurance Portability and Accountability

Act (HIPAA), as amended with respect to protected

health information and the Gramm-Leach-Bliley Act, as

amended, with respect to Personally Identifiable

Information (PII). Physical transcripts and exhibits

are managed under strict facility and personnel access

controls. Electronic files of documents are stored

in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.