1              CITY OF PALM BEACH GARDENS

2

3   PBA/FMCS Case Number:  230921-09536
    ISSUE:  Termination/Guerriero, B

4

5

        ARBITRATION BEFORE RICHARD MILLER, ARBITRATOR

6

                        VOLUME II

7

8   DATE:              April 16, 2024

9   TIME:              1:30 o'clock p.m.

10  PLACE:             City Hall
                       10500 North Military Trail

11                     Palm Beach Gardens, Florida

12  REPORTER:          KIMBERLY IGLEWSKI, Notary Public
                       of State of Florida at Large

13

    JOB NO.:           6456507

14

15

16

17

18

19

20

21

22

23

24

25

```
                                                  Page 137

 1    APPEARANCES:
 2    FOR CITY OF PALM BEACH GARDENS:
                        ALLEN NORTON & BLUE, P.A.
 3                      121 Majorca Avenue, Suite 300
                        Coral Gables, Florida 33134
 4                      (305)445-7801
                        rnorton@anblaw.com
 5                      BY: ROBERT L. NORTON, ESQUIRE
 6    FOR PBA/GUERRIERO:
                        KING|MORSE PLLC
 7                      2240 Palm Beach Lakes Blvd., Suite 300
                        West Palm Beach, Florida  33409
 8                      (561)557-1079
                        rick@kingmorselaw.com
 9                      greg@morselegal.com
                        BY: RALPH E. KING III, ESQUIRE
10                      BY: GREGORY J. MORSE, ESQUIRE
11    ALSO PRESENT:     Dominick Pape, PBG Chief of Police
                        Sheryl Stewart, PBG Human Resources
12                      Brooke Judkins, PBG Human Resources
                        Bethany Guerriero, Grievant
13                      Kristen Penque, King|Morse Assistant
14
15
16
17
18
19
20
21
22
23
24
25
```

```
 1                      -  -  -
 2                   I N D E X
 3                      -  -  -
 4
 5   WITNESS:           DIRECT   CROSS   REDIRECT   RECROSS
 6
     SERGEANT MARC GLASS
 7
     BY MR. NORTON      139
 8   BY MR. MORSE                147
     BY MR. NORTON                         188
 9
     CHIEF DOMINICK PAPE
10
     BY MR. NORTON      189
11   BY MR. KING                203
     BY MR. NORTON                         213
12
     BETHANY GUERRIERO
13
     BY MR. KING        216
14   BY MR. NORTON              254
     BY MR. KING                           278
15
16
17
18
19
20
21
22
23
24
25
```

Page 139

1

2

3                    P R O C E E D I N G S

4                          - - -

5  AND THEREUPON,

6                    SERGEANT MARC GLASS

7  called as a witness herein, after having been first duly

8  sworn, was examined and testified as follows:

9              THE WITNESS:  I do.

10  DIRECT EXAMINATION

11  BY MR. NORTON:

12       Q    Good afternoon, Sergeant.

13       A    Good afternoon.

14       Q    You have been, I believe, with the City of

15  Palm Beach Gardens for 19 years in their police

16  department?

17       A    Yes, sir.

18       Q    And you're currently the senior, am I allowed

19  to say, road patrol sergeant?

20       A    I am a road patrol sergeant, yes.

21       Q    And you are the senior sergeant?

22       A    As a term of endearment, yes.

23       Q    And you're in a platoon with two squads.

24  Right?

25       A    Correct.

1     Q    And one squad is run by Sergeant Beath and

2    that squad would have Guerriero.  Excuse my language if

3    I mispronounce that, ma'am.  Living in Miami, I

4    shouldn't.  So there are two squads in a platoon is the

5    way you guys are configured.  Correct?

6     A    Correct.

7     Q    Okay.  And did you end up at a scene where

8    there was an incident involving Officer Guerriero?

9     A    I did.

10    Q    And why don't you just kind of tell the

11    arbitrator what happened there, when you arrived on the

12    scene, et cetera.

13    A    So when I arrived on-scene, you know, I

14    observed an individual on the ground in handcuffs.

15   Officer Guerriero approached me and basically first

16   words out of her mouth was, I had to draw or I drew on

17   him.

18    Q    A little slower for the court reporter.

19    A    I had to draw on him or I drew on him, I

20   forget the exact phrase.

21         I took her aside to get exactly, you know,

22   tell me what happened, walk me through this.

23         She said he had reached into his pockets

24   several times or multiple times, wasn't compliant, and

25   as such, she had to draw her weapon and proceeded,

Page 141

1    obviously, to handcuff him.

2         Q    All right.  Is it normal in law enforcement to

3    say, I drew down on somebody?

4         A    Well after the fact.  Not the initial -- I've

5    never had anybody come up to me when I've arrived on a

6    scene before and immediately say that to me, especially

7    twice.  And that's what caused -- just caused me to be a

8    little more heightened, if you will, because it was an

9    unusual thing to have happen.

10        Q    And if you could, in most definite terms that

11   you can do, describe how she explained to you what he

12   did that caused her to draw down with the use of his

13   hands and his pockets.

14        A    She just said that he kept reaching into his

15   pockets, which implied multiple times, wasn't following

16   commands, and as such, took the action that she took

17   which resulted in him being handcuffed.

18        Q    When you analyze that situation, did you have

19   some concerns about what might have gone down?

20        A    Yes.

21        Q    And did you have a little sidebar with

22   Sergeant Beath?

23        A    I did.

24        Q    And share with the arbitrator what came down.

25        A    So I've been doing this, you know, been a

Page 142

 1   supervisor for just over 14 years now in this position
 2   or close to that number, and as you eloquently term it,
 3   the senior.  So based on experience, just what I was
 4   hearing, Officer Guerriero's actions, she was clearly
 5   agitated and heightened.
 6           I had told Sergeant Beath that when we're
 7   done, I'd like to, when we get back to the station,
 8   because I assumed at the time that's where Officer
 9   Guerriero was going to go and Mr. Gould was going to go,
10   that I wanted to get her camera docked and take a look
11   at the video just to make sure that everything lined up
12   with what was being presented to me as the supervisor.
13           So Sergeant Beath actually said to me, what,
14   you don't trust your officers?
15           And I said, I trust my officers implicitly, I
16   said, but something is just not sitting right with me.
17   I hate to use the term the hair was standing up on the
18   back of my neck but something just wasn't right.
19           And I've learned in my career that when your
20   gut tells you something, to at least follow that
21   through, and if nothing else, just dispel that concern I
22   may have.
23           And I told Dennis, I said, I trust them
24   implicitly but I want to go back and look at this just
25   to make sure everything is lining up.

1    Q    And you looked at the videos.  Did you also

2  look at the surveillance videos?

3    A    Yes.  A little bit later, we looked at the

4  surveillance videos when we were able to ascertain

5  those.

6         But initially when I got back to the station

7  with Sergeant Beath, we looked at the body-worn camera

8  footage.  And, unfortunately, it was in line with what I

9  was thinking, that this just wasn't right.

10    Q    And if you can for a moment put yourself in

11  the head of a law enforcement officer who's driving up

12  to this scene, even though the guy is in -- it was a wet

13  bathing suit, was it not?  He had been in the pool.

14    A    Yes.

15    Q    Even though he's in a bathing suit, assume

16  that you are concerned, when you drive up, about whether

17  or not he has a weapon on him.  What would you have done

18  in this scenario?  What should anybody do?

19    A    Well, obviously we're going to a potential gun

20  call.  So on my arrival, even if it had -- let's say

21  Mr. Gould subsequently was detained.  The very first

22  thing you do after that then would be dispel the fear of

23  a firearm, which would be to search him, to make sure he

24  doesn't have a weapon on him.

25         I believe he was carrying a towel as well,

1    which was down on the ground, and then you make

2    sure that the towel is clear of any weapons, firearms,

3    et cetera.

4         So that would be the first thing you would do

5    to dispel your fear of, if this person is armed, let's

6    make sure either they are, and if so, take the

7    appropriate action to disarm them or confirm that, no,

8    he doesn't have a weapon, and then we go forward with

9    the investigation from there.

10   Q    If Officer Guerriero drove up to this scene,

11   used Officer Valerio's vehicle as cover and ordered this

12   gentleman to pull his pockets out of his bathing suit,

13   turn around, get down on the ground, et cetera, from her

14   car, would this entire matter have been over?

15   A    In my opinion, yes.  She would have been

16   behind sufficient cover.  If his pockets are emptied, he

17   did the full 360, which we do in any situation,

18   specifically when somebody's exiting a vehicle

19   sometimes, we'll ask them put their hands up, grab the

20   back of their shirt and lift it up and do a 360 so we

21   can see their waistband to show that they're not armed,

22   that quickly can dispel your fear that, at least at that

23   point, that that person does not have a weapon on them,

24   at least that's clearly visible.

25        Yes, it would have been at that point, I

1    think, deescalated.

2         Q    From what you've seen there, and of course

3    you've, I assume, read the IA and the attached

4    documents, was there any reason to even have this guy

5    laying on a hot pavement with handcuffs?

6         A    No.  Once a person is handcuffed in that

7    situation, sit them up, and being the time of day it was

8    and the weather that we had that day anyway, if nothing

9    else, either stand him up and move him over to a police

10   car, if need be, or move him to the grass or a cool

11   sidewalk, someplace where he could sit up but not be on

12   the pavement.  I wouldn't leave somebody in

13   85-plus-degree weather on a pavement.

14        Q    Okay.  Did you have any interaction with

15   Officer Valerio on the scene?

16        A    Briefly, you know, just that he arrived

17   on-scene, said that he had been in contact with

18   Mr. Gould and then went -- I think he pretty much

19   believed that the other person involved was the one that

20   had the weapon.  So he left Mr. Gould to have a seat,

21   said have a seat, I've got a couple of officers coming.

22   There were more officers coming.  And he then proceeded

23   to go around back.

24             And then I believe he even told me that, at

25   that point, he heard the commotion up front, left from

1     back there, I think we had somebody else there, and came

2     back around front to see what had happened because he

3     was, I think more in shock that whatever had happened

4     had gone south the way it did.

5          Q    Would his radio call -- he made a radio call

6     that he was going around back.  Would that in any way

7     suggest to you that he obviously did not consider the

8     guy up front to be a threat?

9          A    Yeah.  Listening to a traffic like that, when

10    he said on the radio, I'm going to go around back to

11    make contact with the other party, that would tell me in

12    my mind, all right, he's already made contact with

13    somebody, that's not the person that may have the

14    firearm, he's on his way around to make contact with the

15    person that probably is armed.

16          You wouldn't leave somebody that you think has

17    the firearm by themselves.

18          MR. MORSE:  I'm going to object on just the

19        speculation of Officer Valerio's mindset or what he

20        was thinking.

21          MR. NORTON:  It's what he said, I think.

22          THE ARBITRATOR:  Go ahead.

23          THE WITNESS:  Continue?

24          THE ARBITRATOR:  Yes.

25          THE WITNESS:  Okay.  So, yeah, that was just,

1      that's exactly how I think he interpreted it is

2      certainly how I would have interpreted it as I was

3      already on my way to the call anyway.

4            MR. NORTON:  That's all I got.

5    CROSS (SERGEANT MARC GLASS)

6    BY MR. MORSE:

7        Q    Good afternoon, Sergeant Glass.

8        A    Good afternoon.

9        Q    My name is Greg Morse.  I'm going to ask you a

10   few questions, some general questions and then we'll get

11   into the incident.  Okay?

12       A    Sure.

13       Q    You're a sergeant with Palm Beach Gardens

14   Police Department?

15       A    Yes.

16       Q    You've been on firearm calls before?

17       A    I have.

18       Q    Okay.  And generally when there's a firearm

19   call, would you consider it high risk?

20       A    Yes.

21       Q    And in this particular case, there was a

22   firearm call and it was either one or two firearms, it

23   wasn't known yet when the initial call came out.  Is

24   that correct?

25       A    I just knew it was a firearm call.

1    Q    Okay.  And did you -- did you have a chance to

2    review your internal affairs statement?

3    A    Yes.

4    Q    Okay.  And do you recall at a point --

5    A    And if I may, with respect, if you're going to

6    ask me questions, if I can have a copy of it in front of

7    me again, only because I reviewed it in the past.

8         MR. KING:  Is that mine on top there?  Just

9         let me see that.  Just close the book.  Yes, so

10        it's Exhibit Number 6, I believe.  So tab number

11        six.

12        THE WITNESS:  It's got a picture of a phone.

13        MR. KING:  Which page is he on, ten?

14        MR. MORSE:  He starts on page ten.

15        THE ARBITRATOR:  Can I also get a book, too?

16        MR. KING:  Yes, sir.

17        MR. NORTON:  Oh, this is in -- you want to

18        follow this along?  I tell you what, if you don't

19        mind, I can direct him to our exhibit book which is

20        in front of him.

21        MR. KING:  Oh, here you go.  I have one for

22        him right here.

23        THE ARBITRATOR:  All right.  Thank you.

24   BY MR. MORSE:

25        Q    And I'm specifically referring to 21:02 of

Page 149

 1    your statement.

 2         A    Okay.  I'm sorry, 21:02.

 3         Q    Of your statement, and you're being referred

 4    to the arbitrator's report which recites some of your

 5    interviewing on page nine.

 6         A    Page nine.

 7         Q    I don't recall specifically.

 8         A    That's Officer Valerio.  I'm on page ten.

 9              MR. NORTON:  Yeah, you are.

10    BY MR. MORSE:

11         Q    At 4:31, right in the beginning of your

12    statement.

13         A    Okay.

14         Q    We're going to play it for you.

15         A    Oh.

16         Q    We're going to just play the beginning of it.

17    And all I'm pointing out, and again, I'm not -- just

18    from the statement, that you had said that:  I believe

19    it was a disturbance and somebody may have had a

20    firearm.  I don't remember.  I don't think they said

21    that they -- they pointed it at anyone or of that nature

22    but I believe that -- that some -- one -- one of the

23    parties, if not both, something about a firearm being

24    involved.

25              That's all.  And I'm just trying to find out,

Page 150

1   when the initial officers arrived, especially, it's just

2   a firearm call.  No one knows, is it one, is it two, how

3   many, nothing's determined yet.

4        A    Correct.

5        Q    Is that correct?

6        A    That's correct.

7        Q    Okay.  And so when Officer Guerriero responds,

8   she does not know who's a suspect, who has a firearm or

9   if any have been even discovered at that point.

10       A    Correct.

11       Q    And at no time did Officer Valerio say over

12  the radio, before Officer Guerriero, and I don't believe

13  he did before you got there, that firearms were secured.

14       A    I don't recall hearing that.

15       Q    Okay.  And now when you respond -- and we can

16  agree that it's a high-risk call, a firearm call.  And

17  just to get it out of the way, Officer Guerriero is

18  lawfully responding to a call for service.  Correct?

19       A    Yes.

20       Q    And when you respond to a firearm call,

21  although you're assessing everything as an officer, your

22  main priority is to, whatever those firearms are that

23  aren't with the police, you need to find and lock down

24  for officer and the public safety.  Is that fair to say?

25       A    Fair to say.

 1      Q    Okay.  So by the time Officer Guerriero gets

 2    there, this firearm is still a risk to officers and

 3    civilians.

 4      A    Again, I don't know what Officer Guerriero was

 5    thinking so that would be a question for her.

 6           Based on what I heard from Officer Valerio is

 7    that he was on his way around back to meet with the

 8    other party which would tell me that at least one party

 9    was not the person that would be armed.

10      Q    Okay.  And again, so when you're on a -- a

11    firearm call happens.  At some point, when the firearm

12    is in law enforcement's hands or it's neutralized, the

13    other officers would be knowing that by the radio.

14    Right?

15      A    Yes.

16      Q    The firearm's secured.

17      A    Yes.

18      Q    And again, when Officer Guerriero arrives,

19    Officer Valerio does not say a firearm is secured yet.

20      A    Right.

21      Q    Okay.  So when she gets there, the firearm

22    still could be on the loose or more than one.

23      A    Well, again, I'm going back to what I know

24    which is that Officer Valerio went around to meet with

25    the other party.

Page 152

1          Q     Okay.

2          A     I don't believe he would have, nor would have

3    I, left a person who may be armed unattended.  So when

4    he went around back to meet with the other party, it

5    leads me, as an arriving person, to go, okay, this is

6    probably the person that doesn't have a firearm.

7          Q     Okay.

8          A     Just in my mind.  I'm not saying that they

9    couldn't but probably doesn't, based on Officer

10   Valerio's statement.

11         Q     But just to go on that point, so you watched

12   the videos in this case?

13         A     I did.

14         Q     And you see Officer Valerio doesn't search

15   Ryan Gould.  Correct?

16         A     Correct.

17         Q     And you're aware Officer Valerio tells

18   Mr. Gould to sit where he leaves him to go around back.

19         A     Say that again.

20         Q     Officer Valerio tells Mr. Gould, when he goes

21   around back, and it's on the video and we can play it,

22   but to stay put.  And he's sitting at one point on a

23   stanchion when Officer Valerio goes around back.

24         A     Yes.

25         Q     But when Officer Guerriero arrives, Mr. Gould

Page 153

1    is up and walking around in that area.

2        A    I believe he stands up when she arrives.

3        Q    And --

4        A    I think to greet the officers.

5        Q    And again -- okay.  We'll come back to that.

6             Now, when Officer Guerriero -- well, you

7    learned in the police academy when you arrive to a

8    scene, especially a firearm call, that you can't assume

9    someone is not armed.  Correct?

10       A    Correct.

11       Q    You have to know that for certain.

12       A    Yes.

13       Q    Okay.  And Mr. Gould was wearing shorts?

14       A    Yes.  A bathing suit, I believe.

15       Q    And he had a towel in his hand?

16       A    Yes.

17       Q    And we know that he could have concealed a

18   firearm in his pockets.

19       A    I would assume anybody can conceal a firearm

20   in their pockets.

21            He's wearing a bathing suit so I think it

22   would be pretty prevalent if there was a bulge that

23   would alert me to somebody that may be armed in a

24   bathing suit.

25       Q    Well, we know he had something in his pocket.

Page 154

1    Right?

2         A    At the time?

3         Q    At the time.

4         A    I did not know.  I learned that he had a

5    phone.

6         Q    So he had a phone in his pocket.

7         A    Yes.

8         Q    So he had a phone concealed in his pocket when

9    Officer Guerriero arrived.

10        A    Okay.

11        Q    If you don't know -- can we pull up officer --

12   okay.  Let's switch that out.

13             While we're waiting for this, and maybe you've

14   had the occasion in your career to do this, if you

15   respond to a firearm call, no one knows who's what yet.

16   So you're still doing your threat assessment on the

17   scene when you get there.

18             If someone who you don't know if they're a

19   suspect, a victim or anything, they just say, hey, I'm

20   not the guy with the gun, as an officer, do you believe

21   that person or do you continue to do a threat assessment

22   and investigate until you know for sure?

23        A    Well, I would investigate to make sure that

24   this person is being truthful and that, yes, he is not

25   the person with the firearm, that he's the person that

Page 155

1   had the firearm displayed to him.

2       Q    So it's probably not good police policy to

3   just believe someone that says, hey, I don't have a gun,

4   don't worry about it.  Is that a fair statement?

5       A    We would not just believe.  We would do our

6   investigation to basically show that the person is not

7   armed and that is the victim in the case versus the,

8   let's say aggressor or suspect.

9       Q    When you say the victim in the case, are you

10  referring about Mr. Gould or you're just generally

11  saying that?

12      A    No, I'm referring in this case to Mr. Gould at

13  the time, that he was the victim of having a gun

14  displayed to him.

15      Q    Yes.

16      A    Yes, that's what I'm referring to.

17      Q    But when Officer Guerriero arrives and Officer

18  Valerio even before Officer Guerriero, that's not

19  determined yet.

20      A    Well, once Officer Valerio said he was going

21  around back, I think it was pretty clear that this was

22  not the person that had the firearm.  Like I said, I

23  believe Officer Valerio wouldn't have left him by

24  himself if he thought he was armed for another officer

25  to come in blindly to that.

1    Q    But you're speculating on what you believe

2  Officer Valerio would or would not do.  As far as the

3  video and what you actually heard over the radio, there

4  was nothing that indicated someone was a suspect or

5  someone was a victim before Officer Guerriero arrived on

6  the radio.

7    A    I can just tell you what Officer Valerio said

8  over the radio which was he was on his way around back

9  to make contact with the other party.

10    Q    Did he indicate that he had searched the

11  person and determined 100 percent there was no firearm?

12    A    I didn't hear that.

13        MR. NORTON:  If the only question is whether

14        he had that phone in his pocket when she arrived,

15        I'll stipulate to it and save the trouble of doing

16        this.

17        MR. MORSE:  Well, we're going to need the

18        videos, anyway, so might as well get it ready.

19        MR. NORTON:  Got you.

20  BY MR. MORSE:

21    Q    So let's initially go to the surveillance in

22  the top left and then I'll let you know when to play the

23  video.

24        So, again, I'll ask the question just to keep

25  us until the video.  When Officer Guerriero arrives, she

Page 157

 1   doesn't know what's in Mr. Gould's pockets.

 2        A    Correct.

 3        Q    She doesn't know if he has a gun or not.

 4        A    Correct.

 5        Q    And we know that he has something in his

 6   pockets and it's a cellphone.

 7        A    We determined that, yes.

 8        Q    Determined that he had something concealed in

 9   his pocket when Officer Guerriero arrived.

10        A    Yes.  When he took it out of his pocket.

11        Q    Okay.  And if you can play this from here to

12   when he goes to put the cellphone in the pocket.

13             So that's Officer Guerriero arriving.  She

14   gets out of the car.

15             Back up just a couple.

16             And we see right there, we see his hand in his

17   pocket as Officer Guerriero is approaching.  Right?

18        A    I can't see it from here.  I'd have to walk up

19   to the screen.  I can't tell if his hand is in his

20   pocket or on the outside of his pants.

21        Q    Okay.

22        A    If somebody could tell me that maybe.  I don't

23   know.

24        Q    We'll go back a little bit to when he has the

25   cellphone out.  Okay.  Right there.

1    So would you agree with me, in his right hand,

2    there's something?

3    A    I apologize, I do not have my glasses.

4    Q    Oh, please get up.  I started wearing glasses

5    last year so I get it.

6    A    Yes.

7    Q    Okay.  And now from Officer Guerriero, we see

8    it in the background there, she doesn't know what's in

9    his hand at that point.  Would you agree with that?

10   A    You'd have to ask her.  At this point, I can't

11   speak on her behalf.

12   Q    Okay.  And go forward by stages.

13   MS. PENQUE:  Like slowly?

14   BY MR. MORSE:

15   Q    Yep.

16   So we see him put that device in his pocket.

17   Correct?

18   A    Yes.

19   Q    Okay.  Now, if Officer Guerriero assumed that

20   there was nothing in his pockets, she would be wrong.

21   Correct?

22   A    Well --

23   Q    We just saw him put his cellphone in his

24   pocket.

25   A    Yeah.  Well, we never assume when we're going

Page 159

1   to a gun call.

2        Q    Okay.  But again, Officer Guerriero didn't

3   search Mr. Gould.

4        A    And as I stated earlier, he said he was going

5   around back to meet with the other party involved so

6   leads me to believe that this is not the person with the

7   firearm.

8        Q    Okay.  But here, Officer Valerio didn't know

9   what was in his pockets because he didn't search him,

10  and he had something in his pockets.  Correct?

11       A    Well, again, I don't know when he put that

12  phone in his pocket or not because officer Valerio went

13  around back.

14       Q    Okay.

15       A    So I don't know if he had it in his towel, I

16  don't know if he got it when he stood up.  I can see him

17  putting what appears to be his phone in his pocket now,

18  yes.

19            But prior to that, I can only go off what I

20  heard off the radio traffic at the time which was, I'm

21  going around back to meet with the other party.

22       Q    Okay.  And again, just because you referenced

23  the radio traffic, he didn't follow it up with firearm

24  secure.

25       A    Correct.

1      Q    Okay.  And we also see that there's something

2  placed on the foreground to the left by the guest

3  stanchion.

4      A    Talking about here?

5      Q    Yes.

6      A    This towel?

7      Q    You see that towel there.  Okay.

8           And is it fair to say that Officer Guerriero

9  doesn't know what that is as she responds?

10     A    Sure.

11     Q    Okay.  And this is the first time, as Officer

12  Guerriero is responding, his hands go in his pocket to

13  put that phone.  Correct?

14     A    I didn't see his hand go in his pocket because

15  I can see his hand outside of his pocket.  Looks like

16  whatever he did, he slipped it into the pocket.

17     Q    Well, I just want to point out, you used your

18  index finger and it actually went into the rim of your

19  pocket when you just exampled that.  So he probably did

20  something similar.

21     A    Okay.

22     Q    I'm not saying he's hiding his hand in his

23  pocket or anything like that.  I'm just saying he put

24  his hand into his pocket to drop his phone.

25           MR. NORTON:  Object to argumentative.  The

1        witness said he didn't see it.  The counselor did.

2        Good.  Let him testify.

3    BY MR. MORSE:

4        Q    Okay.  I'm going through the video with him

5    and your witness just made a motion putting his finger

6    in his pocket.  And I just pointed out that the tip went

7    into his pocket.

8        A    I'm making it so this is a phone.  My phone

9    would be out here, it would probably slide into my

10   pocket.

11       Q    Okay.  For this video, that's all for right

12   now.

13            And I'm going to go to it on the video but

14   when Officer Guerriero, we first hear her encountering

15   Mr. Gould, and we'll see it, his hand at his pocket, she

16   tells him to, hey, keep your hands out of your pocket.

17       A    Yes.

18       Q    And I just want to play it and I want to play

19   her statement.

20            So when she says that, Officer Guerriero is

21   calm.  Right?

22       A    Hm-hmm.

23       Q    And she just says, not knowing, hey, is this

24   the suspect or is this a victim or what she has at this

25   point.  Is that fair to say?

Page 162

1      A     Yes.

2      Q     Okay.  And she calmly asked him to keep his

3  hands out of his pocket.

4      A     Yes.

5      Q     And he immediately becomes a no man, doesn't

6  he?

7      A     Becomes what?

8      Q     Becomes a no man and starts challenging her.

9      A     I believe he said, I'm not the one with the

10  gun.

11     Q     And he puts his hand down by his side?

12     A     We'd have to go through it.

13     Q     Okay.  Sure.

14           So right at that moment, we've established

15  Officer Guerriero was on a lawful call for service.

16  Correct?

17     A     Yes.

18     Q     And we know that this individual was already

19  interacted with by a police officer.

20     A     Yes.

21     Q     And not searched.

22     A     Yes.

23     Q     And also, there was no call of a firearm being

24  secure.  Correct?

25     A     Yes.

Page 163

1       Q    So her order to keep his hands out of his

2   pocket, the calm way she said it when she arrives,

3   that's a lawful order to him in that moment.

4       A    Yes.

5       Q    And he violates that order when he goes in his

6   pocket.  Correct?

7       A    He reached into his pocket, yes.  He did not

8   listen to her.

9       Q    And would you agree with me that under

10  resisting an officer's lawful command, that statute,

11  technically speaking under the letter of the law, he

12  just violated the law by not listening to her initial

13  command?

14      A    On the initial command?

15      Q    Yes.

16      A    Yes.  Under the letter of the law.

17      Q    Okay.  And now, we are all here in hindsight,

18  and would you agree with me that in your years of

19  experience and training, looking at incidents by law

20  enforcement in hindsight can be problematic because

21  things happen in real time, real fast, with emotion and

22  adrenaline for law enforcement officers?

23      A    Yes.

24      Q    And so realistically speaking right here, when

25  you're on a gun call, you don't know the gun is secure,

1   you ask someone who is coming towards you to keep your

2   hands out of your pocket, they reach in, sometimes

3   police officers don't go home when that happens.  Is

4   that fair to say?

5        A    I would say sometimes.

6        Q    Okay.  So would you agree with me, and we can

7   dispute levels of control and levels of how we heighten

8   as officers, but once that command, Officer Guerriero's

9   calm command to, hey, keep your hands out of your

10  pocket, once he goes in there, she really needs to

11  elevate at least her voice to try to get control of the

12  situation because he's noncompliant now with her first

13  order that was calm?

14       A    Not necessarily.

15       Q    So again, in your training and experience --

16  well, let's look at a couple of things here also.  At

17  some point, he steps back.  Right?

18            You can just play it.

19            See how he steps back?

20       A    Hm-hmm.

21       Q    Would you agree with me he's in a bladed

22  position as his foot drops back?

23       A    No.  I think he's just stepping back at that

24  point.  I think he's more upset that he's being yelled

25  at.

Page 165

1      Q    So again, you don't consider dropping your

2    foot back a bladed position?

3      A    For all I know, because she's coming at him,

4    he's taking a step back.  Like I didn't do anything.

5           His hands aren't really up other than his one.

6    It's like he's talking with his other hand saying, I'm

7    not the person with the gun.

8      Q    And we've established that until you get

9    control of the scene and that firearm is secure, right,

10   you don't necessarily believe the person that tells you,

11   hey, I don't have the gun.  You want to confirm for

12   yourself.  Right?

13     A    That's fine.  Yes.  And there's ways of doing

14   that.

15     Q    She hasn't had the chance to confirm that yet

16   because Officer Valerio never confirmed that, who was

17   first responder, nor has she even had a chance to

18   interact with this gentleman before he started

19   challenging.  Is that fair to say?

20          MR. NORTON:  Object to an incredibly compound

21      question.

22          MR. MORSE:  It wasn't a compound question.

23          MR. NORTON:  Yeah, it was.  It was like four

24      different questions, actually.

25          MR. MORSE:  It was restating facts in

Page 166

1        evidence.  No, it wasn't.  It was one question that

2        restated facts in evidence.  If you'd like me to

3        say it again, I will.

4             THE WITNESS:  I'd like it repeated back.

5    BY MR. MORSE:

6        Q    Sure, no problem.

7             So with regard to this situation, this person

8    is on-scene, we don't know if the firearm yet is secure.

9    Even though he says, I don't have the firearm, it

10   wouldn't be prudent police policy for Officer Guerriero

11   to just believe the suspect and go on.  She would want

12   to confirm that.  Correct?

13       A    Yes.

14       Q    Okay.  And now, when this person violates the

15   order that she calmly gives him and reaches in the

16   pocket to pull something out, at that moment, she

17   doesn't know what's coming out.  Right?

18       A    In that split second?  No.  But obviously we

19   can see it's a cellphone.

20       Q    Okay.  Have you had training on cellphones as

21   weapons?

22       A    I have.

23       Q    And have you seen them before, a picture at

24   least?

25       A    I have.

1      Q    So they exist.

2      A    They do.

3      Q    And at this point, we don't know if that's

4  a -- no one in law enforcement knew if that was an

5  actual cellphone gun at that point.

6      A    At that point, no.

7      Q    Okay.  And, again, the initial response by

8  Officer Guerriero, maybe later you find out, but in her

9  initial response, we don't know the answer.

10     A    No.

11     Q    Okay.  And officers are trained not to assume

12  anything, as you said before.  Correct?

13     A    You're trained to observe everything.

14     Q    Okay.  But not assume anything.

15     A    Correct.  Until we can confirm, correct.

16     Q    And if you could go forward a little bit,

17  please.  Just go back a little bit.

18          You know what we also see him doing, he's

19  pointing that cellphone at her as he's challenging her.

20     A    No, he's not.  I disagree with that,

21  Counselor.  He's holding his finger up.  He's got his

22  hand wrapped around his phone.  In no way is his arm

23  extended out, is it pointed at her or anything that

24  would indicate that this was a possible threat.  You can

25  tell he's holding his hand up with his finger saying,

Page 168

```
1    I'm not the one with the gun.
2         Q    Okay.
3         A    If it were a threat, the threat would be out
4    at you, not up like that.
5         Q    Is his hand in front of his body?
6         A    He's holding his phone.  Yes.
7         Q    His hand's in front of his body.
8         A    Yes.
9         Q    He doesn't put the phone on the ground and
10   say, hey, it's just a phone, I'm sorry, nothing like
11   that?
12        A    I don't remember.  I believe at some point, he
13   said something about, it's my phone, but I don't
14   remember.  I would have to watch it again.
15        Q    Okay.  I'm asking in this moment that we've
16   seen.  I'm not asking later on but now.  Does he do
17   that?
18        A    No.
19        Q    Okay.
20        A    He says -- you have to play it back one more
21   time but he says, I'm not the one with the gun, I think.
22        Q    And pause that for a second.  Go forward.
23   Right there.
24             So by the way, where is his left hand?
25        A    Down to his side.
```

1      Q    Okay.  And prior to this, he's now received, I

2    believe it's two lawful commands to keep his hands away

3    from his pockets.  Right?

4      A    Two.

5      Q    Two lawful commands.

6      A    It's out of your pockets, not away from your

7    pockets.

8      Q    So just as far as training, and you've been on

9    the job a long time, when you tell someone to keep their

10   hands away from their pockets and their hands are at one

11   point at their sides, are you going to be concerned if

12   their hands start going around their pocket as an

13   officer?

14     A    Counsel, I've asked people to keep their hands

15   out of their pockets, away from their pockets.  And I've

16   asked people who are either both victims and people who

17   are just legitimately nervous who have reached into

18   their pockets before, even though I've asked them not

19   to, because it's just a reaction.

20          It's just like you saw me standing there and

21   my hand coming down towards my pocket, it's just a

22   comfortable position.  There's no intent behind it even

23   though we're going to keep our awareness up about what's

24   going on.

25          But I've had people put their hands in their

Page 170

1    pockets more than once and it has not risen to the level

2    of resisting because I could tell there's more to this.

3         Q    Okay.  So in this moment, though, her calm

4    command is ignored.  Another command is ignored.  He's

5    backing away.  Right?

6         A    Hm-hmm.

7         Q    So again, his hand, though, is violating her

8    order, it's down by his side.

9         A    Again, her order was I believe to keep his

10   hands out of your pocket.  I think she said, I said keep

11   your hands out of your pockets.  Out of your pocket.

12        Q    So again, just to be clear, it's your policy

13   that on a firearm call, if someone's reaching their

14   hands around their pocket, which we know something was

15   in in this case, that wouldn't concern you.

16        A    I'm sorry, I don't understand the question.

17        Q    Well, again, I'm not sure why this is that

18   much of a challenge from the video.  You have someone

19   that we already established, a gun is not secured on the

20   scene.  There might be one gun, there might be two guns.

21   We don't know this yet or Officer Guerriero doesn't know

22   this yet.

23             She asked the person to keep his hands from

24   his pockets, and as he's holding out a cellphone in

25   front of his body, he keeps his hands going around his

Page 171

1    left pocket.

2          So I'm just asking you, as an officer, would

3    that concern you?  You seem to indicate it wouldn't.

4          MR. NORTON:  I object to an inappropriate

5       characterization.  She never said keep your hands

6       away from your pocket.  You can't characterize

7       testimony inappropriately in questioning a witness.

8          MR. MORSE:  Okay.  Well, it's already in

9       evidence so the arbitrator can rely on the

10      testimony that's before him.

11         MR. NORTON:  Yeah, but I still have a right to

12      protect my client sitting there.

13         MR. MORSE:  That is the -- okay.

14         MR. NORTON:  I don't think he's actually my

15      client.

16         MR. MORSE:  No, but you feel that way so I get

17      it.

18         MR. NORTON:  Yeah.

19   BY MR. MORSE:

20      Q    So you've had training on both verbal and

21   nonverbal cues for assessing a threat?

22      A    I have.

23      Q    Okay.  And some of the nonverbal cues -- there

24   are nonverbal cues that are a tipoff that an attack may

25   be imminent.  Right?  Is that what you learn in the

Page 172

1    academy?

2         A    Yes.

3         Q    Okay.  Dropping or shifting shoulders?

4         A    Yes.

5         Q    Increased breathing, someone's getting very

6    excited as you're interacting with them?

7         A    Sure.

8         Q    Sometimes people stop moving all together and

9    give that you thousand-mile stare which could cause you

10   to have concern?

11        A    Yes.

12        Q    Red or flushed face?

13        A    Okay.

14        Q    Is that something you've learned?

15        A    It depends, it's something I might look at but

16   I'm more concerned about body language.

17        Q    Okay.  And again, well, that's what we're

18   talking about, nonverbal cues, as we go through.  And

19   I'm not asking specific to this, I'm just asking about

20   your training, that's all.

21        A    Okay.

22        Q    Expanding veins in the neck or forearm?

23        A    Sure.

24        Q    Grinding of the teeth pulsing the jaw?

25        A    Sure.

Page 173

1      Q     Rapid angry movements?

2      A     Yes.

3      Q     Blades his stance or changes stance?

4      A     Yes.

5      Q     Doesn't follow directions?

6      A     Yes.

7      Q     Would you agree with me that Mr. Gould doesn't

8    follow Officer Guerriero's directions?

9      A     Mr. Gould is clearly in a heightened state at

10   this point and it got even worse when she continued to

11   escalate versus assessing maybe this isn't the person

12   with the firearm.

13     Q     Okay.  So again, and again, you can qualify,

14   you're going to have a chance to be questioned again by

15   the City.  I'm just asking you if Mr. Gould is following

16   Officer Guerriero's directions initially.

17     A     He did not comply the first time by keeping

18   his hands out of his pocket.

19     Q     Okay.  And he changes his stance as she gets

20   out of the car and approaches?

21     A     Not from where I'm sitting.  He took a step

22   back because of her approaching him.

23     Q     Okay.  We'll go through it.  I think it's

24   easier.  We can go back to the beginning.  Pause right

25   there.

```
                                                    Page 174
```

1          So he's violating her order right there.

2    Right?

3          A    Run it back.

4          Q    Okay.  Sure.

5          A    So I can see the whole thing, start to finish.

6          Q    Sure.

7          A    Okay.

8          Q    So he violates her order by putting his hands

9    in his pocket.  Right?

10         A    Yes.

11         Q    Okay.  He's moving around as he's talking to

12   her?

13         A    He's reaching into his pocket.

14         Q    Okay.  Keep playing, please.

15              He just changed his stance?

16         A    Yeah, he stepped back.

17         Q    Okay.  That's a change of stance?

18         A    Yes.

19         Q    Okay.  His hands are moving around quite

20   rapidly?

21         A    His right hand.

22         Q    Okay.  He shifts his weight as he's moving

23   around?

24         A    He took a step back, Counselor.

25         Q    Puts his hand on his head at one point?

1          Let's go back to the beginning.

2      A     In the beginning?  I think his hand was on his

3   head.

4      Q     And he's actually, if you go back a few,

5   please, to where he puts the phone in his pocket.  Let's

6   just show what his left hand's doing there and right

7   when his left hand goes over.

8          So actually what we see, pause it, both of his

9   hands actually go to his pocket.  Correct?

10     A     Well, he's holding it.  Like I said, he was in

11  the pool.  So if he's pulling something out, he's

12  holding his pocket to keep it obviously from riding up.

13     Q     I'm just asking, his left hand goes to his

14  pocket?

15     A     It goes to his outside of his pants or outside

16  of the bathing suit, yes.

17     Q     Okay.  Is his right hand going in that pocket?

18     A     It appears to be going into that pocket, yes.

19     Q     Okay.  And the left hand goes across his body

20  to that pocket.

21     A     Again, Counselor, I don't know where his

22  pocket starts.  I'm not trying to split hairs with you.

23     Q     You are trying to split hairs.

24     A     He's holding the front of his bathing suit.

25     Q     Okay.

Page 176

1       A     Whether his pocket's there or not, he's

2    holding the front of his bathing suit.

3       Q     All my point is, he's told to get his hands

4    away from his pockets and both of his hands go to his

5    right pocket.

6            MR. NORTON:   Improper characterization of

7         testimony for the fourteenth time.

8            MR. MORSE:   Can you play it again from the

9         beginning, please?   And if we can just have this

10        into the record so I know it's in the record, but

11        for some reason, the first calm statement Officer

12        Guerriero states is not known by the City's lawyer.

13        So let's hear it again.

14           MR. NORTON:   Keep your hands out of your

15        pockets for me.

16           MR. MORSE:   Okay.   Yeah.

17           THE WITNESS:   Twice.

18    BY MR. MORSE:

19       Q     So, again, she calmly tells to keep his hands

20    out of his pockets.

21       A     So I did get it right, keep your hands out of

22    your pockets.

23       Q     Okay.   Well, there's more.

24       A     Okay.

25       Q     Again, please, I'm just trying to ask you

Page 177

1    questions about the incident.  You want to complete

2    everything before we get there.  I promise you we'll get

3    to the whole thing.  Nothing is being tricked here, it's

4    a video.

5            I'm just asking the obvious, simply, when his

6    hand goes in the pocket with his right hand, his left

7    hand also moves and goes across to the right pocket.

8    A    Yes.

9    Q    Okay.  Thank you.  That's all.

10           And by going in that pocket, he's immediately

11   defying her initial order.

12   A    Yes.

13   Q    Okay.  Now, if we could go forward with this.

14   You can just play it and then we'll go back.

15           When you arrived on-scene, Mr. Gould was being

16   noncompliant and belligerent as well.  Correct?

17   A    I believe he was -- now I have to remember.  I

18   believe he was in a seated position and there were words

19   going back and forth between him and Guerriero.

20   Q    Do you recall telling him to shut up?

21   A    I believe I told him to be quiet.  I don't

22   remember if I said shut up.

23   Q    You put your hand out?  You weren't near him.

24   A    When I was -- yeah.  When we were way on the

25   side, because he was yelling when I'm trying to talk to

Page 178

1    Officer Guerriero and find out what happened.

2         Q    And at some point, he goes into the police

3    car?

4         A    Yes.

5         Q    And he wouldn't give his name?

6         A    I don't remember how all that folded out

7    because I was still dealing with the entire scene.

8         Q    Now, you used the phrase that you said in the

9    beginning of this and you told IA that this phrase draw

10   down, whatever, caused you to think something was amiss

11   by the use of that phrase.  Correct?

12        A    Yes.

13        Q    However, you understood it to mean that she

14   had to pull her firearm.

15        A    Yes.

16        Q    So she wasn't lying to you, she was honest in

17   telling you what her action was by using that phrase,

18   draw down.

19        A    Yes.

20        Q    Okay.  And there's also an aspect, when an

21   officer draws their firearm, they don't draw it in a

22   relaxed way by mistake, they draw it with the intent

23   they may have to use it to defend themselves or others.

24   Correct?

25        A    Yes.

Page 179

1       Q    Generally speaking, firearms are not drawn by

2   accident by police officers, they're drawn with purpose.

3       A    Yes.

4       Q    Because there's a perceived threat.

5       A    Yes.

6       Q    And potentially, on a firearm call, that could

7   happen, that that threat could be real and the use of

8   threat and deadly force has to happen by an officer.

9       A    Okay.  I'm sorry.  I'm a little confused about

10   the question again, the way that you had said it.

11       Q    Sure.  No problem.

12            So on a firearm call, just speaking generally,

13   I'm not speaking about this case, when an officer

14   responds to a firearm call, if you respond to a firearm

15   call, there's a real chance, especially it's a firearm

16   call, that you may have to draw your firearm to defend

17   either yourself, other officers or civilians.

18       A    Yes.

19       Q    Okay.  And again, until every officer knows

20   that the firearm or firearms, if there's multiple, are

21   secured, that threat is always present.

22       A    Yes.

23       Q    You don't rely on, I'm sure it was taken care

24   of by somebody else.  That's not how officers work when

25   there are threats.

Page 180

1       A    Correct.

2       Q    Okay.  And there is a point that you explained

3    that Officer Guerriero walks away from you on scene when

4    you're trying to talk to her.

5       A    Yes.

6       Q    You agree, though, that was to show you where

7    Officer Valerio went and the other suspect, around the

8    pool?

9       A    No.

10      Q    Okay.  Before we get to that, because we just

11   passed him when he's on the ground, would you agree with

12   me that when Mr. Gould is on the ground, Officer

13   Guerriero says, let's take it down a notch?  Do you

14   recall that in the video?

15      A    After she had -- I'd have to go back and watch

16   the whole video again, but it was after her initial rant

17   towards him, then she tried to -- she made that

18   statement, let's take it down a notch.  But at that

19   point, she had already said what she had said to him and

20   he was continuing with what she had said.

21      Q    And just back to the pulling the firearm out,

22   I'm sorry, I didn't complete it.  That creates a

23   tremendous adrenaline rush in an officer, that you're

24   pulling your firearm and being faced with that choice.

25   Would you agree with that?

Page 181

1      A    Pulling my firearm?  I don't know if it

2  creates a huge adrenaline rush.  I think it's the scene

3  itself or the issue of the threat that might be towards

4  you that could create that fear.  I don't know if I

5  would call it an adrenaline rush.

6      Q    So when you're pulling your firearm -- and

7  you're making that decision.  Right?  Because now

8  there's a threat.  So you're going to make that decision

9  to pull your firearm.  You don't agree it increases your

10  adrenaline, it gives you a heightened state of tension?

11      A    I'm sure it does increase your adrenaline at

12  some point but not immediately as you're pulling your

13  firearm, it's that I'm just addressing whatever the

14  issue is that caused me to have to do that.

15      Q    And then it takes time for that adrenaline to

16  come down.

17      A    Yes.

18      Q    So she tells you, Mike's over there, right, as

19  she's walking towards that?  Would you agree with that?

20      A    Yeah.  I think I might have asked where's

21  Mike.

22      Q    But that's my point is she's walking away from

23  you and she's showing you where Mike is which is around

24  I guess this pool area.

25      A    No.  She just walked away from me.  She said,

Page 182

1   Mike's over there when I asked the question, but right

2   in the middle of the conversation, she just turned and

3   walked away from me for a minute.

4        Q    Okay.  And she's showing you where Mike is

5   but, okay, that was your view of it.

6        A    Counsel, she's not showing me where Mike is.

7   I'm sorry, please don't put words in my mouth.

8        Q    Oh, I'm not.

9        A    She said, Mike's over there based on a

10  question I asked.

11            In the middle of my conversation with her, I

12  just turned and walked away.

13       Q    Sergeant Glass, I wasn't talking about your

14  words, I was talking about the video.

15            MR. NORTON:  Counsel, you're argumentative.

16       You don't like the answers he's giving you, and I

17       don't blame you because it's disassembled your

18       case.  This has got to stop at some point.

19            MR. MORSE:  That is completely inappropriate.

20            MR. NORTON:  He said, that is your view of it.

21       I have a different one.

22            MR. MORSE:  I do.  I was pointing out the

23       video.  There's nothing wrong with that.  So you

24       can stop your antics of trying to, I don't know,

25       argue your case and let me ask my questions like we

Page 183

1      let you ask, that's all.
2           MR. NORTON:  Well, I ask them in an
3      appropriate way.  There's a difference.
4           MR. MORSE:  Okay.  Yeah, I get it.
5           THE WITNESS:  I'm sorry, Counselor, I didn't
6      hear that.
7  BY MR. MORSE:
8      Q    Didn't hear what?
9      A    What you just said under your breath.
10     Q    I didn't say anything under my breath.  I'm
11 going through my questions and looking at the next one
12 I'm going to ask you.
13     A    Thank you.
14     Q    And are you aware that initially this call
15 goes out as there's no firearm, right, it just goes out
16 as a disturbance?
17     A    I believe it went out as a disturbance, and
18 then subsequently, we learned there may be a firearm
19 involved.
20     Q    And then the dispatch goes out and another
21 firearm -- and then it gets updated with a call that
22 there's a firearm.
23     A    Again, because of the timeframe, I'd have to
24 go back and look at the actual notes to recall exactly
25 how it was dispatched out.

Page 184

1      Q    Oh, okay.  I'm sure we can do that.  The CAD

2   report.  Let's take a look at the CAD report.  And we'll

3   use the City's exhibits so there's no issue.

4           And this is also in the IA summary as well

5   with regard to this.  You can look at either one.  But

6   well go to the CAD report.  If you can go to our folder

7   and Exhibit 8 is the CAD report.

8      A    Exhibit 8.

9      Q    And again, my question is just simply, did

10  this initially go out without the firearm, then dispatch

11  updates it that there's a firearm at some point in the

12  call?

13     A    Yes.

14     Q    Okay.  And in fact, although we see Mr. Gould

15  and you characterized him as the victim, when the

16  initial 911 calls come in, there's multiple people

17  calling 911?

18     A    That I don't know.

19     Q    There's a Mr. Salvia that calls 911, the

20  person that was ultimately arrested?

21     A    Okay.

22     Q    Do you know that or you don't know that?

23     A    I don't know that.

24     Q    Okay.

25     A    That he called.  I don't remember hearing that

1    he called.

2         Q     If you could go to --

3         A     But if he did, he did.

4         Q     Let's go to Number 6 in the City's folder.

5               CHIEF PAPE:  That's the other book.

6    BY MR. MORSE:

7         Q     I'm sorry.  We have it in ours as well while

8    it's in front of you.  We have it as Number 3 in our

9    book, the investigative summary, but you can look at

10   either one.  Same thing.

11        A     Okay.

12        Q     And if you go to the first page of 36, do you

13   see there's 911 calls from Mr. Ryan Gould?

14        A     I do.

15        Q     And that's the person we've seen here today on

16   the screen mostly, right, when we watch the videos, as

17   far as the civilian?

18        A     Yes.

19        Q     And then we see 911 call from Mr. Bendetto

20   Salvia?

21        A     Yes.

22        Q     And that call was that Mr. Gould was harassing

23   Mr. Salvia's wife by the pool?  It's right in the same

24   part of the summary.  And these have been put into

25   evidence.

Page 186

1          A     Okay.  Yes.

2          Q     Okay.  And then we also see another call, 911

3     call on the second page for Ms. Anna Ivanova?

4          A     His wife.

5          Q     Yes.  And she also says Mr. Gould is harassing

6     her.

7          A     Okay.

8          Q     Would you agree with that from the recitation

9     in the investigative report?

10         A     Yes.

11         Q     Okay.  So when officers are responding,

12    especially Officer Guerriero, at least from the calls,

13    there's Mr. Gould is a defendant to two people, or

14    someone, a suspect who is harassing them, and then

15    Mr. Salvia and Ms. Salvia were harassing Mr. Gould so he

16    was a victim to them, at least in the 911 calls before

17    it's investigated?

18         A     Well, even his wife says, according to this

19    report that you referred me to, that she saw no weapons

20    during her involvement with Mr. Gould but that her

21    husband was currently armed.

22         Q     Okay.

23         A     But that the weapon was secured in a waistband

24    holster.

25               So to answer your question, yes, multiple 911

1    calls, but she's kind of articulating that it's her

2    husband that has the weapon, not Mr. Gould.

3        Q    Would you agree with me Mr. Salvia is not

4    calling to say he's a defendant, he's calling to say

5    he's being harassed by Mr. Gould, wanting the police to

6    respond to that?

7        A    Yeah, it says harassing in the pool.

8        Q    Okay.  And when you arrived on-scene, when

9    Sergeant Beath arrived on-scene, what was Officer

10   Guerriero's demeanor as she was speaking with you?

11       A    She was still very agitated, angry.

12       Q    And then at some point, she has to leave the

13   scene to go to the hospital.  Correct?

14       A    Yes.

15       Q    Okay.  And she was having what turned out to

16   be some type of coronary incident?

17       A    I don't know what happened.  It's under HIPAA.

18   I just know she was taken to the hospital.

19       Q    Okay.  Were you aware she was admitted for

20   three days?

21       A    I thought it was two days but, yes, I was

22   aware.

23       Q    Okay.  And how long after the incident that

24   she went to the hospital did you go there?

25       A    I didn't.

Page 188

1      Q     Okay.  You never went to visit her in the

2    hospital?

3      A     No.

4      Q     Okay.  And actually, you noticed her having

5    medical distress on-scene.

6      A     Yes.

7            MR. MORSE:  Okay.  Thank you, very much, for

8        your time, sir.

9    REDIRECT (SERGEANT MARC GLASS)

10   BY MR. NORTON:

11     Q     Just one question.  What kind of, if you

12   know -- I assume you've interacted for many years with

13   Officer Valerio?

14     A     I have.

15     Q     Tell the arbitrator what kind of an officer he

16   is in your opinion.

17     A     He is very methodical in his approach of how

18   he handles calls.  He's very smart.  He's forward

19   thinking.  He quickly can assess.  He knows how to talk

20   to people.  He's good at deescalating, you know,

21   incidents.  He's just a pleasure to work with, to be

22   honest.  He's very well-rounded.

23            MR. NORTON:  That's all I've got.

24            MR. MORSE:  That's fine.  Thank you.

25            THE ARBITRATOR:  Thank you, very much, for

Page 189

1        appearing.

2              THE WITNESS:  Thank you, sir.  It was very

3        nice meeting you.

4              MR. NORTON:  Can we take five?

5              (A recess was taken.)

6  AND THEREUPON,

7                    CHIEF DOMINICK PAPE

8  called as a witness herein, after having been first duly

9  sworn, was examined and testified as follows:

10             THE WITNESS:  Yes, I do.

11  DIRECT EXAMINATION

12  BY MR. NORTON:

13       Q    Would you please spell your name for this

14  court reporter, sir?

15       A    Yes.  First name Dominick, D-O-M-I-N-I-C-K,

16  last name Pape, P-A-P-E.

17       Q    And your current position is?

18       A    Chief of Palm Beach Gardens Police Department.

19       Q    All right.  And your previous position?

20       A    Assistant Chief of Palm Beach Gardens PD.

21       Q    And for how long were you assistant?

22       A    A little over five years.

23       Q    And do you have prior law enforcement

24  experience?

25       A    Yes, I do.  I have 25 years with the Florida

Page 190

1   Department of Law Enforcement and six years with the

2   Gainesville Police Department.

3        Q    All right.  Well, let's just talk about FDLE

4   for a minute.  When you were with FDLE, did you have

5   occasion to investigate law enforcement officers having

6   engaged in what was alleged to be misconduct?

7        A    Yes.

8        Q    And were you the assistant chief when the

9   issue arose with the grievant here?

10       A    Yes, I was.

11       Q    And did you get personally involved in this

12  case?

13       A    Yes.  I was second seat when Officer Guerriero

14  was interviewed by Sergeant Grossman.

15       Q    You sat through her entire interview with

16  internal affairs?

17       A    Yes, I did.

18       Q    And the prior chief, Shannon, you replaced

19  him?

20       A    Yes.  He retired.

21       Q    Okay.  And is he the one that assigned you to

22  open this investigation?

23       A    Yes, he did.

24       Q    And was the initial basis, if you want, for

25  opening this investigation a complaint by Mr. Gould

Page 191

1  related to the treatment he received by the grievant?

2        A    Yes.  That was part of it.

3        Q    Well, what's the first action you took when

4  being assigned it?

5        A    I assigned it to Major Ed Guillen and Sergeant

6  Todd Grossman.

7        Q    And that's the Major Guillen that testified

8  here today?

9        A    Absolutely, yes.

10       Q    Okay.  And Grossman, has he also retired?

11       A    Yes, he has.

12       Q    Okay.  Have you had an opportunity to review

13  every piece and portion of this IA investigation?

14       A    Yes, I have.

15       Q    Including all the videos?

16       A    Yes, I have.

17       Q    The audios that went with them?

18       A    Yes.

19       Q    The interview statements?

20            Did you agree with the recommendations that

21  were made for termination?

22       A    Yes, I do.

23       Q    And those recommendations were made, were they

24  not, by a Captain Garcia?

25       A    Yes.

Page 192

1       Q    And a Captain Anton --

2       A    Franks.

3       Q    Franks.

4       A    Yes.

5       Q    And how about Assistant Chief Bechtel?

6       A    Yes.

7       Q    And Major Guillen?

8       A    Yes.

9       Q    Okay.  So pretty much the hierarchy of the

10  department was involved in making this recommendation

11  and decision.

12      A    That is correct.

13      Q    When the department is considering a serious

14  disciplinary action, do you explore the individual's

15  prior disciplinary history?

16      A    Yes, we do.

17      Q    Okay.  And was that done in this case?

18      A    Yes, it was.

19      Q    And have you reviewed that disciplinary

20  history?

21      A    Yes, I have.

22      Q    And in so doing, did you find that the

23  grievant engaged in, at least certainly in one occasion

24  but in others, with behavior similar to that which she

25  was charged with here?

Page 193

1        A    Yes, I did.

2        Q    Did your analysis of the internal affairs

3    investigation as well as any secondary information you

4    may have gotten from court proceedings and so forth lead

5    you to any kind of a conclusion that the grievant was

6    exhibiting very disturbing behavior, losing control of

7    herself, having emotional breakdowns if you will?

8        A    Yes.

9        Q    And was there an incident in 2019 where the

10   grievant became very aggressive and utilized profanity

11   in making an arrest?

12       A    Yes, she did.

13       Q    And was the arrest itself within department

14   guidelines?

15       A    Yes, the arrest was within our guidelines, it

16   was the conduct that was not.

17       Q    Okay.  And if you'll look at the white book in

18   front of you.  You want a number?  How about seven.  Is

19   this the incident you were referring to in your

20   testimony?

21       A    Yes.

22       Q    And if you look down there at the third

23   paragraph, it says:  Officer Guerriero used profanity in

24   addressing the subject.

25       A    Yes.

Page 194

1      Q     And that her response to resistance was

2   reviewed and deemed appropriate there.

3      A     That is correct.

4      Q     And then it continues on:   However, it was

5   determined that her demeanor and verbal response to the

6   subject's belligerence were inappropriate in violation

7   of rules and regulations.

8      A     That is correct.

9      Q     And if you go -- and she got a written

10  reprimand.  It's on the next page.

11     A     Yes, she did.

12     Q     Go to the third page, please.  Was there a

13  recommendation there, in looking at the bottom of that

14  sheet, that Officer Guerriero reacquaint herself with

15  the department's core values of respect, accountability

16  and professionalism?

17     A     Yes.

18     Q     Subsequent to this write-up, did she adhere to

19  those three principles?

20     A     Absolutely not.

21     Q     Okay.  Within approximately -- oh, by the way,

22  in that prior interaction you just testified to, was it

23  also stated in there that she was instigative in her

24  dealings with the subject?

25     A     Yes.

Page 195

1       Q    And is that the opposite of deescalation?

2       A    Absolutely.

3       Q    Okay.  Within six months of this incident, did

4    the grievant once again engage in inappropriate

5    behavior?

6       A    Yes.

7       Q    And did she, and we're going to go back to

8    Exhibit 8, utilize the secure databases of the

9    department to spy on or track or stalk, I don't know the

10   term to be used, two individuals she believed to be

11   associated with her estranged ex-wife?

12      A    Yes.

13      Q    And was that ex-wife also a law enforcement

14   officer at another department?

15      A    Yes.  She was at Delray Police Department, I

16   believe was the department at the time.

17      Q    Okay.  And this particular case resulted in a

18   two-day suspension.

19      A    Two-day suspension, yes.

20      Q    Okay.  And if you'll turn a couple of pages

21   over, you reported that to FDLE of course.

22      A    We had to, yes.

23      Q    By law, you have to.

24      A    By law.  Yep.

25      Q    And what did FDLE do with that information?

Page 196

1      A     They had a hearing.  We of course did not

2   attend that hearing, so.

3            But they did issue a final response which

4   ended up being a 30-day prospective suspension.

5      Q     And Rick King who's sitting in here

6   represented her according to this order.  Correct?  Look

7   at the first page of final order.

8      A     Yes.

9      Q     Okay.  And now she's been suspended for 30

10  days by FDLE.  Right?

11     A     Correct.

12     Q     Did you have any obligation whatsoever to

13  employ her during those 30 days when she could not

14  perform as a law enforcement officer?

15     A     Absolutely not.

16     Q     And what did you do?

17     A     We made modified duty for her so she was able

18  to keep her full pay.

19     Q     All right.  And if you turn to the second

20  page, under conclusions of law from the Florida

21  Department of Law Enforcement, do you see down there

22  number three at the bottom?

23     A     Yes.

24     Q     They require her to have ethics training prior

25  to the probationary period ending.

Page 197

1        A     Yes, it does.  It does state that.

2        Q     Now, during this period of time that we're

3    talking about right here, did she also, and it's Number

4    9, I don't have a lot to ask you about it, leave an

5    authorized department weapon in her car along with a

6    magazine with police rounds in it?

7        A     Yes.  And it was an AR-15 rifle.  Not just a

8    small handgun, a major weapon.

9        Q     And fortunately the weapon itself was not

10   stolen.  Right?

11       A     No.  They couldn't get it out of the locking

12   mechanism.

13       Q     But they got the --

14       A     Magazine.

15       Q     -- magazine with police rounds.  Okay.

16             Now, let's go back to, not in terms of your

17   book but in terms of your testimony, to when she

18   utilized the agency's sensitive database to spy on these

19   individuals or do whatever terminology, I can't think of

20   a better one, but in addition to the FDLE 30-day

21   suspension, did she also end up arrested and charged

22   with stalking and end up having a temporary restraining

23   order put on her?

24       A     Yes.  Absolutely.

25       Q     And did that result in an additional extensive

Page 198

1    modified duty for her?

2         A    Yes.  We could have put her on leave without

3    pay but we chose to leave her on pay.

4         Q    So she stays out, not out, but she does

5    modified duty for an additional two months?

6         A    I think it's pretty close.

7         Q    Okay.  And if you look at this --

8         A    What exhibit are we on?

9         Q    10.  I gotta start sharing these with you if

10   you're going to testify.

11            If you go into 10, look at right here in this

12   first page, in that second paragraph, this is a probable

13   cause affidavit which means it was sworn to by a law

14   enforcement officer to be truthful and accurate to the

15   best of his or her knowledge.  Right?

16        A    That is correct.

17        Q    And it says there at the third paragraph,

18   Nicole stated, that's the complainant, that Bethany,

19   that's the grievant's, behavior had become obsessive?

20        A    That's correct.

21        Q    And go to the next page.  Second paragraph.

22   Third paragraph, I think.  This individual has found

23   that there were initially 449 text messages from the

24   grievant to the complainant here.  Correct?

25        A    349.

Page 199

1      Q    What did I say?

2      A    I think you said 449.

3      Q    Okay.

4      A    349.

5      Q    349 is what it says for sure.

6      A    Okay.

7      Q    And if you drop into the next paragraph, it's

8   stated in there that Bethany could be guilty of

9   emotional outbursts.  Is that correct?

10     A    Yes.  Topics that trigger Bethany's emotional

11   outbursts, yes.

12     Q    And then the next paragraph after that,

13   Bethany had become enraged.  Is that correct?

14     A    Hang on.

15     Q    It is the last paragraph on that second page.

16     A    The last paragraph.  Okay.

17     Q    Second line.

18     A    Yes.  While her child was in the presence of

19   Bethany.

20     Q    And in the next line, it was confirmed that

21   Bethany had emotional tantrums in the past, some of

22   these tantrums are documented with text messages?

23     A    Yes.

24     Q    Now, if you'll go to the next page, in the

25   last little paragraph down there, supplemental

1   documentation was provided that she sent 850 text

2   messages.

3        A    That's correct.

4        Q    In the last page, if you look at the paragraph

5   second from the bottom, is that a temporary stalking

6   injunction order was signed by Judge Burton.

7        A    That is correct.

8        Q    Now, in this particular case, the IA summaries

9   were I guess sent to the chief via, I'm looking at

10  Javier Garcia.

11       A    Okay.  Got it.  Number 11.

12       Q    Yes.  I'm sorry, it's Number 11.

13       A    Got it.

14       Q    And the allegations were sustained here.

15  Correct?

16       A    That is correct.

17       Q    And the recommendation here is for

18  termination.

19       A    That is correct.

20       Q    From Mr. Garcia.

21       A    Yes.

22       Q    And look at that recommendation.  It's

23  basically, I don't want you to have to read the whole

24  thing, but that she was basically in violation of the

25  department's core responsibility which we talked about

1   earlier, respect, accountability, professionalism.

2        A     Right.

3        Q     She misrepresented the facts.  You believe

4   that?

5        A     Correct.  Yep.

6        Q     Was she untruthful at the scene to her two

7   sergeants?

8        A     The best that we can tell, yes.

9        Q     And that she eroded trust in the department,

10  in the community.

11       A     Absolutely.

12       Q     And did that erosion of trust and her behavior

13  as it became public, which Mr. Gould himself was

14  involved in, I believe, would you agree with that?

15       A     Yes.  Absolutely.

16       Q     Okay.  And if you go to Exhibit Number 12.

17  Did you ask Candice or Candice Temple, the public media

18  relations director for this city, to give you some

19  samples of what the City endured as a result of her

20  behavior?

21       A     Yes, I did.

22       Q     And when you look down here, and it talks

23  about 257,000 views, 291,000 views, one million two,

24  2 million, one million two, all of these, the

25  individuals at least went on the website.

Page 202

1      A     Correct.

2      Q     And were there newspaper articles and all

3   sorts of other negative publicity for the City?

4      A     Yes.  Text messages, just phone calls to our

5   communications center, phone calls to our administrative

6   staff, vulgar, nasty, hateful comments.

7      Q     Yeah, were there comments in there that the

8   chief needed to be fired?  And of course the grievant

9   needed to be fired?

10      A     Right.

11      Q     Okay.  If you go to Exhibit 13.  Now, has

12   Mr. Gould now sued the grievant?

13      A     Yes.  Yes, he has.

14      Q     In federal court?

15      A     Yes, he has.

16      Q     Okay.  And has the City's insurance carrier

17   analyzed that complaint?

18      A     Yes, they have.

19      Q     Okay.  And if you'll turn to number 14.  And

20   if you go in there to the fourth page in.  Look up at

21   the top left, it says four of five.

22      A     Okay.

23      Q     And basically they denied even providing a

24   defense with a reservation of rights finally.  Right?

25      A     That is correct.

1     Q    And if you look down there, the basis for

2   doing that is:  An act or omission of a member committed

3   while acting outside the course and scope of his

4   employment, committed in bad faith with malicious

5   purpose or in a manner exhibiting a wanton and willful

6   disregard of human rights, safety or property.

7     A    That is correct.

8     Q    And that was the basis that your insurance

9   company, the City's insurance company, declined to

10  defend.

11    A    That's correct.

12    Q    Do you have any doubt that the grievant should

13  not be employed by the department?

14    A    No doubt whatsoever.

15        MR. NORTON:  That's all I have.

16  CROSS (CHIEF DOMINICK PAPE)

17  BY MR. KING:

18    Q    I only have a few questions for you, Chief.

19    A    Okay.

20        MR. NORTON:  That's not possible.

21        MR. KING:  I'm telling you, just a few.

22        MR. NORTON:  I know you too well, Rick.

23  BY MR. KING:

24    Q    You could use their book and let's go to tab

25  number six.

Page 204

```
 1        A    All right.

 2        Q    You can go to the second page.

 3        A    Okay.

 4        Q    This is the verification from internal

 5   affairs.

 6        A    Okay.

 7        Q    And you see the place where Sergeant Grossman

 8   signed it and he says, I, the undersigned, do hereby

 9   swear that under the penalty of perjury, that part?

10        A    Yes.

11        Q    And that would be compliant with part two of

12   the Police Officers' Bill of Rights, 112, section 533.

13   Correct?

14            MR. NORTON:  I object unless he's certified as

15        an authority on what sections of that law apply to

16        what.

17   BY MR. KING:

18        Q    No problem.  No problem at all.  Standby.

19            Are you familiar with the Police Officers'

20   Bill of Rights, sir?

21        A    Yes, I am.

22        Q    And under Section 112.533, and that's the

23   section about the verification --

24        A    Can I see the statute?

25        Q    Yes, you can.  I'm going to have to show it to
```

Page 205

1  you in here, sir, because we forgot to print it out.

2  And I apologize.  We'll put it up on the screen for you.

3             THE ARBITRATOR:  Thank you.

4             MR. KING:  Much like Sergeant Glass, I'm going

5         to have to walk closer to that screen as well

6         because I had two corneal transplants.  We can both

7         walk up there if you want to.

8             MR. NORTON:  If this is just a legal argument,

9         Rick, why can't we stay with ours is in writing and

10        the statute is in writing.

11  BY MR. KING:

12    Q    All right.  So 112.533, and this talks about

13  the processing of complaints.  Correct?

14    A    Yes.

15    Q    And this says that you have to develop a

16  procedure for doing it.

17    A    It does.

18    Q    And at the time the report is completed, you

19  have to verify it pursuant to 92.525, that the report is

20  true and accurate based on the person's personal

21  knowledge, information and belief.

22    A    Correct.

23    Q    Leave that up there just for a second.

24            And then just stepping one step forward, the

25  second part says you also have to include the following

Page 206

1    statement, sworn to and subscribed.  It says:  I, the

2    undersigned, swear that under penalty of perjury, to the

3    best of my knowledge, information and belief, that I

4    have not knowingly and willfully deprived, that whole

5    part.  Right?

6        A    Yeah.

7        Q    So that's there.  Correct?

8        A    Correct.

9        Q    But that first part is missing, isn't it,

10   where he swears it's true and accurate based on a

11   person's personal knowledge, information or belief,

12   that's not there, is it?

13           MR. NORTON:  I object.  The document speaks

14       for itself, sir.  It's either here or it isn't.

15   BY MR. KING:

16       Q    He can see it.  It's not there.  Correct?

17       A    I don't see it on this page.

18       Q    Perfect.  That's all.

19           All right.  So Mr. Norton asked you about your

20   decision to terminate Officer Guerriero.  And the

21   contract and I think your policies also talk about

22   progressive discipline.  Yes?

23       A    And it also talks about totality of

24   circumstances.

25       Q    Absolutely.  But they talk about progressive

1  discipline.  Correct?

2       A    That's correct.

3       Q    And it talks about when you make the decision

4  to terminate, you're saying that she can't possibly work

5  here ever again.  Correct?

6       A    That's correct.

7       Q    And so you're taking her time on the job into

8  consideration?

9       A    Absolutely.

10      Q    You're taking her evaluations into

11 consideration?

12      A    Yes, we are.

13      Q    And you're taking all of the accolades that

14 she received over the years into consideration?

15      A    Yes.  And also the bad issues that she had

16 since 2019.

17      Q    I'm getting to that.

18      A    Okay.

19      Q    And you take the discipline into

20 consideration.  Right?

21      A    Absolutely.

22      Q    All right.  And let's talk about her

23 discipline just for a minute.  All right?

24      A    Okay.  Which, can you point me to a section?

25      Q    Let's use this book because he had it out and

1  that's easier.  This first one here, this is, I think

2  it's number seven, tab number seven.  And this is the

3  response to resistance and conduct.  Right?

4      A     Hang on.  Yep.

5      Q     And I think that under Mr. Norton, you agreed

6  that this was a -- she had a violent encounter with

7  someone who was acting belligerent and out of control.

8  Right?

9      A     Yes.

10     Q     And it was a violent arrest?

11     A     I don't know if it was a violent arrest.

12     Q     She ended up fighting with him.

13     A     Yes.

14     Q     And she had to tase him.

15     A     Yes.

16     Q     And when it was over, what we sustained was

17  that she used bad language during this arrest.  Correct?

18     A     That's correct.

19     Q     All right.  That was in September of 2019.

20  Correct?

21     A     2019, correct.

22     Q     So nearly four years ago.

23     A     Yeah.

24     Q     Almost five years ago.  Well, almost five.

25         So next, we go to this tab number eight --

Page 209

1      A     Okay.

2      Q     -- which is the DAVID allegation.  And while

3  this was investigated in 2020, it actually occurred in

4  2017, didn't it?

5      A     That's correct.

6      Q     So you got a complaint, you went back three

7  years at that time, and three years prior to your

8  investigation, nearly almost eight years from today, she

9  went into DAVID and she looked up the names of three

10 people in the system.  Correct?

11     A     Yes.

12     Q     And what DAVID is, for the arbitrator's

13 purpose, DAVID is the driver's license picture thing.

14 Correct?

15     A     That's correct.

16     Q     So what she did was she looked up the pictures

17 of three people that were involved in some relationship

18 that she had.  Correct?

19     A     Right.

20     Q     And there was no evidence that she

21 disseminated the information.

22     A     Well, we don't know that.

23     Q     But there's no evidence of that.

24     A     The violation is going into the law

25 enforcement secured system.

Page 210

1      Q    I understand that.  I'm asking you, there's no

2    evidence that she disseminated the information.

3      A    Well, I have no idea whether or not she has.

4      Q    Right.  There's no evidence of that.  Right?

5      A    I don't know what she did with it.

6      Q    Okay.  All right.  But if there was evidence

7    that she disseminated it, that would be in this

8    investigation, though, wouldn't it?

9      A    Well, if we could find it.

10     Q    Because it's a crime to disseminate it, isn't

11   it?

12     A    Yes.

13     Q    And so if she disseminated and she committed a

14   crime, you would probably put it in the report.  Right?

15     A    Well, we don't know what she did with it.

16     Q    I get that.  I'm asking you, if you had

17   evidence that she disseminated it, it would be a crime.

18   Correct?

19     A    Yes.

20     Q    And as a police agency, you document crime.

21   Right?

22     A    That's correct.

23     Q    And if you document it in the reports, you

24   want to be thorough in your reports.  Correct?

25     A    That's correct.

Page 211

1       Q    Because you want to have all the information

2   in the report.  Isn't that right?

3       A    That's true.

4       Q    And you want to be accurate.  Right?

5       A    Yes.

6       Q    Because you want the report to reflect what

7   accurately happened at that time.  Right?

8       A    Right.

9       Q    And you want to be truthful.

10      A    That's true.

11      Q    Because those are the things that we learn in

12  the police academy.  Right?

13      A    Okay.

14      Q    And in this case, in this accurate, thorough,

15  truthful report, is there any mention that she

16  disseminated the information?

17      A    We have no earthly idea what she did with the

18  information.

19           MR. NORTON:  He's repeatedly testified he

20      doesn't know.

21  BY MR. KING:

22      Q    Not that you know.  It's not in this report.

23      A    I don't know what happened.

24      Q    Well, take a look at the report.

25      A    I am looking at the report.

Page 212

1      Q    Do you see it in there?

2      A    No.

3      Q    So it's not in the report.

4      A    No.  It didn't mean it didn't happen.  We

5   don't know what she did with the information.

6      Q    But the whole question is, it's not in the

7   report.

8      A    Okay.

9      Q    And if it happened, because you do accurate,

10  thorough and truthful reports, it likely would be in

11  there.  Right?

12     A    Right.

13     Q    That's what I thought.  Okay.

14          All right.  The next one is back in 2022,

15  someone broke into her car.  Right?

16     A    That's correct.

17     Q    And the weapon that she had in there, the

18  AR-15, was locked in the mechanism with which you give

19  the cars to lock them in there.  Correct?

20     A    That is true.

21     Q    So the violation was she was supposed to take

22  out -- she's supposed to take out weapons, ballistic

23  helmets and ammunition, and she didn't take those things

24  out.

25     A    That's correct.

Page 213

1      Q     And so somebody stole the magazine.

2      A     Right.

3      Q     But not the rifle.

4      A     They couldn't got it.

5      Q     Because it was locked in that thing you put in

6   there.

7            And for that, I guess she got a written

8   reprimand?  Or maybe she didn't get discipline at

9   all.

10     A     No, she didn't.

11     Q     What did she get?

12     A     No.  She secured a weapon per department

13  policy.  Verbal counseling.

14     Q     Verbal counseling for that.  So she's had

15  verbal counseling, a two-day suspension and a written

16  warning for her discipline in 20 years.

17     A     Yes.

18           MR. KING:  Okay.  That's it.  Thank you.

19  REDIRECT (CHIEF DOMINICK PAPE)

20  BY MR. NORTON:

21     Q     Just a couple things.

22           You testified that the DAVID system provides

23  you with driver license information, photographic

24  information.  It provides with you a lot more

25  information than that, does it not?

Page 214

1     A     Yeah.  There's a whole series of stuff that

2    can be run through it.

3     Q     And shortly after this, or maybe

4    contemporaneous with it, she got charged with stalking,

5    and in that stalking, charged with having disseminated

6    all kinds of information.  I'm not suggesting that she

7    got it from DAVID but the stalking charge in part, for

8    which there was a temporary injunction put in by a

9    circuit judge here, was --

10    A     There's all sorts of texts.  Yep.

11    Q     And Mr. King asked you about the internal

12   affairs investigation that was done and whether or not

13   Grossman signed it, and it contained some provisions in

14   the law.  Right?

15    A     Yes.

16    Q     Is that the exact same IA procedure that has

17   been utilized to the PBA's knowledge for as long as you

18   can remember?

19    A     For as long as I've been here, yes.

20    Q     And was it even in a case in the last two --

21   the last month maybe, in this room, a similar procedure

22   used to investigate in an IA?

23    A     I was not in the room but I was advised that

24   it was brought up at that time.

25             MR. NORTON:  That's all I have.

Page 215

1          MR. KING:  Yeah, he brought it up.  All right.

2     That's it.

3          THE ARBITRATOR:  Any further questions?

4          MR. KING:  No, I'm good.

5          THE ARBITRATOR:  Okay.  Thank you, very much.

6          THE WITNESS:  Okay.  Thank you, sir.

7          MR. NORTON:  Let's take about ten minutes.

8     I'm 90 percent sure I'm going to close.

9          THE ARBITRATOR:  Okay.  Very good.

10          MR. NORTON:  But I like to run things past my

11     folks.

12          (A recess was taken.)

13          MR. NORTON:  On the record.  We rest.

14          THE ARBITRATOR:  All right.

15          MR. KING:  All right.  We call the grievant,

16     Bethany Guerriero.

17          THE ARBITRATOR:  All right.  Have you back

18     over here.  Okay?

19          MR. MORSE:  A lot of musical chairs in this

20     conference room set-up.

21  AND THEREUPON,

22                    BETHANY GUERRIERO

23  called as a witness herein, after having been first duly

24  sworn, was examined and testified as follows:

25          THE WITNESS:  Yes, sir.

Page 216

1    DIRECT EXAMINATION

2    BY MR. KING:

3         Q    Please state your name for the record and

4    spell your last name.

5         A    Bethany Guerriero, G-U-E-R-R-I-E-R-O.

6         Q    All right.  And Officer Guerriero, can you

7    just take the arbitrator back through your history with

8    the Palm Beach Gardens Police Department.

9              Before that, is this your first police job?

10        A    Yes.

11        Q    Okay.  So take the arbitrator back from the

12   beginning of your police career and the positions that

13   you've held and the assignments that you've had, special

14   assignments.

15        A    Okay.  So I was sponsored through the police

16   academy January of 2004.  Come June of 2004, I was

17   starting here at the agency as a trainee.  Within a

18   couple years of being here, I think by year three, I was

19   lateral transferred to a field training officer.

20        Q    Stop right there.  What is a field training

21   officer?

22        A    A field training officer is somebody who takes

23   brand new police officers when they start and puts them

24   through a training process.

25        Q    And that training process teaches them what?

1      A    Everything.  Policies, procedures, geography,

2    you know, how to respond to calls, the types of calls

3    that we have and, you know, we basically put them

4    through four levels of training for the course of

5    several months before they are released for a

6    probationary period.

7      Q    Okay.  And then go from there, what did you do

8    next?

9      A    After FTO, I went to our tactical or crime

10   unit.  Back then, we did a lot of, you know, like

11   narcotics work and whatnot, but I spent almost four

12   years doing that.

13     Q    Okay.

14     A    I had gone back to the road, reinstated as a

15   field training officer.  From there, after being back on

16   the road a couple years, an opening presented itself in

17   our community involvement unit so I had gone there for a

18   few years.

19          I was in charge of our Explorer which are the

20   young men and women that look forward to possibly having

21   law enforcement careers.  And I also ran our juvenile

22   first offender program back then.

23          In 2012, I left CIU and I came back to the

24   road, reinstated again as an FTO.  And I had been on

25   that day shift road patrol since 2012 until 2023.

Page 218

1      Q    Okay.  Did you have any other specialized

2   assignments or units that you were part of?

3      A    Yes.  For 17 of almost 20 years that I have

4   been here, I was a crisis negotiator, hostage

5   negotiator.  So I was one of the senior members on that

6   team.  I previously spent some time on the S.W.A.T. team

7   here.  I was a CPR instructor.

8      Q    Let me just stop you real quick.  Let's talk

9   about the S.W.A.T. team for a second.

10      A    Yes.

11      Q    At the S.W.A.T. team, were you given

12   specialized instructions with firearms and tactical --

13   well, let me ask you, what kind of training did you

14   have?

15      A    I would consider it to be an advanced tactical

16   training.  I went through two different types of

17   trainings, one way was on tactical entry and then I went

18   through a week's worth of sniper training.  So at the

19   time, I was certified for both.

20      Q    Okay.  And during your last, the last 20

21   years, 19 or so, almost 20 years with the Palm Beach

22   Gardens Police Department, tell the arbitrator about

23   your evaluations.

24      A    I've always had outstanding evaluations.  I

25   always considered myself to be a team player.  I was

Page 219

1   always prided on being a team player.  I was looked at

2   as a leader and mentor amongst, you know, not only other

3   officers but supervisors that I worked with.

4           I was often sought after.  I didn't go too

5   long where, you know, different sergeants would be like,

6   come work for me or, you know, so I really considered

7   myself and prided myself on being a team player here.

8       Q    You got a couple of awards.

9       A    I did.

10      Q    What were those for?

11      A    I've gotten several life saving awards over

12  the years.

13      Q    Tell the arbitrator about the one where the

14  woman was trapped in the car.

15      A    I had a couple.

16      Q    Okay.  Tell me about one of them.

17      A    Several, several years ago, I had a woman that

18  had been huffing keyboard cleaner and she drove her

19  vehicle into a canal.  And she was sinking.  And I

20  dropped my belt, gave it to another officer, and I was

21  able to break the window and get her out of the car.

22          Several years after that, at Lake Catherine,

23  there was a woman who was unfortunately under the

24  influence and what we deemed possibly suicidal and had

25  crawled herself into a storm drain.

Page 220

1          And with the hecticness of the scene, of

2     course you have us, you have the fire department there,

3     media's starting to show up, and for her being under the

4     influence, you know, it was scaring her and forcing her

5     further into the drain.

6          I was able to get into the water and get

7     halfway into the drain and I was able to drag her out to

8     get her the help that she needed that day.

9          Q    All right.  So there's been a lot of

10     conversation here today about your three -- in the 20

11     years you were here, the three disciplinary cases you

12     had over 20 years.

13          A    Yes.

14          Q    Let's start with the mall case.

15          A    Okay.

16          Q    Tell the arbitrator, what happened there?

17          A    So oddly enough, I was asked to cover the mall

18     briefly, like we try very hard to keep an officer all

19     the time at the mall just because it's a very large

20     populated area in our city.  And, you know, it's not

21     something we take lightly when it comes to civilian

22     safety so we always make sure we have an officer

23     stationed there.  Another officer was going on a meal

24     break, I just happened to be taking that spot

25     temporarily.

1          And while I was there, a call went out for a

2     disturbance.  There was a male that was intoxicated and

3     he had wandered from the Park Avenue Restaurant at the

4     time right across the way to a nail salon and was just

5     going in there, wreaking havoc, you know, disturbing

6     customers, threatening them, which prompted a phone call

7     to the police.

8          So I was extremely close by, I responded.  He

9     was being extremely belligerent with me and I wanted to

10    just remove him from the situation and all the attention

11    that was now starting to draw from inside the mall to

12    outside the mall.  And I realized he was very unsteady

13    on his feet, I could smell the alcohol.  There was a

14    bench and I directed him to have a seat at the bench.

15         Well, he was not wanting to listen.  We

16    gathered, in a very short amount of time, that his mom

17    and grandma were somewhere wandering around the mall.

18    So we were trying to make arrangements to get his phone

19    to call the mom and the grandma, just come get him, get

20    him out of here, that's it.  That's all we want.  You

21    know, leave.  We don't want to complicate things.

22         And he kept standing up, being unsteady.  I

23    was afraid this guy was either going to crack his head

24    or whatever.  So like after the third time of me telling

25    him, hey, just have a seat, I was waiting for a back-up

Page 222

1    officer to get there, he got up and he shoved me.

2          And at that point, my back-up officer came,

3    she saw it.  And when she went to grab his arm to, you

4    know, handcuff him, he turned around, swung on her and

5    ripped her radio off and shoved her, which prompted me

6    tasing him.

7          While in the process of him being tased, the

8    first deployment, although both probes landed, he was

9    still very belligerent and was reaching for the probes

10   to rip them out.

11         And I instructed him again, you're going to

12   get tased again, and I did.  He got tased for the second

13   time, fell back on the bench.

14         And at the same time that that had happened, I

15   guess his mom or grandma were coming out, I didn't know

16   who they were, and they're approaching me while I'm

17   trying to maintain control and, yeah, I, you know, I

18   said words I probably shouldn't have said in that heat

19   of that moment.

20       Q    Okay.

21       A    Taking that man into custody.

22       Q    All right.  Let's talk about the DAVID case.

23       A    Okay.

24       Q    All right.  So back in 2017 --

25       A    Hm-hmm.

1      Q     -- nearly eight years ago, what was going on?

2      A     Unfortunately, I was in the middle of a very

3    contentious divorce.  My now ex-wife is a lieutenant at

4    the Delray Beach Police Department.  We had, just six

5    weeks prior to this initiation of the divorce, adopted a

6    child out of the system.

7            So emotionally, there was a lot going on, you

8    know, for me at that time because my ex-wife had

9    instructed me and my daughter, who was just adopted six

10   weeks prior, to leave the home.  And I was sleeping on

11   the couch of a friend for several months with my

12   daughter until a place had opened up for us to reside,

13   so.

14     Q     So they mentioned during the course of this,

15   and we're going to go back to what happens with the

16   incident itself, but Mr. Norton has made a point to

17   mention 300 text messages, 800 text messages.  Tell me

18   what's going on.

19     A     So what happened with the text messages were

20   because -- and it was over the course of a

21   two-and-a-half year period.  It wasn't in like a couple

22   days or whatever, this was over the course of two and a

23   half years.

24     Q     So just so we're clear, so over two and a half

25   years, you had messages back and forth.

Page 224

1        A     Yes, her and I back and forth.

2        Q     This wasn't 850 isolated text messages, these

3   were conversations.

4        A     These were conversations.  Correct.

5        Q     And sometimes conversation, there might be 50

6   texts back and forth.

7        A     Absolutely.

8              And because we were both police officers, it's

9   not always very easy to have to keep taking phone calls.

10  And the nature of my relationship with her from the very

11  beginning was we always texted.  Like it's just the way

12  we communicated.

13       Q     All right.  So as a result of -- well, first

14  of all, when you were confronted with the knowledge that

15  they had done this investigation and they alleged that

16  you had looked at DAVID, did you deny it?

17       A     No.

18       Q     Did you admit it right away?

19       A     I did.

20       Q     And offer an explanation as to what was going

21  on?

22       A     Yeah.  Hm-hmm.

23       Q     And the agency gave you a two-day suspension.

24       A     They did, yes.

25       Q     All right.  So Mr. Norton says, oh, my gosh,

Page 225

1   it sounds so looming and dramatic.  You were charged

2   with stalking.

3        A    Yes.

4        Q    What happened with that charge?

5        A    It was dismissed right away.

6        Q    What about the temporary restraining order?

7        A    It was dismissed very quickly.

8        Q    And was it dismissed in part because of

9   something about your ex-wife?

10       A    Yes.

11       Q    Tell me, why were they dismissed?

12       A    Well, she was also put under an IA

13  investigation.  She was overseeing the IA department

14  herself at the time that this had all happened to me.

15            And I had discovered that there were some very

16  unfavorable people being brought around my daughter when

17  I wasn't there.

18            And when I had confronted her about that, I

19  actually had tried to get a restraining order down at

20  South County from one of the parties that I knew was not

21  a good person at all.  And I was denied that.

22            And she got wind that I had tried to get a

23  restraining order for this particular person to stay

24  away from my child.

25            And the minute that that happened, like within

Page 226

1    maybe a week or two, I'm being served a restraining

2    order.  And then five days after that restraining order,

3    a warrant had been issued for my arrest for stalking.

4    And I was -- I was completely taken aback by that.

5           Apparently, like there was an investigation

6    going on where I was a subject of that where I was never

7    once contacted by the Delray Beach Police Department.  I

8    didn't even know that I was a subject of anything.  No

9    one had ever come to talk to me about it, it was just,

10   came out of nowhere.

11   Q    Ultimately were there allegations sustained

12   against her?

13   A    Yes.

14   Q    What were they?

15   A    She was sustained on six counts of perjury.

16   It was proven that she had fabricated, her and the

17   detective that wrote the PC fabricated and cherry picked

18   text messages to create conversations that didn't exist.

19   And because there were so many text messages over the

20   course of two and a half years, this made it very easy

21   for her to do so.

22          It was also uncovered that Nicole Guerriero

23   falsely created a domestic partnership affidavit through

24   the clerk of court advising that one of the men in

25   question that I did not want my daughter around was

Page 227

1    supposedly living with her and that was not -- an

2    investigation revealed that that was not the case.  They

3    actually colluded with one another to put him on her

4    medical benefits at work which prompted an investigation

5    for medical insurance fraud.

6        Q    Okay.  All right.  So ultimately -- I had

7    another question, I'm sorry.  Did you disseminate the

8    information about the DAVID information?

9        A    No.

10       Q    Were you arrested for that?

11       A    No.

12       Q    Were you charged with that?

13       A    No.

14       Q    Okay.  So the conduct for which you were

15   disciplined was you accessed DAVID to look at the

16   pictures of these people.

17       A    Yes.

18       Q    All right.

19       A    I'd also like to add, and I can't really

20   expand much on it because there still is an active case

21   going on with Delray in reference to a phone dump, but I

22   did have to sign an NDA because the City of Delray Beach

23   was sued for false arrest and false report and a couple

24   of other civil rights violations to which I won, so.

25       Q    Okay.  Let's talk about the final disciplinary

Page 228

1    action.  Someone broke into your car.

2         A    Hm-hmm.  Yeah, I was one of like 15 cars in my

3    neighborhood that night unfortunately that got broken

4    into.

5         Q    All right.  So now we've gone through that and

6    we've talked about your discipline.  All your

7    evaluations in the last 20 -- I'm sorry -- 18 plus years

8    were 34 and above outstanding.  Right?

9         A    Hm-hmm.

10        Q    Let's talk about the event that we're here

11   for.

12        A    Okay.

13        Q    All right.  When you got the call, what did

14   you know?

15        A    I knew that there was a disturbance at the

16   pool at Sabal Ridge and that there was a firearm

17   involved.

18        Q    Okay.  And were you the primary or the

19   secondary officer?

20        A    I was dispatched as a back-up officer.

21   Officer Strzelecki was deemed the -- or sent as the

22   primary officer.  I was asked second to provide his

23   back-up.

24        Q    Okay.  And at that time, what is Strzelecki's

25   status at the agency?  Like how long had he been there?

Page 229

1    A    He's a new kid, you know, maybe a couple

2    months on his own.

3    Q    When you say on his own, do you mean outside

4    of the field training program?

5    A    Yeah, I'm sorry.  Outside of field training,

6    he had just been released on his own in a probationary

7    status.

8    Q    All right.  And so as you proceed to the --

9    let me back up.  What were you doing prior to the call?

10    A    I was actually, we were at District Park,

11    Officer Strzelecki and I.  We were just -- it was

12    relatively early in the day so we were just at the park.

13    Q    Okay.  And so the call comes and you respond

14    to the call.  As you drive up to the call, what are you

15    doing?

16    A    I am listening and waiting for radio traffic.

17         You know, with something like this, because

18    you have three separate people calling 911, you're also

19    getting those three callers getting three separate

20    dispatchers.  So now we have some hecticness when it

21    comes to how information is being received and

22    disseminated.

23         So me personally, on calls like that, I try

24    very little to get on the radio.  I don't want to clog

25    just in case if god forbid something does go wrong or,

Page 230

1    you know, I'm knowing that Officer Valerio is there

2    initially by himself and, yes, he's a very competent and

3    great officer, I've worked with him plenty, but still,

4    like that's my thing, like radio is less.  But I never,

5    ever heard that who he was 10-12 with at the pool, just

6    that he was on the other side.

7          Q    When you say 10-12, what does that mean?

8          A    That means being with somebody in company,

9    you're with that person or some people.

10         Q    So you're on your way and you hear that he is

11   with someone on the other side of the pool.

12         A    Yeah.

13         Q    Do you know that he has met with Mr. Gould on

14   this side of the pool?

15         A    No, I didn't know that at all.  I had no clue.

16         Q    Okay.  Has he mentioned anything about

17   securing a gun at that point?

18         A    No.

19         Q    When you arrive, what do you see?

20         A    So when I'm pulling in, I remember there being

21   a radio transmission, I just don't remember exactly who

22   or what was said.

23              But I remember looking at my computer screen

24   as we were pulling in because some of the last bit of

25   information that was put in that screen and I remember

Page 231

1   seeing was multicolored bathing suit, gun in groin area.

2   That's the last thing I remember seeing.

3       Q    Okay.

4       A    So I know everyone is trying to say that I saw

5   him but I really didn't, because as I'm pulling in

6   there, I'm looking at that last bit of information that

7   like I just told you.

8       Q    Okay.  So you pull into the parking space and

9   you get out of your car?

10      A    Hm-hmm.

11      Q    And tell me -- tell the arbitrator what you

12  see at that point.

13      A    So I see who I eventually end up being

14  Mr. Gould but -- we've heard this before today, like the

15  hair kind of stands up on the back of your neck.  Well,

16  that's kind of what happened with me that day.  Because

17  initially, he just was not presenting like a typical

18  victim.

19          And I'm not saying every situation is typical

20  or it's going to be the same because it's not, but 20

21  years is a long time to be analyzing and looking at

22  people in a split second decision and trying to take

23  everything in.  And to me, he just didn't seem right.

24      Q    When you initially got out of your car, the

25  first thing you did was you told him to keep his hands

Page 232

1    out of his pockets.  Why?

2        A    Because from my vantage point, getting out of

3    the car and like I'm now trying to look over two sets of

4    hoods so I'm trying to like move around to see him but

5    still kind of maintain some cover, and I'm not very

6    tall, I'm 5'6", I'm not tall like these other guys, you

7    know, so my vantage point of seeing things may not be

8    the same as what these 6-foot plus guys might be seeing.

9            And when I see both hands disappear, to me,

10   that is sending off all bells and whistles because I'm

11   already in the back of my brain going, I don't really

12   know who Mike is with and I never heard that a gun was

13   secured.

14       Q    Now, let me just back up, just a hair.  This

15   is a gun call.  Right?

16       A    Yes.

17       Q    And at a gun call, are you in a heightened

18   state of awareness?

19       A    Yes.

20       Q    And why is that?  For the obvious reasons I'm

21   sure.

22       A    Well, the obvious reasons.  I mean, you know,

23   I have to protect me, I have to protect my partners, I

24   have to protect the general public and I, eventually, I

25   have to protect a suspect, you know, whether Mr. Gould

Page 233

```
 1   was a suspect or not or whatever, you have to protect
 2   everybody including yourself.
 3        Q    And do you assume anything about anyone who
 4   you're interacting with?
 5        A    What do you mean, do I assume it?
 6        Q    Like do you make an assumption whether they're
 7   armed, not armed?  How do you handle those calls?  It's
 8   a gun call.
 9        A    I have to assume that everybody is armed.
10             You know, like you said, you're already
11   bringing one gun to the table with your own firearm, so
12   my mentality is that, until I can prove otherwise,
13   everyone is armed.
14        Q    Okay.  So you give him the command, you see
15   him, his hands are below where you can see.  You tell
16   him, keep your hands out of your pockets, and then tell
17   me what goes on next.
18        A    I tell him to, you know, the first time nice,
19   hey, man, do me a favor, keep your hands out of your
20   pockets.  And then like I can see them like dipping
21   again.
22             And then when I'm walking around and then I
23   can see him pull out the phone, it took me a couple
24   seconds to have it register, like that's probably what
25   that is, but you're super agitated, you're not
```

Page 234

1    presenting like a victim would.

2        Q    And when you say he's not presenting like a

3    victim, what do you mean?  Explain that.

4        A    So there have been plenty of situations over

5    the 20 years that have been, you know, chaotic or

6    hectic, there's a lot of people involved, you know,

7    there's a lot going on and, you know, sometimes you

8    gotta come in and like detain or cuff everybody until

9    you can figure out what is going on.

10           And in my mind, this was going to be no

11   different.  You know what I'm saying?  Because I did not

12   hear certain information that I felt was pertinent for

13   safety.  And I did what I had to do based on that.

14       Q    Okay.  So now you are passing either

15   Strzelecki's or Valerio's car.  You're at the point of

16   their car.  He has come out with the phone, hands are at

17   the side.  What's in your mind right now?  Now what's

18   going on?

19       A    I can still see what we know now is a towel,

20   you know, but I was not privy to all the information

21   that involved Officer Valerio.  I did not know he had

22   that much of a conversation with that guy.  I knew

23   nothing of the sort.

24           You know, I didn't even know that he met with

25   him that long.  I did not know that, you know, was he

Page 235

1    pat down or -- I didn't know who he was.

2        Q    Let me stop you for a second.  Did you even

3    know that Valerio met with that guy at that point?

4        A    No, I didn't.

5        Q    Okay.  So you're now advancing toward him and

6    his hands are out by his side and he starts talking to

7    you.  What's he saying to you?

8        A    When I say to him the first time, hey, man, do

9    me a favor, just keep your hands away from your pockets,

10   out of your pockets, basically I don't want your hands

11   near or in your pockets.  Okay?

12           And then he's like, he looks at me almost

13   confused and like he has like this scowl and he goes,

14   I'm not the one with the gun.

15           Like, I have never in 20 years been spoken to

16   like that by a victim.  Most people are like, okay, okay

17   I'm really sorry, it's not me, or what do you need me to

18   do, Officer?  I'm like, hey, I need you to just do this.

19           But I was met with a constant -- like it just

20   wasn't -- it wasn't sitting right with me, like that

21   wasn't a typical behavior of a victim.

22       Q    Okay.  So there's been also some talk about so

23   he -- you see him, his hands were down below.  You tell

24   him, hey, buddy, keep your hands out of your pockets,

25   whatever you say.

Page 236

1          A      Hm-hmm.

2          Q      I know he touches his head, he says something,

3     and then, boom, right back to his pocket?

4          A      Hm-hmm.

5          Q      At that point, why didn't you pull your gun?

6          A      Why didn't I?

7          Q      Why didn't you pull your gun at that point?

8          A      I'm still, like, analyzing and looking and

9     waiting, but I don't want to wait too much longer

10    because you've already not listened to me twice.  I'm

11    not going to wait a third time, I'm sorry, but me and

12    everyone else I'm here to protect is going home.

13             And you look and turn on the news every single

14    day and like I'm not going to downplay it, there are

15    cops getting shot and dying every single day on normal,

16    quote, unquote, routine things.

17             And rule number one, and this is what I always

18    taught my trainee, nothing is routine.  You can sit here

19    and try to say all day that stuff is routine, it's not

20    in this job.  I'm sorry.

21         Q      So in the investigation, and not so much here

22    today but in the investigation, a lot was made about the

23    fact that after he came out with the phone, eight

24    seconds before you actually pulled your gun, what

25    happened in the eight seconds that made you escalate to

Page 237

1    a deadly force?

2         A    Because you didn't listen the first two times.

3              And when he took that step back and now I see

4    the left hand drop, I don't know what's in that other

5    pocket.  Okay.  And now I'm more concerned about what's

6    under that towel or shirt or bag.  I didn't know, I just

7    knew there was something there.

8              And when I saw the step back, I wasn't

9    thinking he's retreating from me, I'm thinking

10   tactically, like what if there's something under there?

11   I can't let him get to that.

12        Q    So let's talk about tactics for a second

13   because they made a big deal about you not retreating

14   back to the car.  Why didn't you just retreat at that

15   point?

16        A    Well, to me, I am committed to stopping a

17   threat.  And retreating that way, if I'm already

18   advancing on you and like I'm doing what I need to do to

19   maintain or try to get you under control, I'm now not

20   going to retreat.

21        Q    Let me ask you a question.  Tactically, at the

22   point where you are -- and you've been in S.W.A.T.

23   Correct?

24        A    Yeah.

25        Q    You've had training.

Page 238

```
 1        A     Hm-hmm.

 2        Q     Special weapons and tactics is what it is?

 3        A     Hm-hmm.

 4        Q     So you've had tactical training, you've had

 5   S.W.A.T. training.  Correct?

 6        A     Hm-hmm.

 7        Q     And how often do you do defensive tactics or

 8   scenario training with the agency?

 9        A     We do it several times a year.

10        Q     Okay.  What is the theory on advancing

11   superior weapons?  Do you know?  If you don't know, you

12   can say that.  It's okay.

13        A     I don't really know, like what you mean in

14   this context.

15        Q     All right.  Let me slow it down for you at

16   this point because I'm going a little fast, I know.

17        A     That's okay.

18        Q     Once you are past Valerio's or whoever car is

19   the last car, you're out in no man's land.  Correct?

20        A     Hm-hmm.

21        Q     And he is in some sort of fade.  Right?  He's

22   fading.

23        A     Hm-hmm.

24        Q     Tactically, what are your options?

25        A     Retreat or advance.
```

1      Q    Okay.  And is advancing an option?

2      A    Yes, it is.

3      Q    Okay.  And once you advance on him, does that

4   put you now in a superior position?  He's back and

5   you're forward.  Are you now in a superior position?

6      A    Hm-hmm.

7      Q    Okay.  And what happens as you advance?  What

8   happens next?

9      A    I tell him to get on the ground.  And he does,

10   he complies, but there's still verbal back and forth.

11   There's still a very verbal, you know, what I call like

12   a defiance or a resistance at that point.

13           And to me, I'm still trying to get control of

14   the situation because if you're still verbally being

15   defiant like that, you're making it even more difficult

16   for me to now try to explain to you why you are in the

17   position that you're in and I need to try to find out

18   more information from you at this point.

19      Q    Okay.  So he prones out and you handcuff him.

20      A    Hm-hmm.

21      Q    Why didn't you search him?

22      A    Because he was still being, like, verbally

23   aggressive towards me.  And I knew that there were other

24   officers coming there so, I don't know, maybe it was my

25   mistake to assume that I wasn't the one that always has

Page 240

1    to do the searching.  We've got other officers coming.

2    I'm just trying to maintain and hold it together until

3    there's enough people there and I can walk away.

4         Q    Okay.  The towel, did anyone ever look at the

5    towel?

6         A    I don't -- no.

7         Q    Do you know why no one did that?

8         A    I'm not sure.  I don't know.

9         Q    But, so you didn't do it.  Correct?

10        A    No.

11        Q    And there were other officers, you weren't the

12   only officer on the scene at that point.  Correct?

13        A    Correct.

14        Q    And did Strzelecki search him?

15        A    I don't think so.  I don't remember.

16        Q    Did Carter search him?

17        A    I don't think so.

18        Q    Did Ayala search him?

19        A    I don't think so, no.

20        Q    Did Glass search him?

21        A    I don't think so.

22        Q    Did Beath search him?

23        A    No.

24        Q    Did Valerio ever search him?

25        A    As far as I know, no.

Page 241

1       Q    So no one searched this guy at all.

2       A    That's correct.

3       Q    While I'm thinking about that, I'll come back

4   to the towel in a minute, but no one searched the towel,

5   either, that you know of.

6       A    Correct.

7       Q    Let me ask you this.  And I was kind of

8   shocked when I asked other people about this.  You go to

9   a gun call.  I should have asked the chief, I know he

10  would have been straightforward.  You go to a gun call

11  and there's a towel over the person's hand that you're

12  approaching.  Do you let someone walk up on you like

13  that?

14      A    No.

15      Q    Why?

16      A    Because I don't know you, I don't really -- I

17  can't trust that you're going to tell me the truth right

18  off the rip.  Like I need to do some investigating here.

19  And it's just for safety.  Like I'm not going to -- I

20  don't care who you are at that point.

21      Q    Right.

22      A     I'm not trying to sound combative, it's just,

23  it is what it is.  I'm like, hey, can you put that on

24  the ground or -- let's separate you from that and we'll

25  talk.

Page 242

1       Q    And let's back up even further.  When I first

2  opened up today, I talked about, I showed a video of a

3  gentleman who was wearing a bathing suit.

4       A    Hm-hmm.  You're talking about the Indian River

5  case?

6       Q    Yes.

7            And in the bathing suit, he had a gun

8  concealed.  Correct?

9       A    Hm-hmm.

10      Q    So in your opinion, is it possible to conceal

11  a handgun in your bathing suit?

12      A    Yes.

13      Q    Have you seen someone -- well, actually, we

14  don't know how that guy concealed a gun, but Mr. Salvia,

15  he had a, like a belly band-type thing under his shorts,

16  didn't he?

17      A    Hm-hmm.

18      Q    Did you see his holster?

19      A    Hm-hmm.

20      Q    It's like a belly band thing.

21           So it's possible, there's different ways to

22  conceal firearms in shorts.  Right?

23           MR. NORTON:  I apologize for doing so but this

24      continuous leading, and now it's actually

25      testifying with a yes or no to -- that's my

Page 243

```
 1       objection, it's leading.
 2            MR. KING:  Sustained.  I'll sustain it for
 3       you.  I'll move on.
 4            MR. NORTON:  Okay.
 5            THE ARBITRATOR:  Thank you.
 6            MR. NORTON:  I've done it for him before, too.
 7  BY MR. KING:
 8       Q    All right.  So I'll bring it to a close.
 9  While he's wearing those shorts, as he presented to you
10  that day, could you tell definitively whether he was
11  armed or not armed?
12       A    No.
13       Q    All right.  So let's move on to your, we'll
14  call it tongue wrestling with Mr. Gould after the
15  handcuffing went on.
16       A    Hm-hmm.
17       Q    What do you have to say for yourself?
18       A    Never should have happened.  Never should have
19  happened.
20       Q    Why?  Why did you engage in that?  Do you
21  know?
22       A    I really don't.  I don't know if it was the
23  combination of the adrenaline dump or the later on
24  cardiac event that I ended up having.
25            I know for myself, I'm not always the best as
```

Page 244

1   a police officer when it comes to admitting that maybe

2   I'm not feeling so great or, you know, I'm actually

3   pretty annoying with that.  Like you can ask my wife

4   now, like you have a 103 fever, what are you doing?  So

5   it was kind of under that same guise that day.

6          But again, you know, it never should have

7   happened.

8      Q    At that moment, what was going on with you

9   physiologically?  Tell me about the effects of drawing

10  your gun.  What was going on with you?

11     A    I noticed that like I was having an issue,

12  like I could feel my heart rate like not returning to a

13  normal place for me.

14         And I'm a very regular occupant of the gym.  I

15  heavy lift, you know, so me like really being into heavy

16  duty weight lifting is nothing new.  I mean, even Chief

17  Pape has seen me numerous times in the gym, you know,

18  doing stuff like that.  So exercise and recovery, I'm

19  familiar with that.

20         That particular day, for whatever reason, and

21  I could -- when I was looking back at my body cam

22  footage, I was breathing extra hard than I normally do.

23         And it wasn't until like I had gone inside, my

24  watch started going off.  Like my heart -- and this was

25  considerably a little bit of time later.  I was over 136

Page 245

1   beats a minute to the point where my watch was alerting

2   me.

3           And that's when Sergeant Glass looked at me

4   and he goes, is that your watch?  He goes, are you all

5   right?  I'm like, I don't think so.

6      Q    So when you met with Sergeant Glass initially

7   right after the event, you were pretty amped up.

8      A    Yes.

9      Q    What was that about?  Why did you remain in

10  that state?  What happened?

11     A    You know, I think a lot of things were

12  probably going through my head at that point.  Like here

13  we have this call.  Why did it take me, you know, to

14  have to call a supervisor when we had three on duty that

15  day?  You know, if I was a supervisor and I heard that

16  type of call, I would have already been en route.

17     Q    That's a great question.  Why did you call the

18  supervisor?

19     A    I called the supervisor because I could tell

20  that this was a very convoluted thing and there was a

21  lot going on that we needed to sort through.  And I

22  couldn't just do it alone with all these other officers

23  showing up, like there needed to be a supervisory

24  presence, which is why I called for one.

25     Q    Okay.  All right.  So you meet with Sergeant

Page 246

 1    Glass and he describes you as agitated, angry, animated.

 2    How do you plead?  What was going on?  Did you feel like

 3    you were that way?

 4        A    I mean, a little bit, yeah.  Yeah, like I was

 5    agitated, but I think a lot of it had to do with the

 6    fact of what happened with me being admitted into the

 7    hospital not long after that.

 8            Like I was not feeling myself.  There was

 9    something going on and I wasn't really too quick to push

10    that button and be like, oh, because I know sometimes

11    when you go through something like that, it may take a

12    little bit of time to come down and recover.  It just

13    wasn't happening like that.

14        Q    All right.  So you meet with Glass.  You tell

15    him what happened.

16        A    Hm-hmm.

17        Q    And then what do you do next?

18        A    He was asking me something about Mike, like

19    where Mike was.  And I was like, oh, he's over here.

20            And I was under the assumption, like I wasn't

21    trying to walk away from him or be disrespectful, I

22    thought he was legitimately asking a question.

23            So I was walking towards where -- you can see

24    me in the video saying, he's over here.  So I thought

25    maybe he needed something from Mike.  So I wasn't trying

1   to walk away from him and be disrespectful, I was like,

2   he's over here.

3        Q    And then ultimately, did you turn around and

4   walk around the back side of the building?

5        A    I did.

6        Q    And that's where you encountered Mr. Salvia

7   and his wife.

8        A    Hm-hmm.

9        Q    And then you began that investigation.  I'm

10  sorry.  I'm sorry.

11       And then what did you do on the back side of

12  the building?  Sorry.

13       A    I started to ask questions.  I remember

14  reading Mr. Salvia his Miranda warnings at that point

15  just because now he's, to me, he's been identified as

16  the person who had the firearm.  Okay.  So now I got

17  this.  And then I saw his wife there.

18       And then it became apparent who Mr. Gould was

19  at that point.  But that was not that way when I first

20  got there.

21       Q    Okay.  So you talk to Glass and then you went

22  around to the building and you had enough time to -- how

23  long do you think you were back there before you came

24  back to the front again?

25       A    Maybe five minutes.

Page 248

1      Q    Okay.  And ultimately you came back around the

2    front?

3      A    I believe I did.

4      Q    All right.  When did you meet with Sergeant

5    Beath?

6      A    I think when I came back around again.

7      Q    Okay.

8      A    I'm not a hundred percent sure.

9      Q    Okay.  And how was your -- what was your state

10   of physiology at that point?  Were you still animated?

11   How were you?

12     A    I mean, I believe I was still aggravated but I

13   don't think I was how initially when I had first gotten

14   there and encountered Gould.

15     Q    And what did you and Glass talk about -- I'm

16   sorry -- you and Beath talk about?  If you remember.

17     A    What happened or what I perceived was going on

18   and the actions I took.

19     Q    Okay.  You know what, I forgot to ask you a

20   question.  I'm going to go back to something.

21          When you put the handcuffs on Mr. Gould, you

22   tell him you're being detained.

23     A    Hm-hmm.

24     Q    At some point, you tell Sergeant Glass that

25   he's -- or you tell somebody, I don't remember if you

Page 249

```
 1   told Gould or you told -- actually you told Gould first
 2   and then you told Glass that he's under arrest.
 3        A    Hm-hmm.
 4        Q    What happened?  What changed?  How did you go
 5   from detain to arrest?  What happened there?
 6        A    He was just so difficult to try to, you know,
 7   get under control.  Because the Gould I had was not the
 8   Gould that Officer Valerio had or, you know, even the
 9   other guys were experiencing.  So I'm not quite sure
10   what went wrong there, but.
11        Q    Okay.  Did you have the elements for -- do you
12   believe that you had the elements for a resisting an
13   officer charge?
14        A    Yes.  And obstructing, because I asked him for
15   his name and he had expletives for that, so.
16        Q    What was your probable cause for arresting him
17   for resisting an officer?
18        A    Not doing what he was asked to do and then
19   maintained the verbal defiance, you know, even once in
20   custody, when I'm trying to decipher and gather
21   information on a gun call.
22        Q    Let me ask you this question.  If you had
23   chosen not to, do you have the discretion not to make an
24   arrest if you want?
25        A    Yes.
```

Page 250

1      Q    And do you also, I guess conversely, do you

2    have the discretion to make an arrest if you choose to?

3      A    Yes.

4      Q    As long as you have probable cause, I'm

5    imagining.

6      A    Correct.

7      Q    All right.  And you believed you had probable

8    cause.

9      A    I did, yes.

10     Q    All right.  I want to go -- well, let's talk

11   about it first.  Much to do has been given about your

12   attempts or lack thereof to deescalate.  At one point,

13   and I think Sergeant Glass talked about it, you said,

14   let's bring this down a notch.

15     A    Hm-hmm.

16     Q    Was that your attempt to deescalate?

17     A    One of the attempts, yes.

18     Q    Tell me about the others.

19     A    When enough people had gotten there, I walked

20   away instead of continuing and trying to engage.  Once I

21   knew Ayala was there, we had a couple people there, I

22   felt comfortable enough to walk away and no longer

23   engage with this person because it was going nowhere

24   good.

25     Q    Did you make efforts to try and explain to him

Page 251

1  why he was in handcuffs?

2       A    I did, numerous times.  And he just kept

3  talking over me or the name calling was ensuing or I'm

4  not his mom or I don't have to listen to you.

5            How am I supposed to get anything done when,

6  you know, you want to know why you're in handcuffs and

7  potentially under arrest and I'm trying to explain that

8  to you but you keep wanting to talk over me and yell at

9  me and --

10      Q    Captain Garcia, is that who -- that's who

11  wrote the decision for termination.  Correct?  Yes?

12      A    Yes.

13      Q    So he wrote in there that he thought that you

14  were untruthful to Sergeant Beath and Sergeant Glass.

15  What is your response to that?  Were you untruthful?

16      A    No.  Because I was telling them through my

17  eyes and what I was feeling in that moment and what I

18  was experiencing at that moment.  And to me, that was my

19  truth.  I didn't make anything up.

20      Q    Did you ever write a probable cause affidavit

21  in this case?

22      A    No, I didn't.

23      Q    Did you tell Sergeant Beath what to include in

24  the probable cause affidavit?

25      A    No.

```
 1        Q    Did you tell Officer Strzelecki what to add to
 2   the probable cause affidavit?
 3        A    I did not.
 4        Q    Did you tell anyone, these are the elements
 5   for probable cause?
 6        A    No.
 7        Q    You told them what happened.
 8        A    I told them what happened, yes.  And then I
 9   got carted off to the hospital and admitted for a couple
10   days.
11        Q    Sergeant Glass, you didn't tell Sergeant
12   Glass, you didn't help him or tell him what to put in
13   the probable cause affidavit.
14        A    No.
15        Q    Other than not drafting the probable cause,
16   did you make any official statement in this case?  Did
17   you swear and tell anyone, this is what happened?
18        A    No.  Not until I found out about the IA.
19        Q    So IA was the first time that you made an
20   official statement.
21        A    Yes.
22        Q    And the IA statement is something that you're
23   making here today.  Correct?  It's the same thing.
24        A    Hm-hmm.  Hm-hmm.  Yes.  I'm sorry.
25        Q    So after the Gould incident and you meet with
```

Page 253

1    Mr. Salvia, you come back, you talk to Sergeant Beath,

2    where do you go next?

3         A    We're in the clubhouse now.

4         Q    All right.  And tell me about the incident,

5    medical situation.  What happened?

6         A    I continued to like not feel well and I'm like

7    leaning up against the desk and like I had been inside

8    for a little bit but I just start profusely like

9    sweating.  And I'm like, and it's getting really

10   difficult for me to breathe to the point where both of

11   them look at me and are like, are you all right?

12   They're like, what's going on?  I'm like, I don't know.

13        And that's when my watch went off.  And Marc

14   looked at me and --

15        Q    Marc is Sergeant Glass?

16        A    Yeah, Sergeant Glass was like, we need to get

17   a fire rescue over here for you.

18        And I'm like, yeah, because I'm like, I don't

19   know what's going on but I can't breathe, it feels like

20   there's a knife in my chest and something's not right.

21        Q    Did you leave the scene with fire rescue?

22        A    I did, yeah.

23        Q    And they took you to the hospital?

24        A    Yep.  Palm Beach Gardens Medical Center.

25        Q    All right.  And how long were you in the

Page 254

1   hospital?

2        A    Two nights.  And then on the third day, I was

3   released at like 5:00 in the evening on the third day.

4        Q    I'm not going to go into what your medical

5   situation was but I'm going to ask you, how long was it

6   until you returned to work?

7        A    At least eight weeks.  Because this happened

8   in May.  I didn't come back to like an administrative

9   duty inside until July 8th.

10       Q    All right.  I think you were pretty clear that

11  your interaction with Mr. Gould wasn't your finest hour?

12       A    Correct.

13       Q    If you could do that again, what would you do

14  differently?

15       A    Not get into the verbal, you know, tongue

16  lashing with him.

17            MR. KING:  I think that's all I have.  Thank

18       you.

19            THE ARBITRATOR:  Okay.  You want a few minute?

20            MR. NORTON:  No.  It's late in the day, let's

21       rock.

22            THE ARBITRATOR:  All right.  Let's go.

23  CROSS (BETHANY GUERRIERO)

24  BY MR. NORTON:

25       Q    How are you this afternoon, ma'am?

Page 255

1       A    I'm okay, Mr. Norton.  Thank you.

2       Q    I think I'm going to start where you stopped.

3  What would you do differently May the 9th, 2023?  And

4  your answer was not get into a verbal tongue lashing or

5  the discourse that was going on.

6            You used the term fuck, he used the term fuck,

7  you were shouting at each other.  Right?

8       A    Correct.

9       Q    And you've heard, you know that your -- first

10  of all, Garcia did not make a determination of any kind.

11  He made a recommendation.  Right?

12      A    Correct.

13      Q    So it was signed off on two captains, a major,

14  an assistant chief, all of whom looked at all the

15  evidence.  Right?

16      A    (Nodding head.)

17      Q    And all of them came to the conclusion that

18  you didn't perform very well on that day.  Correct?

19      A    Okay.

20      Q    Okay.  I'm going to assume, first of all, you

21  drove in, at least I looked at it, there's a 6-foot man

22  in a bathing suit that you drove within 20 feet of and

23  you turned all the way around.  Are you so focused --

24  how did you not crash?  Because if you looked up one

25  time, you're going to see him.  You never saw him once.

Page 256

1      A    I didn't say that I didn't see somebody but I

2  was not like acutely, like, looking directly at him

3  because I was also trying to just see the last bit of

4  notes that came up before I pulled parallel to the other

5  police vehicles.

6      Q    I got that, but you're coming to a scene where

7  somebody you think has a gun there, or the department

8  thinks, it doesn't matter.

9      A    Hm-hmm.

10      Q    And there's this guy, so you do see him, it's

11  unavoidable in my view, and I'm asking you yours, not to

12  have looked at the back of him and seen there was no

13  damn gun in the back of his bathing suit.

14      A    Okay.  But there's other --

15      Q    No, I'm asking.

16      A    Yeah, I respect what you're saying, you know.

17      Q    That's only one element.  Believe me.

18      A    Hm-hmm.

19      Q    But there's no gun in the back of his bathing

20  suit so we're dealing with what you saw when you're

21  confronting him front-wise.  Right?

22      A    Correct.

23      Q    Okay.  Now, I think you would concede that it

24  is inappropriate for an officer that is confronting

25  somebody or investigating, talking to potential suspects

1   or witnesses, to get personally involved, to get your

2   personality involved with the individual.  Wouldn't you

3   agree with that?

4       A    What are you referencing there?

5       Q    I'm not referencing, I'm asking you a

6   question.  Should an officer ever get personally

7   involved where you're taking -- you're getting angry,

8   he's getting angry, that kind of involvement?  Should

9   that ever happen?

10      A    It shouldn't.  But people are also human, both

11  suspects and law enforcement officers and regular

12  civilians and, you know.

13      Q    People are people.

14      A    People are people.

15      Q    But cops carry guns, tasers, handcuffs and

16  have authority way beyond anybody normally.  Right?

17      A    Correct.

18      Q    So your behavior has to be more controlled,

19  that is a part of being a law enforcement officer,

20  wouldn't you agree?

21      A    I agree.

22      Q    Okay.  Now, aren't you also supposed to kind

23  of remain cool under fire?

24      A    You are.

25      Q    And you didn't do that here, didn't even come

Page 258

```
 1   close.  Would you agree with that?
 2       A    Again, I'm telling you from me being in that
 3   moment, not here --
 4       Q    Now I'm talking about what happened, not the
 5   moment.
 6            MR. KING:  Whoa, whoa, whoa.  You have to let
 7       her answer the question like you told me.
 8            MR. NORTON:  Yeah, and you didn't listen once.
 9       Anyway.
10            MR. KING:  He ain't right.
11            MR. NORTON:  I think I won that one.  Never
12       mind.
13   BY MR. NORTON:
14       Q    Anyway, I'll progress along here.
15            You used the DAVID system and you just
16   testified under oath it was to access pictures of
17   individuals.
18       A    Hm-hmm.
19       Q    It was to access a lot more than pictures,
20   wasn't it?  You were looking at where they lived,
21   whatever the other information you could get off of
22   DAVID on the individuals, you were looking, or were you
23   just looking for their pictures?
24       A    I was just literally looking for the pictures.
25       Q    Okay.  Just the pictures.
```

Page 259

1      A     Hm-hmm.

2      Q     Now, are you telling this arbitrator that you

3  went on this system and looked up these two individuals

4  but you had never seen either one of them before?

5      A     No.  I had never seen --

6      Q     You had never seen Charlie Navarro?

7      A     Huh-uh.

8      Q     How did you know to look him up?

9      A     This was one of the individuals that --

10          MR. KING:  I'm going to object.  I don't

11      understand the relevance of Charlie Navarro to this

12      case.

13          MR. NORTON:  He's one of the two people that

14      she impermissibly used the DAVID system on.

15          MR. KING:  But his particular information as

16      to how she knew who he was is really irrelevant.

17      The fact is she's admitted she went into the system

18      and she did this.  Who Charlie Navarro is, how she

19      knew to look him up, who the other person is, it's

20      irrelevant to this matter.

21          MR. NORTON:  She testified under oath she only

22      went on there to look at their two pictures.  I've

23      got lots of evidence that's not true and I'll get

24      into it.

25          THE ARBITRATOR:  All right.  Go ahead.

1            MR. NORTON:   Thank you.

2    BY MR. NORTON:

3        Q    So you had never seen Charlie Navarro ever.

4        A    In person?  No.

5        Q    Had you ever seen a picture of him?  Did you

6    have any -- if he walked into a room, would you have

7    known him?

8        A    From looks-wise?  No.

9             From the history of Nicole?  Probably.

10       Q    From her having a relationship with him, you

11   would know what he looked like?

12       A    No.  I'm confused by your question, I'm sorry.

13       Q    Okay.  Let's just do this one more time

14   because I want to be certain.

15       A    Okay.

16       Q    When you went on that DAVID, before you went

17   on it, did you know what Charlie Navarro looked like?

18       A    No.

19       Q    Okay.  All you know is he has a relationship

20   with your ex-wife.

21       A    He had some type of relationship, yes.

22       Q    How about Amy Johnson?

23       A    I never met her, encountered her, knew what

24   she looked like, anything.

25       Q    So why did you want to see a picture of her

Page 261

1    then?  You went on an impermissible, that system tells

2    you you don't go on here unless it's for law enforcement

3    purposes.  Right?

4        A    Correct.

5        Q    You violated that and you've admitted it.

6        A    Yep.

7        Q    Why did you select Amy to invade her privacy?

8        A    She -- I don't -- I don't know.  I don't know.

9        Q    You don't know that Amy and Charlie had a

10   thing going ever?

11       A    Well, I mean, I did know that, but.

12       Q    Okay.  You knew they had a relationship.

13   Right?

14       A    Yeah.

15       Q    You also knew that Charlie had a relationship

16   with your ex-wife.

17       A    Yeah.

18       Q    But all you went on there for is to get

19   pictures of the two people.

20       A    That's correct.

21       Q    Okay.  So, and you never, ever shared that

22   with anybody else.  Now, you're under oath.  Did you

23   share the information you got off of DAVID with anybody

24   else on this earth?

25       A    Nicole.

Page 262

1        Q    Okay.  That's a crime of course.

2        A    It is.

3        Q    Okay.  So you now, you've gone on DAVID and

4   you're now sharing information with a third-party about

5   these other two parties.  Right?

6        A    Well, she's a law enforcement officer, but.

7        Q    You weren't doing that for law enforcement,

8   ma'am.  You're not telling us that here today, are you?

9   This is all about relationships that have nothing to do

10  with the law.

11            MR. KING:  This is all very irrelevant right

12       now.

13            MR. NORTON:  I think it's incredibly relevant.

14            MR. KING:  I don't think it's relevant at all.

15       She's admitted to the violations.  She was

16       disciplined.  That was five years ago.

17            MR. NORTON:  No, she's testified to things

18       here today that I believe could turn out to be

19       false.  And if they are, it could turn out to

20       damage her credibility.  So I certainly would like

21       to have an opportunity to explore them.

22            THE ARBITRATOR:  Go ahead.

23  BY MR. NORTON:

24       Q    So tell me about that.  What's going on here?

25  Amy is having I guess a relationship with Charles,

Page 263

1    Charlie?

2         A    Hm-hmm.

3         Q    And Nicole, your ex, is having a relationship

4    with Charlie?

5         A    As far as I knew, yes.

6         Q    And you're not happy about that.  You sent 850

7    documented texts.  Right?

8         A    But that's also over the course of two and a

9    half years, sir.

10        Q    Yeah.  And it's funny, Charlie's name gets

11   mentioned in there all the time, doesn't it?

12        A    Well, we were two about to be

13   recently-divorced people with a newly adopted daughter

14   and there were unfavorable people, Charlie being one of

15   them, being brought around my daughter.

16        Q    So he's unfavorable but all you wanted to do

17   was look at a picture of him.

18             So did you tell Nicole things like I know

19   where you were, I know you were with Charlie, I know

20   where Amy was?  You're disclosing this stuff by text.

21   Correct?

22        A    Hm-hmm.

23        Q    Over a three-year period.

24        A    (Nodding head.)

25        Q    Okay.  Now, you were an FTO trainer.  Right?

Page 264

1      A     Hm-hmm.

2      Q     And you showed up at the scene on May the 9th.

3      A     Yep.

4      Q     Immediately Officer Strzelecki, if I said that

5  correctly, shows up right beside you.  So he's there

6  from the first minute.

7      A     Hm-hmm.

8      Q     Okay.  And he's a newbie.  He's two months

9  into probation.

10      A     (Nodding head.)

11      Q     And your performance that day is the kind of

12  thing you would like to have a new officer see from a

13  senior officer.  You were satisfied that what you did

14  then would be a good learning experience for him.

15      A     I did what I had to do to initially keep

16  everybody safe.

17      Q     Okay.  But let's talk about that because what

18  you have testified to is there's only one thing you'd

19  change and that is getting in a verbal debate with

20  Gould.

21      A     Hm-hmm.

22      Q     What about, you're assuming this man may be

23  carrying a weapon.

24      A     Hm-hmm.

25      Q     You're not assuming he is or he is not but you

Page 265

1   don't know.

2        A    I don't know.

3        Q    And everybody that's testified from

4   management's side in this case said that you should have

5   gone up and gotten behind Valerio's car so you would be

6   in a concealed position or somewhat concealed.  Right?

7   Cover.

8        A    Okay.

9        Q    You even mention that in your own sworn

10  testimony.

11            But you didn't do that.  You chose to expose

12  yourself.

13            Now, the dangers are, and you've testified to

14  it at length, him and the towel which you refer to as a

15  backpack or a towel or whatever.  And it's sitting over

16  there.  We've all looked at it 20 times.  Right?

17       A    Hm-hmm.

18       Q    How long would it take you to tell Strzelecki,

19  go over there and make sure there's nothing in that?

20  Isn't that good policing would tell you to do that?

21            But you went through this whole thing thinking

22  there might be a gun there.  And to this day, well, I

23  guess we know to this day, but to that day, you had

24  never once did anything to check out what's under that

25  towel.  Of course, there was nothing.

1      A     Okay.  Well, again, I wanted to make sure that

2   there were enough people there because I did not want to

3   continue down that road with Mr. Gould.

4      Q     Okay.  Let's just assume it's only you.

5      A     Okay.

6      Q     You have now handcuffed this guy and he's on a

7   tar parking lot.  And you got another officer right

8   there, two feet away.  Go over and check the towel out.

9   Let's just make sure.

10          Because you're thinking he might get up

11   handcuffed and go to that towel?  Isn't that what you

12   just testified to?

13     A     No.

14          MR. KING:  Objection, she did not.

15          THE WITNESS:  I didn't.  That's not what I

16     said.

17  BY MR. NORTON:

18     Q     What did you say?  You said you had concern he

19   might go for the towel?

20     A     That was before he was even handcuffed.

21     Q     When he first stepped back.

22     A     Yeah, he took that step back.  That was my

23   concern.

24     Q     Got you.  Thank you.

25     A     Hm-hmm.

Page 267

1      Q    So once you get him down on the ground, you

2   immediately go to that towel and make sure there's not a

3   gun there.

4      A    I did not.

5      Q    Then you immediately have him searched.  He's

6   handcuffed.  You still think he may have a gun?

7           MR. KING:  Mr. Miller, she's answered these

8        questions on direct.  She's already been through

9        the fact that she has not searched him, not looked

10       at the towel.  We've been through that a hundred

11       times.

12           MR. NORTON:  I didn't know I wasn't able to go

13       beyond direct.  Anyway, may I continue?

14           THE ARBITRATOR:  Please go ahead.

15           MR. NORTON:  Thank you, kindly.

16   BY MR. NORTON:

17      Q    So the two things that concerned you the most

18   that day that resulted in us being here today, other

19   than your background, were the towel and him.  And you

20   didn't search either one of them ever.  And you had

21   another officer with you.  Right?

22      A    Yeah.

23      Q    And you had the suspect, in your mind,

24   handcuffed.  So not too tough to search somebody

25   handcuffed, is it?

Page 268

1        A    No.

2        Q    Okay.  Now, when you were involved -- you've

3    had an illustrious career, but from 2019 forward, it

4    sure hasn't been.  Would you agree with that?  You've

5    had stalking charges against you, you've had a lawsuit

6    filed against you from your behavior, you've had

7    multiple disciplines including a written reprimand,

8    two-day suspension and another verbal.  Right?

9        A    Yes, but when you're referring to the other

10   incident, there was -- I wouldn't describe anything as a

11   downward spiral since 2019.  You know, my ex-wife was

12   also held accountable for some very egregious things,

13   you know, she was sustained on six counts of perjury.

14       Q    I'm going to be honest with you, I don't care

15   if she's a serial killer, I'm just worried about what

16   you may have done.

17       A    Okay.

18       Q    So your defense to having lost your composure,

19   you do agree, when you made the arrest at the mall that

20   resulted in a written reprimand, that you engaged in too

21   aggressive behavior verbally.

22       A    I cursed at the guy.

23       Q    You screamed fuck to him and everything else.

24   You got him all riled up.  You went in, and multiple

25   people saw it.  And you got a written reprimand and you

Page 269

1   accepted it.

2        A    I did, yes.

3        Q    And you blamed it on the fact that this was an

4   emotionally traumatic time in your life.

5        A    Well --

6        Q    Your whole life has been emotionally

7   traumatic, hasn't it?

8             MR. KING:  Objection.  Objection.

9             MR. NORTON:  I agree.  I'm sorry.

10            THE ARBITRATOR:  Sustained.

11            MR. KING:  Thank you.

12  BY MR. NORTON:

13       Q    You have struggled with emotional issues the

14  entire time since 2019.

15       A    That's not true, sir.

16       Q    It's not?

17       A    That's really not true.

18       Q    Well, you spent three years, three years,

19  texting back and forth with a woman you were trying to

20  get back in the fold with you, were you not?

21       A    Well, to be fair, Mr. Norton, she was also

22  engaging in behavior to try to mend fences.

23            But that's my personal life.  You know what

24  I'm saying?

25       Q    It may not have anything to do with you but

Page 270

```
 1   you ended up getting charged, you know, we ended up
 2   putting you on modified work release because a judge
 3   signed an injunction against you.  And in that discourse
 4   with her, at least 50 times she said, please stop
 5   texting me, did she not?
 6       A    She did, but what you don't know is that after
 7   I would stop doing that, two days later, she would
 8   engage conversation with me again.
 9       Q    So she's telling you to stop, you keep doing
10   it.
11            And you guys regularly discussed, we went
12   through this side thing, Charles Navarro who you do the
13   DAVID on and Amy Johnson.  Mostly Charles but Amy, also.
14   Right?
15       A    Yes.
16       Q    You've heard these two sergeants come in here
17   and testify under oath that you told them that he
18   repeatedly thrust his hands in his pockets despite your
19   giving him orders and far more than what we see on
20   video.  You heard that.
21       A    Hm-hmm.
22       Q    Are those two guys lying or is it what you say
23   was, quote, my truth?
24       A    Listen, I'm not calling anybody a liar.  Okay?
25   But --
```

Page 271

1      Q    But this is a case where if they are, you
2  should, in my opinion.
3      A    Okay.  Well, I'm telling you from my
4  perspective that day what I saw, what I felt, what I
5  did.  I'm not going to sit here and split hairs and say
6  or testify to what they said.  I'm telling you and
7  everyone else here what I saw, what I did, what I was
8  feeling at that moment.
9      Q    Okay.  That's your answer.
10     A    Yes, sir.
11     Q    You had a cardiac event that day.  Was that
12  because you knew you did something wrong?
13     A    No.
14     Q    Okay.
15     A    No.
16     Q    And then you were in the hospital.
17     A    Yes.
18     Q    City kept you at full pay.
19     A    Hm-hmm.
20     Q    You filed a workers' comp claim.
21     A    Well, I had --
22          MR. KING:  Objection.
23          THE WITNESS:  Well, I had an incident on duty.
24          MR. KING:  That is irrelevant.  It's
25  irrelevant.  And if something happens on duty,

Page 272

 1          she's required to do it.

 2     BY MR. NORTON:

 3          Q     It was denied, was it not, ma'am?

 4          A     No.

 5          Q     You don't know your workers' comp claim was

 6     denied?

 7          A     How was it denied?  I was getting treatment

 8     for several months.  I was seeing a workmen's comp

 9     cardiologist in Fort Lauderdale until I was released

10     from his care when the case was closed July 8th.

11          Q     Okay.

12          A     And I was sent back here on modified duty.  So

13     as far as I'm concerned, that was never dismissed.

14          Q     Okay.  That's your answer.

15          A     And when I did ask for my medical records, I

16     was told I couldn't have them.

17          Q     You also, you have a lawsuit against you.  I

18     guess you're aware of that.

19          A     Yes, sir, I do.

20          Q     And the City's insurance carrier has denied

21     you a defense.

22          A     Hm-hmm.

23          Q     Finding that you acted outside the scope of

24     your duties.  Are you aware of that?  They sent you a

25     letter.

Page 273

1     A     Yes, they did.

2     Q     Is that what they said?

3     A     That's what they said.

4     Q     Okay.  Now, when Mr. Gould was handcuffed on

5  there, did you comment and call him a punk?

6     A     I did.

7     Q     And did you comment and make a comment about

8  his painted toenails?

9     A     Yeah, I did.

10     Q     And tell him to shut up multiple times?

11     A     I did.

12     Q     You know, the department gave you a two-day

13  suspension for your utilization of DAVID.  FDLE took a

14  little more serious approach, didn't they?

15     A     They did.

16     Q     And gave you a 30-day suspension.

17     A     Yes, sir.  Hm-hmm.

18     Q     Told you to take ethics training, which I

19  trust you did.

20     A     I did, yes.

21     Q     And while you were twice put on modified

22  leave, once due to the stalking and another due to the

23  FDLE, in both cases, the department paid you your full

24  salary.  Correct?

25     A     They did.

Page 274

```
1        Q    I take it you don't believe sitting here today
2   that you've made any real effort to deescalate the
3   interaction with Mr. Gould, do you?
4        A    I believe I could have done a better job at
5   it.
6        Q    Would you characterize what you did as -- I
7   know you made one comment, we need to cool this down or
8   something, and then immediately both of you went at it
9   again.
10            Did you make any real effort to deescalate?
11  Because this guy was willing to drop the charges against
12  the other guy.  You didn't try to deescalate.
13            MR. KING:  Objection.  She answered it
14       already.
15            MR. NORTON:  I'm still asking a question.
16            THE ARBITRATOR:  Go ahead.
17            MR. NORTON:  And his lasted for a long time.
18  BY MR. NORTON:
19       Q    Yeah, did you do anything to try to talk him
20  down and say, look, we don't need to go here?  Never.
21       A    Well, he was making that very --
22       Q    No, did you do that?  Did you try to
23  deescalate?
24            MR. KING:  She gets to answer her question.
25            MR. NORTON:  I'm trying to ask it and get it
```

 1       answered.

 2            MR. KING:  But she was answering and you cut

 3       her off again.

 4  BY MR. NORTON:

 5       Q    Okay.  Did you do anything to deescalate?  If

 6  you could answer that yes or no, and then explain your

 7  answer as long as you want.

 8            MR. KING:  Objection.  He can't tell her how

 9       to answer.

10            Answer the question.

11            THE WITNESS:  I tried initially by telling

12       him, hey, let's reset, let's take this down a

13       notch.  That did not work.

14  BY MR. NORTON:

15       Q    That wasn't initially, ma'am.  That was way

16  into it while he's handcuffed on the ground.

17       A    Okay.  But you're asking me at any point did I

18  make efforts and I'm telling you that I did.  And then

19  when other officers got there, I had to remove myself

20  and walk away.

21       Q    You know, he removed the cellphone.  You even

22  identified it actually on your body cam as a cellphone.

23  So you now know the guy's holding a cellphone.  You can

24  see both hands.  Right?

25       A    Hm-hmm.

Page 276

```
 1        Q    Eight seconds later, he's mouthing off, I
 2   didn't commit a crime, whatever he's saying, then you
 3   drew down on him.
 4             If you perceived a threat at that point with
 5   now there's multiple -- well, there's at least one other
 6   officer there armed, of course, and Valerio is there
 7   somewhere, so there's three cops around here, you
 8   perceive that to be a threat?
 9             MR. KING:  Objection.  It's a
10        mischaracterization of the evidence.  Valerio was
11        in the back.
12             MR. NORTON:  It's not evidence, it's a
13        question, Counselor.
14             MR. KING:  Mischaracterization of the evidence
15        in the record.
16             THE ARBITRATOR:  It is.
17             MR. NORTON:  You're telling me there weren't
18        three officers there?
19             THE ARBITRATOR:  No.
20             MR. NORTON:  That's all I asked her.  I said
21        there's three officers, Strzelecki, Valerio and
22        her.  And we got a guy holding a cellphone up.  Is
23        that a threat, is my question?
24             THE ARBITRATOR:  Go ahead, answer that
25        question.
```

```
 1            THE WITNESS:  It could be when he dropped his

 2       left hand again and, again, I don't know what's on

 3       that left side, and then when he took that step

 4       back with the left foot.  So I was still perceiving

 5       it --

 6  BY MR. NORTON:

 7       Q    So that was it.

 8       A    Yeah.

 9       Q    That was the threat, his hand at his side.

10            You'd have to agree it's almost down to his

11  knee.  It's not in his pocket.  Right?

12       A    But it's close enough.

13       Q    Okay.  In your internal affairs investigation,

14  do you recall making the statement that with respect to

15  Mr. Gould, that he is amped up on something, that was

16  your take on it, and that he didn't listen to you about

17  keeping his hands out of his fucking pockets?

18            First of all, we didn't go into two pockets.

19  Right?

20       A    What do you mean, we didn't go in two pockets?

21       Q    Well, pockets is plural to me.  I just want to

22  know, he's standing there, the left pocket never got

23  entered in anything we saw.  Would you agree with that?

24       A    Right.

25       Q    So it's related to one pocket and two
```

Page 278

1    commands.

2         A    I said keep your hands out of your pockets.

3    Left, right, it --

4         Q    Okay.

5         A    I'm giving you a verbal command at that point.

6              MR. NORTON:  If you could give me maybe five

7         minutes.

8              THE ARBITRATOR:  Sure can.

9              MR. NORTON:  I would appreciate it, sir.

10             THE ARBITRATOR:  All right.

11             (A recess was taken.)

12   REDIRECT (BETHANY GUERRIERO)

13   BY MR. KING:

14        Q    Just a couple of things.  This isn't going to

15   take long at all.

16             He questioned you with regard to driving in

17   and not seeing the six-foot tall man standing there in a

18   bathing suit.  Were you operating a motor vehicle at

19   that time?

20        A    Yes.

21        Q    About how fast were you going?

22        A    I don't know.  Not very.  Maybe 15.

23        Q    So you were looking at the road clearly?

24        A    Hm-hmm.

25        Q    Were you doing anything else at that time?

Page 279

1        A     I quickly glanced at the -- I remember looking

2   at the MPT screen because it like alerted so, again,

3   that was like the last alert that I saw before getting

4   out and confronting him.

5        Q     Would you stake your life on the fact that he

6   didn't have anything in his back at that point?

7        A     I can't say a hundred percent for sure.  I

8   wasn't --

9        Q     The question is, would you stake your life on

10  it?

11       A     No.

12       Q     Yeah.  And in terms of the backpack --

13  sorry -- the towel and Mr. Gould, do you admit that not

14  searching him was a failure?

15       A     I --

16       Q     You didn't do it.

17       A     I didn't search him.

18       Q     Okay.  And for that matter, neither did

19  Strzelecki.  Correct?

20       A     Correct.

21       Q     Neither did any of those guys.  Correct?

22       A     No.  Correct.

23       Q     So everybody failed.  Team failure.

24       A     (Nodding head.)

25             MR. NORTON:  That is so leading.  It is

Page 280

```
 1        also -- it assumes things not in evidence.  Valerio

 2        hasn't testified here.  We don't know if he

 3        searched that thing or not.

 4             MR. KING:  I watched the video.  I know he

 5        doesn't.  I watched the video.

 6             MR. NORTON:  Never mind.  Go ahead.  I'm done.

 7   BY MR. KING:

 8        Q    To your knowledge, did anybody search the

 9   towel or Mr. Gould?

10        A    To my knowledge, no.

11        Q    So to your knowledge, is this a team fail?

12        A    Could be.

13        Q    I think Mr. Norton was asking you about where

14   his hands were, he said down by his knees or on his

15   side.  Hands are the danger part, right, that's the part

16   you focus on?

17        A    Hm-hmm.

18        Q    By his hands being down closer to his pockets,

19   if he had a weapon, is that a problem?

20        A    Yes.

21        Q    Also, again, he questioned you about you're

22   going to pull your weapon.  At that point, other than

23   his having dropped his hand, what were you looking at in

24   terms of making your decision to draw your weapon?

25        A    I guess just the, you know, the compliance
```

```
 1   level with him, which was, again, not super great.
 2        Q    Did you consider his nonverbal cues?
 3        A    I did.
 4             MR. NORTON:  Okay.  We're leading again,
 5        Counselor, and I've got to object.
 6             MR. KING:  Did you consider his nonverbal
 7        cues?
 8             MR. NORTON:  That's a leading question.  Yes
 9        or no.  And what do you want her to say?
10             MR. KING:  She could say what she wants.
11        That's not leading.  Did you consider is not
12        leading.
13             MR. NORTON:  Yeah, it is.  If it suggests an
14        answer, it is leading.
15             MR. KING:  I didn't suggest.
16             MR. NORTON:  I'd like the arbitrator to rule
17        on that.
18             You've led all day and that's leading.  And
19        after cross.
20             MR. KING:  Leading would be, you relied on
21        cues.  Right?  You relied on cues.  Correct?
22             No, I said, did you rely on cues?  It's not
23        leading.
24             THE ARBITRATOR:  Let's just go on.
25             MR. KING:  Thank you.
```

Page 282

1          She's already answered anyway.  It's fine.

2          One second.  That's all we have.  We rest.

3          THE ARBITRATOR:  All right.  Thank you.

4          MR. NORTON:  Briefings.

5          THE ARBITRATOR:  Oh, yeah.  We're done.

6          MR. NORTON:  We rested.  Yeah, apparently.

7          THE ARBITRATOR:  Any rebuttal evidence?

8          MR. NORTON:  No.

9          THE ARBITRATOR:  Okay.  Great.  What date are

10    we looking at?

11         MR. NORTON:  I don't think I've called a

12    rebuttal witness in ten years.  But I have, of

13    course.

14         Are you going to ask for a copy of the

15    transcript?

16         MR. KING:  From you.

17         MR. NORTON:  That's how the court reporters

18    get had, it ain't us.

19         MR. KING:  I told her.  She's aware.

20         MR. NORTON:  But you will send one to the

21    arbitrator?  Or do they all come through me?

22         THE COURT REPORTER:  I actually don't handle

23    that part.  I don't -- how do you want me to do it?

24         MR. NORTON:  Well, I want whatever this

25    gentleman wants.

1           THE ARBITRATOR:  I would like a compressed

2      copy of the transcript.  Okay?

3           MR. NORTON:  Okay.  I'll be responsible.

4      We're on the record.  Right?  If you send me a

5      condensed, I'll forward it to the arbitrator.  And

6      if you send me a regular -- Rick, do you want

7      condensed or regular?

8           MR. KING:  Regular.

9           MR. NORTON:  Okay.  Regular to me and I'll

10      forward that to him.

11           If this is agreeable to you, sir, when those

12      transcripts arrive in my place, I will promptly

13      send them out and say, I have received them, here

14      they come.  And I suggest 30 days, although we may

15      very well need an extension, that happens, 30 days

16      from that date but ending on a Friday.  In other

17      words, if 30 days is up on a Tuesday, we run to

18      Friday.

19           MR. MORSE:  I like that.

20           MR. NORTON:  I thought you would.

21           Is that okay with you?

22           THE ARBITRATOR:  That's fine.  That's perfect.

23           MR. NORTON:  My assistant will read that and

24      make sure I do it correctly.  It's on the record.

25           THE ARBITRATOR:  In terms of transmission of

Page 284

```
 1        the brief, file your brief by e-mail.
 2            MR. NORTON:  We just do standard court
 3        certificate of service.
 4            THE ARBITRATOR:  Okay.  By e-mail.
 5            MR. KING:  I generally e-mail it to him.
 6            MR. NORTON:  Yeah, we do everything by e-mail.
 7            MR. KING:  So what I'll do is I'll send it to
 8        you on Friday and then I'll send you my copy on
 9        Monday.
10            MR. NORTON:  Yeah, he does that to me.  You
11        did that to me last time.
12            MR. KING:  That's what I do.
13            MR. NORTON:  I sent you mine on time.
14            Okay.  That is a cool thing.  We send it to
15        the arbitrator, and the following Monday?  But what
16        if it's not --
17            MR. KING:  What do you want to do?  Tell me
18        what you want to do.
19            MR. NORTON:  How about the next day, the
20        parties will exchange.
21            MR. KING:  You want it on Saturday?
22            MR. NORTON:  I don't work Saturdays.
23            MR. KING:  That's what I said.
24            MR. NORTON:  Now let me see if I got this, one
25        more time.  We're going to send the briefs to the
```

Page 285

1      arbitrator, and the next workday, we exchange with

2      each other, which it may not be because that Friday

3      we may change things.

4           MR. KING:  Oh, I see.  I understand.

5           MR. NORTON:  The next workday.  Yeah.  We

6      don't know where things will end up.

7           THE ARBITRATOR:  Very good.  I want to thank

8      the parties for an excellent presentation of the

9      evidence.

10     We'll have a written decision back to the

11    parties no later than 30 days upon receipt of

12    post-hearing brief.

13     So thank you, very much, for the appointment.

14    It's a pleasure meeting both of you gentlemen and

15    working with both of you and working with everybody

16    else.

17     (The arbitration was concluded 4:47 p.m.)

18

19

20

21

22

23

24

25

Page 286

1                    CERTIFICATE OF REPORTER

2

3

4          I, Kimberly Iglewski, Court Reporter, in and

5    for the State of Florida at large, do hereby certify

6    that I was authorized to and did report the foregoing

7    proceedings, and that the transcript, pages 136 through

8    285 is a true and correct record of the proceedings to

9    the best of my ability.

10          Done and dated this 29th day of April, 2024 at

11   Martin County, Florida.

12

13

14

15

16

         Kimberly Iglewski

17       Court Reporter

18

19

20

21

22

23

24

25

## &

**&**   137:2

## 1

**10**   198:9,11
**10-12**   230:5,7
**100**   156:11
**103**   244:4
**10500**   136:10
**11**   200:11,12
**112**   204:12
**112.533**   204:22
   205:12
**12**   201:16
**121**   137:3
**13**   202:11
**136**   244:25
   286:7
**139**   138:7
**14**   142:1 202:19
**147**   138:8
**15**   197:7 212:18
   228:2 278:22
**16**   136:8
**17**   218:3
**18**   228:7
**188**   138:8
**189**   138:10
**19**   139:15
   218:21
**1:30**   136:9

## 2

**2**   201:24
**20**   213:16 218:3
   218:20,21

220:10,12 228:7
231:20 234:5
235:15 255:22
265:16
**2004**   216:16,16
**2012**   217:23,25
**2017**   209:4
   222:24
**2019**   193:9
   207:16 208:19
   208:21 268:3,11
   269:14
**2020**   209:3
**2022**   212:14
**2023**   217:25
   255:3
**2024**   136:8
   286:10
**203**   138:11
**213**   138:11
**216**   138:13
**21:02**   148:25
   149:2
**2240**   137:7
**230921-09536**
   136:3
**25**   189:25
**254**   138:14
**257,000**   201:23
**278**   138:14
**285**   286:8
**291,000**   201:23
**29th**   286:10

## 3

**3**   185:8
**30**   196:4,9,13
   197:20 273:16
   283:14,15,17
   285:11
**300**   137:3,7
   223:17
**305**   137:4
**32163**   286:16
**33134**   137:3
**33409**   137:7
**34**   228:8
**349**   198:25
   199:4,5
**36**   185:12
**360**   144:17,20

## 4

**445-7801**   137:4
**449**   198:23
   199:2
**4:31**   149:11
**4:47**   285:17

## 5

**5'6**   232:6
**50**   224:5 270:4
**533**   204:12
**557-1079**   137:8
**561**   137:8
**5:00**   254:3

## 6

**6**   148:10 185:4
   232:8 255:21

**6456507**   136:13

## 8

**8**   184:7,8 195:8
**800**   223:17
**85**   145:13
**850**   200:1 224:2
   263:6
**8th**   254:9
   272:10

## 9

**9**   197:4
**90**   215:8
**911**   184:16,17
   184:19 185:13
   185:19 186:2,16
   186:25 229:18
**92.525**   205:19
**9th**   255:3 264:2

## a

**aback**   226:4
**ability**   286:9
**able**   143:4
   196:17 219:21
   220:6,7 267:12
**above**   228:8
**absolutely**
   191:9 194:20
   195:2 196:15
   197:24 201:11
   201:15 206:25
   207:9,21 224:7
**academy**   153:7
   172:1 211:12
   216:16

**accepted**  269:1
**access**  258:16
   258:19
**accessed**  227:15
**accident**  179:2
**accolades**
   207:13
**accountability**
   194:15 201:1
**accountable**
   268:12
**accurate**  198:14
   205:20 206:10
   211:4,14 212:9
**accurately**
   211:7
**act**  203:2
**acted**  272:23
**acting**  203:3
   208:7
**action**  141:16
   144:7 178:17
   191:3 192:14
   228:1
**actions**  142:4
   248:18
**active**  227:20
**actual**  167:5
   183:24
**actually**  142:13
   156:3 160:18
   165:24 171:14
   175:4,8,9 188:4
   209:3 225:19
   227:3 229:10

236:24 242:13
242:24 244:2
249:1 275:22
282:22
**acutely**  256:2
**add**  227:19
   252:1
**addition**  197:20
**additional**
   197:25 198:5
**addressing**
   181:13 193:24
**adhere**  194:18
**administrative**
   202:5 254:8
**admit**  224:18
   279:13
**admitted**  187:19
   246:6 252:9
   259:17 261:5
   262:15
**admitting**  244:1
**adopted**  223:5,9
   263:13
**adrenaline**
   163:22 180:23
   181:2,5,10,11
   181:15 243:23
**advance**  238:25
   239:3,7
**advanced**
   218:15
**advancing**
   235:5 237:18
   238:10 239:1

**advised**  214:23
**advising**  226:24
**affairs**  148:2
   190:16 193:2
   204:5 214:12
   277:13
**affidavit**  198:13
   226:23 251:20
   251:24 252:2,13
**afraid**  221:23
**afternoon**
   139:12,13 147:7
   147:8 254:25
**agency**  210:20
   216:17 224:23
   228:25 238:8
**agency's**  197:18
**aggravated**
   248:12
**aggressive**
   193:10 239:23
   268:21
**aggressor**  155:8
**agitated**  142:5
   187:11 233:25
   246:1,5
**ago**  208:22,24
   219:17 223:1
   262:16
**agree**  150:16
   158:1,9 163:9
   163:18 164:6,21
   173:7 180:6,11
   180:25 181:9,19
   186:8 187:3

191:20 201:14
257:3,20,21
258:1 268:4,19
269:9 277:10,23
**agreeable**
   283:11
**agreed**  208:5
**ahead**  146:22
   259:25 262:22
   267:14 274:16
   276:24 280:6
**ain't**  258:10
   282:18
**alcohol**  221:13
**alert**  153:23
   279:3
**alerted**  279:2
**alerting**  245:1
**allegation**  209:2
**allegations**
   200:14 226:11
**alleged**  190:6
   224:15
**allen**  137:2
**allowed**  139:18
**amiss**  178:10
**ammunition**
   212:23
**amount**  221:16
**amped**  245:7
   277:15
**amy**  260:22
   261:7,9 262:25
   263:20 270:13
   270:13

**[analysis - arriving]** Page 289

analysis 193:2
analyze 141:18
analyzed 202:17
analyzing
231:21 236:8
anblaw.com
137:4
angry 173:1
187:11 246:1
257:7,8
animated 246:1
248:10
anna 186:3
annoying 244:3
answer 167:9
186:25 255:4
258:7 271:9
272:14 274:24
275:6,7,9,10
276:24 281:14
answered 267:7
274:13 275:1
282:1
answering
275:2
answers 182:16
antics 182:24
anton 192:1
anybody 141:5
143:18 153:19
257:16 261:22
261:23 270:24
280:8
anyway 145:8
147:3 156:18

258:9,14 267:13
282:1
apologize 158:3
205:2 242:23
apparent
247:18
apparently
226:5 282:6
appearances
137:1
appearing
189:1
appears 159:17
175:18
apply 204:15
appointment
285:13
appreciate
278:9
approach
188:17 273:14
approached
140:15
approaches
173:20
approaching
157:17 173:22
222:16 241:12
appropriate
144:7 183:3
194:2
approximately
194:21
april 136:8
286:10

ar 197:7 212:18
arbitration
136:5 285:17
arbitrator
136:5 140:11
141:24 146:22
146:24 148:15
148:23 171:9
188:15,25 205:3
215:3,5,9,14,17
216:7,11 218:22
219:13 220:16
231:11 243:5
254:19,22 259:2
259:25 262:22
267:14 269:10
274:16 276:16
276:19,24 278:8
278:10 281:16
281:24 282:3,5
282:7,9,21
283:1,5,22,25
284:4,15 285:1
285:7
arbitrator's
149:4 209:12
area 153:1
181:24 220:20
231:1
argue 182:25
argument 205:8
argumentative
160:25 182:15
arm 167:22
222:3

armed 144:5,21
146:15 151:9
152:3 153:9,23
155:7,24 186:21
233:7,7,9,13
243:11,11 276:6
arose 190:9
arrangements
221:18
arrest 193:11,13
193:15 208:10
208:11,17 226:3
227:23 249:2,5
249:24 250:2
251:7 268:19
arrested 184:20
197:21 227:10
arresting
249:16
arrival 143:20
arrive 153:7
230:19 283:12
arrived 140:11
140:13 141:5
145:16 150:1
154:9 156:5,14
157:9 177:15
187:8,9
arrives 151:18
152:25 153:2
155:17 156:25
163:2
arriving 152:5
157:13

**[articles - basis]**

articles   202:2
articulating
   187:1
ascertain   143:4
aside   140:21
asked   162:2
   169:14,16,18
   170:23 181:20
   182:1,10 206:19
   214:11 220:17
   228:22 241:8,9
   249:14,18
   276:20
asking   168:15
   168:16 171:2
   172:19,19
   173:15 175:13
   177:5 210:1,16
   246:18,22
   256:11,15 257:5
   274:15 275:17
   280:13
aspect   178:20
assess   188:19
assessing
   150:21 171:21
   173:11
assessment
   154:16,21
assigned   190:21
   191:4,5
assignments
   216:13,14 218:2
assistant   137:13
   189:20,21 190:8

192:5 255:14
   283:23
associated
   195:11
assume   143:15
   145:3 153:8,19
   158:25 167:11
   167:14 188:12
   233:3,5,9
   239:25 255:20
   266:4
assumed   142:8
   158:19
assumes   280:1
assuming
   264:22,25
assumption
   233:6 246:20
attached   145:3
attack   171:24
attempt   250:16
attempts   250:12
   250:17
attend   196:2
attention
   221:10
audios   191:17
authority
   204:15 257:16
authorized
   197:5 286:6
avenue   137:3
   221:3
awards   219:8
   219:11

aware   152:17
   183:14 187:19
   187:22 272:18
   272:24 282:19
awareness
   169:23 232:18
ayala   240:18
   250:21

**b**

b   136:3
back   142:7,18
   142:24 143:6
   144:20 145:23
   146:1,2,6,10
   151:7,23 152:4
   152:18,21,23
   153:5 155:21
   156:8 157:15,24
   159:5,13,21
   164:17,19,22,23
   165:2,4 166:4
   167:17 168:20
   173:22,24 174:3
   174:16,24 175:1
   175:4 177:14,19
   180:15,21
   183:24 195:7
   197:16 209:6
   212:14 215:17
   216:7,11 217:10
   217:14,15,22,23
   221:25 222:2,13
   222:24 223:15
   223:25 224:1,6
   228:20,23 229:9

231:15 232:11
   232:14 236:3
   237:3,8,14
   239:4,10 241:3
   242:1 244:21
   247:4,11,23,24
   248:1,6,20
   253:1 254:8
   256:12,13,19
   266:21,22
   269:19,20
   272:12 276:11
   277:4 279:6
   285:10
background
   158:8 267:19
backing   170:5
backpack
   265:15 279:12
bad   203:4
   207:15 208:17
bag   237:6
ballistic   212:22
band   242:15,20
based   142:3
   151:6 152:9
   182:9 205:20
   206:10 234:13
basically   140:15
   155:6 200:23,24
   202:23 217:3
   235:10
basis   190:24
   203:1,8

**bathing** 143:13
143:15 144:12
153:14,21,24
175:16,24 176:2
231:1 242:3,7
242:11 255:22
256:13,19
278:18
**beach** 136:1,11
137:2,7,7
139:15 147:13
189:18,20 216:8
218:21 223:4
226:7 227:22
253:24
**beath** 140:1
141:22 142:6,13
143:7 187:9
240:22 248:5,16
251:14,23 253:1
**beats** 245:1
**bechtel** 192:5
**began** 247:9
**beginning**
149:11,16
173:24 175:1,2
176:9 178:9
216:12 224:11
**behalf** 158:11
**behavior** 192:24
193:6 195:5
198:19 201:12
201:20 235:21
257:18 268:6,21
269:22

**belief** 205:21
206:3,11
**believe** 139:14
143:25 145:24
148:10 149:18
149:22 150:12
152:2 153:2,14
154:20 155:3,5
155:23 156:1
159:6 162:9
165:10 166:11
168:12 169:2
170:9 177:17,18
177:21 183:17
195:16 201:3,14
248:3,12 249:12
256:17 262:18
274:1,4
**believed** 145:19
195:10 250:7
**belligerence**
194:6
**belligerent**
177:16 208:7
221:9 222:9
**bells** 232:10
**belly** 242:15,20
**belt** 219:20
**bench** 221:14,14
222:13
**bendetto** 185:19
**benefits** 227:4
**best** 198:15
201:8 206:3
243:25 286:9

**bethany** 137:12
138:12 198:18
199:8,13,19,21
215:16,22 216:5
254:23 278:12
**bethany's**
199:10
**better** 197:20
274:4
**beyond** 257:16
267:13
**big** 237:13
**bill** 204:12,20
**bit** 143:3 157:24
167:16,17
230:24 231:6
244:25 246:4,12
253:8 256:3
**bladed** 164:21
165:2
**blades** 173:3
**blame** 182:17
**blamed** 269:3
**blindly** 155:25
**blue** 137:2
**blvd** 137:7
**body** 143:7
168:5,7 170:25
172:16 175:19
244:21 275:22
**book** 148:9,15
148:19 185:5,9
193:17 197:17
203:24 207:25

**boom** 236:3
**bottom** 194:13
196:22 200:5
**brain** 232:11
**brand** 216:23
**break** 219:21
220:24
**breakdowns**
193:7
**breath** 183:9,10
**breathe** 253:10
253:19
**breathing** 172:5
244:22
**brief** 284:1,1
285:12
**briefings** 282:4
**briefly** 145:16
220:18
**briefs** 284:25
**bring** 243:8
250:14
**bringing** 233:11
**broke** 212:15
228:1
**broken** 228:3
**brooke** 137:12
**brought** 214:24
215:1 225:16
263:15
**buddy** 235:24
**building** 247:4
247:12,22
**bulge** 153:22

**burton** 200:6
**button** 246:10

**c**

**c** 139:3 189:15
**cad** 184:1,2,6,7
**call** 143:20
146:5,5 147:3
147:19,22,23,25
150:2,16,16,18
150:20 151:11
153:8 154:15
159:1 162:15,23
163:25 170:13
179:6,12,14,15
179:16 181:5
183:14,21
184:12 185:19
185:22 186:2,3
215:15 221:1,6
221:19 228:13
229:9,13,14,14
232:15,17 233:8
239:11 241:9,10
243:14 245:13
245:14,16,17
249:21 273:5
**called** 139:7
184:25 185:1
189:8 215:23
245:19,24
282:11
**callers** 229:19
**calling** 184:17
187:4,4 229:18
251:3 270:24

**calls** 147:16
184:16,19
185:13 186:12
186:16 187:1
188:18 202:4,5
217:2,2 224:9
229:23 233:7
**calm** 161:21
163:2 164:9,13
170:3 176:11
**calmly** 162:2
166:15 176:19
**cam** 244:21
275:22
**camera** 142:10
143:7
**canal** 219:19
**candice** 201:17
201:17
**captain** 191:24
192:1 251:10
**captains** 255:13
**car** 144:14
145:10 157:14
173:20 178:3
197:5 212:15
219:14,21 228:1
231:9,24 232:3
234:15,16
237:14 238:18
238:19 265:5
**cardiac** 243:24
271:11
**cardiologist**
272:9

**care** 179:23
241:20 268:14
272:10
**career** 142:19
154:14 216:12
268:3
**careers** 217:21
**carrier** 202:16
272:20
**carry** 257:15
**carrying** 143:25
264:23
**cars** 212:19
228:2
**carted** 252:9
**carter** 240:16
**case** 136:3
147:21 152:12
155:7,9,12
170:15 179:13
182:18,25
190:12 192:17
195:17 200:8
211:14 214:20
220:14 222:22
227:2,20 229:25
242:5 251:21
252:16 259:12
265:4 271:1
272:10
**cases** 220:11
273:23
**catherine**
219:22

**cause** 172:9
198:13 249:16
250:4,8 251:20
251:24 252:2,5
252:13,15
**caused** 141:7,7
141:12 178:10
181:14
**cellphone** 157:6
157:12,25
158:23 166:19
167:5,19 170:24
275:21,22,23
276:22
**cellphones**
166:20
**center** 202:5
253:24
**certain** 153:11
234:12 260:14
**certainly** 147:2
192:23 262:20
**certificate** 284:3
286:1
**certified** 204:14
218:19
**certify** 286:5
**cetera** 140:12
144:3,13
**chairs** 215:19
**challenge**
170:18
**challenging**
162:8 165:19
167:19

**chance**  148:1
165:15,17
173:14 179:15
**change**  174:17
264:19 285:3
**changed**  174:15
249:4
**changes**  173:3
173:19
**chaotic**  234:5
**characterization**
171:5 176:6
**characterize**
171:6 274:6
**characterized**
184:15
**charge**  214:7
217:19 225:4
249:13
**charged**  192:25
197:21 214:4,5
225:1 227:12
270:1
**charges**  268:5
274:11
**charles**  262:25
270:12,13
**charlie**  259:6,11
259:18 260:3,17
261:9,15 263:1
263:4,14,19
**charlie's**  263:10
**check**  265:24
266:8

**cherry**  226:17
**chest**  253:20
**chief**  137:11
138:9 185:5
189:7,18,20
190:8,18 192:5
200:9 202:8
203:16,18
213:19 241:9
244:16 255:14
**child**  199:18
223:6 225:24
**choice**  180:24
**choose**  250:2
**chose**  198:3
265:11
**chosen**  249:23
**circuit**  214:9
**circumstances**
206:24
**city**  136:1,10
137:2 139:14
173:15 201:18
201:19 202:3
220:20 227:22
271:18
**city's**  176:12
184:3 185:4
202:16 203:9
272:20
**ciu**  217:23
**civil**  227:24
**civilian**  185:17
220:21

**civilians**  151:3
179:17 257:12
**claim**  271:20
272:5
**cleaner**  219:18
**clear**  144:2
155:21 170:12
223:24 254:10
**clearly**  142:4
144:24 173:9
278:23
**clerk**  226:24
**client**  171:12,15
**clog**  229:24
**close**  142:2
148:9 198:6
215:8 221:8
243:8 258:1
277:12
**closed**  272:10
**closer**  205:5
280:18
**clubhouse**  253:3
**clue**  230:15
**colluded**  227:3
**combative**
241:22
**combination**
243:23
**come**  141:5
153:5 155:25
181:16 184:16
216:16 219:6
221:19 226:9
234:8,16 241:3

246:12 253:1
254:8 257:25
270:16 282:21
283:14
**comes**  220:21
229:13,21 244:1
**comfortable**
169:22 250:22
**coming**  145:21
145:22 164:1
165:3 166:17
169:21 222:15
239:24 240:1
256:6
**command**
163:10,13,14
164:8,9 170:4,4
233:14 278:5
**commands**
141:16 169:2,5
278:1
**comment**  273:5
273:7,7 274:7
**comments**  202:6
202:7
**commit**  276:2
**committed**
203:2,4 210:13
237:16
**commotion**
145:25
**communicated**
224:12
**communicatio...**
202:5

**community**
201:10 217:17
**comp** 271:20
272:5,8
**company** 203:9
203:9 230:8
**competent**
230:2
**complainant**
198:18,24
**complaint**
190:25 202:17
209:6
**complaints**
205:13
**complete** 177:1
180:22
**completed**
205:18
**completely**
182:19 226:4
**compliance**
280:25
**compliant**
140:24 204:11
**complicate**
221:21
**complies** 239:10
**comply** 173:17
**composure**
268:18
**compound**
165:20,22
**compressed**
283:1

**computer**
230:23
**conceal** 153:19
242:10,22
**concealed**
153:17 154:8
157:8 242:8,14
265:6,6
**concede** 256:23
**concern** 142:21
170:15 171:3
172:10 266:18
266:23
**concerned**
143:16 169:11
172:16 237:5
267:17 272:13
**concerns** 141:19
**concluded**
285:17
**conclusion**
193:5 255:17
**conclusions**
196:20
**condensed**
283:5,7
**conduct** 193:16
208:3 227:14
**conference**
215:20
**configured**
140:5
**confirm** 144:7
165:11,15
166:12 167:15

**confirmed**
165:16 199:20
**confronted**
224:14 225:18
**confronting**
256:21,24 279:4
**confused** 179:9
235:13 260:12
**consider** 146:7
147:19 165:1
218:15 281:2,6
281:11
**considerably**
244:25
**consideration**
207:8,11,14,20
**considered**
218:25 219:6
**considering**
192:13
**constant** 235:19
**contact** 145:17
146:11,12,14
156:9
**contacted** 226:7
**contained**
214:13
**contemporane...**
214:4
**contentious**
223:3
**context** 238:14
**continue** 146:23
154:21 266:3
267:13

**continued**
173:10 253:6
**continues** 194:4
**continuing**
180:20 250:20
**continuous**
242:24
**contract** 206:21
**control** 164:7,11
165:9 193:6
208:7 222:17
237:19 239:13
249:7
**controlled**
257:18
**conversation**
182:2,11 220:10
224:5 234:22
270:8
**conversations**
224:3,4 226:18
**conversely**
250:1
**convoluted**
245:20
**cool** 145:10
257:23 274:7
284:14
**cops** 236:15
257:15 276:7
**copy** 148:6
282:14 283:2
284:8
**coral** 137:3

**core** 194:15
200:25
**corneal** 205:6
**coronary**
187:16
**correct** 139:25
140:5,6 147:24
150:4,5,6,10,18
152:15,16 153:9
153:10 157:2,4
158:17,21
159:10,25
160:13 162:16
162:24 163:6
166:12 167:12
167:15,15 175:9
177:16 178:11
178:24 180:1
187:13 192:12
194:3,8 196:6
196:11 198:16
198:20,24 199:9
199:13 200:3,7
200:15,16,19
201:5 202:1,25
203:7,11 204:13
205:13,22 206:7
206:8,16 207:1
207:2,5,6
208:17,18,20,21
209:5,10,14,15
209:18 210:18
210:22,24,25
212:16,19,25
224:4 237:23

238:5,19 240:9
240:12,13 241:2
241:6 242:8
250:6 251:11
252:23 254:12
255:8,12,18
256:22 257:17
261:4,20 263:21
273:24 279:19
279:20,21,22
281:21 286:8
**correctly** 264:5
283:24
**couch** 223:11
**counsel** 169:14
182:6,15
**counseling**
213:13,14,15
**counselor** 161:1
167:21 174:24
175:21 183:5
276:13 281:5
**counts** 226:15
268:13
**county** 225:20
286:11
**couple** 145:21
157:15 164:16
195:20 213:21
216:18 217:16
219:8,15 223:21
227:23 229:1
233:23 250:21
252:9 278:14

**course** 145:2
195:21 196:1
202:8 203:3
217:4 220:2
223:14,20,22
226:20 262:1
263:8 265:25
276:6 282:13
**court** 140:18
189:14 193:4
202:14 226:24
282:17,22 284:2
286:4,17
**cover** 144:11,16
220:17 232:5
265:7
**cpr** 218:7
**crack** 221:23
**crash** 255:24
**crawled** 219:25
**create** 181:4
226:18
**created** 226:23
**creates** 180:22
181:2
**credibility**
262:20
**crime** 210:10,14
210:17,20 217:9
262:1 276:2
**crisis** 218:4
**cross** 138:5
147:5 203:16
254:23 281:19

**cues** 171:21,23
171:24 172:18
281:2,7,21,21
281:22
**cuff** 234:8
**current** 189:17
**currently**
139:18 186:21
**cursed** 268:22
**custody** 222:21
249:20
**customers** 221:6
**cut** 275:2

**d**

**d** 138:2 139:3
189:15
**damage** 262:20
**damn** 256:13
**danger** 280:15
**dangers** 265:13
**database** 197:18
**databases** 195:8
**date** 136:8
282:9 283:16
**dated** 286:10
**daughter** 223:9
223:12 225:16
226:25 263:13
263:15
**david** 209:2,9
209:12,13
213:22 214:7
222:22 224:16
227:8,15 258:15
258:22 259:14

260:16 261:23
262:3 270:13
273:13
**day** 145:7,8
195:18,19 196:4
197:20 213:15
217:25 220:8
224:23 229:12
231:16 236:14
236:15,19
243:10 244:5,20
245:15 254:2,3
254:20 255:18
264:11 265:22
265:23,23
267:18 268:8
271:4,11 273:12
273:16 281:18
284:19 286:10
**days** 187:20,21
196:10,13
223:22 226:2
252:10 270:7
283:14,15,17
285:11
**deadly** 179:8
237:1
**deal** 237:13
**dealing** 178:7
256:20
**dealings** 194:24
**debate** 264:19
**decipher** 249:20
**decision** 181:7,8
192:11 206:20

207:3 231:22
251:11 280:24
285:10
**declined** 203:9
**deemed** 194:2
219:24 228:21
**deescalate**
250:12,16 274:2
274:10,12,23
275:5
**deescalated**
145:1
**deescalating**
188:20
**deescalation**
195:1
**defend** 178:23
179:16 203:10
**defendant**
186:13 187:4
**defense** 202:24
268:18 272:21
**defensive** 238:7
**defiance** 239:12
249:19
**defiant** 239:15
**definite** 141:10
**definitively**
243:10
**defying** 177:11
**degree** 145:13
**delray** 195:15
223:4 226:7
227:21,22

**demeanor**
187:10 194:5
**denied** 202:23
225:21 272:3,6
272:7,20
**dennis** 142:23
**deny** 224:16
**department**
139:16 147:14
189:18 190:1,2
192:10,13
193:13 195:9,14
195:15,16
196:21 197:5
201:9 203:13
213:12 216:8
218:22 220:2
223:4 225:13
226:7 256:7
273:12,23
**department's**
194:15 200:25
**depends** 172:15
**deployment**
222:8
**deprived** 206:4
**describe** 141:11
268:10
**describes** 246:1
**desk** 253:7
**despite** 270:18
**detain** 234:8
249:5
**detained** 143:21
248:22

**detective** 226:17
**determination**
255:10
**determined**
150:3 155:19
156:11 157:7,8
194:5
**develop** 205:15
**device** 158:16
**difference** 183:3
**different** 165:24
182:21 218:16
219:5 234:11
242:21
**differently**
254:14 255:3
**difficult** 239:15
249:6 253:10
**dipping** 233:20
**direct** 138:5
139:10 148:19
189:11 216:1
267:8,13
**directed** 221:14
**directions** 173:5
173:8,16
**directly** 256:2
**director** 201:18
**disagree** 167:20
**disappear** 232:9
**disarm** 144:7
**disassembled**
182:17
**disciplinary**
192:14,15,19

220:11 227:25

**discipline**
206:22 207:1,19
207:23 213:8,16
228:6

**disciplined**
227:15 262:16

**disciplines**
268:7

**disclosing**
263:20

**discourse** 255:5
270:3

**discovered**
150:9 225:15

**discretion**
249:23 250:2

**discussed**
270:11

**dismissed** 225:5
225:7,8,11
272:13

**dispatch** 183:20
184:10

**dispatched**
183:25 228:20

**dispatchers**
229:20

**dispel** 142:21
143:22 144:5,22

**displayed** 155:1
155:14

**dispute** 164:7

**disregard** 203:6

**disrespectful**
246:21 247:1

**disseminate**
210:10 227:7

**disseminated**
209:21 210:2,7
210:13,17
211:16 214:5
229:22

**distress** 188:5

**district** 229:10

**disturbance**
149:19 183:16
183:17 221:2
228:15

**disturbing**
193:6 221:5

**divorce** 223:3,5

**divorced** 263:13

**docked** 142:10

**document**
206:13 210:20
210:23

**documentation**
200:1

**documented**
199:22 263:7

**documents**
145:4

**doing** 141:25
154:16 156:15
165:13 167:18
175:6 192:22
203:2 205:16
217:12 229:9,15

237:18 242:23
244:4,18 249:18
262:7 270:7,9
278:25

**domestic** 226:23

**dominick**
137:11 138:9
189:7,15 203:16
213:19

**doubt** 203:12,14

**downplay**
236:14

**downward**
268:11

**drafting** 252:15

**drag** 220:7

**drain** 219:25
220:5,7

**dramatic** 225:1

**draw** 140:16,19
140:25 141:12
178:9,18,21,22
179:16 221:11
280:24

**drawing** 244:9

**drawn** 179:1,2

**draws** 178:21

**drew** 140:16,19
141:3 276:3

**drive** 143:16
229:14

**driver** 213:23

**driver's** 209:13

**driving** 143:11
278:16

**drop** 160:24
199:7 237:4
274:11

**dropped** 219:20
277:1 280:23

**dropping** 165:1
172:3

**drops** 164:22

**drove** 144:10
219:18 255:21
255:22

**due** 273:22,22

**duly** 139:7
189:8 215:23

**dump** 227:21
243:23

**duties** 272:24

**duty** 196:17
198:1,5 244:16
245:14 254:9
271:23,25
272:12

**dying** 236:15

**e**

**e** 137:9 138:2
139:3,3 189:16
216:5,5 284:1,4
284:5,6

**earlier** 159:4
201:1

**early** 229:12

**earth** 261:24

**earthly** 211:17

**easier** 173:24
208:1

easy  224:9
226:20
ed  191:5
effects  244:9
effort  274:2,10
efforts  250:25
275:18
egregious
268:12
eight  208:25
209:8 223:1
236:23,25 254:7
276:1
either  144:6
145:9 147:22
169:16 179:17
184:5 185:10
206:14 221:23
234:14 241:5
259:4 267:20
element  256:17
elements  249:11
249:12 252:4
elevate  164:11
eloquently
142:2
emotion  163:21
emotional  193:7
199:9,10,21
269:13
emotionally
223:7 269:4,6
employ  196:13
employed
203:13

employment
203:4
emptied  144:16
en  245:16
encounter  208:6
encountered
247:6 248:14
260:23
encountering
161:14
endearment
139:22
ended  196:4
208:12 243:24
270:1,1
endured  201:19
enforcement
141:2 143:11
163:20,22 167:4
189:23 190:1,5
195:13 196:14
196:21 198:14
209:25 217:21
257:11,19 261:2
262:6,7
enforcement's
151:12
engage  195:4
243:20 250:20
250:23 270:8
engaged  190:6
192:23 268:20
engaging
269:22

enraged  199:13
ensuing  251:3
entered  277:23
entire  144:14
178:7 190:15
269:14
entry  218:17
eroded  201:9
erosion  201:12
escalate  173:11
236:25
especially  141:6
150:1 153:8
179:15 186:12
esquire  137:5,9
137:10
established
162:14 165:8
170:19
estranged
195:11
et  140:12 144:3
144:13
ethics  196:24
273:18
evaluations
207:10 218:23
218:24 228:7
evening  254:3
event  228:10
243:24 245:7
271:11
eventually
231:13 232:24

everybody
233:2,9 234:8
264:16 265:3
279:23 285:15
evidence  166:1
166:2 171:9
185:25 209:20
209:23 210:2,4
210:6,17 255:15
259:23 276:10
276:12,14 280:1
282:7 285:9
ex  195:11,13
223:3,8 225:9
260:20 261:16
263:3 268:11
exact  140:20
214:16
exactly  140:21
147:1 183:24
230:21
examination
139:10 189:11
216:1
examined  139:8
189:9 215:24
exampled
160:19
excellent  285:8
exchange
284:20 285:1
excited  172:6
excuse  140:2
exercise  244:18

[exhibit - firearm]                                    Page 299

exhibit  148:10
  148:19 184:7,8
  195:8 198:8
  201:16 202:11
exhibiting  193:6
  203:5
exhibits  184:3
exist  167:1
  226:18
exiting  144:18
expand  227:20
expanding
  172:22
experience
  142:3 163:19
  164:15 189:24
  264:14
experiencing
  249:9 251:18
explain  234:3
  239:16 250:25
  251:7 275:6
explained
  141:11 180:2
explanation
  224:20
expletives
  249:15
explore  192:14
  262:21
explorer  217:19
expose  265:11
extended
  167:23

extension
  283:15
extensive
  197:25
extra  244:22
extremely  221:8
  221:9
eyes  251:17

**f**

fabricated
  226:16,17
face  172:12
faced  180:24
fact  141:4
  184:14 236:23
  246:6 259:17
  267:9 269:3
  279:5
facts  165:25
  166:2 201:3
fade  238:21
fading  238:22
fail  280:11
failed  279:23
failure  279:14
  279:23
fair  150:24,25
  155:4 160:8
  161:25 164:4
  165:19 269:21
faith  203:4
false  227:23,23
  262:19
falsely  226:23

familiar  204:19
  244:19
far  156:2 169:8
  185:17 240:25
  263:5 270:19
  272:13
fast  163:21
  238:16 278:21
favor  233:19
  235:9
fdle  190:3,4
  195:21,25
  196:10 197:20
  273:13,23
fear  143:22
  144:5,22 181:4
federal  202:14
feel  171:16
  244:12 246:2
  253:6
feeling  244:2
  246:8 251:17
  271:8
feels  253:19
feet  221:13
  255:22 266:8
fell  222:13
felt  234:12
  250:22 271:4
fences  269:22
fever  244:4
field  216:19,20
  216:22 217:15
  229:4,5

fighting  208:12
figure  234:9
file  284:1
filed  268:6
  271:20
final  196:3,7
  227:25
finally  202:24
find  149:25
  150:23 167:8
  178:1 192:22
  210:9 239:17
finding  272:23
fine  165:13
  188:24 282:1
  283:22
finest  254:11
finger  160:18
  161:5 167:21,25
finish  174:5
fire  220:2
  253:17,21
  257:23
firearm  143:23
  146:14,17
  147:16,18,22,25
  149:20,23 150:2
  150:8,16,20
  151:2,11,11,19
  151:21 152:6
  153:8,18,19
  154:15,25 155:1
  155:22 156:11
  159:7,23 162:23
  165:9 166:8,9

**[firearm - gather]**                                                 Page 300

170:13 173:12
178:14,21 179:6
179:12,14,14,15
179:16,20
180:21,24 181:1
181:6,9,13
183:15,18,21,22
184:10,11
228:16 233:11
247:16
**firearm's**
151:16
**firearms**   144:2
147:22 150:13
150:22 179:1,20
218:12 242:22
**fired**   202:8,9
**first**   139:7
140:15 143:21
144:4 160:11
161:14 164:12
165:17 173:17
176:11 185:12
189:8,15 191:3
196:7 198:12
206:9 208:1
215:23 216:9
217:22 222:8
224:13 231:25
233:18 235:8
237:2 242:1
247:19 248:13
249:1 250:11
252:19 255:9,20
264:6 266:21

277:18
**five**   189:4,22
202:21 208:24
208:24 226:2
247:25 262:16
278:6
**florida**   136:11
136:12 137:3,7
189:25 196:20
286:5,11
**flushed**   172:12
**fmcs**   136:3
**focus**   280:16
**focused**   255:23
**fold**   269:20
**folded**   178:6
**folder**   184:6
185:4
**folks**   215:11
**follow**   142:20
148:18 159:23
173:5,8
**following**
141:15 173:15
205:25 284:15
**follows**   139:8
189:9 215:24
**foot**   164:22
165:2 232:8
255:21 277:4
278:17
**footage**   143:8
244:22
**forbid**   229:25

**force**   179:8
237:1
**forcing**   220:4
**forearm**   172:22
**foregoing**   286:6
**foreground**
160:2
**forget**   140:20
**forgot**   205:1
248:19
**fort**   272:9
**forth**   177:19
193:4 223:25
224:1,6 239:10
269:19
**fortunately**
197:9
**forward**   144:8
158:12 167:16
168:22 177:13
188:18 205:24
217:20 239:5
268:3 283:5,10
**found**   198:22
252:18
**four**   165:23
202:21 208:22
217:4,11
**fourteenth**
176:7
**fourth**   202:20
**franks**   192:2,3
**fraud**   227:5
**friday**   283:16
283:18 284:8

285:2
**friend**   223:11
**front**   145:25
146:2,8 148:6
148:20 168:5,7
170:25 175:24
176:2 185:8
193:18 247:24
248:2 256:21
**fto**   217:9,24
263:25
**fuck**   255:6,6
268:23
**fucking**   277:17
**full**   144:17
196:18 271:18
273:23
**funny**   263:10
**further**   215:3
220:5 242:1

**g**

**g**   139:3 216:5
**gables**   137:3
**gainesville**
190:2
**garcia**   191:24
200:10,20
251:10 255:10
**gardens**   136:1
136:11 137:2
139:15 147:13
189:18,20 216:8
218:22 253:24
**gather**   249:20

**gathered**  221:16
**general**   147:10
  232:24
**generally**
  147:18 155:10
  179:1,12 284:5
**gentleman**
  144:12 165:18
  242:3 282:25
**gentlemen**
  285:14
**geography**
  217:1
**getting**   172:5
  207:17 229:19
  229:19 232:2
  236:15 253:9
  257:7,8 264:19
  270:1 272:7
  279:3
**give**  172:9 178:5
  201:18 212:18
  233:14 278:6
**given**  218:11
  250:11
**gives**  166:15
  181:10
**giving**  182:16
  270:19 278:5
**glanced**  279:1
**glass**  138:6
  139:6 147:5,7
  182:13 188:9
  205:4 240:20
  245:3,6 246:1

246:14 247:21
248:15,24 249:2
250:13 251:14
252:11,12
253:15,16
**glasses**  158:3,4
**go**   142:9,9,24
  144:8 145:23
  146:10,22
  148:21 152:5,11
  152:18 156:21
  157:24 158:12
  159:19 160:12
  160:14 161:13
  162:12 164:3
  166:11 167:16
  167:17 168:22
  172:18 173:23
  173:24 175:1,4
  175:9 176:4
  177:13,14
  180:15 183:24
  184:6,6,10
  185:2,4,12
  187:13,24 194:9
  194:12 195:7
  197:16 198:11
  198:21 199:24
  201:16 202:11
  202:20 203:24
  204:2 208:25
  217:7 219:4
  223:15 229:25
  241:8,10 246:11
  248:20 249:4

250:10 253:2
254:4,22 259:25
261:2 262:22
265:19 266:8,11
266:19 267:2,12
267:14 274:16
274:20 276:24
277:18,20 280:6
281:24
**god**  229:25
**goes**  152:20,23
  157:12 163:5
  164:10 175:7,13
  175:15,19 177:6
  177:7 178:2
  183:15,15,20
  233:17 235:13
  245:4,4
**going**   142:9,9
  143:19 146:6,10
  146:18 147:9
  148:5 149:14,16
  151:23 155:20
  156:17 158:25
  159:4,21 161:4
  161:13 169:11
  169:12,23,24
  170:25 173:14
  175:17,18
  177:10,19 181:8
  183:11,12 195:7
  198:10 204:25
  205:4 209:24
  215:8 220:23
  221:5,23 222:11

223:1,7,15,18
224:20 226:6
227:21 231:20
232:11 234:7,9
234:10,18
236:11,12,14
237:20 238:16
241:17,19 244:8
244:10,24
245:12,21 246:2
246:9 248:17,20
250:23 253:12
253:19 254:4,5
255:2,5,20,25
259:10 261:10
262:24 268:14
271:5 278:14,21
280:22 282:14
284:25
**good**   139:12,13
  147:7,8 155:2
  161:2 188:20
  215:4,9 225:21
  250:24 264:14
  265:20 285:7
**gosh**  224:25
**gotta**   198:9
  234:8
**gotten**   193:4
  219:11 248:13
  250:19 265:5
**gould**   142:9
  143:21 145:18
  145:20 152:15
  152:18,20,25

153:13 155:10
155:12 159:3
161:15 173:7,9
173:15 177:15
180:12 184:14
185:13,22 186:5
186:13,15,20
187:2,5 190:25
201:13 202:12
230:13 231:14
232:25 243:14
247:18 248:14
248:21 249:1,1
249:7,8 252:25
254:11 264:20
266:3 273:4
274:3 277:15
279:13 280:9
**gould's** 157:1
**grab** 144:19
222:3
**grandma**
221:17,19
222:15
**grass** 145:10
**great** 230:3
244:2 245:17
281:1 282:9
**greet** 153:4
**greg** 137:9
147:9
**gregory** 137:10
**grievant** 137:12
190:9 191:1
192:23 193:5,10

195:4 198:24
202:8,12 203:12
215:15
**grievant's**
198:19
**grinding** 172:24
**groin** 231:1
**grossman**
190:14 191:6,10
204:7 214:13
**ground** 140:14
144:1,13 168:9
180:11,12 239:9
241:24 267:1
275:16
**guerriero** 136:3
137:6,12 138:12
140:2,8,15
142:9 144:10
150:7,12,17
151:1,4,18
152:25 153:6
154:9 155:17,18
156:5,25 157:9
157:13,17 158:7
158:19 159:2
160:8,12 161:14
161:20 162:15
166:10 167:8
170:21 176:12
177:19 178:1
180:3,13 186:12
190:13 193:23
194:14 206:20
215:16,22 216:5

216:6 226:22
254:23 278:12
**guerriero's**
142:4 164:8
173:8,16 187:10
**guess** 181:24
200:9 213:7
222:15 250:1
262:25 265:23
272:18 280:25
**guest** 160:2
**guidelines**
193:14,15
**guillen** 191:5,7
192:7
**guilty** 199:8
**guise** 244:5
**gun** 143:19
154:20 155:3,13
157:3 159:1
162:10 163:25
163:25 165:7,11
167:5 168:1,21
170:19,20
230:17 231:1
232:12,15,17
233:8,11 235:14
236:5,7,24
241:9,10 242:7
242:14 244:10
249:21 256:7,13
256:19 265:22
267:3,6
**guns** 170:20
257:15

**gut** 142:20
**guy** 143:12
145:4 146:8
154:20 221:23
234:22 235:3
241:1 242:14
256:10 266:6
268:22 274:11
274:12 276:22
**guy's** 275:23
**guys** 140:5
232:6,8 249:9
270:11,22
279:21
**gym** 244:14,17

## h

**hair** 142:17
231:15 232:14
**hairs** 175:22,23
271:5
**half** 223:21,23
223:24 226:20
263:9
**halfway** 220:7
**hall** 136:10
**hand** 153:15
157:16,19 158:1
158:9 160:14,15
160:22,24
161:15 162:11
165:6 167:22,25
168:5,24 169:21
170:7 174:21,25
175:2,7,13,17
175:19 177:6,6

177:7,23 237:4
241:11 277:2,9
280:23
**hand's**  168:7
175:6
**handcuff**  141:1
222:4 239:19
**handcuffed**
141:17 145:6
266:6,11,20
267:6,24,25
273:4 275:16
**handcuffing**
243:15
**handcuffs**
140:14 145:5
248:21 251:1,6
257:15
**handgun**  197:8
242:11
**handle**  233:7
282:22
**handles**  188:18
**hands**  141:13
144:19 151:12
160:12 161:16
162:3 163:1
164:2,9 165:5
169:2,10,10,12
169:14,25
170:10,11,14,23
170:25 171:5
173:18 174:8,19
175:9 176:3,4
176:14,19,21

231:25 232:9
233:15,16,19
234:16 235:6,9
235:10,23,24
270:18 275:24
277:17 278:2
280:14,15,18
**hang**  199:14
208:4
**happen**  141:9
163:21 179:7,8
212:4 257:9
**happened**
140:11,22 146:2
146:3 178:1
187:17 211:7,23
212:9 220:16,24
222:14 223:19
225:4,14,25
231:16 236:25
243:18,19 244:7
245:10 246:6,15
248:17 249:4,5
252:7,8,17
253:5 254:7
258:4
**happening**
246:13
**happens**  151:11
164:3 223:15
239:7,8 271:25
283:15
**happy**  263:6
**harassed**  187:5

**harassing**
185:22 186:5,14
186:15 187:7
**hard**  220:18
244:22
**hate**  142:17
**hateful**  202:6
**havoc**  221:5
**head**  143:11
174:25 175:3
221:23 236:2
245:12 255:16
263:24 264:10
279:24
**hear**  156:12
161:14 176:13
183:6,8 230:10
234:12
**heard**  145:25
151:6 156:3
159:20 230:5
231:14 232:12
245:15 255:9
270:16,20
**hearing**  142:4
150:14 184:25
196:1,2 285:12
**heart**  244:12,24
**heat**  222:18
**heavy**  244:15,15
**hectic**  234:6
**hecticness**  220:1
229:20
**heighten**  164:7

**heightened**
141:8 142:5
173:9 181:10
232:17
**held**  216:13
268:12
**helmets**  212:23
**help**  220:8
252:12
**hey**  154:19
155:3 161:16,23
164:9 165:11
168:10 221:25
233:19 235:8,18
235:24 241:23
275:12
**hiding**  160:22
**hierarchy**  192:9
**high**  147:19
150:16
**hindsight**
163:17,20
**hipaa**  187:17
**history**  192:15
192:20 216:7
260:9
**hm**  161:22
164:20 170:6
222:25 224:22
228:2,9 231:10
236:1,4 238:1,3
238:6,20,23
239:6,20 242:4
242:9,17,19
243:16 246:16

247:8 248:23
249:3 250:15
252:24,24 256:9
256:18 258:18
259:1 263:2,22
264:1,7,21,24
265:17 266:25
270:21 271:19
272:22 273:17
275:25 278:24
280:17
**hmm**   161:22
164:20 170:6
222:25 224:22
228:2,9 231:10
236:1,4 238:1,3
238:6,20,23
239:6,20 242:4
242:9,17,19
243:16 246:16
247:8 248:23
249:3 250:15
252:24,24 256:9
256:18 258:18
259:1 263:2,22
264:1,7,21,24
265:17 266:25
270:21 271:19
272:22 273:17
275:25 278:24
280:17
**hold**   240:2
**holding**   167:21
167:25 168:6
170:24 175:10

175:12,24 176:2
275:23 276:22
**holster**   186:24
242:18
**home**   164:3
223:10 236:12
**honest**   178:16
188:22 268:14
**hoods**   232:4
**hospital**   187:13
187:18,24 188:2
246:7 252:9
253:23 254:1
271:16
**hostage**   218:4
**hot**   145:5
**hour**   254:11
**huffing**   219:18
**huge**   181:2
**huh**   259:7
**human**   137:11
137:12 203:6
257:10
**hundred**   248:8
267:10 279:7
**husband**   186:21
187:2

**i**

**ia**   145:3 178:9
184:4 191:13
200:8 214:16,22
225:12,13
252:18,19,22
**idea**   210:3
211:17

**identified**
247:15 275:22
**iglewski**   136:12
286:4,16
**ignored**   170:4,4
**ii**   136:6
**iii**   137:9
**illustrious**   268:3
**imagining**   250:5
**immediately**
141:6 162:5
177:10 181:12
264:4 267:2,5
274:8
**imminent**
171:25
**impermissible**
261:1
**impermissibly**
259:14
**implicitly**
142:15,24
**implied**   141:15
**improper**   176:6
**inappropriate**
171:4 182:19
194:6 195:4
256:24
**inappropriately**
171:7
**incident**   140:8
147:11 177:1
187:16,23 193:9
193:19 195:3
223:16 252:25

253:4 268:10
271:23
**incidents**
163:19 188:21
**include**   205:25
251:23
**including**
191:15 233:2
268:7
**increase**   181:11
**increased**   172:5
**increases**   181:9
**incredibly**
165:20 262:13
**index**   160:18
**indian**   242:4
**indicate**   156:10
167:24 171:3
**indicated**   156:4
**individual**
140:14 162:18
198:22 257:2
**individual's**
192:14
**individuals**
195:10 197:19
201:25 258:17
258:22 259:3,9
**influence**
219:24 220:4
**information**
193:3 195:25
205:21 206:3,11
209:21 210:2
211:1,16,18

212:5 213:23,24
213:25 214:6
227:8,8 229:21
230:25 231:6
234:12,20
239:18 249:21
258:21 259:15
261:23 262:4
**initial**   141:4
147:23 150:1
163:12,14 167:7
167:9 177:11
180:16 184:16
190:24
**initially**   143:6
156:21 173:16
183:14 184:10
198:23 230:2
231:17,24 245:6
248:13 264:15
275:11,15
**initiation**   223:5
**injunction**
200:6 214:8
270:3
**inside**   221:11
244:23 253:7
254:9
**instigative**
194:23
**instructed**
222:11 223:9
**instructions**
218:12

**instructor**   218:7
**insurance**
202:16 203:8,9
227:5 272:20
**intent**   169:22
178:22
**interact**   165:18
**interacted**
162:19 188:12
**interacting**
172:6 233:4
**interaction**
145:14 194:22
254:11 274:3
**internal**   148:2
190:16 193:2
204:4 214:11
277:13
**interpreted**
147:1,2
**interview**
190:15 191:19
**interviewed**
190:14
**interviewing**
149:5
**intoxicated**
221:2
**invade**   261:7
**investigate**
154:22,23 190:5
214:22
**investigated**
186:17 209:3

**investigating**
241:18 256:25
**investigation**
144:9 155:6
190:22,25
191:13 193:3
209:8 210:8
214:12 224:15
225:13 226:5
227:2,4 236:21
236:22 247:9
277:13
**investigative**
185:9 186:9
**involved**   145:19
149:24 159:5
183:19 190:11
192:10 201:14
209:17 228:17
234:6,21 257:1
257:2,7 268:2
**involvement**
186:20 217:17
257:8
**involving**   140:8
**irrelevant**
259:16,20
262:11 271:24
271:25
**isolated**   224:2
**issue**   136:3
181:3,14 184:3
190:9 196:3
244:11

**issued**   226:3
**issues**   207:15
269:13
**ivanova**   186:3

**j**

**j**   137:10
**january**   216:16
**javier**   200:10
**jaw**   172:24
**job**   136:13
169:9 207:7
216:9 236:20
274:4
**johnson**   260:22
270:13
**judge**   200:6
214:9 270:2
**judkins**   137:12
**july**   254:9
272:10
**june**   216:16
**juvenile**   217:21

**k**

**k**   189:15
**keep**   156:24
161:16 162:2
163:1 164:1,9
169:2,9,14,23
170:9,10,23
171:5 174:14
175:12 176:14
176:19,21
196:18 220:18
224:9 231:25

233:16,19 235:9
235:24 251:8
264:15 270:9
278:2
**keeping**  173:17
277:17
**keeps**  170:25
**kept**  141:14
221:22 251:2
271:18
**keyboard**
219:18
**kid**  229:1
**killer**  268:15
**kimberly**
136:12 286:4,16
**kind**  140:10
187:1 188:11,15
193:5 218:13
231:15,16 232:5
241:7 244:5
255:10 257:8,22
264:11
**kindly**  267:15
**kinds**  214:6
**king**  137:6,9,13
138:11,13,14
148:8,13,16,21
196:5 203:17,21
203:23 204:17
205:4,11 206:15
211:21 213:18
214:11 215:1,4
215:15 216:2
243:2,7 254:17

258:6,10 259:10
259:15 262:11
262:14 266:14
267:7 269:8,11
271:22,24
274:13,24 275:2
275:8 276:9,14
278:13 280:4,7
281:6,10,15,20
281:25 282:16
282:19 283:8
284:5,7,12,17
284:21,23 285:4
**kingmorselaw...**
137:8
**knee**  277:11
**knees**  280:14
**knew**  147:25
167:4 225:20
228:15 234:22
237:7 239:23
250:21 259:16
259:19 260:23
261:12,15 263:5
271:12
**knife**  253:20
**know**  140:13,21
141:25 145:16
150:8 151:4,23
153:11,17,25
154:4,11,18,22
156:22 157:1,3
157:5,23 158:8
159:8,11,15,16
160:9 162:18

163:25 165:3
166:8,17 167:3
167:9,18 170:14
170:21,21
175:21 176:10
181:1,4 182:24
184:18,22,22,23
187:17,18
188:12,20 195:9
203:22 208:11
209:22 210:5,15
211:20,22,23
212:5 217:2,3
217:10 219:2,5
219:6 220:4,20
221:5,21 222:4
222:15,17 223:8
226:8 228:14
229:1,17 230:1
230:13,15 231:4
232:7,12,22,25
233:10,18 234:5
234:6,7,11,19
234:20,21,24,24
234:25,25 235:1
235:3 236:2
237:4,6 238:11
238:11,13,16
239:11,24 240:7
240:8,25 241:5
241:9,16 242:14
243:21,22,25
244:2,6,15,17
245:11,13,15
246:10 248:19

249:6,8,19
251:6,6 253:12
253:19 254:15
255:9 256:16
257:12 259:8
260:11,17,19
261:8,8,9,11
263:18,19,19
265:1,2,23
267:12 268:11
268:13 269:23
270:1,6 272:5
273:12 274:7
275:21,23 277:2
277:22 278:22
280:2,4,25
285:6
**knowing**  151:13
161:23 230:1
**knowingly**
206:4
**knowledge**
198:15 205:21
206:3,11 214:17
224:14 280:8,10
280:11
**known**  147:23
176:12 260:7
**knows**  150:2
154:15 179:19
188:19
**kristen**  137:13

**l**

**l** 137:5
**lack** 250:12
**lake** 219:22
**lakes** 137:7
**land** 238:19
**landed** 222:8
**language** 140:2
  172:16 208:17
**large** 136:12
  220:19 286:5
**lashing** 254:16
  255:4
**lasted** 274:17
**late** 254:20
**lateral** 216:19
**lauderdale**
  272:9
**law** 141:2
  143:11 151:12
  163:11,12,16,19
  163:22 167:4
  189:23 190:1,5
  195:13,23,24
  196:14,20,21
  198:13 204:15
  209:24 214:14
  217:21 257:11
  257:19 261:2
  262:6,7,10
**lawful** 162:15
  163:3,10 169:2
  169:5
**lawfully** 150:18

**lawsuit** 268:5
  272:17
**lawyer** 176:12
**laying** 145:5
**lead** 193:4
**leader** 219:2
**leading** 242:24
  243:1 279:25
  281:4,8,11,12
  281:14,18,20,23
**leads** 152:5
  159:6
**leaning** 253:7
**learn** 171:25
  211:11
**learned** 142:19
  153:7 154:4
  172:14 183:18
**learning** 264:14
**leave** 145:12
  146:16 187:12
  197:4 198:2,3
  205:23 221:21
  223:10 253:21
  273:22
**leaves** 152:18
**led** 281:18
**left** 145:20,25
  152:3 155:23
  156:22 160:2
  168:24 171:1
  175:6,7,13,19
  177:6 202:21
  217:23 237:4
  277:2,3,4,22

  278:3
**legal** 205:8
**legitimately**
  169:17 246:22
**length** 265:14
**letter** 163:11,16
  272:25
**level** 170:1
  281:1
**levels** 164:7,7
  217:4
**liar** 270:24
**license** 209:13
  213:23
**lieutenant** 223:3
**life** 219:11
  269:4,6,23
  279:5,9
**lift** 144:20
  244:15
**lifting** 244:16
**lightly** 220:21
**likely** 212:10
**line** 143:8
  199:17,20
**lined** 142:11
**lining** 142:25
**listen** 163:8
  221:15 237:2
  251:4 258:8
  270:24 277:16
**listened** 236:10
**listening** 146:9
  163:12 229:16

**literally** 258:24
**little** 140:18
  141:8,21 143:3
  157:24 167:16
  167:17 179:9
  189:22 199:25
  229:24 238:16
  244:25 246:4,12
  253:8 273:14
**lived** 258:20
**living** 140:3
  227:1
**lock** 150:23
  212:19
**locked** 212:18
  213:5
**locking** 197:11
**long** 169:9
  187:23 189:21
  214:17,19 219:5
  228:25 231:21
  234:25 246:7
  247:23 250:4
  253:25 254:5
  265:18 274:17
  275:7 278:15
**longer** 236:9
  250:22
**look** 142:10,24
  143:2 164:16
  172:15 183:24
  184:2,5 185:9
  193:17,22 196:6
  198:7,11 200:4
  200:22 201:22

**[look - mentioned]**                                              Page 308

202:20 203:1
211:24 217:20
227:15 232:3
236:13 240:4
253:11 259:8,19
259:22 263:17
274:20
**looked** 143:1,3,7
209:9,16 219:1
224:16 245:3
253:14 255:14
255:21,24
256:12 259:3
260:11,17,24
265:16 267:9
**looking** 163:19
183:11 194:13
200:9 211:25
230:23 231:6,21
236:8 244:21
256:2 258:20,22
258:23,24
278:23 279:1
280:23 282:10
**looks** 160:15
235:12 260:8
**looming** 225:1
**loose** 151:22
**losing** 193:6
**lost** 268:18
**lot** 197:4 213:24
215:19 217:10
220:9 223:7
234:6,7 236:22
245:11,21 246:5

258:19 266:7
**lots** 259:23
**lying** 178:16
270:22

### m

**m** 189:15
**ma'am** 140:3
254:25 262:8
272:3 275:15
**made** 146:5,12
161:5 180:17
191:21,23
196:17 223:16
226:20 236:22
236:25 237:13
252:19 255:11
268:19 274:2,7
**magazine** 197:6
197:14,15 213:1
**mail** 284:1,4,5,6
**main** 150:22
**maintain**
222:17 232:5
237:19 240:2
**maintained**
249:19
**major** 191:5,7
192:7 197:8
255:13
**majorca** 137:3
**make** 142:11,25
143:23 144:1,6
146:11,14
154:23 156:9
181:8 207:3

220:22 221:18
233:6 249:23
250:2,25 251:19
252:16 255:10
265:19 266:1,9
267:2 273:7
274:10 275:18
283:24
**making** 161:8
181:7 192:10
193:11 239:15
252:23 274:21
277:14 280:24
**male** 221:2
**malicious** 203:4
**mall** 220:14,17
220:19 221:11
221:12,17
268:19
**man** 162:5,8
222:21 233:19
235:8 255:21
264:22 278:17
**man's** 238:19
**management's**
265:4
**manner** 203:5
**marc** 138:6
139:6 147:5
188:9 253:13,15
**martin** 286:11
**matter** 144:14
256:8 259:20
279:18

**meal** 220:23
**mean** 178:13
212:4 229:3
230:7 232:22
233:5 234:3
238:13 244:16
246:4 248:12
261:11 277:20
**means** 198:13
230:8
**mechanism**
197:12 212:18
**media** 201:17
**media's** 220:3
**medical** 188:5
227:4,5 253:5
253:24 254:4
272:15
**meet** 151:7,24
152:4 159:5,21
245:25 246:14
248:4 252:25
**meeting** 189:3
285:14
**member** 203:2
**members** 218:5
**men** 217:20
226:24
**mend** 269:22
**mentality**
233:12
**mention** 211:15
223:17 265:9
**mentioned**
223:14 230:16

263:11
**mentor** 219:2
**messages**
198:23 199:22
200:2 202:4
223:17,17,19,25
224:2 226:18,19
**met** 230:13
234:24 235:3,19
245:6 260:23
**methodical**
188:17
**miami** 140:3
**middle** 182:2,11
223:2
**mike** 181:21,23
182:4,6 232:12
246:18,19,25
**mike's** 181:18
182:1,9
**mile** 172:9
**military** 136:10
**miller** 136:5
267:7
**million** 201:23
201:24,24
**mind** 146:12
148:19 152:8
234:10,17
258:12 267:23
280:6
**mindset** 146:19
**mine** 148:8
284:13

**minute** 182:3
190:4 207:23
225:25 241:4
245:1 254:19
264:6
**minutes** 215:7
247:25 278:7
**miranda** 247:14
**mischaracteri...**
276:10,14
**misconduct**
190:6
**mispronounce**
140:3
**misrepresented**
201:3
**missing** 206:9
**mistake** 178:22
239:25
**modified** 196:17
198:1,5 270:2
272:12 273:21
**mom** 221:16,19
222:15 251:4
**moment** 143:10
162:14 163:3
166:16 168:15
170:3 222:19
244:8 251:17,18
258:3,5 271:8
**monday** 284:9
284:15
**month** 214:21
**months** 195:3
198:5 217:5

223:11 229:2
264:8 272:8
**morse** 137:6,10
137:13 138:8
146:18 147:6,9
148:14,24
149:10 156:17
156:20 158:14
161:3 165:22,25
166:5 171:8,13
171:16,19 176:8
176:16,18
182:19,22 183:4
183:7 185:6
188:7,24 215:19
283:19
**morselegal.com**
137:9
**motion** 161:5
**motor** 278:18
**mouth** 140:16
182:7
**mouthing** 276:1
**move** 145:9,10
232:4 243:3,13
**movements**
173:1
**moves** 177:7
**moving** 172:8
174:11,19,22
**mpt** 279:2
**multicolored**
231:1
**multiple** 140:24
141:15 179:20

184:16 186:25
268:7,24 273:10
276:5
**musical** 215:19

| n |
|---|

**n** 138:2 139:3
189:15
**nail** 221:4
**name** 147:9
178:5 189:13,15
189:16 216:3,4
249:15 251:3
263:10
**names** 209:9
**narcotics**
217:11
**nasty** 202:6
**nature** 149:21
224:10
**navarro** 259:6
259:11,18 260:3
260:17 270:12
**nda** 227:22
**near** 177:23
235:11
**nearly** 208:22
209:8 223:1
**necessarily**
164:14 165:10
**neck** 142:18
172:22 231:15
**need** 145:10
150:23 156:17
235:17,18
237:18 239:17

241:18 253:16
274:7,20 283:15
**needed**  202:8,9
220:8 245:21,23
246:25
**needs**  164:10
**negative**  202:3
**negotiator**
218:4,5
**neighborhood**
228:3
**neither**  279:18
279:21
**nervous**  169:17
**neutralized**
151:12
**never**  141:5
158:25 165:16
171:5 188:1
226:6 230:4
232:12 235:15
243:18,18 244:6
255:25 258:11
259:4,5,6 260:3
260:23 261:21
265:24 272:13
274:20 277:22
280:6
**new**  216:23
229:1 244:16
264:12
**newbie**  264:8
**newly**  263:13
**news**  236:13

**newspaper**
202:2
**nice**  189:3
233:18
**nicole**  198:18
226:22 260:9
261:25 263:3,18
**night**  228:3
**nights**  254:2
**nine**  149:5,6
**nodding**  255:16
263:24 264:10
279:24
**noncompliant**
164:12 177:16
**nonverbal**
171:21,23,24
172:18 281:2,6
**normal**  141:2
236:15 244:13
**normally**
244:22 257:16
**north**  136:10
**norton**  137:2,5
138:7,8,10,11
138:14 139:11
146:21 147:4
148:17 149:9
156:13,19
160:25 165:20
165:23 171:4,11
171:14,18 176:6
176:14 182:15
182:20 183:2
188:10,23 189:4

189:12 203:15
203:20,22
204:14 205:8
206:13,19 208:5
211:19 213:20
214:25 215:7,10
215:13 223:16
224:25 242:23
243:4,6 254:20
254:24 255:1
258:8,11,13
259:13,21 260:1
260:2 262:13,17
262:23 266:17
267:12,15,16
269:9,12,21
272:2 274:15,17
274:18,25 275:4
275:14 276:12
276:17,20 277:6
278:6,9 279:25
280:6,13 281:4
281:8,13,16
282:4,6,8,11,17
282:20,24 283:3
283:9,20,23
284:2,6,10,13
284:19,22,24
285:5
**notary**  136:12
**notch**  180:13,18
250:14 275:13
**notes**  183:24
256:4

**nothing's**  150:3
**noticed**  188:4
244:11
**number**  136:3
142:2 148:10,10
185:4,8 193:18
196:22 197:3
200:11,12
201:16 202:19
203:25 208:2,2
208:25 236:17
**numerous**
244:17 251:2

**o**

**o**  139:3 189:15
216:5
**o'clock**  136:9
**oath**  258:16
259:21 261:22
270:17
**object**  146:18
160:25 165:20
171:4 204:14
206:13 259:10
281:5
**objection**  243:1
266:14 269:8,8
271:22 274:13
275:8 276:9
**obligation**
196:12
**observe**  167:13
**observed**
140:14

**obsessive**
198:19
**obstructing**
249:14
**obvious** 177:5
232:20,22
**obviously** 141:1
143:19 146:7
166:18 175:12
**occasion** 154:14
190:5 192:23
**occupant**
244:14
**occurred** 209:3
**oddly** 220:17
**offender** 217:22
**offer** 224:20
**officer** 140:8,15
142:4,8 143:11
144:10,11
145:15 146:19
149:8 150:7,11
150:12,17,21,24
151:1,4,6,18,19
151:24 152:9,14
152:17,20,23,25
153:6 154:9,11
154:20 155:17
155:17,18,20,23
155:24 156:2,5
156:7,25 157:9
157:13,17 158:7
158:19 159:2,8
159:12 160:8,11
161:14,20

162:15,19 164:8
165:16 166:10
167:8 169:13
170:21 171:2
173:8,16 176:11
178:1,21 179:8
179:13,19 180:3
180:7,12,23
186:12 187:9
188:13,15
190:13 193:23
194:14 195:14
196:14 198:14
206:20 216:6,19
216:21,22
217:15 219:20
220:18,22,23
222:1,2 228:19
228:20,21,22
229:11 230:1,3
234:21 235:18
240:12 244:1
249:8,13,17
252:1 256:24
257:6,19 262:6
264:4,12,13
266:7 267:21
276:6
**officer's** 163:10
**officers** 142:14
142:15 145:21
145:22 150:1
151:2,13 153:4
163:22 164:3,8
167:11 179:2,17

179:24 186:11
190:5 204:12,19
216:23 219:3
224:8 239:24
240:1,11 245:22
257:11 275:19
276:18,21
**official** 252:16
252:20
**oh** 148:17,21
149:15 158:4
182:8 184:1
194:21 224:25
246:10,19 282:5
285:4
**okay** 140:7
145:14 146:25
147:11,18 148:1
148:4 149:2,13
150:7,15 151:1
151:10,21 152:1
152:5,7 153:5
153:13 154:10
154:12 157:11
157:21,25 158:7
158:12,19 159:2
159:8,14,22
160:1,7,11,21
161:4,11 162:2
162:13 163:17
164:6 166:14,20
167:7,11,14
168:2,15,19
169:1 170:3
171:8,13,23

172:3,13,17,21
173:13,19,23
174:4,7,11,14
174:17,19,22
175:17,19,25
176:16,23,24
177:9,13 178:20
179:9,19 180:2
180:10 182:4,5
183:4 184:1,14
184:21,24
185:11 186:1,2
186:7,11,22
187:8,15,19,23
188:1,4,7
190:21 191:10
191:12 192:9,17
193:17 194:21
195:3,17,20
196:9 197:15
198:7 199:3,6
199:16 200:11
201:16 202:11
202:16,19,22
203:19 204:3,6
207:18,24 209:1
210:6 211:13
212:8,13 213:18
215:5,6,9,18
216:11,15 217:7
217:13 218:1,20
219:16 220:15
222:20,23 227:6
227:14,25
228:12,18,24

229:13 230:16
231:3,8 233:14
234:14 235:5,11
235:16,16,22
237:5 238:10,12
238:17 239:1,3
239:7,19 240:4
243:4 245:25
247:16,21 248:1
248:7,9,19
249:11 254:19
255:1,19,20
256:14,23
257:22 258:25
260:13,15,19
261:12,21 262:1
262:3 263:25
264:8,17 265:8
266:1,4,5 268:2
268:17 270:24
271:3,9,14
272:11,14 273:4
275:5,17 277:13
278:4 279:18
281:4 282:9
283:2,3,9,21
284:4,14
**omission** 203:2
**once** 145:6
155:20 164:8,10
170:1 195:4
226:7 238:18
239:3 249:19
250:20 255:25
258:8 265:24

267:1 273:22
**open** 190:22
**opened** 223:12
242:2
**opening** 190:25
217:16
**operating**
278:18
**opinion** 144:15
188:16 242:10
271:2
**opportunity**
191:12 262:21
**opposite** 195:1
**option** 239:1
**options** 238:24
**order** 163:1,3,5
164:13 166:15
170:8,9 174:1,8
177:11 196:6,7
197:23 200:6
225:6,19,23
226:2,2
**ordered** 144:11
**orders** 270:19
**outbursts** 199:9
199:11
**outside** 157:20
160:15 175:15
175:15 203:3
221:12 229:3,5
272:23
**outstanding**
218:24 228:8

**overseeing**
225:13
**own** 229:2,3,6
233:11 265:9

**p**

**p** 139:3 189:16
189:16
**p.a.** 137:2
**p.m.** 136:9
285:17
**page** 148:13,14
149:5,6,8
185:12 186:3
194:10,12 196:7
196:20 198:12
198:21 199:15
199:24 200:4
202:20 204:2
206:17
**pages** 195:20
286:7
**paid** 273:23
**painted** 273:8
**palm** 136:1,11
137:2,7,7
139:15 147:13
189:18,20 216:8
218:21 253:24
**pants** 157:20
175:15
**pape** 137:11
138:9 185:5
189:7,16 203:16
213:19 244:17

**paragraph**
193:23 198:12
198:17,21,22
199:7,12,15,16
199:25 200:4
**parallel** 256:4
**park** 221:3
229:10,12
**parking** 231:8
266:7
**part** 185:24
191:2 204:9,11
205:25 206:5,9
214:7 218:2
225:8 257:19
280:15,15
282:23
**particular**
147:21 195:17
200:8 225:23
244:20 259:15
**parties** 149:23
225:20 262:5
284:20 285:8,11
**partners** 232:23
**partnership**
226:23
**party** 146:11
151:8,8,25
152:4 156:9
159:5,21 262:4
**passed** 180:11
**passing** 234:14
**past** 148:7
199:21 215:10

238:18
pat 235:1
patrol 139:19
139:20 217:25
pause 168:22
173:24 175:8
pavement 145:5
145:12,13
pay 196:18
198:3,3 271:18
pba 136:3 137:6
pba's 214:17
pbg 137:11,11
137:12
pc 226:17
pd 189:20
penalty 204:9
206:2
penque 137:13
158:13
people 169:14
169:16,16,25
172:8 184:16
186:13 188:20
209:10,17
225:16 227:16
229:18 230:9
231:22 234:6
235:16 240:3
241:8 250:19,21
257:10,13,13,14
257:14 259:13
261:19 263:13
263:14 266:2
268:25

perceive 276:8
perceived 179:4
248:17 276:4
perceiving
277:4
percent 156:11
215:8 248:8
279:7
perfect 206:18
283:22
perform 196:14
255:18
performance
264:11
period 196:25
197:2 217:6
223:21 263:23
perjury 204:9
206:2 226:15
268:13
person 144:5,23
145:6,19 146:13
146:15 151:9
152:3,5,6
154:21,24,25,25
155:6,22 156:11
159:6 165:7,10
166:7,14 170:23
173:11 184:20
185:15 225:21
225:23 230:9
247:16 250:23
259:19 260:4
person's 205:20
206:11 241:11

personal 205:20
206:11 269:23
personality
257:2
personally
190:11 229:23
257:1,6
perspective
271:4
pertinent
234:12
phone 148:12
154:5,6,8
156:14 159:12
159:17 160:13
160:24 161:8,8
167:22 168:6,9
168:10,13 175:5
202:4,5 221:6
221:18 224:9
227:21 233:23
234:16 236:23
photographic
213:23
phrase 140:20
178:8,9,11,17
physiologically
244:9
physiology
248:10
picked 226:17
picture 148:12
166:23 209:13
260:5,25 263:17

pictures 209:16
227:16 258:16
258:19,23,24,25
259:22 261:19
piece 191:13
place 136:10
204:7 223:12
244:13 283:12
placed 160:2
platoon 139:23
140:4
play 149:14,16
152:21 156:22
157:11 161:18
161:18 164:18
168:20 176:8
177:14
player 218:25
219:1,7
playing 174:14
plead 246:2
please 158:4
167:17 174:14
175:5 176:9,25
182:7 189:13
194:12 216:3
267:14 270:4
pleasure 188:21
285:14
plenty 230:3
234:4
pllc 137:6
plural 277:21
plus 145:13
228:7 232:8

**pocket** 153:25
154:6,8 156:14
157:9,10,12,17
157:20 158:16
158:24 159:12
159:17 160:12
160:14,15,16,19
160:23,24 161:6
161:7,10,15,16
162:3 163:2,6,7
164:2,10 166:16
169:12,21
170:10,11,14
171:1,6 173:18
174:9,13 175:5
175:9,12,14,17
175:18,20,22
176:5 177:6,7
177:10 236:3
237:5 277:11,22
277:25
**pocket's** 176:1
**pockets** 140:23
141:13,15
144:12,16
153:18,20 157:1
157:6 158:20
159:9,10 169:3
169:6,7,10,15
169:15,18 170:1
170:11,24 176:4
176:15,20,22
232:1 233:16,20
235:9,10,11,24
270:18 277:17

277:18,20,21
278:2 280:18
**point** 144:23,25
145:25 148:4
150:9 151:11
152:11,22 158:9
158:10 160:17
161:25 164:17
164:24 167:3,5
167:6 168:12
169:11 173:10
174:25 176:3
178:2 180:2,19
181:12,22
182:18 184:11
187:12 207:24
222:2 223:16
230:17 231:12
232:2,7 234:15
235:3 236:5,7
237:15,22
238:16 239:12
239:18 240:12
241:20 245:1,12
247:14,19
248:10,24
250:12 253:10
275:17 276:4
278:5 279:6
280:22
**pointed** 149:21
161:6 167:23
**pointing** 149:17
167:19 182:22

**police** 137:11
139:15 145:9
147:14 150:23
153:7 155:2
162:19 164:3
166:10 178:2
179:2 187:5
189:18 190:2
195:15 197:6,15
204:12,19
210:20 211:12
216:8,9,12,15
216:23 218:22
221:7 223:4
224:8 226:7
244:1 256:5
**policies** 206:21
217:1
**policing** 265:20
**policy** 155:2
166:10 170:12
213:13
**pool** 143:13
175:11 180:8
181:24 185:23
187:7 228:16
230:5,11,14
**populated**
220:20
**portion** 191:13
**position** 142:1
164:22 165:2
169:22 177:18
189:17,19 239:4
239:5,17 265:6

**positions** 216:12
**possible** 167:24
203:20 242:10
242:21
**possibly** 207:4
217:20 219:24
**post** 285:12
**potential** 143:19
256:25
**potentially**
179:6 251:7
**presence** 199:18
245:24
**present** 137:11
179:21
**presentation**
285:8
**presented**
142:12 217:16
243:9
**presenting**
231:17 234:1,2
**pretty** 145:18
153:22 155:21
192:9 198:6
244:3 245:7
254:10
**prevalent**
153:22
**previous** 189:19
**previously**
218:6
**prided** 219:1,7
**primary** 228:18
228:22

**principles**
194:19
**print** 205:1
**prior** 159:19
169:1 189:23
190:18 192:15
194:22 196:24
209:7 223:5,10
229:9
**priority** 150:22
**privacy** 261:7
**privy** 234:20
**probable**
198:12 249:16
250:4,7 251:20
251:24 252:2,5
252:13,15
**probably**
146:15 152:6,9
155:2 160:19
161:9 210:14
222:18 233:24
245:12 260:9
**probation** 264:9
**probationary**
196:25 217:6
229:6
**probes** 222:8,9
**problem** 166:6
179:11 204:18
204:18 280:19
**problematic**
163:20
**procedure**
205:16 214:16

214:21
**procedures**
217:1
**proceed** 229:8
**proceeded**
140:25 145:22
**proceedings**
193:4 286:7,8
**process** 216:24
216:25 222:7
**processing**
205:13
**profanity**
193:10,23
**professionalism**
194:16 201:1
**profusely** 253:8
**program** 217:22
229:4
**progress** 258:14
**progressive**
206:22,25
**promise** 177:2
**prompted** 221:6
222:5 227:4
**promptly**
283:12
**prones** 239:19
**property** 203:6
**prospective**
196:4
**protect** 171:12
232:23,23,24,25
233:1 236:12

**prove** 233:12
**proven** 226:16
**provide** 228:22
**provided** 200:1
**provides** 213:22
213:24
**providing**
202:23
**provisions**
214:13
**prudent** 166:10
**public** 136:12
150:24 201:13
201:17 232:24
**publicity** 202:3
**pull** 144:12
154:11 166:16
178:14 181:9
231:8 233:23
236:5,7 280:22
**pulled** 236:24
256:4
**pulling** 175:11
180:21,24 181:1
181:6,12 230:20
230:24 231:5
**pulsing** 172:24
**punk** 273:5
**purpose** 179:2
203:5 209:13
**purposes** 261:3
**pursuant**
205:19
**push** 246:9

**put** 143:10
144:19 152:22
157:12 158:16
158:23 159:11
160:13,23 168:9
169:25 177:23
182:7 185:24
197:23 198:2
205:2 210:14
213:5 214:8
217:3 225:12
227:3 230:25
239:4 241:23
248:21 252:12
273:21
**puts** 162:11
174:25 175:5
216:23
**putting** 159:17
161:5 174:8
270:2

**q**

**qualify** 173:13
**question** 151:5
156:13,24
165:21,22 166:1
170:16 179:10
182:1,10 184:9
186:25 188:11
212:6 226:25
227:7 237:21
245:17 246:22
248:20 249:22
257:6 258:7
260:12 274:15

274:24 275:10
276:13,23,25
279:9 281:8
**questioned**
173:14 278:16
280:21
**questioning**
171:7
**questions**
147:10,10 148:6
165:24 177:1
182:25 183:11
203:18 215:3
247:13 267:8
**quick** 218:8
246:9
**quickly** 144:22
188:19 225:7
279:1
**quiet** 177:21
**quite** 174:19
249:9
**quote** 236:16
270:23

**r**

**r** 139:3 216:5,5
216:5
**radio** 146:5,5,10
150:12 151:13
156:3,6,8
159:20,23 222:5
229:16,24 230:4
230:21
**ralph** 137:9

**ran** 217:21
**rant** 180:16
**rapid** 173:1
**rapidly** 174:20
**rate** 244:12
**reach** 164:2
**reached** 140:23
163:7 169:17
**reaches** 166:15
**reaching** 141:14
170:13 174:13
222:9
**reacquaint**
194:14
**reaction** 169:19
**read** 145:3
200:23 283:23
**reading** 247:14
**ready** 156:18
**real** 163:21,21
179:7,15 218:8
274:2,10
**realistically**
163:24
**realized** 221:12
**really** 164:10
165:5 219:6
227:19 231:5
232:11 235:17
238:13 241:16
243:22 244:15
246:9 253:9
259:16 269:17
**reason** 145:4
176:11 244:20

**reasons** 232:20
232:22
**rebuttal** 282:7
282:12
**recall** 148:4
149:7 150:14
177:20 180:14
183:24 277:14
**receipt** 285:11
**received** 169:1
191:1 207:14
229:21 283:13
**recently** 263:13
**recess** 189:5
215:12 278:11
**recitation** 186:8
**recites** 149:4
**recommendati...**
192:10 194:13
200:17,22
255:11
**recommendati...**
191:20,23
**record** 176:10
176:10 215:13
216:3 276:15
283:4,24 286:8
**records** 272:15
**recover** 246:12
**recovery** 244:18
**recross** 138:5
**red** 172:12
**redirect** 138:5
188:9 213:19
278:12

**refer** 265:14
**reference**
227:21
**referenced**
159:22
**referencing**
257:4,5
**referred** 149:3
186:19
**referring**
148:25 155:10
155:12,16
193:19 268:9
**reflect** 211:6
**regard** 166:7
184:5 278:16
**register** 233:24
**regular** 244:14
257:11 283:6,7
283:8,9
**regularly**
270:11
**regulations**
194:7
**reinstated**
217:14,24
**related** 191:1
277:25
**relations** 201:18
**relationship**
209:17 224:10
260:10,19,21
261:12,15
262:25 263:3

**relationships**
262:9
**relatively**
229:12
**relaxed**  178:22
**release**  270:2
**released**  217:5
229:6 254:3
272:9
**relevance**
259:11
**relevant**  262:13
262:14
**relied**  281:20,21
**rely**  171:9
179:23 281:22
**remain**  245:9
257:23
**remember**
149:20 168:12
168:14 177:17
177:22 178:6
184:25 214:18
230:20,21,23,25
231:2 240:15
247:13 248:16
248:25 279:1
**remove**  221:10
275:19
**removed**  275:21
**repeated**  166:4
**repeatedly**
211:19 270:18
**replaced**  190:18

**report**  149:4
184:2,2,6,7
186:9,19 205:18
205:19 210:14
211:2,6,15,22
211:24,25 212:3
212:7 227:23
286:6
**reported**  195:21
**reporter**  136:12
140:18 189:14
282:22 286:1,4
286:17
**reporters**
282:17
**reports**  210:23
210:24 212:10
**represented**
196:6
**reprimand**
194:10 213:8
268:7,20,25
**require**  196:24
**required**  272:1
**rescue**  253:17
253:21
**reservation**
202:24
**reset**  275:12
**reside**  223:12
**resistance**  194:1
208:3 239:12
**resisting**  163:10
170:2 249:12,17

**resources**
137:11,12
**respect**  148:5
194:15 201:1
256:16 277:14
**respond**  150:15
150:20 154:15
179:14 187:6
217:2 229:13
**responded**
221:8
**responder**
165:17
**responding**
150:18 160:12
186:11
**responds**  150:7
160:9 179:14
**response**  167:7
167:9 194:1,5
196:3 208:3
251:15
**responsibility**
200:25
**responsible**
283:3
**rest**  215:13
282:2
**restated**  166:2
**restating**  165:25
**restaurant**
221:3
**rested**  282:6
**restraining**
197:22 225:6,19

225:23 226:1,2
**result**  197:25
201:19 224:13
**resulted**  141:17
195:17 267:18
268:20
**retired**  190:20
191:10
**retreat**  237:14
237:20 238:25
**retreating**  237:9
237:13,17
**returned**  254:6
**returning**
244:12
**revealed**  227:2
**review**  148:2
191:12
**reviewed**  148:7
192:19 194:2
**richard**  136:5
**rick**  137:8 196:5
203:22 205:9
283:6
**ridge**  228:16
**riding**  175:12
**rifle**  197:7 213:3
**right**  139:24
141:2 142:16,18
143:9 146:12
148:22,23
149:11 151:14
151:20 154:1
157:16,17,25
158:1 161:11,21

**[right - says]** Page 318

162:14 163:24
164:17 165:9,12
166:17 168:23
169:3 170:5
171:11,25
173:24 174:1,2
174:9,21 175:6
175:17 176:5,21
177:6,7 181:7
181:18 182:1
183:15 185:16
185:23 189:19
190:3 196:10,19
197:3,10 198:11
198:15 201:2
202:10,24 204:1
205:12 206:5,19
207:20,22,23
208:3,8,19
209:19 210:4,4
210:6,14,21
211:2,4,7,8,12
212:11,12,14,15
213:2 214:14
215:1,14,15,17
216:6,20 220:9
221:4 222:22,24
224:13,18,25
225:5 227:6,18
228:5,8,13
229:8 231:23
232:15 234:17
235:20 236:3
238:15,21
241:17,21

242:22 243:8,13
245:5,7,25
246:14 248:4
250:7,10 253:4
253:11,20,25
254:10,22 255:7
255:11,15
256:21 257:16
258:10 259:25
261:3,13 262:5
262:11 263:7,25
264:5 265:6,16
266:7 267:21
268:8 270:14
275:24 277:11
277:19,24 278:3
278:10 280:15
281:21 282:3
283:4
**rights** 202:24
203:6 204:12,20
227:24
**riled** 268:24
**rim** 160:18
**rip** 222:10
241:18
**ripped** 222:5
**risen** 170:1
**risk** 147:19
150:16 151:2
**river** 242:4
**rnorton** 137:4
**road** 139:19,20
217:14,16,24,25
266:3 278:23

**robert** 137:5
**rock** 254:21
**room** 214:21,23
215:20 260:6
**rounded** 188:22
**rounds** 197:6,15
**route** 245:16
**routine** 236:16
236:18,19
**rule** 236:17
281:16
**rules** 194:7
**run** 140:1 174:3
214:2 215:10
283:17
**rush** 180:23
181:2,5
**ryan** 152:15
185:13

**s**

**s** 139:3
**s.w.a.t.** 218:6,9
218:11 237:22
238:5
**sabal** 228:16
**safe** 264:16
**safety** 150:24
203:6 220:22
234:13 241:19
**salary** 273:24
**salon** 221:4
**salvia** 184:19
185:20 186:15
186:15 187:3
242:14 247:6,14

253:1
**salvia's** 185:23
**samples** 201:19
**sat** 190:15
**satisfied** 264:13
**saturday** 284:21
**saturdays**
284:22
**save** 156:15
**saving** 219:11
**saw** 158:23
169:20 186:19
222:3 231:4
237:8 247:17
255:25 256:20
268:25 271:4,7
277:23 279:3
**saying** 152:8
155:11 160:22
160:23 165:6
167:25 207:4
231:19 234:11
235:7 246:24
256:16 269:24
276:2
**says** 155:3
161:20,23 166:9
168:20,21
180:13 186:5,18
187:7 193:23
198:17 199:5
202:21 204:8
205:15,25 206:1
224:25 236:2

scaring 220:4
scenario 143:18
238:8
scene 140:7,12
140:13 141:6
143:12 144:10
145:15,17 153:8
154:17 165:9
166:8 170:20
177:15 178:7
180:3 181:2
187:8,9,13
188:5 201:6
220:1 240:12
253:21 256:6
264:2
scope 203:3
272:23
scowl 235:13
screamed
268:23
screen 157:19
185:16 205:2,5
230:23,25 279:2
search 143:23
152:14 159:3,9
239:21 240:14
240:16,18,20,22
240:24 267:20
267:24 279:17
280:8
searched 156:10
162:21 241:1,4
267:5,9 280:3

searching 240:1
279:14
seat 145:20,21
190:13 221:14
221:25
seated 177:18
second 166:18
168:22 186:3
190:13 196:19
198:12,21
199:15,17 200:5
204:2 205:23,25
218:9 222:12
228:22 231:22
235:2 237:12
282:2
secondary
193:3 228:19
seconds 233:24
236:24,25 276:1
section 204:12
204:22,23
207:24
sections 204:15
secure 159:24
162:24 163:25
165:9 166:8
195:8
secured 150:13
151:16,19
170:19 179:21
186:23 209:25
213:12 232:13
securing 230:17

see 144:21 146:2
148:9 152:14
157:16,16,18
158:7,16 159:16
160:1,7,14,15
161:1,15 164:19
166:19 167:18
174:5 175:8
184:14 185:13
185:19 186:2
196:21 204:7,24
206:16,17 212:1
230:19 231:12
231:13 232:4,9
233:14,15,20,23
234:19 235:23
237:3 242:18
246:23 255:25
256:1,3,10
260:25 264:12
270:19 275:24
284:24 285:4
seeing 231:1,2
232:7,8 272:8
278:17
seem 171:3
231:23
seen 145:2
166:23 168:16
185:15 242:13
244:17 256:12
259:4,5,6 260:3
260:5
select 261:7

send 282:20
283:4,6,13
284:7,8,14,25
sending 232:10
senior 139:18
139:21 142:3
218:5 264:13
sensitive 197:18
sent 200:1,9
228:21 263:6
272:12,24
284:13
separate 229:18
229:19 241:24
september
208:19
sergeant 138:6
139:6,12,19,20
139:21 140:1
141:22 142:6,13
143:7 147:5,7
147:13 182:13
187:9 188:9
190:14 191:5
204:7 205:4
245:3,6,25
248:4,24 250:13
251:14,14,23
252:11,11 253:1
253:15,16
sergeants 201:7
219:5 270:16
serial 268:15
series 214:1

**[serious - sorry]**                                              Page 320

serious 192:13
  273:14
served 226:1
service 150:18
  162:15 284:3
set 215:20
sets 232:3
seven 193:18
  208:2,2
several 140:24
  217:5 219:11,17
  219:17,22
  223:11 238:9
  272:8
shannon 190:18
share 141:24
  261:23
shared 261:21
sharing 198:9
  262:4
sheet 194:14
sheryl 137:11
shift 217:25
shifting 172:3
shifts 174:22
shirt 144:20
  237:6
shock 146:3
shocked 241:8
short 221:16
shortly 214:3
shorts 153:13
  242:15,22 243:9
shot 236:15

shoulders 172:3
shouting 255:7
shoved 222:1,5
show 144:21
  155:6 175:6
  180:6 204:25
  220:3
showed 242:2
  264:2
showing 181:23
  182:4,6 245:23
shows 264:5
shut 177:20,22
  273:10
side 162:11
  168:25 170:8
  177:25 230:6,11
  230:14 234:17
  235:6 247:4,11
  265:4 270:12
  277:3,9 280:15
sidebar 141:21
sides 169:11
sidewalk 145:11
sign 227:22
signature
  286:16
signed 200:6
  204:8 214:13
  255:13 270:3
similar 160:20
  192:24 214:21
simply 177:5
  184:9

single 236:13,15
sinking 219:19
sir 139:17
  148:16 188:8
  189:2,14 204:20
  205:1 206:14
  215:6,25 263:9
  269:15 271:10
  272:19 273:17
  278:9 283:11
sit 145:7,11
  152:18 236:18
  271:5
sitting 142:16
  152:22 171:12
  173:21 196:5
  235:20 265:15
  274:1
situation 141:18
  144:17 145:7
  164:12 166:7
  221:10 231:19
  239:14 253:5
  254:5
situations 234:4
six 148:11 190:1
  195:3 203:25
  223:4,9 226:15
  268:13 278:17
sleeping 223:10
slide 161:9
slipped 160:16
slow 238:15
slower 140:18

slowly 158:13
small 197:8
smart 188:18
smell 221:13
sniper 218:18
somebody 141:3
  145:12 146:1,13
  146:16 149:19
  153:23 157:22
  179:24 213:1
  216:22 230:8
  248:25 256:1,7
  256:25 267:24
somebody's
  144:18
someone's
  170:13 172:5
someplace
  145:11
something's
  253:20
somewhat 265:6
sorry 149:2
  168:10 170:16
  179:9 180:22
  182:7 183:5
  185:7 200:12
  227:7 228:7
  229:5 235:17
  236:11,20
  247:10,10,12
  248:16 252:24
  260:12 269:9
  279:13

sort 234:23
238:21 245:21
sorts 202:3
214:10
sought 219:4
sound 241:22
sounds 225:1
south 146:4
225:20
space 231:8
speak 158:11
speaking 163:11
163:24 179:1,12
179:13 187:10
speaks 206:13
special 216:13
238:2
specialized
218:1,12
specific 172:19
specifically
144:18 148:25
149:7
speculating
156:1
speculation
146:19
spell 189:13
216:4
spent 217:11
218:6 269:18
spiral 268:11
split 166:18
175:22,23
231:22 271:5

spoken 235:15
sponsored
216:15
spot 220:24
spy 195:9
197:18
squad 140:1,2
squads 139:23
140:4
staff 202:6
stages 158:12
stake 279:5,9
stalk 195:9
stalking 197:22
200:5 214:4,5,7
225:2 226:3
268:5 273:22
stance 173:3,3
173:19 174:15
174:17
stanchion
152:23 160:3
stand 145:9
standard 284:2
standby 204:18
standing 142:17
169:20 221:22
277:22 278:17
stands 153:2
231:15
stare 172:9
start 169:12
174:5 198:9
216:23 220:14
253:8 255:2

started 158:4
165:18 244:24
247:13
starting 216:17
220:3 221:11
starts 148:14
162:8 175:22
235:6
state 136:12
173:9 181:10
197:1 216:3
232:18 245:10
248:9 286:5
stated 159:4
194:23 198:18
199:8
statement 148:2
149:1,3,12,18
152:10 155:4
161:19 176:11
180:18 206:1
252:16,20,22
277:14
statements
191:19
states 176:12
station 142:7
143:6
stationed
220:23
status 228:25
229:7
statute 163:10
204:24 205:10

stay 152:22
205:9 225:23
stays 198:4
step 165:4
173:21 174:24
205:24 237:3,8
266:22 277:3
stepped 174:16
266:21
stepping 164:23
205:24
steps 164:17,19
stewart 137:11
stipulate 156:15
stole 213:1
stolen 197:10
stood 159:16
stop 172:8
182:18,24
216:20 218:8
235:2 270:4,7,9
stopped 255:2
stopping 237:16
storm 219:25
straightforward
241:10
struggled
269:13
strzelecki
228:21 229:11
240:14 252:1
264:4 265:18
276:21 279:19
strzelecki's
228:24 234:15

**stuff** 214:1
236:19 244:18
263:20
**subject** 193:24
194:24 226:6,8
**subject's** 194:6
**subscribed**
206:1
**subsequent**
194:18
**subsequently**
143:21 183:18
**sued** 202:12
227:23
**sufficient**
144:16
**suggest** 146:7
281:15 283:14
**suggesting**
214:6
**suggests** 281:13
**suicidal** 219:24
**suit** 143:13,15
144:12 153:14
153:21,24
175:16,24 176:2
231:1 242:3,7
242:11 255:22
256:13,20
278:18
**suite** 137:3,7
**summaries**
200:8
**summary** 184:4
185:9,24

**super** 233:25
281:1
**superior** 238:11
239:4,5
**supervisor**
142:1,12 245:14
245:15,18,19
**supervisors**
219:3
**supervisory**
245:23
**supplemental**
199:25
**supposed**
212:21,22 251:5
257:22
**supposedly**
227:1
**sure** 142:11,25
143:23 144:2,6
147:12 154:22
154:23 160:10
162:13 166:6
170:17 172:7,23
172:25 174:4,6
179:11,23
181:11 184:1
199:5 215:8
220:22 232:21
240:8 248:8
249:9 265:19
266:1,9 267:2
268:4 278:8
279:7 283:24

**surveillance**
143:2,4 156:21
**suspect** 150:8
154:19 155:8
156:4 161:24
166:11 180:7
186:14 232:25
233:1 267:23
**suspects** 256:25
257:11
**suspended**
196:9
**suspension**
195:18,19 196:4
197:21 213:15
224:23 268:8
273:13,16
**sustain** 243:2
**sustained**
200:14 208:16
226:11,15 243:2
268:13 269:10
**swear** 204:9
206:2 252:17
**swears** 206:10
**sweating** 253:9
**switch** 154:12
**sworn** 139:8
189:9 198:13
206:1 215:24
265:9
**swung** 222:4
**system** 209:10
209:25 213:22
223:6 258:15

259:3,14,17
261:1

**t**

**tab** 148:10
203:24 208:2,25
**table** 233:11
**tactical** 217:9
218:12,15,17
238:4
**tactically**
237:10,21
238:24
**tactics** 237:12
238:2,7
**take** 142:10
144:6 180:13,18
184:2 189:4
207:19 211:24
212:21,22,23
215:7 216:7,11
220:21 231:22
245:13 246:11
265:18 273:18
274:1 275:12
277:16 278:15
**taken** 179:23
187:18 189:5
215:12 226:4
278:11
**takes** 181:15
216:22
**talk** 177:25
180:4 188:19
190:3 206:21,25
207:22 218:8

222:22 226:9
227:25 228:10
235:22 237:12
241:25 247:21
248:15,16
250:10 251:8
253:1 264:17
274:19
**talked** 200:25
228:6 242:2
250:13
**talking** 160:4
165:6 172:18
174:11 182:13
182:14 197:3
235:6 242:4
251:3 256:25
258:4
**talks** 201:22
205:12 206:23
207:3
**tall** 232:6,6
278:17
**tantrums**
199:21,22
**tar** 266:7
**tase** 208:14
**tased** 222:7,12
222:12
**tasers** 257:15
**tasing** 222:6
**taught** 236:18
**teaches** 216:25
**team** 218:6,6,9
218:11,25 219:1

219:7 279:23
280:11
**technically**
163:11
**teeth** 172:24
**tell** 140:10,22
146:11 148:18
151:8 156:7
157:19,22
167:25 169:9
170:2 188:15
201:8 218:22
219:13,16
220:16 223:17
225:11 231:11
231:11 233:15
233:16,18
235:23 239:9
241:17 243:10
244:9 245:19
246:14 248:22
248:24,25
250:18 251:23
252:1,4,11,12
252:17 253:4
262:24 263:18
265:18,20
273:10 275:8
284:17
**telling** 177:20
178:17 203:21
221:24 251:16
258:2 259:2
262:8 270:9
271:3,6 275:11

275:18 276:17
**tells** 142:20
152:17,20
161:16 165:10
176:19 181:18
261:1
**temple** 201:17
**temporarily**
220:25
**temporary**
197:22 200:5
214:8 225:6
**ten** 148:13,14
149:8 215:7
282:12
**tension** 181:10
**term** 139:22
142:2,17 195:10
255:6,6
**terminate**
206:20 207:4
**termination**
136:3 191:21
200:18 251:11
**terminology**
197:19
**terms** 141:10
197:16,17
279:12 280:24
283:25
**testified** 139:8
189:9 191:7
194:22 211:19
213:22 215:24
258:16 259:21

262:17 264:18
265:3,13 266:12
280:2
**testify** 161:2
198:10 270:17
271:6
**testifying**
242:25
**testimony** 171:7
171:10 176:7
193:20 197:17
265:10
**text** 198:23
199:22 200:1
202:4 223:17,17
223:19 224:2
226:18,19
263:20
**texted** 224:11
**texting** 269:19
270:5
**texts** 214:10
224:6 263:7
**thank** 148:23
177:9 183:13
188:7,24,25
189:2 205:3
213:18 215:5,6
243:5 254:17
255:1 260:1
266:24 267:15
269:11 281:25
282:3 285:7,13
**theory** 238:10

**thereof**  250:12
**thing**  141:9
  143:22  144:4
  174:5  177:3
  185:10  200:24
  209:13  213:5
  230:4  231:2,25
  242:15,20
  245:20  252:23
  261:10  264:12
  264:18  265:21
  270:12  280:3
  284:14
**things**  163:21
  164:16  211:11
  212:23  213:21
  215:10  221:21
  232:7  236:16
  245:11  262:17
  263:18  267:17
  268:12  278:14
  280:1  285:3,6
**think**  145:1,18
  146:1,3,16,21
  147:1  149:20
  153:4,21  155:21
  164:23,24
  168:21  170:10
  171:14  173:23
  175:2  178:10
  181:2,20  197:19
  198:6,22  199:2
  206:21  208:1,5
  216:18  240:15
  240:17,19,21

  245:5,11  246:5
  247:23  248:6,13
  250:13  254:10
  254:17  255:2
  256:7,23  258:11
  262:13,14  267:6
  280:13  282:11
**thinking**  143:9
  146:20  151:5
  188:19  237:9,9
  241:3  265:21
  266:10
**thinks**  256:8
**third**  193:22
  194:12  198:17
  198:22  221:24
  236:11  254:2,3
  262:4
**thorough**
  210:24  211:14
  212:10
**thought**  155:24
  187:21  212:13
  246:22,24
  251:13  283:20
**thousand**  172:9
**threat**  146:8
  154:16,21
  167:24  168:3,3
  171:21  179:4,7
  179:8,21  181:3
  181:8  237:17
  276:4,8,23
  277:9

**threatening**
  221:6
**threats**  179:25
**three**  187:20
  194:19  196:22
  209:6,7,9,17
  216:18  220:10
  220:11  229:18
  229:19,19
  245:14  263:23
  269:18,18  276:7
  276:18,21
**thrust**  270:18
**time**  136:9
  142:8  145:7
  150:11  151:1
  154:2,3  155:13
  159:20  160:11
  163:21  168:21
  169:9  173:17
  176:7  181:15
  188:8  195:16
  197:2  205:18
  207:7  209:7
  211:7  214:24
  218:6,19  220:19
  221:4,16,24
  222:13,14  223:8
  225:14  228:24
  231:21  233:18
  235:8  236:11
  244:25  246:12
  247:22  252:19
  255:25  260:13
  263:11  269:4,14

  274:17  278:19
  278:25  284:11
  284:13,25
**timeframe**
  183:23
**times**  140:24,24
  141:15  237:2
  238:9  244:17
  251:2  265:16
  267:11  270:4
  273:10
**tip**  161:6
**tipoff**  171:24
**today**  185:15
  191:8  209:8
  220:10  231:14
  236:22  242:2
  252:23  262:8,18
  267:18  274:1
**todd**  191:6
**toenails**  273:8
**together**  172:8
  240:2
**told**  142:6,23
  145:24  176:3
  177:21  178:9
  231:7,25  249:1
  249:1,1,2  252:7
  252:8  258:7
  270:17  272:16
  273:18  282:19
**tongue**  243:14
  254:15  255:4
**took**  140:21
  141:16,16

157:10 173:21
174:24 191:3
233:23 237:3
248:18 253:23
266:22 273:13
277:3
**top** 148:8
156:22 202:21
**topics** 199:10
**totality** 206:23
**touches** 236:2
**tough** 267:24
**toward** 235:5
**towards** 164:1
169:21 180:17
181:3,19 239:23
246:23
**towel** 143:25
144:2 153:15
159:15 160:6,7
234:19 237:6
240:4,5 241:4,4
241:11 265:14
265:15,25 266:8
266:11,19 267:2
267:10,19
279:13 280:9
**track** 195:9
**traffic** 146:9
159:20,23
229:16
**trail** 136:10
**trained** 167:11
167:13

**trainee** 216:17
236:18
**trainer** 263:25
**training** 163:19
164:15 166:20
169:8 171:20
172:20 196:24
216:19,20,22,24
216:25 217:4,15
218:13,16,18
229:4,5 237:25
238:4,5,8
273:18
**trainings**
218:17
**transcript**
282:15 283:2
286:7
**transcripts**
283:12
**transferred**
216:19
**transmission**
230:21 283:25
**transplants**
205:6
**trapped** 219:14
**traumatic** 269:4
269:7
**treatment** 191:1
272:7
**tremendous**
180:23
**tricked** 177:3

**tried** 180:17
225:19,22
275:11
**trigger** 199:10
**trouble** 156:15
**true** 205:20
206:10 211:3,10
212:20 259:23
269:15,17 286:8
**trust** 142:14,15
142:23 201:9,12
241:17 273:19
**truth** 241:17
251:19 270:23
**truthful** 154:24
198:14 211:9,15
212:10
**try** 164:11
220:18 229:23
236:19 237:19
239:16,17 249:6
250:25 269:22
274:12,19,22
**trying** 149:25
175:22,23
176:25 177:25
180:4 182:24
221:18 222:17
231:4,22 232:3
232:4 239:13
240:2 241:22
246:21,25
249:20 250:20
251:7 256:3
269:19 274:25

**tuesday** 283:17
**turn** 144:13
195:20 196:19
202:19 236:13
247:3 262:18,19
**turned** 182:2,12
187:15 222:4
255:23
**twice** 141:7
176:17 236:10
273:21
**two** 139:23
140:4 147:22
150:2 169:2,4,5
170:20 186:13
187:21 195:10
195:18,19 198:5
201:6,23,24
204:11 205:6
213:15 214:20
218:16 223:21
223:22,24
224:23 226:1,20
232:3 237:2
254:2 255:13
259:3,13,22
261:19 262:5
263:8,12 264:8
266:8 267:17
268:8 270:7,16
270:22 273:12
277:18,20,25
**type** 187:16
242:15 245:16
260:21

**types**  217:2
218:16
**typical**  231:17
231:19 235:21

**u**

**u**  216:5
**uh**  259:7
**ultimately**
184:20 226:11
227:6 247:3
248:1
**unattended**
152:3
**unavoidable**
256:11
**uncovered**
226:22
**under**  163:9,11
163:16 183:9,10
187:17 196:20
204:9,22 206:2
208:5 219:23
220:3 225:12
237:6,10,19
242:15 244:5
246:20 249:2,7
251:7 257:23
258:16 259:21
261:22 265:24
270:17
**undersigned**
204:8 206:2
**understand**
170:16 210:1
259:11 285:4

**understood**
178:13
**unfavorable**
225:16 263:14
263:16
**unfortunately**
143:8 219:23
223:2 228:3
**unit**  217:10,17
**units**  218:2
**unquote**  236:16
**unsteady**
221:12,22
**untruthful**
201:6 251:14,15
**unusual**  141:9
**updated**  183:21
**updates**  184:11
**upset**  164:24
**use**  141:12
142:17 178:11
178:23 179:7
184:3 203:24
207:25
**used**  144:11
160:17 178:8
193:23 195:10
208:17 214:22
255:6,6 258:15
259:14
**using**  178:17
**utilization**
273:13
**utilize**  195:8

**utilized**  193:10
197:18 214:17

**v**

**valerio**  145:15
149:8 150:11
151:6,19,24
152:14,17,20,23
155:18,20,23
156:2,7 159:8
159:12 165:16
180:7 188:13
230:1 234:21
235:3 240:24
249:8 276:6,10
276:21 280:1
**valerio's**  144:11
146:19 152:10
234:15 238:18
265:5
**values**  194:15
**vantage**  232:2,7
**vehicle**  144:11
144:18 219:19
278:18
**vehicles**  256:5
**veins**  172:22
**verbal**  171:20
194:5 213:13,14
213:15 239:10
239:11 249:19
254:15 255:4
264:19 268:8
278:5
**verbally**  239:14
239:22 268:21

**verification**
204:4,23
**verify**  205:19
**versus**  155:7
173:11
**victim**  154:19
155:7,9,13
156:5 161:24
184:15 186:16
231:18 234:1,3
235:16,21
**victims**  169:16
**video**  142:11
152:21 156:3,23
156:25 161:4,11
161:13 170:18
177:4 180:14,16
182:14,23 242:2
246:24 270:20
280:4,5
**videos**  143:1,2,4
152:12 156:18
185:16 191:15
**view**  182:5,20
256:11
**views**  201:23,23
**violated**  163:12
261:5
**violates**  163:5
166:14 174:8
**violating**  170:7
174:1
**violation**  194:6
200:24 209:24
212:21

**violations**
    227:24 262:15
**violent**   208:6,10
    208:11
**visible**   144:24
**visit**   188:1
**voice**   164:11
**volume**   136:6
**vulgar**   202:6

**w**

**waistband**
    144:21 186:23
**wait**   236:9,11
**waiting**   154:13
    221:25 229:16
    236:9
**walk**   140:22
    157:18 205:5,7
    240:3 241:12
    246:21 247:1,4
    250:22 275:20
**walked**   181:25
    182:3,12 250:19
    260:6
**walking**   153:1
    181:19,22
    233:22 246:23
**walks**   180:3
**wandered**   221:3
**wandering**
    221:17
**want**   142:24
    148:17 160:17
    161:18,18
    165:11 166:11

177:1 190:24
193:18 200:23
205:7 210:24
211:1,4,6,9
221:20,21
226:25 229:24
235:10 236:9
249:24 250:10
251:6 254:19
260:14,25 266:2
275:7 277:21
281:9 282:23,24
283:6 284:17,18
284:21 285:7
**wanted**   142:10
    221:9 263:16
    266:1
**wanting**   187:5
    221:15 251:8
**wanton**   203:5
**wants**   281:10
    282:25
**warning**   213:16
**warnings**
    247:14
**warrant**   226:3
**watch**   168:14
    180:15 185:16
    244:24 245:1,4
    253:13
**watched**   152:11
    280:4,5
**water**   220:6
**way**   140:5 146:4
    146:6,14 147:3

150:17 151:7
156:8 163:2
167:22 168:24
171:16 177:24
178:22 179:10
183:3 194:21
218:17 221:4
224:11 230:10
237:17 246:3
247:19 255:23
257:16 275:15
**ways**   165:13
    242:21
**we've**   162:14
    165:8 168:15
    185:15 228:5,6
    231:14 240:1
    265:16 267:10
**weapon**   140:25
    143:17,24 144:8
    144:23 145:20
    186:23 187:2
    197:5,8,9
    212:17 213:12
    264:23 280:19
    280:22,24
**weapons**   144:2
    166:21 186:19
    212:22 238:2,11
**wearing**   153:13
    153:21 158:4
    242:3 243:9
**weather**   145:8
    145:13

**website**   201:25
**week**   226:1
**week's**   218:18
**weeks**   223:5,10
    254:7
**weight**   174:22
    244:16
**went**   145:18
    151:24 152:4
    159:12 160:18
    161:6 180:7
    183:17 187:24
    188:1 191:17
    201:25 209:6,9
    217:9 218:16,17
    221:1 222:3
    243:15 247:21
    249:10 253:13
    259:3,17,22
    260:16,16 261:1
    261:18 265:21
    268:24 270:11
    274:8
**west**   137:7
**wet**   143:12
**whatnot**   217:11
**whatsoever**
    196:12 203:14
**whistles**   232:10
**white**   193:17
**whoa**   258:6,6,6
**whosever**
    238:18
**wife**   185:23
    186:4,18 195:11

**[wife - young]**

195:13 223:3,8
225:9 244:3
247:7,17 260:20
261:16 268:11
**willful** 203:5
**willfully** 206:4
**willing** 274:11
**wind** 225:22
**window** 219:21
**wise** 256:21
260:8
**witness** 138:5
139:7,9 146:23
146:25 148:12
161:1,5 166:4
171:7 176:17
183:5 189:2,8
189:10 215:6,23
215:25 266:15
271:23 275:11
277:1 282:12
**witnesses** 257:1
**woman** 219:14
219:17,23
269:19
**women** 217:20
**won** 227:24
258:11
**words** 140:16
177:18 182:7,14
222:18 283:17
**work** 179:24
188:21 207:4
217:11 219:6
227:4 254:6

270:2 275:13
284:22
**workday** 285:1
285:5
**worked** 219:3
230:3
**workers** 271:20
272:5
**working** 285:15
285:15
**workmen's**
272:8
**worn** 143:7
**worried** 268:15
**worry** 155:4
**worse** 173:10
**worth** 218:18
**wrapped** 167:22
**wreaking** 221:5
**wrestling**
243:14
**write** 194:18
251:20
**writing** 205:9
205:10
**written** 194:9
213:7,15 268:7
268:20,25
285:10
**wrong** 158:20
182:23 229:25
249:10 271:12
**wrote** 226:17
251:11,13

**x**

**x** 138:2

**y**

**yeah** 146:9,25
149:9 158:25
165:23 171:11
171:18 174:16
176:16 177:24
181:20 183:4
187:7 202:7
206:6 208:23
214:1 215:1
222:17 224:22
228:2 229:5
230:12 237:24
246:4,4 253:16
253:18,22
256:16 258:8
261:14,17
263:10 266:22
267:22 273:9
274:19 277:8
279:12 281:13
282:5,6 284:6
284:10 285:5
**year** 158:5
216:18 223:21
238:9 263:23
**years** 139:15
142:1 163:18
188:12 189:22
189:25 190:1
207:14 208:22
208:24 209:7,7
209:8 213:16

216:18 217:12
217:16,18 218:3
218:21,21
219:12,17,22
220:11,12 223:1
223:23,25
226:20 228:7
231:21 234:5
235:15 262:16
263:9 269:18,18
282:12
**yell** 251:8
**yelled** 164:24
**yelling** 177:25
**yep** 158:15
195:24 201:5
208:4 214:10
253:24 261:6
264:3
**young** 217:20

FLORIDA RULES OF CIVIL PROCEDURE

Rule 1.310

(e) Witness Review. If the testimony is
transcribed, the transcript shall be furnished to
the witness for examination and shall be read to or
by the witness unless the examination and reading
are waived by the witness and by the parties. Any
changes in form or substance that the witness wants
to make shall be listed in writing by the officer
with a statement of the reasons given by the
witness for making the changes. The changes shall
be attached to the transcript. It shall then be
signed by the witness unless the parties waived the
signing or the witness is ill, cannot be found, or
refuses to sign. If the transcript is not signed by
the witness within a reasonable time after it is
furnished to the witness, the officer shall sign
the transcript and state on the transcript the
waiver, illness, absence of the witness, or refusal
to sign with any reasons given therefor. The
deposition may then be used as fully as though
signed unless the court holds that the reasons
given for the refusal to sign require rejection of



the deposition wholly or partly, on motion under

rule 1.330(d)(4).

DISCLAIMER:  THE FOREGOING CIVIL PROCEDURE RULES

ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.

THE ABOVE RULES ARE CURRENT AS OF APRIL 1,

2019.  PLEASE REFER TO THE APPLICABLE STATE RULES

OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.