UNITED STATES DISTRICT COURT SOUTHERN DISTRICT OF FLORIDA

CASE NO. 24-CV-80022-DMM

RYAN GOULD,

    Plaintiff,

vs.

BETHANY GUERRIERO, and
JOSEPH STRZELECKI,

    Defendants.
_____/

## DECLARATION OF BETHANY GUERRIERO

I, Bethany Guerriero, pursuant to 28 U.S.C. §1746, declare as follows:

1. My name is Bethany Guerriero, I am over 18 years of age, and I have personal knowledge of the facts set forth herein.

2. I am a 49-year-old law enforcement officer previously employed by the City of Palm Beach Gardens Police Department (PBGPD).

3. On May 9, 2023, I was on duty serving as a road patrol officer.

4. I was operating a solo police unit.

5. PBGPD Communications dispatched broadcasted a a call about a female arguing with a male, and dispatch advised that one party to the argument had a firearm. The location was the community pool at Sabal Ridge.

6. I was dispatched as a backup unit.

1

Doc ID: 5bb9b6e38a8e71b1dfc08dd0a3aaf873197eeb43

7. Officer Joseph Strzelecki, a rookie officer with approximately 7 months of experience was dispatched as the primary officer.

8. Palm Beach Gardens Police K-9 Officer Michael Valerio also responded to the call.

9. There were multiple 911 calls for this incident.

10. The information from dispatch was relayed over the air and also provided on the on-board computer.

11. There was a call by a male (later identified as Gould), stating that he was threatened with a gun.

12. There was a call by another male (later identified as Benadetto Savia) stating that a male was harassing his wife.

13. There was a third call from the wife also claiming she was being harassed by a man (Gould) at the pool.

14. Call involving firearms are treated as high-risk calls and I treated this call in that manner.

15. My main focus was to determine who had the gun and ensure that my partners, the community and I were safe.

16. At every call for service, there is the possibility that persons are armed. The police dispatchers make every attempt to provide factual information, but they are not at the scene and rely on information that is not always clear.

17. Information from dispatch is not always reliable, because dispatchers often rely on involved parties.

18. It's the officer job to access the scene and investigate the situation,

19. Under the best of circumstances, an officer won't get all the information for a call, but when driving with lights and sirens activated it's nearly impossible.

Doc ID: 5bb9b6e38a8e71b1dfc08dd0a3aaf873197eeb43

20. I was uncertain at the time of my arrival who was armed with a gun.

6. As I arrived the information that resonated with me the most was that the armed person was wearing a multicolored bathing suit.

7. The best evidence of what occurred on scene is my body-worn-camera ("BWC") video, which is conventionally filed with the Court.

8. I arrived at the pool parking lot and parked my vehicle in front of the clubhouse of the pool area at the community, near Officer Valerio's police vehicle.

9. Officer Strzelecki arrived at about the same time.

10. I saw a shirtless male (later identified as Gould) at the far end of the lot walking toward me as I was exiting my vehicle.

11. The shirtless man was wearing a multicolored bathing suit.

12. I saw the shirtless man reaching into his right front pocket.

13. I yelled out to him, "Hey man, how are you doing, keep your hands out of your pockets for me."

14. On a gun call, an officer telling someone to keep hands out of pockets is not an optional request, but a directive given for officer safety.  Guns can be small and concealed in bathing suit pockets or waistbands in the back.

15. Gould responded with words to the effect that he did not have a gun as he came closer to me.  But at that moment, I did not know whether, in fact, he was armed or unarmed.

16. To my knowledge, he had not been searched

17. Gould then placed his right hand into his right pocket, even though I told him not to put his hands in his pockets.

Doc ID: 5bb9b6e38a8e71b1dfc08dd0a3aaf873197eeb43

18. I understand Gould has since testified that perhaps he did not hear what I said, but he responded that he wasn't the one with the gun.

19. Gould reached into his pocket again.

20. When he did I repeated the command with more emphasis, "Keep your hands out of your pockets!."

21. Gould withdrew what appeared to be a phone from his pocket.

22. As an experienced officer, I was now at a heightened sense of awareness noting that Gould had just defied a reasonable command to not conceal his hands.

23. It was clear that he knew about a gun, because he immediately stated that he wasn't the one with the gun. My experience also tells me that people lie.

24. I then told Gould twice to put his phone down. Gould refused to put his phone down and began debating my ability to give him orders.

25. Gould then began to slowly move backwards toward a black unidentified object on the ground.

26. I did not know what the object was but having not secured the weapon, and faced with the odd behavior of Gould, I drew my firearm.

27. Gould was not acting like a victim.

28. I ordered Gould to the ground.

29. Gould complied with my command and detained him in handcuffs pending further investigation.

30. Gould laughed, and when I asked him if he thought it was funny, Gould told her she was "fucked."

4

31. Officer Strzelecki asked Gould if he had identification, at which point he began to attempt to stand up.

32. I directed him back to the ground into a seated position. As I did so Gould turned to Officer Strzelecki and said, "who the fuck is this?"

33. I tried to explain to Gould why we took the actions we did and he continued to explain that I was not his mom or dad.

34. I tried to explain to Gould that if he listened to me I would explain why we took the actions we did. As I tried to explain he continued to talk over me and berate me.

35. Gould continued to argue with and insult me.

36. He asked her for her supervisor. He then proceeded to ask another male officer, "are you in charge of this lady?"

37. My supervisor, Sgt, Glass arrived and without the benefit of reviewing my BWC, I explained what I had observed.

38. I was directed to go to the pool area and speak with the other parties.

39. Gould's was taken from the ground and placed in a PBGPD police car. During his time with law enforcement, he insulted me, other police officers military veterans,; he lied about being an attorney, and begged officers to arrest him. Some of these actions I saw later on the BWC's of other responding officers.

40. I began to conduct an investigation to determine, what happened previously to require our response.

41. While I was inside of the community club house, I began feeling ill. My smart watch alerted me that my heart rate was irregular.

5

42. Sgt, Glass, saw me and identified that I was looking ill and inquired if I was ok. I told him that I was not, and he called the medics.

43. I was transported to the hospital where I was treated for a cardiac issue.

44. I was not there when Gould was arrested, but I understand that the probable cause was based on the statements and my description of Gould's conduct that I made to the sergeants without the benefit of viewing my BWC.

45. Officer Strzelecki, who was with me and also observed the conduct of Gould was tasked with writing the probable cause affidavit by Sergeant Beath.

46. Sergeant Beath, I learned made substantive changes to Officer Strzelecki's probable cause affidavit.

47. Sergeant Beath was also the sergeant that made the decision to unarrest Gould, after watching the video of the incident.

48. To my knowledge, Gould was not charged with any crime since no papers charging him with a crime were filed or submitted.

49. I have never seen probable cause affidavit drafted by Officer Strzelecki.

50. I was in the hospital when I learned that Gould had been released.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

_____
Bethany Guerriero

Date: 07 / 11 / 2024

6