UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

**CASE NO.: 9:24-CV-80022-DMM**

RYAN GOULD,

    Plaintiff,

v.

BETHANY GUERRIERO, an individual, and
JOSEPH STRZELECKI, an individual.

    Defendants.
_____/

**DEFENDANT, BETHANY GUERRIERO'S STATEMENT OF MATERIAL
FACTS IN SUPPORT OF HER MOTION FOR SUMMARY JUDGMENT**

COMES NOW the Defendant, BETHANY GUERRIERO, by and through his undersigned counsel, pursuant to Rule 56, *Fed. R. Civ. P.,* and Local Rule 56.1, *S.D. Fla. L. R.,* files this Concise Statement of Material Facts in support of her Motion for Summary Judgment, as follows:

1. Bethany Guerriero ("Guerriero") is a twenty-year veteran of law enforcement with a distinguished career that included a position on S.W.A.T., a field training officer, explorer program, hostage negotiator and numerous commendations throughout her career. *Guerriero Depo*[1]. *16:9-25, 17:1-9* **[DE 32-5]**).

2. At all times relevant, Guerriero was employed by the Palm Beach Gardens Police Department. *Guerriero Depo. Pg. 10, Ln. 14.*

3. On May 9, 2023, an argument took place between Plaintiff, Ryan Gould, a pregnant woman and then her husband, while they were utilizing a community pool. Each blames the other for the argument. *Palm Beach Gardens Police Department Executive Summary Report,* **Appendix 1.**

4. The female complainant called 911 first and informed that she was being harassed by

---

[1] Defendant Guerriero will rely on evidence already made a part of the record by other parties for the sake of economy instead of filing duplicative exhibits; Guerriero deposition is at **[DE 32-5]**.

a male (Gould). *Conventionally filed audio[2], 03 G23-002514 911* **[DE 29]**). Her husband's complaint was similar, advising that a male in a multi-colored suit was screaming at his wife, calling her a "retard" and demanding that she get out of the pool. He believed the male (Gould) may have been on drugs based upon his behavior. *Id.*

5. Gould also called 911 after the Silvas and reported that a gun was on scene, had been brandished and that he wanted police to respond, and that he wanted to press charges. *Id.*

6. Palm Beach Gardens Police dispatched the call as a dispute, where at least one party was armed with a gun. *Id.*

7. Guerriero was on duty and dispatched to the call of the dispute, which occurred at Sable Ridge Community Center Pool. *Id.*

8. Palm Beach Gardens Police Officer Michael Valerio ("Valerio") was the first officer to arrive on scene. *BWC Valerio*[3].

9. Valerio encountered Gould on scene and briefly spoke with him about the incident before Guerriero arrived a short time later. *Id.*

10. When Valerio encountered Gould he had a towel covering his left arm and was wearing swim trunks and no shirt. *Id.*

11. Valerio failed to search Gould's person or even asked him to show his hand which was hidden under a towel prior to Officers Guerriero and Joseph Strzelecki ("Strzelecki") arriving on scene. *BWC Valerio.*

12. Within a minute or so, Officer Guerriero arrived on scene. *BWC Guerriero*[4].

13. A few seconds after, almost simultaneously with Guerriero, Officer Strzelecki arrived. *BWC Guerriero; BWC Strzelecki*[5].

---

[2] Defendant Guerriero will rely on evidence already made a part of the record by other parties for the sake of economy instead of filing duplicative exhibits; [ntionally filed audio at **[DE 29]**.
[3] Defendant Guerriero will rely on evidence already made a part of the record by other parties for the sake of economy instead of filing duplicative exhibits; conventionally filed BWC Valerio at **[DE 29]**.
[4] Defendant Guerriero will rely on evidence already made a part of the record by other parties for the sake of economy instead of filing duplicative exhibits; conventionally filed BWC Guerriero at **[DE 29]**.
[5] Defendant Guerriero will rely on evidence already made a part of the record by other parties for the sake of economy

14. All of the officers who arrived on scene, including Officer Guerriero, were lawfully responding to a valid call for service and in the lawful execution of their legal duties as sworn officers. *BWC Guerriero; BWC Strzelecki, BWC Valerio, Conventionally filed audio.* **[DE-29]**

15. Officers Guerriero and Strzelecki arrived in marked patrol vehicles and were dressed in full police uniforms, so there could be no mistake that they were police officers. *BWC Guerriero; BWC Strzelecki.*

16. Prior to officers Guerriero and Strzelecki arriving on scene, neither Valerio nor any other officer notified the other responding officers that the "gun had been secured." *Guerriero Depo., Pg. 41, Ln.13, BWC Valerio.*

17. Since there had been calls from both sides of the argument, Guerriero was uncertain who was armed with a gun. But with any gun call, she treated it as a priority call, with a sense of urgency to get there quickly, determine who has the weapon, and secure it; thus, eliminating any possibility that it may be utilized to harm an officer or civilians. *Guerriero depo., Pg. 48, Ln 17.*

18. Information from dispatch is often useful in assessing who to approach first on scene, and the way to approach, but it is just a tool, and should not cause an officer to definitively conclude on a gun call that any person is unarmed or not a threat until the gun is secured and no longer a threat. *Strzelecki Depo[6]. Pg. 32, Ln. 9.*

19. When multiple callers are relaying information, often inconsistently, it is the officer's job to investigate the situation, and not simply credit second-hand information dispatched from on-scene citizen callers. Again, citizen callers are often interested in seeking to impugn one side and exonerate themselves.

20. When driving quickly with lights and sirens to a gun call, hearing and absorbing every fact that comes over the radio is not typical or reasonable. That is why there is no substitute on a gun call for addressing those on scene, and determining who is armed. *Guerriero Depo., Pg. 45, Ln 3.*

---

instead of filing duplicative exhibits; conventionally filed BWC Strzelecki at **[DE 29]**.
[6] Defendant Guerriero will rely on evidence already made a part of the record by other parties for the sake of economy instead of filing duplicative exhibits; Strzelecki deposition is at **[DE 32-5]**.

21. Guerriero generally understood while traveling to this call that there were two males on scene, and one had a gun that was reported to be in the groin area at the time of the call. Whether it would have remained in his groin area after officers arrived is speculative since a gun can easily be moved on a person.

22. Guerriero's primary objective upon arrival was to ensure that whoever had the gun could not use it and to secure the firearm. *Guerriero depo., Pg. 48, Ln 17*.

23. Guerriero recalls reading the following dispatch notes as she arrived and exited her vehicle on scene: "has the weapon in a holster and groin area." Then under that entry, "white male, brown hair, multi-colored suit." *Guerriero depo., Pg. 45, Ln 3*.

24. Gould is a white male with brown hair who was wearing multi-colored swim trunks on the day of the incident when the officers arrived. *BWC Valerio*; *BWC Guerriero*; *BWC Strzelecki*.

25. On a firearm call, an officer telling someone to keep hands out of pockets is not an optional request, but a directive given for officer safety. Guns can be small and concealed in bathing suit pockets or waistbands in the back. *Guerriero depo., Pg. 61, Ln.14; Strzelecki Dec., ¶19*.

26. Officer Guerriero could not see if Gould was hiding a firearm or other weapon in the back waistband of his shorts or in his pockets when she arrived on scene to the gun call and first encountered Gould. *BWC Guerriero; BWC Strzelecki;; Guerriero Depo, Pg.72, Ln. 19, Beath, Arbitration Transcript, Vol. I, pg. 62, Ln. 24,* **Appendix, Tab 2**.

27. Officer Guerriero engaged Gould in conversation after she exited her vehicle. Officer Strzelecki was in the process of exiting his vehicle at this time. Guerriero calmly said, "hey man, how are you doing, keep your hands out of your pockets for me." *BWC Guerriero; BWC Strzelecki*

28. Gould responded with words to the effect that he did not have a gun as he came closer to the police *Id.*

29. But at that moment, Guerriero and Strzelecki did not know whether, in fact, Gould was armed. Gould had not been searched by Valerio. *Guerriero Depo., Pg.92, Ln.5; Strzelecki Dec., ¶20).*

30. Gould then placed his right hand into his right pocket, even though he had been lawfully ordered by Officer Guerriero not to put his hands in his pockets. *BWC Guerriero; BWC Strzelecki*

31. Whether Gould had been told once or twice to keep his hands out of his pocket, at a minimum, Gould should not have put his hand in his pocket and pulled out his cell phone.

32. After Gould violated Officer Guerriero's first, lawful command to keep his hands away from his pockets, she had arguable probable cause to arrest Gould for resisting arrest without violence in violation of FL. Stat. § 843.02 (2023).

33. After Gould violated Officer Guerriero's first, lawful command to keep his hands away from his pockets, she had actual probable cause to arrest Gould for resisting arrest without violence in violation of FL. Stat. § 843.02. (2023).

34. Guerriero's superiors agree that after Gould violated her first lawful command to keep his hands away from his pockets and he reached into his pockets, there was probable cause to arrest him for resisting an officer without violence. *Sgt. Beath Arbitration, Tr. Vol. II, Pg. 116, Ln. 22 - Pg. 117, Ln. 25; Sgt. Glass, Arbitration Tr. Vol. II, Pg. 163, Ln. 9.*

35. Guerriero also had arguable probable cause to arrest Gould for resisting arrest without violence in violation of FL. Stat. § 843.02. (2023) after he violated Officer Guerriero's second lawful command to keep his hands out of his pockets and he then reached into his pocket to pull out what later became known to the officers as a cell phone.

36. Guerriero also had actual cause to arrest Gould for resisting arrest without violence in violation of FL. Stat. § 843.02. (2023) after he violated Officer Guerriero's second lawful command to keep his hands out of his pockets and he then reached into his pocket to pull out what later became known to the officers as a cell phone.

37. On this "gun call", where the gun had yet to be secured by any officer, in the split-second it took for Gould to reach into his pocket and pull out the black object, Guerriero could not immediately determine if it was a cell phone, gun, or other weapon as Gould was pulling it out. *Guerriero Depo., Pg.56, Ln.4.*

38. Guerriero then told Gould twice to put his phone down. Gould remained with his phone in hand, refusing to do so, and then commenced arguing with Officer Guerriero. *BWC Guerriero; BWC Strzelecki; Strzelecki Dec., ¶27.*

39. Gould had been given four lawful commands: two not to go in his pockets, and two to put his phone down, all four of which were not complied with. *BWC Guerriero; BWC Strzelecki.*

40. Gould recognized Officers Valerio, Guerriero and Strzelecki as legitimate police officers responding to a lawful call. *Gould Depo. Pg. 163, Ln. 4.*

41. Gould admitted that he disobeyed Officer Guerriero's lawful command to keep his hands out of his pockets. *Gould Depo, Pg.173, Ln.12.*

42. Gould asked officers to "arrest him" *Gould Depo. 180, Ln. 4.*

43. It was reasonable for Officer Guerriero to direct Gould not to place his hands in his pockets. This is not a command that intrudes to any degree on one's freedom as one can just as easily approach and speak with officers (that notably were there, in part, due to his 911 call) with hands away from pockets.

44. As the senior officer, Guerriero took the lead and Strzelecki's primary role backup for officer and scene safety. *Strzelecki Dec., ¶30.*

45. Officer Guerriero, based upon her experience and the fact that she didn't know if Gould was armed, drew her firearm, ordered Gould to the ground and detained Gould in handcuffs pending further investigation. *BWC Guerriero; BWC Strzelecki.*

46. Strzelecki unholstered his taser for 23 seconds, until Gould was secured in handcuffs by Officer Guerriero. *BWC Guerriero; BWC Strzelecki; Strzelecki Dec., ¶43.*

47. Gould began laughing when Officer Guerriero explained she was detaining him. Gould told her she was "fucked." *BWC Guerriero; BWC Strzelecki; Strzelecki; and Strzelecki Dec., ¶44*

48. Strzelecki asked Gould if he had identification, at which point he began to attempt to

stand up. *BWC Guerriero; BWC Strzelecki; Strzelecki*; *and Strzelecki Dec., ¶45*.

49. Officer Guerriero directed him back to the ground into a seated position for officer safety, after which Gould asked, "who the fuck is this?" *BWC Guerriero; BWC Strzelecki; Strzelecki Dec., ¶46*.

50. Gould was excited at this point, and Strzelecki told him a couple of times to relax to de-escalate. *BWC Guerriero; BWC Strzelecki; and Strzelecki Dec., ¶47*.

51. When Gould engaged in more arguments with Officer Guerriero and said he did not have a gun, Strzelecki explained to him that officers would not know that upon arrival. *BWC Guerriero; BWC Strzelecki; and Strzelecki Dec., ¶48*.

52. Officer Valerio observed Gould in handcuffs being detained, and he too did not request or direct Officer Guerriero to release him. *BWC Guerriero*; *BWC Valerio and Strzelecki Dec. ¶55*.

53. The remainder of Gould's interaction with PBGPD law enforcement officers (and it was prolonged and included Gould calling Guerriero a "psycho" and "pussy," impugning police officers repeatedly, insulting military veterans, lying about being an attorney, and effectively imploring officers to arrest him on several occasions, even explaining he "would love it" if he were arrested). *Gould Depo, Pg.106, Ln. 2; Pg. 29, Ln. 9; Pg. 24, Ln. 15; and Strzelecki Dec., ¶56*.

54. Shortly after Gould was detained by Officer Guerriero, she was taken from the scene with chest pain and admitted to the hospital for a cardiac event. *Guerriero Depo, Pg. 105, Ln. 17*.

55. Sergeant Beath ("Beath") ordered Strzelecki to arrest Gould. *Beath, Arbitration Transcript, Vol I, Pg.118, Ln 6*.

56. Strzelecki drafted the probable cause affidavit charging Gould with Resisting an Officer pursuant to F.S.S. 843.02. *Strzelecki Dec ¶ 62*.

57. Beath, believing Strzelecki's probable cause affidavit was too vague, added substantive changes to the document. *Beath, Arbitration Transcript, Vol I, Pg. 118, Ln.14*.

58. Officer Guerriero did not draft the probable cause affidavit, nor did she review it.

*Arbitration Transcript, Vol I, Pg. 119, Ln.8.*

59. Beath after determining that Gould was the victim in the matter involving Salvia, ordered Strzelecki to un-arrest Gould. *Beath, Arbitration Transcript, Vol I, Pg. 122, Ln.11.*

60. Gould was not charged with any crime since no papers charging him with a crime were filed or submitted. He was not booked into the Palm Beach County Jail, photographed, or fingerprinted. *Gould Depo., Pg. 45, Ln. 16.*

61. Gould was unemployed at the time of the incident *Gould Depo., Pg. 151, Ln. 19.*

62. Gould has not sought or received any medical treatment whatsoever for any reason relating to this occurrence. *Gould Depo., Pg. 42, Ln. 18.*

63. Gould made no complaints about any hot pavement or other concerns to his wellbeing while on scene. *Id., Pg. 18, Ln. 24; Pg.184, Ln. 9; Pg. 187. Ln. 7.*

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing motion has been furnished by CM/ECF to all counsel of record on July 11, 2024.

| | | |
|---|---|---|
| /s/ Ralph E. King III | | /s/ Gregory J. Morse |
| Ralph E. King III. Esq. | | Gregory J. Morse, Esq. |
| King \| Morse, P.L.L.C. | | King \| Morse, P.L.L.C. |
| 2240 Palm Beach Lakes Blvd., 300 | & | 2240 Palm Bch lakes Blvd., 300 |
| West Palm Beach, FL 33409 | | West Palm Beach, FL 33409 |
| (561) 557-1079 | | (561) 651-4145 |
| E-Mail: Rick@kingmorselaw.com | | E-Mail: greg@morselegal.com |
| Kristen@kingmorselaw.com | | tiffany@kingmorselaw.com |
| Florida Bar No.: 0090473 | | Florida Bar No.: 0505099 |
| Attorney for Def. B. Guerriero | | Attorney for Def. B. Guerriero |